**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on January 23, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 312] (the "Disclosure Statement Order"): (a) authorizing Parker Drilling Company and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* [Docket No. 309] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* [Docket No. 310] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement with the Court on February 12, 2019.  The Plan Supplement contains the drafts of the following documents (each, as defined in the Plan): (a) the form of material New Organizational Documents; (b) the New Warrant Agreement; (c) the Registration Rights Agreement; (d) the New Debt Documents; (e) the Schedule of Assumed Executory Contracts and Unexpired Leases; (f) the Rejected Executory Contracts and Unexpired Leases; (g) the Schedule of Retained Causes of Action; (h) the 1129(a)(5) Disclosures and Members of the New Boards; (i) the Restructuring Transactions Exhibit; (j) the form of the Management Incentive Plan and related agreements; (k) the Amended and Restated Backstop Commitment Agreement; and (l) the Restructuring Support Agreement.  The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

reasonably acceptable to the Debtors and the Required Consenting Stakeholders.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **March 5, 2019, at 2:30 p.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **February 22, 2019, at 4:00 p.m.** prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan *must*:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| *Co-Counsel to the Debtors* |
| :---: |
| James H.M. Sprayregen, P.C.<br>Laura E. Krucks<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br><br>-and-<br><br>Christopher Marcus, P.C.<br>Brian E. Schartz, P.C.<br>Matthew C. Fagen<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>Patricia B. Tomasco<br>Matthew D. Cavenaugh<br>**JACKSON WALKER LLP**<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010 |

| *U.S. Trustee* |
|:---:|
| Hector Duran<br>Stephen Statham<br>**Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 |
| *Counsel to the Consenting Stakeholders* |
| James Savin<br>Kevin Eide<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1333 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br><br>-and-<br><br>Michael S. Stamer<br>**Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park, Bank of America Tower<br>New York, NY  10036 |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, **at no additional cost,** you should contact Prime Clerk, LLC, the Balloting Agent retained by the Debtors in the Chapter 11 Cases (the "Balloting Agent") by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ParkerDrilling; (b) writing to Prime Clerk, LLC Re: Parker Drilling Company, et al., 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing parkerdrillingballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

**US/CANADA TOLL FREE:  (855) 631-5345**

**INTERNATIONAL:  (347) 338-6451**

You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

**<u>Certificate of Service</u>**

I certify that on February 12, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/   *Matthew D.  Cavenaugh*
Matthew D. Cavenaugh

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) Case No. 18-36958 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**PLAN SUPPLEMENT FOR THE AMENDED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**PARKER DRILLING COMPANY AND ITS DEBTORS AFFILIATES**

**Table of Contents[2]**

**Exhibit A**      Form of New Organizational Documents

**Exhibit B**      New Warrant Agreement

**Exhibit C**      Registration Rights Agreement

**Exhibit D**      New Debt Documents

**Exhibit E**      Schedule of Assumed Executory Contract and Unexpired Leases

**Exhibit F**      Rejected Executory Contracts and Unexpired Leases

**Exhibit G**      Schedule of Retained Causes of Action

**Exhibit H**      1129(a)(5) Disclosures and Members of the New Boards

**Exhibit I**      Restructuring Transactions Exhibit

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

[2]   Capitalized terms used but undefined herein shall have the meanings ascribed to them in the *Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* [Docket No. 309] (as amended from time to time, the "Plan").

**Exhibit J**      Form of Management Incentive Plan and Related Documents

**Exhibit K**      Amended and Restated Backstop Commitment Agreement

**Exhibit L**      Restructuring Support Agreement

**<u>Exhibit A</u>**

**Form of New Organizational Documents**

This **<u>Exhibit A</u>** includes the following organizational documents for the Reorganized Debtors:

- **<u>Exhibit A(i)</u>**: Revised Certificate of Incorporation for Parker Drilling Company

- **<u>Exhibit A(ii)</u>**: Revised Bylaws for Parker Drilling Company

Certain documents, or portions thereof, contained in this **<u>Exhibit A</u>** and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors and the Consenting Stakeholders.  The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

**<u>Exhibit A(i)</u>**

**Revised Certificate of Incorporation for Parker Drilling Company**

*Draft 2/12/19*

## AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION

### OF

### PARKER DRILLING COMPANY

Parker Drilling Company, a corporation organized and existing under the laws of the State of Delaware (the "***Corporation***"), hereby certifies as follows:

1. The Certificate of Incorporation of the Corporation was originally filed with the Secretary of State of the State of Delaware on August 4, 1970.

2. On December 12, 2018 the Corporation and certain of its subsidiaries (collectively with the Corporation, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***").

3. This Amended and Restated Certificate of Incorporation (this "***Certificate***") was duly adopted, without the need for approval of the Board of Directors or the stockholders of the Corporation, in accordance with Sections 242, 245 and 303 of the Delaware General Corporation Law, as amended (the "***DGCL***"), in accordance with the Chapter 11 Plan of Reorganization of the Debtors (the "***Plan of Reorganization***") confirmed by order, dated [●], 2019, of the Bankruptcy Court, jointly administered under the caption "In re: PARKER DRILLING COMPANY, et al.", Case No. 18-36958 (MI).

4. This Certificate shall become effective when filed with the Secretary of State of the State of Delaware.

5. This Certificate amends and restates the Certificate of Incorporation of the Corporation to read in full as follows:

## ARTICLE I
## NAME

**Section 1.1**      Name.  The name of the corporation is Parker Drilling Company.

## ARTICLE II
## PURPOSE

**Section 2.1**      Purpose.  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE III
## REGISTERED AGENT

**Section 3.1**      Registered Agent.  The street address of the registered office of the Corporation in the State of Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. The name of the Corporation's registered agent at such address is Corporation Service Company.

## ARTICLE IV
## CAPITALIZATION

**Section 4.1**      Authorized Capital Stock.  The total number of shares of capital stock that the Corporation is authorized to issue is [●] shares, divided into two classes consisting of [●] shares of common stock, par value $0.01 per share (the "***Common Stock***"), and [●] shares of preferred stock, par value $0.01 per share (the "***Preferred Stock***").

**Section 4.2**      Preferred Stock.

        (a)      Shares of Preferred Stock may be issued in one or more series from time to time. The board of directors of the Corporation (the "***Board***") is expressly authorized, by resolution adopted and filed in accordance with law, to provide, out of unissued shares of Preferred Stock that have not been designated as to series, for series of Preferred Stock and, with respect to each such series, to fix the number of shares in each series and to fix the voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights thereof, and the qualifications, limitations or restrictions thereon, and the variations in voting powers, if any, and preferences and rights as between series, as shall be stated in the resolution or resolutions providing for the issuance of such series adopted by the Board and included in a certificate of designations (a "***Preferred Stock Designation***"). Any shares of any class or series of Preferred Stock purchased, exchanged, converted or otherwise acquired by the Corporation, in any manner whatsoever shall be retired and cancelled promptly after the acquisition thereof. All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock, without designation as to series, and may be reissued as part of any series of Preferred Stock created by resolution or resolutions of the Board, subject to the conditions and restrictions on issuance set forth in this Certificate or in such resolution or resolutions.

        (b)      Subject to the rights of the holders of any series of Preferred Stock pursuant to the terms of this Certificate (including any Preferred Stock Designation), the number of authorized

shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the outstanding shares of Common Stock, without a vote of the holders of the Preferred Stock, or any series thereof, irrespective of the provisions of Section 242(b)(2) of the DGCL, unless a vote of any such holders of Preferred Stock is required pursuant to another provision of this Certificate (including any Preferred Stock Designation).

**Section 4.3**    Common Stock.

(a)    Each holder of shares of Common Stock, as such, shall be entitled to one vote for each share of Common Stock held of record by such holder on all matters on which stockholders generally are entitled to vote. Except as otherwise required by law or this Certificate (including any Preferred Stock Designation), at any annual or special meeting of the stockholders the Common Stock shall have the exclusive right to vote for the election of directors and on all other matters properly submitted to a vote of the stockholders. Notwithstanding the foregoing, except as otherwise required by law or this Certificate (including a Preferred Stock Designation), holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate (including any amendment to any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate (including any Preferred Stock Designation) or pursuant to the DGCL.

(b)    Subject to the rights of the holders of Preferred Stock, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.

(c)    In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, and subject to the rights of the holders of Preferred Stock in respect thereof, the holders of shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

**Section 4.4**    Nonvoting Equity Securities.  The Corporation shall not issue nonvoting equity securities; provided, however, the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of nonvoting equity securities is included in this Certificate in compliance with Section 1123(a)(6) of the Bankruptcy Code.

**ARTICLE V**
**RELATED PARTY TRANSACTIONS AND CORPORATE OPPORTUNITIES**

The following provisions are inserted for the management of the business and for the conduct of the affairs of the Corporation, and the same are in furtherance of and not in limitation of the powers conferred by law.

**Section 5.1**    Related Party Transactions.  No contract or other transaction of the Corporation with any other person, firm, corporation or other entity in which the Corporation has an interest, shall be affected or invalidated by the fact that any one or more of the directors or officers of the Corporation, individually or jointly with others, may be a party to or may be interested in any contract or transaction so long as the contract or other transaction is approved by the Board in accordance with the DGCL.

**Section 5.2**    Corporate Opportunities.

(a)    The provisions of this Section 5.2 are set forth to regulate and define the conduct of certain affairs of the Corporation with respect to certain classes or categories of business opportunities as they may involve the Corporation's stockholders, the Non-Employee Directors (as defined below) or their respective Affiliates and the powers, rights, duties and liabilities of the Corporation and the Corporation's directors, officers and stockholders in connection therewith, in recognition and anticipation that (i) certain directors, principals, officers and employees and/or other representatives of stockholders of the Corporation and their respective Affiliates (as defined below) may serve as directors or officers of the Corporation, (ii) stockholders of the Corporation and their respective Affiliates may now engage and may continue to engage in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, and (iii) members of the Board who are not employees of the Corporation ("***Non-Employee Directors***"), including, for the avoidance of doubt, the Chairman of the Board if he or she is not otherwise an employee, consultant or officer of the Corporation, and their respective Affiliates may now engage and may continue to engage in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage.

(b)    None of (i) the stockholders of the Corporation or any of their Affiliates or (ii) any Non-Employee Director or his or her Affiliates shall, to the fullest extent permitted by law, have any duty to refrain from directly or indirectly (x) engaging in a corporate opportunity in the same or similar business activities or lines of business in which the Corporation or any of its Affiliates now engages, engages in the future or proposes to engage, (y) making investments in any kind of property in which the Corporation makes or may make investments or (z) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by the DGCL, no Identified Person (as defined below) shall (A) be deemed to have acted in bad faith or in a manner inconsistent with the best interests of the Corporation or its stockholders or to have acted in a manner inconsistent with or opposed to any fiduciary duty to the Corporation or its stockholders or (B) be liable to the Corporation or its stockholders for breach of any fiduciary duty, in each case, by reason of the fact that such Identified Person (as defined below) engages in any such activities. The Corporation hereby renounces any interest or expectancy in, or in being offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for an Identified Person (as defined below) and the Corporation or any of its Affiliates, except as

3

provided in paragraph (c) of this Section 5.2(b). Subject to Section 5.2(c), in the event that any Identified Person (as defined below) acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, such Identified Person (as defined below) shall have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by the DGCL, shall not (I) be deemed to have acted in bad faith or in a manner inconsistent with the best interests of the Corporation or its stockholders or to have acted in a manner inconsistent with or opposed to any fiduciary duty to the Corporation or its stockholders or (II) be liable to the Corporation or its stockholders for breach of any fiduciary duty as a stockholder, director or officer of the Corporation, in each case, by reason of the fact that such Identified Person (as defined below) pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

(c)        The Corporation does not renounce its interest in any corporate opportunity offered to any Non-Employee Director (including any Non-Employee Director who serves as an officer of this Corporation) if such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of the Corporation and the provisions of Section 5.2(b) shall not apply to any such corporate opportunity.

(d)        In addition to and notwithstanding the foregoing provisions of this Section 5.2, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that the Corporation is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's business or is of no practical advantage to it or that is one in which the Corporation has no interest or reasonable expectancy.

(e)        For purposes of this Certificate (i) "*Affiliate*" shall mean (x) in respect of stockholders of the Corporation, any Person that, directly or indirectly, is controlled by such stockholder, controls such stockholder or is under common control with such stockholder and shall include any principal, member, manager, director, partner, shareholder, officer, employee or other representative of any of the foregoing (other than the Corporation and any entity that is controlled by the Corporation), (y) in respect of a Non-Employee Director, any Person that, directly or indirectly, is controlled by such Non-Employee Director (other than the Corporation and any entity that is controlled by the Corporation) and (z) in respect of the Corporation, any Person that, directly or indirectly, is controlled by the Corporation; and (ii) "*Person*" shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, trust, association or any other entity, and (iii) the Persons identified in (b)(i) and (ii) above shall be referred to, collectively, as "*Identified Persons*" and, individually, as an "*Identified Person*"; provided, however, that no employee, consultant or officer of the Corporation shall be an Identified Person.

(f)        To the fullest extent permitted by law, any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Section 5.2.

4

## ARTICLE VI
## BOARD OF DIRECTORS

**Section 6.1**   Board Powers.  The business and affairs of the Corporation shall be managed by, or under the direction of, the Board.  In addition to the powers and authority expressly conferred upon the Board by the DGCL, this Certificate or the Bylaws of the Corporation (the "*Bylaws*"), the Board is hereby authorized and empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject to the provisions of the DGCL, this Certificate and the Bylaws; provided, however, that no Bylaws hereafter adopted, or any amendments thereto, shall invalidate any prior act of the Board that would have been valid if such Bylaws had not been adopted.

**Section 6.2**   Election and Term.

(a)   The total number of directors constituting the Board shall be determined from time to time exclusively by resolution adopted by a majority of the Whole Board. The Board shall initially be comprised of seven (7) directors, the composition of which shall be determined pursuant to the Plan of Reorganization (including any supplements thereto). The directors shall consist of a single class, with the initial term of office to expire at the 2020 annual meeting of stockholders to take place in 2020, and each director shall hold office until his or her successor shall have been duly elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification, removal or incapacity. For purposes of this Certificate, "*Whole Board*" shall mean the total number of directors the Corporation would have if there were no vacancies.

(b)   Subject to Section 6.6, at each annual meeting of stockholders, directors elected to succeed those directors whose terms then expire shall be elected for a term of office to expire at the next succeeding annual meeting of stockholders after their election, with each director to hold office until his or her successor shall have been duly elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification, removal or incapacity.

(c)   Unless and except to the extent that the Bylaws shall so require, the election of directors of the Corporation need not be by written ballot.

**Section 6.3**   Directorships and Vacancies.  Subject to Section 6.6, directorships resulting from an increase in the number of directors and any vacancies on the Board resulting from death, resignation, retirement, disqualification, removal, incapacity or other cause may be filled solely by a majority vote of the directors then in office, even if less than a quorum, or by a sole remaining director (and not by stockholders), and any director so chosen shall hold office for the remainder of the full term and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification, removal or incapacity.

**Section 6.4**   Cumulative Voting.  There shall be no cumulative voting in the election of directors.

**Section 6.5**   Removal.  Subject to Section 6.6, any or all of the directors may be removed from office at any time, but only by the affirmative vote of holders of at least a majority of the

outstanding shares of Common Stock entitled to vote generally in the election of directors, voting together as a single class.

**Section 6.6**  Preferred Stock – Directors.  Notwithstanding any other provision of this Article VI, and except as otherwise required by law, whenever the holders of one or more series of Preferred Stock shall have the right, voting separately by class or series, to elect one or more directors, the term of office, the filling of vacancies, the removal from office and other features of such directorships shall be governed by the terms of such series of Preferred Stock as set forth in this Certificate (including any Preferred Stock Designation).

<div align="center">

**ARTICLE VII**
**BYLAWS**

</div>

**Section 7.1**  Bylaws.  In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power to adopt, amend, alter or repeal the Bylaws by the affirmative vote of a majority of the Board. The Bylaws also may be adopted, amended, altered or repealed without Board action by the affirmative vote of the holders of a majority of the voting power of all outstanding shares of Common Stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, in addition to any vote of the holders of any class or series of capital stock of the Corporation required by applicable law or the Certificate of Incorporation.

<div align="center">

**ARTICLE VIII**
**MEETINGS OF STOCKHOLDERS**

</div>

**Section 8.1**  Action by Written Consent. Subject to any restrictions or requirements set forth in the Bylaws, any action required or permitted to be taken by stockholders of the Corporation at any meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by holders of outstanding stock having not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

**Section 8.2**  Special Meetings.  Except as otherwise required by law or the terms of any one or more series of Preferred Stock, special meetings of stockholders of the Corporation may be called only by the Chairman of the Board, the Board pursuant to a resolution adopted by a majority of the Board, or the Secretary of the Corporation upon the request of stockholders holding at least a majority of the outstanding shares of Common Stock in accordance with the procedures set forth in the Bylaws.

**Section 8.3**  Advance Notice.  Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws.

## ARTICLE IX
## LIMITATION ON LIABILITY OF DIRECTORS

**Section 9.1**    Limitation on Liability of Directors.  To the fullest extent that the DGCL or any other law of the State of Delaware as the same exists or is hereafter amended permits the limitation or elimination of the liability of directors, no Person who is or was a director of the Corporation shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director.  Any repeal or amendment of this Article IX as permitted by this Certificate or by changes in law, or the adoption of any other provision of this Certificate inconsistent with this Article IX will, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to further limit or eliminate the liability of directors) and shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or amendment or adoption of such inconsistent provision with respect to acts or omissions occurring prior to such repeal or amendment or adoption of such inconsistent provision.

## ARTICLE X
## INDEMNIFICATION

**Section 10.1**    Right to Indemnification.

(a)    To the fullest extent permitted by applicable law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("*Proceeding*"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that the Person is or was a director or officer of the Corporation, or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of another corporation, partnership, joint venture, trust or other enterprise ("*Other Entity*"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with such Proceeding if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful, provided, however, that the Corporation shall not be obligated to indemnify against any amount paid in settlement unless the Corporation has consented to such settlement.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or Proceeding, had reasonable cause to believe that the Person's conduct was unlawful.  To the extent specified by the members of the Board not party to the applicable action or suit at any time and to the fullest extent permitted by law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the Person is or was a director or officer of the Corporation, or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of an Other Entity against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection

7

with the defense or settlement of such action or suit if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware (the "*Court of Chancery*") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(b)      The Corporation may indemnify to the fullest extent permitted by law any person who is not a director or officer of the Corporation to whom the Corporation is permitted by applicable law to provide indemnification, whether pursuant to, or provided by, the DGCL or other rights created by (i) resolution of stockholders, (ii) resolution of directors, or (iii) a written agreement providing for such indemnification authorized by any officer designated by the Board for such purpose, it being expressly intended that this Certificate authorize the creation of such rights in any such manner.

**Section 10.2**   <u>Reimbursement or Advancement of Expenses</u>.  The Corporation shall, from time to time, reimburse or advance to any director or officer or other Person entitled to indemnification hereunder the funds necessary for payment of expenses, including attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; <u>provided</u>, <u>however</u>, that, if required by the DGCL, such expenses incurred by or on behalf of any director or officer or other Person may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer (or other Person indemnified hereunder), to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director, officer or other Person is not entitled to be indemnified for such expenses.

**Section 10.3**   <u>Claims by Indemnifiable Persons</u>.  If a claim for indemnification or advancement of expenses under this <u>Article X</u> is not paid in full within 45 days after a written claim therefor by any Person entitled to indemnification and/or advancement of expenses under this <u>Article X</u> (an "*Indemnifiable Person*") has been received by the Corporation (and any undertaking required under <u>Section 10.2</u>), the Indemnifiable Person may file suit to recover the unpaid amount of such claim.  In any such action the Corporation shall have the burden of proving that the Indemnifiable Person is not entitled to the requested indemnification or advancement of expenses under law. Neither the failure of the Corporation (including its Board or a committee thereof, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board or a committee thereof, its independent legal counsel and its stockholders) that such Indemnifiable Person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such Indemnifiable Person is not so entitled.  Such an Indemnifiable Person shall also be indemnified, to the fullest extent permitted by law, for any expenses incurred in connection with successfully establishing such Indemnifiable Person's right to such indemnification or reimbursement or advancement of expenses, in whole or

8

in part, in any such action. Any right to indemnification or reimbursement or advancement of expenses shall be determined by the applicable law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

**Section 10.4**   Non-Exclusivity of Rights.  The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article X shall not be deemed exclusive of any other rights to which a Person seeking indemnification or reimbursement or advancement of expenses may have or hereafter be entitled under any statute, this Certificate, the Bylaws, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors, officers, employees and other agents of the Corporation are covered), any vote of the holders of capital stock of the Corporation entitled to vote or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

**Section 10.5**   Continuing Rights.  The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article X shall continue as to a Person who has ceased to be a director or officer (or other Person indemnified hereunder) and shall inure to the benefit of the executors, administrators, legatees and distributees of such Person.

**Section 10.6**   Insurance.  The Corporation shall have the power to purchase and maintain insurance on behalf of any Person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, member, manager, employee or agent of an Other Entity, against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, whether or not the Corporation would have the power to indemnify such Person against such liability under the provisions of this Article X, the Bylaws or under Section 145 of the DGCL or any other provision of law.

**Section 10.7**   Contract Rights; Amendment or Repeal.  The provisions of this Article X shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Article X is in effect and any other Person indemnified hereunder, on the other hand, pursuant to which the Corporation and each such director, officer, or other Person intend to be legally bound.  Notwithstanding anything to the contrary contained in this Certificate, no amendment, repeal or modification of this Article X shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any Proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

**Section 10.8**   Requested Services.  Any director, officer, employee, fiduciary or agent of the Corporation serving in any capacity in (i) another corporation of which a majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation or (ii) any employee benefit plan of the Corporation or any corporation referred to in clause (i) shall be deemed to be doing so at the request of the Corporation.

**Section 10.9**   Indemnitor of First Resort.  It is the intent that with respect to all advancement, reimbursement and indemnification obligations under this Article X, the Corporation shall be the indemnitor of first resort (*i.e.*, its obligations to indemnitees under this Certificate are primary and

9

any obligation of any stockholder (or any of its Affiliates) to provide advancement or indemnification for the same losses incurred by indemnitees are secondary), and if a stockholder pays or causes to be paid, for any reason, any amounts otherwise indemnifiable hereunder or under any other indemnification agreement (whether pursuant to this Certificate, the Bylaws, contract, law or regulation), then (i) such stockholder (or such Affiliate, as the case may be) shall be fully subrogated to all rights hereunder of the indemnitee with respect to such payment and (ii) the Corporation shall reimburse such stockholder (or such Affiliate, as the case may be) for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such stockholder (or such Affiliate, as the case may be).

## ARTICLE XI
## AMENDMENT OF CERTIFICATE OF INCORPORATION

**Section 11.1**   Amendment of Certificate of Incorporation.  Subject to Section 4.2, this Certificate may be amended, restated, amended and restated or otherwise modified only with (i) the affirmative vote of a majority of the Board and (ii) the affirmative vote of the holders of a majority of the voting power of all outstanding shares of Common Stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, in addition to any vote of the holders of any class or series of capital stock of the Corporation required by applicable law. The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate (including any Preferred Stock Designation), in the manner now or hereafter prescribed by this Certificate and the DGCL, and, except as set forth in Article IX and Article X, all rights, preferences and privileges herein conferred upon stockholders, directors or any other persons by and pursuant to this Certificate in its present form or as hereafter amended are granted subject to the right reserved in this Article XI.

## ARTICLE XII
## SECTION 203

**Section 12.1**   Section 203.  The Corporation shall not be governed by the provisions of Section 203 of the DGCL.

## ARTICLE XIII
## ENFORCEABILITY; SEVERABILITY; FORUM FOR ADJUDICATION OF DISPUTES

**Section 13.1**   Enforceability; Severability.  Each provision of this Certificate shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in case any one or more of the provisions contained in this Certificate shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Certificate, and this Certificate shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

**Section 13.2**   Exclusive Forum.  Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or Proceeding brought on behalf of the Corporation, (b) any action or Proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the

10

Corporation to the Corporation or the Corporation's stockholders, (c) any action or Proceeding asserting a claim arising pursuant to any provision of the DGCL, this Certificate or the Bylaws (as each may be amended from time to time) or as to which the DGCL confers jurisdiction on the Court of Chancery or (d) any action or Proceeding asserting a claim governed by the internal affairs doctrine shall, in each case, be the Court of Chancery (or, if and only if the Court of Chancery lacks subject matter jurisdiction, the federal district court for the District of Delaware). Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 13.2.

**Section 13.3**   Stockholder Consent to Personal Jurisdiction.  If any action the subject matter of which is within the scope of Section 13.2 above is filed in a court other than a court located within the State of Delaware without the approval of the Board (a "***Foreign Action***") in the name of any stockholder, such stockholder shall be deemed to have consented to (a) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any such court to enforce Section 13.2 above (an "***FSC Enforcement Action***") and (b) having service of process made upon such stockholder in any such FSC Enforcement Action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

11

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation as of this [●] day of [●], 2019.

Parker Drilling Company

_____

Name:
Title:

[*Signature Page to Amended and Restated Certificate of Incorporation*]

<u>**Exhibit A(ii)**</u>

**Revised Bylaws for Parker Drilling Company**

*Draft 2/12/19*

## AMENDED AND RESTATED BYLAWS OF

## PARKER DRILLING COMPANY

Incorporated under the Laws of the State of Delaware

**Effective as of [●], 2019**

### ARTICLE I
### OFFICES

Section 1.01    **Registered Office.** The registered office of Parker Drilling Company (the "*Corporation*") within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

Section 1.02    **Additional Offices.** The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "*Board*") may from time to time determine or as the business and affairs of the Corporation may require.

### ARTICLE II
### MEETINGS OF STOCKHOLDERS

Section 2.01    **Annual Meetings.** The annual meeting of stockholders shall be held at such place and time and on such date as shall be determined by the Board and stated in the notice of the meeting; provided, that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 8.05(A). At each annual meeting, the stockholders shall elect directors of the Corporation and may transact any other business as may properly be brought before the meeting.

Section 2.02    **Special Meetings.**

(A)    Except as otherwise required by applicable law or provided in the Corporation's Amended and Restated Certificate of Incorporation, as the same may be amended or restated from time to time (the "*Certificate of Incorporation*"), special meetings of stockholders, for any purpose or purposes, may be called only by (i) the Chairman of the Board, (ii) the Board pursuant to a resolution adopted by a majority of the Board or (iii) the Secretary upon the delivery of a written request complying with Section 2.02(B) of these Bylaws to the Corporation by the holders of at least a majority of the outstanding shares of the common stock of the Corporation ("*Common Stock*"), in the aggregate (a "*Stockholder-Requested Meeting*"). Special meetings of stockholders shall be held at such place and time and on such date as shall be determined by the Board and stated in the Corporation's notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 8.05(A).

(B)    To be valid, a written request for a Stockholder-Requested Meeting must (i) be in writing, signed and dated by or on behalf of one or more stockholder(s) of record representing

at least a majority of the outstanding shares of Common Stock, (ii) set forth the proposed date, time and place of the special meeting (which may not be earlier than 30 days after the date the request is delivered or 90 days in the case of a Stockholder-Requested Meeting to elect directors), provided, for the avoidance of doubt, that such proposed date, time and place of the special meeting shall not be binding on the Corporation or the Board, (iii) set forth a statement of the purpose or purposes of and the matters proposed to be acted on at the special meeting, (iv) include the information required by Section 2.07(A) or Section 3.02 of these Bylaws to be set forth in a stockholder's notice for the proposal of business or nominations, as applicable, and (v) be delivered personally or sent by certified or registered mail, return receipt requested, to the Secretary at the principal executive offices of the Corporation. If the Board determines that a stockholder request pursuant to Section 2.02(A)(iii) is valid, the Board will determine the time and place, if any, of a Stockholder-Requested Meeting, which time will be not less than 30 days nor more than 90 days after the receipt of such request, and will set a record date for the determination of stockholders entitled to vote at such meeting in the manner set forth in Section 8.02 hereof. Notwithstanding the foregoing, a Stockholder-Requested Meeting need not be held if (1) the special meeting request relates to an item of business that is not a proper subject for stockholder action under applicable law, (2) the special meeting request is delivered during the period commencing 90 days prior to the first anniversary of the immediately preceding annual meeting of stockholders and ending on the earlier of (x) the date of the next annual meeting and (y) 30 calendar days after the first anniversary of the date of the immediately preceding annual meeting, (3) an identical or substantially similar item (as determined in good faith by the Board, a "*Similar Item*"), other than the election of directors, was presented at a meeting of the stockholders held not more than 12 months before the special meeting request is delivered, (4) a Similar Item was presented at a meeting of the stockholders held not more than 90 days before the special meeting request is delivered (and, for purposes of this clause (4), the election of directors shall be deemed a "Similar Item" with respect to all items of business involving the election or removal of directors), (5) a Similar Item is included in the Corporation's notice as an item of business to be brought before a stockholder meeting that has been called by the time the special meeting request is delivered but not yet held or (6) the special meeting request was made in a manner that involved a violation of Regulation 14A under the Securities Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder (the "*Exchange Act*"). No business may be transacted at a special meeting, including a Stockholder-Requested Meeting, unless specified in the Corporation's notice of meeting.

Section 2.03   **Notices.** Notice of each stockholders meeting stating the place, if any, date, and time of the meeting, and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting if such date is different from the record date for determining stockholders entitled to notice of the meeting shall be given in the manner permitted by Section 8.03 to each stockholder entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting. Unless otherwise provided by applicable law or the Certificate of Incorporation, such notice shall be given by the Corporation not less than 10 nor more than 60 days before the date of the meeting. If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto). Any meeting of stockholders as to which notice has been given may be postponed or rescheduled,

2

and any special meeting of stockholders as to which notice has been given may be cancelled, postponed or rescheduled, by the Board upon public announcement (as defined in Section 2.07(C)) given before the date previously scheduled for such meeting.

Section 2.04 **Quorum.** Except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding Common Stock representing a majority of the voting power of all outstanding shares of Common Stock entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business. Whether or not a quorum is present or represented by proxy at any meeting of the stockholders, the chairman of the meeting may adjourn the meeting from time to time in the manner provided in Section 2.06 until a quorum shall attend. The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. If a quorum is present at the original duly organized meeting, it is also present at an adjourned session of such meeting. Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the voting power of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

Section 2.05 **Voting of Shares.**

(A) Voting Lists. The Corporation shall prepare, at least 10 days before every meeting of stockholders, a complete list of the stockholders of record entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date), arranged in alphabetical order for each class of stock and showing the address and the number of shares registered in the name of each stockholder. Nothing contained in this Section 2.05(A) shall require the Corporation to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. If the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be examined by any stockholder who is present. If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 8.05(A), then such list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting. The stock ledger shall be the only evidence as to who are the

3

stockholders entitled to examine the list required by this Section 2.05(A) or to vote in person or by proxy at any meeting of stockholders.

(B)     Manner of Voting.  At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy. If authorized by the Board, the voting by stockholders or proxyholders at any meeting conducted by remote communication may be effected by a ballot submitted by Electronic Transmission (as defined in Section 8.03), provided that any such Electronic Transmission must either set forth or be submitted with information from which the Corporation can determine that the Electronic Transmission was authorized by the stockholder or proxyholder. The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(C)     Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. Proxies need not be filed with the Secretary until the meeting is called to order, but shall be filed with the Secretary before being voted. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority:

(1)     A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile or other reproduction signature.

(2)     A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an Electronic Transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such Electronic Transmission must either set forth or be submitted with information from which it can be determined that the Electronic Transmission was authorized by the stockholder. To the extent required by law, if it is determined that any such Electronic Transmission is valid, the inspectors or, if there are no inspectors, such other persons making that determination, shall specify the information upon which they relied.

(3)     A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or a new proxy bearing a later date.

Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which

4

the original writing or transmission could be used; <u>provided</u> that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(D)     <u>Required Vote</u>.  Subject to the rights of the holders of one or more series of preferred stock of the Corporation ("***Preferred Stock***"), voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. All other matters shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation, these Bylaws or applicable stock exchange rules, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(E)     <u>Inspectors of Election</u>.  The Board may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof. The Board may appoint one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspectors of election or alternates appointed by the Board are able to act at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall ascertain and report the number of outstanding shares and the voting power of each; determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots; count all votes and ballots and report the results; determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. Such certification and report shall specify such other information as may be required by law. In determining the validity and counting of proxies and ballots cast at any meeting of stockholders of the Corporation, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for an office at an election may serve as an inspector at such election. Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors.

Section 2.06   **Adjournments.** Any meeting of stockholders, annual or special, may be adjourned by the chairman of the meeting, from time to time, whether or not there is a quorum, to reconvene at the same or some other place. Notice need not be given of any such adjourned meeting if the date, time and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting the stockholders, or the holders of any class or series of stock entitled to vote separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting. If the adjournment is for more than 30 days, notice of the adjourned

5

meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with Section 2.03, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 2.07   **Advance Notice for Business.**

(A)      Annual Meetings of Stockholders.  No business may be transacted at an annual meeting of stockholders, other than business that is either (i) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board, (ii) otherwise properly brought before the annual meeting by or at the direction of the Board or (iii) otherwise properly brought before the annual meeting by any stockholder of the Corporation (x) who is a stockholder of record on both the date of the giving of the notice provided for in this Section 2.07(A) and the record date for the determination of stockholders entitled to vote at such meeting, (y) who is entitled to vote at such annual meeting and (z) who complies with the notice procedures set forth in this Section 2.07(A). Except for proposals properly made in accordance with Rule 14a-8 under the Exchange Act, and included in the notice of meeting given by or at the direction of the Board, the foregoing clause (iii) shall be the exclusive means for a stockholder to propose business to be brought before an annual meeting of stockholders. Stockholders seeking to nominate persons for election to the Board must comply with Section 3.02, and this Section 2.07 shall not be applicable to nominations.

(1)      In addition to any other applicable requirements, for business (other than nominations) to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary and such business must otherwise be a proper matter for stockholder action. Subject to Section 2.07(A)(4), to be timely, a stockholder's notice to the Secretary with respect to such business must (x) comply with the provisions of this Section 2.07(A)(1) and (y) be timely updated by the times and in the manner required by the provisions of Section 2.07(A)(3). A stockholder's notice must be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that if the annual meeting is called for a date that is more than 30 days earlier or more than 60 days later than such anniversary date or if no annual meeting occurred in the immediately preceding year, notice by the stockholder to be timely must be so received not earlier than the opening of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation. The public announcement of an adjournment or postponement of an annual meeting shall not commence a new time period for the giving of a stockholder's notice as described in this Section 2.07(A).

(2)      To be in proper written form, a stockholder's notice to the Secretary with respect to any business (other than nominations, which are addressed in Section 3.02 hereof) must set forth (A) as to each such matter such stockholder proposes to bring before

6

the annual meeting (1) a brief description of the business desired to be brought before the annual meeting and any material interest in such business of such stockholder and any Stockholder Associated Person (as defined below), individually or in the aggregate, (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and if such business includes a proposal to amend these Bylaws, the text of the proposed amendment) and (3) the reasons for conducting such business at the annual meeting, (B) the name and address of the stockholder proposing such business, as they appear on the Corporation's books, and the name and address of any Stockholder Associated Person, (C) the class or series and number of shares of capital stock of the Corporation that are owned of record or are directly or indirectly owned beneficially by such stockholder and by any Stockholder Associated Person (provided that, solely for purposes of the disclosure required by this Section 2.07(A)(2)(C), such stockholder and any Stockholder Associated Persons shall be deemed to beneficially own any shares of any class or series and number of shares of capital stock of the Corporation as to which such stockholder or Stockholder Associated Person has a right to acquire beneficial ownership at any time in the future), (D) any option, warrant, convertible security, stock appreciation right, swap or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of the Corporation, whether or not such instrument or right is subject to settlement in the underlying class or series of shares of the Corporation or otherwise (a "*Derivative Instrument*") directly or indirectly owned beneficially by such stockholder or by any Stockholder Associated Person and any other direct or indirect opportunity of such stockholder or any Stockholder Associated Person to profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation, (E) any proxy, contract, arrangement, understanding or relationship pursuant to which such stockholder or any Stockholder Associated Person has a right to vote any shares of the Corporation, (F) any short interest in any security of the Corporation held by such stockholder or any Stockholder Associated Person (for purposes of this Section 2.07 a person shall be deemed to have a short interest in a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security), (G) any rights to dividends on the shares of the Corporation owned beneficially by such stockholder or Stockholder Associated Person that are separated or separable from the underlying shares of the Corporation, (H) any proportionate interest in shares of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or similar entity in which such stockholder or any Stockholder Associated Person is a general partner or, directly or indirectly, beneficially owns an interest in a general partner, or is the manager or managing member of or directly or indirectly beneficially owns any interest in the manager or managing member of a limited liability company or similar entity, (I) any performance-related fees (other than an asset-based fee) that such stockholder or any Stockholder Associated Person is entitled to based on any increase or decrease in the value of shares of the Corporation or Derivative Instruments, if any, (J) any such interests described in clauses (D) through (I) of this paragraph held by members of such stockholder's or any Stockholder Associated Person's immediate family sharing the same household, (K) a complete and accurate description of

7

all agreements, arrangements or understandings (written or oral) between or among such stockholder, any Stockholder Associated Person or any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (L) any other information relating to such stockholder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitation of proxies for election of directors (even if an election contest is not involved), or would be otherwise required, in each case pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (M) a representation that such stockholder intends to appear in person or by proxy at the annual meeting to bring such business before the meeting, and (N) a statement of whether such stockholder or any Stockholder Associated Person intends, or is part of a group that intends, to (1) deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding shares of capital stock required to approve or adopt the proposal and/or (2) otherwise solicit proxies in connection with the proposal and (O) such stockholder's representation as to the accuracy of the information set forth in the notice to the best of its knowledge.

(3)     A stockholder providing notice of business proposed to be brought before an annual meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2.07(A) shall be true and correct as of the record date for determining the stockholders entitled to notice of the meeting and as of the date that is 10 business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation (x) in the case of the update and supplement required to be made as of such record date, not later than 5 business days after such record date and (y) in the case of the update and supplement required to be made as of 10 business days prior to the meeting or any adjournment or postponement thereof, as applicable, not later than 8 business days prior to the date for the meeting or any adjournment or postponement thereof, if practicable (or if not practicable, on the first practicable date prior to the date for the meeting or such adjournment or postponement thereof).

(4)     The foregoing notice requirements of this Section 2.07(A) shall be deemed satisfied by a stockholder as to any proposal (other than nominations) if the stockholder has notified the Corporation of such stockholder's intention to present such proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) of the Exchange Act, and such stockholder's proposal has been included in a proxy statement prepared by the Corporation to solicit proxies for such annual meeting. No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2.07(A), provided, however, that once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 2.07(A) shall be deemed to preclude discussion by any stockholder of any such business. If the Board or the chairman of the annual meeting determines that any stockholder proposal was not made in accordance with the provisions of this Section 2.07(A) or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 2.07(A), such proposal shall not be presented for action at the annual meeting. Notwithstanding the foregoing provisions of

8

this Section 2.07(A), if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation and present the proposed business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

(5)      In addition to the provisions of this Section 2.07(A), a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein; provided, however, that any references herein to the Exchange Act or the rules and regulations promulgated thereunder are not intended to and shall not limit any requirements applicable to proposals as to any business to be considered pursuant to this Section 2.07(A) and compliance with this Section 2.07(A) shall be the exclusive means for a stockholder to submit business (other than business properly brought under and in compliance with Rule 14a-8 of the Exchange Act or any successor provision). Nothing in this Section 2.07(A) shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(B)      Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been stated in the notice of such special meeting. The proposal by stockholders of other business to be conducted at a special meeting of stockholders may be made only in accordance with Section 2.02. Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting only pursuant to Section 3.02.

(C)      Definitions. For purposes of these Bylaws, "*public announcement*" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act; and "*Stockholder Associated Person*" shall mean for any stockholder (i) any person controlling, directly or indirectly, or acting in concert with, such stockholder, (ii) any beneficial owner of shares of stock of the Corporation owned of record or beneficially by such stockholder, or (iii) any person controlling, controlled by or under common control with such person referred to in the preceding clauses (i) and (ii).

Section 2.08   **Conduct of Meetings.** The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, such other person as shall be appointed by the Board. The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the chairman of the meeting. The Board may adopt such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate. Except to the extent inconsistent with these Bylaws or such rules and regulations as adopted by the Board, the chairman of any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and

9

procedures for maintaining order at the meeting and the safety of those present; (c) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (e) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary so appointed to act by the chairman of the meeting. In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 2.09   **Consents in Lieu of Meeting.**

(A)      Except as otherwise provided by law or by the Certificate of Incorporation, any action required or permitted to be taken by stockholders of the Corporation at any meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by holders of outstanding stock having not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board. Any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent shall, by delivery of a written notice sent by certified or registered mail, return receipt requested, to the Secretary at the principal executive offices of the Corporation, request that the Board fix a record date, and such written notice shall include such information as would have been required to be provided under Section 2.02 if the stockholders had requested that a Stockholder-Requested Meeting be held to take such action. The Board shall promptly, but in all events within 10 days after the date on which such written notice is received, adopt a resolution fixing the record date (unless a record date has previously been fixed by the Board pursuant to this Section 2.09(A)). If no record date has been fixed by the Board pursuant to this Section 2.09(A), the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or to an officer or agent of the Corporation having custody of the book or books in which meetings of stockholders are recorded. If no record date has been fixed by the Board pursuant to this Section 2.09(A), the record date for determining stockholders entitled to consent to corporate action in writing without a meeting if prior action by the Board is required by applicable law shall be at the close of business on the date on which the Board adopts the resolution taking such prior action.

(B)      In the event of the delivery, in the manner provided by Section 2.09(A) and applicable law, to the Corporation of written consent or consents to take corporate action and/or

10

any related revocation or revocations, the Corporation shall engage independent inspectors of elections for the purpose of performing promptly a ministerial review of the validity of the consents and revocations. For the purpose of permitting the inspectors to perform such review, no action by written consent without a meeting shall be effective until such inspectors have completed their review, determined that the requisite number of valid and unrevoked consents delivered to the Corporation in accordance with this Section 2.09 and applicable law have been obtained to authorize or take the action specified in the consents, and certified such determination for entry in the records of the Corporation kept for the purpose of recording the proceedings of meetings of stockholders. Nothing contained in this Section 2.09(B) shall in any way be construed to suggest or imply that the Board or any stockholder shall not be entitled to contest the validity of any consent or revocation thereof, whether before or after such certification by the independent inspectors, or to take any other action (including, without limitation, the commencement, prosecution or defense of any litigation with respect thereto, and the seeking of injunctive relief in such litigation).

## ARTICLE III
## DIRECTORS

Section 3.01   **Powers; Term.**

(A)   The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws required to be exercised or done by the stockholders.

(B)   The number of directors constituting the Board shall be as set forth in the Certificate of Incorporation or shall be fixed from time to time exclusively pursuant to a resolution adopted by a majority of the Whole Board. For purposes of these Bylaws, "*Whole Board*" shall mean the total number of directors the Corporation would have if there were no vacancies.

(C)   The Board shall consist of a single class of directors. Directors need not be stockholders or residents of the State of Delaware. The term of office of each director will be from the time of his or her respective election until the next annual meeting of stockholders or until his or her respective successor is duly elected and qualified, except as in the case of such director's earlier death, resignation, retirement, disqualification, removal or incapacity.

(D)   The Board may appoint one or more Board observers as it determines from time to time in its sole discretion.

Section 3.02   **Advance Notice for Nomination of Directors.**

(A)   Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors by the stockholders of the Corporation, except as may be otherwise provided by (x) the Certificate of Incorporation or (y) the terms of one or more series of Preferred Stock with respect to the rights of holders of one or more series of Preferred Stock to elect directors. Nominations of persons for election to the Board at any annual meeting of stockholders, or at any special meeting of stockholders called for the purpose of electing directors as set forth in the Corporation's notice of such special meeting, may be made (i) by or at the direction of the Board (or, in the case of a special meeting, by the stockholders pursuant to

11

Section 2.02) or (ii) by any stockholder of the Corporation (x) who is a stockholder of record on the date of the giving of the notice provided for in this Section 3.02 and the record date for the determination of stockholders entitled to vote at such meeting, (y) who is entitled to vote in the election of directors at such meeting and (z) who complies with the notice procedures set forth in this Section 3.02 provided, in the case of a special meeting, that the Board (or the stockholders pursuant to Section 2.02) has determined that directors shall be elected at such special meeting.

(B)     In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary. To be timely, a stockholder's notice to the Secretary must (x) comply with the provisions of this Section 3.02(B) and (y) be timely updated by the times and in the manner required by the provisions of Section 3.02(E). A stockholder's notice must be received by the Secretary at the principal executive offices of the Corporation (i) in the case of an annual meeting, not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that if the annual meeting is called for a date that is more than 30 days earlier or more than 60 days after such anniversary date or if no annual meeting occurred in the immediately preceding year, notice by the stockholder to be timely must be so received not earlier than the opening of business on the 120th day before the meeting and not later than the later of (A) the close of business on the 90th day before the meeting or (B) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation; and (ii) in the case of a special meeting of stockholders called for the purpose of electing directors, not earlier than the opening of business on the 120th day before the meeting and not later than the later of (A) the close of business on the 90th day before the meeting or (B) the close of business on the 10th day following the day on which public announcement of the date of the special meeting is first made by the Corporation. The public announcement of an adjournment or postponement of an annual meeting or special meeting shall not commence a new time period for the giving of a stockholder's notice as described in this Section 3.02.

(C)     Notwithstanding anything in paragraph (B) to the contrary, if the number of directors to be elected to the Board at an annual meeting is greater than the number of directors whose terms expire on the date of the annual meeting and there is no public announcement by the Corporation naming all of the nominees for the additional directors to be elected or specifying the size of the increased Board before the close of business on the 90th day prior to the anniversary date of the immediately preceding annual meeting of stockholders, a stockholder's notice required by this Section 3.02 shall also be considered timely, but only with respect to nominees for the additional directorships created by such increase that are to be filled by election at such annual meeting, if it shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the date on which such public announcement was first made by the Corporation.

(D)     To be in proper written form, a stockholder's notice to the Secretary must set forth (i) as to each person whom the stockholder proposes to nominate for election as a director (A) the name, age, business address and residence address of the person (present and for the past 3 years), (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation that are owned of record or are directly or

12

indirectly owned beneficially by the person (provided that, solely for purposes of the disclosure required by this Section 3.02(D), such person shall be deemed to beneficially own any shares of any class or series and number of shares of capital stock of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future), (D) any Derivative Instrument directly or indirectly owned beneficially by such person and any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation, (E) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in an election contest or is otherwise required pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (F) a written questionnaire with respect to the background and qualification of such person (in the form to be provided by the Secretary within 5 business days of a written request by a stockholder of record) and (G) a written representation (email being sufficient) that such person (w) is not and will not become a party to (1) any agreement, arrangement or understanding (whether written or oral) with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote in such capacity on any issue or question (a "*Voting Commitment*") that has not been disclosed to the Corporation or (2) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law; (x) is not and will not become a party to any agreement, arrangement or understanding (whether written or oral) with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director of the Corporation that has not been disclosed to the Corporation, (y) accepts his or her nomination by the nominating stockholder or beneficial owner, consents to being named in the Corporation's proxy statement as a nominee and, if elected as a director of the Corporation, intends to serve for a full term and (z) in such person's individual capacity and on behalf of any person or entity on whose behalf the nomination is being made, would be in compliance, if elected as a director of the Corporation, and will comply with all applicable law and all applicable rules of the U.S. exchanges upon which the Common Stock of the Corporation is listed and all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and other guidelines of the Corporation duly adopted by the Board; and (ii) as to the stockholder giving the notice (A) the name and address of such stockholder as they appear on the Corporation's books, and the name and address of any Stockholder Associated Person, (B) the class or series and number of shares of capital stock of the Corporation that are owned of record or directly or indirectly owned beneficially by such stockholder and any Stockholder Associated Person (provided that, solely for purposes of this clause (B), such stockholder and any Stockholder Associated Persons shall be deemed to beneficially own any shares of any class or series and number of shares of capital stock of the Corporation as to which such stockholder or Stockholder Associated Person has a right to acquire beneficial ownership at any time in the future), (C) any Derivative Instrument directly or indirectly owned beneficially by such stockholder or Stockholder Associated Person and any other direct or indirect opportunity of such stockholder or any Stockholder Associated Person to profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation, (D) any proxy, contract, arrangement, understanding or relationship pursuant to which such stockholder or any Stockholder Associated Person has a right to vote any shares of the Corporation, (E) any short interest in any security of the Corporation held by such stockholder or any Stockholder Associated Person (for purposes of

13

this Section 3.02 a person shall be deemed to have a short interest in a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security), (F) any rights to dividends on the shares of the Corporation beneficially owned, directly or indirectly, by such stockholder or Stockholder Associated Person that are separated or separable from the underlying shares of the Corporation, (G) any proportionate interest in shares of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or similar entity in which such stockholder or any Stockholder Associated Person is a general partner or, directly or indirectly, beneficially owns an interest in a general partner or is the manager or managing member of or directly or indirectly beneficially owns any interest in the manager or managing member of a limited liability company or similar entity, (H) any performance-related fees (other than an asset-based fee) that such stockholder or any Stockholder Associated Person is entitled to based on any increase or decrease in the value of shares of the Corporation or Derivative Instruments, if any, (I) any such interests described in clauses (C) through (H) of this paragraph held by members of such stockholder's or any Stockholder Associated Person's immediate family sharing the same household, (J) a description of all agreements, arrangements or understandings (written or oral) between or among such stockholder, any Stockholder Associated Person, any proposed nominee or any other person or persons (including their names) pursuant to which the nomination or nominations are to be made by such stockholder, (K) a representation that such stockholder intends to appear in person or by proxy at the meeting to nominate the persons named in its notice, (L) any other information relating to such stockholder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (M) a complete and accurate description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings (whether written or oral) during the past three years, and any other material relationships, between or among such stockholder or any Stockholder Associated Person, or others acting in concert therewith, on the one hand, and each proposed nominee, and his or her respective affiliates and associates, or others acting in concert therewith, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Rule 404 promulgated under Regulation S-K under the Securities Act of 1933, as amended, if such stockholder and any Stockholder Associated Person on whose behalf the nomination is made, if any, were the "registrant" for purposes of such rule and the nominee were a director or executive officer of such registrant, and (N) a statement of whether such stockholder or any Stockholder Associated Person intends, or is part of a group that intends, to (1) deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding shares of capital stock required to approve or adopt the proposal and/or (2) otherwise solicit proxies for the election of the proposed nominee.

(E)     A stockholder providing notice of a director nomination shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 3.02 shall be true and correct as of the record date for determining the stockholders entitled to notice of the meeting and as of the date that is 10 business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation (x) in the case of the update and supplement required to be

14

made as of such record date, not later than 5 business days after such record date and (y) in the case of the update and supplement required to be made as of 10 business days prior to the meeting or any adjournment or postponement thereof, as applicable, not later than 8 business days prior to the date for the meeting or any adjournment or postponement thereof, if practicable (or if not practicable, on the first practicable date prior to the date for the meeting or such adjournment or postponement thereof). In addition, at the request of the Board, a proposed nominee shall furnish to the Secretary of the Corporation within 10 days after receipt of such request such information as may reasonably be required by the Corporation to determine (x) the eligibility of such proposed nominee to serve as a director of the Corporation and (y) whether such nominee qualifies as an "independent director" or "audit committee financial expert" under applicable law, securities exchange rule or regulation, or any publicly disclosed corporate governance guideline or committee charter of the Corporation, including any information that could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such nominee, and if such information is not furnished within such time period, the notice of such director's nomination shall not be considered to have been timely given for purposes of this Section 3.02.

(F)　　Except as otherwise provided by the Certificate of Incorporation or the terms of one or more series of Preferred Stock with respect to the rights of one or more series of Preferred Stock to nominate and elect directors, no person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in this Section 3.02. If the Board or the chairman of the meeting of stockholders determines that any nomination was not made in accordance with the provisions of this Section 3.02, then such nomination shall not be considered at the meeting in question. Notwithstanding the foregoing provisions of this Section 3.02, if the stockholder (or a qualified representative of the stockholder) does not appear at the meeting of stockholders of the Corporation and present the nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Corporation.

(G)　　In addition to the provisions of this Section 3.02, a stockholder providing notice of a director nomination shall also comply with all of the applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein; provided, however, that any references herein to the Exchange Act or the rules and regulations promulgated thereunder are not intended to and shall not limit any requirements applicable to nominations to be considered pursuant to this Section 3.02 and compliance with this Section 3.02 shall be the exclusive means for a stockholder to make nominations.

(H)　　Nothing in this Section 3.02 shall be deemed to affect any rights of the holders of Preferred Stock to nominate and elect directors pursuant to the Certificate of Incorporation or the right of the Board to fill newly created directorships and vacancies on the Board pursuant to the Certificate of Incorporation.

Section 3.03　**Compensation.** Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board shall have the authority to fix the compensation of directors. The directors may be reimbursed their expenses, if any, for attendance at each meeting of the Board and may be paid either a fixed sum for attendance at each meeting of the Board or other compensation as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of committees

of the Board may be allowed like compensation and reimbursement of expenses for service on the committee.

Section 3.04 **Appointment of Directors; Vacancies.** Newly created directorships resulting from an increase in the number of directors and any vacancies on the Board resulting from death, resignation, retirement, disqualification, removal, incapacity or other cause shall be filled in accordance with the Certificate of Incorporation.

Section 3.05 **Removal of Directors.** Any director or the entire Board may be removed from office, with or without cause, as set forth in the Certificate of Incorporation.

### ARTICLE IV
### BOARD MEETINGS

Section 4.01 **Annual Meetings.** The Board shall meet as soon as practicable after the adjournment of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board, provided, that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 8.05(B). No notice to the directors shall be necessary to legally convene this meeting, except as provided in this Section 4.01.

Section 4.02 **Regular Meetings.** Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places as shall from time to time be determined by the Board, such determination by the Board to constitute the only notice of such regular meetings to which any director shall be entitled. In the absence of any such determination, such meetings shall be held, upon notice to each director in accordance with Section 8.03, at such times and places, within or without the State of Delaware, as shall be designated by the Chairman of the Board, provided, that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 8.05(B).

Section 4.03 **Special Meetings.** Special meetings of the Board (a) may be called by the Chairman of the Board or Chief Executive Officer and (b) shall be called by the Chairman of the Board or Secretary on the written request of at least a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request, provided, that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 8.05(B). Notice of each special meeting of the Board shall be given, as provided in Section 8.03, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of Electronic Transmission and delivery; (ii) at least 2 days before the meeting if such notice is sent by a nationally recognized overnight delivery service; and (iii) at least 5 days before the meeting if such notice is sent through the United States mail. If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting. Any and all business that may be transacted

16

at a regular meeting of the Board may be transacted at a special meeting. Except as may be otherwise expressly provided by applicable law, the Certificate of Incorporation or these Bylaws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting. A special meeting may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 8.04.

Section 4.04   **Quorum; Required Vote.** A majority of the Whole Board shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, in each case except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these Bylaws. If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

Section 4.05   **Consent in Lieu of Meeting.** Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by Electronic Transmission, and the writing or writings or Electronic Transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee, as applicable. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 4.06   **Organization.** The Board shall elect a Chairman of the Board from among the directors by resolution passed by a majority of the Board; provided, however, that the Chairman of the Board shall initially be determined pursuant to the terms of the Plan of Reorganization (as defined in the Certificate of Incorporation). The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, a chairman elected from the directors present. The Secretary shall act as secretary of all meetings of the Board. In the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary shall perform the duties of the Secretary at such meeting. In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

## ARTICLE V
## COMMITTEES OF DIRECTORS

Section 5.01   **Establishment.** The Board may by resolution passed by a majority of the Whole Board designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board when required. The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.

Section 5.02   **Available Powers.** Any committee established pursuant to Section 5.01 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and may exercise all of the powers and authority of the Board in the management of the business and

17

affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

Section 5.03   **Alternate Members.** The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

Section 5.04   **Procedures.** Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee, provided, that such committee may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 8.05(B). At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business. The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these Bylaws or the Board. If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. Unless the Board otherwise provides and except as provided in these Bylaws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article III and Article IV of these Bylaws.

<div align="center">

**ARTICLE VI**
**OFFICERS**

</div>

Section 6.01   **Officers.** The officers of the Corporation elected by the Board may include a Chief Executive Officer, a President, a Treasurer, a Controller, a Secretary and such other officers (including without limitation a Chief Financial Officer, Vice Presidents, Assistant Secretaries and Assistant Treasurers) as the Board from time to time may determine. Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this Article VI. Such officers shall also have such powers and duties as from time to time may be conferred by the Board. The Chief Executive Officer or the President may also appoint such other officers (including without limitation one or more Vice Presidents and Controllers) as may be necessary or desirable for the conduct of the business of the Corporation. Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these Bylaws or as may be prescribed by the Board or, if such officer has been appointed by the Chief Executive Officer or the President, as may be prescribed by the appointing officer.

(A)   <u>Chief Executive Officer</u>. The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board.

<div align="center">

18

</div>

(B)     President. The President, if any, shall be subject to the direction and control of the Chief Executive Officer and the Board and shall have such powers and duties as the Board or the Chief Executive Officer may assign to the President.

(C)     Controller. The Controller shall be the chief accounting officer of the Corporation. The Controller shall report to the Chief Financial Officer and, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or the Chief Financial Officer or as the Board may from time to time determine.

(D)     Vice Presidents. In the absence (or inability or refusal to act) of the President, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President. Any one or more of the Vice Presidents may be given an additional designation of rank or function. Specifically, Vice Presidents may include Executive Vice Presidents and Senior Vice Presidents.

(E)     Secretary.

(1)     The Secretary shall attend all meetings of the stockholders, the Board and (as required) committees of the Board and shall record the proceedings of such meetings in books to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chief Executive Officer or the President. The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(2)     The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

(3)     The Secretary may designate one (1) or more Assistant Secretaries who shall have such of the authority and perform such of the duties of the Secretary as may be assigned to them by the Board, the President or the Secretary.

(F)     Assistant Secretaries. The Assistant Secretary or, if there be more than one, the Assistant Secretaries in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Secretary, perform the duties and have the powers of the Secretary.

(G)     Treasurer. The Treasurer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the

19

Corporation which from time to time may come into the Treasurer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board, the Chief Executive Officer or the President may authorize). The Treasurer may designate one (1) or more Assistant Treasurers who shall have such of the authority and perform such of the duties of the Treasurer as may be assigned to them by the Board, the President or the Treasurer.

(H)     Assistant Treasurers. The Assistant Treasurer or, if there shall be more than one, the Assistant Treasurers in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Treasurer, perform the duties and exercise the powers of the Treasurer.

Section 6.02    **Term of Office; Removal; Vacancies.** The officers of the Corporation shall hold office until their successors are chosen and qualified or until their earlier death, resignation, retirement, disqualification, incapacity, or removal from office. Any officer may be removed, with or without cause, at any time by the Board. Any officer appointed by the Chief Executive Officer or the President may also be removed, with or without cause, by the Chief Executive Officer or the President, as the case may be, unless the Board otherwise provides. Any vacancy occurring in any elected office of the Corporation may be filled by the Board. Any vacancy occurring in any office appointed by the Chief Executive Officer or the President may be filled by the Chief Executive Officer or the President, as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

Section 6.03    **Other Officers.** The Board may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

Section 6.04    **Multiple Officeholders; Stockholder and Director Officers.** Any number of offices may be held by the same person, unless the Certificate of Incorporation or these Bylaws otherwise provide. Officers need not be stockholders or residents of the State of Delaware.

## ARTICLE VII
## SHARES

Section 7.01    **Certificated and Uncertificated Shares.** The shares of the Corporation shall be uncertificated, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be represented by certificates. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate representing the number of shares registered in certificate form. Certificates for shares of stock of the Corporation shall be issued under the seal of the Corporation, or a facsimile thereof, and shall be numbered and shall be entered in the books of the Corporation as they are issued. Each certificate shall bear a serial number, shall exhibit the holder's name and the number of shares evidenced thereby, and shall be signed in accordance with Section 7.03. The Corporation shall not have power to issue a certificate representing shares in bearer form.

Section 7.02    **Multiple Classes of Stock.** The Corporation shall, by resolution of the Board, be authorized to issue, from time to time, one or more classes or series of stock of the

20

Corporation and, with respect to each such class or series, to fix the terms thereof. If the Corporation issues more than one class of stock or more than one series of any class, the Corporation shall (a) cause the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; provided, however, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

Section 7.03   **Signatures.** Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by any two authorized officers of the Corporation, including, without limitation, the Chief Executive Officer, the President, any Vice President, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Corporation. Any or all the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

Section 7.04   **Consideration and Payment for Shares.**

(A)   Subject to applicable law and the Certificate of Incorporation, shares of stock may be issued for such consideration, having in the case of shares with par value a value not less than the par value thereof, and to such persons, as determined from time to time by the Board. The consideration may consist of any tangible or intangible property or benefit to the Corporation including cash, promissory notes, services performed, contracts for services to be performed or other securities.

(B)   Subject to applicable law and the Certificate of Incorporation, shares may not be issued until the full amount of the consideration has been paid, unless upon the face or back of each certificate issued to represent any partly paid shares of capital stock, or upon the books and records of the Corporation in the case of partly paid uncertificated shares, there shall have been set forth the total amount of the consideration to be paid therefor and the amount paid thereon up to and including the time said certificate representing certificated shares or said uncertificated shares are issued.

Section 7.05   **Lost, Destroyed or Wrongfully Taken Certificates.**

(A)   If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate

21

representing such shares or shall issue such shares in uncertificated form if the owner: (i) requests such a new certificate or the issuance of uncertificated shares before the Corporation has notice that the certificate representing such shares has been acquired by a protected purchaser (as such term is defined in Section 8-303 of the Uniform Commercial Code as adopted by the State of Delaware); (ii) if requested by the Corporation, delivers to the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(B)     If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

Section 7.06   **Transfer of Stock.**

(A)     If a certificate representing shares of the Corporation is presented to the Corporation with a stock power or other endorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(1)     in the case of certificated shares, the certificate representing such shares has been surrendered;

(2)     (A) with respect to certificated shares, the indorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the indorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(3)     the Corporation has received a guarantee of signature of the person signing such indorsement or instruction or such other reasonable assurance that the indorsement or instruction is genuine and authorized as the Corporation may request;

(4)     the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.08(a); and

(5)     such other conditions for such transfer as shall be provided for under applicable law have been satisfied.

(B)     Whenever any transfer of shares shall be made for collateral security and not absolutely, the Corporation shall so record such fact in the entry of transfer if, when the certificate for such shares is presented to the Corporation for transfer or, if such shares are

22

uncertificated, when the instruction for registration of transfer thereof is presented to the Corporation, both the transferor and transferee request the Corporation to do so.

Section 7.07   **Registered Stockholders.** Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting registration of transfer of uncertificated shares, the Corporation may treat the registered owner as the person exclusively entitled to inspect for any proper purpose the stock ledger and the other books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

Section 7.08   **Effect of the Corporation's Restriction on Transfer.**

(A)   A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(B)   A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares; provided, however, that no restrictions so imposed shall be binding with respect to shares of the Corporation issued prior to the adoption of the restriction unless the holders of such shares are parties to an agreement or voted in favor of the restriction.

Section 7.09   **Regulations.** The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares. The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

23

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01   **Place of Meetings.** If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these Bylaws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 8.05 hereof, then such meeting shall not be held at any place.

Section 8.02   **Fixing Record Dates.**

(A)   In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the Board so fixes a record date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 8.02(A) at the adjourned meeting.

(B)   In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Section 8.03   **Means of Giving Notice.**

(A)   Notice to Directors. Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any director, such notice shall be given either (i) in writing and sent by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, (ii) by means of facsimile telecommunication or other form of Electronic Transmission, or (iii) by oral notice given

24

personally or by telephone. A notice to a director will be deemed given as follows: (A) if given by hand delivery, orally, or by telephone, when actually received by the director, (B) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (C) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (D) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (E) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (F) if sent by any other form of Electronic Transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(B)     Notice to Stockholders. Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of Electronic Transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in Section 232 of the DGCL. A notice to a stockholder shall be deemed given as follows: (A) if given by hand delivery, when actually received by the stockholder, (B) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (C) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, or (D) if given by a form of Electronic Transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above, (I) if by facsimile transmission, when directed to a number at which the stockholder has consented to receive notice, (II) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (III) if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and (IV) if by any other form of Electronic Transmission, when directed to the stockholder. A stockholder may revoke such stockholder's consent to receiving notice by means of electronic communication by giving written notice of such revocation to the Corporation. Any such consent shall be deemed revoked if (x) the Corporation is unable to deliver by Electronic Transmission two consecutive notices given by the Corporation in accordance with such consent and (y) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(C)     Electronic Transmission. "*Electronic Transmission*" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by facsimile telecommunication or electronic mail.

25

(D)    Notice to Stockholders Sharing Same Address. Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice or a single Electronic Transmission to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation. Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(E)    Exceptions to Notice Requirements. Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these Bylaws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings or of the taking of action by written consent of stockholders without a meeting to such stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required. Any action or meeting that shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given. If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then-current address, the requirement that notice be given to such stockholder shall be reinstated. If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230(b) of the DGCL.

Section 8.04    **Waiver of Notice.** Whenever any notice is required to be given under applicable law, the Certificate of Incorporation or these Bylaws, a written waiver of such notice, signed before or after the date of such meeting by the person or persons entitled to said notice, or a waiver by Electronic Transmission by the person entitled to said notice, shall be deemed equivalent to such required notice. All such waivers shall be kept with the books of the Corporation. Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

26

Section 8.05   **Meeting Attendance via Remote Communication Equipment.**

(A)   Stockholder Meetings. If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(1)   participate in a meeting of stockholders; and

(2)   be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(B)   Board Meetings. Unless otherwise restricted by applicable law, the Certificate of Incorporation or these Bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 8.06   **Dividends.** The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

Section 8.07   **Reserves.** The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

Section 8.08   **Contracts and Negotiable Instruments.** Except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize. Such authority may be general or confined to specific instances as the Board may determine. The Chief Executive Officer, the President or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation. Subject to any restrictions imposed by the Board, the Chief Executive Officer, the President or any Vice President may delegate powers to execute

27

and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

Section 8.09    **Fiscal Year.** The fiscal year of the Corporation shall be fixed by the Board.

Section 8.10    **Seal.** The Board may adopt a corporate seal, which shall be in such form as the Board determines. The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 8.11    **Books and Records.** The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board. Any books or records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device or method; provided, however, that the books and records so kept can be converted into clearly legible paper form within a reasonable time. The Corporation shall so convert any books or records so kept upon the request of any person entitled to inspect such records pursuant to the Certificate of Incorporation, these Bylaws, or the DGCL.

Section 8.12    **Resignation.** Any director, committee member or officer may resign by giving notice thereof in writing or by Electronic Transmission to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary. The resignation shall take effect at the time specified therein, or at the time of receipt of such notice if no time is specified or the specified time is earlier than the time of such receipt. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 8.13    **Surety Bonds.** Such officers, employees and agents of the Corporation (if any) as the Chief Executive Officer, the President or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification, incapacity or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chief Executive Officer, the President or the Board may determine. The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

Section 8.14    **Securities of Other Corporations.** Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chief Executive Officer, the President, any Vice President or the Secretary. Any such officer, may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership

28

of such securities and which, as the owner thereof, the Corporation might have exercised and possessed. The Board may from time to time confer like powers upon any other person or persons.

Section 8.15    **Amendments.** The Board shall have the power to adopt, amend, alter or repeal the Bylaws by the affirmative vote of a majority of the Board. The Bylaws also may be adopted, amended, altered or repealed without Board action by the affirmative vote of the holders of a majority of the voting power of all outstanding shares of Common Stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, in addition to any vote of the holders of any class or series of capital stock of the Corporation required by applicable law or the Certificate of Incorporation.

29

## Exhibit B

### New Warrant Agreement

Certain documents, or portions thereof, contained in this **Exhibit B** and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors and the Consenting Stakeholders. The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

*Draft 2/12/19*

**WARRANT AGREEMENT**

**between**

**PARKER DRILLING COMPANY**

**and**

**[●],**
**as Warrant Agent**

**Dated as of [●], 2019**

**Warrants To Purchase Common Stock**

**TABLE OF CONTENTS**

**Page**

1.    Definitions.................................................................................................................1

2.    Warrant Certificates ................................................................................................8
      2.1    Original Issuance of Warrants.....................................................................8
      2.2    Form of Warrant Certificates.......................................................................8
      2.3    Execution and Delivery of Warrant Certificates .........................................8
      2.4    Global Warrant Certificates ........................................................................9

3.    Exercise and Expiration of Warrants ....................................................................11
      3.1    Right to Acquire Common Stock Upon Exercise .......................................11
      3.2    Exercise and Expiration of Warrants ........................................................11
      3.3    Application of Funds upon Exercise of Warrants ......................................13
      3.4    Payment of Taxes.....................................................................................13
      3.5    Cancellation of Warrant Certificates.........................................................13
      3.6    Shares Issuable........................................................................................13
      3.7    Maximum Percentage ...............................................................................13

4.    Dissolution, Liquidation or Winding Up ................................................................14

5.    Adjustments ..........................................................................................................15
      5.1    Adjustments ..............................................................................................15
      5.2    Fractional Interest .....................................................................................23
      5.3    No Other Adjustments...............................................................................23

6.    Loss or Mutilation.................................................................................................24

7.    Reservation and Authorization of Common Stock .................................................25

8.    Warrant Transfer Books .......................................................................................25

9.    Warrant Holders ...................................................................................................27
      9.1    No Voting or Dividend Rights ...................................................................27
      9.2    Rights of Action ........................................................................................27
      9.3    Treatment of Holders of Warrant Certificates...........................................27

10.   Concerning the Warrant Agent..............................................................................27
      10.1   Nature of Duties and Responsibilities Assumed.......................................27
      10.2   Right to Consult Counsel ..........................................................................29
      10.3   Compensation, Reimbursement and Indemnification................................29
      10.4   Warrant Agent May Hold Company Securities..........................................29
      10.5   Resignation and Removal; Appointment of Successor...............................29
      10.6   Appointment of Countersigning Agent ......................................................30

11.   Notices .................................................................................................................31
      11.1   Notices Generally......................................................................................31
      11.2   Required Notices to Holders......................................................................33

12.   Inspection.............................................................................................................34

13.   Amendments .........................................................................................................34

i

**14.** Waivers ............................................................................................................................... 35

**15.** Successor to Company ......................................................................................................... 35

**16.** Headings ............................................................................................................................. 35

**17.** Counterparts ........................................................................................................................ 35

**18.** Severability ......................................................................................................................... 35

**19.** No Redemption .................................................................................................................... 35

**20.** Persons Benefiting .............................................................................................................. 36

**21.** Applicable Law; Venue ....................................................................................................... 36

**22.** Entire Agreement ................................................................................................................ 37

**<u>EXHIBITS</u>**

Exhibit A            Form of Warrant Certificate

ii

**WARRANT AGREEMENT**

This Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "*Agreement*"), dated as of [●], 2019, between Parker Drilling Company, a Delaware corporation (the "*Company*"), and [●], a [●], as warrant agent (the "*Warrant Agent*").  Capitalized terms that are used in this Agreement shall have the meanings set forth in Section 1 hereof.

**WITNESSETH THAT:**

**WHEREAS**, pursuant to the terms and conditions of the *Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates*, Docket No. 17 (the "*Plan*") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Company proposes to issue and deliver Warrants (as defined below) to purchase up to an aggregate of **[●]** shares of its Common Stock (as defined below), subject to adjustment as provided herein, and the Warrant Certificates evidencing such Warrants;

**WHEREAS**, each Warrant shall entitle the registered owner thereof to purchase one share of the Common Stock, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the shares of Common Stock issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act (as defined below) and of any applicable state securities or "blue sky" laws afforded by Section 1145 of the Bankruptcy Code; and

**WHEREAS**, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants and the Warrant Certificates evidencing such Warrants.

**NOW THEREFORE** in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

**1.      Definitions.**

"*Action*" has the meaning set forth in Section 11.2.

"*Affiliate*" of any specified Person, means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Agent Members*" has the meaning set forth in Section 2.4(b).

"*Agreement*" has the meaning set forth in the preamble hereto.

"*Applicable Procedures*" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the procedures of the Depositary that apply to such transfer, exchange or exercise.

"*Appropriate Officer*" means any person designated as such by the Board of Directors from time to time.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Black-Scholes Value*" means, with respect to any Sale Cash Only Transaction, the fair market value of a Warrant on the date of consummation of such Sale Cash Only Transaction in accordance with the Black-Scholes model for valuing options, using (a) a risk free rate equal to the annual yield on the U.S. Treasury security with a maturity date closest to the Scheduled Expiration Date, as the yield on that security exists as of such date, (b) a term equal to the time in years (rounded to the nearest 1/1000th of a year) from such date until the Scheduled Expiration Date, (c) an assumed volatility of 35%, (d) an underlying security price for Common Stock of the value of the consideration received in such Sale Cash Only Transaction in respect of each outstanding share of Common Stock and (e) the aggregate number of shares of Common Stock for which such Warrant is then exercisable.

"*Black-Scholes Value Limit*" for each Warrant means, with respect to any Sale Cash Only Transaction, the quotient obtained by dividing (i) $15,000,000 by (ii) the aggregate number of Warrants outstanding immediately prior to the closing of such Sale Cash Only Transaction.

"*Board of Directors*" means either the board of directors of the Company or any duly authorized committee of that board.

"*Business Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a legal holiday in the State of New York or a day on which banking institutions and trust companies in the state in which the Corporate Agency Office is located are authorized or obligated by law, regulation or executive order to close.

"*Cash Consideration*" means, with respect to any Sale Cash Only Transaction or Sale Cash and Securities Transaction, the consideration constituting cash and property other than securities receivable upon such Sale Transaction by holders of shares of Common Stock that are Qualifying Persons on account of their holdings of Common Stock.

"*Commission*" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"*Common Stock*" means, subject to the provisions of Section 5.1(h), the common stock, par value $0.01 per share, of the Company.

"*Company*" means the company identified in the preamble hereof, and any Successor Company that becomes successor to the Company in accordance with Section 15.

2

"*Company Order*" means a written request or order signed in the name of the Company by an Appropriate Officer, and delivered to the Warrant Agent.

"*Constituent Person*" has the meaning set forth in the definition of "Qualifying Person."

"*Corporate Agency Office*" has the meaning set forth in Section 8.

"*corporation*" means a corporation, association, company (including limited liability company), joint-stock company, business trust or other similar entity.

"*Countersigning Agent*" means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Certificates.

"*Current Market Price*" means on any date:

(i)     if the reference is to the per share price of Common Stock on any date herein specified and if on such date the Common Stock is listed or admitted to trading on any U.S. national securities exchange or traded in the over-the-counter market in the United States (A) the average of the Quoted Prices for the 30 consecutive Trading Days ending on the Trading Day that next precedes such date or, if such date is not a Trading Day, for the next preceding Trading Day or (B) in the case of any computation under Section 5.1(d), the average of the Quoted Prices for the 30 consecutive Trading Days ending on the Trading Day that is the day before the "ex" date for the Spin-Off Dividend requiring such computation; or

(ii)     if the reference is to the per share price of Common Stock on any date herein specified and if on such date the Common Stock is not listed or admitted to trading on any U.S. national securities exchange or traded in the over-the-counter market in the United States, the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for one share of the Common Stock as determined as of such date by the Treasurer or Chief Financial Officer of the Company in good faith, whose determination shall be conclusive and evidenced by a certificate of such officer delivered to the Warrant Agent.

"*Definitive Warrant Certificate*" means a Warrant Certificate registered in the name of the Holder thereof that does not bear the Global Warrant Legend and that does not have a "Schedule of Decreases in Warrants" attached thereto.

"*Depositary*" means DTC and its successors as depositary hereunder.

"*DTC*" means The Depository Trust Company.

"*ex' date*" means, when used with respect to any dividend or distribution, the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Quoted Price was obtained, in each case without the right to receive such dividend or distribution.

3

"*Exchange Act*" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case, as amended from time to time.

"*Exercise Date*" has the meaning set forth in Section 3.2(f).

"*Exercise Form*" has the meaning set forth in Section 3.2.

"*Exercise Period*" means the period from and including the Original Issue Date to and including the Expiration Date.

"*Exercise Price*" means the exercise price per share of Common Stock, initially set at $[●], subject to adjustment as provided in Section 5.1.[1]

"*Expiration Date*" means the earlier to occur of (x) the Scheduled Expiration Date, (y) the date of consummation of a Sale Cash Only Transaction and (z) a Winding Up.

"*Fair Market Value*" means on any date, as to any non-cash property that is receivable upon conversion, change or exchange of shares of Common Stock in any Sale Transaction or comprises all or a portion of any Spin-Off Dividend: the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for such security or other non-cash property, as determined as of such date by the Board of Directors in good faith, whose determination shall be evidenced by a resolution of the Board of Directors filed with the Warrant Agent with written notice of such determination given by the Company to the Holders in accordance with Section 11.2.

"*Global Warrant Certificate*" means a Warrant Certificate deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases in Warrants" attached thereto.

"*Global Warrant Legend*" means the legend set forth in Section 2.4(a).

"*Group Member*" has the meaning set forth in Section 3.7.

"*Holder*" means any Person in whose name at the time any Warrant Certificate is registered upon the Warrant Register and, when used with respect to any Warrant Certificate, the Person in whose name such Warrant Certificate is registered in the Warrant Register.

"*Maximum Percentage*" has the meaning set forth in Section 3.7.

"*Non-Sale Transaction*" means any Transaction if immediately after consummation of such Transaction a Specified Person beneficially own more than 50% of the Common Stock (if a Surviving Transaction) or the common equity securities of the Successor Company (if a Non-Surviving Transaction).

---

[1] NTD: To be set as set forth in the term sheet.

"*Non-Surviving Transaction*" has the meaning set forth in Section 5.1(h).

"*Original Issue Date*" means [●], 2019, the date on which Warrants are originally issued under this Agreement.

"*outstanding*" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement except (i) Warrants that have been exercised pursuant to Section 3.2(a), (ii) Warrants that have expired, terminated and become void pursuant to Section 3.2(b), Section 4 or Section 5.1(h) and (iii) Warrants that have otherwise been acquired by the Company; provided, however, that in determining whether the Holders of the requisite amount of the outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Company or any Subsidiary of the Company or any of their respective employees shall be disregarded and deemed not to be outstanding.

"*Person*" means any individual, corporation, partnership, joint venture, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Plan*" has the meaning set forth in the recitals hereto.

"*Qualifying Electing Person*" means, with respect to any Non-Sale Transaction, a holder of Common Stock that (i) is a Qualifying Person; and (ii) if (as a result of rights of election or otherwise) the kind or amount of securities, cash and other property receivable upon such Transaction is not the same for each share of Common Stock held immediately prior to such Transaction, makes an election to receive the maximum amount of securities pursuant to any rights of election, if any, as to the kind or amount of securities, cash and other property receivable upon conversion, change or exchange of shares of Common Stock in such Transaction.

"*Qualifying Person*" means, with respect to any Transaction, a holder of Common Stock that is neither (i) an employee of the Company or of any Subsidiary thereof nor (ii) a Person with which the Company consolidated or into which the Company merged or which merged into the Company or to which such sale or transfer was made, as the case may be ("*Constituent Person*"), or an Affiliate of a Constituent Person.

"*Quoted Price*" means, on any Trading Day, with respect to the Common Stock, the VWAP of the Common Stock on such Trading Day on the principal U.S. national securities exchange on which the Common Stock is listed or admitted to trading or, if the Common Stock is not listed or admitted to trading on any U.S. national securities exchange, the average of the closing bid and asked prices in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm that shall be selected from time to time by the Company for that purpose.

"*Recipient*" has the meaning set forth in Section 3.2(e).

"*Redomestication Transaction*" means a Non-Surviving Transaction in which all of the property received upon such Non-Surviving Transaction by each holder of shares of Common Stock consists solely of securities, cash in lieu of fractional shares and other de minimis consideration, and the holders of the shares of Common Stock immediately prior to such Non-

5

Surviving Transaction are the only holders of the equity securities of the Successor Company immediately after the consummation of such Non-Surviving Transaction.

"*Related Fund*" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised, sub-advised, managed or co-managed by such Person, by any Affiliate of such Person, or, if applicable, such Person's investment manager.

"*Required Warrant Holders*" means Holders of Warrant Certificates evidencing a majority of the then-outstanding Warrants.

"*Sale Cash and Securities Transaction*" means a Sale Transaction that is neither (i) a Sale Cash Only Transaction nor (ii) a Sale Securities Only Transaction.

"*Sale Cash Only Transaction*" means a Sale Transaction in which all of the consideration receivable upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole)) of such Sale Transaction by holders of shares of Common Stock that are Qualifying Persons on account of their holdings of Common Stock consists of cash and/or property other than securities.

"*Sale Securities Only Transaction*" means a Sale Transaction in which all of the property received upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole)) of such Sale Transaction by holders of shares of Common Stock that are Qualifying Persons on account of their holdings of Common Stock consists solely of securities.

"*Sale Transaction*" means any Transaction that does not constitute a Non-Sale Transaction or a Redomestication Transaction (i.e. either (i) a Sale Cash and Securities Transaction, (ii) a Sale Cash Only Transaction or (iii) a Sale Securities Only Transaction).

"*Scheduled Expiration Date*" means [●], 2024 (the fifth and a half (5 1/2) anniversary of the Original Issue Date) or, if not a Business Day, then the next Business Day thereafter.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Special Dividend*" means any payment by the Company to all holder of its Common Stock of any dividend, or any other distribution by the Company to such holders, of cash to the extent paid from and on account of (directly or indirectly) the proceeds of any sale of assets of the Company or any of its Subsidiaries other than any dividend or distribution upon a Transaction to which Section 5.1(h) applies.

"*Specified Person*" means any of (i) Brigade Capital Management, LLC and its Related Funds and controlled Affiliates, (ii) Highbridge Capital Management LLC and its Related Funds and controlled Affiliates, (iii) Whitebox Advisors LLC and its Related Funds and controlled Affiliates or (iv) Värde Partners and its Related Funds and controlled Affiliates.

6

"*Spin-Off Dividend*" means any payment by the Company to all holders of its Common Stock of any dividend, or any other distribution by the Company to such holder of any shares of capital stock of any class or series, or similar equity interest, of or relating to a Subsidiary or other business unit or of any rights, warrants or other securities exercisable for or convertible for or exchangeable into any such shares of capital stock, other than any dividend or distribution (i) upon a Transaction to which Section 5.1(h) applies or (ii) of any Common Stock referred to in Section 5.1(b).

"*Subsidiary*" means a corporation (as defined in this Section 1) more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock which ordinarily has voting power for the election of directors, whether at all times or only so long as no senior class of stock has such voting power by reason of any contingency.

"*Substituted Property*" has the meaning set forth in Section 5.1(h)(y)(i)(A).

"*Substituted Securities*" has the meaning set forth in Section 5.1(h).

"*Successor Company*" has the meaning set forth in Section 15.

"*Surviving Transaction*" has the meaning set forth in Section 5.1(h).

"*Trading Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday, other than any day on which securities are not traded on the applicable securities exchange or in the applicable securities market.

"*Transaction*" has the meaning set forth in Section 5.1(h).

"*VWAP*" means the volume-weighted average price for trading hours of the regular trading session (including any extensions thereof), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof).

"*Warrant Agent*" means the warrant agent set forth in the preamble hereof or the successor or successors of such Warrant Agent appointed in accordance with the terms hereof.

"*Warrant Certificates*" means those certain warrant certificates evidencing the Warrants, substantially in the form set forth in Exhibit A attached hereto, which, for the avoidance of doubt, are either Global Warrant Certificates or Definitive Warrant Certificates.

"*Warrant Register*" has the meaning set forth in Section 8.

"*Warrants*" means those certain warrants to purchase initially up to an aggregate of [●] shares of Common Stock at the Exercise Price, subject to adjustment pursuant to Section 5, issued hereunder.

"*Winding Up*" has the meaning set forth in Section 4.

7

**2.** **Warrant Certificates**.

2.1     Original Issuance of Warrants.

(a)     On the Original Issue Date, one or more Global Warrant Certificates evidencing the Warrants shall be executed by the Company and delivered to the Warrant Agent for countersignature, and the Warrant Agent shall, upon receipt of a Company Order and at the direction of the Company set forth therein, countersign and deliver such Global Warrant Certificates for original issuance to the Depositary, or its custodian, for crediting to the accounts of its participants for the benefit of the holders of beneficial interests in the Warrants on the Original Issue Date pursuant to the Applicable Procedures of the Depositary on the Original Issue Date.

(b)     Except as set forth in Section 2.4, Section 3.2(d), Section 6 and Section 8, the Global Warrant Certificates delivered to the Depositary (or a nominee thereof) on the Original Issue Date shall be the only Warrant Certificates issued or outstanding under this Agreement.

(c)     Each Warrant Certificate shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one share of Common Stock, subject to adjustment as provided in Section 5.

2.2     Form of Warrant Certificates.

The Warrant Certificates evidencing the Warrants shall be in registered form only and substantially in the form set forth in Exhibit A hereto, shall be dated the date on which countersigned by the Warrant Agent, shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.

2.3     Execution and Delivery of Warrant Certificates.

(a)     Warrant Certificates evidencing the Warrants which may be countersigned and delivered under this Agreement are limited to Warrant Certificates evidencing [●] Warrants except for Warrant Certificates countersigned and delivered upon registration of transfer of, or in exchange for, or in lieu of, one or more previously countersigned Warrant Certificates pursuant to Section 2.4, Section 3.2(d), Section 6 and Section 8.

(b)     The Warrant Agent is hereby authorized to countersign and deliver Warrant Certificates as required by Section 2.1 or by Section 2.4, Section 3.2(d), Section 6 or Section 8.

(c)     The Warrant Certificates shall be executed in the corporate name and on behalf of the Company by the Chairman (or any Co-Chairman) of the Board of Directors, the Chief

Executive Officer, the President or any one of the Vice Presidents of the Company under corporate seal reproduced thereon and attested to by the Secretary or one of the Assistant Secretaries of the Company, either manually or by facsimile signature printed thereon.  The Warrant Certificates shall be manually countersigned by the Warrant Agent and shall not be valid for any purpose unless so countersigned.  In case any officer of the Company whose signature shall have been placed upon any of the Warrant Certificates shall cease to be such officer of the Company before countersignature by the Warrant Agent and issue and delivery thereof, such Warrant Certificates may, nevertheless, be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Company, and any Warrant Certificate may be signed on behalf of the Company by such person as, at the actual date of the execution of such Warrant Certificate, shall be a proper officer of the Company, although at the date of the execution of this Agreement any such person was not such officer.

    2.4    <u>Global Warrant Certificates</u>.

    (a)    Any Global Warrant Certificate shall bear the legend substantially in the form set forth in <u>Exhibit A</u> hereto (the "***Global Warrant Legend***").

    (b)    So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("***Agent Members***") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Warrants, and as the sole Holder of such Warrant Certificate, for all purposes. Accordingly, any such Agent Member's beneficial interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

    (c)    Any holder of a beneficial interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through a book-entry system maintained by the Holder of such Global Warrant Certificate (or its agent), and that ownership of a beneficial interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

    (d)    Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in <u>Section 2.4(e)</u>. Interests of beneficial owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures of the Depositary.

<div align="center">9</div>

(e)       A Global Warrant Certificate registered in the name of the Depositary or its nominee shall be exchanged for Definitive Warrant Certificates only if the Depositary (i) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (ii) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, each Global Warrant Certificate registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation in accordance with Section 3.5, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant Certificate, Definitive Warrant Certificates evidencing, in the aggregate, the number of Warrants theretofore represented by such Global Warrant Certificate with respect to such beneficial owner's respective beneficial interest. Any Definitive Warrant Certificate delivered in exchange for an interest in a Global Warrant Certificate pursuant to this Section 2.4(e) shall not bear the Global Warrant Legend. Interests in any Global Warrant Certificate may not be exchanged for Definitive Warrant Certificates other than as provided in this Section 2.4(e).

(f)       The Holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a Warrant Certificate is entitled to take under this Agreement or such Global Warrant Certificate.

(g)       Each Global Warrant Certificate will evidence such of the outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of outstanding Warrants from time to time endorsed thereon and that the aggregate number of outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises or expirations.  Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c) or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(h)       The Company initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

(i)       Every Warrant Certificate authenticated and delivered in exchange for, or in lieu of, a Global Warrant Certificate or any portion thereof, pursuant to this Section 2.4 or Section 8 or Section 10, shall be authenticated and delivered in the form of, and shall be, a Global Warrant Certificate, and a Global Warrant Certificate may not be exchanged for a Definitive Warrant Certificate, in each case, other than as provided in Section 2.4(e).  Whenever any provision herein refers to issuance by the Company and countersignature and delivery by the Warrant Agent of a new Warrant Certificate in exchange for the portion of a surrendered Warrant Certificate that has not been exercised, in lieu of the surrender of any Global Warrant Certificate and the issuance, countersignature and delivery of a new Global Warrant Certificate in exchange therefor, the Warrant Agent may endorse such Global Warrant Certificate to reflect a reduction in

10

the number of Warrants evidenced thereby in the amount of Warrants so evidenced that have been so exercised.

(j)    Beneficial interests in any Global Warrant Certificate may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Global Warrant Certificate in accordance with the Applicable Procedures.

(k)    At such time as all Warrants evidenced by a particular Global Warrant Certificate have been exercised or expires, terminates or become void in whole and not in part, such Global Warrant Certificate shall, if not in custody of the Warrant Agent, be surrendered to or retained by the Warrant Agent for cancellation in accordance with Section 3.5.

**3.    Exercise and Expiration of Warrants.**

3.1    Right to Acquire Common Stock Upon Exercise.  Each Warrant Certificate shall, when countersigned by the Warrant Agent, entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to acquire from the Company, for each Warrant evidenced thereby, one share of Common Stock at the Exercise Price, subject to adjustment as provided in this Agreement.  The Exercise Price, and the number of shares of Common Stock obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by Section 5.1.

3.2    Exercise and Expiration of Warrants.

(a)    Exercise of Warrants.  Subject to and upon compliance with the terms and conditions set forth herein, a Holder of a Warrant Certificate may exercise all or any whole number of the Warrants evidenced thereby, on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date, for the shares of Common Stock obtainable thereunder.

(b)    Expiration of Warrants.  The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York time, on the Expiration Date. No further action of any Person (including by, or on behalf of, any Holder, the Company, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this Section 3.2(b).

(c)    Method of Exercise.  In order for a Holder to exercise all or any of the Warrants represented by a Warrant Certificate, the Holder thereof must (i) (x) in the case of a Global Warrant Certificate, deliver to the Warrant Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in Exhibit A hereto (an "***Exercise Form***"), setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Definitive Warrant Certificate, at the Corporate Agency Office, (I) deliver to the Warrant Agent an Exercise Form, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof, and (II) surrender to the Warrant Agent the Definitive Warrant Certificate evidencing such Warrants; and (ii) pay to the Warrant Agent an amount equal to (x) all taxes required to be paid by the Holder, if any, pursuant

11

to Section 3.4 prior to, or concurrently with, exercise of such Warrants and (y) the aggregate of the Exercise Price in respect of each share of Common Stock into which such Warrants are exercisable, in case of (x) and (y), by wire transfer in immediately available funds, to the account [(No. [●]; ABA No. [●]; Reference: [●]; Attention: [●])] of the Company at the Warrant Agent or such other account of the Company at such banking institution as the Company shall have given notice to the Warrant Agent and such Holder in accordance with Section 11.1(b).

(d) Partial Exercise. If fewer than all the Warrants represented by a Warrant Certificate are exercised, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Definitive Warrant Certificate, such Definitive Warrant Certificate shall be surrendered and a new Definitive Warrant Certificate of the same tenor and for the number of Warrants which were not exercised shall be executed by the Company. The Warrant Agent shall countersign the new Definitive Warrant Certificate, registered in such name or names, subject to the provisions of Section 8 regarding registration of transfer and payment of governmental charges in respect thereof, as may be directed in writing by the Holder, and shall deliver the new Definitive Warrant Certificate to the Person or Persons in whose name such new Definitive Warrant Certificate is so registered. The Company, whenever required by the Warrant Agent, will supply the Warrant Agent with Definitive Warrant Certificates duly executed on behalf of the Company for such purpose.

(e) Issuance of Common Stock. Upon due exercise of Warrants evidenced by any Warrant Certificate in conformity with the foregoing provisions of Section 3.2(c), the Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received, deliver to the Company the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit all funds received as instructed in writing by the Company and advise the Company by telephone at the end of such day of the amount of funds so deposited to its account. The Company shall thereupon, as promptly as practicable, and in any event within five (5) Business Days after the Exercise Date referred to below, (i) determine the number of shares of Common Stock issuable pursuant to exercise of such Warrants pursuant to Section 3.6 and (ii) (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient (as defined below) in accordance with the Applicable Procedures shares of Common Stock in book-entry form to be so held through the facilities of DTC in an amount equal to, or, if the Common Stock may not then be held in book-entry form through the facilities of DTC, duly executed certificates representing, or (y) in the case of exercise of Warrants evidenced by Definitive Warrant Certificates, execute or cause to be executed and deliver or cause to be delivered to the Recipient (as defined below) a certificate or certificates representing, in case of (x) and (y), the aggregate number of shares of Common Stock issuable upon such exercise (based upon the aggregate number of Warrants so exercised), as so determined, together with an amount in cash in lieu of any fractional share(s), if the Company so elects pursuant to Section 5.2. The shares of Common Stock in book-entry form or certificate or certificates representing shares of Common Stock so delivered shall be, to the extent possible, in such denomination or denominations as such Holder shall request in the applicable Exercise Form and shall be registered or otherwise placed in the name of, and delivered to, the Holder or, subject to Section 3.4, such other Person as shall be designated by the Holder in such Exercise Form (the Holder or such other Person being referred to herein as the "*Recipient*").

12

(f)     Time of Exercise.  Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the requirements for exercise of such Warrant specified in Section 3.2(c) has been duly satisfied (the "*Exercise Date*").  At such time, subject to Section 5.1(f)(iv), shares of Common Stock in book-entry form or the certificates for the shares of Common Stock issuable upon such exercise as provided in Section 3.2(e) shall be deemed to have been issued and, for all purposes of this Agreement, the Recipient shall, as between such Person and the Company, be deemed to be and entitled to all rights of the holder or record of such Common Stock.

3.3     Application of Funds upon Exercise of Warrants.  Any funds delivered to the Warrant Agent upon exercise of any Warrant(s) shall be held by the Warrant Agent in trust for the Company.  The Warrant Agent shall promptly deliver and pay to or upon the written order of the Company all funds received by it upon the exercise of any Warrants by bank wire transfer to an account designated by the Company or as the Warrant Agent otherwise may be directed in writing by the Company.

3.4     Payment of Taxes.  The Company shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of shares of Common Stock on exercise of Warrants pursuant hereto.  The Company shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of shares of Common Stock in book-entry form or any certificates for shares of Common Stock or payment of cash or other property to any Recipient other than the Holder of the Warrant Certificate evidencing the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any shares of Common Stock in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid.

3.5     Cancellation of Warrant Certificates.  Any Definitive Warrant Certificate surrendered for exercise shall, if surrendered to the Company, be delivered to the Warrant Agent. All Warrant Certificates surrendered or delivered to or received by the Warrant Agent for cancellation pursuant to this Section 3.5 or Section 2.4(e) or Section 2.4(k) shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company.  The Warrant Agent shall destroy any such cancelled Warrant Certificates and deliver its certificate of destruction to the Company, unless the Company shall otherwise direct.

3.6     Shares Issuable.  The number of shares of Common Stock "obtainable upon exercise" of Warrants at any time shall be the number of shares of Common Stock into which such Warrants are then exercisable.  The number of shares of Common Stock "into which each Warrant is exercisable" shall be one share, subject to adjustment as provided in Section 5.1.

3.7     Maximum Percentage. A Holder of a Warrant will notify the Company and the Warrant Agent in writing by submitting the notice form included as Exhibit [B] attached hereto to the Company and the Warrant Agent prior to the Original Issue Date in the event it elects to be subject to the provisions contained in this Section 3.7; however, no Holder of a Warrant shall be subject to this Section 3.7 unless he, she or it makes such election. If the election is made by a

13

Holder, the Warrant Agent shall not effect the exercise of the Holder's Warrant, and such Holder shall not have the right to exercise such Warrant, to the extent that after giving effect to such exercise, such Person (together with such Person's Affiliates and any Person who is a member of a group (as defined in Rule 13d-5 under the Exchange Act) with such Person (such Person a "*Group Member*") relating to the equity securities of the Company), to the Warrant Agent's knowledge based solely on the information certified to the Warrant Agent in the Exercise Form, would beneficially own in excess of 9.9% (the "*Maximum Percentage*") of the shares of Common Stock outstanding. For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by such Person, its Affiliates and its Group Members shall include the number of shares of Common Stock issuable upon exercise of the Warrant with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock that would be issuable upon (x) exercise of the remaining, unexercised portion of the Warrant beneficially owned by such Person and its Affiliates and Group Members, if the shares underlying the Warrant would exceed the Maximum Percentage and (y) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company beneficially owned by such Person and its Affiliates and Group Members (including, without limitation, any convertible notes or convertible preferred stock or warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein. Except as set forth in the preceding sentence, for purposes of this paragraph, beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. Solely the Warrant Agent shall determine the extent to which the Warrant is exercisable in accordance with this Section 3.7, and neither the Company nor any transfer agent of the Company shall have any obligation to verify or confirm the accuracy of such determination. For purposes of making the foregoing determination, the Company shall, within two (2) Business Days, confirm orally and in writing to the Warrant Agent the number of shares of Common Stock then outstanding. For any reason at any time, upon the written request of the Holder of the Warrant, the Company shall, within two (2) Business Days, confirm orally and in writing to such Holder the number of shares of Common Stock then outstanding. By written notice to the Company and the Warrant Agent, the Holder of a Warrant may from time to time (i) increase or decrease the Maximum Percentage applicable to such Holder to any other percentage specified in such notice or (ii) revoke its election pursuant to this Section 3.7; provided, however, that any such increase, decrease or revocation shall not be effective until the sixty-first (61st) day after such notice is delivered to the Company.

**4.      Dissolution, Liquidation or Winding Up.**

Unless Section 5.1(h) applies, if, on or prior to the Expiration Date, the Company (or any other Person controlling the Company) shall propose a voluntary or involuntary dissolution, liquidation or winding up (collectively, a "*Winding Up*"; provided that a Winding Up shall not be effected pursuant to a Transaction) of the affairs of the Company, the Company shall give written notice thereof to the Warrant Agent and all Holders in the manner provided in Section 11.1(b) prior to the date on which such transaction is expected to become effective or, if earlier, the record date for such transaction.  Such notice shall also specify the date as of which the holders of record of the shares of Common Stock shall be entitled to exchange their shares for securities, money or other property deliverable upon such dissolution, liquidation or winding up, as the case may be, on which date each Holder of Warrant Certificates shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of the shares of Common Stock into which the Warrants were exercisable immediately

14

prior to such dissolution, liquidation or winding up (net of the then applicable Exercise Price) and the rights to exercise the Warrants shall terminate.

Unless Section 5.1(h) applies, in case of any Winding Up of the Company, the Company shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with a Company Order as to the distribution thereof. After receipt of such deposit from the Company and after receipt of surrendered Warrant Certificates evidencing Warrants, the Warrant Agent shall make payment in appropriate amount to such Person or Persons as it may be directed in writing by the Holder surrendering such Warrant Certificate. The Warrant Agent shall not be required to pay interest on any money deposited pursuant to the provisions of this Section 4 except such as it shall agree with the Company to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Company or on its behalf with the Warrant Agent pursuant to this Section 4 shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in trust for the purpose for which such moneys, securities or other property shall have been deposited; provided that moneys, securities or other property need not be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

**5.     Adjustments**.

5.1     Adjustments. In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this Section 5.1 and the number of shares of Common Stock obtainable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this Section 5.1.

(a)     Subdivisions and Combinations. In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, effect a subdivision (by any stock split, subdivision or otherwise) of the outstanding shares of Common Stock into a greater number of shares of Common Stock (other than (x) a subdivision upon a Transaction to which Section 5.1(h) applies or (y) a stock split effected by means of a stock dividend or distribution to which Section 5.1(b) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such subdivision becomes effective shall be proportionately decreased. Conversely, if the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, effect a combination (by any reverse stock split, combination or otherwise) of the outstanding shares of Common Stock into a smaller number of shares of Common Stock (other than a combination upon a Transaction to which Section 5.1(h) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such combination becomes effective shall be proportionately increased. Any adjustment under this Section 5.1(a) shall become effective immediately after the opening of business on the day after the date upon which the subdivision or combination becomes effective.

(b)     Stock Dividends. In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, make or issue to the holders of its Common Stock a dividend or distribution

15

payable in, or otherwise make or issue a dividend or other distribution on any class of its capital stock payable in, shares of Common Stock (other than a dividend or distribution upon a Transaction to which Section 5.1(h) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date for the determination of the holders of shares of Common Stock entitled to receive such dividend or distribution shall be decreased by multiplying such Exercise Price by a fraction (not to be greater than 1):

(i)     the numerator of which shall be the total number of shares of Common Stock issued and outstanding at the close of business on such date for determination; and

(ii)     the denominator of which shall be the total number of shares of Common Stock issued and outstanding at the close of business on such date for determination plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Any adjustment under this Section 5.1(b) shall, subject to Section 5.1(f)(iv), become effective immediately after the opening of business on the day after the date for the determination of the holders of shares of Common Stock entitled to receive such dividend or distribution.

(c)     Reclassifications.  A reclassification of the Common Stock (other than any such reclassification in connection with a Transaction to which Section 5.1(h) applies) into shares of Common Stock and shares of any other class of stock shall be deemed:

(i)     a Spin-Off Dividend by the Company to the holders of its Common Stock of such shares of such other class of stock for the purposes and within the meaning of Section 5.1(d) (and the effective date of such reclassification shall be deemed to be "the date for the determination of the holders of Common Stock entitled to receive such Spin-Off Dividend" for the purposes and within the meaning of Section 5.1(d)); and

(ii)     if the outstanding shares of Common Stock shall be changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, such change shall be deemed a subdivision or combination, as the case may be, of the outstanding shares of Common Stock for the purposes and within the meaning of Section 5.1(a) (and the effective date of such reclassification shall be deemed to be "the date upon which such subdivision becomes effective" or "the date upon which such combination becomes effective," as applicable, for the purposes and within the meaning of Section 5.1(a)).

(d)     Spin-Off Dividend. In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, make or issue any Spin-Off Dividend, then and in each such event, the Exercise Price in effect immediately prior to the close of business on the date for the determination of the holders of Common Stock entitled to receive such Spin-Off Dividend shall be decreased by multiplying such Exercise Price by a fraction (not to be greater than 1):

(i)     the numerator of which shall be the Current Market Price per share of Common Stock on such date for determination minus the portion applicable to one share

16

of Common Stock of the Fair Market Value ( as determined in good faith by the Board of Directors, whose determination shall be evidenced by a resolution of the Board of Directors filed with the Warrant Agent) of such Spin-Off Dividend so distributed; and

(ii)    the denominator of which shall be such Current Market Price per share of Common Stock.

Any adjustment under this Section 5.1(d) shall, subject to Section 5.1(f)(v) become effective immediately prior to the opening of business on the day after the date for the determination of the holders of Common Stock entitled to receive such Spin-Off Dividend. If the Board of Directors determines the Fair Market Value of any Spin-Off Dividend for purposes of this Section 5.1(d) by reference to the actual or when issued trading market for any securities comprising such Spin-Off Dividend, it must in doing so consider the volume weighted average prices in such market on the same date used in computing the Current Market Price per share of Common Stock.

For purposes of clarity, if a Spin-Off Dividend would have reduced the Exercise Price to an amount below the par value per share of the Common Stock, the Exercise Price will be reduced to the par value per share of the Common Stock.

(e)    Special Dividends. In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, pay or make any Special Dividend, then and in each such event, the Exercise Price in effect immediately prior to the close of business on the date for the determination of the holders of Common Stock entitled to receive such Special Dividend shall be decreased (to an amount not less than the lesser of the par value of the Common Stock as of the date hereof and such par value as of such date of determination) by an amount equal to the amount of the cash so distributed to one share of Common Stock.

Any adjustment under this Section 5.1(e) shall, subject to Section 5.1(f)(v), become effective immediately prior to the opening of business on the day after the date for the determination of the holders of Common Stock entitled to receive such Special Dividend.

For purposes of clarity, if a Special Dividend would have reduced the Exercise Price to an amount below the par value per share of the Common Stock, the Exercise Price will be reduced to the par value per share of the Common Stock and any remaining amount of cash of the Special Dividend that would have resulted in a reduction of the Exercise Price below the par value per share of the Common Stock shall be disregarded.

(f)    Other Provisions Applicable to Adjustments. The following provisions shall be applicable to the making of adjustments to the Exercise Price and the number of shares of Common Stock into which each Warrant is exercisable under Section 5.1:

(i)    Treasury Stock.  The dividend or distribution of any issued shares of Common Stock owned or held by or for the account of the Company shall be deemed a dividend or distribution of shares of Common Stock for purposes of Section 5.1(b).  The Company shall not make or issue any dividend or distribution on shares of Common Stock held in the treasury of the Company.  For the purposes

17

of Section 5.1(b), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company.

(ii)     When Adjustments Are to be Made.  The adjustments required by Section 5.1(a), Section 5.1(b), Section 5.1(c), Section 5.1(d) and Section 5.1(e) shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price immediately prior to the making of such adjustment by at least 1%.  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by Section 5.1(a), Section 5.1(b), Section 5.1(c), Section 5.1(d) and Section 5.1(e) and not previously made, would result in such minimum adjustment.

(iii)     Fractional Interests.  In computing adjustments under this Section 5.1, fractional interests in Common Stock shall be taken into account to the nearest one-thousandth of a share.

(iv)     Deferral of Issuance Upon Exercise.  In any case in which Section 5.1(b) or Section 5.1(d) shall require that a decrease in the Exercise Price be made effective prior to the occurrence of a specified event and any Warrant is exercised after the time at which the adjustment became effective but prior to the occurrence of such specified event and, in connection therewith, Section 5.1(g) shall require a corresponding increase in the number of shares of Common Stock into which each Warrant is exercisable, the Company may elect to defer (but not in any event later than the Expiration Date or the closing date of the applicable Sale Transaction) until the occurrence of such specified event (A) the issuance to the Holder of the Warrant Certificate evidencing such Warrant (or other Person entitled thereto) of, and the registration of such Holder (or other Person) as the record holder of, the Common Stock over and above the Common Stock issuable upon such exercise on the basis of the number of shares of Common Stock obtainable upon exercise of such Warrant immediately prior to such adjustment and to require payment in respect of such number of shares the issuance of which is not deferred on the basis of the Exercise Price in effect immediately prior to such adjustment and (B) the corresponding reduction in the Exercise Price; provided, however, that the Company shall deliver to such Holder or other person a due bill or other appropriate instrument that meet any applicable requirements of the principal national securities exchange or other market on which the Common Stock is then traded and evidences the right of such Holder or other Person to receive, and to become the record holder of, such additional shares of Common Stock, upon the occurrence of such specified event requiring such adjustment (without payment of any additional Exercise Price in respect of such additional shares).

(v)     Deferral of Reduction in Exercise Price. In any case in which Section 5.1(e) shall require that a decrease in the Exercise Price be made effective

18

prior to the occurrence of a specified event and any Warrant is exercised after the time at which the adjustment became effective but prior to the occurrence of such specified event, the Company may elect to defer (but not in any event later than the Expiration Date or the closing date of the applicable Sale Transaction) until the occurrence of such specified event the corresponding reduction in the Exercise Price; provided, however, that the Company shall deliver to the Holder of the Warrant Certificate evidencing such Warrant an appropriate instrument that evidences the right of such Holder to receive from the Company, upon the occurrence of such specified event requiring such adjustment, a cash refund equal to the difference between (x) the Exercise Price paid to the Company on the Exercise Date and (y) the Exercise Price as so reduced as a result of such adjustment pursuant to Section 5.1(e).

(g)    Adjustment to Shares Obtainable Upon Exercise.  Whenever the Exercise Price is adjusted as provided in this Section 5.1 (other than in Section 5.1(e) in the case of a Special Dividend), the number of shares of Common Stock into which a Warrant is exercisable shall simultaneously be adjusted by multiplying such number of shares of Common Stock into which a Warrant is exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment, and the denominator of which shall be the Exercise Price immediately thereafter.

(h)    Changes in Common Stock.  In case at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, the Company (including any Successor Company) shall be a party to or shall otherwise engage in any transaction or series of related transactions constituting: (1) a consolidation of the Company with, a merger of the Company into, a sale of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole) to, any other Person, or any similar transaction, in each case, in which the previously outstanding shares of Common Stock shall be entitled to receive (either directly or upon subsequent liquidation), cancelled, reclassified or converted or changed into or exchanged for securities or other property (including cash) or any combination of the foregoing (a "*Non-Surviving Transaction*"), or (2) any merger of another Person into the Company in which the previously outstanding shares of Common Stock shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Company or other property (including cash) or any combination of the foregoing (a "*Surviving Transaction*"; any Non-Surviving Transaction or Surviving Transaction being herein called a "*Transaction*"); then:

(x)    if such Transaction constitutes a Sale Cash Only Transaction, then, at the effective time of the consummation of such Sale Cash Only Transaction, (i) any Warrants not exercised prior to the closing of such Sale Cash Only Transaction shall automatically expire, terminate and become void and (ii) the Company shall deliver or cause to be delivered to the Holder of each Warrant Certificate evidencing any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to (1) the product of (I) the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the Fair Market Value of the Cash Consideration per share of Common Stock in the Transaction and the Exercise Price per share of Common Stock immediately prior to such closing plus (2) if the effective time of

19

the consummation of such Transaction is prior to both (a) the eighteen (18) month anniversary of the Original Issue Date and (b) the effective time of any Sale Securities Only Transaction or Sale Cash and Securities Transaction that occurs after the Original Issue Date, the lesser of (I) the Black-Scholes Value Limit with respect to such Sale Cash Only Transaction and (II) the Black-Scholes Value of each Warrant as of the date of the consummation of the Sale Cash Only Transaction; or

(y) if such Transaction is a Redomestication Transaction, a Non-Sale Transaction, a Sale Cash and Securities Transaction or a Sale Securities Only Transaction:

(i)      as a condition to the consummation of such Transaction, the Company shall (or, in the case of any Non-Surviving Transaction, the Company shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that:

(A)      if such Transaction constitutes a Redomestication Transaction or a Non-Sale Transaction, any Warrant that remains outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Stock issuable upon such exercise prior to such consummation, only the securities or other property ("*Substituted Property*") that would have been receivable upon such Transaction by a Qualifying Electing Person holding the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and for an aggregate Exercise Price for such Warrant equal to the product of (I) the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per share of Common Stock immediately prior to such Transaction; provided that if (i) such Non-Sale Transaction would have otherwise been a Sale Cash Only Transaction (but for the percentage beneficial ownership of a Specified Person specified in the definition of such term that caused such Non-Sale Transaction to become such) and (ii) such Warrants would not be entitled to any amount of cash pursuant to Subsection 5.1(h)(x)(ii)(1) or Subsection 5.1(h)(x)(ii)(2), then the Warrants shall automatically expire, terminate and become void upon the closing of such Non-Sale Transaction;

(B)      if such Transaction constitutes a Sale Securities Only Transaction, any Warrant that remains outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such

20

terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Stock issuable upon such exercise prior to such consummation, only the securities ("**Substituted Securities**") that would have been receivable upon the consummation of such Transaction by a Qualifying Person holding the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and for an aggregate Exercise Price for such Warrant equal to the product of (I) the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per share of Common Stock immediately prior to such Transaction; or

(C)    if such Transaction constitutes a Sale Cash and Securities Transaction, any Warrant that remains outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Stock issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon such Transaction by a Qualifying Person holding the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and for an aggregate Exercise Price for such Warrant equal to the product of (I) the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per share of Common Stock immediately prior to such time as decreased (to an amount not less than the lesser of the par value of the Common Stock as of the date hereof and such par value as of such date of determination) by an amount equal to the Fair Market Value of the Cash Consideration per share of Common Stock receivable in such Sale Cash and Securities Transaction by a Qualifying Person; provided further, however, that if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon such Sale Cash and Securities Transaction is not the same for each share of Common Stock held by a Qualifying Person, then, for the purposes of this Section 5.1(h)(y)(i)(C), the kind and amount of securities, cash and other property receivable upon such Sale Cash and Securities Transaction for each share of Common Stock held by a Qualifying Person shall be deemed to be the pro rata kind and amount per share of Common Stock (determined on the basis of all outstanding shares of Common Stock held by Qualifying Persons) actually received by all Qualifying Persons;

21

(ii)    except as otherwise specified in Section 5.1(h)(y)(i), the rights and obligations of the Company (or, in the event of a Non-Surviving Transaction, such other Person) and the Holders in respect of Substituted Property (in the case of Section 5.1(h)(y)(i)(A)) or Substituted Securities (in the case of Section 5.1(h)(y)(i)(B) or (C)) shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Company and Holders in respect of Common Stock hereunder as set forth in Section 3.1 hereof; and

(iii)    such written instrument under clause (y)(i) above shall provide for adjustments which, for events subsequent to the effective date of such written instrument, shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 5.  The above provisions of this Section 5.1(h) shall similarly apply to successive Transactions.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, (i) in no event shall a Holder be entitled to any Fair Market Value on account of the Warrants (using the Black-Scholes Value or otherwise) in any Sale Cash Only Transaction (other than the amount of cash specified in Section 5.1(h)(x)(ii)(1)) if the effective time of the consummation of a Sale Cash Only Transaction is prior to the eighteen (18) month anniversary of the Original Issue Date but after the effective time of any Sale Securities Only Transaction or Sale Cash and Securities Transaction that occurs after the Original Issue Date and (ii) in no event shall a Holder be entitled to any Fair Market Value on account of the Warrants (using the Black-Scholes Value or otherwise) in any Sale Cash and Securities Transaction, Sale Securities Only Transaction, Redomestication Transaction or Non-Sale Transaction (other than the amount of Substituted Property or Substituted Securities, as applicable, specified in Section 5.1(h)(y)(i)(A), (B) or (C), as applicable).

(i)    Compliance with Governmental Requirements.  Before taking any action that would cause an adjustment reducing the Exercise Price below the then par value of any of the shares of Common Stock into which the Warrants are exercisable, the Company will take any corporate action that may be necessary in order that the Company may validly and legally issue fully paid and non-assessable shares of such Common Stock at such adjusted Exercise Price.

(j)    Optional Tax Adjustment.  The Company may at its option, at any time during the term of the Warrants, increase the number of shares of Common Stock into which each Warrant is exercisable, or decrease the Exercise Price, in addition to those changes required by Section 5.1(a), Section 5.1(b), Section 5.1(c), Section 5.1(d) or Section 5.1(e) as deemed advisable by the Board of Directors of the Company, in order that any event treated for Federal income tax purposes as a dividend of stock or stock rights shall not be taxable to the recipients.

(k)    Warrants Deemed Exercisable.  For purposes solely of this Section 5, the number of shares of Common Stock which the holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time shall be determined assuming such Warrant was exercisable in full at such time.

22

(l)      Notice of Adjustment.  Upon the occurrence of each adjustment of the Exercise Price or the number of shares of Common Stock into which a Warrant is exercisable pursuant to this Section 5.1, the Company at its expense shall promptly:

(i)      compute such adjustment in accordance with the terms hereof;

(ii)      after such adjustment becomes effective, deliver to all Holders, in accordance with Section 11.1(b) and Section 11.2 (including by means of a current report on Form 8-K), a notice setting forth such adjustment and showing in detail the facts upon which such adjustment (including the kind and amount of securities, cash or other property for which the Warrants shall be exercisable and the Exercise Price) is based; and

(iii)      deliver to the Warrant Agent a certificate of the Treasurer of the Company setting forth the Exercise Price and the number of shares of Common Stock into which each Warrant is exercisable after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Current Market Price of the Common Stock or the Fair Market Value of any evidences of indebtedness, shares of capital stock, securities, cash or other assets or consideration used in the computation was determined). As provided in Section 10.1, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same from time to time to any Holder desiring an inspection thereof during reasonable business hours.

(m)      Statement on Warrant Certificates.  Irrespective of any adjustment in the Exercise Price or amount or kind of shares into which the Warrants are exercisable, Warrant Certificates theretofore or thereafter issued may continue to express the same Exercise Price initially applicable or amount or kind of shares initially issuable upon exercise of the Warrants evidenced thereby pursuant to this Agreement.

5.2      Fractional Interest.  The Company shall not be required upon the exercise of any Warrant to issue any fractional shares, but may, in lieu of issuing any fractional shares of Common Stock make an adjustment therefore in cash on the basis of the Current Market Price per share of Common Stock on the date of such exercise.  If Warrant Certificates evidencing more than one Warrant shall be presented for exercise at the same time by the same Holder, the number of full shares of Common Stock which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of the Warrant Certificates, expressly waive their right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

5.3      No Other Adjustments.  Except in accordance with Section 5.1, the applicable Exercise Price and the number of shares of Common Stock obtainable upon exercise of any Warrant will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing, including, without limitation:

23

(i)      upon the issuance of any other securities by the Company on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of shares of Common Stock upon the exercise of any such securities;

(ii)      upon the issuance of any shares of Common Stock or other securities or any payments pursuant to the Management Incentive Plan (as defined in the Plan) or any other equity incentive plan of the Company;

(iii)      upon the issuance of any shares of Common Stock pursuant to the exercise of the Warrants; or

(iv)      upon the issuance of any shares of Common Stock or other securities of the Company in connection with a business acquisition transaction.

**6.      Loss or Mutilation**.

If (a) any mutilated Warrant Certificate is surrendered to the Warrant Agent or (b) both (i) there shall be delivered to the Company and the Warrant Agent (A) a claim by a Holder as to the destruction, loss or wrongful taking of any Warrant Certificate of such Holder and a request thereby for a new replacement Warrant Certificate, and (B) such indemnity bond as may be required by them to save each of them and any agent of either of them harmless and (ii) such other reasonable requirements as may be imposed by the Company and the Warrant Agent as permitted by Section 8-405 of the Uniform Commercial Code have been satisfied, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a "protected purchaser" within the meaning of Section 8-405 of the Uniform Commercial Code, the Company shall execute and upon its written request the Warrant Agent shall countersign and deliver to the registered Holder of the lost, wrongfully taken, destroyed or mutilated Warrant Certificate, in exchange therefore or in lieu thereof, a new Warrant Certificate of the same tenor and for a like aggregate number of Warrants.  At the written request of such registered Holder, the new Warrant Certificate so issued shall be retained by the Warrant Agent as having been surrendered for exercise, in lieu of delivery thereof to such Holder, and shall be deemed for purposes of Section 3.2 to have been surrendered for exercise on the date the conditions specified in clauses (a) or (b) of the preceding sentence were first satisfied.

Upon the issuance of any new Warrant Certificate under this Section 6, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other expenses (including the fees and expenses of the Warrant Agent and of counsel to the Company) in connection therewith.

Every new Warrant Certificate executed and delivered pursuant to this Section 6 in lieu of any lost, wrongfully taken or destroyed Warrant Certificate shall constitute an additional contractual obligation of the Company, whether or not the allegedly lost, wrongfully taken or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.

The provisions of this <u>Section 6</u> are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of mutilated, lost, wrongfully taken, or destroyed Warrant Certificates.

**7.      Reservation and Authorization of Common Stock**.

The Company covenants that, for the duration of the Exercise Period, the Company will at all times reserve and keep available, from its authorized and unissued Common Stock solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of shares of Common Stock and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all outstanding Warrants for cash.  The Company further covenants that it shall, from time to time, take all steps necessary to increase the authorized number of shares of its Common Stock if at any time the authorized number of shares of Common Stock remaining unissued would otherwise be insufficient to allow delivery of all the shares of Common Stock then deliverable upon the exercise in full of all outstanding Warrants.  The Company covenants that all shares of Common Stock issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer and will be free from all taxes, liens and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously or otherwise specified herein). The Company shall take all such actions as may be necessary to ensure that all such shares of Common Stock may be so issued without violation of any applicable law or governmental regulation or any requirements of any U.S. national securities exchange upon which shares of Common Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).  The Company covenants that all shares of Common Stock will, at all times that Warrants are exercisable, be duly approved for listing subject to official notice of issuance on each securities exchange, if any, on which the Common Stock is then listed. The Company covenants that the stock certificates, if any, issued to evidence any shares of Common Stock issued upon exercise of Warrants will comply with the Delaware General Corporation Law and any other applicable law.

The Company hereby authorizes and directs its current and future transfer agents for the Common Stock at all times to reserve stock certificates for such number of authorized shares, to the extent as, and if, required.  The Warrant Agent is hereby authorized to requisition from time to time from any such transfer agents stock certificates required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Agreement, and the Company hereby authorizes and directs such transfer agents to comply with all such requests of the Warrant Agent. The Company will supply such transfer agents with duly executed stock certificates for such purposes, to the extent as, and if, required.

**8.      Warrant Transfer Books**.

The Warrant Agent will maintain an office (the "*Corporate Agency Office*") in the United States of America, where Warrant Certificates may be surrendered for registration of transfer or exchange and where Warrant Certificates may be surrendered for exercise of Warrants evidenced thereby, which office is [●] on the Original Issue Date.  The Warrant Agent will give prompt written notice to all Holders of Warrant Certificates of any change in the location of such office.

25

The Warrant Certificates evidencing the Warrants shall be issued in registered form only. The Company shall cause to be kept at the office of the Warrant Agent designated for such purpose a warrant register (the "***Warrant Register***") in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates as herein provided.

Upon surrender for registration of transfer of any Warrant Certificate at the Corporate Agency Office, the Company shall execute, and the Warrant Agent shall countersign and deliver, in the name of the designated transferee or transferees, one or more new Warrant Certificates evidencing a like aggregate number of Warrants.

At the option of the Holder, Warrant Certificates may be exchanged at the office of the Warrant Agent upon payment of the charges hereinafter provided for other Warrant Certificates evidencing a like aggregate number of Warrants. Whenever any Warrant Certificates are so surrendered for exchange, the Company shall execute, and the Warrant Agent shall countersign and deliver, the Warrant Certificates of the same tenor and evidencing the same number of Warrants as evidenced by the Warrant Certificates surrendered by the Holder making the exchange.

All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such registration of transfer or exchange.

Every Warrant Certificate surrendered for registration of transfer or exchange shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Company and the Warrant Agent, duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made for any registration of transfer or exchange of Warrant Certificates; provided, however, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates.

The Warrant Agent shall, upon request of the Company from time to time, deliver to the Company such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the shares of Common Stock as the Company may request. The Warrant Agent shall also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may request, such original books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection by the Holders during normal business hours at the Corporate Agency Office. The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agency may request.

**9.      Warrant Holders**.

9.1      <u>No Voting or Dividend Rights</u>.

(a)      No Holder of a Warrant Certificate evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Stock of the Company, including, without limitation, the right to vote, to receive dividends and other distributions as a holder of Common Stock or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Stock.

(b)      The consent of any Holder of a Warrant Certificate shall not be required with respect to any action or proceeding of the Company.

(c)      Except as provided in <u>Section 4</u>, no Holder of a Warrant Certificate, by reason of the ownership or possession of a Warrant or the Warrant Certificate representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant.

(d)      No Holder of a Warrant Certificate shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrant Certificate held by such Holder.

9.2      <u>Rights of Action</u>.  All rights of action against the Company in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrant Certificates, and any Holder of any Warrant Certificate, without the consent of the Warrant Agent or the Holder of any other Warrant Certificate, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

9.3      <u>Treatment of Holders of Warrant Certificates</u>.  Every Holder, by virtue of accepting a Warrant Certificate, consents and agrees with the Company, with the Warrant Agent and with every subsequent holder of such Warrant Certificate that, prior to due presentment of such Warrant Certificate for registration of transfer, the Company and the Warrant Agent may treat the Person in whose name the Warrant Certificate is registered as the owner thereof for all purposes and as the Person entitled to exercise the rights granted under the Warrants, and neither the Company, the Warrant Agent nor any agent thereof shall be affected by any notice to the contrary.

**10.     Concerning the Warrant Agent**.

10.1     <u>Nature of Duties and Responsibilities Assumed</u>.  The Company hereby appoints the Warrant Agent to act as agent of the Company as set forth in this Agreement.  The Warrant Agent hereby accepts the appointment as agent of the Company and agrees to perform that agency upon the terms and conditions set forth in this Agreement and in the Warrant Certificates or as the Company and the Warrant Agent may hereafter agree, by all of which the Company and the Holders of Warrant Certificates, by their acceptance thereof, shall be bound; provided, however, that the terms and conditions contained in the Warrant Certificates are subject to and governed by

27

this Agreement or any other terms and conditions hereafter agreed to by the Company and the Warrant Agent.

The Warrant Agent shall not, by countersigning Warrant Certificates or by any other act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants or the Warrant Certificates (except as to its countersignature thereon), (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of stock or other securities or other property deliverable upon exercise of any Warrant or (iv) the correctness of any of the representations of the Company made in such certificates that the Warrant Agent receives.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 5 hereof with respect to the kind and amount of shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 5 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property upon the surrender of any Warrant Certificate for the purpose of exercise or upon any adjustment pursuant to Section 5 hereof or to comply with any of the covenants of the Company contained in Section 5 hereof.

The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Warrant Certificates or for any action taken, suffered or omitted by it in good faith on the belief that any Warrant Certificate or any other documents or any signatures are genuine or properly authorized, (ii) be responsible for any failure on the part of the Company to comply with any of its covenants and obligations contained in this Agreement or in the Warrant Certificates or (iii) be liable for any act or omission in connection with this Agreement except for its own gross negligence, bad faith or willful misconduct.

The Warrant Agent is hereby authorized to accept and protected in accepting instructions with respect to the performance of its duties hereunder by Company Order and to apply to any such officer named in such Company Order for instructions (which instructions will be promptly given in writing when requested), and the Warrant Agent shall not be liable for any action taken or suffered to be taken by it in good faith in accordance with the instructions in any Company Order.

The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees; provided, however, reasonable care has been exercised in the selection and in the continued employment of any such attorney, agent or employee.  The Warrant Agent shall not be under any obligation or duty to institute, appear in or defend any action, suit or legal proceeding in respect hereof, unless first indemnified to its satisfaction, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without such indemnity.  The Warrant Agent shall promptly notify the Company in writing of any

28

claim made or action, suit or proceeding instituted against it arising out of or in connection with this Agreement.

The Company shall perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable it to carry out or perform its duties under this Agreement.

The Warrant Agent shall act solely as agent of the Company hereunder and does not assume any obligation or relationship of agency or trust for or with any of the Holders or any beneficial owners of Warrants.  The Warrant Agent shall not be liable except for the failure to perform such duties as are specifically set forth herein or specifically set forth in the Warrant Certificates, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent whose duties and obligations shall be determined solely by the express provisions hereof or the express provisions of the Warrant Certificates.

10.2    Right to Consult Counsel.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by it in good faith in accordance with the opinion or advice of such counsel.

10.3    Compensation, Reimbursement and Indemnification.  The Company agrees to pay the Warrant Agent from time to time compensation for all fees and expenses relating to its services hereunder as the Company and the Warrant Agent may agree from time to time and to reimburse the Warrant Agent for reasonable expenses and disbursements, including reasonable counsel fees incurred in connection with the execution and administration of this Agreement.  The Company further agrees to indemnify the Warrant Agent for and hold it harmless against any losses, liabilities or reasonable expenses arising out of or in connection with the acceptance and administration of this Agreement, including the reasonable costs, legal fees and expenses of investigating or defending any claim of such liability, except that the Company shall have no liability hereunder to the extent that any such loss, liability or expense results from the Warrant Agent's own gross negligence, bad faith or willful misconduct.

10.4    Warrant Agent May Hold Company Securities.  The Warrant Agent, any Countersigning Agent and any stockholder, director, officer or employee of the Warrant Agent or any Countersigning Agent may buy, sell or deal in any of the warrants or other securities of the Company or its Affiliates, become pecuniarily interested in transactions in which the Company or its Affiliates may be interested, contract with or lend money to the Company or its Affiliates or otherwise act as fully and freely as though it were not the Warrant Agent or the Countersigning Agent, respectively, under this Agreement.  Nothing herein shall preclude the Warrant Agent or any Countersigning Agent from acting in any other capacity for the Company or for any other legal entity.

10.5    Resignation and Removal; Appointment of Successor.

(a)    The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross

29

negligence or willful misconduct) after giving 30 days' prior written notice to the Company. The Company may remove the Warrant Agent upon 30 days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid. The Warrant Agent shall, at the expense of the Company, cause notice to be given in accordance with Section 11.1(b) to each Holder of a Warrant Certificate of said notice of resignation or notice of removal, as the case may be. Upon such resignation or removal, the Company shall appoint in writing a new Warrant Agent. If the Company shall fail to make such appointment within a period of 30 calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant Certificate may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent. Any new Warrant Agent, whether appointed by the Company or by such a court, shall be a corporation doing business under the laws of the United States or any state thereof in good standing, authorized under such laws to act as Warrant Agent, and having a combined capital and surplus of not less than $25,000,000. The combined capital and surplus of any such new Warrant Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Warrant Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After acceptance in writing of such appointment by the new Warrant Agent, it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. Not later than the effective date of any such appointment, the Company shall file notice thereof with the resigning or removed Warrant Agent. Failure to give any notice provided for in this Section 10.5(a), however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

(b)     Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any corporation resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act; provided, that, such corporation would be eligible for appointment as successor to the Warrant Agent under the provisions of Section 10.5(a). Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be given in accordance with Section 11.1(b) to each Holder of a Warrant Certificate at such Holder's last address as shown on the Warrant Register.

10.6    Appointment of Countersigning Agent.

(a)     The Warrant Agent may appoint a Countersigning Agent or Agents which shall be authorized to act on behalf of the Warrant Agent to countersign Warrant Certificates issued upon original issue and upon exchange, registration of transfer or pursuant to Section 6, and Warrant Certificates so countersigned shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder. Wherever reference is made in this Agreement to the countersignature and delivery of Warrant Certificates by the Warrant Agent or to Warrant Certificates countersigned by the Warrant

30

Agent, such reference shall be deemed to include countersignature and delivery on behalf of the Warrant Agent by a Countersigning Agent and Warrant Certificates countersigned by a Countersigning Agent. Each Countersigning Agent shall be acceptable to the Company and shall at the time of appointment be a corporation doing business under the laws of the United States of America or any State thereof in good standing, authorized under such laws to act as Countersigning Agent, and having a combined capital and surplus of not less than $25,000,000. The combined capital and surplus of any such new Countersigning Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Countersigning Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority.

(b)　Any Person into which a Countersigning Agent may be merged or any corporation resulting from any consolidation to which such Countersigning Agent shall be a party, shall be a successor Countersigning Agent without any further act; provided, that, such corporation would be eligible for appointment as a new Countersigning Agent under the provisions of Section 10.6(a), without the execution or filing of any paper or any further act on the part of the Warrant Agent or the Countersigning Agent. Any such successor Countersigning Agent shall promptly cause notice of its succession as Countersigning Agent to be given in accordance with Section 11.1(b) to each Holder of a Warrant Certificate at such Holder's last address as shown on the Warrant Register.

(c)　A Countersigning Agent may resign at any time by giving 30 days' prior written notice thereof to the Warrant Agent and to the Company. The Warrant Agent may at any time terminate the agency of a Countersigning Agent by giving 30 days' prior written notice thereof to such Countersigning Agent and to the Company.

(d)　The Warrant Agent agrees to pay to each Countersigning Agent from time to time reasonable compensation for its services under this Section 10.6 and the Warrant Agent shall be entitled to be reimbursed for such payments, subject to the provisions of Section 10.3.

(e)　Any Countersigning Agent shall have the same rights and immunities as those of the Warrant Agent set forth in Section 10.1.

**11.　Notices**.

11.1　Notices Generally.

(a)　Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Company or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing (including telecopy communication) and telecopied or delivered by hand (including by courier service) as follows:

if to the Company, to:

Parker Drilling Company
5 Greenway Plaza, Suite 100

31

Houston, Texas 77046
Attention: John Edward Menger and
Jennifer Simons
Facsimile: [●]

with a copy which shall not constitute notice to:

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attention: Julian J. Seiguer, P.C.
Facsimile: (713) 836-3601

if to the Warrant Agent, to:

[●]
[●]
[●]
Attention: [●]
Facsimile: [●]

with a copy which shall not constitute notice to:

[●]
[●]
[●]
Attention: [●]
Facsimile: [●]

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this Section 11.1(a).

All such communications shall, when so telecopied or delivered by hand, be effective when telecopied with confirmation of receipt or received by the addressee, respectively.

Any Person that telecopies any communication hereunder to any Person shall, on the same date as such telecopy is transmitted, also send, by first class mail, postage prepaid and addressed to such Person as specified above, an original copy of the communication so transmitted.

(b)     Where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  Where

this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made by a method approved by the Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressees shall constitute a sufficient notification for every purpose hereunder.

Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

11.2    Required Notices to Holders.  In the event the Company shall:

(a)    take any action that would result (or, but for the third paragraph of Section 5.1(d) or the third paragraph of Section 5.1(e), would have resulted) in (x) an adjustment to the Exercise Price and/or the number of shares of Common Stock issuable upon exercise of a Warrant pursuant to Section 5.1 or (y) any dividend or distribution to holders of the Common Stock that does not constitute a Special Dividend or a Spin-Off Dividend;

(b)    consummate any Winding Up; or

(c)    consummate any Sale Transaction (each of (a), (b) or (c), an "*Action*");

then, in each such case, unless the Company has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such Action, the Company shall cause to be delivered to the Warrant Agent and shall give to each Holder of a Warrant Certificate, in accordance with Section 11.1(b) hereof, a written notice of such Action, including, in the case of an action pursuant to Section 11.2(a), the information required under Section 5.1(l)(ii).  Such notice shall be given promptly after (or, in the case of an Action specified in clause (a)(y) or the parenthetical in clause (a), at least five (5) Business Days prior to) the earlier of (i) the effective date of such Action or (ii) the date for the determination of the holders of Common Stock entitled to receive any dividend or distribution or otherwise participate in such Action.

If at any time the Company shall cancel any of the Actions for which notice has been given under this Section 11.2 prior to the consummation thereof, the Company shall give each Holder prompt notice of such cancellation in accordance with Section 11.1(b), unless the Company has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses the cancellation of such Actions.

In addition, in the event the Company enters into any definitive agreement with respect to any Sale Transaction, unless the Company has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such agreement, the Company shall cause to be delivered to the Warrant Agent and shall give to each Holder of a Warrant

33

Certificate, in accordance with Section 11.1(b), a notice of the entering into such definitive agreement.

**12.     Inspection**.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant Certificate. The Warrant Agent may require any such Holder to submit its Warrant Certificate for inspection by the Warrant Agent.

**13.     Amendments**.

(a)     Subject to Section 13(c), this Agreement may be amended by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

(b)     Notwithstanding the foregoing, subject to Section 13(c), the Company and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrant Certificates, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Company in this Agreement further covenants and agreements of the Company thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Company in this Agreement; provided, however, that in either case such amendment shall not adversely affect the rights or interests of the Holders of the Warrant Certificates hereunder in any material respect.

(c)     The consent of each Holder of any Warrant Certificate evidencing any Warrants affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of shares of Common Stock receivable upon exercise of Warrants, in each case other than as provided in Section 5.1; (ii) the Expiration Date is changed to an earlier date; or (iii) modify the provisions contained in Section 5.1 in a manner adverse to the Holders of Warrant Certificates generally with respect to their Warrants.

(d)     The Warrant Agent shall join with the Company in the execution and delivery of any such amendment unless such amendment affects the Warrant Agent's own rights, duties or immunities hereunder, in which case the Warrant Agent may, but shall not be required to, join in such execution and delivery; provided, that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 13. Upon execution and delivery of any amendment pursuant to this Section 13, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

(e)     Promptly after the execution by the Company and the Warrant Agent of any such amendment, unless the Company has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses such adjustment, the Company shall give

34

notice to the Holders of Warrant Certificates, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 11.1(b). Any failure of the Company to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

14.     **Waivers**.

The Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Required Warrant Holders as required pursuant to Section 13 and, if Section 13(c) applies, the consent of the Holders of any Warrant Certificates evidencing any Warrants affected thereby.

15.     **Successor to Company**.

So long as Warrants remain outstanding, the Company will not enter into any Non-Surviving Transaction in which Warrants would be outstanding after consummation unless the acquirer (a "*Successor Company*") shall expressly assume by a supplemental agreement, executed and delivered to the Warrant Agent, in form reasonably satisfactory to the Warrant Agent, the due and punctual performance of every covenant of this Agreement on the part of the Company to be performed and observed and shall have provided for exercise rights in accordance with Section 5.1(h). Upon the consummation of such Non-Surviving Transaction, the acquirer shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Agreement with the same effect as if such acquirer had been named as the Company herein.

16.     **Headings**.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

17.     **Counterparts**.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument.

18.     **Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided, that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or governmental body not to be enforceable in accordance with its terms, the parties agree that the court or governmental body making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

19.     **No Redemption**.

35

The Warrants shall not be subject to redemption by the Company or any other Person; provided, that, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.

**20.     Persons Benefiting**.

This Agreement shall be binding upon and inure to the benefit of the Company, the Warrant Agent and the Holders from time to time.  Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Company, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders.  Each Holder, by acceptance of a Warrant Certificate, agrees to all of the terms and provisions of this Agreement applicable thereto.

**21.     Applicable Law; Venue**.

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) TO THE EXTENT SUCH RULES OR PROVISIONS WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.  EACH OF THE PARTIES TO THIS AGREEMENT CONSENTS AND AGREES THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTE ARISES IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY.  THE PARTIES HERETO CONSENT AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS.  EACH OF THE PARTIES TO THIS AGREEMENT WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (II) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE IN THE MANNER HEREIN PROVIDED.

36

**22.     Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

PARKER DRILLING COMPANY, a Delaware corporation

By: _____
      Name:
      Title:

[●], as Warrant Agent

By: _____
      Name:
      Title:

[*Signature Page to Warrant Agreement*]

EXHIBIT A

**[FACE OF WARRANT CERTIFICATE]**[2]

**PARKER DRILLING COMPANY**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON STOCK**

[FACE]

No. [___]                                                                  CUSIP No. [●]

[UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO PARKER DRILLING COMPANY (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.][3]

---

[2] To be removed in the versions of the Definitive Warrant Certificates printed in multiple copies for use by the Warrant Agent in preparing Definitive Warrants Certificates for issuance and delivery from time to time to holders.

[3] Include only on Global Warrant Certificate.

A-1

## PARKER DRILLING COMPANY

No. [__]                                              [__,__,___] Warrants
                                                       CUSIP No. [●]

THIS CERTIFIES THAT, for value received, [_____], or registered assigns, is the registered owner of the number of Warrants to purchase Common Stock of Parker Drilling Company, a Delaware corporation (the "***Company***", which term includes any successor thereto under the Warrant Agreement, dated as of [●], 2019 (the "***Warrant Agreement***"), between the Company and [●], as warrant agent (the "***Warrant Agent***", which term includes any successor thereto permitted under the Warrant Agreement)) specified above [or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto][4], and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to purchase from the Company one share of Common Stock of the Company for each Warrant evidenced hereby, at the purchase price of $[●][5] per share (as adjusted from time to time, the "***Exercise Price***"), payable in full at the time of purchase, the number of shares of Common Stock into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Section 5 of the Warrant Agreement.

All shares of Common Stock issuable by the Company upon the exercise of Warrants shall, upon such issuance, be duly and validly issued and fully paid and nonassessable. The Company shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of shares of Common Stock on exercise of Warrants. The Company shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of shares of Common Stock in book-entry form or any certificates for shares of Common Stock or payment of cash to any Person other than the Holder of the Warrant Certificate evidencing the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any shares of Common Stock in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Company or (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by, in the case of a Global Warrant Certificate, delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and delivering such Warrants by

---

[4] Include only on Global Warrant Certificate.

[5] NTD: To be set as set forth in the term sheet.

book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with Applicable Procedures in respect of the exercise of such Warrants or, in the case of a Definitive Warrant Certificate, delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and surrendering this Warrant Certificate to the Warrant Agent at its office maintained for such purpose (the "*Corporate Agency Office*"), together with payment in full of the Exercise Price as then in effect for each share of Common Stock receivable upon exercise of each Warrant being submitted for exercise.  Any such payment of the Exercise Price is to be by wire transfer in immediately available funds to such account of the Company at such banking institution as the Company shall have designated from time to time for such purpose.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Warrant Certificate has been countersigned by the Warrant Agent by manual signature of an authorized officer on behalf of the Warrant Agent, this Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Company has caused this certificate to be duly executed under its corporate seal.

Dated:  [_____ __], 20[__]

Parker Drilling Company

[SEAL]                                                    By:  _____
                                                                        Vice President and Treasurer

ATTEST:

Countersigned:

[●], as Warrant Agent                              [●], as Warrant Agent

OR

By:  _____             By:  _____
            Authorized Agent                                      as Countersigning Agent

By:  _____
            Authorized Officer

A-3

**Reverse of Warrant Certificate**

**PARKER DRILLING COMPANY**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON STOCK**

The Warrants evidenced hereby are one of a duly authorized issue of Warrants of the Company designated as its Warrants to Purchase Common Stock ("*Warrants*"), limited in aggregate number to [●] issued under and in accordance with the Warrant Agreement, to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Warrant Agent, the Holders of Warrant Certificates and the owners of the Warrants evidenced thereby and of the terms upon which the Warrant Certificates are, and are to be, countersigned and delivered. A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Warrant Agreement provides that, in addition to certain adjustments to the number of shares of Common Stock into which a Warrant is exercisable and the Exercise Price required to be made in certain circumstances, (x) in the case of any Transaction that is a Redomestication Transaction, a Non-Sale Transaction, a Sale Cash and Securities Transaction or a Sale Securities Only Transaction, the Company shall (or, in the case of any Non-Surviving Transaction, the Company shall cause the other Person involved in such Transaction to) execute and deliver to the Warrant Agent a written instrument providing that (i) the Warrants evidenced hereby, if then outstanding, will be exercisable thereafter, during the period the Warrants evidenced hereby shall be exercisable as specified herein, only into the Substituted Securities (in the case of any Sale Securities Only Transaction or Sale Cash and Securities Transaction) or Substituted Property (in the case of any Transaction (other than a Sale Transaction)), subject to certain limitations if the Warrants have no value, that would have been receivable upon such Transaction by a Qualifying Person holding the number of shares of Common Stock that would have been issued upon exercise of such Warrant if such Warrant had been exercised in full immediately prior to such Transaction (upon certain assumptions specified in the Warrant Agreement); (ii) in the case of any Sale Cash and Securities Transaction, the aggregate Exercise Price for any Warrant will be reduced in respect of the Cash Consideration receivable upon such Transaction by a Qualifying Person holding such number of shares of Common Stock; and (iii) the rights and obligations of the Company (or, in the case of any Non-Surviving Transaction, the other Person involved in such Transaction) and the holders in respect of Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Company and Holders in respect of Common Stock, and (y) in the case of any Sale Cash Only Transaction, the Company shall make certain specified payments of cash and the Warrants will expire or become immediately exercisable, in each case as more fully specified in the Warrant Agreement.

Except as provided in the Warrant Agreement, all outstanding Warrants shall expire, terminate and become void and all rights of the Holders of Warrant Certificates evidencing such

A-4

Warrants shall automatically terminate and cease to exist, as of 5:00 p.m., New York time, on the Expiration Date.  The "***Expiration Date***" shall mean the earlier to occur of (x) [●], 2024 (the fifth and a half (5 1/2) anniversary of the Original Issue Date) or, if not a Business Day, then the next Business Day thereafter; (y) the date of consummation of any Sale Cash Only Transaction; and (z) a Winding Up.

In the event of the exercise of less than all of the Warrants evidenced hereby, a new Warrant Certificate of the same tenor and for the number of Warrants which are not exercised shall be issued by the Company in the name or upon the written order of the Holder of this Warrant Certificate upon the cancellation hereof.

The Warrant Certificates are issuable only in registered form in denominations of whole numbers of Warrants.  Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Warrant Certificate may be exchanged for Warrant Certificates in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; provided, however, that such other Warrant Certificates issued upon exchange or registration of transfer shall evidence the same aggregate number of Warrants as this Warrant Certificate.  The Company shall cause to be kept at the office of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates.  No service charge shall be made for any registration of transfer or exchange of Warrant Certificates; provided, however, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates.

Prior to due presentment of this Warrant Certificate for registration of transfer, the Company, the Warrant Agent and any agent of the Company or the Warrant Agent may treat the Person in whose name this Warrant Certificate is registered as the owner hereof for all purposes, and neither the Company, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Holders of Warrant Certificates under the Warrant Agreement at any time by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

Until the exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Warrant Certificate evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Stock of the Company, including, without limitation, the right to vote, to receive dividends and other distributions or to receive notice of, or attend meetings of, stockholders or any other proceedings of the Company; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Company; (iii) except as provided with respect to a Winding Up of the Company, no such Holder, by reason of the ownership or possession of a Warrant or the Warrant Certificate representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions (except as specifically

A-5

provided in the Warrant Agreement), paid, allotted or distributed or distributable to the stockholders of the Company prior to or for which the relevant record date preceded the date of the exercise of such Warrant; and (iv) no such Holder shall have any right not expressly conferred by the Warrant or Warrant Certificate held by such Holder.

This Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York. Any action to enforce the this Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City.

All terms used in this Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement. In the event of any conflict between this Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

A-6

Exercise Form

[Warrant Agent]
Address
Attention: Transfer Department

Re: Parker Drilling Company Warrant Agreement, dated as of [●]

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement, the undersigned registered Holder of this Warrant Certificate hereby irrevocably elects to exercise _____ Warrants evidenced by this Warrant Certificate and represents that for each of the Warrants evidenced hereby being exercised such Holder has tendered the Exercise Price in the aggregate amount of $_____ by wire transfer in immediately available funds to such account of the Company at such banking institution as the Company shall have designated from time to time for such purpose.[6]

The undersigned requests that the shares of Common Stock issuable upon exercise be in fully registered form in such denominations and registered in such names and delivered, together with any other property receivable upon exercise, in such manner as is specified in the instructions set forth below.

If the number of Warrants exercised is less than all of the Warrants evidenced hereby, (i) if this Warrant Certificate is a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised or (ii) if this Warrant Certificate is a Definitive Warrant Certificate, the undersigned requests that a new Definitive Warrant Certificate representing the remaining Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

---

[6] If electing Holder pursuant to Section 3.7, Exercise Form will also state beneficial ownership of Common Stock by the Holder, its Affiliates and its Group Members.

A-7

Dated: _____

(Insert Social Security or Other
Identifying Number of Holder)

Name: _____

(Please Print)

Address: _____

_____

_____
Signature
(Signature must conform in all respects to name
of Holder as specified on the face of this Warrant
Certificate and must bear a signature guarantee
by a bank, trust company or member firm of a
U.S. national securities exchange.)

Signature Guaranteed:

     Instructions (i) as to denominations and names of Common Stock issuable upon exercise and as to delivery of such securities and any other property issuable upon exercise and (ii) if applicable, as to Definitive Warrant Certificates evidencing unexercised Warrants:

## Assignment

(Form of Assignment To Be Executed If Holder Desires To Transfer Warrant Certificate)

     FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto

Please insert social security or
other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Warrant Certificate and does hereby irrevocably constitute and appoint _____ Attorney, to transfer said Warrant Certificate on the books of the within-named Company with full power of substitution in the premises.

Dated: _____

Signature _____

(Signature must conform in all respects to name
of Holder as specified on the face of this Warrant
Certificate and must bear a signature guarantee by
a bank, trust company or member firm of a U.S.
national securities exchange.)

A-8

**[SCHEDULE A**

**SCHEDULE OF DECREASES IN WARRANTS**

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory][7] |
|------|------|------|------|

---

[7] Include only on Global Warrant Certificate.

A-9

EXHIBIT B

B-1

## Exhibit C

## Registration Rights Agreement

Certain documents, or portions thereof, contained in this **Exhibit C** and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors and the Consenting Stakeholders.  The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

*Draft 2/12/19*

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (including all exhibits hereto and as may be amended, supplemented or amended and restated from time to time in accordance with the terms hereof, this "***Agreement***") is made and entered into as of [●], 2019 by and among Parker Drilling Company, a Delaware corporation (the "***Company***"), and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto.

WHEREAS, on December 12, 2018, Parker Drilling Company and certain of its subsidiaries (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***");

WHEREAS, the Chapter 11 Plan of Reorganization of the Debtors, Case No. 18-36958 (including all exhibits, schedules and supplements thereto and as amended from time to time, the "***Plan***") was confirmed by the Bankruptcy Court on [●], 2019;

WHEREAS, the Plan provides that the Company will enter into a registration rights agreement with certain recipients of the shares of Common Stock and Warrant Shares (each as defined below); and

WHEREAS, the Company and the Holders (as defined below) are entering into this Agreement in furtherance of the aforesaid provisions of the Plan.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each of the Holders agree as follows:

1.	Definitions. Capitalized terms used and not otherwise defined herein that are defined in the Plan have the meanings given such terms in the Plan. As used in this Agreement, the following terms shall have the following meanings:

"***Affiliate***" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") as used in this definition means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of management, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning set forth in the Preamble.

"***Automatic Shelf Registration Statement***" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act, as such definition may be amended from time to time.

"***Bankruptcy Court***" has the meaning set forth in the Preamble.

"***beneficially own***" (and related terms such as "beneficial ownership" and "beneficial owner") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"***Board***" means the Board of Directors of the Company or any authorized committee thereof.

"***Bought Deal***" has the meaning set forth in Section 8(a).

"***Business Day***" means any day, other than a Saturday or Sunday or a day on which the commercial banks in New York City are authorized or required by law to be closed.

"***Commission***" means the Securities and Exchange Commission.

"***Common Stock***" means the common stock of the Company, par value $0.01 per share, and any securities into which such shares of common stock may hereinafter be reclassified.

"***Company***" has the meaning set forth in the Preamble and includes the Company's successors by merger, acquisition, reorganization or otherwise.

"***Counsel to the Holders***" means (i) with respect to any Demand Registration, the counsel selected by the Holders of a majority of the Registrable Securities initially requesting such Demand Registration and (ii) with respect to any Underwritten Offering or Piggyback Offering, the counsel selected by the Majority Holders.

"***Debtors***" has the meaning set forth in the Preamble.

"***Demand Registration***" has the meaning set forth in Section 5(a).

"***Demand Registration Request***" has the meaning set forth in Section 5(a).

"***Effective Date***" means the date that a Registration Statement filed pursuant to this Agreement is first declared effective by the Commission.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"***FINRA***" has the meaning set forth in Section 10.

"***Form S-1***" means Form S-1 under the Securities Act, or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

"***Form S-3***" means Form S-3 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-3.

"***Form S-4***" means Form S-4 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-4.

"***Form S-8***" means Form S-8 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-8.

"***Grace Period***" has the meaning set forth in <u>Section 7(a)(ii)</u>.

"***Holder***" or "***Holders***" means the parties signatory to this Agreement, other than the Company, and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant to this Agreement. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"***Indemnified Party***" has the meaning set forth in <u>Section 12(c)</u>.

"***Indemnifying Party***" has the meaning set forth in <u>Section 12(c)</u>.

"***Initial Shelf Expiration Date***" has the meaning set forth in <u>Section 2(f)</u>.

"***Initial Shelf Registration Statement***" has the meaning set forth in <u>Section 2(a)</u>.

"***Lockup Period***" has the meaning set forth in <u>Section 11(a)</u>.

"***Losses***" has the meaning set forth in <u>Section 12(a)</u>.

"***Majority Holders***" means, with respect to any Underwritten Offering, the Holders of a majority of the Registrable Securities to be included in such Underwritten Offering held by all Holders that have made the request requiring the Company to conduct such Underwritten Offering (but not including any Holders that have exercised "piggyback" rights hereunder to be included in such Underwritten Offering).

"***Opt-Out Notice***" has the meaning set forth in <u>Section 8(e)</u>.

"***Person***" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"***Piggyback Notice***" has the meaning set forth in <u>Section 8(a)</u>.

"***Piggyback Offering***" has the meaning set forth in <u>Section 8(a)</u>.

"***Plan***" has the meaning set forth in the Preamble.

"***Plan Effective Date***" shall mean the date on which the Plan becomes effective.

"***Proceeding***" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"***Prospectus***" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A

promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means, collectively, (a) as of the Plan Effective Date, all shares of Common Stock issued to any Holder or to any Affiliate or Related Fund of any Holder, either directly or pursuant to a joinder or assignment, and any additional shares of Common Stock acquired by any Holder or any Affiliate or Related Fund of any Holder in open market or other purchases and issued or issuable to any Holder or any Affiliate or Related Fund of any Holder upon the conversion, exchange or exercise of options, warrants (including the Warrant Shares and any other securities issued or issuable with respect to or in exchange for the Warrant Shares) and other securities convertible, exchangeable or exercisable (at any time or upon the occurrence of any event or contingency without regard to any vesting or other conditions to which such securities may be subject) for Common Stock, after the Plan Effective Date and (b) any additional shares of Common Stock paid, issued or distributed in respect of any such shares described under clause (a) by way of a stock dividend, stock split or distribution, or in connection with a combination of shares, and any security into which such Common Stock shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution or otherwise; *provided*, *however*, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (i) the date on which such securities are sold or disposed of pursuant to an effective Registration Statement; (ii) the date on which such securities are disposed of pursuant to Rule 144 under circumstances in which all of the applicable conditions of Rule 144 (then in effect) are met; (iii) the date on which such Registrable Securities cease to be outstanding; and (iv) the date on which such securities cease to be held by a Holder holding 2% or more of the then outstanding Common Stock.

"*Registration Statement*" means any one or more registration statements of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement (including without limitation any Shelf Registration Statement), amendments and supplements to such Registration Statements, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such Registration Statements.

"*Related Fund*" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised, sub-advised, managed or co-managed by such Person, by any Affiliate of such Person, or, if applicable, such Person's investment manager.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Rule 158*" means Rule 158 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

4

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Stockholder Questionnaire*" means a questionnaire reasonably adopted by the Company from time to time.

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission in accordance with the Securities Act for the offer and sale of Registrable Securities by Holders on a continuous or delayed basis pursuant to Rule 415.

"*Trading Market*" means whichever of the New York Stock Exchange, Nasdaq, OTC Bulletin Board, or OTC Markets Group marketplace (including, for the avoidance of doubt, OTCQX Premier, OTCQX and the OTCQB) on which the Common Stock is listed or quoted for trading on the date in question.

"*Transfer*" has the meaning set forth in Section 15.

"*Underwritten Offering*" means an offering of Registrable Securities under a Registration Statement in which the Registrable Securities are sold to an underwriter for reoffering to the public.

"*Underwritten Takedown*" has the meaning set forth in Section 2(h).

"**Warrant Shares**" means collectively the shares of Common Stock issuable upon exercise of the Warrants in accordance with their terms, as such number may be adjusted pursuant to the provisions thereof, and any other Securities to which a Holder may become entitled pursuant to the terms of the Warrants.

"**Warrants**" means those certain warrants issued as of the Plan Effective Date under that certain warrant agreement, dated as of the date hereof, by and between the Company and [●], as warrant agent.

2.      Initial Shelf Registration.

(a)      The Company shall prepare a Shelf Registration Statement (as may be amended from time to time, the "*Initial Shelf Registration Statement*"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall have requested inclusion therein of some or all of their Registrable Securities by checking the appropriate box on the signature page of such Holder hereto or by written notice to the Company no later than five (5) days after the Plan Effective Date, *provided* that at the time of delivery of such written notice the Holder delivers a completed Selling Stockholder Questionnaire. The Company shall (i) file the

5

Initial Shelf Registration Statement as soon as reasonably practicable after the Plan Effective Date (but in no event later than fifteen (15) days after the Plan Effective Date unless (x) extended by the Board for a period of no more than an additional fifteen (15) days or (y) further extended beyond the period in clause (x) upon the consent of the Holders beneficially owning a majority of the Registrable Securities) and (ii) use its reasonable best efforts to have the Initial Shelf Registration Statement declared effective by the Commission as soon as reasonably practicable after the Company files the Initial Shelf Registration Statement (but in no event later than thirty (30) days after it shall have filed such Initial Shelf Registration Statement, unless it is not practicable to do so due to circumstances directly relating to outstanding comments of the Commission relating to such Shelf Registration Statement; provided that the Company is using its reasonable best efforts to address any such comments as promptly as possible).

(b)        The Company shall include in the Initial Shelf Registration Statement all Registrable Securities whose inclusion has been timely requested as aforesaid; *provided*, *however*, that the Company shall not be required to include an amount of Registrable Securities in excess of the amount as may be permitted to be included in such Registration Statement under the rules and regulations of the Commission and the applicable interpretations thereof by the Staff of the Commission (with any Registrable Securities not permitted to be included in the Initial Shelf Registration Statement pursuant to this Section 2(b) to be allocated among the Holders on a pro rata basis, unless the Commission otherwise requires or the Holders otherwise agree).

(c)        Subject to Section 2(b), upon the request of any Holder (i) whose Registrable Securities are not included in the Initial Shelf Registration Statement at the time of such request or (ii) whose Registrable Securities included in the Initial Shelf Registration Statement constitute less than all of the Registrable Securities held by such Holder at the time of such request, the Company shall amend the Initial Shelf Registration Statement to include the Registrable Securities of such Holder; *provided*, *however*, that the Company shall not be required to amend the Initial Shelf Registration Statement more than once every one hundred and twenty (120) days.

(d)        Within five (5) days after receiving a request pursuant to Section 2(b), the Company shall give written notice of such request to all other Holders of Registrable Securities and shall include in such amendment all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) days after the Company's giving of such notice, *provided*, that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)        The Initial Shelf Registration Statement shall be on Form S-1; *provided*, *however*, that, upon the Company becoming eligible to register the Registrable Securities for resale by the Holders on Form S-3 (including without limitation a Form S-3 filed as an Automatic Shelf Registration Statement), the Company shall use commercially reasonable efforts to amend the Initial Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial Shelf Registration Statement as initially filed as soon as reasonably practicable thereafter.

(f)        The Company shall use reasonable best efforts to keep the Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other

6

similar order or requirement of the Commission, until the earlier of (i) the date the Company (A) is eligible to register the Registrable Securities for resale by Holders on Form S-3 and (B) has filed such Registration Statement with the Commission and which is effective and (ii) the date that all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "***Initial Shelf Expiration Date***").

(g)        If the Initial Shelf Registration Statement is on Form S-1, then for so long as any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law, any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) the Initial Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact necessary in order to make the statements therein not misleading, and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under Section 7 of this Agreement.

(h)        Upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering (each, an *"Underwritten Takedown"*), in the manner and subject to the conditions described in Section 6 of this Agreement, *provided*, that the number of shares of Common Stock included in such Underwritten Takedown shall equal at least five percent (5%) of all outstanding shares of Common Stock at such time.

3.        Subsequent Shelf Registration Statements.

(a)        After the Effective Date of the Initial Shelf Registration Statement and for so long as any Registrable Securities remain outstanding, the Company shall use its best efforts to (A) become eligible and/or to maintain its eligibility to register the Registrable Securities on Form S-3 and (B) meet the requirements of General Instruction VII of Form S-1.

(b)        After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, if there is not an effective Registration Statement which includes the Registrable Securities that are currently outstanding, the Company shall (i) if the Company is eligible to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-3 and use its reasonable best efforts to cause such Registration Statement to be declared effective as promptly as practicable or (ii) if the Company is not eligible at such time to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-1 and use its reasonable best efforts to cause such Registration Statement to be declared effective as promptly as practicable and for so long as any Registrable Securities covered by such Shelf Registration Statement on Form S-1 remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law, any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (x) such Shelf Registration Statement shall not include any untrue statement of material fact or omit to state

7

any material fact necessary in order to make the statements therein not misleading, and (y) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under <u>Section 7</u> of this Agreement.

      4.     <u>Quotation</u>.

      (a)     The Company shall use its reasonable best efforts to cause all Common Stock to be listed on the New York Stock Exchange or Nasdaq as soon as possible after the Plan Effective Date; if, despite the Company's reasonable best efforts to satisfy the preceding clause, the Company is unsuccessful in obtaining a listing on the New York Stock Exchange or Nasdaq as of the Plan Effective Date, the Company shall use its reasonable best efforts to be listed on OTCQX Premier; and if, despite the Company's reasonable best efforts, the Company is unsuccessful in obtaining a listing of the Common Stock on the OTCQX Premier, the Company shall use its reasonable best efforts for the Common Stock to be listed on OTCQX; and if, despite the Company's reasonable best efforts, the Company is unsuccessful in satisfying the preceding listing requirements, the Company shall use its reasonable best efforts to have the Common Stock listed on OTCQB, and, in each case, shall thereafter use its reasonable best efforts to maintain such quotation or listing.

      5.     <u>Demand Registration</u>.

      (a)     At any time and from time to time beginning on the date the Company is eligible to use Form S-3 for the offer and sale of the Registrable Securities, any Holder or group of Holders (together with any of their respective Affiliates or Related Funds) that hold, in the aggregate, at least five percent (5%) of the outstanding Common Stock at such time, may request in writing ("***Demand Registration Request***") that the Company effect the registration of all or part of such Holder's or Holders' Registrable Securities with the Commission under and in accordance with the provisions of the Securities Act (each, a "***Demand Registration***"). The Company will file a Registration Statement covering such Holder's or Holders' Registrable Securities requested to be registered, and shall use its reasonable best efforts to cause such Registration Statement to be declared effective, as promptly as practicable after receipt of such request; *provided*, *however*, that the Company will not be required to file a Registration Statement pursuant to this <u>Section 5(a)</u>:

         (i)     unless the Registrable Securities requested to be sold by the Holders pursuant to such Registration Statement have an anticipated aggregate gross offering price (before deducing underwriting discounts and commissions) of at least $25 million;

         (ii)     if the Registrable Securities requested to be registered are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offer and sale of the Registrable Securities requested to be registered; or

         (iii)     if the number of Demand Registration Requests previously made pursuant to this <u>Section 5(a)</u> shall equal or exceed three (3) in any twelve (12)-month period; *provided*, *however*, that a Demand Registration Request shall not be considered made for purposes of this clause (iii) unless the requested Registration Statement has been declared

8

effective by the Commission for more than seventy-five percent (75%) of the full amount of Registrable Securities for which registration has been requested.

(b)      A Demand Registration Request shall specify (i) the then-current name and address of such Holder or Holders, (ii) the aggregate number of Registrable Securities requested to be registered, (iii) the total number of Registrable Securities then beneficially owned by such Holder or Holders, and (iv) the intended means of distribution.

(c)      The Company may satisfy its obligations under Section 5(a) hereof by amending (to the extent permitted by applicable law) any registration statement previously filed by the Company under the Securities Act, so that such amended registration statement will permit the disposition (in accordance with the intended methods of disposition specified as aforesaid) of all of the Registrable Securities for which a Demand Registration Request has been properly made under Section 5(b) hereof. If the Company so amends a previously filed registration statement, it will be deemed to have effected a registration for purposes of Section 5(a) hereof.

(d)      Within three (3) Business Days after receiving a Demand Registration Request, the Company shall give written notice of such request to each Holder (together with any of their respective Affiliates or Related Funds) that hold, in the aggregate, at least five percent (5%) of the outstanding Common Stock and shall, subject to the provisions of Section 6(c) in the case of an Underwritten Offering, include in such registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within five (5) days after the Company's giving of such notice, *provided*, that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)      The Company will use its reasonable best efforts to keep a Registration Statement that has become effective as contemplated by this Section 5 continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission:

(i)      in the case of a Registration Statement other than a Shelf Registration Statement on Form S-3, until all Registrable Securities registered thereunder have been sold pursuant to such Registration Statement; and

(ii)      in the case of a Shelf Registration Statement on Form S-3, until the earlier of: (x) three (3) years following the Effective Date of such Shelf Registration Statement on Form S-3; and (y) the date that all Registrable Securities covered by such Shelf Registration Statement on Form S-3 shall cease to be Registrable Securities.

(f)      The Holder or Holders making a Demand Registration Request may, at any time prior to the Effective Date of the Registration Statement relating to such registration, revoke their request for the Company to effect the registration of all or part of such Holder's or Holders' Registrable Securities by providing a written notice to the Company. If, pursuant to the preceding sentence, the entire Demand Registration Request is revoked, then, at the option of the Holder or Holders who revoke such request, either (i) such Holder or Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of

9

doubt, shall not include overhead expenses and which requested registration shall not count as one of the permitted Demand Registration Requests hereunder or (ii) the requested registration that has been revoked will be deemed to have been effected for purposes of Section 5(a).

(g) If a Registration Statement filed pursuant to this Section 5 is a Shelf Registration Statement, then upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering, in the manner and subject to the conditions described in Section 6 of this Agreement, *provided*, that the number of shares of Common Stock included in such underwritten "takedown" shall equal at least five percent (5%) of all outstanding shares of Common Stock at such time.

6. Procedures for Underwritten Offerings. The following procedures shall govern Underwritten Offerings pursuant to Section 2(h) or Section 5(g), whether in the case of an Underwritten Takedown or otherwise.

(a) The Majority Holders shall specify one or more investment banking firm(s) of national standing reasonably acceptable to the Company (which approval shall not be unreasonably conditioned, withheld or delayed) to be the managing underwriter or underwriters for any Underwritten Offering pursuant to a Demand Registration Request or an Underwritten Takedown.

(b) All Holders proposing to distribute their Registrable Securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided*, *however*, that the underwriting agreement is in customary form and reasonably acceptable to the Majority Holders and *provided*, *further*, that no Holder of Registrable Securities included in any Underwritten Offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (i) such Holder's ownership of its Registrable Securities to be sold or transferred, (ii) such Holder's power and authority to effect such transfer and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested).

(c) Notwithstanding Section 8(b), if the managing underwriter or underwriters for an Underwritten Offering pursuant to a Demand Registration or an Underwritten Takedown advises the Holders that the total amount of Registrable Securities proposed to be included in such offering is such as to materially adversely affect the price, timing or distribution of the securities being offered pursuant to such Underwritten Offering, the number of Registrable Securities to be registered on such Registration Statement will be reduced as follows: *first*, the Company shall reduce or eliminate any securities of the Company to be included by the Company; and *second*, the Company shall reduce the number of Registrable Securities to be included by Holders on a pro rata basis based on the total amount of Registrable Securities owned by the Holders requesting their Registrable Securities be included in the Underwritten Offering.

(d) The Company will not be required to undertake an Underwritten Offering pursuant to Section 2(h) or Section 5(g) if the number of Underwritten Offerings previously made pursuant to Section 2(h) or Section 5(g) in the immediately preceding twelve (12)-month period shall exceed three (3); *provided*, *however*, that an Underwritten Offering shall not be considered made for

10

purposes of this Section 6(d) unless the offering has resulted in the disposition by the Holders of at least seventy-five percent (75%) of the amount and type of Registrable Securities requested to be sold.

7.      Grace Periods.

(a)      Other than with respect to the filing of the Initial Shelf Registration Statement under Section 2(a),

(i)      the Company shall be entitled to postpone the filing or effectiveness of, or, at any time after a Registration Statement has been declared effective by the Commission suspend the use of, a Registration Statement (including the Prospectus included therein) if in the good faith judgment of the Board, such registration, offering or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any bona fide material financing of the Company or any material transaction under consideration by the Company or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner; *provided*, *however*, that in the event such Registration Statement relates to a Demand Registration Request or an Underwritten Offering pursuant to Section 2(h) or Section 5(g), then the Holders initiating such Demand Registration Request or such Underwritten Offering shall be entitled to withdraw the Demand Registration Request or request for the Underwritten Offering and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 5(a)(iv) or Section 6(d) and the Company shall pay all registration expenses in connection with such registration; and

(ii)      at any time after a Registration Statement has been declared effective by the Commission and there is no duty to disclose under applicable law, the Company may delay the disclosure of material non-public information concerning the Company if the disclosure of such information at the time would, in the good faith judgment of the Board, adversely affect the Company (the period of a postponement or suspension as described in clause (i) and/or a delay described in this clause (ii), a "***Grace Period***").

(b)      The Company shall promptly (i) notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (*provided*, that the Company shall not disclose the content of such material non-public information to any Holder, without the express consent of such Holder) or the need to file a post-effective amendment, as applicable, and the date on which such Grace Period will begin, (ii) use reasonable best efforts to terminate a Grace Period as promptly as practicable and (iii) notify the Holders in writing of the date on which the Grace Period ends.

(c)      The duration of any one Grace Period shall not exceed sixty (60) days, the aggregate of all Grace Periods in total during any three hundred sixty-five (365) day period shall not exceed ninety (90) days, and the maximum number of Grace Periods that may be declared by the Company in any fiscal year shall not exceed three (3). For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in clause (i) of Section 7(b) and shall end on and include the later of

11

the date the Holders receive the notice referred to in clause (iii) of <u>Section 7(b)</u> and the date referred to in such notice.  In the event the Company declares a Grace Period, the period during which the Company is required to maintain the effectiveness of an Initial Shelf Registration Statement or a Registration Statement filed pursuant to a Demand Registration Request shall be extended by the number of days during which such Grace Period is in effect.

8.        <u>Piggyback Registration</u>.

(a)        If at any time, and from time to time, the Company proposes (whether for its own account or for the account of any other Person) to—

(i)        file a registration statement under the Securities Act with respect to an Underwritten Offering of Common Stock of the Company or any securities convertible or exercisable into Common Stock of the Company (other than with respect to a registration statement (x) on Form S-8 (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to an employee stock plan or other employee benefit arrangement), (y) on Form S-4 that relates to a transaction subject to Rule 145 under the Securities Act or any successor rule thereto or (z) on another form not available for registering the Registrable Securities for sale to the public); or

(ii)        conduct an Underwritten Offering constituting a "takedown" of a class of Common Stock or any securities convertible or exercisable into Common Stock registered under a Shelf Registration Statement previously filed by the Company;

the Company shall give written notice (the "***Piggyback Notice***") of such proposed filing or Underwritten Offering to each Holder (together with any of their respective Affiliates or Related Funds) that hold, in the aggregate, at least five percent (5%) of the outstanding Common Stock at least ten (10) Business Days before the anticipated filing date; *provided*, that in the case of a "bought deal," "registered direct offering" or "overnight transaction" (a "***Bought Deal***"), such Piggyback Notice shall be given not less than two (2) Business Days prior to the expected date of commencement of the public announcement of the transaction; *provided further, however,* that within three (3) days after receiving a request for an Underwritten Offering constituting a "takedown" from a Shelf Registration Statement, the Company shall provide the Piggyback Notice and subject to the provisions of <u>Section 8(b)</u> hereof, include in such Underwritten Offering all such Registrable Securities that are the subject of such "takedown" with respect to which the Company has received written requests for inclusion therein within five (5) days after the Company's giving of such notice.  Such notice shall include the number and class of securities proposed to be registered or offered, the proposed date of filing of such registration statement or the conduct of such Underwritten Offering, any proposed means of distribution of such securities, any proposed managing underwriter of such securities and a good faith estimate by the Company of the proposed maximum offering price of such securities as such price is proposed to appear on the front cover page of such registration statement, and shall offer such Holders the opportunity to register such amount of Registrable Securities as each Holder may request on the same terms and conditions as the registration of the Company's and/or the holders of other securities of the Company securities, as the case may be (a "***Piggyback Offering***").  Subject to <u>Section 8(b)</u>, the Company will include in each Piggyback Offering all Registrable Securities for which the Company has received written requests for inclusion within seven (7) Business Days after the date the Piggyback Notice is given

12

(*provided*, that in the case of a Bought Deal, such written requests for inclusion must be received within one (1) Business Day after the date the Piggyback Notice is given); *provided, however*, that the Company will either (i) include such Registrable Securities in such Underwritten Offering in such registration statement or (ii) if such Registrable Securities are otherwise registered pursuant to an existing and effective Shelf Registration Statement under this Agreement, include such Registrable Securities in such Underwritten Offering under such Shelf Registration Statement.

(b)       The Company will cause the managing underwriter or underwriters of the proposed offering to permit the Holders that have requested Registrable Securities to be included in the Piggyback Offering to include all such Registrable Securities on the same terms and conditions (*provided*, that no Holder shall be required to make any representations or warranties except as provided in Section 6(b)) as any similar securities, if any, of the Company. Notwithstanding the foregoing, if the managing underwriter or underwriters of such Underwritten Offering advises the Company and the selling Holders in writing that, in its view, the total amount of securities that the Company and such Holders propose to include in such offering is such as to materially adversely affect the price, timing or distribution of the securities being offered pursuant to such Underwritten Offering, then the Company will include in such Piggyback Offering:  (i) *first*, all securities to be offered by the Company only if the Company has initiated the offering, (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders and (iii) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by any other holders, if any, entitled to participate in such Offering, such that, in each case, the total amount of securities to be included in such Piggyback Offering is the full amount that, in the view of such managing underwriter, can be sold without materially adversely affecting the price, timing or distribution of the securities being offered in such Underwritten Offering, *provided*, that, if in the view of such managing underwriter, the full amount of the securities requested to be included in such Piggyback Offering pursuant to clause (ii) alone could materially adversely affect the price, timing or distribution of the securities being offered in such Piggyback Offering, then the number of Registrable Securities included in such Piggyback Offering shall be on a pro rata basis based on the total amount of Registrable Securities owned by the Holders requesting their Registrable Securities be included in such Piggyback Offering.

(c)       If the Company has initiated such Piggyback Offering and at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, the Company determines for any reason not to register or delay the registration of the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation to register any Registrable Securities in connection with the abandoned or delayed Piggyback Offering, without prejudice.

(d)       Any Holder of Registrable Securities requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company, at least three (3) Business Days prior to the anticipated Effective Date of the Registration Statement filed in connection with such Piggyback Offering (in the case that the Registration Statement requires acceleration of effectiveness), or in all other cases, one (1) Business Day prior to the anticipated date of the filing by the Company under Rule 424 of a supplemental prospectus (which shall be the preliminary supplemental prospectus, if one is used in the "takedown") with respect to such offering, of its intention to withdraw from that Piggyback Offering; *provided*, *however*, that (i) the

13

Holder's request be made in writing and (ii) the withdrawal will be irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

(e)     Notwithstanding the foregoing, any Holder may deliver written notice (an "*Opt-Out Notice*") to the Company at any time requesting that such Holder not receive notice from the Company of any proposed Underwritten Offering; *provided*, *however*, that such Holder may later revoke any such Opt-Out Notice in writing.

9.     Registration Procedures. If and when the Company is required to effect any registration under the Securities Act as provided in this Agreement, the Company shall use its reasonable best efforts to:

(a)     prepare and file with the Commission the requisite Registration Statement to effect such registration and thereafter use its reasonable best efforts to cause such Registration Statement to be declared or become effective as soon as reasonably practicable and in any event within the time periods set forth within this Agreement, and remain effective, subject to the limitations contained herein;

(b)     prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as all of such Registrable Securities have been disposed of in accordance with the method of disposition set forth in such Registration Statement, subject to the limitations contained herein;

(c)     (i) before filing a Registration Statement or Prospectus or any amendments or supplements thereto, at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference into such Registration Statement or Prospectus, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email), and afford Counsel to the Holders a reasonable opportunity to review and comment on such documents; and (ii) in connection with the preparation and filing of each such Registration Statement pursuant to this Agreement, (A) upon reasonable advance notice to the Company, give each of the foregoing such reasonable access to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and Exchange Act, and (B) upon reasonable advance notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and the Exchange Act;

14

(d)      notify each selling Holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed;

(e)      with respect to any offering of Registrable Securities, furnish to each selling Holder of Registrable Securities, and the managing underwriters for such Underwritten Offering, if any, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act)), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(f)      (i) register or qualify all Registrable Securities covered by such Registration Statement under such other securities or blue sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to enable such Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (f) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(g)      cause all Registrable Securities included in such Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or Counsel to the Holders to enable such Holder or Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(h)      with respect to any Underwritten Offering, obtain and, if obtained, furnish to each Holder that is named as an underwriter in such Underwritten Offering and each other underwriter thereof, a signed

(i)      opinion of outside counsel for the Company (including a customary 10b-5 statement), dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such underwriters, if any, and

15

(ii)      "comfort" letter, dated the date of the Underwriting Agreement and another dated the date of the closing under the underwriting agreement and addressed to the underwriters and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such Holder and such underwriters, if any,

in each case, covering substantially the same matters with respect to such Registration Statement (and the Prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(i)      notify each Holder of Registrable Securities included in such Registration Statement at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made and for which the Company chooses to suspend the use of the Registration Statement and Prospectus in accordance with the terms of this Agreement, and, at the written request of any such Holder, promptly prepare and furnish (at the Company's expense) to it a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such Prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made;

(j)      notify the Holders of Registrable Securities included in such Registration Statement promptly of any written comments from the Commission or any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

(k)      advise the Holders of Registrable Securities included in such Registration Statement promptly after the Company receives notice or obtains knowledge of any order suspending the effectiveness of a registration statement relating to the Registrable Securities at the earliest practicable moment and promptly use its reasonable best efforts to obtain the withdrawal of such order;

(l)      otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering of Registrable Securities, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar

16

month after the Effective Date of such Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder and which requirement will be deemed satisfied if the Company timely files complete and accurate information on Form 10-Q and 10-K and Current Reports on Form 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(m)      provide and cause to be maintained a transfer agent and registrar for the Registrable Securities included in a Registration Statement no later than the Effective Date thereof;

(n)      enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification; and provide reasonable cooperation, including causing at least one (1) executive officer and a senior financial officer to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested; *provided*, *however*, that the Company shall have no obligation to participate in more than two (2) "road shows" in any twelve (12)-month period and such participation shall not unreasonably interfere with the business operations of the Company;

(o)      if requested by the managing underwriter(s) or the Majority Holders in connection with an Underwritten Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such Registrable Securities provided to the Company in writing by the managing underwriters and the Majority Holders and that is required to be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation, information with respect to the number of Registrable Securities being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information;

(p)      cooperate with the Holders of Registrable Securities included in a Registration Statement and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such share amounts and registered in such names as the managing underwriters, or, if none, the Holders beneficially owning a majority of the Registrable Securities being offered for sale, may reasonably request at least three (3) Business Days prior to any sale of Registrable Securities to the underwriters;

(q)      cause all Registrable Securities included in a Registration Statement to be listed on a Trading Market on which similar securities issued by the Company are then listed or quoted;

17

(r) permit any Holder of Registrable Securities who, in the reasonable judgment of the Company upon advice of counsel, might be deemed to be an underwriter or controlling person of the Company, to participate in the preparation of such Registration Statement; and

(s) otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, prior to the first anticipated filing date of a Registration Statement for any registration under this Agreement, the Company may from time to time reasonably request each Holder for information the Company requires from that Holder, including any update to or confirmation of the information contained in the Selling Stockholder Questionnaire. Each Holder agrees to furnish such information to the Company and cooperate with the Company as reasonably necessary to enable the Company to comply with the provisions of this Agreement. Each Holder acknowledges and agrees that the information in the Selling Stockholder Questionnaire or request for further information as described in this <u>Section 9</u> will be used by the Company in the preparation of the Registration Statement and hereby consents to the inclusion of such information in the Registration Statement.

10. <u>Registration Expenses</u>. All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement (excluding any underwriting discounts or commissions or transfer taxes, if any, of any Holder) shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the Common Stock is then listed for trading or quoted, if any, (B) with respect to compliance with applicable state securities or blue sky laws (including, without limitation, fees and disbursements of counsel for the Company in connection with blue sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the Holders) and (C) if not previously paid by the Company, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("*FINRA*") pursuant to FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale), (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) the reasonable fees and expenses incurred in connection with any road show for Underwritten Offerings, (vi) Securities Act liability insurance, if the Company so desires such insurance, and (vii) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company will pay the reasonable, documented fees and disbursements of Counsel to the Holders, including, for the avoidance of doubt, any expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or free writing prospectus hereunder or any Underwritten Offering.

18

11.    Lockups.

(a)    In connection with any Underwritten Takedown or underwritten registration pursuant to a Demand Registration Request or other underwritten public offering of equity securities by the Company, to the extent requested by any underwriters managing such offering, except with the written consent of such underwriter, no Holder who participates in such offering or, together with its Affiliates and Related Funds, beneficially owns five percent (5%) or more of the outstanding shares of Common Stock shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, for up to a sixty (60)-day period (or such lesser period as the underwriter may agree) beginning on the date of the final prospectus filed in connection with such offering (as such period may be waived by the underwriters, the "***Lockup Period***"), except as part of such offering, *provided*, that the Lockup Period shall be the same with respect to all Holders; *provided*, *further*, that such Lockup Period restrictions are applicable on substantially similar terms to the Company and all of its and its subsidiaries' executive officers and directors; *provided*, *further*, that such Lockup Period shall include customary carve-outs, including that a Holder may make a distribution of Registrable Securities to any of its partners, members or stockholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section 11(a). To the extent requested by any underwriter managing such offering, each Holder agrees to execute a lock-up agreement in favor of the underwriter managing such offering to such effect.  The provisions of this Section 11(a) will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

(b)    In connection with any Underwritten Offering, the Company agrees not to effect any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities (except pursuant to registrations on Form S-4 or Form S-8 or any successor thereto or as part of any registration of securities of offering and sale to employees, directors or consultants of the Company and its subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement), during the Lockup Period, except as part of such offering, without the prior written consent from the Majority Holders.  To the extent requested by any underwriter managing such offering, the Company agrees to execute a lock-up agreement in favor of the underwriter managing such offering to such effect.

12.    Indemnification.

(a)    Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, investment manager, managers, stockholders, Affiliates and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, investment manager, managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and investigation and reasonable attorneys' fees) and expenses (collectively, "***Losses***"), to which any of them may become subject, that arise out of or are based upon (i) any

19

untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (ii) any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon an untrue statement or alleged untrue statement or omission or alleged omission so made in strict conformity with information furnished in writing to the Company by such Holder expressly for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Company may otherwise have.

(b)      Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its respective directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or are based upon any untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus, or any form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such claim, to the extent, but only to the extent, that such untrue statements or omissions are based upon an untrue statement or omission so made in strict conformity with information furnished in writing to the Company by such Holder expressly for use therein. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Holder may otherwise have.

(c)      Conduct of Indemnification Proceedings.

(i)      If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "*Indemnified Party*"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "*Indemnifying Party*") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with defense thereof; *provided*, *however*, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement,

20

except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party.

(ii)     An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel there may be reasonable defenses available to the Indemnified Party that are in addition to or different from those available to the Indemnified Party or a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided*, *however*, that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

(iii)     Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 12(c)) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided*, *however*, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder.

(d)     Contribution.

(i)     If a claim for indemnification under Section 12(a) or 12(b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including, as applicable, any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying

21

Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

(ii)     The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 12(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 12(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue statement or omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

13.     Registration under the Exchange Act. The Company shall use its reasonable best efforts to cause the Common Stock to be registered under Section 12(b) or 12(g) of the Exchange Act as a successor to Parker Drilling Company as soon as possible after the Plan Effective Date. For as long as any shares of Registrable Securities are outstanding, the Company shall maintain the registration of the Common Stock under Section 12(b) or 12(g) of the Exchange Act and to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act regardless of whether the Company is not then subject to the reporting requirements of the Exchange Act.

14.     Section 4(a)(7), Rule 144 and Rule 144A; Other Exemptions.  With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 and Rule 144A promulgated under the Securities Act and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company without registration, until such time as when no Registrable Securities remain outstanding, the Company covenants that it will (i) if it is subject to the reporting requirement of 13 or 15(d) of the Exchange Act, file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder or (ii) if it is not subject to the reporting requirement of 13 or 15(d) of the Exchange Act, make available information necessary to comply with Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A, if available, with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A promulgated under the Securities Act (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time or (y) any other rules or regulations now existing or hereafter adopted by the Commission.  Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

22

15.     Transfer of Registration Rights.  Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment, or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee, including any Affiliate of any Holder; *provided*, that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws; and (b) such transferee or assignee executes a joinder to this Agreement substantially in the form attached as Exhibit A hereto and delivers it to the Company as promptly as reasonably practicable; *provided*, *further*, that (i) any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement.

16.     Further Assurances.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

17.     Miscellaneous.

(a)     Remedies. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(b)     Compliance. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to any Registration Statement and shall sell the Registrable Securities pursuant to any Registration Statement only in accordance with a method of distribution described in each Registration Statement.

(c)     Discontinued Disposition. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of a Grace Period or any event of the kind described in Section 9(i), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company may provide appropriate stop transfer orders to its transfer agent to enforce the provisions of this paragraph.

(d)     No Inconsistent Agreements; Limitation on Subsequent Registration Rights. The Company has not entered, as of the date hereof, and the Company shall not enter, after the date of this Agreement, without the prior written consent of the Holders of a majority of the Registrable Securities outstanding at such time, into any agreement that is inconsistent with or grants

23

registration rights that have parity with or are more favorable than the rights granted to the Holders in this Agreement or otherwise conflicts with the provisions hereof.  From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of a majority of the Registrable Securities outstanding at such time file or have declared effective a registration statement for equity securities before the Initial Shelf Registration Statement is declared effective.  From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of a majority of the Registrable Securities outstanding at such time, enter into any agreement with any current or future holder of any securities of the Company that would allow such current or future holder to require the Company to include securities in the Initial Shelf Registration Statement, or in any Piggyback Offering on a basis that is on parity with, or superior in any material respect to, the Piggyback Offering rights granted to the Holders pursuant to Section 8 of this Agreement.

(e)        Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Company and Holders holding at least a majority of the then outstanding Registrable Securities; *provided*, *however*, that any party may give a waiver as to itself; *provided*, *further*, that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; *provided further,* that the definition of "Holders" in Section 1 and the provisions of Section 2(c) may not be amended, modified or supplemented, or waived unless in writing and signed by all the signatories to this Agreement; *provided*, *further*, that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least a majority of the then outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering.  Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of a majority of the Registrable Securities outstanding at such time to which such waiver or consent relates; *provided*, *however*, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.  No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.  The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(f)        Notices. Any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail(return receipt requested, postage prepaid), by private national courier service, by personal delivery, by electronic mail or by facsimile transmission.  Such notice or communication shall be deemed given (i) if mailed, two

24

(2) days after the date of mailing, (ii) if sent by national courier service, one (1) Business Day after being sent, (iii) if delivered personally, when so delivered, (iv) if sent by electronic mail, on the Business Day such electronic mail is transmitted (if delivered prior to 5 p.m. Houston, Texas time, or, if thereafter, then as of the next day), or (v) if sent by facsimile transmission, on the Business Day such facsimile is transmitted, in each case as follows:

> (i)     If to the Company:
>
> Parker Drilling Company
> Five Greenway Plaza, Suite 100
> Houston, Texas 77046
> Attention:  John Edward Menger and Jennifer Simons
> E-mail address:  Ed.Menger@parkerdrilling.com and
> Jennifer.Simons@parkerdrilling.com
>
> with copies (which shall not constitute notice) to:
>
> Kirkland & Ellis LLP
> 609 Main Street
> Houston, TX 77002
> Attention:  Julian J. Seiguer, P.C.
> E-mail address:  Julian.Seiguer@kirkland.com
>
> (ii)    If to the Holders (or to any of them), at their addresses as they appear in the records of the Company or the records of the transfer agent or registrar, if any, for the Common Stock.

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(g)     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns (including any trustee in bankruptcy).  In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); *provided*, *however*, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement substantially in the form attached as Exhibit A hereto.  No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(h)     Execution and Counterparts. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

25

(i)        <u>Delivery by Electronic Means</u>.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means (including electronic mail), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(j)        <u>Governing Law; Venue</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.  Each of the parties to this Agreement consents and agrees that any action to enforce this Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Agreement shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City.  The parties hereto consent and agree to submit to the exclusive jurisdiction of such courts.  Each of the parties to this Agreement waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party and such party's property is immune from any legal process issued by such courts or (ii) any litigation or other proceeding commenced in such courts is brought in an inconvenient forum.  The parties hereby agree that mailing of process or other papers in connection with any such action or proceeding to an address provided in writing by the recipient of such mailing, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service in the manner herein provided.

(k)        <u>Waiver of Jury Trial</u>.  Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings.  Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 17(k)</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS,

26

RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(l)        Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(m)       Descriptive Headings; Interpretation; No Strict Construction.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa.  Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof.  The words "include", "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation".  The use of the words "or," "either" or "any" shall not be exclusive.  All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time.  All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.  All Registrable Securities held by a Holder, its Affiliates (including any portfolio company) and its Related Funds shall be aggregated together for purposes of determining the availability of any rights under this Agreement. The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(n)       Entire Agreement. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(o)       Termination. The obligations of the Company and of any Holder, other than those obligations contained in Section 12 and this Section 17, shall terminate with respect to the Company and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

27

(p)      <u>No Third Party Beneficiaries</u>.  Except as provided in <u>Section 12</u> with respect to indemnification of certain third parties hereunder, nothing in this Agreement shall confer any rights upon any Person other than the parties hereto and their respective heirs, successors and permitted assigns.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**PARKER DRILLING COMPANY**

By: _____
      Name:
      Title:

29

HOLDERS:

**[Holder Name]**

By: _____
                Name:
                Title:

☐      By checking this box, the Holder signing above hereby requests the inclusion of all of its Registrable Securities in the Initial Shelf Registration Statement.

☐      By checking this box, the Holder signing above hereby requests the inclusion of _____ Registrable Securities in the Initial Shelf Registration Statement, constituting less than all of its Registrable Securities.

30

Exhibit A

FORM OF JOINDER

THIS JOINDER (this "Joinder") to the Registration Rights Agreement dated as of [●], 2019, by and among Parker Drilling Company, a Delaware corporation (the "Company"), and the holders party thereto (the "Registration Rights Agreement"), is made and entered into as of [ ], 20[    ] by the undersigned (the "Assuming Holder").  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Registration Rights Agreement.

As a condition to the acquisition of rights under the Registration Rights Agreement in accordance with the terms thereof, the Assuming Holder represents and agrees as follows:

1.     Transfer or Assignment.  The Assuming Holder has acquired certain Registrable Securities from [    ] as set forth on the signature page.

2.     Agreement to be Bound.  The Assuming Holder hereby agrees that upon execution of this Joinder, it shall become a party to the Registration Rights Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Registration Rights Agreement as though an original party thereto and shall be deemed a Holder for all purposes thereof.

3.     Successors and Assigns.  Except as otherwise provided herein, this Joinder shall bind and inure to the benefit of and be enforceable by the Company and its successors, heirs and assigns and the Assuming Holder and its successors, heirs and assigns.

4.     Governing Law.  The Joinder is governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to any conflicts of law principles that would result in the application of the laws of any law other than the law of the State of New York.

5.     Descriptive Headings.  The descriptive headings of this Joinder are inserted for convenience only and do not constitute a part of this Joinder.

[*Signature Page Follows*]

**IN WITNESS WHEREOF,** undersigned has executed this Joinder to the Registration Rights Agreement as of the date first written above.

**[HOLDER]**


By: _____
        Name:
        Title:


Address:      _____

              _____

              _____

              _____


Email:       _____


Amount and type of Registrable Securities Acquired:

_____

## Exhibit D

### New Debt Documents

This **Exhibit D** includes the following financing documents for the Reorganized Debtors:

- **Exhibit D(i)**: Exit Facility Credit Agreement

- **Exhibit D(ii)**: New Second Lien Term Loan Agreement

- **Exhibit D(iii)**: Intercreditor Agreement

Certain documents, or portions thereof, contained in this **Exhibit D** and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors, the Consenting Stakeholders, and in the case of the Exit Facility Credit Agreement and the Intercreditor Agreement, the Exit Facility Agent.  The Exit Facility Credit Agreement, New Second Lien Term Loan Agreement, and Intercreditor Agreement remain subject to ongoing review, revision, and further negotiation.  The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders, and in the case of the Exit Facility Credit Agreement and the Intercreditor Agreement, the final versions of such documents shall also be reasonably acceptable to the Exit Facility Agent.

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

## Exhibit D(i)

## Exit Facility Credit Agreement


The Exit Facility Credit Agreement remains subject to continuing negotiations among the Debtors, potential counterparties to the Exit Facility Credit Agreement and the Consenting Stakeholders.

*K&E Comments 2/12/19*

CREDIT AGREEMENT

Dated as of March [_], 2019

among

PARKER DRILLING COMPANY,
as the Parent Borrower,
certain Subsidiaries of the Parent Borrower, as
Borrowers,

BANK OF AMERICA, N.A.,
as Administrative Agent and an L/C Issuer,

and

THE OTHER LENDERS AND L/C ISSUERS
from time to time party hereto

————————————————

Bank of America, N.A.

and

Deutsche Bank Securities Inc.

as

Joint Lead Arrangers and Joint Bookrunners

KE 59116433.8

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ...................................................1

    Section 1.1    Defined Terms ...........................................................................1
    Section 1.2    Other Interpretive Provisions.................................................45
    Section 1.3    Accounting Terms...................................................................46
    Section 1.4    Rounding.................................................................................47
    Section 1.5    Exchange Rates; Currency Equivalents .................................47
    Section 1.6    Alternative Currencies ...........................................................47
    Section 1.7    Change of Currency ...............................................................48
    Section 1.8    Times of Day..........................................................................48
    Section 1.9    Letter of Credit Amounts .......................................................48
    Section 1.10    Uniform Commercial Code.....................................................48
    Section 1.11    Divisions ................................................................................48

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS .................................49

    Section 2.1    The Loans................................................................................49
    Section 2.2    Borrowings, Conversions and Continuations of Loans .........49
    Section 2.3    Letters of Credit .....................................................................50
    Section 2.4    Borrowing Base Calculations; Inclusion of Assets in Borrowing Base ......................................................................60
    Section 2.5    Prepayments...........................................................................61
    Section 2.6    Termination or Reduction of Commitments...........................62
    Section 2.7    Repayment of Loans ..............................................................62
    Section 2.8    Interest....................................................................................62
    Section 2.9    Fees ........................................................................................63
    Section 2.10    Computation of Interest and Fees ..........................................64
    Section 2.11    Evidence of Debt....................................................................64
    Section 2.12    Payments Generally; Administrative Agent's Clawback ...................................................................................64
    Section 2.13    Sharing of Payments by Lenders ...........................................66
    Section 2.14    Designated Borrower .............................................................67
    Section 2.15    LIBOR Successor Rate ..........................................................69
    Section 2.16    Defaulting Lenders.................................................................70
    Section 2.17    Protective Advances...............................................................72
    Section 2.18    Increase in Commitments. .....................................................72

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY...................................74

    Section 3.1    Taxes......................................................................................74
    Section 3.2    Illegality.................................................................................80
    Section 3.3    Inability to Determine Rates ..................................................80
    Section 3.4    Increased Costs ......................................................................81
    Section 3.5    Compensation for Losses.......................................................82
    Section 3.6    Mitigation Obligations; Replacement of Lenders..............................................................................83
    Section 3.7    Survival..................................................................................83
    Section 3.8    Keepwell ................................................................................83

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS .........................84

    Section 4.1    Conditions of Initial Credit Extension ...................................84
    Section 4.2    Conditions to all Credit Extensions .......................................88

i

ARTICLE V REPRESENTATIONS AND WARRANTIES....................................................89

    Section 5.1    Existence; Compliance with Law ...........................................89
    Section 5.2    Power; Authorization; Enforceable Obligations...............................89
    Section 5.3    No Legal Bar.............................................................89
    Section 5.4    No Material Litigation ..................................................90
    Section 5.5    Financial Statements; No Material Adverse Effect ...........................90
    Section 5.6    No Default...............................................................91
    Section 5.7    Ownership of Property; Liens.............................................91
    Section 5.8    Intellectual Property....................................................91
    Section 5.9    Taxes....................................................................91
    Section 5.10   Federal Regulations .....................................................92
    Section 5.11   Labor Matters...........................................................92
    Section 5.12   ERISA Compliance........................................................92
    Section 5.13   Investment Company Act; Other Regulations ...............................93
    Section 5.14   Subsidiaries.............................................................93
    Section 5.15   Use of Proceeds.........................................................93
    Section 5.16   Environmental Matters...................................................94
    Section 5.17   Accuracy of Information, etc ............................................94
    Section 5.18   Collateral Documents....................................................95
    Section 5.19   Solvency.................................................................95
    Section 5.20   Insurance...............................................................95
    Section 5.21   OFAC/Sanctions ..........................................................95
    Section 5.22   Anti-Corruption Laws....................................................96
    Section 5.23   EEA Financial Institution ...............................................96

ARTICLE VI AFFIRMATIVE COVENANTS .........................................................96

    Section 6.1    Financial Statements; Borrowing Base Certificate ...........................96
    Section 6.2    Certificates; Other Information...........................................97
    Section 6.3    Notices .................................................................99
    Section 6.4    Conduct of Business and Maintenance of Existence, etc .................100
    Section 6.5    Maintenance of Property; Insurance ..................................100
    Section 6.6    Inspection of Property; Books and Records; Discussions ................101
    Section 6.7    Environmental Laws ...................................................101
    Section 6.8    Payment of Obligations................................................101
    Section 6.9    Additional Collateral; Additional Guarantors...................101
    Section 6.10   [Reserved]..............................................................102
    Section 6.11   Cash Management Systems .............................................102
    Section 6.12   Inspection and Appraisal of Collateral ...............................104
    Section 6.13   Casualty and Condemnation; Disposition Outside the Ordinary
                   Course of Business.....................................................104
    Section 6.14   Anti-Corruption Laws; Sanctions ....................................104
    Section 6.15   Further Assurances; Post-Closing Deliveries ...................105

ARTICLE VII NEGATIVE COVENANTS.............................................................105

    Section 7.1    Liens...................................................................105
    Section 7.2    Minimum Liquidity.....................................................108
    Section 7.3    Indebtedness...........................................................108
    Section 7.4    Fundamental Changes...................................................110
    Section 7.5    Disposition of Property ................................................112
    Section 7.6    Restricted Payments....................................................113

Section 7.7    Modifications of Debt Instruments, etc ...........................................115
Section 7.8    Transactions with Affiliates.................................................................115
Section 7.9    Changes in Fiscal Periods .................................................................116
Section 7.10   Negative Pledge Clauses...................................................................116
Section 7.11   Restrictions on Subsidiary Distributions ..........................................117
Section 7.12   Lines of Business ..............................................................................117
Section 7.13   Swap Contracts .................................................................................118
Section 7.14   Anti-Corruption Laws.........................................................................118
Section 7.15   Sanctions ...........................................................................................118
Section 7.16   Prepayment, etc. of Term Loan Obligations and Certain
               Indebtedness......................................................................................118

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ............................................118

Section 8.1    Events of Default ...............................................................................118
Section 8.2    Remedies Upon Event of Default ......................................................121
Section 8.3    Application of Funds...........................................................................122

ARTICLE IX ADMINISTRATIVE AGENT....................................................................123

Section 9.1    Appointment and Authority .................................................................123
Section 9.2    Rights as a Lender.............................................................................124
Section 9.3    Exculpatory Provisions ......................................................................124
Section 9.4    Reliance by Administrative Agent.......................................................125
Section 9.5    Delegation of Duties ..........................................................................125
Section 9.6    Resignation of Administrative Agent ..................................................125
Section 9.7    Non-Reliance on Administrative Agent and Other Lenders..............127
Section 9.8    No Other Duties, Etc..........................................................................127
Section 9.9    Administrative Agent May File Proofs of Claim; Credit Bidding
               ...........................................................................................................127
Section 9.10   Collateral and Guaranty Matters.......................................................129
Section 9.11   Secured Cash Management Agreements and Secured Hedge
               Agreements .......................................................................................129
Section 9.12   Lender ERISA Representation............................................................130

ARTICLE X MISCELLANEOUS ...................................................................................132

Section 10.1   Amendments, Etc...............................................................................132
Section 10.2   Notices; Effectiveness; Electronic Communication ..........................133
Section 10.3   No Waiver; Cumulative Remedies; Enforcement...............................135
Section 10.4   Expenses; Indemnity; Damage Waiver...............................................136
Section 10.5   Payments Set Aside...........................................................................138
Section 10.6   Successors and Assigns.....................................................................139
Section 10.7   Treatment of Certain Information; Confidentiality.............................143
Section 10.8   Right of Setoff....................................................................................144
Section 10.9   Interest Rate Limitation .....................................................................144
Section 10.10  Counterparts; Integration; Effectiveness...........................................145
Section 10.11  Survival of Representations and Warranties......................................145
Section 10.12  Severability .........................................................................................145
Section 10.13  Replacement of Lenders .....................................................................145
Section 10.14  Governing Law; Jurisdiction; Etc. .....................................................146
Section 10.15  Waiver of Jury Trial............................................................................147
Section 10.16  No Advisory or Fiduciary Responsibility............................................147

Section 10.17  Electronic Execution of Assignments and Certain Other Documents ...................................................................................148
Section 10.18  USA PATRIOT Act...........................................................................148
Section 10.19  Judgment Currency ...........................................................................148
Section 10.20  [Reserved]..........................................................................................149
Section 10.21  Release of Collateral and Loan Parties .............................................149
Section 10.22  ENTIRE AGREEMENT.....................................................................150
Section 10.23  Acknowledgment and Consent to Bail-In of EEA Financial Institutions...............................................................................150

ARTICLE XI THE PARENT BORROWER ......................................................................150
Section 11.1  Appointment; Nature of Relationship...............................................150
Section 11.2  Powers................................................................................................151
Section 11.3  Employment of Agents ......................................................................151
Section 11.4  No Successor Parent Borrower ..........................................................151
Section 11.5  Execution of Loan Documents...........................................................151

## SCHEDULES

| | |
|---|---|
| 1.1(a) | Existing Letters of Credit |
| 2.1 | Commitments and Applicable Percentages |
| 5.2 | Consents, Authorizations, Filings and Notices |
| 5.4 | Litigation |
| 5.7(A) | Specified Barge Rigs |
| 5.7(B) | Specified Land Rigs |
| 5.14 | Subsidiaries; Other Equity Investments |
| 5.16 | Environmental Matters |
| 5.18 | UCC Filing Jurisdiction; United States Coast Guard Filing |
| 5.21 | OFAC |
| 6.11 | Deposit Accounts |
| 6.15 | Post-Closing Deliveries |
| 7.1(f) | Existing Liens |
| 7.3(d) | Existing Indebtedness |
| 7.8 | Existing Affiliate Transactions |
| 10.2 | Administrative Agent's Office; Certain Addresses for Notices |

## EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B-1 | U.S. Tax Compliance Certificate |
| B-2 | U.S. Tax Compliance Certificate |
| B-3 | U.S. Tax Compliance Certificate |
| B-4 | U.S. Tax Compliance Certificate |
| C | Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |

iv

F  Borrowing Base Certificate
G  Secured Party Designation Notice
H  Designated Borrower Request and Assumption Agreement
I  Designated Borrower Notice
J  Solvency Certificate

## CREDIT AGREEMENT

This CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**") is entered into as of March [_], 2019, among PARKER DRILLING COMPANY, a Delaware corporation (the "**Parent Borrower**"), certain Subsidiaries of the Parent Borrower party hereto from time to time pursuant to Section 2.14 (each as "**Designated Borrower**" and together with the Parent Borrower, the "**Borrowers**"), each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**") and BANK OF AMERICA, N.A., as the Administrative Agent and an L/C Issuer, and is acknowledged and agreed to by the Subsidiary Guarantors (as defined below).

## PRELIMINARY STATEMENTS:

On December 12, 2018, the Borrowers and each of the Subsidiary Guarantors (as defined below) filed voluntary petitions with the Bankruptcy Court commencing their respective cases  that are pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**").  In connection with the Cases, the Loan Parties, Bank of America, N.A., as administrative agent, and the lenders party thereto entered into that certain Debtor-In-Possession Credit Agreement dated as of December 14, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**").

The Loan Parties filed the Joint Chapter 11 Plan of Reorganization for Parker Drilling Company and its Affiliated Debtors dated [_____] (as amended, supplemented or otherwise modified from time to time, the "**Plan of Reorganization**") with the Bankruptcy Court, which Plan of Reorganization was confirmed by the Bankruptcy Court on [_____], 2019.

The Parent Borrower and the other Borrowers have requested that the Lenders provide exit financing to the Borrowers in connection with the consummation of the Plan of Reorganization, to refinance certain outstanding Indebtedness under the DIP Credit Agreement and to provide working capital for their business enterprise. The Lenders are willing to provide the exit financing by entering into this Agreement on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.1     Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"**Account Debtor**" means a Person obligated under an Account, chattel paper or general intangible.

"**Accounts**" means accounts receivable of the Parent Borrower or any other Borrower, as applicable, arising out of the sales or leasing of goods or services made by the Parent

1

Borrower or any other Borrower, as applicable, in the Ordinary Course of Business, to the extent constituting an "account" as defined in the Uniform Commercial Code.

"**Acquisition**" means the acquisition, directly or indirectly, by any Person of (a) any Equity Interests of another Person, (b) all or substantially all of the assets of another Person or (c) all or substantially all of a line of business or division of another Person, in each case (i) whether or not involving a merger or a consolidation with such other Person and (ii) whether in one transaction or a series of related transactions.

"**Administrative Agent**" means Bank of America in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.2, or such other address or account as the Administrative Agent may from time to time notify to the Parent Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form approved by the Administrative Agent.

"**Advance Rate**" means at any time, the applicable percentage set forth in clause (i) or (ii) of the definition of "Borrowing Base" or such other percentage having similar effect as may become effective in lieu of or in addition to such applicable percentage in accordance with such definition.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agents**" means, collectively, the Administrative Agent and any other agent appointed in accordance with the terms of this Agreement, if any.

"**Aggregate Commitments**" means the Commitments of all the Lenders. As of the Closing Date, the Aggregate Commitments are [$100,000,000][1].

"**Agreement**" has the meaning specified in the introductory paragraph hereto.

"**Alternative Currency**" means each currency (other than Dollars) that is approved in accordance with Section 1.6.

"**Alternative Currency Equivalent**" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or an L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"**Applicable Fee Rate**" means 0.50% per annum.

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time. If the Aggregate Commitments have been

---

[1] [**NTD**: Subject to syndication of additional commitments.]

2

terminated or expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. As of the Closing Date, the Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.1 and thereafter in the Assignment and Assumption (or such other instrument) pursuant to which such Lender becomes a party hereto, as applicable.

"**Applicable Rate**" means (a) from the Closing Date through and including June 30, 2019, (i) 2.25% in the case of Eurodollar Rate Loans and Letters of Credit and (ii) 1.25% in the case of Base Rate Loans, and (b) thereafter, the applicable percentage per annum set forth below for each fiscal quarter (each an "Applicable Quarter") determined by reference to the average daily Availability as a percentage of the Line Cap during the fiscal quarter immediately preceding such Applicable Quarter (as to each Applicable Quarter, the "Reference Quarter") as determined by the Administrative Agent based on the Borrowing Base Certificates delivered by the Borrowers to the Administrative Agent:

| Pricing Level | Average Daily Availability | Eurodollar Rate Loans and Letters of Credit | Base Rate Loans |
|---|---|---|---|
| I | >66.67% | 2.25% | 1.25% |
| II | ≤66.67% but >33.33% | 2.50% | 1.50% |
| III | ≤33.33% | 2.75% | 1.75% |

Any increase or decrease in the Applicable Rate for any Applicable Quarter resulting from a change in the average daily Availability for the applicable Reference Quarter shall become effective as of the first day of the first calendar month in the Applicable Quarter. If the Administrative Agent is unable to calculate average daily Availability for any Reference Quarter due to Borrowers' failure to deliver any Borrowing Base Certificate when required pursuant to Section 6.01(d), then, at the option of the Administrative Agent or the Required Lenders, Pricing Level III shall apply during the Applicable Quarter until the date of delivery of such Borrowing Base Certificate.

"**Applicable Time**" means, with respect to any payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the applicable L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"**Applicant Borrower**" has the meaning specified in Section 2.14(b).

"**Applicant Borrower Materials**" has the meaning specified in Section 2.14(b).

"**Appropriate Lender**" means, at any time, (a) a Lender that has a Commitment or holds a Loan at such time and (b) with respect to the Letter of Credit Sublimit, (i) the L/C Issuers and (ii) if any Letters of Credit have been issued pursuant to Section 2.3(a), the Lenders.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

3

"**Arrangers**" means each of Bank of America and Deutsche Bank Securities Inc. in its capacity as a joint lead arranger and joint bookrunner.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.6(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"**Attributable Indebtedness**" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"**Audited Financial Statements**" means the audited consolidated balance sheet of the Parent Borrower and its Subsidiaries for each of the fiscal years ended on December 31, 2017 and, to the extent available on or prior to the Closing Date, December 31, 2018, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal years of the Parent Borrower and its Subsidiaries, including the notes thereto.

"**Auto-Extension Letter of Credit**" has the meaning specified in Section 2.3(b)(iii).

"**Availability**" means (a) the Line Cap minus (b) Total Outstandings.

"**Availability Period**" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Commitments pursuant to Section 2.6, and (c) the date of termination of the commitment of each Lender to make Loans and of the obligation of the L/C Issuers to make L/C Credit Extensions pursuant to Section 8.2.

"**Availability Reserve**" means the sum (without duplication) of (a) the Rent and Charges Reserve; (b) the Bank Product Reserve; (c) the Dilution Reserve, (d) the aggregate amount of liabilities secured by Liens upon Collateral that are senior to Administrative Agent's Liens (but imposition of any such reserve shall not waive an Event of Default arising therefrom); (e) the Casualty Reserve; (f) the Disposition Reserve; and (g) such additional reserves, in such amounts and with respect to such matters, as Administrative Agent in its Permitted Discretion may elect to impose from time to time upon, so long as no Event of Default is continuing, two (2) Business Days' prior written notice to the Parent Borrower (which notice shall include a reasonably detailed description of such reserve being established). During such two (2) Business Day period, the Administrative Agent shall, if requested by the Parent Borrower, discuss any such reserve or change with the Parent Borrower and the Parent Borrower may take such action as may be required so that the event, condition or matter that is the basis for such reserve or change no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent reasonably satisfactory to the Administrative Agent. Notwithstanding

4

anything to the contrary herein, (x) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or change and (y) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria (including collection/advance rates).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank of America**" means Bank of America, N.A. and its successors.

"**Bank Product Reserve**" means at any time, reserves in respect of Secured Hedge Agreements and Secured Cash Management Agreements then provided and outstanding, including, without limitation, the reserves established by the Administrative Agent pursuant to Section 2.4(a).

"**Bankruptcy Code**" means 11 U.S.C. § 101 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas Houston Division or any other court having jurisdiction over the Cases from time to time and any Federal appellate court thereof.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the higher of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate", and (c) the Eurodollar Rate plus 1.00%; and if Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Borrower Materials**" has the meaning specified in Section 6.2.

"**Borrowers**" has the meaning specified in the introductory paragraph hereto.

5

"**Borrowing**" means a borrowing consisting of simultaneous Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Lenders pursuant to Section 2.1.

"**Borrowing Base**" means, at any time, the amount equal at such time to:

(i)     eighty-five percent (85%) of the aggregate Net Amount of Eligible Domestic Accounts Receivable, plus

(ii)     the lesser of (A) seventy-five percent (75%) of the aggregate Net Amount of Eligible Unbilled Domestic Accounts Receivable and (B) $5,000,000, plus

(iii)     the lesser of (A) ninety percent (90%) of the Net Book Value of the Eligible Rental Equipment and (B) forty percent (40%) of the Net Equipment OLV of the Eligible Rental Equipment; *provided* that prior to the inclusion of any new or additional Eligible Rental Equipment in the Borrowing Base, the Administrative Agent shall have obtained an appraisal thereof in accordance with Section 6.12, minus

(iv)     the Availability Reserve,

in the case of (i), (ii) and (iii) above, as determined on the basis of the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.1(d). This definition of Borrowing Base will not be modified to increase the Advance Rates or dollar sublimits stated above or amend the definition of "Borrowing Base" (or any material defined terms used in such definition) such that more credit would be available to the Borrowers without the approval, as of any date of determination, of Lenders holding at least two-thirds of the sum of the Aggregate Commitments or, if the Aggregate Commitments have expired or terminated, Lenders holding in the aggregate more than two-thirds of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition); *provided* that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of these determinations.

No Borrowing Base calculation shall include Collateral acquired in a Permitted Acquisition or otherwise outside the Ordinary Course of Business until completion of applicable field examinations and/or appraisals satisfactory to the Administrative Agent (which shall not be included in the limits provided in Section 6.12).

"**Borrowing Base Certificate**" means a certificate duly executed by a Responsible Officer of the Parent Borrower substantially in the form of Exhibit F, or in such other form as is reasonably satisfactory to the Administrative Agent, by which Parent Borrower certifies to the calculation of the Borrowing Base.

"**Borrowing Base Collateral**" means the Accounts and Quail Rental Assets.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York or the state where the Administrative Agent's Office is located and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

6

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"**Cases**" has the meaning specified in the preliminary statements hereto.

"**Cash Collateralize**" has the meaning specified in Section 2.3(g).

"**Cash Dominion Trigger Period**" means the period (a) commencing on the date that (i) Availability shall be less than $25,000,000, (ii) the aggregate principal amount of outstanding Loans equals or exceeds $20,000,000 or (iii) an Event of Default shall have occurred, and (b) continuing until, during each of the preceding thirty (30) consecutive days, (x) no Event of Default shall have existed, (y) Availability shall have been equal to or greater than $25,000,000 and (z) the aggregate principal amount of outstanding Loans shall have been less than $20,000,000.

"**Cash Equivalents**" means any of the following:

(a)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; *provided* that the full faith and credit of the United States of America is pledged in support thereof;

(b)      time deposits, Euro time deposits or overnight bank deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)      commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-2" (or the then equivalent grade) by Moody's or at least "A-2" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)      repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government;

(e)      securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's;

(f)      securities with maturities of 180 days or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition;

(g)      Investments, classified in accordance with GAAP as current assets of the Parent Borrower or any of its Subsidiaries, in money market investment programs which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a) through (f) of this definition; and

(h)      shares of any money market fund for which an affiliate of Bank of America provides investment advisory services.

"**Cash Management Agreement**" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"**Cash Management Bank**" means (a) any Person that, at the time it enters into a Cash Management Agreement, is a Lender or an Affiliate of a Lender, in its capacity as a party to such Cash Management Agreement and (b) any Lender or Affiliate of a Lender that is party to a Cash Management Agreement with a Borrower or one of its Subsidiaries as of the Closing Date or the date that such Person or such Person's Affiliate becomes a Lender hereunder.

"**Casualty Event**" means any loss, casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any Property or asset of the Parent Borrower, the other Borrowers or any of their respective Material Subsidiaries.

"**Casualty Reserve**" means any reserve in respect of any Significant Casualty Event affecting Borrowing Base Collateral established by the Administrative Agent in its Permitted Discretion.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and any successor statute.

"**CFC**" means a "controlled foreign corporation" as defined in Section 957 of the Code.

"**CFC Holdco**" means any direct or indirect Subsidiary that has no material assets (as determined in good faith by the Parent Borrower in consultation with the Administrative Agent) other than (i) Equity Interests or debt instruments in (A) one or more CFCs that are not Excluded CFCs or (B) one or more other CFC Holdcos, [**and (ii) cash and cash equivalents incidental to the ownership of such assets**].

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives

8

promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means an event or series of events by which:

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Investors, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 35% or more of the equity securities of the Parent Borrower entitled to vote for members of the board of directors or equivalent governing body of the Parent Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right);

(b)     a majority of the members of the board of directors or other equivalent governing body of the Parent Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the Closing Date, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(c)     a "Change of Control", under and as defined in the Term Loan Credit Agreement, or a like event with respect to the Parent Borrower under any other agreement governing third-party Indebtedness of a Loan Party having an aggregate principal amount in excess of the Threshold Amount, shall have occurred.

"**Closing Date**" means the first date all of the conditions precedent in Section 4.1 are satisfied or waived in accordance with Section 10.1.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means all of the "**Collateral**" and "**Vessels**" referred to in the Collateral Documents and all of the other Property of the Loan Parties, now owned or hereafter acquired, that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties (and excluding, for the avoidance of doubt, any Excluded Assets (as defined in the Security Agreement)).

"**Collateral Documents**" means, collectively, the Security Agreement, the Mortgages, each of the supplements (or amendments and/or restatements, as applicable) to any of the foregoing, the Control Agreements, mortgages, collateral assignments, Security Agreement Supplements, security agreements (including intellectual property security agreements), pledge agreements or other similar agreements, instruments, filings or recordings (and amendments to

9

the foregoing, as applicable) delivered to the Administrative Agent pursuant to Section 6.9, and each of the other agreements, instruments, documents, filings or recordings that creates or purports to create (or continue) a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Commitment**" means, as to each Lender, its obligation to (a) make Loans to the Borrowers pursuant to Section 2.1, and (b) purchase participations in L/C Obligations, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.1 as of the Closing Date under the caption "Commitment" or opposite such caption in the Assignment and Assumption (or such other instrument) pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Committed Loan Notice**" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.2(a), which shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent (including any form of an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Parent Borrower.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" means a certificate duly executed by a Responsible Officer of the Parent Borrower substantially in the form of Exhibit D.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan of Reorganization pursuant to Section 1129 of the Bankruptcy Code, which Confirmation Order shall be in form and substance reasonably satisfactory to the Administrative Agent.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Cash Balance**" means any unrestricted cash or Cash Equivalents of the Parent Borrower and its Subsidiaries (other than any cash or Cash Equivalents held in a deposit account in any non-U.S. jurisdiction in the Ordinary Course of Business with respect to amounts received from or anticipated to become due and owing in the near term to unaffiliated third parties).

"**Consolidated EBITDA**" means, at any date of determination, for any period, an amount equal to Consolidated Net Income of the Parent Borrower and its Subsidiaries on a consolidated basis for such period plus (a) the following to the extent deducted in calculating such Consolidated Net Income: (i) Consolidated Interest Charges, amortization or writeoff of debt discount and debt issuance costs and commissions, discounts, and other fees and charges associated with Indebtedness for such period, (ii) the provision for Federal, state, local and foreign income taxes payable by the Parent Borrower and its Subsidiaries for such period, (iii) depreciation and amortization expense, (iv) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (v) other extraordinary, unusual or non-recurring expenses or losses of the Parent Borrower and its Subsidiaries reducing such Consolidated Net Income (including, whether or not otherwise includable as a separate item in the statement of

10

Consolidated Net Income for such period, losses on sales of assets outside of the Ordinary Course of Business), *provided* that, in the case of such extraordinary, unusual or nonrecurring expenses or losses, such additions are found to be acceptable by the Administrative Agent, acting reasonably, (vi) restructuring costs and any consulting or professional fees incurred in connection with the Cases, and (vii) other non-cash charges and minus (b) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax credits of the Parent Borrower and its Subsidiaries for such period, (ii) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the Ordinary Course of Business), *provided* that, in the case of such extraordinary, unusual or non-recurring income or gains, such deductions are found to be acceptable by the Administrative Agent, acting reasonably, (iii) any other non-cash income, all as determined on a consolidated basis, (iv) items of income or gain relating to the Cases, and (v) the amount of any cash expenditures during such period in respect of items that were added as non-cash charges in determining Consolidated EBITDA for a prior period.

"**Consolidated Fixed Charge Coverage Ratio**" means the ratio, determined on a consolidated basis for the Parent Borrower and its Subsidiaries on a consolidated basis for the most recent Measurement Period of (a) Consolidated EBITDA minus capital expenditures (except those financed with borrowed money other than Loans or the proceeds of the sale or issuance of Equity Interests) and cash taxes paid, to (b) Consolidated Fixed Charges.

"**Consolidated Fixed Charges**" means the sum of Consolidated Interest Charges (other than payment-in-kind or amortization of fees and other non-cash items treated as interest in accordance with GAAP), scheduled principal payments and voluntary prepayments made on borrowed money (including purchase money Indebtedness, Attributable Indebtedness and the deferred purchase price of property or services), and Restricted Payments made in cash.

"**Consolidated Interest Charges**" means, for any period, for the Parent Borrower and its Subsidiaries on a consolidated basis, the sum of total interest expense (including that attributable under Capitalized Leases) for such period with respect to all outstanding Indebtedness of the Parent Borrower and its Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges owed by the Parent Borrower or its Subsidiaries with respect to letters of credit and bankers' acceptance financing and net costs under Swap Contracts in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP).

"**Consolidated Net Income**" means, for any period, for the Parent Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP, the consolidated net income (or loss) of the Parent Borrower and its Subsidiaries for that period; *provided*, *that* in calculating Consolidated Net Income of the Parent Borrower and its consolidated Subsidiaries for any period, there shall be excluded (a) the net income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of the Parent Borrower or is merged into or consolidated with the Parent Borrower or any of its Subsidiaries, (b) the net income (or deficit) of any Person (other than a Subsidiary of the Parent Borrower) in which the Parent Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such net income is actually received by the Parent Borrower or such Subsidiary in the form of cash dividends or similar cash distributions and (c) the net income of any Subsidiary of the Parent Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other

11

than under any Loan Document) or Requirement of Law applicable to such Subsidiary (*provided* that, 100% of any net losses of such Subsidiary shall be included).

"**Consolidated Tangible Assets**" means, with respect to any Person as of any date of determination, the amount which, in accordance with GAAP, would be set forth under the caption "Total Assets" (or any like caption) on a consolidated balance sheet of such Person and its Subsidiaries, less all goodwill, patents, tradenames, trademarks, copyrights, franchises, experimental expenses, organization expenses and any other amounts classified as intangible assets in accordance with GAAP.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Agreement**" means in respect of any deposit account, securities account, lockbox account, concentration account, collection account or disbursement account, a control agreement, in form and substance reasonably satisfactory to the Administrative Agent, which establishes the Administrative Agent's control over such account (within the meaning of Sections 8-106, 9-104 or 9-106 of the UCC, as applicable) and pursuant to which the Loan Party that is the owner of such account irrevocably instructs the bank or securities intermediary that maintains such account that such bank or securities intermediary shall follow the instructions or entitlement orders, as the case may be, of the Administrative Agent without further consent of such Loan Party. Each Control Agreement shall contain such other terms as shall be customary for agreements of such type.

"**Cost**" means in respect of any Quail Rental Assets, the net cost of such Quail Rental Assets to Quail Tools after all cash and other discounts or other allowances which were allowed or taken by Quail Tools against the purchase price of such Quail Rental Assets.

"**Credit Extension**" means each of the following: (a) the making of a Loan and (b) an L/C Credit Extension.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means (a) when used with respect to Obligations other than Letter of Credit Fees, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Rate, if any, applicable to Base Rate Loans plus (iii) 2% per annum; *provided*, *however*, that with respect to a Eurodollar Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2% per annum, and

12

(b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Rate plus 2% per annum.

"**Defaulting Lender**" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Parent Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the L/C Issuer or any Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within two Business Days of the date when due, (b) has notified the Parent Borrower, the Administrative Agent or the L/C Issuer in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Parent Borrower, to confirm in writing to the Administrative Agent and the Parent Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Parent Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) becomes the subject of a Bail-In Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Parent Borrower, any L/C Issuer, and each other Lender promptly following such determination.

"**Derivatives Counterparty**" has the meaning specified in Section 7.6.

"**Designated Borrower**" has the meaning specified in the introductory paragraph hereto.

"**Designated Borrower Notice**" has the meaning specified in Section 2.14.

"**Designated Borrower Request and Assumption Agreement**" has the meaning specified in Section 2.14.

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of any [**comprehensive**] Sanction.

"**Dilution Percent**" means the percent, determined for the Borrowers most recent fiscal quarter, equal to (a) bad debt write-downs or write-offs, discounts, returns, promotions, credits, credit memos and other dilutive items with respect to Accounts, divided by (b) gross sales.

"**Dilution Reserve**" means the aggregate amount of reserves in an amount equal to the Value of the Eligible Domestic Accounts Receivable multiplied by 1.0% for each percentage point (or portion thereof) that the Dilution Percent exceeds 5.0%.

"**DIP Credit Agreement**" has the meaning specified in the preliminary statements hereto.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any Property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disposition Reserve**" means any reserve in respect of any Disposition of Borrowing Base Collateral outside the Ordinary Course of Business established by the Administrative Agent in its Permitted Discretion.

"**Disqualified Stock**" means any Equity Interests that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Equity Interests), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder of the Equity Interests, in whole or in part, in each case, on or prior to the date that is 91 days after the date (a) which is the Maturity Date or (b) on which there are no Obligations outstanding; *provided* that only the portion of Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, that if such Equity Interests is issued to any employee or to any plan for the benefit of employees of the Parent Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Parent Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Equity Interests of such Person that by its terms requires such Person to satisfy its obligations thereunder by delivery of Equity Interests that is not Disqualified Stock shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interests that would constitute Disqualified Stock solely because the holders of the Equity Interests have the right to require the Parent Borrower to repurchase such Equity Interests upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock if the terms of such Equity Interests provide that the Parent Borrower may not repurchase or redeem any such Equity Interests pursuant to such provisions prior to obtaining any waiver or amendment to this Agreement required to permit such repurchase or redemption.

"**Division**" has the meaning specified in Section 1.11.

"**Dollar**" and "**$**" mean lawful money of the United States.

14

"**Dollar Equivalent**" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent or the applicable L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"**Dominion Account**" means a special account established by a Borrower at Bank of America or another bank acceptable to the Administrative Agent, over which the Administrative Agent will have exclusive dominion and control for withdrawal purposes at any time; *provided* that, the applicable Borrower may access the funds in the Dominion Account until such time as a Cash Dominion Trigger Period exists.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.6(b)(v) and (b)(vi) (subject to such consents, if any, as may be required under Section 10.6(b)(iii)).

"**Eligible Domestic Accounts Receivable**" means Accounts of the Borrowers, invoiced from operations in the United States, payable in Dollars and meeting the criteria specified below. In determining the amount to be so included, the face amount of such Accounts shall exclude any such Accounts that the Administrative Agent determines to be ineligible in its Permitted Discretion. Unless otherwise approved in writing by the Administrative Agent, no Account of a Borrower shall be deemed to be an Eligible Domestic Account Receivable if:

        (a)     it arises out of a sale or rendition made by a Borrower to an Affiliate; or

        (b)     (i) in the case of any Account due to any Borrower from an Account Debtor other than a Qualified Account Debtor, it is unpaid more than (A) 60 days after the original payment due date and/or (B) 90 days after the original invoice date and (ii) in the case of any Account due to any Borrower from an Account Debtor (or any Affiliate thereof) whose long-term unsecured debt obligations are rated at least A2 by Moody's or A by S&P (each, a "**Qualified Account Debtor**"), it is unpaid for more than (A) 90 days after the original payment due date and/or (B) 120 days after the original invoice date; or

(c)     it is from the same Account Debtor (or any Affiliate thereof) and fifty percent (50%) or more, in face amount, of all Accounts from such Account Debtor (and any Affiliate thereof) due to the Borrowers are ineligible pursuant to clause (b) above; or

(d)     the Account due to a Borrower, when aggregated with all other Eligible Domestic Accounts Receivable of such Account Debtor (and any Affiliate thereof) due to all of the Borrowers, exceeds fifteen percent (15%) (or such higher percentage as the Administrative Agent may establish for any Account Debtor from time to time in its Permitted Discretion) in face value of all Eligible Domestic Accounts Receivable of the Borrowers combined then outstanding, to the extent of such excess; *provided*, to the extent that such Account is otherwise deemed to be an Eligible Domestic Account Receivable, that if such Account is supported or secured by an irrevocable letter of credit in form and substance reasonably satisfactory to the Administrative Agent, issued or confirmed by a financial institution reasonably satisfactory to the Administrative Agent, and duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent), it shall be excluded to the extent of the face amount of such letter of credit for the purposes of such calculation; or

(e)     (i) the Account Debtor is also a creditor of a Borrower, (ii) the Account Debtor has disputed its liability on, or the Account Debtor has made any claim with respect to, such Account or any other Account due from such Account Debtor to a Borrower, which has not been resolved or (iii) the Account otherwise is or may reasonably be expected to become subject to any right of setoff by the Account Debtor or with respect to which any other claim, counterclaim, chargeback, credit, defense, dispute, deduction, discount, recoupment, reserve, rebate, allowance or offset has been, or may reasonably be expected to be, asserted; *provided* that any Account deemed ineligible pursuant to this clause (e) shall only be ineligible to the extent of the amount owed by such Borrower to the Account Debtor, the amount of such dispute or claim, or the amount of such setoff, other claim, counterclaim, chargeback, credit, defense, dispute, deduction, discount, recoupment, reserve, rebate, allowance or offset, as applicable; *provided further*, that the portion of any Account that would otherwise be deemed ineligible pursuant to this clause (e) shall not be deemed ineligible pursuant to this clause (e) to the extent (i) supported or secured by an irrevocable letter of credit in form and substance reasonably satisfactory to the Administrative Agent, issued or confirmed by a financial institution reasonably satisfactory to the Administrative Agent, and duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent) or (ii) subject to a no-offset letter in form and substance reasonably satisfactory to the Administrative Agent; or

(f)     the Account Debtor has commenced a voluntary case under any Debtor Relief Law, as now constituted or hereafter amended, or made an assignment for the benefit of creditors, or if a decree or order for relief has been entered by a court having jurisdiction over the Account Debtor in an involuntary case under any Debtor Relief Law, as now constituted or hereafter amended, or if any other petition or other application for relief under any Debtor Relief Law has been filed by or against the Account Debtor, or if the Account Debtor has filed a certificate of dissolution under applicable state law or shall be liquidated, dissolved or wound-up, or shall authorize or commence any action or proceeding for dissolution, winding-up or liquidation, or if the Account Debtor has failed, suspended business, is insolvent, has declared itself to be insolvent, is generally not paying its debts as they become due or has consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs (any such act or event an "**Act of Bankruptcy**") unless

16

(i) (x) a court presiding and having primary jurisdiction over the applicable Act of Bankruptcy has entered an order or decree making the applicable Borrower a "critical vendor", and such order or decree is reasonably acceptable to the Administrative Agent and (y) such Account Debtor has obtained adequate post-petition financing to pay the Accounts of such Borrower in the sole discretion of the Administrative Agent and (ii) either (A) the payment of Accounts from such Account Debtor is secured by assets of, or guaranteed by, in either case in a manner satisfactory to the Administrative Agent, a Person with respect to which an Act of Bankruptcy has not occurred and that is acceptable to the Administrative Agent; (B) if the Account from such Account Debtor arises subsequent to a decree or order for relief with respect to such Account Debtor under any Debtor Relief Law, as now or hereafter in effect, the Administrative Agent shall have determined that the timely payment and collection of such Account will not be impaired; or (C) the payment of such Account is supported or secured by an irrevocable letter of credit in form and substance satisfactory to the Administrative Agent, issued or confirmed by a financial institution satisfactory to the Administrative Agent, and duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent); or

(g)    the sale is to an Account Debtor outside of the United States unless (i) such Account Debtor is a Qualified Account Debtor, (ii) such Account Debtor has supplied the applicable Borrower with an irrevocable letter of credit in form and substance satisfactory to the Administrative Agent, issued or confirmed by a financial institution satisfactory to the Administrative Agent and which has been duly transferred to the Administrative Agent (together with sufficient documentation to permit direct draws by the Administrative Agent); or (iii) such Account is fully insured by credit insurance satisfactory to the Administrative Agent; *provided* that the maximum aggregate amount of Accounts eligible under (i), (ii) and (iii) above shall not exceed $2,500,000 at any time; or

(h)    the sale to the Account Debtor is on a bill-and-hold, cash-on-delivery, guarantied sale, sale-and-return, sale on approval or consignment basis or made pursuant to any other written agreement providing for repurchase or return or from a sale for personal, family or household purposes; or

(i)    the Administrative Agent determines in its Permitted Discretion that collection of such Account is insecure or that such Account may not be paid by reason of the Account Debtor's financial inability to pay; or

(j)    the Account Debtor is the United States of America, any State or any political subdivision, department, agency or instrumentality thereof, unless such Borrower duly assigns its rights to payment of such Account to the Administrative Agent pursuant to the Collateral Assignment of Claims Act of 1940 (31 U.S.C. § 3727 et seq.) or complies with any similar State or local law as the Administrative Agent shall require; or

(k)    the goods giving rise to such Account have not been delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been performed by such Borrower and accepted by the Account Debtor or the Account otherwise does not represent a final sale (except to the extent that such Account arises from a leasing transaction); or

(l)    any documentation relating to the Account fails to comply in any material respect with all applicable legal requirements, including, where applicable, the Federal

17

Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board of Governors of the Federal Reserve System; or

(m)　　the Administrative Agent does not have a valid and perfected first priority security interest in such Account or such Account is subject to any Lien (other than Permitted Liens) or the Account does not otherwise conform to the covenants, representations and warranties contained in the Credit Agreement, any Collateral Document or any of the other Loan Documents with respect to Accounts; or

(n)　　it is subject to any adverse security deposit, progress payment, retainage (so long as such retainage is not then due and payable) or other similar advance made by or for the benefit of the applicable Account Debtor; *provided* that any Account deemed ineligible pursuant to this clause (n) shall only be ineligible to the extent of the amount of any such deposit, payment, retainage or other similar advance; or

(o)　　it is evidenced by or arises under any instrument or chattel paper, or it has been reduced to judgment; or

(p)　　the Account Debtor has a presence in a State requiring the filing of Notice of Business Activities Report or similar report in order to permit the applicable Borrower to seek judicial enforcement in such State of payment of such Account unless such Borrower has qualified to do business in such State or has filed a Notice of Business Activities Report or equivalent report for the then current year or such failure to file and inability to seek judicial enforcement is capable of being remedied without any material delay or material cost; or

(q)　　it arises from progress billings or other billing arrangements such that the obligation of the Account Debtor with respect to such Account is conditioned upon such Borrower's satisfactory completion of any further performance under the agreement giving rise thereto; or

(r)　　the Account Debtor is subject to Sanctions[**, such as through inclusion on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC**]; or

(s)　　it includes a billing for interest, fees or late charges, but only to the extent thereof; or

(t)　　it is deemed by the Administrative Agent in its Permitted Discretion to be otherwise ineligible.

"**Eligible Rental Equipment**" means the appraised Quail Rental Assets. Unless otherwise approved in writing by the Administrative Agent, no Quail Rental Assets shall be Eligible Rental Equipment unless: (i) it is owned solely by Quail Tools and Quail Tools has good, valid and marketable title thereto; (ii) it is at all times subject to the Administrative Agent's valid and duly perfected first priority security interest granted pursuant to the Security Agreement and no other Lien (other than (x) any Permitted Liens or (y) any Lien of a landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possess any Quail Rental Assets unless a Lien Waiver or a Rent and Charges Reserve with respect thereto is required and exists, in each case in accordance with clause (ii) of the following sentence); (iii) Quail Tools shall at all times have title to such Quail Rental

18

Assets and shall have the ability to direct the disposition thereof (subject only to the rights of any lessee under any lease in effect with respect to such Quail Rental Assets) and such Quail Rental Asset is not located outside the continental United States, Alaska or the Gulf of Mexico waters subject to U.S. state or federal jurisdiction; (iv) it is not obsolete, unmerchantable, slow moving, in other than good working order and condition (ordinary wear and tear excepted), in each case, as determined by the Administrative Agent in its Permitted Discretion; (v) it conforms in all respects to the covenants, warranties and representations set forth in this Agreement or any other Collateral Document with respect to Quail Rental Assets; (vi) is not subject to any agreement that restricts the ability of Quail Tools to use, sell, transport or dispose of such Quail Rental Assets (other than this Agreement or any other Loan Document or Indebtedness permitted under Section 7.3(m) or any Refinancing Debt in respect thereof) or that restricts the Administrative Agent's ability to take possession of, sell or otherwise dispose of such Quail Rental Assets (subject only to the rights of any lessee under any lease in effect with respect to such Quail Rental Assets); or (vii) it does not constitutes "fixtures" under the applicable Laws of the jurisdiction in which such Quail Rental Assets is located. In no event shall Eligible Rental Equipment include (i) any Quail Rental Assets held under a Vendor Lease, (ii) any Quail Rental Assets held at a non-owned property (other than Quail Rental Assets on active lease located at customer locations in the Ordinary Course of Business) unless the lessor or such Person in possession of the Quail Rental Assets has delivered a Lien Waiver (except if a Rent and Charges Reserve for amounts due or to become due with respect to such facility has been established by Administrative Agent in its Permitted Discretion); *provided* that a Lien Waiver shall not be required in connection with any Quail Rental Asset that is temporarily (A) located on leased premises, (B) held by a warehouseman, processor, shipper, broker or freight forwarder, or (C) held by a repairman, mechanic or bailee, in each case for a period of less than 60 days (it being understood that the Administrative Agent may still impose a Rent and Charges Reserve in such circumstances in its Permitted Discretion), (iii) any Quail Rental Asset that is being held for sale or is not used or held for use by Quail Tools in the Ordinary Course of Business, or (iv) any Quail Rental Assets otherwise deemed ineligible by the Administrative Agent in its Permitted Discretion.

"**Eligible Unbilled Domestic Accounts Receivable**" means Accounts of the Borrowers, other than Eligible Domestic Accounts Receivable, which would qualify as an Eligible Domestic Account Receivable except that the invoice with respect thereto has not yet been submitted to the Account Debtor, so long as the period following the date on which a Borrower recognizes such Account in its books and records and prior to the date of the issuance of the invoice with respect thereto is less than 30 days.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Environmental Laws**" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, codes, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, governmental agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any [**Hazardous Materials**] into the environment, including those related to air emissions and discharges to waste or public systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Parent Borrower, any other Loan Party or any of their respective Subsidiaries resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling,

transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Parent Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 or 430 of the Code or Section 302 or 303 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Parent Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Parent Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Parent Borrower or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Euro**" and "**EUR**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Eurodollar Base Rate**" means:

(a)  for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate ("**LIBOR**") or a comparable or successor rate, which rate is approved by the Administrative Agent, as published on the

20

applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "Eurodollar Base Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b)      for any rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day;

*provided* that to the extent a comparable or successor rate is approved by the Administrative Agent in connection with any rate set forth in this definition, the approved rate shall be applied in a manner consistent with market practice; *provided*, *further* that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

"**Eurodollar Rate**" means for any Interest Period with respect to a Eurodollar Rate Loan, or a Base Rate Loan the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, a rate per annum determined by the Administrative Agent pursuant to the following formula:

$$\text{Eurodollar Rate} = \frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

*provided* that, if the Eurodollar Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"**Eurodollar Reserve Percentage**" means, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency liabilities"). The Eurodollar Rate for each outstanding Eurodollar Rate Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"**Event of Default**" has the meaning specified in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Account**" means (i) any deposit account, securities account or commodities account exclusively used for payroll, payroll taxes and other employee wage and benefit payment to or for the benefit of the Parent Borrower's or any Subsidiary's salaried employees in each case as long as such account remains a zero-balance account or, with respect to any such account maintained in Louisiana, constitutes an Immaterial Account on each Business Day other than the Business Day immediately preceding the payment of payroll and (ii) any deposit account, trust account, escrow account or security deposit established pursuant to statutory obligations or for the payment of taxes or holding funds in trust for third parties not affiliated with the Parent Borrower in the Ordinary Course of Business or in connection with acquisitions, investments or dispositions permitted under this Agreement, deposits in the Ordinary Course of Business in connection with workers' unemployment insurance and other types of social security and escrow accounts established pursuant to contractual obligations to third parties not affiliated with the Parent Borrower for casualty payments and insurance proceeds.

"**Excluded CFC**" means any CFC the primary assets of which are Domestic Subsidiaries.

"**Excluded Subsidiaries**" means: (a) Parker Drilling Investment Company, an Oklahoma corporation, (b) the PKD Sales Corporation, an Oklahoma corporation, (c) [**any Domestic Subsidiary owned by any Foreign Subsidiary [unless such Foreign Subsidiary is an Excluded CFC],[2]** ](d) any CFC other than any Excluded CFC, (e) any CFC Holdco, (f) any Domestic Subsidiary designated by the Parent Borrower by written notice to the Administrative Agent as an "Excluded Subsidiary" and certified by a Responsible Officer of the Parent Borrower to the Administrative Agent that (i) such Domestic Subsidiary has no material assets other than Equity Interests of one or more other Excluded Subsidiaries or (ii) substantially all of such Domestic Subsidiary's revenues for the fiscal year most recently ended were generated (or, in the case of a newly-formed or acquired Subsidiary, are intended by the Parent Borrower to be generated in the current fiscal year) from assets, including rigs and equipment, located outside of the United States (including located outside the territorial waters of the United States) and/or contracts performed primarily outside of the United States (including performed outside of the territorial waters of the United States); *provided*, *that* a Subsidiary shall cease to be an Excluded Subsidiary if (and for so long as) either (x) it provides a guaranty of the Term Loan Obligations or any other Junior Loan Obligations or (y) ceases to satisfy the requirements set forth in clause (e)(i) or (ii) above, (f) any Subsidiary that is prohibited by law, regulation or contractual obligation (provided that such contractual obligation existed at the time such Subsidiary was acquired and was not entered into in contemplation of such acquisition) from providing a Guarantee under the Guaranty or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such Guarantee or where the provision of such Guarantee would result in material adverse tax consequences as reasonably determined by the Parent Borrower in consultation with the Administrative Agent, (g) special purpose entities used for permitted securitization facilities, if any, (h) any not for profit Subsidiary and (i) any Subsidiary to the extent that the burden or cost of providing a Guarantee under the Guaranty outweighs the benefit afforded thereby as reasonably determined by the Administrative Agent and the Parent Borrower.

---

[2]     Note to Draft: Per the guarantor chart, the way this language is constructed, it does not remove any of the guarantors from the system.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder (determined after giving effect to Section 3.8 and any other "keepwell, support or other agreement" for the benefit of such Guarantor and any and all Guaranties of such Guarantor's Swap Obligations by other Loan Parties) at the time of the Guaranty of such Guarantor, or a grant by such Guarantor of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes excluded in accordance with the first sentence of this definition.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Administrative Agent, any Lender, any L/C Issuer or any other recipient of any payment or required to be withheld or deducted from a payment to such recipient, (a) Taxes imposed on or measured by net income (however denominated), branch profits Taxes, and franchise Taxes, in each case, (i) imposed as a result of such recipient being organized under the Laws of, or having its principal office or, in the case of any Lender or L/C Issuer, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender or L/C Issuer, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender or L/C Issuer with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender or L/C Issuer acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Parent Borrower under Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.1(a)(ii) or (c), amounts with respect to such Taxes were payable either to such Lender or L/C Issuer's assignor immediately before such Lender or L/C Issuer became a party hereto or to such Lender or L/C Issuer immediately before it changed its Lending Office, (c) Taxes attributable to such recipient's failure to comply with Section 3.1(e), and (d) any U.S. federal withholding Taxes imposed by FATCA.

"**Existing Letters of Credit**" means each letter of credit described in Schedule 1.1(a) attached hereto.

"**FASB ASC**" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal

Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" means the letter agreement, dated December 12, 2018, among the Parent Borrower, the Administrative Agent and the Arrangers.

"**Foreign Benefit Event**" means, with respect to any Foreign Plan or Foreign Government Scheme or Arrangement, (i) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Plan or Foreign Government Scheme or Arrangement; (ii) the failure to register or loss of good standing (if applicable) with applicable regulatory authorities of any such Foreign Plan or Foreign Government Scheme or Arrangement required to be registered; or (iii) the failure of any Foreign Plan or Foreign Government Scheme or Arrangement to comply with any provisions of applicable law and regulations or with the terms of such Foreign Plan or Foreign Benefit Arrangement.

"**Foreign Government Scheme or Arrangement**" has the meaning specified in Section 5.12(e).

"**Foreign Lender**" means any Lender that is not a U.S. Person.

"**Foreign Plan**" has the meaning specified in Section 5.12(e).

"**Foreign Subsidiary**" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States, a State thereof or the District of Columbia.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, with respect to the L/C Issuer, such Defaulting Lender's Applicable Percentage of the Outstanding Amount of all outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

24

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" means, as to any Person, any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided*, *however*, that the term Guarantee shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantors**" means the Parent Borrower, any other Borrower and the Subsidiary Guarantors.

"**Guaranty**" means that certain Guaranty Agreement dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time), together with each other guaranty and guaranty supplement delivered pursuant to Section 6.9.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes regulated pursuant to, or could give rise to liability under, any Environmental Law due to their harmful or deleterious properties.

"**Hedge Bank**" means (a) any Person that, at the time it enters into a Swap Contract permitted under Article VI or VII, is a Lender or an Affiliate of a Lender, in its capacity as a party to such Swap Contract and (b) any Lender or Affiliate of a Lender that is party to a Swap Contract with the Parent Borrower or one of its Subsidiaries as of the Closing Date or the date that such Person or such Person's Affiliate becomes a Lender hereunder.

25

"**Honor Date**" has the meaning specified in Section 2.3(c)(i).

"**Immaterial Account**" means any account in which the aggregate amount on deposit (or, in the case of any securities account, the total fair market value of all securities held in such account) does not at any time exceed $25,000; *provided*, that if the aggregate amount on deposit (or, in the case of any securities account, the total fair market value of all securities held) at all such Immaterial Accounts exceeds $[**500,000**], Parent Borrower shall provide notice to the Administrative Agent identifying one or more of such Immaterial Accounts which shall no longer be considered an Immaterial Account such that after giving effect thereto, the aggregate amount on deposit (or, in the case of any securities account, the total fair market value of all securities held) at all such Immaterial Accounts is equal to or less than $[**500,000**].

"**Immaterial Subsidiary**" means any Subsidiary designated by the Parent Borrower, by written notice to the Administrative Agent, as an "Immaterial Subsidiary"; *provided*, that (a) no Subsidiary may be so designated unless such Subsidiary (i) generated less than 2.5% of Consolidated EBITDA for the last Measurement Period and (ii) owned assets that have an aggregate fair market value less than 2.5% of Consolidated Tangible Assets of the Parent Borrower and its Subsidiaries as of the end of such Measurement Period and (b) any Subsidiary shall automatically cease to be an Immaterial Subsidiary if at the end of any subsequent Measurement Period such Subsidiary would not meet the requirements set forth in the foregoing clause (a).

"**Incurrence Date**" means the date on which any Junior Loan Obligations are incurred or are to be incurred.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money;

(b)    all obligations of such Person for the deferred purchase price of Property or services (other than (i) trade payables incurred in the ordinary course of such Person's business, and (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet or such Person in accordance with GAAP and if not paid after becoming due and payable);

(c)    all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(d)    all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property);

(e)    all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(f)    all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities;

26

(g)      all obligations of such Person, contingent or otherwise, to purchase, redeem, retire, defease or otherwise acquire for value (other than through the issuance of common stock of such Person) any Equity Interest in such Person or any other Person, other than any such obligations the payment of which would be permitted by Section 7.6(d); *provided* that such obligations to acquire Equity Interests after 91 days after the Maturity Date shall not be Indebtedness for purposes of this clause (g);

(h)      all Guarantees of such Person in respect of any of the foregoing;

(i)      all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person (other than a Lien of the type described in Section 7.1(t)), whether or not such Person has assumed or become liable for the payment of such obligation; *provided*, *however*, if such Indebtedness is limited in recourse solely to such Property, then the amount of such Indebtedness for purposes of this Agreement will not exceed the fair market value of such Property; and

(j)      for purposes of Section 8.1(e) only, net obligations of such Person under any Swap Contract.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. Notwithstanding the foregoing, Indebtedness shall not include any indebtedness which has been defeased in accordance with GAAP or defeased pursuant to the deposit of cash or Cash Equivalents (in an amount sufficient to satisfy all such indebtedness obligations at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such indebtedness, and subject to no other Liens.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitees**" has the meaning specified in Section 10.4(b).

"**Information**" has the meaning specified in Section 10.7.

"**Initial Projections**" has the meaning specified in Section 4.1(a)(xvi).

"**Intellectual Property**" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, trade dress, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of the Closing Date, by and between the Administrative Agent and the Term Loan Agent, and acknowledged by the Loan Parties, as amended restated, modified, supplemented, extended, increased, renewed or replaced in any manner.

"**Interest Payment Date**" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; *provided*, *however*, that if any Interest Period for a Eurodollar Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the first day of each January, April, July and October and the Maturity Date.

"**Interest Period**" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one, two, three or six months thereafter, as selected by the Parent Borrower in its Committed Loan Notice; *provided* that:

(a) any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c) no Interest Period shall extend beyond the Maturity Date.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person (including by way of Guarantee or otherwise), or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**ISP**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance of such Letter of Credit).

"**Issuer Documents**" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the applicable L/C Issuer and the Parent Borrower (or any Subsidiary) or in favor of such L/C Issuer and relating to any such Letter of Credit.

28

"**Junior Loan Documents**" means any agreements, instruments or documents evidencing and/or governing any Junior Loan Obligations other than Term Loan Obligations.

"**Junior Loan Obligations**" means the Term Loan Obligations and any other Indebtedness that is secured by a Lien that is subordinated to the Liens securing the Obligations on terms satisfactory to the Administrative Agent or that is unsecured.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements or determination of an arbitration with, any Governmental Authority, in each case whether or not having the force of law.

"**L/C Advance**" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage. All L/C Advances shall be denominated in Dollars.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing. All L/C Borrowings shall be denominated in Dollars.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"**L/C Issuer**" means (a) in respect of the Existing Letters of Credit only, Bank of America and (b) in respect of each Letter of Credit issued hereunder on or after the Closing Date, (1) Bank of America in its capacity as an issuer of Letters of Credit hereunder, (2) Deutsche Bank AG New York Branch in its capacity as an issuer of Letters of Credit hereunder, (3) any other Lender from time to time designated by the Parent Borrower as an L/C Issuer with the consent of such Lender and the Administrative Agent, or (4) any successor issuer of Letters of Credit hereunder.

"**L/C Issuer Sublimit**" means (i) $15,000,000 in the case of Bank of America, and (ii) $15,000,000 in the case of Deutsche Bank AG New York Branch, as such amounts may be adjusted from time to time by the agreement of the L/C Issuers.

"**L/C Obligations**" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.9. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**Lender**" has the meaning specified in the introductory paragraph hereto.

29

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Parent Borrower and the Administrative Agent.

"**Letter of Credit**" means any standby or commercial letter of credit, foreign guaranty, documentary banker's acceptance, indemnity, reimbursement agreement or similar instrument issued by an L/C Issuer hereunder for the account or benefit of Parent Borrower or its Subsidiaries and shall be deemed to include the Existing Letters of Credit. Letters of Credit may be issued in Dollars or in an Alternative Currency.

"**Letter of Credit Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant L/C Issuer.

"**Letter of Credit Expiration Date**" means the day that is seven days prior to the Maturity Date (or, if such day is not a Business Day, the next preceding Business Day).

"**Letter of Credit Fee**" has the meaning specified in Section 2.3(i).

"**Letter of Credit Sublimit**" means an amount equal to $30,000,000. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments hereunder.

"**LIBOR Screen Rate**" means the LIBOR quote on the applicable screen page the Administrative Agent designates to determine LIBOR (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"**LIBOR Successor Rate**" has the meaning specified in Section 2.15.

"**LIBOR Successor Rate Conforming Changes**" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, as agreed between the Administrative Agent and the Parent Borrower, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent agrees with the Parent Borrower).

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Lien Waiver**" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, by which (a) for any Quail Rental Assets located on leased premises, the lessor waives or subordinates any Lien it may have on such Quail Rental Assets, and agrees to permit the Administrative Agent to enter upon the premises and remove such Quail Rental

Assets or to use the premises to store or dispose of such Quail Rental Assets; (b) for any Quail Rental Assets held by a warehouseman, processor, shipper, broker or freight forwarder, such Person waives or subordinates any Lien it may have on such Quail Rental Assets, agrees to hold any documents in its possession relating to such Quail Rental Assets as agent for the Administrative Agent, and agrees to deliver such Quail Rental Assets to the Administrative Agent upon request; (c) for any Quail Rental Assets held by a repairman, mechanic or bailee, such Person acknowledges the Administrative Agent's Lien, waives or subordinates any Lien it may have on such Quail Rental Assets, and agrees to deliver such Quail Rental Assets to the Administrative Agent upon request or permit the Administrative Agent to take possession of such Quail Rental Assets and (d) for any Quail Rental Assets subject to a licensor's intellectual property rights, the licensor grants to the Administrative Agent the right, vis-à-vis such licensor, to enforce the Administrative Agent's Liens with respect to the Quail Rental Assets, including the right to dispose of it with the benefit of the Intellectual Property, whether or not a default exists under any applicable license. Notwithstanding the foregoing, a Lien Waiver shall not be required to be delivered in connection with any Quail Rental Assets that are temporarily (i) located on leased premises, (ii) held by a warehouseman, processor, shipper, broker or freight forwarder, or (iii) held by a repairman, mechanic or bailee, in each case for a period of less than 60 days.

"**Line Cap**" means, as of any date of determination, the lesser of (a) the Aggregate Commitments and (b) the Borrowing Base then in effect.

"**Liquidity**" means, as of any date of determination, the sum of (a) all domestic unrestricted cash of the Borrowers held in the Liquidity Account (*provided* that the amount of Liquidity contributed pursuant to this clause (a) shall not exceed $10,000,000) and (b) Availability.

"**Liquidity Account**" means the deposit account number XXXXXX6694 maintained with Bank of America; *provided* that, such deposit account is subject to no Liens other than the Administrative Agent's first priority security interest and, subject to the Intercreditor Agreement, Liens permitted under Sections 7.1(q)(ii) and (w).

"**Loan**" means any loan made by the Lenders pursuant to this Agreement, including loans made pursuant to Section 2.1 and any Protective Advance.

"**Loan Documents**" means, collectively, this Agreement, each Designated Borrower Request and Assumption Agreement, the Notes, the Guaranty, the Collateral Documents, the Fee Letter, the Intercreditor Agreement and each Issuer Document, and, in each case, all other agreements and certificates (including, without limitation, any perfection certificates) executed by a Loan Party in connection with this Agreement (exclusive of commitment letters and term sheets pertaining to this Agreement as in effect on the Closing Date, and, for the avoidance of doubt, any Secured Cash Management Agreement and any Secured Hedge Agreement).

"**Loan Parties**" means, collectively, Parent Borrower, any other Borrower and each Subsidiary Guarantor.

"**Material Adverse Effect**" means any event, development or circumstance that has had or could reasonably be expected to have (a) a material adverse effect upon the business, assets, properties or financial condition of the Parent Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document or of the ability of any Loan Party to perform its obligations

under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity or enforceability against any Loan Party of any material provision of any Loan Document to which it is a party.

"**Material Subsidiary**" means each Domestic Subsidiary that is not an Immaterial Subsidiary.

"**Maturity Date**" means March [_], 2023; *provided*, *however*, that if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"**Measurement Period**" means, at any date of determination, the most recently completed four fiscal quarters of the Parent Borrower and its Subsidiaries for which financial statements are required to have been delivered pursuant to Section 6.1(a) or (b).

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means any first preferred fleet mortgage (as amended from time to time) in form and substance reasonably satisfactory to the Administrative Agent and executed and recorded on or after the date hereof over a Specified Barge Rig which is pledged to the Administrative Agent, as trustee, for security of the Obligations, in each case, as may be amended, restated, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Parent Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Amount**" means with respect to any Account at any time, the face amount of such Account on any date less (to the extent not otherwise deducted pursuant to the definition of "Eligible Domestic Accounts Receivable") any and all returns, rebates, discounts (which may, at the Administrative Agent's option, be calculated on shortest terms), credits, allowances or taxes (including any sales, excise or other taxes) at any time issued, owing, claimed by any Account Debtor, granted, outstanding or payable in connection with, or any interest accrued on the amount of, such Account at such time.

"**Net Book Value**" means (i) Cost minus (ii) accumulated depreciation calculated (A) in accordance with GAAP and (B) consistently with the Borrowers' accounting practices as of the Closing Date.

"**Net Cash Proceeds**" means, in connection with any issuance or sale of debt securities or instruments or the incurrence of loans, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"**Net Equipment OLV**" means, as reasonably determined by the Administrative Agent in good faith based on the most recent appraisal conducted prior to the Closing Date or conducted pursuant to Section 6.12 after the Closing Date, the appraised value of the Eligible Rental Equipment that is estimated to be recoverable in an orderly liquidation of such equipment (less applicable freight and duty charges, if any), net of liquidation expenses.

"**Net Loss Proceeds**" means, in connection with any Casualty Event, all insurance proceeds or other amounts actually received, less any deductibles applied or to be paid and any costs and expenses incurred in the collection thereof.

"**Non-Consenting Lender**" has the meaning set forth in Section 10.1.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-Extension Notice Date**" has the meaning specified in Section 2.3(b)(iii).

"**Non-JLO Indebtedness**" means all Indebtedness of the Parent Borrower and its Subsidiaries other than Junior Loan Obligations.

"**Non-Recourse Debt**" means Indebtedness and other obligations of the Parent Borrower or any Subsidiary incurred for the purpose of financing all or any part of the purchase price or cost of construction, design, repair, replacement, installation, or improvement of property, plant or equipment used in the business of the Parent Borrower or such Subsidiary with respect to which:

(a) the holders of such Indebtedness and other obligations agree that they will look solely to the property so acquired or constructed and securing such Indebtedness (plus improvements, accessions, proceeds or distributions and directly related general intangibles) and other obligations, and neither the Parent Borrower nor any Subsidiary (i) provides any direct or indirect credit support, including any undertaking, agreement or instrument that would constitute Indebtedness or (ii) is otherwise directly or indirectly liable for such Indebtedness; and

(b) no default with respect to such Indebtedness or obligations would cause, or permit (after notice or passage of time or otherwise), according to the terms thereof, any holder (or any representative of any such holder) of any other Indebtedness of the Parent Borrower or such Subsidiary equal to or in excess of the Threshold Amount to declare a default on such Indebtedness or cause the payment, repurchase, redemption, defeasance or other acquisition or retirement for value thereof to be accelerated or payable prior to any scheduled principal payment, scheduled sinking fund or scheduled maturity.

"**Note**" means a promissory note made by the Borrowers in favor of a Lender or its registered assigns evidencing Loans made by such Lender to the Borrowers, substantially in the form of Exhibit C, or an amended, restated or replacement note otherwise reasonably satisfactory to the Administrative Agent.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, Letter of Credit, Secured Cash Management Agreement or Secured Hedge Agreement, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding; *provided*, *that* (a) obligations of the Parent Borrower or any Subsidiary under any Secured Cash Management Agreement or Secured Hedge Agreement shall constitute "Obligations"

33

hereunder only until the Termination Date, (b) any release of Collateral or Loan Parties (other than the Parent Borrower) effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under the Secured Cash Management Agreements and Secured Hedge Agreements, and (c) the Obligations shall exclude any Excluded Swap Obligations.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Ordinary Course of Business**" means with respect to any transaction involving any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, limited partnership, joint venture, trust or other form of business entity, the partnership, limited partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to any Lender or L/C Issuer, Taxes imposed as a result of a present or former connection between such Lender or L/C Issuer and the jurisdiction imposing such Tax (other than connections arising from such Lender or L/C Issuer having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, registration, filing or similar Taxes or any other excise or property or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment pursuant to Section 3.6).

"**Outstanding Amount**" means (a) with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date; (b) with respect to any L/C Obligations on any date that are not Cash Collateralized, the Dollar Equivalent of the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrowers of Unreimbursed Amounts or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date.

"**Parent Borrower**" has the meaning specified in the introductory paragraph hereto.

"**Participant**" has the meaning specified in Section 10.6(d).

"**Participating Member State**" means any member state of the European Union that has the Euro as its lawful currency in accordance with any EMU Legislation.

"**Payment Conditions**" means, in the case of Acquisitions, Investments, prepayments of Indebtedness and Restricted Payments, that no Default or Event of Default has occurred and is continuing or would result therefrom and satisfaction of the following:[3]

(a)   with respect to Acquisitions and Investments, either:

(i)   Availability shall be higher than the greater of (A) 20% of the [**Line Cap**] and (B) $[●], in each case on a pro forma basis for each day during the consecutive 30-day period immediately preceding such transaction and after giving effect thereto as though such Acquisition or Investment (and any Loans being requested to fund any part thereof) had been made on the first day of such 30-day period; or

(ii)   both (A) the pro forma Consolidated Fixed Charge Coverage Ratio after giving effect to such transaction shall be greater than 1.00 to 1.00 for the most recently reported Measurement Period, and (B) Availability shall be higher than the greater of (1) 15% of the [**Line Cap**] and (2) $[●], in the case of this subclause (B) on a pro forma basis for each day during the consecutive 30-day period immediately preceding such transaction and after giving effect thereto as though such Acquisition or Investment (and any Loans being requested to fund any part thereof) had been made on the first day of such 30-day period;

(b)   with respect to Restricted Payments and prepayments of Indebtedness, either:

(i)   Availability shall be higher than the greater of (A) 22.5% of the [**Line Cap**] and (B) $[●], in each case on a pro forma basis for each day during the consecutive 30-day period immediately preceding such Restricted Payment or prepayment of Indebtedness and after giving effect thereto as though such Restricted Payment or prepayment of Indebtedness (and any Loans being requested to fund any part thereof) had been made on the first day of such 30-day period; or

(ii)   both (A) the Pro Forma Consolidated Fixed Charge Coverage Ratio after giving effect to such transaction shall be greater than 1.00 to 1.00 for the most recently reported Measurement Period, and (B) Availability shall be higher than the greater of (1) 17.5% of the [**Line Cap**] and (2) $[●], in the case of this subclause (B) on a pro forma basis for each day during the consecutive 30-day period immediately preceding such Restricted Payment or prepayment of Indebtedness and after giving effect thereto as though such Restricted

---

[3]      [**Note to Draft**: **Dollar amounts to correspond to agreed percentages of final amount of commitments**.]

Payment or prepayment of Indebtedness (and any Loans being requested to fund any part thereof) had been made on the first day of such 30-day period; and

(c)     in any case under (a) or (b) above, delivery to Administrative Agent at least three (3) Business Days and not more than five (5) Business Days (or such shorter or longer period of time, as applicable, as may be agreed by the Administrative Agent in its sole discretion) prior to the date of the proposed Acquisition, prepayment of Indebtedness, or Restricted Payment of a certificate of the Borrower signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower giving notice of the intent to consummate such Acquisition, prepayment of Indebtedness, or Restricted Payment and certifying compliance with the applicable foregoing conditions (including calculations of Availability for the applicable days and, if applicable, of the Pro Forma Consolidated Fixed Charge Coverage Ratio).

"**Payment Items**" means each check, draft or other item payable to a Borrower, including those constituting proceeds of any Collateral.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Parent Borrower or any ERISA Affiliate or to which the Parent Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Permitted Acquisition**" means any Acquisition by a Loan Party that satisfies each of the following requirements:

(a)     no Default or Event of Default exists and the Acquisition could not reasonably be expected to cause a Default or Event of Default immediately after giving effect thereto;

(b)     the Acquisition is not hostile;

(c)     the lines of business of the Person to be (or the Property of which is to be) so purchased or otherwise acquired shall be substantially the same as, or complimentary or ancillary to, or an expansion of, the lines of business then conducted by the Parent Borrower and its Subsidiaries in the ordinary course;

(d)     the requirements of Section 6.9 are satisfied;

(e)     the applicable Payment Conditions are satisfied before and after giving effect thereto; and

(f)     the Borrower shall have delivered to the Administrative Agent and each Lender, at least three (3) Business Days (or such shorter period of time as may be agreed by the Administrative Agent in its sole discretion) prior to the date on which any such Acquisition is to be consummated, a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that all of the foregoing requirements have been satisfied or will be satisfied on or prior to the date on which such Acquisition is consummated.

"**Permitted Discretion**" means a determination made in the exercise, in good faith, of reasonable business judgment (from the perspective of a secured, asset-based lender).

"**Permitted Investors**" means Brigade Capital Management, LLC, Highbridge Capital Management LLC, Whitebox Advisors LLC and Värde Partners and any of their respective Affiliates and accounts, funds or partnerships managed, advised or sub-advised by any of them or any of their respective Affiliates, but not including, however, any portfolio company of any of the foregoing.

"**Permitted Junior Loan Obligations**" means any Junior Loan Obligations which meet the following requirements: (a) on and as of the Incurrence Date with respect thereto, the principal amount of such Junior Loan Obligations [(**other than Indebtedness of the type described in clause (f) of the definition of "Indebtedness", except to the extent such facilities have been drawn and not reimbursed**)] (after giving pro forma effect to the issuance or incurrence thereof and of any other Indebtedness on such Incurrence Date and to the application of the net proceeds therefrom), when added to the aggregate amount of all other Junior Loan Obligations outstanding [(**other than Indebtedness of the type described in clause (f) of the definition of "Indebtedness", except to the extent such facilities have been drawn and not reimbursed**)] as of such Incurrence Date, does not exceed an amount equal to (i) the product of (A) Consolidated EBITDA for the most recently ended Measurement Period multiplied by (B) 2.0, minus (ii) the aggregate amount of all Non-JLO Indebtedness [(**other than Indebtedness of the type described in clause (f) of the definition of "Indebtedness", except to the extent such facilities have been drawn and not reimbursed**)] as of such Incurrence Date, (b) (i) such Junior Loan Obligations have a scheduled maturity occurring at least 91 days after the Maturity Date and (ii) have no scheduled amortization occurring prior to the Maturity Date and (c) the Junior Loan Documents governing or evidencing such Junior Loan Obligations contain terms (including covenants and events of default) no more restrictive, taken as a whole, to the Parent Borrower and its Subsidiaries than those contained in this Agreement[**, excluding as to interest rates (including through fixed exchange rates), interest rate margins, rate floors, fees, funding discounts, original issue discount and redemption or prepayment terms and premiums**].

"**Permitted Liens**" means (a) as used in the definition of Eligible Domestic Accounts Receivable or Eligible Rental Equipment, any Liens permitted by Sections 7.1(a) (only to the extent then inchoate), (h), (q)(ii) or (w) or (b) for other purposes, any Liens permitted by Section 7.1.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Parent Borrower or any of its Subsidiaries or, with respect to any such plan that is subject to Section 412 or 403 of the Code or Section 302 or 303 or Title IV of ERISA, any ERISA Affiliate.

"**Plan of Reorganization**" has the meaning specified in the preliminary statements hereto.

"**Platform**" has the meaning specified in Section 6.2.

"**Pledged Equity Interests**" has the meaning specified in the Security Agreement.

37

"**pro forma basis**" or "**pro forma effect**" means with respect to any transaction, that such transaction shall be deemed to have occurred as of the first day of the period of four consecutive Fiscal Quarters, or such other applicable period, ending as of the end of the most recent Fiscal Quarter for which annual or quarterly financial statements shall have been delivered in accordance with the provisions hereof. Further, for purposes of making calculations on a "pro forma basis" hereunder, (x) in the case of any Acquisition, merger or consolidation, (i) income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject thereof shall be included to the extent relating to any period prior to the date thereof and (ii) Indebtedness incurred in connection with such Acquisition, merger or consolidation shall be deemed to have been incurred as of the first day of the applicable period, and (y) in the case of a Disposition of all or substantially all of the assets of, or all of the Equity Interests of, a Loan Party or any Subsidiary of the Parent Borrower or any division or product line of a Loan Party or any of the Parent Borrower's Subsidiaries, income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject thereof shall be excluded to the extent relating to any period prior to the date thereof.

"**Pro Forma Consolidated Fixed Charge Coverage Ratio**" means the Consolidated Fixed Charge Coverage Ratio, redetermined on a pro forma basis to include any prepayment of Indebtedness or Restricted Payment, as applicable, as a Consolidated Fixed Charge.

"**Project Finance Subsidiary**" means a Subsidiary that is a special-purpose entity created solely to (i) construct or acquire any asset or project that will be or is financed solely with Project Financing for such asset or project and related equity investments in, loans to, or capital contributions in, such Subsidiary that are not prohibited hereby and/or (ii) own an interest in any such asset or project.

"**Project Financing**" means Indebtedness and other obligations that (a) are incurred by a Project Finance Subsidiary, (b) are secured by a Lien of the type permitted under Section 7.1(g) and (c) constitute Non-Recourse Debt (other than recourse to the assets of, and Equity Interests in, such Project Finance Subsidiary).

"**Projections**" has the meaning specified in Section 6.2(c) and includes the Initial Projections.

"**Property**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Equity Interests.

"**Protective Advance**" has the meaning specified in Section 2.17.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" has the meaning specified in Section 6.2.

"**Quail Rental Assets**" means all inventory (as defined in the UCC) owned by Quail Tools which is of a type offered for lease in the Ordinary Course of Business as conducted on the Closing Date.

"**Quail Tools**" means Quail Tools, L.P. an Oklahoma limited partnership.

38

"**Qualified ECP Guarantor**" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under § 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Refinanced Indebtedness**" has the meaning specified in Section 7.3(g).

"**Refinancing Debt**" has the meaning specified in Section 7.3(g).

"**Register**" has the meaning specified in Section 10.6(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, advisors and representatives of such Person and of such Person's Affiliates.

"**Removal Effective Date**" has the meaning specified in Section 9.6.

"**Rent and Charges Reserve**" means the aggregate of (a) all past due rent and other amounts owing by a Borrower to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Eligible Rental Equipment or could assert a Lien on any Eligible Rental Equipment; and (b) a reserve as determined in the Administrative Agent in its Permitted Discretion in respect of rent and other charges that could be payable to any such Person, unless it has executed a Lien Waiver. Rent payable under Capitalized Leases will not be included in the Rent and Charges Reserve.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, (a) at any time there are two or fewer unaffiliated Lenders, all Lenders, and (b) at any time there are three or more unaffiliated Lenders, Lenders holding more than 50% of the Aggregate Commitments or, if the Aggregate Commitments have expired or terminated, Lenders holding in the aggregate more than 50% of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition); *provided* that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Requirement of Law**" means as to any Person, any Law applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Resignation Effective Date**" has the meaning specified in Section 9.6.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer, or controller of a Loan Party and (i) solely for purposes of delivery of incumbency certificates pursuant to Section 4.1 or any similar requirement under any Loan Document, the secretary or any assistant secretary of such Loan Party, (ii) with respect to financial matters, the chief financial officer of such Loan Party, (iii) in the case of Compliance Certificates or Borrowing Base Certificates, the chief financial officer, controller or the treasurer of such Loan Party, (iv) for purposes of executing the Loan Documents, the chief executive officer, president, chief financial officer, treasurer, controller or any vice president

39

of a Loan Party and (v) solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent (and, in each case, for any Loan Party that is a limited partnership, the foregoing individuals of its general partner). Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" has the meaning specified in Section 7.6.

"**Revaluation Date**" means with respect to any Letter of Credit, each of the following: (a) each date of issuance of a Letter of Credit denominated in an Alternative Currency, (b) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (c) each date of any payment by the applicable L/C Issuer under any Letter of Credit denominated in an Alternative Currency, (d) in the case of all Existing Letters of Credit denominated in Alternative Currencies, the fifth day of the month immediately following the month that includes the Closing Date and (e) such additional dates as the Administrative Agent or the applicable L/C Issuer shall reasonably determine or the Required Lenders shall require.

"**Revolving Credit Increase Effective Date**" has the meaning specified in Section 2.18(d).

"**Revolving Facility Obligations**" means all Obligations, other than Obligations in respect of any Secured Cash Management Agreement or Secured Hedge Agreement.

"**RSA**" means that certain Restructuring Support Agreement dated as of December 12, 2018, by and among the Loan Parties and the Consenting Stakeholders (as defined therein).

"**S&P**" means S&P Global Ratings, a division of S&P Global, Inc. and any successor thereto.

"**Sanction(s)**" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, or Her Majesty's Treasury ("**HMT**").

"**Scheduled Unavailability Date**" has the meaning specified in Section 2.15.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Cash Management Agreement**" means any Cash Management Agreement that is entered into by and between any Loan Party and any Cash Management Bank which, if entered into after the Closing Date, has delivered a Secured Party Designation Notice.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Article VI or VII that is entered into by and between any Loan Party and any Hedge Bank which, if entered into after the Closing Date, has delivered a Secured Party Designation Notice.

"**Secured Parties**" means, collectively, the Administrative Agent, each other Agent, the Lenders, the L/C Issuers, the Hedge Banks, the Cash Management Banks, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.5, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"**Secured Party Designation Notice**" means a notice from any Lender or an Affiliate of a Lender, substantially in the form of Exhibit G, (a) describing the Secured Cash Management Agreement or Secured Hedge Agreement and setting forth the maximum amount to be secured by the Collateral and the methodology to be used in calculating such amount and (b) agreeing to be bound by Section 9.11.

"**Security Agreement**" means that certain Pledge and Security Agreement dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time) made by the Loan Parties from time to time party thereto in favor of the Administrative Agent.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**Significant Casualty Event**" means any Casualty Event where the fair market value of the resulting loss of Property shall be in excess of $5,000,000 (or its equivalent in other currencies), determined as of the date of the occurrence of an applicable Casualty Event; *provided* that if insurance or other recoveries in connection with such Casualty Event reduce the net loss therefrom to an amount less than $5,000,000, then such Significant Casualty Event shall be deemed not to have occurred and any Casualty Reserve established therefor shall be released.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the Ordinary Course of Business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Barge Rig**" has the meaning set forth in the definition of Specified Rigs.

"**Specified Land Rig**" has the meaning set forth in the definition of Specified Rigs.

"**Specified Personal Property**" means any Property of a type in which a Lien is purported to be granted pursuant to the Security Agreement or any Mortgage.

"**Specified Rigs**" means (a) each of the barge rigs, located and operating in and along the inland waterways and coast of the continental United States or in Gulf of Mexico waters

41

subject to U.S. state or federal jurisdiction, owned by the Parent Borrower or any other Loan Party (each, a "**Specified Barge Rig**") and (b) each of the land rigs located and operating in the contiguous United States or Alaska, owned by the Parent Borrower or any other Loan Party (each, a "**Specified Land Rig**"). Each Specified Barge Rig and each Specified Land Rig as of the Closing Date are set forth on Schedule 5.7(A) and Schedule 5.7(B), respectively.

"**Spot Rate**" for a currency means the rate determined by the Administrative Agent or the relevant L/C Issuer, as applicable, to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; *provided* that the Administrative Agent or the relevant L/C Issuer may obtain such spot rate from another financial institution designated by the Administrative Agent or the relevant L/C Issuer if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; and *provided further* that the relevant L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Letter of Credit denominated in an Alternative Currency.

"**Subordinated Debt**" means Indebtedness of the Parent Borrower or any Subsidiary that is expressly subordinate and junior in right of payment to the Obligations on terms satisfactory to the Administrative Agent and such subordination is evidenced by a subordination agreement or other documentation satisfactory to the Administrative Agent.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Parent Borrower.

"**Subsidiary Guarantors**" means, collectively, at any time, (a) each Material Subsidiary of the Parent Borrower other than any Excluded Subsidiary or Project Finance Subsidiary, in each case, to the extent such Person is a party to the Guaranty at such time and (b) any other Subsidiary otherwise party to the Guaranty at such time; notwithstanding anything else to the contrary herein, no Borrower shall be considered a Subsidiary Guarantor. For the avoidance of doubt, upon the termination of any Subsidiary's status as a Designated Borrower pursuant to Section 2.14(e), such Subsidiary shall be deemed a Subsidiary Guarantor.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the

42

International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligations**" means with respect to any Guarantor any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Synthetic Debt**" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

["**Tax Distribution**" **means (a) with respect to any tax period (or portion thereof) in which the Borrower or any of its Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for income Tax purposes of which a Borrower (or one or more holding companies controlling Borrower) is the common parent (a "Tax Group"), distributions by any Subsidiary, directly or indirectly, to Borrower to pay the federal, state, and local income and similar Taxes of such Tax Group attributable to the Borrower and its Subsidiaries; provided, further, that each Subsidiary may also make distributions to Borrower (or any holding company) to enable Borrower (or any such holding company) to pay licensing (and similar) expenses, franchise taxes, and other fees, taxes and expenses required to maintain the legal existence of such Person, to the extent incurred in the ordinary course of business.**]

["**Tax Group**" **shall have the meaning assigned to such term in the definition of "Tax Distribution**."]

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

43

"**Term Loan Agent**" means UMB Bank, National Association, as administrative agent and collateral agent for those lenders party to the Term Loan Credit Agreement, together with its successors and assigns in such capacity.

"**Term Loan Credit Agreement**" means that certain Second Lien Term Loan Credit Agreement, dated as of the Closing Date, among the Parent Borrower, the Term Loan Agent and the lenders party thereto, together with any permitted amendments, modifications, replacements, refinancings, refundings, extensions, renewals or supplements to, or restatements of, the foregoing in accordance with the Intercreditor Agreement.

"**Term Loan Documents**"  means the Term Loan Credit Agreement and the other "Loan Documents" (as defined in the Term Loan Credit Agreement), together with any permitted amendments, modifications, replacements, refinancings, refundings, extensions, renewals or supplements to, or restatements of, the foregoing in accordance with the Intercreditor Agreement.

"**Term Loan Obligations**"  means the "Obligations" under and as defined in the Term Loan Credit Agreement.

"**Termination Date**" means such time as when (a) all Commitments have been terminated or expired, (b) all Revolving Facility Obligations have been paid in full in cash (other than indemnification obligations and other contingent obligations not then due and payable and as to which no claim has been made as at the time of determination) and (c) all Letters of Credit have terminated or expired (other than Letters of Credit as to which cash collateral has been provided to the applicable L/C Issuer in an amount equal to 105% of the amount of such outstanding Letters of Credit or other arrangements satisfactory to the applicable L/C Issuer (in the sole discretion of such L/C Issuer) have been made).

"**Threshold Amount**" means $[**15,000,000**].

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans (including Protective Advances) and all L/C Obligations.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" mean the United States of America.

"**Unreimbursed Amount**" has the meaning specified in Section 2.3(c)(i).

44

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning specified in Section 3.1(e)(ii)(B)(III).

"**Value**" means (a) for an Account, its face amount, net of any returns, rebates, discounts (calculated on the shortest terms then available to the applicable Account Debtor), credits, allowances or Taxes (including sales, excise or other taxes) that have been or could properly be claimed by the Account Debtor or any other Person and (b) with reference to the value of the Quail Rental Assets, value determined on the basis of the lower of cost or market of such Quail Rental Assets in accordance with GAAP, with the cost thereof calculated on a first-in, first-out basis determined in accordance with GAAP.

"**Vendor Lease**" means a lease pursuant to which Goods (as defined in the UCC) are leased from a Vendor Lessor, whether or not such lease constitutes an operating or a capital lease under GAAP and whether or not such lease constitutes a true lease or a secured transaction under the UCC or any other Requirement of Law.

"**Vendor Lessor**" means a Person who leases Goods (as defined in the UCC) to another Person pursuant to a Vendor Lease.

"**Weekly BBC Trigger Period**" means the period (a) commencing on the day that an Event of Default occurs or Availability is less than $25,000,000 (unless the Administrative Agent gives notice to the Parent Borrower that such period shall not commence on such date, in which case such period shall commence on any date during which such Event of Default exists, or Availability is less than $25,000,000, and in either case the Administrative Agent gives notice to the Parent Borrower that such period then commences) and (b) continuing until, during each of the preceding 30 consecutive days, no Event of Default has existed and Availability has been equal to or greater than $25,000,000.

"**Wholly-Owned**" means, as to any Person, any other Person all of the Equity interest of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly-Owned Subsidiaries.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.2    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or

45

otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.3     Accounting Terms.

(a)     Generally. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Parent Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Parent Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Parent Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the Audited Financial Statements for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding

46

principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

Section 1.4    Rounding.  Any financial ratios required to be maintained by the Parent Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.5    Exchange Rates; Currency Equivalents. (a) The Administrative Agent or the relevant L/C Issuer, as applicable, shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of L/C Credit Extensions and Outstanding Amounts denominated in Alternative Currencies. Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur. Except for purposes of financial statements delivered by Loan Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as so determined by the Administrative Agent or the relevant L/C Issuer, as applicable.

(b)    Wherever in this Agreement in connection with the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent or the relevant L/C Issuer, as the case may be.

(c)    The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Eurodollar Rate" or with respect to any comparable or successor rate thereto.

Section 1.6    Alternative Currencies. (a) The Parent Borrower may from time to time request that Letters of Credit be issued in a currency other than Dollars; *provided* that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars. In the case of any such request with respect to the issuance of Letters of Credit, such request shall be subject to the approval of the Administrative Agent and the L/C Issuer that is to issue such Letter of Credit.

(b)    Any such request shall be made to the Administrative Agent not later than 10:00 a.m., 20 Business Days prior to the date of the desired L/C Credit Extension (or such other time or date as may be agreed by the Administrative Agent and the applicable L/C Issuer, in their sole discretion). In the case of any such request pertaining to Letters of Credit, the Administrative Agent shall promptly notify each L/C Issuer thereof. Each L/C Issuer shall notify the Administrative Agent, not later than 10:00 a.m., ten Business Days after receipt of such request whether it consents, in its sole discretion, to the issuance of Letters of Credit in such requested currency.

(c)      Any failure by an L/C Issuer to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by such L/C Issuer to permit Letters of Credit to be issued in such requested currency. If the Administrative Agent and any L/C Issuer consent to the issuance of Letters of Credit in such requested currency, the Administrative Agent shall so notify the Parent Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Letter of Credit issuances. If the Administrative Agent shall fail to obtain consent to any request for an additional currency under this Section 1.6, the Administrative Agent shall promptly so notify the Parent Borrower.

Section 1.7      Change of Currency. (a) Each obligation of the Borrowers to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euro at the time of such adoption (in accordance with the EMU Legislation). If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency.

(b)      Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

(c)      Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

Section 1.8      Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Central Time (daylight savings or standard, as applicable).

Section 1.9      Letter of Credit Amounts. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the Dollar Equivalent of the stated amount of such Letter of Credit in effect at such time; *provided*, *however*, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the Dollar Equivalent of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

Section 1.10      Uniform Commercial Code. Terms relating to Collateral used and not otherwise defined herein that are defined in the UCC shall have the meanings set forth in the UCC, as applicable and as the context requires.

Section 1.11      Divisions. For all purposes under the Loan Documents, any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation) pursuant to Section 18-217 of the Delaware Limited

48

Liability Company Act or any similar provision under the laws of any other applicable jurisdiction (any such division, allocation of assets or unwinding, a "**Division**"), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Notwithstanding anything to the contrary in this Agreement, any division of a limited liability company shall constitute a separate Person hereunder, and each resulting division of any limited liability company that, prior to such division, is a Loan Party shall remain a Loan Party after giving effect to such division, and any resulting divisions of such Persons shall remain subject to the same restrictions applicable to the pre-division predecessor of such divisions.

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.1    The Loans.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make revolving loans to the Borrowers in Dollars from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Commitment; *provided*, *however*, that immediately after giving effect to any Borrowing, (i) the Total Outstandings shall not exceed the Line Cap and (ii) the aggregate Outstanding Amount of the Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such Lender's Commitment. Within the limits of the Line Cap, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.1, prepay under Section 2.5, and reborrow under this Section 2.1. Loans may be Base Rate Loans or Eurodollar Rate Loans, as *further provided* herein.

Section 2.2    Borrowings, Conversions and Continuations of Loans. (a) Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Parent Borrower's irrevocable notice to the Administrative Agent, which may be given by (A) telephone or (B) a Committed Loan Notice; *provided* that any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a written Committed Loan Notice. Each such Committed Loan Notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans and (ii) on the requested date of any Borrowing of Base Rate Loans. Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. Each Committed Loan Notice shall specify (i) whether the Parent Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, (v) if applicable, the duration of the Interest Period with respect thereto and (vi) if applicable, the Designated Borrower. If the Parent Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the Parent Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Committed Loan

49

Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of Loans, and if no timely notice of a conversion or continuation is provided by the Parent Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans as described in the preceding subsection. In the case of a Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 2:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction or waiver pursuant to the terms of this Agreement of the applicable conditions set forth in Section 4.2 (and, if such Borrowing is the initial Credit Extension, Section 4.1), the Administrative Agent shall make all funds so received available to the Parent Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Parent Borrower on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Parent Borrower; *provided*, *however*, that if, on the date a Committed Loan Notice with respect to a Borrowing is given by the Parent Borrower, there are L/C Borrowings outstanding, then the proceeds of such Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and, second, shall be made available to the Parent Borrower as provided above.

(c)     Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan. During the existence of an Event of Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)     The Administrative Agent shall promptly notify the Parent Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than five Interest Periods in effect.

(f)     Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all of the portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Parent Borrower, the Administrative Agent, and such Lender.

Section 2.3     Letters of Credit.

(a)     The Letter of Credit Commitment. (i) Subject to the terms and conditions set forth herein, (A) each L/C Issuer agrees, in reliance upon the agreements of the Lenders set forth in this Section 2.3, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit denominated in Dollars or in one or more Alternative Currencies for the account of the Parent Borrower or its Subsidiaries, and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.3(b), and (2) to honor drawings under the Letters of Credit;

50

and (B) the Lenders severally agree to participate in Letters of Credit issued for the account of the Parent Borrower or its Subsidiaries and any drawings thereunder; *provided* that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Line Cap, (y) the aggregate Outstanding Amount of the Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations shall not exceed such Lender's Commitment and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Parent Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Parent Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Parent Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Parent Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed. All Existing Letters of Credit shall be deemed to have been issued pursuant hereto, and from and after the Closing Date shall be subject to and governed by the terms and conditions hereof.

(ii)    No L/C Issuer shall issue any Letter of Credit if:

(A)    subject to Section 2.3(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Required Lenders have approved such expiry date; *provided*, *that*, Letters of Credit in an aggregate amount up to $5,000,000 may have a longer expiry date of up to three years after the date of issuance or extension, *provided*, *further*, that if any Letter of Credit issued pursuant to the preceding proviso is outstanding on the 180th day prior to the Maturity Date or is issued or extended on or after such date, a Borrower shall Cash Collateralize such Letter of Credit in an amount equal to 105% of the stated amount of such Letter of Credit on or before the 170th day prior to the Maturity Date (or if issued or extended on or after the 180th day prior to the Maturity Date, immediately upon such issuance or extension); or

(B)    except with respect to Letters of Credit issued pursuant to the provisos in clause (A) above, the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all the Lenders have approved such expiry date.

(iii)    No L/C Issuer shall be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or request that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement not in effect on the Closing Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the

51

Closing Date (or, if different, the date on which such L/C Issuer became an L/C Issuer hereunder) and which such L/C Issuer in good faith deems material to it;

(B)    the issuance of such Letter of Credit would violate one or more policies of such L/C Issuer applicable to letters of credit generally;

(C)    except as otherwise agreed by the Administrative Agent and such L/C Issuer, such Letter of Credit is in an initial stated amount less than $25,000;

(D)    except as otherwise agreed by the Administrative Agent and such L/C Issuer, such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency;

(E)    such L/C Issuer does not as of the issuance date of such requested Letter of Credit issue Letters of Credit in the requested currency;

(F)    such Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder;

(G)    immediately after giving effect to such issuance, the outstanding L/C Obligations in respect of all Letters of Credit issued by such L/C Issuer would exceed such L/C Issuer's L/C Issuer Sublimit; or

(H)    a default of any Lender's obligations to fund under Section 2.3(c) exists or any Lender is at such time a Defaulting Lender hereunder, unless the applicable L/C Issuer has entered into arrangements satisfactory to the L/C Issuer with the Parent Borrower or such Lender to eliminate such L/C Issuer's risk with respect to such Lender.

(iv)    No L/C Issuer shall amend any Letter of Credit if such L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof.

(v)    No L/C Issuer shall be under any obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(vi)    Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article IX included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to each L/C Issuer.

(vii)    Notwithstanding anything to the contrary herein, Deutsche Bank AG New York Branch shall have no obligation to issue any Letters of Credit other than Letters of Credit that are standby letters of credit.

52

(b)    Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

Subject to Section 1.6:

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Parent Borrower delivered to the applicable L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Parent Borrower. Such Letter of Credit Application must be received by the applicable L/C Issuer and the Administrative Agent not later than 10:00 a.m. at least two Business Days (or such later date and time as the Administrative Agent and such L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the applicable L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer (I) the Letter of Credit to be amended; (II) the proposed date of amendment thereof (which shall be a Business Day); (III) the nature of the proposed amendment; and (IV) such other matters as such L/C Issuer may reasonably require. Additionally, the Parent Borrower shall furnish to the applicable L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as such L/C Issuer or the Administrative Agent may reasonably require.

(ii)    Promptly after receipt of any Letter of Credit Application, the applicable L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Parent Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof. Unless such L/C Issuer has received written notice from any Lender, the Administrative Agent or any Loan Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Section 4.2 (and, if such L/C Credit Extension is to be made on the Closing Date, Section 4.1) shall not then be satisfied, then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of a Borrower (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with such L/C Issuer's usual and customary business practices. Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the applicable L/C Issuer a risk participation in such Letter of Credit in an amount equal to the product

of such Lender's Applicable Percentage multiplied by the amount of such Letter of Credit.

(iii)   If the Parent Borrower so requests in any applicable Letter of Credit Application, the applicable L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); *provided* that any such Auto-Extension Letter of Credit must permit such L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "**Non-Extension Notice Date**") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the applicable L/C Issuer, the Parent Borrower shall not be required to make a specific request to such L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; *provided*, *however*, that the applicable L/C Issuer shall not permit any such extension if (A) such L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.3(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is seven Business Days before the Non-Extension Notice Date (I) from the Administrative Agent that the Required Lenders have elected not to permit such extension or (II) from the Administrative Agent, any Lender or the Parent Borrower that one or more of the applicable conditions specified in Section 4.2 is not then satisfied, and in each such case directing such L/C Issuer not to permit such extension.

(iv)   Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the Parent Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment. On a monthly basis, each L/C Issuer shall deliver to the Administrative Agent a complete list of all outstanding Letters of Credit issued by such L/C Issuer as provided in Section 2.3(f).

(c)   Drawings and Reimbursements; Funding of Participations.

(i)   Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the applicable L/C Issuer shall notify the Parent Borrower and the Administrative Agent thereof. In the case of a Letter of Credit denominated in an Alternative Currency, the Parent Borrower shall reimburse the applicable L/C Issuer in such Alternative Currency, unless (A) such L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (B) in the absence of any such requirement for reimbursement in Dollars, the Parent Borrower shall have notified such L/C Issuer promptly following receipt of the notice of drawing that the Parent Borrower will reimburse such L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing under a Letter of Credit denominated in an Alternative Currency, the applicable L/C Issuer shall notify the Parent Borrower of the Dollar Equivalent of the amount of the drawing promptly following the determination thereof. Not later than (x) 12:30 p.m. on the date of any

54

payment by the applicable L/C Issuer under a Letter of Credit (each such date, an "**Honor Date**") if the Parent Borrower shall have received notice of such payment prior to 10:00 a.m. on such date or (y) if such notice has not been received by the Parent Borrower prior to such time on the Honor Date, then 12:30 p.m. on the Business Day immediately following the day that the Parent Borrower receives such notice, the Parent Borrower shall reimburse the applicable L/C Issuer in an amount equal to the amount of such drawing and in the applicable currency. If the Parent Borrower fails to so reimburse the applicable L/C Issuer by such time, such L/C Issuer shall promptly notify the Administrative Agent, who shall then promptly notify each Lender, of the Honor Date, the amount of the unreimbursed drawing (expressed in Dollars in the amount of the Dollar Equivalent thereof in the case of a Letter of Credit denominated in an Alternative Currency) (the "**Unreimbursed Amount**"), and the amount of such Lender's Applicable Percentage thereof. In such event, the Parent Borrower shall be deemed to have requested a Borrowing of Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.2 for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Commitments and the conditions set forth in Section 4.2 (other than the delivery of a Committed Loan Notice). Any notice given by an L/C Issuer or the Administrative Agent pursuant to this Section 2.3(c)(i) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    Each Lender shall upon any notice pursuant to Section 2.3(c)(i) make funds available to the Administrative Agent for the account of the applicable L/C Issuer, in Dollars, at the Administrative Agent's Office in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 12:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.3(c)(iii), each Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Parent Borrower in such amount. The Administrative Agent shall remit the funds so received to the applicable L/C Issuer in Dollars.

(iii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Borrowing of Base Rate Loans because the conditions set forth in Section 4.2 cannot be satisfied or for any other reason, the Parent Borrower shall be deemed to have incurred from the applicable L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate. In such event, each Lender's payment to the Administrative Agent for the account of the applicable L/C Issuer pursuant to Section 2.3(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.3.

(iv)    Until each Lender funds its Loan or L/C Advance pursuant to this Section 2.3(c) to reimburse the applicable L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Percentage of such amount shall be solely for the account of such L/C Issuer.

(v)     Each Lender's obligation to make Loans or L/C Advances to reimburse each L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.3(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against any L/C Issuer, the Parent Borrower, any Subsidiary or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided*, *however*, that each Lender's obligation to make Loans pursuant to this Section 2.3(c) is subject to the conditions set forth in Section 4.2 (other than delivery by the Parent Borrower of a Committed Loan Notice). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Parent Borrower to reimburse each L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Lender fails to make available to the Administrative Agent for the account of the applicable L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.3(c) by the time specified in Section 2.3(c)(ii), such L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by such L/C Issuer in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by such L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Loan included in the relevant Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be. A certificate of the relevant L/C Issuer submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.3(c)(vi) shall be conclusive absent manifest error.

(d)     Repayment of Participations.

(i)     At any time after any L/C Issuer has made a payment under any Letter of Credit and has received from any Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.3(c), if the Administrative Agent receives for the account of any L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from a Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Applicable Percentage thereof in Dollars and in the same funds as those received by the Administrative Agent.

(ii)     If any payment received by the Administrative Agent for the account of any L/C Issuer pursuant to Section 2.3(c)(i) is required to be returned under any of the circumstances described in Section 10.5 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each Lender shall pay to the Administrative Agent for the account of the applicable L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations

56

of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)   Obligations Absolute. The obligation of the Parent Borrower to reimburse each L/C Issuer for each drawing under each Letter of Credit issued by such L/C Issuer and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)   any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)   the existence of any claim, counterclaim, setoff, defense or other right that the Parent Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), any L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)   any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)   any payment by the applicable L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by such L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)   any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to the Parent Borrower or any Subsidiary or in the relevant currency markets generally; or

(vi)   any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Parent Borrower or any Subsidiary.

The Parent Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Parent Borrower's instructions or other irregularity, the Parent Borrower will promptly, but in an any event, within three (3) Business Days of receipt of such copy, notify the applicable L/C Issuer. The Parent Borrower shall be conclusively deemed to have waived any such claim against such L/C Issuer and its correspondents unless such notice is given as aforesaid.

57

(f)     Role of the L/C Issuers. Each Lender and the Parent Borrower agree that, in paying any drawing under a Letter of Credit, the L/C Issuers shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuers, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Parent Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided*, *however*, that this assumption is not intended to, and shall not, preclude the Parent Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law, in equity or under any other agreement. None of the L/C Issuers, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.3(e); *provided*, *however*, that anything in such clauses to the contrary notwithstanding, the Parent Borrower may have a claim against the applicable L/C Issuer, and the applicable L/C Issuer may be liable to the Parent Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Parent Borrower which the Parent Borrower proves were caused by such L/C Issuer's willful misconduct or gross negligence or such L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)     Cash Collateral.

(i)     Upon the request of the Administrative Agent, (A) if any L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing or (B) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Parent Borrower shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations.

(ii)     The Administrative Agent may, with respect to outstanding Letters of Credit issued in an Alternative Currency, at any time and from time to time after the initial deposit of Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations.

(iii)     Sections 2.5(b), 2.16 and Section 8.2(c) set forth certain additional requirements to deliver Cash Collateral hereunder. For purposes of this Section 2.3, Section 2.5(b), Section 2.16 and Section 8.2(c), "**Cash Collateralize**" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit

of the L/C Issuers and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the L/C Issuers (which documents are hereby consented to by the Lenders) in an amount equal to 105% of the Outstanding Amount of the applicable L/C Obligations as of the relevant date. Derivatives of such term have corresponding meanings. The Borrowers hereby grant to the Administrative Agent, for the benefit of the L/C Issuers and the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in blocked deposit accounts at Bank of America. Reasonable interest shall accrue on any such cash deposit, which accrued interest shall be for the account of the applicable Borrower, subject to this Agreement. If at any time the Administrative Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Parent Borrower will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the applicable L/C Issuer.

(h)     Applicability of ISP and UCP. Unless otherwise expressly agreed by the applicable L/C Issuer and the Parent Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance shall apply to each commercial Letter of Credit.

(i)     Letter of Credit Fees. The Parent Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, in Dollars, a Letter of Credit fee (the "**Letter of Credit Fee**") for each Letter of Credit equal to the Applicable Rate for Eurodollar Rate Loans multiplied by the Dollar Equivalent of the daily amount available to be drawn under such Letter of Credit. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.9. Letter of Credit Fees shall be (A) due and payable on the first day of each January, April, July and October, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand and (B) computed on a quarterly basis in arrears. If there is any change in the Applicable Rate during any quarter, the daily amount available to be drawn under each standby Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect. Notwithstanding anything to the contrary contained herein, while any Letter of Credit Fee is not paid when due, all such overdue Letter of Credit Fees shall accrue at the Default Rate.

(j)     Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer. The Parent Borrower shall pay directly to the applicable L/C Issuer for its own account, in Dollars, a fronting fee (i) with respect to each commercial Letter of Credit or any amendment

59

of a commercial Letter of Credit increasing the amount of such Letter of Credit, at a rate and on terms separately agreed in writing between the Parent Borrower and the applicable L/C Issuer (including, without limitation, as to the time of payment of such fee), and (ii) with respect to each standby Letter of Credit, at the rate per annum agreed upon from time to time in writing between the Parent Borrower and such L/C Issuer, but in each case under clause (i) or (ii), not to exceed 0.125% per annum, computed on the Dollar Equivalent of the daily amount available to be drawn under such Letter of Credit on a quarterly basis in arrears. Such fronting fee for each standby Letter of Credit shall be due and payable on the first day of each January, April, July and October in respect of the most recently-ended quarterly period (or portion thereof, in the case of the first payment), commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.9. In addition, the Parent Borrower shall pay directly to each L/C Issuer for its own account, in Dollars, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k)     Conflict with Issuer Documents. In the event of any conflict or inconsistency between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(l)     Letters of Credit Issued for Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Parent Borrower shall be obligated to reimburse the applicable L/C Issuer hereunder for any and all drawings under such Letter of Credit. The Parent Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Parent Borrower, and that the Parent Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

Section 2.4     Borrowing Base Calculations.

(a)     Concurrently with delivery by the Parent Borrower to the Administrative Agent of (i) any notice designating any Swap Contract as a "Secured Hedge Agreement" and (ii) any Borrowing Base Certificate, the Parent Borrower will deliver to the Administrative Agent a report from the relevant counterparty setting forth the Swap Termination Value of such Swap Contract, determined in accordance with procedures customary in the relevant market. The Administrative Agent will calculate from time to time the net amount of the Swap Termination Values of all Secured Hedge Agreements on the basis of such counterparty report, and if a Borrower would owe a net amount under all of such Borrower's Secured Hedge Agreements if all such Secured Hedge Agreements were terminated on such date, the Administrative Agent may, and at the request of the Required Lenders, will, establish a reserve for purposes of calculating the Borrowing Base pursuant to the definition thereof set forth in Section 1.1 in an amount equal to such net amount, and will maintain such reserve until the next determination by the Administrative Agent pursuant to this paragraph.

(b)     Borrowing Base Collateral Casualty Event or Disposition.

(i)     Upon the occurrence of a Significant Casualty Event related to any Borrowing Base Collateral, the Administrative Agent, in the exercise of its

60

Permitted Discretion, may establish or increase the Casualty Reserve for purposes of calculating the Borrowing Base pursuant to the definition thereof set forth in Section 1.1 as a result thereof.

(ii)     Upon the occurrence of a Disposition outside the Ordinary Course of Business related to any Borrowing Base Collateral, the Administrative Agent, in the exercise of its Permitted Discretion, may establish or increase the Disposition Reserve for purposes of calculating the Borrowing Base pursuant to the definition thereof set forth in Section 1.1 as a result thereof.

Section 2.5     Prepayments.

(a)     Optional. Each Borrower may, upon notice from the Parent Borrower to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; *provided* that (i) such notice must be in a form reasonably acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. (A) three (3) Business Days (or such shorter time period as may be agreed by the Administrative Agent in its sole discretion) prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; and (ii) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if Eurodollar Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment. If such notice is given by the Parent Borrower, the applicable Borrower shall make such prepayment and the prepayment amount specified in such notice shall be due and payable on the date specified therein, *provided*, *however*, that notwithstanding anything to the contrary contained herein, any such prepayment notice may be conditioned upon the effectiveness of other credit facilities or the closing of one or more securities offerings or other transactions; *provided*, *further*, that, the Parent Borrower must affirmatively rescind any such prepayment notice by a subsequent written notice to the Administrative Agent, if the condition in an original prepayment notice shall fail to be satisfied by the proposed effective date of such prepayment, and upon the Administrative Agent's receipt of such rescinding notice, shall have no obligation to make any prepayment in respect of such earlier prepayment notice. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.5.

(b)     Mandatory.

(i)     If for any reason the Total Outstandings at any time exceed the Line Cap at such time, the Borrowers shall immediately prepay Loans and/or the Parent Borrower shall Cash Collateralize the L/C Obligations (other than the L/C Borrowings) in accordance with Section 2.3(g) in an aggregate amount equal to such excess. The Administrative Agent may, at any time and from time to time after the initial deposit of such Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of further exchange rate fluctuations.

(ii)     Each prepayment of Loans pursuant to the foregoing Section 2.5(b)(i) shall be applied in the following manner: first, ratably to the L/C Borrowings, second, ratably to the outstanding Loans, and, third, to Cash Collateralize

61

the remaining L/C Obligations. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the relevant L/C Issuer or the Lenders, as applicable.

Section 2.6    Termination or Reduction of Commitments.

(a)    Optional. The Parent Borrower may, upon notice to the Administrative Agent, terminate the Aggregate Commitments or Letter of Credit Sublimit, or from time to time permanently reduce the Aggregate Commitments or the Letter of Credit Sublimit; *provided* that (i) any such notice shall be received by the Administrative Agent not later than 10:00 a.m. three (3) Business Days (or such shorter time period as may be agreed by the Administrative Agent in its sole discretion) prior to the date of any such termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Parent Borrower shall not terminate or reduce (A) the Aggregate Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Line Cap or (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (iv) if, after giving effect to any reduction of the Aggregate Commitments, the Letter of Credit Sublimit exceeds the amount of the Aggregate Commitments, the Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(b)    Application of Commitment Reductions; Payment of Fees. The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit or the Commitments under this Section 2.6. Upon any reduction of the Aggregate Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees accrued hereunder until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

Section 2.7    Repayment of Loans.

(a)    Each Borrower shall repay to the Lenders on the Maturity Date the aggregate principal amount of all Loans outstanding on such date.

(b)    If, during any Cash Dominion Trigger Period, the Administrative Agent elects to implement cash dominion, the ledger balance in each Dominion Account as of the end of a Business Day shall be applied to the Obligations at the beginning of the next Business Day. If a credit balance results from such application, it shall not accrue interest in favor of the Loan Parties and shall promptly be made available to the Borrowers as long as no Default or Event of Default exists. The Loan Parties may retain access to the funds in the Dominion Accounts until such time as (i) an Event of Default has occurred and is continuing and the Administrative Agent has delivered notice that it is exercising exclusive control over the Dominion Accounts or (ii) a Cash Dominion Trigger Period exists.

Section 2.8    Interest. (a) Subject to the provisions of Section 2.8(b), (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding

62

principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)      (i) If any amount of principal of any Loan or L/C Borrowing is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, all outstanding Loans and L/C Borrowings (whether or not overdue) shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws until such amount is paid in full (after as well as before judgment).

(ii)      If any amount (other than principal of any Loan or L/C Borrowing) payable by any Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such overdue amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws until such amount is paid in full (after as well as before judgment).

(iii)      Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)      Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Notwithstanding anything else to the contrary contained herein, interest hereunder shall be due no less frequently than quarterly. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.9      Fees. In addition to certain fees described in Sections 2.3(i) and (j):

(a)      Commitment Fee. The Parent Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, a commitment fee equal to the Applicable Fee Rate multiplied by the actual daily amount by which the Aggregate Commitments exceeds the Total Outstandings. The commitment fee described in this Section 2.9(a) shall accrue at all times during the relevant Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first day of each January, April, July and October, commencing with the first such date to occur after the Closing Date, and, in the case of the commitment fee with respect to the Aggregate Commitments, on the last day of the Availability Period. The commitment fee described in this Section 2.9(a) shall be calculated quarterly in arrears.

(b)      Other Fees.

(i)      The Parent Borrower shall pay to the Arrangers and the Administrative Agent for their own respective accounts, in Dollars, fees in the amounts and at the times specified in the Fee Letter or any other written agreement with respect to fees in connection with this Agreement. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

63

(ii)    The Parent Borrower shall pay to the respective Lenders, in Dollars, fees in the amounts and at the times specified in the Fee Letter or any other written agreement with respect to fees in connection with this Agreement. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.10    Computation of Interest and Fees.  All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurodollar Rate) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    Evidence of Debt. (a) The Credit Extensions made by each Lender or L/C Issuer shall be evidenced by one or more accounts or records maintained by such Lender or such L/C Issuer, as applicable, and by the Administrative Agent in the Ordinary Course of Business. Such accounts or records maintained by the Administrative Agent and each Lender or L/C Issuer, as applicable, shall be conclusive absent manifest error of the amount of the applicable Credit Extensions to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender or any L/C Issuer and the accounts and records of the Administrative Agent in respect of such matters, the Register and corresponding accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender to the Parent Borrower made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans to the Borrowers in addition to such accounts or records. Each Lender may attach schedules to its Note and record thereon the date, Type (if applicable), amount, and maturity of its Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in Section 2.11, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

Section 2.12    Payments Generally; Administrative Agent's Clawback.

(a)    General. All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. If, for any reason, any Borrower is

64

prohibited by any Law from making any required payment hereunder in an Alternative Currency, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the Alternative Currency payment amount. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent (i) after 2:00 p.m., in the case of payments in Dollars, or (ii) after the Applicable Time specified by the Administrative Agent in the case of payments in an Alternative Currency, shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by any Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be. Each Borrower agrees that, during any Cash Dominion Trigger Period, the Administrative Agent may (and, at the request of the Required Lenders, the Administrative Agent shall), after or substantially concurrently with the delivery of a written notice (which may be by email) thereof to the Parent Borrower, (A) (x) cause each bank that maintains any account subject to a Control Agreement to transfer, on a daily basis, all collected funds in any such account to a Dominion Account and/or (y) require the Loan Parties to instruct each bank at which a Loan Party maintains a deposit account that is not subject to a Control Agreement in favor of the Administrative Agent to transfer, on a daily basis, all collected funds in any such account to a Dominion Account, and (B) apply any amounts on deposit in a Dominion Account to repay Loans whenever any Loans are outstanding.

(b)      (i) <u>Funding by Lenders; Presumption by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurodollar Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 p.m. on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.2</u> (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.2</u>) and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the applicable Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by such Borrower, the interest rate applicable to Base Rate Loans. If the applicable Borrower and applicable Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to such Borrower the amount of such interest paid by such Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by a Borrower shall be without prejudice to any claim such Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

65

(ii)      Payments by Borrowers; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from a Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuers hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Appropriate Lenders the amount due. In such event, if such Borrower has not in fact made such payment, then each of the Appropriate Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or such L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)      Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to any Borrower as provided in the foregoing provisions of this Article II, and such funds are not made available to such Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Section 4.2 (and, if such Credit Extension is to be made on the Closing Date, Section 4.1) are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)      Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and to make payments pursuant to Section 10.4(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 10.4(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.4(c).

(e)      Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)      Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, L/C Borrowings, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and L/C Borrowings then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and L/C Borrowings then due to such parties.

Section 2.13     Sharing of Payments by Lenders. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Revolving Facility Obligations due and payable to such Lender hereunder and under the other Loan Documents at

66

such time in excess of its ratable share (according to the proportion of (i) the amount of such Revolving Facility Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Revolving Facility Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Revolving Facility Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Revolving Facility Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Revolving Facility Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Revolving Facility Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Revolving Facility Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (A) notify the Administrative Agent of such fact, and (B) purchase (for cash at face value) participations in the Loans and subparticipations in L/C Obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Revolving Facility Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, *provided* that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (A) any payment made by or on behalf of any Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or subparticipations in L/C Obligations to any assignee or participant, other than to the Parent Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

Section 2.14     Designated Borrower.

(a)     Effective as of the Closing Date, each of Quail Tools, L.P.; Parker Drilling Arctic Operating, LLC; Parker Drilling Offshore USA, L.L.C. and Parker Well Services, LLC shall be a "**Designated Borrower**" hereunder and may receive Loans for its account on the terms and conditions set forth in this Agreement; *provided* that such Subsidiary shall be a Wholly-Owned Domestic Subsidiary of the Parent Borrower and shall remain a Wholly-Owned Domestic Subsidiary of the Parent Borrower for as long as such Subsidiary is a Designated Borrower.

67

(b)      So long as no Default shall have occurred and is continuing or shall result therefrom: the Parent Borrower may at any time, upon not less than fifteen (15) Business Days' notice from the Parent Borrower to the Administrative Agent (or such shorter period as may be agreed by the Administrative Agent in its sole discretion), designate any additional Wholly-Owned Domestic Subsidiary of Parent Borrower that is not already a Designated Borrower (an "**Applicant Borrower**") as a Designated Borrower to receive Loans hereunder by delivering to the Administrative Agent (which shall promptly deliver counterparts thereof to each Lender) a duly executed notice and agreement in substantially the form of Exhibit H (a "**Designated Borrower Request and Assumption Agreement**"); *provided* that such Applicant Borrower shall remain a Wholly-Owned Domestic Subsidiary of the Parent Borrower for as long as such Subsidiary is a Designated Borrower. Notwithstanding anything else to the contrary in this Section 2.14(b), the parties hereto acknowledge and agree that prior to any Applicant Borrower becoming a Designated Borrower and entitled to utilize the credit facilities provided for herein (x) each Lender and L/C Issuer shall have had 3 Business Days to review such Applicant Borrower's Designated Borrower Request and Assumption Agreement and notify the Administrative Agent in writing of any objection to such Applicant Borrower becoming a Designated Borrower on the basis of such Lender or L/C Issuer (A) not being permitted to make any Loan or to issue a Letter of Credit, as applicable, to such Designated Borrower under applicable Law or (B) not being able to commit or make such Loan or issue such Letter of Credit, as applicable, to such Designated Borrower because of adverse tax consequences for such Lender when such Subsidiary of the Parent Borrower becomes a Designated Borrower, (y) to the extent such Applicant Borrower is not already a Loan Party at the time of such designation, Parent Borrower shall cause such Applicant Borrower to become a party to the Guaranty and the Security Agreement and (z) the Administrative Agent, the L/C Issuers and the Lenders shall have received such supporting resolutions, incumbency certificates, opinions of counsel, appraisals and field exams, any documents or instruments required pursuant to Section 6.9 and other documents or information (including, without limitation, information and documentation of the type provided under Section 4.1(a)(xix), in each case, in form, content and scope reasonably satisfactory to the Administrative Agent, as may be required by the Administrative Agent in its sole discretion, and a Note signed by such new Borrower to the extent any Lender so requires (such deliverables collectively, the "**Applicant Borrower Materials**"). If (1) no Lender objects to the addition of an Applicant Borrower as a Designated Borrower as set forth in clause x of the preceding sentence and (2) the Administrative Agent determines in its sole discretion that an Applicant Borrower shall be entitled to receive Loans hereunder, then promptly following receipt of all the Applicant Borrower Materials, the Administrative Agent shall send a notice in substantially the form of Exhibit I (a "**Designated Borrower Notice**") to the Parent Borrower and the Lenders specifying the effective date upon which the Applicant Borrower shall constitute a Designated Borrower for purposes hereof, whereupon each of the Lenders agrees to permit such Designated Borrower to receive Loans hereunder, on the terms and conditions set forth herein, and each of the parties agrees that such Designated Borrower otherwise shall be a Borrower for all purposes of this Agreement; *provided* that no Committed Loan Notice or Letter of Credit Application may be submitted by or on behalf of such Designated Borrower until the date five (5) Business Days after such effective date (or such shorter period as may be agreed by the Administrative Agent in its sole discretion).

(c)      The Obligations of the Parent Borrower and each Designated Borrower that is a Subsidiary shall be joint and several in nature.

68

(d)      Each Subsidiary of the Parent Borrower that is or becomes a "Designated Borrower" pursuant to this Section 2.14 hereby irrevocably confirms the appointment and powers of the Parent Borrower under Article XI and will become a Guarantor pursuant to Section 6.9.

(e)      The Parent Borrower may from time to time, upon not less than fifteen (15) Business Days' notice from the Parent Borrower to the Administrative Agent (or such shorter period as may be agreed by the Administrative Agent in its sole discretion), terminate a Designated Borrower's status as such, *provided* that (i) there are no outstanding Loans payable by such Designated Borrower, or other amounts payable by such Designated Borrower on account of any Loans made to it, as of the effective date of such termination or (ii) if Total Outstandings exceed the Line Cap at the time of such termination of status, the Borrowers shall contemporaneously make such prepayments as are required hereunder. The Administrative Agent will promptly notify the Lenders of any such termination of a Designated Borrower's status.

Section 2.15      LIBOR Successor Rate. Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Parent Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to Parent Borrower) that the Parent Borrower or Required Lenders (as applicable) have determined, that:

(i)      adequate and reasonable means do not exist for ascertaining LIBOR for any requested Interest Period, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)      the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "**Scheduled Unavailability Date**"), or

(iii)      syndicated loans currently being executed, or that include language similar to that contained in this Section 2.15, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Parent Borrower may amend this Agreement to replace LIBOR with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "**LIBOR Successor Rate**"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Parent Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders do not accept such amendment.

69

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Parent Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, (to the extent of the affected Eurodollar Rate Loans or Interest Periods), and (y) the Eurodollar Rate component shall no longer be utilized in determining the Base Rate. Upon receipt of such notice, the Parent Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for purposes of this Agreement.

Section 2.16   Defaulting Lenders.

(a)   Amendments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)   Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "**Required Lenders**" and Section 10.1.

(ii)   Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.8 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payments of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer hereunder; third, to Cash Collateralize the L/C Issuer's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.3(g), fourth, as the Parent Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Parent Borrower, to be held in a deposit account and released pro rata in order to (A) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (B) Cash Collateralize the L/C Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.3(g), sixth, to the payment of any amounts owing to the Lenders, or the L/C Issuer as a result of any final and nonappealable judgment of a court of competent jurisdiction obtained by any Lender or the L/C Issuer against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default exists, to the payment of any amounts owing to the Parent Borrower as a result of any

final and nonappealable judgment of a court of competent jurisdiction obtained by the Parent Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.16(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.16(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     Certain Fees.

(A)     No Defaulting Lender shall be entitled to receive any fee payable under Section 2.9(a) for any period during which that Lender is a Defaulting Lender (and the Parent Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)     Each Defaulting Lender shall be entitled to receive Letter of Credit Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated face amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.3.

(C)     With respect to any fee payable under Section 2.9 or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Parent Borrower shall (I) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (II) pay to the L/C Issuer the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such L/C Issuer's Fronting Exposure to such Defaulting Lender, and (III) not be required to pay the remaining amount of any such fee.

(iv)     Reallocation of Applicable Percentages to Reduce Fronting Exposure. All or any part of such Defaulting Lender's participation in L/C Obligations shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that such reallocation does not cause the aggregate Outstanding Amount of the Loans of such Non-Defaulting Lender, plus such Non-Defaulting Lender's Applicable Percentage of the Outstanding Amount of all L/C

71

Obligations to exceed such Non-Defaulting Lender's Commitment. Subject to Section 10.23, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender's having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)     Cash Collateral. If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Parent Borrower shall, without prejudice to any right or remedy available to it hereunder or under applicable Law, Cash Collateralize the L/C Issuer's Fronting Exposure in accordance with the procedures set forth in Section 2.3(g).

(b)     Defaulting Lender Cure. If the Parent Borrower, the Administrative Agent and the L/C Issuers agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Commitments (without giving effect to Section 2.16(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Parent Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.17     Protective Advances. The Administrative Agent shall be authorized, in its [**commercially reasonably judgment**], at any time that any condition in Section 4.2 is not satisfied or waived, to make one or more Base Rate Loans ("**Protective Advances**") (a) in an aggregate amount not to exceed 10% of the Aggregate Commitments at any time, if the Administrative Agent deems such Loans necessary or desirable to preserve or protect Collateral, or to enhance the collectability or repayment of Obligations, as long as such Loans do not cause Total Outstandings to exceed the Aggregate Commitments; or (b) to pay any other amounts chargeable to the Loan Parties under any Loan Documents, including interest, costs, fees and expenses, in each case to the extent due and payable [(**and not in dispute by the Parent Borrower, acting in good faith**)]. The Lenders shall participate on a pro rata basis in accordance with their Commitments in Protective Advances outstanding from time to time. The Required Lenders may at any time revoke the Administrative Agent's authority to make further Protective Advances under clause (a) by written notice to the Administrative Agent. Absent such revocation, the Administrative Agent's determination that funding of a Protective Advance is appropriate shall be conclusive. No funding of a Protective Advance shall constitute a waiver by the Administrative Agent or the Lenders of any Event of Default relating thereto. No Loan Party shall be a beneficiary of this Section nor authorized to enforce any of its terms.

Section 2.18     Increase in Commitments.

(a)     Request for Increase. Provided there exists no Default, upon notice to the Administrative Agent (which shall promptly notify the Lenders), the Parent Borrower may

72

from time to time request an increase in the Aggregate Commitments to an amount up to but not exceeding (giving effect to all such increases) [$25,000,000][4]; provided that (i) any such request for an increase shall be in a minimum amount of $10,000,000 (or such lesser amount that permits compliance with Section 2.18(e)(iv) and (ii) the Parent Borrower may make a maximum of [two] [(2)] such requests.  At the time of sending such notice, the Parent Borrower (in consultation with the Administrative Agent) shall specify the time period within which each Lender is requested to respond (which shall in no event be less than ten Business Days from the date of delivery of such notice to the Lenders).

(b)     Lender Elections to Increase.   Each Lender shall notify the Administrative Agent within such time period whether or not it agrees to increase its Commitment and, if so, whether by an amount equal to, greater than, or less than its Applicable Percentage of such requested increase.  Any Lender not responding within such time period shall be deemed to have declined to increase its Commitment.

(c)     Notification by Administrative Agent; Additional Lenders.   The Administrative Agent shall notify the Parent Borrower and each Lender of the Lenders' responses to each request made hereunder.  Subject to the approval of the Administrative Agent and the L/C Issuers (which approvals shall not be unreasonably withheld), to the extent such approval would be required under Section 10.6(b)(iii), the Parent Borrower may also invite additional Eligible Assignees to become Lenders pursuant to a joinder agreement in form and substance satisfactory to the Administrative Agent and its counsel, which invitation may be made concurrently with the notice required by Section 2.18(a).

(d)     Effective Date and Allocations.   If the Aggregate Commitments are increased in accordance with this Section, the Administrative Agent and the Parent Borrower shall determine the effective date (the "Revolving Credit Increase Effective Date") and the final allocation of such increase.  The Administrative Agent shall promptly notify the Parent Borrower and the Lenders of the final allocation of such increase and the Revolving Credit Increase Effective Date.

(e)     Conditions to Effectiveness of Increase.   Any such increase shall be subject to the following additional conditions: (i) the Parent Borrower shall deliver to the Administrative Agent a certificate of each Loan Party dated as of the Revolving Credit Increase Effective Date (in sufficient copies for each Lender) signed by a Responsible Officer of such Loan Party (x) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such increase, and (y) in the case of the Parent Borrower, certifying that, before and after giving effect to such increase, (A) the representations and warranties contained in Article V and the other Loan Documents are true and correct in all material respects (except for such representations and warranties that have a materiality or Material Adverse Effect qualification, which shall be true and correct in all respects) on and as of the Revolving Credit Increase Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date, and except that for purposes of this Section 2.18, the representations and warranties contained in subsections (a) and (b) of Section 5.5 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.1, and (B) no Default or Event of Default shall have occurred and be continuing as of the date of such notice given in accordance with Section 2.18(a) and both immediately before and after giving effect thereto as of the Revolving Credit Increase Effective Date; (ii) the increase in Aggregate

---

[4] [**NTD**: Amount to equal $125 million minus the Aggregate Commitments on the Closing Date.]

Commitments shall be on the same terms and conditions as this Agreement (except with respect to upfront or similar fees payable to the Lenders providing such increase and arrangement fees), including benefiting from the same guarantees and secured by the same liens and Collateral; (iii) the increase in Aggregate Commitments, to the extent arising from the admission of an Eligible Assignee as a Lender, shall be effected pursuant to one or more joinder agreements executed and delivered by the Parent Borrower, the new Lender(s) and the Administrative Agent, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent; (iv) neither the funding of such increase (assuming that the Aggregate Commitments as so increased are fully drawn) nor the existence of the Liens securing the same would exceed 95% of any applicable limitation under the Term Loan Credit Agreement or any other agreement governing material Indebtedness for borrowed money of the Parent Borrower and its Subsidiaries; (v) the Borrowers shall pay all reasonable and documented fees and expenses in connection with the increase in Aggregate Commitments, including payments required pursuant to Section 3.5 in connection with the increase; and (vi) the Loan Parties shall have delivered all customary agreements, certificates, opinions and other customary documents reasonably requested by the Administrative Agent in connection with such increase.  The Borrowers shall prepay any Revolving Credit Loans outstanding on the Revolving Credit Increase Effective Date (and pay any additional amounts required pursuant to Section 3.5) to the extent necessary to keep the outstanding Revolving Credit Loans ratable with any revised Applicable Percentages arising from any nonratable increase in the Commitments under this Section, and the Borrowers may use advances from Lenders having new or increased Commitments for such prepayment.

(f)     Conflicting Provisions.  This Section shall supersede any provisions in Section 2.13 or 10.1 to the contrary.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.1     Taxes.

(a)     Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)     Any and all payments by or on account of any obligation of any Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes. If, however, applicable Laws require any Borrower or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined in the good faith discretion of such Borrower or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)     If any Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental

74

Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)     If any Borrower or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Borrower or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Borrower or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount so withheld or deducted by it to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by the Borrowers. Without limiting the provisions of subsection (a) above, each Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)     Tax Indemnifications.

(i)     Without limiting the provisions of subsection (a) or (b) above, each Borrower shall, and does hereby, jointly and severally indemnify the Administrative Agent, each Lender and each L/C Issuer, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Administrative Agent, such Lender or such L/C Issuer, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of any such payment or liability delivered to the Parent Borrower by a Lender or L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or L/C Issuer, shall be conclusive absent manifest error.

(ii)     Each Lender and L/C Issuer shall indemnify and hold harmless the Administrative Agent, on a several basis, (i) against any Indemnified Taxes attributable to such Lender or L/C Issuer (but only to the extent the Loan Parties have not already paid or reimbursed the Administrative Agent therefor and without limiting the Loan Parties' obligation to do so), (ii) against any Taxes attributable to such Lender's failure to maintain a Participant Register as required hereunder, and (iii) against any Excluded Taxes attributable to such Lender or L/C Issuer, in each case, that are payable or paid by the Administrative Agent in connection with any Obligations,

and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Each Lender and L/C Issuer shall make payment within 10 days after demand for any amount or liability payable under this Section. A certificate as to the amount of such payment or liability delivered to any Lender or L/C Issuer by the Administrative Agent shall be conclusive absent manifest error. Each Lender and each L/C Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or such L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii). The agreements in this clause (ii) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender or any L/C Issuer, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d) Evidence of Payments. As soon as practicable after any payment of Taxes by any Borrower to a Governmental Authority as provided in this Section 3.1, a Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) Status of Lenders; Tax Documentation.

(i) Each Lender and L/C Issuer shall deliver to the Parent Borrower and to the Administrative Agent, [**at the time or times prescribed by applicable Laws or**] when reasonably requested by the Parent Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Parent Borrower or the Administrative Agent, as the case may be, to determine

(A) whether or not payments made by any Borrower hereunder or under any other Loan Document are subject to Taxes, withholding, (including backup withholding) or deduction and if applicable, the required rate of withholding or deduction,

(B) whether or not such Lender or L/C Issuer is subject to information reporting requirements, and

(C) such Lender's or L/C Issuer's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender or L/C Issuer by any Borrower pursuant to this Agreement or otherwise to establish such Lender's or L/C Issuer's status for withholding Tax purposes in the applicable jurisdictions.

Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.1 (e)(ii)(A), (ii)(B)(I)-(IV), (iii) and (v) below) shall not be required if in the Lender's or L/C Issuer's reasonable judgment such completion, execution or submission would subject

such Lender or L/C Issuer to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or L/C Issuer.

(ii)     Without limiting the generality of the foregoing, if a Borrower is a U.S. Person,

(A)     any Lender or L/C Issuer that is a U.S. Person shall deliver to the Parent Borrower and the Administrative Agent on or prior to the date on which such Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon reasonable request of the Parent Borrower or the Administrative Agent) executed copies of IRS Form W-9 certifying that such Lender or L/C Issuer is exempt from United States federal backup withholding; and

(B)     each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Parent Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the request of the Parent Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming benefits of any income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of United States federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(II)     executed copies of IRS Form W-8ECI,

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of a Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable),

(IV)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a

77

U.S. Tax Compliance Certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner, or

(V)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Parent Borrower and the Administrative on or prior to the date on which such Foreign Lender becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Parent Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Laws to permit the Parent Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)      Each Lender and L/C Issuer shall promptly update and deliver any such form or certificate it previously delivered that has expired or become obsolete or inaccurate in any respect or notify the Parent Borrower and the Administrative Agent in writing of its legal inability to do so.

(iv)      Each Borrower shall promptly deliver to the Administrative Agent, any Lender or any L/C Issuer, as the Administrative Agent, such Lender, or such L/C Issuer shall reasonably request, on or prior to the Closing Date, and in a timely fashion thereafter, such documents and forms required by any relevant taxing authorities under the Laws of any jurisdiction, duly executed and completed by such Borrower, as are required to be furnished by such Lender, such L/C Issuer or the Administrative Agent under such Laws in connection with any payment by the Administrative Agent or any Lender of Taxes or Other Taxes, or otherwise in connection with the Loan Documents, with respect to such jurisdiction.

(v)      If a payment made to any Lender or any L/C Issuer under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender or L/C Issuer were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or L/C Issuer shall deliver to the Parent Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Parent Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code), and such additional documentation reasonably requested by the Parent Borrower or the Administrative Agent, in each case, as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender or L/C Issuer has complied with such Lender's or L/C Issuer's obligations under FATCA or to determine the amount to deduct and withhold from such payment. [**Solely for purposes of this clause (v), "FATCA" shall include any amendments made to FATCA after the**

78

**Closing Date. For purposes of determining withholding Taxes imposed under FATCA, from and after the Closing Date, the Parent Borrower and the Administrative Agent shall treat (and the Lenders and L/C Issuers hereby authorize the Administrative Agent to treat) the Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).]**

(vi)    **[If the Administrative Agent is a U.S. Person, it shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-9 or (2) if the Administrative Agent is not a U.S. Person, then it shall provide the Borrower with two properly completed IRS Form W-8ECI with respect to fees received on its own behalf and any such other documentation prescribed by applicable Law and reasonably requested by the Borrower that would allow the applicable Borrower to make payments to such Lender without deduction or withholding of any U.S. federal withholding Taxes. If the Administrative Agent is not a U.S. Person, such Administrative Agent shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-8IMY (or successor form) certifying that it is either (i) a "qualified intermediary" and that it assumes primary withholding responsibility under Chapters 3 and 4 of the Code and primary Form 1099 reporting and backup withholding responsibility for payments it receives for the account of others or (ii) a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the U.S. and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by U.S. Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.]**

**[Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.]**

(f)    <u>Treatment of Certain Refunds</u>. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or an L/C Issuer, or have any obligation to pay to any Lender or any L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or such L/C Issuer, as the case may be. If the Administrative Agent, any Lender or any L/C Issuer determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by any Borrower or with respect to which any Borrower has paid additional amounts pursuant to this Section, it shall pay to such Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses and net of any loss or gain realized in the conversion of such funds from or to another currency incurred by the Administrative Agent, such Lender or any L/C Issuer, as the case may be, and without interest

(other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that each Borrower, upon the request of the Administrative Agent, such Lender or such L/C Issuer, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or such L/C Issuer in the event the Administrative Agent, such Lender or such L/C Issuer is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection (f), in no event will the Administrative Agent, any Lender or any L/C Issuer be required to pay any amount to any Borrower pursuant to this subsection (f) the payment of which would place the Administrative Agent, such Lender or such L/C Issuer in a less favorable net after-Tax position than the Administrative Agent, such Lender or such L/C Issuer would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require the Administrative Agent, any Lender or any L/C Issuer to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower or any other Person.

(g)     Survival. Each party's obligations under this Section 3.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 3.2     Illegality. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to perform any of its obligations hereunder or make, maintain or fund or charge interest with respect to any Credit Extension, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Parent Borrower through the Administrative Agent, any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Credit Extension or to convert Base Rate Loans to Eurodollar Rate Loans, shall be suspended until such Lender notifies the Administrative Agent and the Parent Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Parent Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all such Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

Section 3.3     Inability to Determine Rates. If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Parent Borrower and each Lender. Thereafter,

the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Parent Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.4    Increased Costs.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Eurodollar Rate) or any L/C Issuer;

(ii)    subject the Administrative Agent, any Lender or any L/C Issuer to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or any L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or L/C Issuer of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or such L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by the Administrative Agent, such Lender or such L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of the Administrative Agent, such Lender or such L/C Issuer, the Parent Borrower will pay to the Administrative Agent, such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate the Administrative Agent, such Lender or such L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If any Lender or any L/C Issuer determines that any Change in Law affecting such Lender or such L/C Issuer or any Lending Office of such Lender or such Lender's or such L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such L/C Issuer's capital or on the capital of such Lender's or such L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such L/C Issuer's policies and the policies of such Lender's or such L/C Issuer's holding company with respect to capital adequacy and liquidity), then from time to time the Parent Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate

81

such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement. A certificate of a Lender or L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or such L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Parent Borrower shall be conclusive absent manifest error. The Parent Borrower shall pay such Lender or such L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests. Failure or delay on the part of any Lender or any L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or such L/C Issuer's right to demand such compensation, *provided* that no Borrower shall be required to compensate a Lender or L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or such L/C Issuer, as the case may be, notifies the Parent Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.5     Compensation for Losses. Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Parent Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by any Borrower;

(c)     any failure by any Borrower to make payment of drawing under any Letter of Credit (or interest due thereon) denominated in an Alternative Currency on its scheduled due date or any payment thereof in a different currency; or

(d)     any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by any Borrower pursuant to Section 10.13;

excluding any loss of anticipated profits, but including any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan, from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract. The Parent Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Parent Borrower (or the applicable Designated Borrowers) to the Lenders under this Section 3.5, each Lender shall be deemed to

have funded each Eurodollar Rate Loan made by it at the Eurodollar Base Rate used in determining the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.6    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of a Different Lending Office. If any Lender requests compensation under Section 3.4, or any Borrower is required to pay any [**Indemnified Taxes or**] additional amount to any Lender, any L/C Issuer, or any Governmental Authority for the account of any Lender or any L/C Issuer pursuant to Section 3.1, or if any Lender gives a notice pursuant to Section 3.2, then, at the request of Parent Borrower, such Lender or such L/C Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or such L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or 3.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.2, as applicable, and (ii) in each case, would not subject such Lender or such L/C Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or such L/C Issuer, as the case may be. The Parent Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or any L/C Issuer in connection with any such designation or assignment.

(b)    Replacement of Lenders. If any Lender requests compensation under Section 3.4, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1, and in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with Section 3.6(a), or if any Lender is a Non-Consenting Lender or a Defaulting Lender or otherwise gives notice pursuant to Section 3.2, the Parent Borrower may replace such Lender in accordance with Section 10.13.

Section 3.7    Survival. [**Each party's**] obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

Section 3.8    Keepwell. Each Loan Party that is a Qualified ECP Guarantor at the time the Guaranty, or the grant of the security interest under any Loan Document, by such Loan Party, becomes effective with respect to any Secured Hedge Agreement, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed by each other Loan Party from time to time to honor all of its obligations under its Guaranty and the other Loan Documents in respect of such Secured Hedge Agreement (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Section voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Each Qualified ECP Guarantor intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Secured Party for all purposes of the Commodity Exchange Act.

# ARTICLE IV
# CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.1    Conditions of Initial Credit Extension. The obligation of each L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction (or waiver in compliance with Section 10.1) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals, telecopies or electronic copies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to each Arranger, the Administrative Agent and each of the Lenders:

(i)    executed counterparts of this Agreement, sufficient in number for distribution to the Administrative Agent, each Lender and each Loan Party;

(ii)    a Note executed by the Parent Borrower in favor of each Lender requesting a Note;

(iii)    executed counterparts of the Collateral Documents, sufficient in number for distribution to the Administrative Agent, each Lender and the Parent Borrower, together with:

(A)    to the extent not delivered to the Administrative Agent prior to the Closing Date, certificates representing the Pledged Equity Interests accompanied by undated transfer powers executed in blank or, if any of the Pledged Equity Interests shall be uncertificated securities (as defined in Article 8 of the UCC), confirmation and evidence satisfactory to the Administrative Agent that the security interest in such uncertificated securities has been transferred to and perfected by the Administrative Agent for the benefit of the Secured Parties in accordance with Section 9-106 of the Uniform Commercial Code, and instruments evidencing the debt instruments pledged pursuant to the Collateral Documents, if any, indorsed in blank;

(B)    proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Administrative Agent may deem necessary or desirable in order to perfect the Liens created under the Security Agreement, covering the Collateral described therein;

(C)    copies of any other Uniform Commercial Code, judgment, tax lien, intellectual property, or other searches reasonably requested by the Administrative Agent with respect to the Collateral, together with copies of the financing statements (or similar documents) disclosed by such searches, and accompanied by evidence that any Liens indicated in any such financing statement that are not permitted by Section 7.1 have been or contemporaneously will be released or terminated (or otherwise provided for in a manner reasonably acceptable to the Administrative Agent); and

(D)    evidence that all other actions, recordings and filings that the Administrative Agent may deem necessary or desirable in order to perfect

84

the Liens created under the Collateral Documents have been taken or made (including receipt of duly executed payoff letters, UCC-3 termination statements and consent agreements, if applicable) or arrangements therefor satisfactory to the Administrative Agent shall have been made;

(iv)     a Mortgage, covering each of the Specified Barge Rigs listed on Schedule 5.7(A), duly executed by the appropriate Loan Party, together with:

(A)     evidence that counterparts of the Mortgage have been duly executed, acknowledged and delivered and are in form suitable for filing or recording with the United States Coast Guard and all other filing or recording offices that the Administrative Agent may deem necessary or desirable in order to create a valid first and subsisting Lien on the Specified Barge Rigs described therein in favor of the Administrative Agent for the benefit of the Secured Parties and that all filing, documentary, stamp, intangible and recording taxes and fees have been paid (or arrangements for such payment satisfactory to the Administrative Agent shall have been made); and

(B)     evidence that all other actions that the Administrative Agent may deem necessary or desirable in order to create valid first and subsisting Liens on the property described in the Mortgages has been taken, including delivery of an abstract of title, certificate of ownership, copy of certificate of documentation, and copy of certificate of financial responsibility (for each jurisdiction where applicable) with respect to each Specified Barge Rig;

(v)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(vi)     such documents, agreements and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of the Loan Parties is validly existing and in good standing in its jurisdiction of organization;

(vii)     a favorable opinion of Kirkland & Ellis, LLP, counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, covering such customary matters concerning the Loan Parties and the Loan Documents as the Required Lenders may reasonably request;

(viii)     favorable opinions of local counsel to the Loan Parties in Delaware, Louisiana, Nevada and Oklahoma, addressed to the Administrative Agent and each Lender, covering such customary matters concerning the Loan Parties and the Loan Documents as the Required Lenders may reasonably request;

(ix)     a certificate of a Responsible Officer of the Parent Borrower either (1) attaching copies of all consents (including, without limitation, from any Governmental Authority, shareholder or other third-party), licenses and approvals

85

required in connection with the execution, delivery and performance by any Loan Party and the validity against any Loan Party of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect (except that the following consents do not need to be attached to such certificate to the extent delivered to the Administrative Agent as attachments to any other certificate delivered on the Closing Date: (A) any consents of a member or partner of a Loan Party that are required with respect to the pledge of equity under such Loan Party's Organization Documents and (B) any resolutions by each Loan Party's governing body authorizing and approving the Loan Documents), or (2) stating that no such consents, licenses or approvals are so required;

(x)        executed counterparts of the Intercreditor Agreement, sufficient in number for distribution to the Administrative Agent, each Lender and the Parent Borrower;

(xi)        executed copies of the Term Loan Credit Agreement and the other Term Loan Documents;

(xii)        a certificate signed by a Responsible Officer of the Parent Borrower certifying that the conditions specified in Sections 4.2(a) and (b) have been satisfied;

(xiii)        copies of the Audited Financial Statements and unaudited interim consolidated financial statements of the Parent Borrower and its consolidated Subsidiaries for each calendar month period ended subsequent to December 31, 2018 as to which such financial statements are available, accompanied by a certificate of a Responsible Officer of the Parent Borrower;

(xiv)        a reasonably satisfactory opening balance sheet of the Parent Borrower and its consolidated Subsidiaries giving pro forma effect to the transactions occurring on the effective date of the Plan of Reorganization and a customary funds flow memorandum;

(xv)        projections of the consolidated balance sheets, results of operations, cash flow and Availability for the Parent Borrower and its consolidated Subsidiaries covering the period from January 1, 2019 through the Maturity Date, prepared on a quarterly basis for the fiscal year ending on December 31, 2019 and an annual basis for each fiscal year ending December 31, 2020, December 31, 2021 and December 31, 2022 (the "**Initial Projections**"), prepared by a Responsible Officer of the Parent Borrower having responsibility over financial matters, all in form and substance reasonably satisfactory to the Administrative Agent;

(xvi)        a Solvency Certificate in the form attached hereto as Exhibit J, executed by a Responsible Officer of Parent Borrower;

(xvii)        a Borrowing Base Certificate prepared as of [_____], 2019 and accompanied by such supporting detail and documentation as is contemplated by the Borrowing Base Certificate and/or as shall be reasonably requested by the Administrative Agent (in a form comparable to that previously provided to the Administrative Agent);

(xviii)  all documentation and other information with respect to the Loan Parties required by regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act and the Beneficial Ownership Regulation at least five (5) Business Days prior to the Closing Date to the extent the same have been requested at least ten (10) Business Days prior to the Closing Date;

(xix)  evidence and documentation in form and substance reasonably satisfactory to the Administrative Agent that, prior to or substantially concurrently with the Closing Date, Parent Borrower has received cash proceeds of not less than $95,000,000 from the Rights Offering (as defined in the RSA), as such amount may be reduced to provide for netting of fees and expenses;

(xx)  evidence reasonably satisfactory to the Administrative Agent that, after giving effect to all payments to be made to unsecured creditors and other claimants on the effective date of the Plan of Reorganization, the sum of (A) the Loan Parties' unrestricted cash and Cash Equivalents and (B) Availability shall not be less than $100,000,000; and

(xxi)  such other assurances, certificates (including a perfection certificate, if requested), documents, reports (including any environmental reports), consents or opinions as the Administrative Agent, the L/C Issuers, or any Lender reasonably may require.

(b)  The Administrative Agent, Lenders and Arrangers shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, without limitation, all filing and recording fees and Taxes and, to the extent invoiced at least two (2) Business Days prior to the Closing Date, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Parent Borrower hereunder (including all such reasonable fees, charges and disbursements of counsel to the Administrative Agent, paid directly to such counsel if requested by the Administrative Agent).

(c)  The Loan Parties' capital structure and financing plan shall be satisfactory to the Administrative Agent (it being agreed and understood that the capital structure and financing plan as set forth in the RSA as in effect on the "RSA Effective Date" as defined in the RSA, and as amended by any amendments consented to in writing by the Administrative Agent, shall be deemed satisfactory to the Administrative Agent).

(d)  The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Administrative Agent, and all conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived in accordance therewith.

(e)  There shall be no Outstanding Amounts other than in respect of Letters of Credit.

(f)  Prior to or substantially concurrently with the Closing Date, the DIP Credit Agreement shall have been terminated and all Obligations (as defined in the DIP Credit Agreement) shall have been paid in full in cash (other than (i) indemnification obligations and other contingent obligations not then due and payable and as to which no claim has been made and (ii) any letters of credit issued thereunder that constitute Existing Letters of Credit).

87

Without limiting the generality of the provisions of the last paragraph of Section 9.3, for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document (a draft of which such Lender has reviewed) or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.2    Conditions to all Credit Extensions. The obligation of each Lender and of each L/C Issuer to make any Credit Extension is subject to the following conditions precedent (or the waiver thereof in accordance with Section 10.1):

(a)    The representations and warranties of the Parent Borrower and each other Loan Party contained in Article V or any other Loan Document, shall be true and correct in all material respects (except for such representations and warranties that have a materiality or Material Adverse Effect qualification, which shall be true and correct in all respects) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (except for such representations and warranties that have a materiality or Material Adverse Effect qualification, which shall be true and correct in all respects) as of such earlier date, and except that for purposes of this Section 4.2, the representations and warranties contained in Section 5.5(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Section 6.1(a) and (b), respectively.

(b)    No Default then exists, or would result from such proposed Credit Extension or the application of the proceeds thereof.

(c)    In the case of any request for a Borrowing, the Administrative Agent shall have received a Committed Loan Notice, and in the case of any request for an L/C Credit Extension, the Administrative Agent and the applicable L/C Issuer shall have received a Letter of Credit Application, in each case, in accordance with the requirements hereof.

(d)    In the case of a Credit Extension in the form of any Letter of Credit to be denominated in an Alternative Currency, there shall not have occurred any change in national or international financial, political or economic conditions or currency exchange rates or exchange controls which in the reasonable opinion of the Administrative Agent or the applicable L/C Issuer would make it impracticable for such Credit Extension to be denominated in the relevant Alternative Currency.

(e)    In the case of a Credit Extension in the form of a Borrowing, at any time and immediately after giving effect to such Borrowing (net of any concurrent use of the proceeds of such Borrowing), the Consolidated Cash Balance shall not exceed $30,000,000.

(f)    If the applicable Borrower is a Designated Borrower, then the conditions of Section 2.14 to the designation of such Borrower as a Designated Borrower shall have been met to the satisfaction of the Administrative Agent.

Each request for a Credit Extension submitted by any Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.2(a), (b) and (e) have been satisfied on and as of the date of the applicable Credit Extension.

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES

The Borrowers represent and warrant to the Administrative Agent and the Lenders that:

Section 5.1     Existence; Compliance with Law. Each Loan Party (a) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of the jurisdiction of its organization or formation, (b) has the requisite power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified and licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.2     Power; Authorization; Enforceable Obligations. Each Loan Party has the requisite power and authority to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrowers, to borrow hereunder. Each Loan Party has taken all necessary corporate or other action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrowers, to authorize the borrowings on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to, approval or other act by or in respect of, any Governmental Authority or any other Person is required in connection with (a) the borrowings hereunder or the consummation of the Plan of Reorganization, (b) the execution, delivery, performance, validity or enforceability against any Loan Party of this Agreement or any of the other Loan Documents, (c) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (d) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) or (e) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except, in each case, (i) consents, authorizations, filings and notices described in Schedule 5.2, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect (except as noted on Schedule 5.2), (ii) the filings referred to in Section 5.18, (iii) in the case of any authorization, approval, action, notice or filing from or with a Person other than a Governmental Authority, the failure to have could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (iv) for matters that may be required after the Closing Date in the ordinary course of conducting the business of the Parent Borrower or any Subsidiary thereof. Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable Debtor Relief Laws and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

Section 5.3     No Legal Bar. The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law nor any material Contractual Obligation of the Parent Borrower or any of its Subsidiaries, including, without limitation, arising under the Term Loan Credit Agreement or any other material debt

89

instrument, and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Collateral Documents). No Requirement of Law or Contractual Obligation applicable to the Parent Borrower or any of its Subsidiaries could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.4    No Material Litigation. No litigation, investigation, claim or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Parent Borrower after due and diligent investigation, threatened by or against the Parent Borrower or any of its Subsidiaries or against any of their respective properties or revenues that (a) purport to directly affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby or thereby, or (b) except as specifically disclosed in Schedule 5.4, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described in Schedule 5.4.

Section 5.5    Financial Statements; No Material Adverse Effect. (a) The Audited Financial Statements, reported on by and accompanied by an unqualified report from an independent certified public accounting firm of national reputation, present fairly in all material respects the consolidated financial condition of the Parent Borrower and its Subsidiaries as at December 31, 2017 and, to the extent available on the Closing Date, December 31, 2018, as applicable, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended.

(b)    The unaudited consolidated balance sheet of the Parent Borrower and its Subsidiaries at [January 31, 2019], and the related unaudited consolidated statements of income and cash flows for the period ended on such date, present fairly in all material respects the consolidated financial condition of the Parent Borrower and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the period then ended (subject to the absence of footnotes and normal year-end audit adjustments).

(c)    All such financial statements described in subsections (a) and (b) of this Section, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the applicable accounting firm and disclosed therein or in the case of financial statements described in Section 5.5(b), for the absence of footnotes and normal year-end adjustments). As of the Closing Date, the Parent Borrower and its Subsidiaries do not have any material Guarantees, contingent liabilities and liabilities for taxes (except for any such tax liabilities to taxing authorities outside of the United States which are not, in the aggregate, material to the Parent Borrower and its Subsidiaries taken as a whole) or any long-term leases or unusual forward or long-term commitments, including, without limitation, any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the unaudited consolidated balance sheet of the Parent Borrower and its Subsidiaries at January 31, 2019, and the related unaudited consolidated statements of income and cash flows for the period ended on such date, and which should be so reflected in accordance with GAAP. During the period from January 31, 2019 to and including the Closing Date, there has been no Disposition by the Parent Borrower or any of its Subsidiaries of any material part of its business or Property, except as reflected in the financial statements described in subsections (a) and (b) of this Section which were delivered prior to the Closing Date.

90

(d)      Since December 31, 2017 there has been no event or circumstance, other than the Cases, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(e)      The Projections which have been furnished to the Administrative Agent and/or the Lenders have been prepared in good faith based upon reasonable assumptions at the time such Projections were prepared, it being understood by the Lenders that such Projections are as to future events and are not to be viewed as facts, that such Projections are subject to significant uncertainties and contingencies, many of which are beyond the Parent Borrower's control, that no assurance can be given by the Parent Borrower that any of such Projections will be realized and that actual results during the period or periods covered by such Projections may differ significantly from the projected results and such differences may be material.

Section 5.6      No Default. Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to any of its Contractual Obligations in any respect that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.7      Ownership of Property; Liens. Each Loan Party has good record and marketable title in fee simple to, or a valid leasehold interest in, all its material real property, and good title to, or a valid leasehold interest in, all its other material Property, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and none of such Property is subject to any Lien except Liens permitted by Section 7.1. Schedule 5.7 sets forth a complete and accurate list, as of the Closing Date, of all land rigs and barge rigs located and operating in the continental United States, Alaska or Gulf of Mexico waters subject to U.S. state or federal jurisdiction owned by each Loan Party and each of its Subsidiaries, showing as of the Closing Date the record owner and registration number as presented on any certificate of title or contained in the official records of the National Vessel Documentation Center of the United States Coast Guard, as applicable.

Section 5.8      Intellectual Property. Each Loan Party owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted; no material claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Parent Borrower know of any valid basis for any such claim; and the use of such Intellectual Property by the Parent Borrower and its Subsidiaries does not infringe on the rights of any Person in any material respect.

Section 5.9      Taxes. Solely with respect to periods prior to the Closing Date, except to the extent excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court, each of the Parent Borrower and each of its Subsidiaries has filed or caused to be filed all material Federal, state and other Tax returns and reports that are required to be filed and has paid all Taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other material Taxes, fees or other charges imposed on it or any of its Property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings diligently conducted in each case, with respect to which adequate reserves in conformity with GAAP have been provided on the books of the Parent Borrower or its Subsidiaries, as the case may be); and no [**material**] tax Lien has been filed (except [**for any Liens for taxes the**

**nonpayment of which is excused or prohibited by the Bankruptcy Code, or**] as permitted by Section 7.1(a)).

Section 5.10   Federal Regulations. No part of the proceeds of any Loans or drawings under any Letter of Credit will be used in violation of Regulation U issued by the FRB as now and from time to time hereafter in effect or for any purpose that violates the provisions of the regulations of the FRB. No Loan Party is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB).

Section 5.11   Labor Matters. There are no strikes or other labor disputes against the Parent Borrower or any of its Subsidiaries pending or, to the knowledge of the Parent Borrower, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. Hours worked by and payment made to employees of the Parent Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. Except as could not (individually or in the aggregate) reasonably be expected to have a Material Adverse Effect, all payments due from the Parent Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Parent Borrower or the relevant Subsidiary.

Section 5.12   ERISA Compliance. (a) Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws, except where such non-compliance has not had and could not reasonably be expected to have a Material Adverse Effect. The base prototype plan document which each Plan that is intended to qualify under Section 401(a) of the Code uses an opinion letter from the IRS, or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Parent Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. Except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Parent Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)      There are no pending or, to the knowledge of the Parent Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)      Except to the extent such event could not reasonably be expected to have a Material Adverse Effect: (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Parent Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Parent Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Parent

92

Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(d)     With respect to each scheme or arrangement mandated by a government other than the United States (a "**Foreign Government Scheme or Arrangement**") and with respect to each employee benefit plan maintained or contributed to by any Loan Party or any Subsidiary of any Loan Party that is not subject to United States law (a "**Foreign Plan**"), each Foreign Plan is in compliance in all material respects with the provisions of the applicable law or terms of the applicable Foreign Government Scheme or Arrangement and no Foreign Benefit Event has occurred or is reasonably expected to occur, except where such non-compliance or occurrence has not had and could not reasonably be expected to have a Material Adverse Effect.

(e)     The Parent Borrower represents and warrants as of the Closing Date that none of the Parent Borrower, or its Subsidiaries is or will be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments.

Section 5.13   Investment Company Act; Other Regulations. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the FRB) which limits its ability to incur Indebtedness.

Section 5.14   Subsidiaries. (a) The Subsidiaries listed on Schedule 5.14 constitute all of the Subsidiaries of the Parent Borrower as of the Closing Date. Schedule 5.14 sets forth as of the Closing Date the name and jurisdiction of incorporation and, in the case of each Loan Party, the U.S. taxpayer identification number of each such Subsidiary and, as to each, the percentage of each class of Equity Interest owned by each Loan Party. All of the outstanding Equity Interests in the Subsidiaries of the Parent Borrower have been validly issued, and (to the extent applicable) fully paid and non-assessable. All of the outstanding Pledged Equity Interests that are Collateral are owned free and clear of all Liens except those created under the Collateral Documents and Liens permitted under Section 7.1(w). As of the Closing Date, the Parent Borrower does not directly or indirectly own any Equity Interest in any corporation, limited partnership or limited liability company (or other business entity) other than those specifically disclosed in Schedule 5.14. Schedule 5.14 identifies as of the Closing Date each Material Subsidiary, Immaterial Subsidiary, Project Finance Subsidiary and Excluded Subsidiary.

(b)     As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than Equity Interests granted to employees and/or directors) of any nature relating to any Equity Interests of the Parent Borrower or any Subsidiary, except as disclosed on Schedule 5.14.

Section 5.15   Use of Proceeds. The proceeds of the Loans, and the Letters of Credit, shall be used (a) to pay fees, interest, payments and expenses associated with the consummation of the Plan of Reorganization and (b) to provide liquidity for capital expenditures, acquisitions, working capital and for ongoing general corporate purposes for the Parent Borrower and its Subsidiaries not in contravention of any Law.

Section 5.16     Environmental Matters. Other than as set forth on Schedule 5.16 and exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)     The Parent Borrower and its Subsidiaries: (i) are, and [**for the last five (5) years**] have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any property owned, leased or otherwise operated by any of them; (iii) are, and [**for the last five (5) years**] have been, in compliance with all of their Environmental Permits; and (iv) reasonably believe that: each of their Environmental Permits will be timely renewed and complied with, without material expense; any additional Environmental Permits that may be required of any of them will be timely obtained and complied with, without material expense; and compliance with any Environmental Law that is or is expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)     Hazardous Materials are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by the Parent Borrower or any of its Subsidiaries, or at any other location (including, without limitation, any location to which Hazardous Materials have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of the Parent Borrower or any of its Subsidiaries under any applicable Environmental Law or otherwise result in costs to the Parent Borrower or any of its Subsidiaries, or (ii) interfere with the Parent Borrower's or any of its Subsidiaries' continued operations, or (iii) impair the fair saleable value of any real property owned or leased by the Parent Borrower or any of its Subsidiaries.

(c)     There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which the Parent Borrower or any of its Subsidiaries is, or to the knowledge of the Parent Borrower or any of its Subsidiaries will be, named as a party that is pending or, to the knowledge of the Parent Borrower or any of its Subsidiaries, threatened in writing.

(d)     Neither the Parent Borrower nor any of its Subsidiaries has received any written request for information, or been notified that it is a potentially responsible party under or relating to the CERCLA or any similar Environmental Law, or with respect to any Hazardous Material.

(e)     Neither the Parent Borrower nor any of its Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)     Neither the Parent Borrower nor any of its Subsidiaries has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Hazardous Material other than indemnity obligations in the Ordinary Course of Business.

Section 5.17     Accuracy of Information, etc. No written statement or information contained in this Agreement, any other Loan Document or any other document, certificate or written statement furnished to the Administrative Agent or the Lenders or any of them, by or

on behalf of any Loan Party for use in connection with the transactions contemplated hereby and the negotiation of this Agreement or the other Loan Documents or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished), contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, taken as a whole, not materially misleading in light of the circumstances under which made; *provided* that with respect to the Projections, the Parent Borrower only makes the representation and warranty set forth in Section 5.5(e).

Section 5.18   Collateral Documents. The provisions of the Collateral Documents are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on all right, title and interest of the respective Loan Parties in the Collateral described therein and proceeds thereof. As applicable to Loan Parties on the Closing Date, when financing statements in appropriate form are filed in the offices specified on Schedule 5.18, the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (other than the Specified Barge Rigs covered by a Mortgage) and the proceeds thereof, as security for the Secured Obligations (as defined in the Security Agreement), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.1), to the extent such security interest can be perfected by any filing of UCC financing statements. When any Mortgage is filed for recording in the National Vessel Documentation Center of the United States Coast Guard located in Falling Waters, West Virginia, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Specified Barge Rigs and such other Collateral described therein and the proceeds thereof, as security for the Secured Obligations (as defined in the applicable Mortgage), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.1).

Section 5.19   Solvency. The Loan Parties, on a consolidated basis, are, and immediately after giving effect to the incurrence of all Indebtedness and obligations being incurred in connection herewith and to the transactions contemplated by the Plan of Reorganization will be, Solvent.

Section 5.20   Insurance. The properties of the Parent Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Parent Borrower, in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Parent Borrower or the applicable Subsidiary operates, except to the extent that reasonable self-insurance meeting the same standards is maintained with respect to such risks, and which insurance meets the requirements of the Mortgage.

Section 5.21   OFAC/Sanctions. Except as described on Schedule 5.21, no Loan Party nor, to the knowledge of any Loan Party, no Related Party is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals [**and Blocked Persons**], HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or (iii) located, organized or residing in any Designated Jurisdiction. Except as described on Schedule 5.21, no Loan or Letter of Credit, nor the proceeds from any Loan or Letter of Credit, has been used to lend, contribute, provide or has otherwise been made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject

95

of any Sanctions, or in any other manner that will result in any violation by any Person (including any Lender, any L/C Issuer or the Administrative Agent) of [**applicable**] Sanctions.

Section 5.22    Anti-Corruption Laws. Except as previously disclosed by the Parent Borrower and its Subsidiaries in public filings, the Loan Parties have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar applicable anti-corruption legislation in other jurisdictions in all material respects and have instituted and maintained policies and procedures designed to promote and achieve compliance with such applicable anti-corruption laws.

Section 5.23    EEA Financial Institution. No Loan Party is an EEA Financial Institution.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Until the Termination Date, the Parent Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.1, 6.2, and 6.3) cause each Subsidiary to:

Section 6.1    Financial Statements; Borrowing Base Certificate. Deliver to the Administrative Agent (which shall promptly furnish to each Lender) in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of the Parent Borrower, a copy of the audited consolidated balance sheet of the Parent Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit (other than any such "going concern" or like qualification or exception resulting solely from an upcoming maturity date of the Obligations and/or the obligations under the Term Loan Documents), by independent certified public accountants of nationally recognized standing;

(b)    as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Parent Borrower, the unaudited consolidated balance sheet of the Parent Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer of the Parent Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes); and

(c)    if a Cash Dominion Trigger Period is in effect, as soon as available, but in any event not later than 30 days after the end of each month (or 45 days in the case of any month coinciding with the end of a fiscal quarter), the unaudited consolidated balance sheet of the Parent Borrower and its consolidated Subsidiaries as at the end of such month and the related unaudited consolidated statement of income for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous fiscal year;

(d)        a Borrowing Base Certificate prepared as of the end of the applicable period and accompanied by such supporting detail and documentation as is contemplated by the Borrowing Base Certificate and/or as shall be reasonably requested by the Administrative Agent (in a form and detail satisfactory to the Administrative Agent), as soon as available, but in any event (i) not later than 25 days after the end of each month and (ii) when a Weekly BBC Trigger Period is in effect, not later than 3 Business Days after the end of each week. All calculations of Availability in any Borrowing Base Certificate shall originally be made by the Parent Borrower and certified by a Responsible Officer of the Parent Borrower, *provided* that the Administrative Agent may from time to time review and adjust any such calculation (A) to reflect its reasonable estimate of declines in value of any Collateral, due to collections received in the Dominion Accounts or otherwise; and (B) to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect the Availability Reserve;

(e)        all such financial statements to be complete and correct in all material respects and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein);

As to any information contained in materials furnished pursuant to Section 6.2(e), the Parent Borrower shall not be separately required to furnish such information under clause (a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Parent Borrower to furnish the information and materials described in Section 6.1(a) and (b) above at the times specified therein.

Section 6.2    Certificates; Other Information. Deliver to the Administrative Agent (which shall promptly furnish to each Lender), or, in the case of clause (g), to the relevant Lender (and/or Administrative Agent if making such request itself), in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

(a)        concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public accountants are permitted to cover in such certificates pursuant to their professional standards and customs of the profession);

(b)        concurrently with the delivery of any financial statements pursuant to Section 6.1, a duly completed and executed Compliance Certificate; *provided* that, it is understood such Compliance Certificate shall, among other provisions, contain certifications of a Responsible Officer of the Parent Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate.

(c)        as soon as available, and in any event no later than 45 days after the end of each fiscal year of the Parent Borrower, projections for the following fiscal year (including projected consolidated balance sheets, results of operations, cash flows and Availability of the Parent Borrower and its Subsidiaries for each fiscal quarter of the following fiscal year), and, as soon as available, significant revisions, if any, of such projections with respect to such fiscal year (collectively and together with the Initial Projections, the "**Projections**"), which

97

Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections comply with the representations set forth in Section 5.5(d);

(d)      no later than three (3) Business Days prior to the effectiveness thereof (or such shorter time period as may be agreed by the Administrative Agent in its sole discretion), copies of substantially final drafts of any proposed amendment, supplement, waiver or other modification with respect to the Term Loan Credit Agreement or any material Term Loan Document;

(e)      within five days after the same are sent, copies of all financial statements and reports that the Parent Borrower sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Parent Borrower may make to, or file with, the SEC;

(f)      promptly, at the Parent Borrower's expense, to the Administrative Agent, such other reports, statements and reconciliations with respect to the Borrowing Base or the Collateral as the Administrative Agent shall from time to time reasonably request;

(g)      promptly, such additional financial and other information as any Lender through the Administrative Agent or the Administrative Agent itself may from time to time reasonably request, including without limitation, information for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and the Beneficial Ownership Regulation;

(h)      concurrently with the delivery of a Borrowing Base Certificate, detailed agings of Accounts and a detailed listing of the Quail Rental Assets (together with a reconciliation to its general ledger), prepared as of the end of the applicable period;

(i)      promptly upon the Administrative Agent's request (A) copies of customer statements and credit memos, remittance advices and reports, and copies of deposit slips and bank statements, and (B) a statement of the outstanding loans and payments made, and Accounts owing to, Affiliates, in each case, as of the last day of the immediately preceding period; and

(j)      concurrently with the delivery thereof, copies of any default notices received from the Term Loan Agent.

Documents required to be delivered pursuant to Section 6.1(a) or (b) or Section 6.2(e) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Parent Borrower posts such documents, or provides a link thereto on the Parent Borrower's website on the Internet at the website address listed on Schedule 10.2; or (ii) on which such documents are posted on the Parent Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (i) if so requested by the Administrative Agent or any Lender, the Parent Borrower shall deliver paper copies of such documents to the Administrative Agent or such Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Parent Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such

documents. If so requested by the Administrative Agent or any Lender, the Parent Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.2(b) to the Administrative Agent. Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Parent Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Parent Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arrangers will make available to the Lenders and the L/C Issuers materials, projections and/or information provided by or on behalf of the Parent Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on SyndTrak, ClearPar, IntraLinks or a substantially similar electronic transmission system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to any of the Parent Borrower or its respective Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Parent Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Parent Borrower shall be deemed to have authorized the Administrative Agent, the Arrangers, the L/C Issuers and the Lenders to treat the Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Parent Borrower or their respective securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent the Borrower Materials constitute Information, they shall be treated as set forth in Section 10.7); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (iv) the Administrative Agent and the Arrangers shall be entitled to treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

Section 6.3    Notices. Promptly notify the Administrative Agent (which shall promptly furnish such notice to each Lender) of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any Contractual Obligation of the Parent Borrower or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect or (ii) litigation, investigation or proceeding which may exist at any time between the Parent Borrower or any of its Subsidiaries and any Governmental Authority that, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation, investigation by a third-party (excluding, for the avoidance of doubt, any internal investigations) or proceeding affecting the Parent Borrower or any of its Subsidiaries (i) in which the amount involved is $5,000,000 or more and not covered by insurance or (ii) in which injunctive or similar relief is sought which could reasonably be expected to have a Material Adverse Effect;

(d)      as soon as possible and in any event within 10 days after the Parent Borrower knows or has reason to know of the occurrence of any ERISA Event or Foreign Benefit Event that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)      any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.3 shall be accompanied by a statement of a Responsible Officer of the Parent Borrower setting forth details of the occurrence referred to therein and stating what action the Parent Borrower or relevant Subsidiary has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.3(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 6.4      Conduct of Business and Maintenance of Existence, etc. (a) (i) Preserve, renew and keep in full force and effect its legal existence (except as otherwise permitted under this Agreement) and (ii) take all reasonable action to maintain all rights, privileges and franchises useful and necessary in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of the foregoing clause (ii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Contractual Obligations and Requirements of Law, except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.5      Maintenance of Property; Insurance. (a) Keep all material Property and systems useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and against at least such risks (but including in any event public liability and product liability) as are usually insured against in the same general area by companies engaged in the same or a similar business. The Parent Borrower shall furnish certificates, policies and endorsements to Administrative Agent as Administrative Agent shall reasonably require as proof of such insurance, and, if the Parent Borrower fails to do so, Administrative Agent is authorized, but not required, to obtain such insurance at the expense of the Parent Borrower. All policies shall provide for at least thirty (30) days prior written notice to Administrative Agent of any cancellation or reduction of coverage and that Administrative Agent may act as attorney-in-fact for the Parent Borrower in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending and canceling such insurance. The Parent Borrower shall cause Administrative Agent to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and the Parent Borrower shall obtain non-contributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Administrative Agent. Any such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Administrative Agent, for the ratable benefit of the Secured Parties, as its interests may appear and further specify that Administrative Agent shall be paid regardless of any act or omission by the Parent Borrower or any of its Affiliates. Subject to the terms of the Intercreditor Agreement, the Administrative Agent, at its option, may apply any insurance proceeds received by Administrative Agent at any time while any Event of Default shall have occurred and be continuing to the cost of repairs or replacement of Collateral and/or, to payment of the Obligations, whether or not then due, in

100

any order and in such manner as Administrative Agent may determine or hold such proceeds as cash collateral for the Obligations.

Section 6.6    Inspection of Property; Books and Records; Discussions. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit the Administrative Agent and any Lender (accompanied by any other Lender that so elects) to visit and inspect any of its properties [(**other than any invasive or intrusive investigations or other testing, analysis, or sampling**)] and examine and make abstracts from any of its books and records at any reasonable time, upon reasonable prior notice, and to discuss the business, operations, properties and financial and other condition of the Parent Borrower and its Subsidiaries with officers and employees of the Parent Borrower and its Subsidiaries and with its independent certified public accountants (it being understood that all such notices shall be given through the Administrative Agent and shall be coordinated with any other such notices to the extent reasonably possible); provided that, absent a Default or Event of Default, only two such visits per calendar year shall be at the Loan Parties' expense.

Section 6.7    Environmental Laws. (a) Comply in all respects with, and take all reasonable action to ensure compliance in all respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and (b) obtain and comply in all respects with and maintain, and take all reasonable action to ensure that all tenants and subtenants obtain and comply in all respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except in each case of (a) and (b) to the extent that any failures to so comply, obtain or maintain could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 6.8    Payment of Obligations. Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Parent Borrower or such Subsidiary; (b) all other lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, in each case, where non-payment thereof could reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 6.9    Additional Collateral; Additional Guarantors. (a) With respect to any Specified Personal Property acquired after the Closing Date as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly following such acquisition (i) execute and deliver to the Administrative Agent such amendments or supplements to the Security Agreement or Mortgages or such other documents as the Administrative Agent reasonably deems necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a Lien in such Property, (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority Lien in such Property, subject to Permitted Liens, including without limitation, the filing of UCC financing statements (or equivalent documentation) in such jurisdictions as may be required by the Security Agreement or by Law or as may be requested by the Administrative Agent and the recording of such amendment or supplement with the United States Coast Guard, if applicable, and (iii) if reasonably requested by the Administrative

101

Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(b)      With respect to any new Material Subsidiary (other than an Excluded Subsidiary or a Project Finance Subsidiary) created or acquired after the Closing Date by the Parent Borrower or any other Loan Parties (which, for the purposes of this paragraph, shall include (1) any existing Material Subsidiary that ceases to be an Excluded Subsidiary or a Project Finance Subsidiary, (2) any existing Subsidiary (that is not an Excluded Subsidiary or a Project Finance Subsidiary) that ceases to be an Immaterial Subsidiary and (3) any Subsidiary that guarantees any Indebtedness of the Borrower or any Guarantor), promptly (and in any event within 30 days or such longer period as the Administrative Agent may agree in its sole discretion) following such creation, acquisition or the guaranteeing of any such Indebtedness, (i) cause such Subsidiary (A) to become a party to the Guaranty and the Security Agreement (or enter into other similar documents in form and substance satisfactory to the Administrative Agent), (B) in the case of any such Subsidiary owning a Specified Barge Rig, to execute and deliver a new Mortgage or an amendment to any existing Mortgage to include as covering such Specified Barge Rig, and (C) in the case of any Domestic Subsidiary, to take such actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority Lien in the Collateral described in the Security Agreement (or other similar document referred to in (i)(A) above) or the applicable Mortgage (or amendment to an existing Mortgage), as the case may be, with respect to such Subsidiary (subject to Permitted Liens), including, without limitation, the filing of UCC financing statements (or equivalent documentation) in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent and the recording of such Mortgage or amendment to a Mortgage with the United States Coast Guard, if applicable, and (ii) if reasonably requested by the Administrative Agent deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c)      If, as of the end of any Measurement Period, Immaterial Subsidiaries collectively (i) generated more than 5.0% of Consolidated EBITDA for the Measurement Period most recently ended for which financial statements of the Parent Borrower and its Subsidiaries are available or (ii) own assets that have an aggregate fair market value equal to or greater than 5.0% of Consolidated Tangible Assets of the Parent Borrower and its Subsidiaries, then in each case the Parent Borrower shall cause one or more of such Immaterial Subsidiaries to execute a joinder agreement (or agreements) such that after giving effect thereto, (A) all such remaining Immaterial Subsidiaries that are not Loan Parties generated less than 5.0% of Consolidated EBITDA for such Measurement Period and (B) the total assets owned by all such remaining Immaterial Subsidiaries that are not Loan Parties will have an aggregate fair market value of less than 5.0% of the Consolidated Tangible Assets of the Parent Borrower and its Subsidiaries.

Section 6.10    [Reserved].

Section 6.11    Cash Management Systems. (a) Schedule 6.11 sets forth all deposit accounts maintained by the Loan Parties as of the Closing Date, including all Dominion Accounts. Before or concurrently with (i) the opening by the Parent Borrower or any other Loan Party of any deposit account, securities account, lockbox account, concentration account, collection account or disbursement account in the United States, and (ii) any account which is not subject to a Control Agreement that previously constituted an Immaterial Account or an

102

Excluded Account ceasing to constitute an Immaterial Account or an Excluded Account, in each case, the Parent Borrower shall deliver to the Administrative Agent a schedule (a "**Supplemental Account Identification Schedule**") which provides, in respect of each such account (A) the name and location of each bank and securities intermediary at which the Parent Borrower or such Loan Party maintains a deposit account, securities account, lockbox account, concentration account, collection account or disbursement account in the United States and (B) the account number and account name or other relevant descriptive data with respect to each such account and such other information with respect to each such account as the Administrative Agent shall reasonably request.

(b)  Subject to Section 6.15(a) with respect to accounts in existence on the Closing Date, on or before the date any Loan Party deposits any funds or permits any funds to be deposited in or credited to any account (other than an Excluded Account or an Immaterial Account) not currently subject to a Control Agreement, Parent Borrower shall cause to be delivered to the Administrative Agent a Control Agreement with respect to such account, in each case duly executed and delivered by the Parent Borrower or the relevant Loan Party and by the bank or securities intermediary that maintains such account. The applicable Loan Party shall be the sole account holder of each deposit account, securities account, lockbox account, concentration account, collection account or disbursement account on Schedule 6.11 or a Supplemental Account Identification Schedule and shall not allow any other Person (other than Administrative Agent [**or any agent or similar representative under any Junior Loan Obligations**]) to have control over a deposit account, securities account, lockbox account, concentration account, collection account or disbursement account or any property deposited therein.

(c)  Borrowers shall maintain Dominion Accounts pursuant to lockbox or other arrangements reasonably acceptable to Administrative Agent. On or before the date that is thirty (30) days after the Closing Date (or such later date agreed upon by the Administrative Agent in its sole discretion), each applicable Loan Party shall obtain an agreement (in form and substance satisfactory to Administrative Agent) from each lockbox servicer and Dominion Account bank, establishing Administrative Agent's control over and Lien in the lockbox or Dominion Account, which may be exercised by Administrative Agent during any Cash Dominion Trigger Period, requiring immediate deposit of all remittances received in the lockbox to a Dominion Account, and waiving offset rights of such servicer or bank, except for customary administrative charges. If a Dominion Account is not maintained with Bank of America, Administrative Agent may, during any Cash Dominion Trigger Period, require immediate transfer of all funds in such account to a Dominion Account maintained with Bank of America. Administrative Agent and Lenders assume no responsibility to any Borrower for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any depositary bank.

(d)  Each Borrower shall request in writing and otherwise take such reasonable steps to ensure that all Account Debtors of the Loan Parties forward payment directly to Dominion Accounts (or a lockbox relating to a Dominion Account) maintained pursuant to and in accordance with Section 6.11(c). If any Loan Party receives cash or any Payment Items constituting payments made in respect of any Collateral (whether or not otherwise delivered to a lockbox), it shall hold the same in trust for the Administrative Agent and promptly (and in any event no later than the first Business Day after the date of receipt thereof) deposit the same or cause the same to be deposited into one or more Dominion

103

Accounts. All Net Cash Proceeds of the sale, Net Loss Proceeds relating to or other disposition of any Collateral shall be deposited directly into a Dominion Account.

(e)	The Administrative Agent agrees that it will not give any instructions or entitlement orders, as the case may be, in respect of any account subject to a Control Agreement unless a Cash Dominion Trigger Period has commenced and is continuing.

Section 6.12	Inspection and Appraisal of Collateral.

(a)	At any time upon the Administrative Agent's request, permit the Administrative Agent (or its designee) to conduct two (2) field examinations in any calendar year to ensure the adequacy of Borrowing Base Collateral and related reporting and control systems, and prepared on a basis reasonably satisfactory to the Administrative Agent, such field examinations to include, without limitation, information required by applicable Laws. The Parent Borrower shall reimburse the Administrative Agent for all reasonable charges, costs and expenses (including a per diem field examination charge and out of pocket expenses) related thereto with respect the field examinations during each calendar year made pursuant to the immediately preceding sentence; *provided*, *that* when an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of field examinations that shall be at the sole expense of the Parent Borrower; and

(b)	At any time upon the Administrative Agent's request, promptly provide the Administrative Agent with appraisals of the Quail Rental Assets not more frequently than two (2) times in any calendar year from an appraiser selected and engaged by the Administrative Agent, and prepared on a basis reasonably satisfactory to the Administrative Agent, such appraisals to include, without limitation, information required by applicable Laws; *provided* that, notwithstanding the foregoing, in the sole discretion of the Administrative Agent, the Parent Borrower (and the other Borrowers, as applicable) shall provide the Administrative Agent with an additional appraisal of the Quail Rental Assets for a total of three (3) in any calendar year. The Parent Borrower shall reimburse the Administrative Agent for all reasonable charges, costs and expenses related thereto with respect to the appraisals made during each calendar year pursuant to the immediately preceding sentence; *provided*, *that* when an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of appraisals that shall be at the sole expense of the Parent Borrower.

Section 6.13	Casualty and Condemnation; Disposition Outside the Ordinary Course of Business. (a) Furnish to the Administrative Agent written notice promptly, and in any event within five (5) Business Days of the occurrence, of any Casualty Event affecting Collateral other than Borrowing Base Collateral reasonably expected by the Parent Borrower to result in Net Loss Proceeds in excess of $5,000,000, (b) ensure that the Net Loss Proceeds of any such event (whether in the form of insurance proceeds or otherwise) are collected and applied in accordance with the applicable provisions of the Loan Documents, (c) furnish to the Administrative Agent written notice promptly, and in any event within five (5) Business Days of the occurrence, of any Significant Casualty Event involving Borrowing Base Collateral and (d) furnish to the Administrative Agent written notice promptly, and in any event within five (5) Business Days of the occurrence, of any Disposition outside the Ordinary Course of Business that relates to any Borrowing Base Collateral.

Section 6.14	Anti-Corruption Laws; Sanctions. Except as previously disclosed by the Parent Borrower and its Subsidiaries in public filings, ensure that the Parent Borrower and its Subsidiaries have conducted their businesses in compliance with the United States Foreign

Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar applicable anti-corruption legislation in other jurisdictions in all material respects and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Laws.

Section 6.15   Further Assurances; Post-Closing Deliveries. (a) Deliver all of the Collateral Documents, and any other document, instrument, agreement, recording or filing listed on Schedule 6.15 within the timeframe indicated therein and (b) from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Loan Party which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Parent Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from the Parent Borrower or any of its Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

<div align="center">

**ARTICLE VII**
**NEGATIVE COVENANTS**

</div>

Until the Termination Date, the Parent Borrower shall not, nor shall it permit any Subsidiary (other than any Immaterial Subsidiary) to, directly or indirectly:

Section 7.1   Liens. Create, incur, assume or suffer to exist any Lien upon any of its Property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)   Liens for taxes, assessments or governmental charges or claims not yet due or which are being contested in good faith by appropriate proceedings diligently conducted, *provided* that adequate reserves with respect thereto are maintained on the books of the Parent Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

(b)   Landlords', carriers', warehousemen's, mechanics', repairmen's, laborers', seamen's, preferred maritime and materialmen's liens or other like Liens arising in the Ordinary Course of Business which are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(c)   pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)   deposits to secure the payment or performance of bids, tenders, government contracts, trade contracts (other than for borrowed money), leases, statutory or regulatory obligations, surety and appeal bonds, performance bonds, insurance obligations and other obligations of a like nature incurred in the Ordinary Course of Business;

<div align="center">105</div>

(e)      easements, rights-of-way, restrictions and other similar encumbrances incurred in the Ordinary Course of Business that, in the aggregate, are not substantial in amount and which do not in any case materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of the Parent Borrower or any of its Subsidiaries;

(f)      Liens in existence on the date hereof listed on Schedule 7.1(f), securing Indebtedness permitted by Section 7.3(d), *provided* that no such Lien is spread to cover any additional Property after the Closing Date other than all or part of the same property or assets (plus improvements, accessions, proceeds or distributions and directly related general intangibles in respect thereof) that secured or, under the written arrangements under which the original Lien arose, could secure the Indebtedness;

(g)      Liens securing Indebtedness of the Parent Borrower or any other Subsidiary incurred pursuant to Section 7.3(c) incurred for the purpose of financing all or any part of the acquisition purchase price or cost of construction, design, repair, replacement, installation, or improvement of property, plant or equipment used in the business of the Parent Borrower or such Subsidiary (whether through the direct purchase of such assets or the Equity Interests of the Person owning such assets (but no other material assets)), *provided* that (i) such Liens shall be created prior to or within 120 days after such acquisition, construction or other event, (ii) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness (plus improvements, accessions, proceeds or distributions and directly related general intangibles in respect thereof) and (iii) the amount of Indebtedness secured thereby is not increased;

(h)      Liens created pursuant to the Collateral Documents;

(i)      any interest or title of a lessor under any lease entered into by the Parent Borrower or any other Subsidiary in the ordinary course of its business and covering only the assets so leased;

(j)      Liens not otherwise permitted by this Section 7.1 so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed (as to the Parent Borrower and all Subsidiaries) $20,000,000 at any one time and the maturity of the obligations secured thereby is at least 91 days after the Maturity Date; *provided* that no such Lien shall extend to or cover any Borrowing Base Collateral, or Equity Interests comprising Collateral;

(k)      judgment Liens not giving rise to an Event of Default under Section 8.1(h);

(l)      Liens upon specific items of inventory or other goods of the Parent Borrower or any Subsidiary securing such Person's obligations in respect of banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment, or storage of such inventory or other goods;

(m)      Liens securing reimbursement obligations with respect to commercial letters of credit that encumber documents and other property or assets relating to such letters of credit and products and proceeds thereof;

106

(n)     Liens on assets of Excluded Subsidiaries to secure Indebtedness and related obligations of such Excluded Subsidiary; *provided* that the Indebtedness is permitted by the terms of Section 7.3(c), (d), (f) or (g) to be incurred by such Excluded Subsidiary;

(o)     Liens on Property of a Person existing at the time such Person is merged with or into or consolidated with the Parent Borrower or any Subsidiary of the Parent Borrower or otherwise becomes a Subsidiary of the Parent Borrower; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation or such Person becoming a Subsidiary of the Parent Borrower and do not at any time extend to any Property other than the Property of such Person subject to such Liens on the date such Person becomes a Subsidiary of the Parent Borrower;

(p)     Liens on Property existing at the time of acquisition of the Property by the Parent Borrower or any Subsidiary of the Parent Borrower; *provided* that such Liens were in existence prior to the contemplation of such acquisition and do not extend to any Property other than such acquired Property (plus improvements, accessions, proceeds or distributions and directly related general intangibles in respect thereof);

(q)     (i) Liens securing Refinancing Debt incurred to refinance Indebtedness that was previously so secured; *provided* that (x) no such Lien is on Collateral and (y) any such Lien is limited to all or part of the same property or assets (plus improvements, accessions, proceeds or distributions and related general intangibles in respect thereof) that secured the Indebtedness being refinanced, (ii) Liens securing Refinancing Debt incurred to refinance the Term Loan Obligations; *provided* that any such Liens on the Collateral shall be subject to the Intercreditor Agreement, and (iii) Liens securing Refinancing Debt incurred to refinance Permitted Junior Loan Obligations; *provided* that any such Liens on the Collateral shall be either subject to the Intercreditor Agreement or subordinate to the Liens securing the Obligations pursuant to a separate intercreditor agreement in form and substance satisfactory to the Administrative Agent;

(r)     Liens that secure Non-Recourse Debt that encumber the Property financed by such Indebtedness (plus improvements, accessions, proceeds or distributions and directly related general intangibles in respect thereof);

(s)     Liens on the Property of any Project Finance Subsidiary;

(t)     Liens on and pledges of the Equity Interests of any joint venture or Project Finance Subsidiary owned by the Parent Borrower or any Subsidiary of the Parent Borrower to the extent securing Indebtedness or other obligations of such joint venture or Project Finance Subsidiary; provided that such Indebtedness or obligations are non-recourse as to the applicable pledgor of such Equity Interests other than with respect to such Equity Interests;

(u)     Liens permitted under any Mortgage;

(v)     Liens on Property under construction (and related rights) in favor of the contractor or developer; provided that such Liens do not secure Indebtedness;

(w)     (i) Liens arising under the Term Loan Documents in favor of the Term Loan Agent to secure the Term Loan Obligations; *provided* that such Liens are at all times subject to the Intercreditor Agreement and (ii) Liens arising under Junior Loan Documents in

favor of the trustee, agent or similar representative under any Junior Loan Document to secure Permitted Junior Loan Obligations; *provided* that such Liens are at all times either subject to the Intercreditor Agreement or subordinate to the Liens securing the Obligations pursuant to a separate intercreditor agreement in form and substance satisfactory to the Administrative Agent;

(x)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Parent Borrower or any Subsidiary, in each case granted in the Ordinary Course of Business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(y)     maritime liens for crew wages or for salvage and general average and similar liens, each of which is in respect of obligations that are not delinquent for a period of more than 30 days or are being contested in good faith by appropriate proceedings;

(z)     Liens securing Indebtedness permitted under Section 7.3(l); and

(aa)     Liens arising from the deposit of funds or securities in trust for the purposes of defeasing Indebtedness;

*provided*, *however*, that nothing in this Section 7.1 shall in and of itself constitute or be deemed to constitute an agreement or acknowledgment by the Administrative Agent or any Lender that any Indebtedness subject to or secured by any Lien, right or other interest permitted under subsections (a) through (z) above ranks in priority to any Obligation.

Section 7.2     Minimum Liquidity. Permit Liquidity to be less than $25,000,000 at any time.

Section 7.3     Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness of any Loan Party pursuant to any Loan Document;

(b)     Indebtedness (i) of any Loan Party owed to [**the Parent Borrower or**] any Subsidiary, (ii) of any Subsidiary owed to any Loan Party and (iii) of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party; *provided* that (A) Indebtedness of any Subsidiary that is not a Loan Party that is owed to a Loan Party must be permitted under Section 7.6(h) and (B) Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subordinated to the Obligations on terms reasonably satisfactory to the Administrative Agent;

(c)     Indebtedness (including, without limitation, in respect of Capitalized Leases and Synthetic Lease Obligations) secured by Liens permitted by Section 7.1(g), (i) of the Parent Borrower or any of its Subsidiaries (excluding Foreign Subsidiaries and Project Finance Subsidiaries) in an aggregate principal amount not to exceed the greater of $50,000,000 and [__]% of Consolidated Tangible Assets at any one time outstanding and (ii)

108

of Foreign Subsidiaries (excluding Project Finance Subsidiaries), in an aggregate principal amount not to exceed $100,000,000 at any one time outstanding;

(d)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.3(d);

(e)     Guarantees of the Parent Borrower or any Subsidiary in respect of Indebtedness permitted under this Section 7.3 (excluding Guarantees of Indebtedness permitted under Section 7.3(h)); *provided* that any Guarantee by a Loan Party of Indebtedness of a Subsidiary that is not a Loan Party shall constitute an Investment and must be permitted under Section 7.6(h);

(f)     Indebtedness represented by agreements of the Parent Borrower or any Subsidiary providing for indemnification, adjustment of purchase price, or similar obligations, in each case, incurred or assumed in connection with a Disposition of any business, assets, or Equity Interests of the Parent Borrower or any Subsidiary that is permitted under Section 7.5(k); *provided* that the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Parent Borrower and its Subsidiaries in connection with such Disposition;

(g)     any Indebtedness (the "**Refinancing Debt**") issued in exchange for, or the Net Cash Proceeds of which are to be used to redeem, refinance, replace, defease, discharge, refund, renew, extend or otherwise retire for value, any Indebtedness referred to in clauses (c), (d) or (m) or any Refinancing Debt incurred pursuant to this Section 7.3(g), without any shortening of the maturity of any principal amount of the Indebtedness refinanced (the "**Refinanced Indebtedness**") or to pay premiums (if any), fees or expenses payable in connection with any such refinancing, refunding, renewal or extension; *provided* that the aggregate principal amount of any Refinancing Debt incurred to refinance, replace, renew or extend (A) the Term Loan Obligations shall not exceed the principal amount of the Term Loan Obligations so refinanced, replaced, renewed or extended plus (x) the amount of any premiums (if any), fees or expenses payable in connection with any such refinancing, refunding, renewal or extension [**and (y) any interest or fees capitalized to the principal thereof**], and any such refinancing, replacement, renewal or extension shall be permitted under the terms of the Intercreditor Agreement and (B) any Permitted Junior Loan Obligations shall not exceed the principal amount of the Permitted Junior Loan Obligations so refinanced, replaced, renewed or extended plus (x) the amount of any premiums (if any), fees or expenses payable in connection with any such refinancing, refunding, renewal or extension [**and (y) any interest or fees capitalized to the principal thereof**], and any such refinancing, replacement, renewal or extension shall be permitted under the terms of the Intercreditor Agreement or the other intercreditor agreement to which such refinanced Permitted Junior Loan Obligations were subject, as applicable. The proceeds of the Refinancing Debt shall be used substantially concurrently with the incurrence thereof to redeem, refinance, replace, defease, discharge, renew, extend, refund or otherwise retire for value the Refinanced Indebtedness. Upon the redemption, repayment or other retirement for value of any Refinanced Indebtedness incurred to refinance Indebtedness of the type described in Section 7.3(c) or Section 7.3(m), the Refinancing Debt incurred with respect thereto shall cease to be Refinancing Debt incurred pursuant to this Section 7.3(g) and shall thereafter constitute Indebtedness incurred under, and be subject to the conditions and limitations of, Section 7.3(c) or Section 7.3(m), as applicable;

(h)     Non-Recourse Debt;

(i)  Project Financing incurred by Project Finance Subsidiaries;

(j)  Subordinated Debt, *provided* that, the maturity of such Subordinated Debt shall be at least 91 days after the Maturity Date;

(k)  [reserved];

(l)  additional unsecured Indebtedness or Indebtedness secured by Liens that are subordinate to the Liens securing the Obligations on terms satisfactory to the Administrative Agent, in each case, of the Parent Borrower or any of its Subsidiaries (other than Immaterial Subsidiaries) in an aggregate principal amount (for the Parent Borrower and all such Subsidiaries) not to exceed $30,000,000 at any one time outstanding, as long such Indebtedness: (i) has a scheduled maturity occurring at least 91 days after the Maturity Date, (ii) contains terms (including covenants and events of default) no more restrictive, taken as a whole, to the Parent Borrower and its Subsidiaries than those contained in this Agreement [**excluding as to interest rates (including through fixed exchange rates), interest rate margins, rate floors, fees, funding discounts, original issue discount and redemption or prepayment terms and premiums**], and (iii) has no scheduled amortization occurring prior to the Maturity Date;

(m)  (i) the Term Loan Obligations in an aggregate amount not to exceed at any time outstanding $250,000,000 [**plus any interest or fees capitalized to the principal thereof**] and (ii) Permitted Junior Loan Obligations [**plus any interest or fees capitalized to the principal thereof**]; *provided* that, all Permitted Junior Loan Obligations that are secured by Liens shall be secured only by Liens permitted under Section 7.1(w)(ii); and

(n)  Indebtedness in respect of Swap Contracts permitted under Section 7.13 and Cash Management Agreements;

*provided* that, notwithstanding anything else to the contrary herein or in any other Loan Document, no Subsidiary of a Borrower or any Loan Party shall Guarantee any Junior Loan Obligations or Refinancing Debt in respect thereof of a Borrower unless such Subsidiary is or shall become a Loan Party hereunder.

Section 7.4  Fundamental Changes.  Enter into any merger, consolidation, Division or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all its Property or business except that:

(a)  any Subsidiary of the Parent Borrower may be merged or consolidated with or into the Parent Borrower (*provided* that the Parent Borrower shall be the continuing or surviving Person), with or into any other Borrower (*provided* that a Borrower shall be the continuing or surviving Person) or with or into any other Loan Party (*provided* that (i) a Loan Party shall be the continuing or surviving Person or (ii) simultaneously with such transaction, the continuing or surviving Person shall become a Loan Party and the Parent Borrower shall comply with Section 6.9 in connection therewith);

(b)  any Subsidiary may merge with any other Subsidiary (or any Person that becomes a Subsidiary contemporaneously with such merger) so long as, (x) in the case of any merger involving a Guarantor, the surviving Person shall be (or shall contemporaneously become) a Guarantor or (y) in the case of any merger involving a Borrower, the surviving Person shall be (or shall contemporaneously become) a Borrower;

110

(c)      any Subsidiary of the Parent Borrower (other than a Borrower) may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Parent Borrower or any Subsidiary (so long as, in the case of any such Disposition by a Guarantor, the Subsidiary to whom such assets are disposed of is a Guarantor) and may be dissolved following such Disposition;

(d)      any Excluded Subsidiary, Project Finance Subsidiary or Immaterial Subsidiary may Dispose of any or all of its assets and may be dissolved following such Disposition;

(e)      the Equity Interests of any Excluded Subsidiary, Project Finance Subsidiary or Immaterial Subsidiary may be Disposed of or issued to any other Person;

(f)      the Parent Borrower and any Subsidiary may merge or consolidate with any Person to effectuate a Permitted Acquisition; *provided* that, in the case of a merger or consolidation involving a Loan Party, a Loan Party is the surviving Person (or the surviving Person shall contemporaneously become a Loan Party);

(g)      any merger, consolidation, amalgamation, dissolution or Disposition of any Subsidiary that is not a Loan Party that constitutes a Disposition permitted under Section 7.5(k); and

(h)      any change in the jurisdiction of organization of any Subsidiary if the Parent Borrower determines in good faith that such change is in the best interest of the Borrowers and is not disadvantageous to the Lenders; provided that (i) the Parent Borrower shall have provided not less than 15 days' (or such shorter period as the Administrative Agent may agree to in its sole discretion) prior written notice of such change to the Administrative Agent and (ii) with respect to any such change involving a Subsidiary that is a Loan Party, such Subsidiary (as reorganized in the new applicable jurisdiction) shall comply with all requirements set forth in Section 6.9(b) as if it were a newly created Material Subsidiary, including taking all necessary actions to ensure that the Administrative Agent's Liens in the Collateral of such Subsidiary shall remain in full force and effect;

*provided*, *further*, that, for avoidance of doubt, any transaction permitted under this Section 7.4 that would result in a Change of Control shall cause a Default under Section 8.1(k); *provided further* that if any merger or consolidation is with a Borrower, then prior to including the assets of such Person in the Borrowing Base (i) the Administrative Agent shall consent to including any such Accounts or Quail Rental Assets in calculating the Borrowing Base, (ii) the Administrative Agent shall receive an appraisal from an appraiser selected and engaged by the Administrative Agent and prepared on a basis reasonably satisfactory to the Administrative Agent, such appraisal to include, without limitation, information required by applicable Laws, (iii) the Administrative Agent (or its designee) shall conduct a field examination to ensure the adequacy of the proposed Borrowing Base Collateral and related reporting and control systems, and prepared on a basis reasonably satisfactory to the Administrative Agent, such field examination to include, without limitation, required by applicable Laws and (iv) the Administrative Agent shall receive any other document or information in form, content and scope reasonably satisfactory to the Administrative Agent, as may be required by the Administrative Agent in its sole discretion.

Section 7.5    Disposition of Property. Dispose of any Property (including by way of Division) whether now owned or hereafter acquired, or issue or Dispose of any Equity Interest of any Person that directly or indirectly owns any of the foregoing, except:

(a)    Dispositions permitted by Section 7.4;

(b)    the Disposition of obsolete or worn out property, or property that is no longer used or useful in such Person's business, in the Ordinary Course of Business;

(c)    the Disposition of inventory or other assets in the Ordinary Course of Business or consistent with past practice;

(d)    Dispositions of cash or Cash Equivalents in the Ordinary Course of Business;

(e)    the sale or issuance of (i) the Parent Borrower's Equity Interests (other than Disqualified Stock) or (ii) any Subsidiary's Equity Interests to the Parent Borrower or any other Loan Party;

(f)    (i) transfers of assets between or among the Parent Borrower and the other Loan Parties, (ii) transfers of assets to Loan Parties and (iii) transfers of assets between or among Subsidiaries that are not Loan Parties;

(g)    any Dispositions constituted by the granting of Liens permitted by Section 7.1;

(h)    any lease of drill pipe by Quail Tools to a customer located outside of the United States and any subsequent sale to such customer of any such drill pipe;

(i)    any sale by the Parent Borrower or any Subsidiary to its customers of drill pipe, tools, and associated drilling equipment utilized in connection with a drilling contract for the employment of a drilling rig in the Ordinary Course of Business and consistent with past practice;

(j)    Dispositions constituting Investments permitted under Section 7.6(h); and

(k)    any other Disposition of Property not otherwise permitted under this Section 7.5; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition, (ii) the aggregate fair market value of all Property disposed of in reliance on this Section 7.5(k) in any 12 month period does not exceed $25,000,000 and (iii) at least 75% of the purchase price for such Property shall be paid to the Parent Borrower or the applicable Subsidiary in cash, Cash Equivalents or any combination thereof; provided that any liabilities (as shown on the Parent Borrower's or such Subsidiary's most recent balance sheet) of the Parent Borrower or any Subsidiary (other than (x) liabilities of any Excluded Subsidiary or Project Finance Subsidiary and (y) contingent liabilities and liabilities that are by their terms subordinated to the Loans or any Guarantee pursuant to the Loan Documents) that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Parent Borrower or such Subsidiary from further liability shall be deemed to be cash for purposes of this Section 7.5(k);

*provided*, *that*, notwithstanding the foregoing, this Section 7.5 shall not permit the Parent Borrower or any of its Subsidiaries to Dispose of a Borrower, unless such borrower status is terminated in accordance with Section 2.14(e).

Section 7.6     Restricted Payments and Investments. (i) Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests of the Parent Borrower or any Subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Parent Borrower or any Subsidiary [(**in each case, other than Tax Distributions)**], or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "**Derivatives Counterparty**") obligating the Parent Borrower or any Subsidiary to make payments to such Derivatives Counterparty as a result of any change in market value of any such Equity Interests (collectively, "**Restricted Payments**") or (ii) make or permit to exist any Investments (including by way of Division), except that:

(a)     any Subsidiary may make Restricted Payments to the holders of its Equity Interests on a pro rata basis, or a more favorable basis to any such holder which is a Loan Party or a Subsidiary of a Loan Party;

(b)     (i) the Parent Borrower may make Restricted Payments in the form of Equity Interests (other than Disqualified Stock) of the Parent Borrower and (ii) the Parent Borrower may make cash payments in lieu of the issuance of fractional shares; *provided* that, with respect to a transaction under this Section 7.06(b)(ii), (A) no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any such cash payments and (B) immediately upon consummation of any cash payments for fractional shares, such fractional shares must be retired;

(c)     [reserved];

(d)     so long as no Event of Default has occurred and is continuing or would be caused thereby, the Parent Borrower or any Subsidiary may repurchase, redeem, or otherwise acquire or retire any Equity Interests of the Parent Borrower or any Subsidiary held by any existing or former director, officer or employee of the Parent Borrower or any Subsidiary (or their transferees, estates or beneficiaries) pursuant to any employment agreement, equity subscription agreement, stock option agreement, or similar agreement, *provided*, *that* the aggregate amount of payments under this Section 7.6(d) subsequent to the Closing Date (net of any proceeds received by the Parent Borrower subsequent to the date hereof in connection with resales of any common stock or common stock options so purchased) shall not exceed $5,000,000 in any twelve (12) month period and not more than $15,000,000 in the aggregate during the term of this Agreement;

(e)     the Parent Borrower may acquire Equity Interests in connection with the exercise of stock options or stock appreciation rights by way of cashless exercise or in connection with the satisfaction of withholding tax obligations;

(f)     the Parent Borrower may make any Restricted Payment in exchange for, or in an amount not to exceed, the net cash proceeds of a substantially concurrent sale (other than to a Subsidiary of the Parent Borrower) of, Equity Interests of the Parent Borrower (other than Disqualified Stock), or from the substantially concurrent contribution of common equity

capital to the Parent Borrower, with a sale and contribution being deemed substantially concurrent if such Restricted Payment occurs not more than 60 days after such sale or contribution; *provided* that immediately before and after giving effect to any Restricted Payment under this Section 7.6(f), the Parent Borrower is in compliance with Section 7.2;

(g)     the Parent Borrower may make the payment of any dividend or consummate any irrevocable redemption permitted under Section 7.6(i) within 60 days after the date of declaration of the dividend or the giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or redemption payment would have complied with the provisions of this Agreement; *provided* that immediately before and after giving effect to any Restricted Payment under this Section 7.6(g), the Parent Borrower is in compliance with Section 7.2;

(h)     the Parent Borrower or any Subsidiary may make or hold the following Investments:

(i)     Investments in cash and Cash Equivalents;

(ii)     loans or advances to employees in the Ordinary Course of Business and consistent with past practices, including for payroll, travel and similar expenses, but in any event not to exceed $2,000,000 in the aggregate outstanding at any one time;

(iii)     (A) Investments by the Parent Borrower and its Subsidiaries in their respective Subsidiaries outstanding on the date hereof, (B) additional Investments by the Parent Borrower and its Subsidiaries in Loan Parties, (C) additional Investments by Subsidiaries of the Parent Borrower that are not Loan Parties in other Subsidiaries that are not Loan Parties and (D) so long as no Default or Event of Default exists immediately before the making of such Investment or would exist after giving effect thereto, additional Investments by the Loan Parties in Subsidiaries that are not Loan Parties in an aggregate amount not to exceed $[**15,000,000**];

(iv)     Investments in Project Finance Subsidiaries not to exceed $25,000,000 outstanding in the aggregate (measured on the date each such Investment was made and without giving effect to subsequent changes in value) for all such Investments on or after the date hereof, it being understood that if such Project Finance Subsidiary repays such Investment in full in cash or if a Borrower shall sell such Project Finance Subsidiary in full for cash, such Investment will no longer be outstanding for purposes hereof to the extent of such cash received; *provided* that immediately before and after giving effect to the making of any Investment under this Section 7.6(h)(iv), the Parent Borrower is in compliance with Section 7.2;

(v)     Guarantees of Indebtedness of Loan Parties permitted under Section 7.3;

(vi)     Permitted Acquisitions;

(vii)     so long as the Payment Conditions applicable to Investments are satisfied immediately after giving effect thereto, other Investments;

114

(viii)   any Investment consisting of the non-cash proceeds of a Disposition that was made pursuant to and in compliance with Section 7.5 hereof;

(ix)   any Investments received (a) in satisfaction of judgments or in compromise of obligations of trade creditors or customers that were incurred in the Ordinary Course of Business, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer or (b) as a result of a foreclosure by the Parent Borrower or any of its Subsidiaries with respect to any secured Investment in default;

(x)   to the extent constituting an Investment, Investments in Swap Contracts permitted under Section 7.13;

(i)   so long as the applicable Payment Conditions are satisfied after giving effect thereto, the Parent Borrower may make other Restricted Payments (other than Investments).

Furthermore, for the avoidance of doubt, payments made (i) for the purpose of matching contributions of employees' 401(k) Plan contributions (including payments made to third-parties for the purpose of permitting such third-parties to acquire Equity Interests of the Parent Borrower to be delivered to employees for the purpose of such contributions) and (ii) pursuant to the Parent Borrower's Long-Term Incentive Plan, as amended and restated, shall not be considered Restricted Payments.

Section 7.7   Modifications of Debt Instruments, etc. (a) Amend, modify or otherwise change, or consent or agree to any amendment, modification, waiver or other change to (i) any of the terms of any Refinancing Debt or any other Indebtedness of any Loan Party having a principal amount in excess of the Threshold Amount to the extent that any such amendment, modification, waiver or other change would shorten the maturity or increase the amount of any payment of principal thereof, increase the interest rate or shorten the date for payment of interest thereon or make any covenant or other restriction applicable to the Parent Borrower or any of its Subsidiaries materially more restrictive[, **taken as a whole**] or (ii) the Term Loan Credit Agreement or any other document evidencing or securing Term Loan Obligations, in each case, except to the extent permitted under the Intercreditor Agreement, or (b) amend its Organization Documents in any manner adverse to the Administrative Agent or the Lenders in their capacities as such.

Section 7.8   Transactions with Affiliates. Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property (including by way of Division), the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Parent Borrower or any other Loan Party or in the case of any Subsidiary that is not a Loan Party, any other Subsidiary that is not a Loan Party) unless such transaction is (a) otherwise permitted under this Agreement and (b) upon fair and reasonable terms no less favorable to the Parent Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate. This Section 7.8 shall not apply to the following transactions: (i) any employment agreement entered into by the Parent Borrower or any of its Subsidiaries in the Ordinary Course of Business and consistent with past practices, (ii) payment of reasonable directors' fees, (iii) sales of Equity Interests of the Parent Borrower to Affiliates of the Parent Borrower, (iv) any Restricted Payment or Investment otherwise permitted under Section 7.6 and prepayments of the Term Loan Obligations permitted under Section 7.16, (v) indemnification agreements with,

115

and payments made, to officers, directors, and employees of the Parent Borrower or any Subsidiary pursuant to charter, bylaw, statutory, or contractual provisions, (vi) the performance of obligations of the Parent Borrower or any Subsidiary under the terms of any agreement to which the Parent Borrower or any Subsidiary is a party as of the Closing Date and that is set forth on Schedule 7.8, and any amendments, modifications, supplements, extensions, or renewals of such agreements; *provided* that any such amendments, modifications, supplements, extensions, or renewals of such agreements are not materially more disadvantageous, taken as a whole, to (x) the Parent Borrower or any Subsidiary of the Parent Borrower or (y) the Administrative Agent and the Lenders than the terms of such agreements as in effect on the Closing Date, (vii) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements or stock option or stock ownership plans approved by the board of directors of the Parent Borrower, (viii) loans or advances to employees in the Ordinary Course of Business and consistent with past practices, but in any event not to exceed $2,000,000 in the aggregate outstanding at any one time, (ix) any transaction in which the Parent Borrower or any of its Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an accounting, appraisal or investment banking firm of national standing stating that such transaction is fair to the Parent Borrower or such Subsidiary from a financial point of view or that such transaction meets the requirements of the first sentence of this paragraph, (x) dividends and distributions to the Parent Borrower and its Subsidiaries by any Affiliate, (xi) guarantees of performance by the Parent Borrower and its Subsidiaries of Subsidiaries in the Ordinary Course of Business, except for guarantees of Indebtedness (xii) any transaction where the only consideration paid by the Parent Borrower or a Subsidiary is Equity Interests of the Parent Borrower (other than Disqualified Stock) and (xiii) transactions required to effectuate the Plan of Reorganization.

Section 7.9    Changes in Fiscal Periods. Permit the fiscal year of the Parent Borrower to end on a day other than December 31 or change the Parent Borrower's method of determining fiscal quarters.

Section 7.10   Negative Pledge Clauses. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of the Parent Borrower or any of its Material Subsidiaries (other than Excluded Subsidiaries and Project Finance Subsidiaries) to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Guarantor, its obligations under the Guaranty, other than (a) this Agreement and the other Loan Documents, (b) the Term Loan Credit Agreement, any Junior Loan Documents governing any Permitted Junior Loan Obligations or similar instruments governing any Refinancing Debt incurred to refinance the Term Loan Obligations or any other Junior Loan Obligations, (c) any agreements governing any purchase money Liens or Capitalized Leases or other secured Indebtedness otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby or securing such Indebtedness), (d) customary non-assignment provisions in any contract or lease entered into in the Ordinary Course of Business and consistent with past practices, (e) applicable law or any applicable rule, regulation, or order of any Governmental Authority, (f) provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, stock sale agreements, and other similar agreements, (g) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the Ordinary Course of Business, (h) any agreement in effect at the time such Subsidiary becomes a Subsidiary of Parent Borrower, so long as such agreement was not entered into in connection with or in contemplation of such Person becoming a Subsidiary of Parent Borrower and is not applicable to any Person, or the

116

properties or assets of any Person, other than such Subsidiary or such Subsidiary's properties and assets, and (i) any instrument governing Indebtedness assumed in connection with any acquisition of any Person or asset and not incurred in contemplation of such acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired.

Section 7.11    Restrictions on Subsidiary Distributions. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary (other than Excluded Subsidiaries and Project Finance Subsidiaries) to (a) make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Indebtedness owed to, the Parent Borrower or any other Subsidiary (it being understood that (i) the priority of any preferred equity in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common equity shall not be deemed a restriction on the ability to make distributions on Equity Interests and (ii) the subordination of loans or advances made to the Parent Borrower or any Subsidiary to other Indebtedness incurred by the Parent Borrower or any Subsidiary shall not be deemed a restriction on the ability to pay loans or advances), (b) make Investments in the Parent Borrower or any other Loan Party or (c) transfer any of its assets to the Parent Borrower or any other Loan Party, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Equity Interests or assets of such Subsidiary, (iii) any restrictions imposed pursuant to agreements governing any purchase money Liens or Capitalized Leases or other secured Indebtedness otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective as to transfers of the assets financed thereby or securing such Indebtedness), (iv) customary non-assignment provisions in any contract or lease entered into in the Ordinary Course of Business and consistent with past practices, (v) applicable law or any applicable rule, regulation, or order of any Governmental Authority, (vi) provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, stock sale agreements, and other similar agreements, *provided* that such provisions apply only to the assets subject to such agreements, (vii) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the Ordinary Course of Business, (viii) any agreement in effect at the time such Subsidiary becomes a Subsidiary of Parent Borrower, so long as such agreement was not entered into in connection with or in contemplation of such Person becoming a Subsidiary of Parent Borrower and is not applicable to any Person, or the properties or assets of any Person, other than such Subsidiary or such Subsidiary's properties and assets, and (ix) any instrument governing Indebtedness assumed in connection with any acquisition of any Person or asset and not incurred in contemplation of such acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired.

Section 7.12    Lines of Business. Enter into any material business except for those businesses directly relating to the oil services industry in which the Parent Borrower and its Subsidiaries have previously engaged or are engaged on the Closing Date or that are incidental or reasonably related thereto or that are a reasonable extension thereof, as determined in good faith by the Parent Borrower or applicable Subsidiary.

117

Section 7.13    Swap Contracts. Enter into any Swap Contract other than Swap Contracts entered into in the Ordinary Course of Business, and not for speculative purposes, to protect against changes in interest rates or foreign exchange rates.

Section 7.14    Anti-Corruption Laws. (a) Directly or indirectly use the proceeds of any Credit Extension for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable anti-corruption legislation in other jurisdictions in any material respects. (b) Cause or permit any of the funds of any Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Law.

Section 7.15    Sanctions. Directly or [**knowingly**], indirectly, use the proceeds of any Credit Extension, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other individual, entity or other Person, for the purpose of funding any [**unauthorized**] activities of or business with any individual, entity or other Person, or in any country or territory, in a manner that will result in a violation of applicable Sanctions, or in any other manner that will result in a violation by any individual, entity or other Person (including any individual, entity or other Person participating in the transaction, whether as underwriter, advisor, investor, Lender, Arranger, Administrative Agent, L/C Issuer or otherwise) of applicable Sanctions.

Section 7.16    Prepayment, etc. of Junior Loan Obligations and Certain Indebtedness. Make any optional or mandatory prepayment, repurchase, redemption, defeasance, exchange or any other voluntary or mandatory payment or retirement in respect of any Indebtedness for borrowed money (including the Term Loan Obligations and any other Junior Loan Obligations) [**of any Loan Party**] prior to the scheduled maturity thereof; *provided*, *however*, if (a) the prepayment, repurchase, redemption, defeasance, exchange or other voluntary or mandatory payment or retirement is made from the proceeds from or issuance of a substantially concurrent (i) incurrence of Refinancing Debt permitted under Section 7.3 or (ii) issuance of Equity Interests of the Parent Borrower (other than Disqualified Stock) (in each case with an incurrence or issuance and a prepayment, repurchase, redemption, defeasance, exchange or other voluntary or mandatory payment or retirement being deemed substantially concurrent if such repurchase, redemption, defeasance, exchange or other voluntary or mandatory payment or retirement occurs not more than 60 days after such incurrence or issuance), (b) immediately before and after giving effect to any such voluntary prepayment, repurchase, redemption, defeasance, exchange or other voluntary payment or retirement, the applicable Payment Conditions are satisfied, or (c) immediately before and after giving effect to any such mandatory prepayment, repurchase, redemption, defeasance, exchange or other mandatory payment or retirement, no Default or Event of Default exists immediately prior to or would exist after giving effect thereto, then, in the case of (a), (b) or (c), as applicable, such optional or mandatory prepayment, repurchase, redemption, defeasance, exchange or other voluntary payment or retirement shall be permitted; *provided* that, notwithstanding the foregoing, no optional or mandatory prepayment, repurchase, redemption, defeasance, exchange or other voluntary or mandatory prepayment or retirement shall be permitted under this Section 7.16 with the proceeds of any Loan.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

Section 8.1    Events of Default. Any of the following shall constitute an Event of Default:

118

(a)     Non-Payment. The Parent Borrower or any other Loan Party fails to (i) pay when and as required to be paid herein, and in the currency required hereunder, any amount of principal of any Loan or any L/C Obligation or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) pay within three Business Days after the same becomes due, any interest on any Loan or on any L/C Obligation, any fee due hereunder, or any other amount payable hereunder or under any other Loan Document; or

(b)     Specific Covenants. (i) Any Loan Party shall default in the observance or performance of any agreement contained in Section 6.4(a)(i) (with respect to (A) the Parent Borrower or (B) any other Borrower so long as such Person is a Borrower hereunder), Section 6.3(a), Section 6.11 or Article VII, or in Article IV of the Security Agreement, (iii) any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1(d), and such default shall continue unremedied for a period of (C) during a Weekly BBC Trigger Period, 3 days or (D) at any other time, 5 days, or (iv) any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1 (other than Section 6.1(d)), Section 6.9(a)(i), Section 6.9(b) or Section 6.12 and such default shall continue unremedied for a period of 10 days; or

(c)     Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Sections 8.1(a) or (b) above or (d) below) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) written notice thereof from the Administrative Agent to the Parent Borrower (which notice may be given by the Administrative Agent and will be given at the request of the Required Lenders) or (ii) a Responsible Officer of the Parent Borrower or any other Loan Party otherwise becoming aware of such default or any "Event of Default" under any Loan Document (other than this Agreement) shall occur and continue to exist beyond any applicable grace period set forth in such Loan Document; or

(d)     Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Parent Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default. (i) The Parent Borrower or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of the Term Loan Obligations or any other Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required and after giving effect to the running of any grace periods applicable thereto, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap

119

Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Parent Borrower or any Subsidiary is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which the Parent Borrower or any Subsidiary is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Parent Borrower or such Subsidiary as a result thereof is greater than the Threshold Amount; *provided*, *however*, this clause (e) shall not apply to (1) voluntary prepayments and redemptions, (2) any Non-Recourse Debt or Project Financing or (3) any repurchase or redemption of Indebtedness in connection with a change of control offer or asset sale offer or other similar mandatory prepayment; or

(f)      Insolvency Proceedings, Etc. Any Loan Party or any of its Subsidiaries (other than any Immaterial Subsidiary) institutes or consents to the institution of any proceeding under any Debtor Relief Law (other than the Cases), or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)      Inability to Pay Debts; Attachment. (i) the Parent Borrower or any Subsidiary (other than any Immaterial Subsidiary) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(h)      Judgments. One or more judgments or decrees shall be entered against the Parent Borrower or any of its Subsidiaries involving, for the Parent Borrower and its Subsidiaries taken as a whole, a liability (not paid or fully covered by independent third party insurance as to which the relevant insurance company has acknowledged coverage) in an aggregate amount in excess of the Threshold Amount, and all such judgments or decrees shall not have been paid, vacated, discharged, stayed or bonded pending appeal by the earlier of (i) the date which 60 days from the entry thereof and (ii) the date on which the relevant judgment creditor(s) has begun to enforce such judgment(s) or decree(s); or

(i)      ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Parent Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount that could reasonably be expected to have a Material Adverse Effect, (ii) the Parent Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to have a Material Adverse Effect or (iii) a Foreign Benefit Event occurs which has resulted or could reasonably be expected to result in liability of the Parent Borrower or one of its Subsidiaries in an aggregate amount that could reasonably be expected to have a Material Adverse Effect; or

120

(j)      Invalidity of Loan Documents. Any Loan Document (including, for the avoidance of doubt, the Intercreditor Agreement), at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the occurrence of the Termination Date, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any Loan Document (including, for the avoidance of doubt, the Intercreditor Agreement); or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (including, for the avoidance of doubt, the Intercreditor Agreement), or purports to revoke, terminate or rescind any Loan Document (including, for the avoidance of doubt, the Intercreditor Agreement); or

(k)      Change of Control. There occurs any Change of Control; or

(l)      Collateral Documents. Any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject to Liens permitted by Section 7.1) on (i) the Collateral consisting of Accounts or Quail Rental Assets of the type included in the Borrowing Base or (ii) other Collateral purported to be covered thereby having an aggregate fair market value in excess of $5,000,000, that is purported to be covered thereby unless such occurrence results solely from action of the Administrative Agent or any Lender (or any failure of the Administrative Agent or any Lender to file or record any financing statements (or amendments or continuations thereof), intellectual property security agreements (or amendments, restatements or supplements thereto) and/or mortgages (or amendments, restatements or supplements thereto)) and involves no Default by the Parent Borrower or any other Loan Party hereunder or under any Collateral Document.

Section 8.2      Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)      declare the commitment of each Lender to make Loans and any obligation of each L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(b)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Parent Borrower;

(c)      require that the Parent Borrower Cash Collateralize the L/C Obligations (in an amount equal to 105% of the then Outstanding Amount thereof; *provided*, *however*, that the Administrative Agent or applicable L/C Issuer may, at any time and from time to time after the initial deposit of Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations and the Parent Borrower shall deposit such additional Cash Collateral); and

(d)      exercise on behalf of itself, the Lenders and the L/C Issuers all rights and remedies available to it, the Lenders and the L/C Issuers under the Loan Documents;

*provided*, *however*, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Parent Borrower under the Bankruptcy Code, the obligation of each Lender

121

to make Loans and any obligation of each L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Parent Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

Section 8.3     Application of Funds. After the exercise of remedies provided for in Section 8.2 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.2), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III but excluding any principal, interest and Letter of Credit Fees) payable to the Administrative Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders and the L/C Issuers (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuers) arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees and interest on the Loans, L/C Borrowings and other Obligations arising under the Loan Documents, ratably among the Lenders and the L/C Issuers in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, L/C Borrowings and Obligations then owing under Secured Hedge Agreements and Secured Cash Management Agreements, ratably among the Lenders, the L/C Issuers, the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the Administrative Agent for the account of the L/C Issuers, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn face amount of Letters of Credit;

Sixth, to payment of all other Obligations ratably among the Secured Parties; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Parent Borrower or as otherwise required by Law.

Subject to Section 2.3(c), amounts used to Cash Collateralize the aggregate undrawn face amount of Letters of Credit pursuant to clause Fifth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above. Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from

such Guarantor, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to the Obligations otherwise set forth above in this Section.

Notwithstanding the foregoing, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements shall be excluded from the application described above if the Administrative Agent has not received written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be. After the Closing Date, a Secured Party Designation Notice shall be required. Each Cash Management Bank or Hedge Bank not a party to the Credit Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX hereof for itself and its Affiliates as if a "Lender" party hereto.

### ARTICLE IX
### ADMINISTRATIVE AGENT

Section 9.1    Appointment and Authority. (a) Each of the Lenders and the L/C Issuers hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents (including, for the avoidance of doubt, the Intercreditor Agreement) and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof (including, for the avoidance of doubt, the execution and delivery of the other Loan Documents (including the Intercreditor Agreement)), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article, other than the final sentence of Section 9.10, are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuers, and the Parent Borrower shall not have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents (including, for the avoidance of doubt, the Intercreditor Agreement), and each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank and on behalf of each of its Affiliates that is or may be a Cash Management Bank or Hedge Bank) and each L/C Issuer hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and such L/C Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In furtherance thereon, each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank and on behalf of each of its Affiliates that is or may be a Cash Management Bank or Hedge Bank) and each L/C Issuer hereby irrevocably appoints and authorizes the Administrative Agent (or any sub-agent of the Administrative Agent appointed pursuant to Section 9.5), as "collateral agent" to act as trustee on their behalf solely for the purpose of acting as mortgagee under Mortgages and holding the first preferred mortgage interest in each Specified Rig granted to the Administrative Agent, as "collateral agent", as trustee pursuant to the respective Mortgage. The Administrative Agent hereby accepts such trust and declares that, as trustee, it will hold each Mortgage for the

sole use and benefit of the Lenders and each L/C Issuer and shall, on behalf of the trust created hereby, perform its obligations hereunder, but only upon the terms and conditions of this Agreement. In connection with all of the foregoing, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.5 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.4(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.2    Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.3    Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and each Agent's duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe

in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.1</u> and <u>8.2</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Parent Borrower, a Lender or an L/C Issuer.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 9.4     <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the applicable L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Parent Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.5     <u>Delegation of Duties</u>. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.6     <u>Resignation of Administrative Agent</u>.

(a)      The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuers and the Parent Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Parent Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders and the L/C Issuers, appoint a successor Administrative Agent meeting the qualifications set forth above, *provided* that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed).

(b)      If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Parent Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Parent Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed).

(c)      With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in Section 3.1(g) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by

126

the Parent Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Parent Borrower and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.4 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (a) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (b) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

(d)     Any resignation or removal by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as L/C Issuer. If Bank of America resigns as an L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto, including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.3(c). Upon the appointment by the Parent Borrower of a successor L/C Issuer hereunder (which successor shall in all cases be a Lender other than a Defaulting Lender) and the acceptance by such successor L/C Issuer of the rights, duties and obligations of such capacity hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, (b) the retiring L/C Issuer shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

Section 9.7     Non-Reliance on Administrative Agent and Other Lenders. Each Lender and each L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and each L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.8     No Other Duties, Etc. Anything herein to the contrary notwithstanding, none of the "Bookrunners" or "Arrangers" or the Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or an L/C Issuer hereunder.

Section 9.9     Administrative Agent May File Proofs of Claim; Credit Bidding. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or

127

by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Parent Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise.

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers and the Administrative Agent under Section 2.3(i) and (j), 2.9 and 10.4) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.9 and 10.4.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or any L/C Issuer or in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar Laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity

128

Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.1), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 9.10   Collateral and Guaranty Matters. Each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank and for on behalf of each of its Affiliates that is or may be a Cash Management Bank or Hedge Bank) and each L/C Issuer irrevocably authorize the Administrative Agent, at its option and in its discretion, to (a) release any and all Collateral from the Liens created by the Collateral Documents, subordinate any Lien on any and all such Collateral and/or release any and all Guarantors (other than any Borrower) from their respective obligations under the Guaranty at any time and from time to time in accordance with the provisions of the Collateral Documents and Section 10.21 and (b) execute and deliver, and take any action referred to in Section 10.21 to evidence any such release or subordination.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Borrower (other than the Parent Borrower) or Subsidiary Guarantor from its obligations under the Guaranty pursuant to Section 9.10 or Section 10.21. The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. In addition, the Administrative Agent will have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities of the Parent Borrower, or any other party, or opine or advise on any related Solvency issues.

Section 9.11   Secured Cash Management Agreements and Secured Hedge Agreements. No Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.3, the Guaranty or any Collateral by virtue of the provisions hereof or of the Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements

129

have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

Section 9.12    Lender ERISA Representation.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to

130

the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that:

(i)      none of the Administrative Agent or the Arrangers or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)      no fee or other compensation is being paid directly to the Administrative Agent or the Arrangers or any their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Commitments or this Agreement.

(c)      The Administrative Agent and the Arrangers hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees,

131

processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## ARTICLE X
## MISCELLANEOUS

Section 10.1    Amendments, Etc. Any provision of the Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by (i) in the case of this Agreement, the Parent Borrower and the Required Lenders and acknowledged by the Administrative Agent, and (ii) in the case of any other Loan Document, each party thereto and the Administrative Agent (with the consent of the Required Lenders, or otherwise in accordance with the express terms thereof or pursuant to any Loan Document), and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in Section 4.1 (other than Section 4.1(b)), or, in the case of the initial Credit Extension, Section 4.2, without the written consent of each Lender;

(b)    without limiting the generality of clause (a) above, waive any condition set forth in Section 4.2 as to any Credit Extension without the written consent of the Required Lenders;

(c)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.2) without the written consent of such Lender;

(d)    postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(e)    reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or (subject to clause (iii) of the second proviso to this Section 10.1) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; *provided*, *however*, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Parent Borrower to pay interest or Letter of Credit Fees at the Default Rate even if the effect of such amendment would be to reduce the interest rate on any Loan or L/C Borrowing or to reduce any fee payable hereunder;

(f)    change the definition of "Applicable Percentage", Section 2.12(a), Section 2.12(f), Section 2.13 or Section 8.3 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender affected thereby;

(g)    amend Section 1.6 or the definition of "Alternative Currency" without the written consent of each L/C Issuer;

(h)    change (i) any provision of this Section 10.1 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of

132

Lenders required to amend, waive or otherwise modify any rights hereunder, without the written consent of each Lender;

(i) release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender (except any such release in accordance with a transaction permitted under the Loan Documents);

(j) release all or substantially all of the value of the Guaranty without the written consent of each Lender (except any such release in accordance with a transaction permitted under the Loan Documents); or

(k) amend the penultimate paragraph of Section 9.9 without the written consent of each Lender;

and, *provided further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by each L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuers under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it (and, notwithstanding anything to the contrary contained herein, any term of any Issuer Document may be amended, waived or otherwise modified with only the consent of only the applicable L/C Issuer and the Parent Borrower); (ii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (x) the Commitment of such Lender may not be increased or extended, nor the principal owed to such Lender reduced or the final maturity thereof extended, without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders (a "**Non-Consenting Lender**"), the Parent Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; *provided* that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Parent Borrower to be made pursuant to this paragraph).

Section 10.2    Notices; Effectiveness; Electronic Communication.

(a)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

133

(i)      if to the Parent Borrower, the Administrative Agent, or Bank of America as an L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.2; and

(ii)      if to any other Lender or L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)      Electronic Communications. Notices and other communications to the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail, FpML messaging and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender or any L/C Issuer pursuant to Article II if such Lender or such L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent, any L/C Issuer or the Parent Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Parent Borrower, any Lender, any L/C Issuer or any other Person for losses, claims, damages,

liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Parent Borrower's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to the Parent Borrower, any Lender, any L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc. Each of the Parent Borrower, the Administrative Agent and Bank of America as an L/C Issuer may change its address (including its address for electronic communications), telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender or L/C Issuer may change its address (including its address for electronic communications), telecopier or telephone number for notices and other communications hereunder by notice to the Parent Borrower, the Administrative Agent and the other L/C Issuers. In addition, each Lender and each L/C Issuer (other than Bank of America) agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Parent Borrower or its securities for purposes of United States Federal or state securities laws.

(e)     Reliance by Administrative Agent, L/C Issuers and Lenders. The Administrative Agent, the L/C Issuers and the Lenders shall be entitled to rely and act upon any notices (including telephonic or electronic notices, Committed Loan Notices or Letter of Credit Applications) purportedly given by or on behalf of the Parent Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Parent Borrower shall indemnify the Administrative Agent, each L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Parent Borrower. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.3   No Waiver; Cumulative Remedies; Enforcement. No failure by any Lender, any L/C Issuer or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and

privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.2 for the benefit of all the Secured Parties; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) each L/C Issuer from exercising the rights and remedies that inure to its benefit (solely in its capacity as an L/C Issuer) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 10.8 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.2 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.4   Expenses; Indemnity; Damage Waiver.

(a)   Costs and Expenses. The Borrowers shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arrangers and their Affiliates, including the reasonable and documented out-of-pocket legal fees and expenses (but limited in the case of legal fees to the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, the Arrangers, each L/C Issuer and each Lender, taken as a whole and, if reasonably necessary, of one or more regulatory counsels and one local counsel in any relevant jurisdiction to all such persons, taken as a whole), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by each L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all documented out-of-pocket expenses incurred by the Administrative Agent, the Arrangers, any Lender or any L/C Issuer (including the fees, charges and disbursements of any counsel for the Administrative Agent, any Arranger, any Lender or any L/C Issuer (but limited in the case of legal fees to fees, charges and disbursements of one primary counsel for the Administrative Agent, the Arrangers, each L/C Issuer and each Lender, taken as a whole and, if necessary, of one or more regulatory counsel and one local counsel in any relevant jurisdiction to all such persons, taken as a whole) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made or Letters of Credit issued hereunder, including all such documented out-of-pocket expenses incurred during any workout, restructuring or negotiations

136

in respect of such Loans or Letters of Credit. Without limiting the foregoing, the Parent Borrower agrees to pay all costs, fees and expenses contemplated by Section 6.12.

(b)     Indemnification by the Borrowers. The Borrowers shall indemnify the Administrative Agent (and any sub-agent thereof), each other Agent, each Arranger, each Lender and each L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (but limited in the case of legal fees, to the reasonable and documented out-of-pocket fees, charges and disbursements of one counsel for all Indemnitees, taken as a whole and, solely in the case of an actual or potential conflict of interest, one additional counsel to all affected Indemnitees taken as a whole, and, if reasonably necessary, one local counsel in any relevant jurisdiction to all Indemnitees, taken as a whole, in each such relevant material jurisdiction), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrowers or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.1), (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Parent Borrower or any other Loan Party or any of the Parent Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE**; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Parent Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Parent Borrower or such other Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) result from any dispute solely among the Indemnitees (other than claims against an Indemnitee in its capacity as the Administrative Agent or a similar role) and not arising out of any act or omission of the Parent Borrower or any of its Subsidiaries. This Section 10.4(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, liabilities or related expenses arising from any non-Tax claim.

(c)     Reimbursement by Lenders. To the extent that any Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), each other Agent, any

L/C Issuer or any Related Party of any of the foregoing (and without limiting any Borrower's obligation to do so), each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), such other Agent, such L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), any other Agent or any L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), any other Agent or any L/C Issuer in connection with such capacity; and *provided further* that the obligation to indemnify the L/C Issuers hereunder shall be limited solely to the Lenders. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)  Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, no Loan Party shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)  Payments. All amounts due under this Section shall be payable not later than thirty days after written demand therefor (or such later time as the applicable payee shall agree to in writing in its sole discretion).

(f)  Survival. The agreements in this Section shall survive the resignation of the Administrative Agent and each L/C Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 10.5  Payments Set Aside. To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent, any L/C Issuer or any Lender, or the Administrative Agent, any L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at

138

a rate per annum equal to the Federal Funds Rate from time to time in effect, in the applicable currency of such recovery or payment. The obligations of the Lenders and the L/C Issuers under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.6   Successors and Assigns.

(a)   Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the L/C Issuers and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this subsection (b), participations in L/C Obligations) at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)   Minimum Amounts.

(A)   in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)   in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Parent Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single

assignment for purposes of determining whether such minimum amount has been met.

(ii)    Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)    Required Consents. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Parent Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender with a Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)    the consent of each L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding).

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; *provided*, *however*, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    No Assignment to Parent Borrower or Defaulting Lender. No such assignment shall be made to the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries or to any Defaulting Lender or any of a Defaulting Lender's Affiliates or Subsidiaries.

(vi)    No Assignment to Natural Persons. No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent

140

of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.1, 3.4, 3.5, and 10.4 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, each Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)      Register. The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy (or the equivalent thereof in electronic form) of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Parent Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. [**No assignment shall be effective unless recorded in the Register. The parties hereto agree and intend that the Loans shall be treated as being in "registered form" for purposes of the Code (included Sections 163(f), 871(h)(2), and 881(c)(2) of the Code), and the Register shall be maintained in accordance with such intention.**]

(d)      Participations. Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person, or the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries or to any Defaulting Lender or any of a Defaulting Lender's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations) owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.1 that affects such Participant. Subject to subsection (e) of this Section, the Parent Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1 (subject to the requirements and limitations therein, including the requirements under Section 3.1(e) (it being understood that the documentation

141

required under Section 3.1(e) shall be delivered to the participating Lender)), 3.4 and 3.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.8 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Parent Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.1 or 3.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Parent Borrower's prior written consent.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Resignation as L/C Issuer after Assignment. Notwithstanding anything to the contrary contained herein, if at any time Bank of America acting as an L/C Issuer or other Lender that has issued a then-outstanding Letter of Credit assigns all of its Commitment and Loans pursuant to subsection (b) above, Bank of America or such other Lender, as applicable, may, (i) upon 30 days' notice to the Parent Borrower and the Lenders, resign as an L/C Issuer. In the event of any such resignation as L/C Issuer, the Parent Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer hereunder; *provided*, *however*, that no failure by the Parent Borrower to appoint any such successor shall affect the resignation of Bank of America or such other assigning Lender as L/C Issuer, as the case may be. If Bank of America or such other assigning Lender resigns as an L/C Issuer, it shall retain all the rights, powers, privileges and duties of an L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.3(c)). Upon the appointment of a successor L/C Issuer, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, and (b) the

142

successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America or such other retiring L/C Issuer, as the case may be, to effectively assume the obligations of Bank of America or such other retiring L/C Issuer, as the case may be, with respect to such Letters of Credit.

Section 10.7    Treatment of Certain Information; Confidentiality.    Each of the Administrative Agent, the other Agents, the Lenders and the L/C Issuers agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors, independent auditors, legal counsel and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal or administrative process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee invited to be a Lender pursuant to Section 2.18(c), or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any of the Borrowers or their obligations hereunder, (g) with the consent of the Parent Borrower, (h) for purposes of establishing a "due diligence" defense or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, (y) becomes available to the Administrative Agent, any other Agent, any Lender, any L/C Issuer or any of their respective Affiliates (and the successors and assigns of the foregoing) on a nonconfidential basis from a source other than the Parent Borrower or (z) is independently developed by the Administrative Agent, any other Agent, any Lender, any L/C Issuer or any of their respective Affiliates (and the successors and assigns of the foregoing). In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

For purposes of this Section, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or any of their respective businesses, other than any such information that is available to the Administrative Agent, any other Agent, any Lender or any L/C Issuer on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, *provided* that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the other Agents, the Lenders and the L/C Issuers acknowledges that (a) the Information may include material non-public information concerning the Parent Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 10.8    Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender, each L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency)[, **other than trust and tax withholding accounts,**] at any time held and other obligations (in whatever currency) at any time owing by such Lender, such L/C Issuer or any such Affiliate to or for the credit or the account of the Parent Borrower or any other Loan Party against any and all of the obligations of the Parent Borrower or any other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or such L/C Issuer, irrespective of whether or not such Lender or such L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Parent Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or such L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness; *provided*, *that* (x) in the event that any Defaulting Lender shall exercise any such right of setoff hereunder, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the L/C Issuer and the Lenders, and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff and (y) no Lender, L/C Issuer or any such Affiliate shall set off against a Dominion Account without the Administrative Agent's prior consent. The rights of each Lender, such L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, such L/C Issuer or their respective Affiliates may have. Each Lender and each L/C Issuer agrees to notify the Parent Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.9    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Parent Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

144

Section 10.10 <u>Counterparts; Integration; Effectiveness</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in <u>Section 4.1</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (e.g., ".pdf" or ".tiff") shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.11 <u>Survival of Representations and Warranties</u>. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until the Termination Date.

Section 10.12 <u>Severability</u>. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.13 <u>Replacement of Lenders</u>. If any Lender requests compensation under <u>Section 3.4</u>, or if the Parent Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.1</u>, and in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with <u>Section 3.6(a)</u>, if any Lender is a Non-Consenting Lender or a Defaulting Lender, or if any other circumstance exists hereunder that gives the Parent Borrower the right to replace a Lender as a party hereto, then the Parent Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.6</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(a)     the Parent Borrower shall have paid (or caused a Designated Borrower to pay) to the Administrative Agent the assignment fee specified in <u>Section 10.6(b)</u>;

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including

145

any amounts under <u>Section 3.5</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Parent Borrower or applicable Designated Borrower (in the case of all other amounts);

(c)   in the case of any such assignment resulting from a claim for compensation under <u>Section 3.4</u> or payments required to be made pursuant to <u>Section 3.1</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d)   such assignment does not conflict with applicable Laws; and

(e)   in connection with any such replacement, if any such Non-Consenting Lender or Defaulting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Non-Consenting Lender or Defaulting Lender, then such Non-Consenting Lender or Defaulting Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Non-Consenting Lender or Defaulting Lender.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Parent Borrower to require such assignment and delegation cease to apply.

Section 10.14   <u>Governing Law; Jurisdiction; Etc.</u>

(a)   <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)   <u>SUBMISSION TO JURISDICTION</u>. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, THE L/C ISSUER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR ANY L/C ISSUER MAY OTHERWISE HAVE TO BRING

146

ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.15 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.16 No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Lenders, the L/C Issuers and the Arrangers are arm's-length commercial transactions between such Loan Party and its Affiliates, on the one hand, and the Administrative Agent, the Lenders, the L/C Issuers and the Arrangers, on the other hand, (B) such Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) such Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, each Lender, each L/C Issuer and each Arranger each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for such Loan Party or any of its Affiliates, or any other Person and (B) neither the Administrative Agent

147

nor any Lender, L/C Issuer or Arranger has any obligation to such Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders, the L/C Issuers and the Arrangers and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Loan Party and its Affiliates, and neither the Administrative Agent nor any Lender, L/C Issuer or Arranger has any obligation to disclose any of such interests to such Loan Party or its Affiliates. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent, the Lenders, the L/C Issuers and the Arrangers with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.17 <u>Electronic Execution of Assignments and Certain Other Documents</u>. The words "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation any Assignment and Assumption, any amendment or other modification hereof (including waivers and consents), amendments or other modifications, Committed Loan Notices, or Letter of Credit Applications) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided* that notwithstanding anything contained herein to the contrary neither the Administrative Agent, the L/C Issuer nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent, the L/C Issuer or such Lender pursuant to procedures approved by it and *provided further* without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

Section 10.18 <u>USA PATRIOT Act</u>. Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Parent Borrower and each other Loan Party that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies the Parent Borrower and each other Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act. The Parent Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "<u>know your customer</u>" and anti-money laundering rules and regulations, including the Act and the Beneficial Ownership Regulation.

Section 10.19 <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.

<div align="center">148</div>

The obligation of the Parent Borrower in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or any Lender from the Parent Borrower in the Agreement Currency, the Parent Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or any Lender in such currency, the Administrative Agent or such Lender, as the case may be, agrees to return the amount of any excess to the Parent Borrower (or to any other Person who may be entitled thereto under applicable law).

Section 10.20  [Reserved].

Section 10.21  Release of Collateral and Loan Parties.

(a)  Any Lien on any Collateral granted to or held by the Administrative Agent under any Loan Document shall automatically be released, terminated and discharged in full (as used in this Section 10.21, "**released**") without the need for any further action by any Person: (i) upon the Termination Date, (ii) with respect to any such Lien, in the event that any asset constituting Collateral is, or is to be, Disposed of as part of, or in connection with, any transaction not prohibited hereunder or under any other Loan Document or (iii) if approved, authorized or ratified in writing in accordance with Section 10.1.

(b)  The Administrative Agent, as applicable, shall, without the need for any further action by any Person, subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.1(g), (r) or (t).

(c)  Any Loan Party (other than the Parent Borrower) shall be automatically released from its obligations under the Guaranty and Collateral Documents upon (i) such Person ceasing to be a Subsidiary as a result of a transaction permitted hereunder or otherwise in accordance with the terms hereof and (ii) written notice received by the Administrative Agent executed by a Responsible Officer of the Parent Borrower describing the circumstances giving rise to such claim for release. In addition, (i) if a Subsidiary Guarantor has become an Excluded Subsidiary or (ii) if a Subsidiary Guarantor ceases to be a Material Subsidiary, in each case, as a result of a transaction permitted hereunder or otherwise in accordance with the terms hereof, then automatically upon the receipt by the Administrative Agent of written notice from a Responsible Officer of the Parent Borrower (providing sufficient factual detail supporting a claim for release consistent with this sentence) such Subsidiary Guarantor shall be released from the Guaranty.

(d)  In the case of any release or subordination described in this Section 10.21, the Administrative Agent shall, at the Borrowers' expense, execute and deliver to the relevant Borrower such documents or evidence of such release or subordination as such

149

Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to substantiate its interest in such item, in each case in accordance with the terms of the Loan Documents and this Section 10.21.

Section 10.22 ENTIRE AGREEMENT. **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

Section 10.23 Acknowledgment and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

## ARTICLE XI
## THE PARENT BORROWER

Section 11.1 Appointment; Nature of Relationship. The Parent Borrower is hereby appointed by each of the Borrowers as its contractual representative hereunder and under each other Loan Document, and each Borrower irrevocably authorizes the Parent Borrower to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents. The Parent Borrower agrees to act as such contractual representative upon the express conditions contained in this Article XI. Additionally, each Borrower hereby appoints the Parent Borrower as its agent to receive all of the proceeds of the Loans, at which time the Parent Borrower shall promptly disburse such Loans to the appropriate Borrower. The Administrative Agent and the Lenders, and their respective officers, directors,

agents or employees, shall not be liable to the Parent Borrower or any Borrower for any action taken or omitted to be taken by the Parent Borrower or any Borrower pursuant to this Section 11.1. For the avoidance of doubt, each Loan Party hereby appoints the Parent Borrower to act as its agent for all purposes of this Agreement, the other Loan Documents and all other documents and electronic platforms entered into in connection herewith and agrees that (a) the Parent Borrower may execute such documents and provide such authorizations on behalf of such Loan Party as the Parent Borrower deems appropriate in its sole discretion and each Loan Party shall be obligated by all of the terms of any such document and/or authorization executed on its behalf, (b) any notice or communication delivered by the Administrative Agent, L/C Issuer or a Lender to the Parent Borrower shall be deemed delivered to each Loan Party and (c) the Administrative Agent, L/C Issuer or the Lenders may accept, and be permitted to rely on, any document, authorization, instrument or agreement executed by the Parent Borrower on behalf of each of the Loan Parties.

Section 11.2    Powers. The Parent Borrower shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Parent Borrower by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Parent Borrower shall have no implied duties to any Borrower, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Parent Borrower.

Section 11.3    Employment of Agents. The Parent Borrower may execute any of its duties as the Parent Borrower hereunder and under any other Loan Document by or through authorized officers.

Section 11.4    No Successor Parent Borrower. The Parent Borrower may not resign from its capacity as contractual representative and agent of the Loan Parties under this Agreement and under each other Loan Document.

Section 11.5    Execution of Loan Documents. Each Borrower hereby empowers and authorizes the Parent Borrower, on its behalf, to execute and deliver to the Administrative Agent and the Lenders the Loan Documents and all related agreements, certificates, notices, consents, documents or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including, without limitation, the Compliance Certificates. Each Borrower agrees that any action taken by the Parent Borrower or any other Borrower in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Parent Borrower of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

*(Signature pages begin on following page)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWERS:**

**PARKER DRILLING COMPANY**

By:   _____
Name: Michael W. Sumruld
Title:  Senior Vice President and
        Chief Financial Officer

**PARKER DRILLING ARCTIC OPERATING, LLC**

By:   _____
Name: David W. Tucker
Title:  Vice President and Treasurer

**PARKER DRILLING OFFSHORE USA, L.L.C.**

By:   _____
Name: David W. Tucker
Title:  Vice President and Treasurer

**QUAIL TOOLS L.P.**

By:  Quail USA, LLC, its General Partner

By:   _____
Name: David W. Tucker
Title:  Vice President and Treasurer

[*Signature Page to Credit Agreement*]

**BANK OF AMERICA, N.A.,**
as Administrative Agent


By: _____
Name: _____
Title:

[*Signature Page to Credit Agreement*]

**BANK OF AMERICA, N.A.,**
as a Lender and an L/C Issuer


By: _____
Name:
Title:

**DEUTSCHE BANK AG NEW YORK BRANCH,**
as a Lender and an L/C Issuer


By: _____
Name:
Title:


By: _____
Name:
Title:

[*Signature Page to Credit Agreement*]

**Acknowledged and Agreed:**

**GUARANTORS:**

ANACHORETA, INC.
PARDRIL, INC.
PARKER AVIATION INC.
PARKER DRILLING COMPANY NORTH AMERICA,
INC.
PARKER DRILLING COMPANY OF NIGER
PARKER DRILLING COMPANY OF OKLAHOMA,
INCORPORATED
PARKER DRILLING COMPANY OF SOUTH
AMERICA, INC.
PARKER DRILLING MANAGEMENT SERVICES,
LTD.
PARKER DRILLING OFFSHORE COMPANY, LLC
PARKER NORTH AMERICA OPERATIONS, LLC
PARKER TECHNOLOGY, INC.
PARKER TECHNOLOGY, L.L.C.
PARKER TOOLS, LLC
QUAIL USA, LLC
2M-TEK, INC.
PARKER-VSE, LLC


By:   _____
Name:  David W. Tucker
Title:   Vice President and Treasurer

[*Signature Page to Credit Agreement*]

## **Exhibit D(ii)**

## **New Second Lien Term Loan Agreement**

The New Second Lien Term Loan Agreement remains subject to continuing negotiations among the Debtors and the Consenting Stakeholders.

*K&E Comments 2/12/19*

SECOND LIEN TERM LOAN CREDIT AGREEMENT

Dated as of **[____]**, 2019

among

PARKER DRILLING COMPANY,
as Borrower,

UMB Bank, National Association,
as Administrative Agent,

and

THE LENDERS
from time to time party hereto

1

4821-8648-8708 v23

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS............................................................1
    Section 1.01   Defined Terms............................................................................2
    Section 1.02   Other Interpretive Provisions ..............................................39
    Section 1.03   Accounting Terms ................................................................40
    Section 1.04   Rounding..............................................................................41
    Section 1.05   [Reserved] ............................................................................41
    Section 1.06   [Reserved] ............................................................................41
    Section 1.07   [Change of Currency............................................................41
    Section 1.08   Times of Day........................................................................41
    Section 1.09   [Reserved] ............................................................................41
    Section 1.10   Uniform Commercial Code ..................................................41
    Section 1.11   [Divisions............................................................................41
    Section 1.12   Pro Forma Computations. ..........................**Error! Bookmark not defined.**

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS .......................................41
    Section 2.01   The Loans.............................................................................41
    Section 2.02   Borrowings...........................................................................42
    Section 2.03   [Reserved] ............................................................................42
    Section 2.04   [Reserved] ............................................................................42
    Section 2.05   Prepayments ........................................................................42
    Section 2.06   [Reserved] ............................................................................50
    Section 2.07   Repayment of Loans ............................................................50
    Section 2.08   Interest.................................................................................50
    Section 2.09   Fees .....................................................................................51
    Section 2.10   Computation of Interest and Fees ........................................51
    Section 2.11   Evidence of Debt..................................................................51
    Section 2.12   Payments Generally; Administrative Agent's Clawback.........51
    Section 2.13   Sharing of Payments by Lenders .........................................53
    Section 2.14   Incremental Facility ............................................................54
    Section 2.15   Lender Claimants. ...............................................................57
    Section 2.16   Defaulting Lenders..............................................................58

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ........................................60
    Section 3.01   Taxes ...................................................................................60
    Section 3.02   Illegality ..............................................................................66
    Section 3.03   [Reserved] ............................................................................66
    Section 3.04   Increased Costs ....................................................................66
    Section 3.05   [Reserved] ............................................................................67
    Section 3.06   Mitigation Obligations; Replacement of Lenders..................67
    Section 3.07   Survival ...............................................................................68
    Section 3.08   [Reserved] ............................................................................68

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ..............................68
    Section 4.01   Conditions of Initial Credit Extension .................................68

i

Section 4.02    Conditions to all Credit Extensions ...........................................................72

ARTICLE V REPRESENTATIONS AND WARRANTIES...........................................................73

    Section 5.01    Existence: Compliance with Law .........................................................73
    Section 5.02    Power: Authorization: Enforceable Obligations .....................................73
    Section 5.03    No Legal Bar.........................................................................................74
    Section 5.04    No Material Litigation ..........................................................................74
    Section 5.05    Financial Statements; No Material Adverse Effect.................................74
    Section 5.06    No Default.............................................................................................75
    Section 5.07    Ownership of Property; Liens................................................................75
    Section 5.08    Intellectual Property..............................................................................75
    Section 5.09    Taxes ....................................................................................................75
    Section 5.10    Federal Regulations ..............................................................................76
    Section 5.11    Labor Matters .......................................................................................76
    Section 5.12    ERISA Compliance ...............................................................................76
    Section 5.13    Investment Company Act; Other Regulations .........................................77
    Section 5.14    Subsidiaries ..........................................................................................77
    Section 5.15    Use of Proceeds....................................................................................77
    Section 5.16    Environmental Matters..........................................................................78
    Section 5.17    Accuracy of Information, etc. ................................................................78
    Section 5.18    Collateral Documents............................................................................79
    Section 5.19    Solvency................................................................................................79
    Section 5.20    Insurance ..............................................................................................79
    Section 5.21    OFAC/Sanctions ..................................................................................79
    Section 5.22    Anti-Corruption Laws ...........................................................................80
    Section 5.23    EEA Financial Institution......................................................................80

ARTICLE VI AFFIRMATIVE COVENANTS ..............................................................................80

    Section 6.01    Financial Statements .............................................................................80
    Section 6.02    Certificates; Other Information..............................................................81
    Section 6.03    Notices .................................................................................................83
    Section 6.04    Conduct of Business and Maintenance of Existence, etc. .......................84
    Section 6.05    Maintenance of Property; Insurance ......................................................84
    Section 6.06    Inspection of Property; Books and Records; Discussions .......................84
    Section 6.07    Environmental Laws ..............................................................................85
    Section 6.08    Payment of Obligations.........................................................................85
    Section 6.09    Additional Collateral; Additional Guarantors ........................................85
    Section 6.10    [Reserved] ............................................................................................86
    Section 6.11    Cash Management Systems ....................................................................87
    Section 6.12    [Reserved] ............................................................................................87
    Section 6.13    [Reserved] ............................................................................................87
    Section 6.14    Anti-Corruption Laws; Sanctions ..............**Error! Bookmark not defined.**
    Section 6.15    Further Assurances; Post-Closing Deliveries...........................................87
    Section 6.16    Ratings .................................................................................................88

ARTICLE VII NEGATIVE COVENANTS ...................................................................................88

    Section 7.01    Liens.....................................................................................................88
    Section 7.02    [Reserved] ............................................................................................88

4821-8648-8708 v23

Section 7.03   Incurrence of Indebtedness and Issuance of Preferred Stock ....................88
Section 7.04   Fundamental Changes.................................................................................92
Section 7.05   Dispositions................................................................................................94
Section 7.06   Restricted Payments....................................................................................94
Section 7.07   Modifications of Debt Instruments, etc. ......................................................97
Section 7.08   Transactions with Affiliates .......................................................................98
Section 7.09   Changes in Fiscal Periods ..........................................................................98
Section 7.10   Negative Pledge Clauses............................................................................98
Section 7.11   Dividend and Other Payment Restrictions Affecting Subsidiaries ...........99
Section 7.12   Lines of Business .....................................................................................101
Section 7.13   Swap Contracts ........................................................................................101
Section 7.14   Anti-Corruption Laws ..............................................................................101
Section 7.15   Sanctions ..................................................................................................101

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES.......................................................102
Section 8.01   Events of Default .....................................................................................102
Section 8.02   Remedies Upon Event of Default .............................................................104
Section 8.03   Application of Funds.................................................................................106

ARTICLE IX ADMINISTRATIVE AGENT.............................................................................106
Section 9.01   Appointment and Authority .....................................................................106
Section 9.02   Rights as a Lender....................................................................................107
Section 9.03   Exculpatory Provisions ............................................................................108
Section 9.04   Reliance by Administrative Agent ............................................................110
Section 9.05   Delegation of Duties ................................................................................110
Section 9.06   Resignation of Administrative Agent........................................................110
Section 9.07   Non-Reliance on Administrative Agent and Other Lenders ....................112
Section 9.08   No Other Duties Etc..................................................................................112
Section 9.09   Administrative Agent May File Proofs of Claim; Credit Bidding...........112
Section 9.10   Collateral and Guaranty Matters.............................................................114

ARTICLE X MISCELLANEOUS.............................................................................................114
Section 10.01  Amendments .............................................................................................114
Section 10.02  Notices; Effectiveness; Electronic Communication ................................116
Section 10.03  No Waiver; Cumulative Remedies; Enforcement.....................................118
Section 10.04  Expenses; Indemnity; Damage Waiver .....................................................119
Section 10.05  Payments Set Aside...................................................................................121
Section 10.06  Successors and Assigns.............................................................................121
Section 10.07  Treatment of Certain Information; Confidentiality..................................125
Section 10.08  Right of Setoff...........................................................................................126
Section 10.09  Interest Rate Limitation ...........................................................................127
Section 10.10  Counterparts; Integration; Effectiveness.................................................127
Section 10.11  Survival of Representations and Warranties ...........................................127
Section 10.12  Severability ...............................................................................................127
Section 10.13  Replacement of Lenders ...........................................................................127
Section 10.14  Governing Law; Jurisdiction; Etc. ..........................................................128
Section 10.15  Waiver of Jury Trial .................................................................................129
Section 10.16  No Advisory or Fiduciary Responsibility .................................................130

iii

iv

Section 10.17  Electronic Execution of Assignments and Certain Other
Documents ...........................................................................................130
Section 10.18  USA PATRIOT Act ..................................................................130
Section 10.19  Judgment Currency ...................................................................131
Section 10.20  [Reserved].................................................................................131
Section 10.21  Release of Collateral and Loan Parties ....................................131
Section 10.22  **ENTIRE AGREEMENT** ......................................................132
Section 10.23  Acknowledgment and Consent to Bail-In of EEA Financial
Institutions..........................................................................................132
Section 10.24  Senior Lien Intercreditor Agreement. ......................................133

4821-8648-8708 v23

**SCHEDULES**

| | |
|---|---|
| 2.01 | Commitments and Applicable Percentages |
| 5.02 | Consents, Authorizations, Filings and Notices |
| 5.04 | Litigation |
| 5.07(A) | Specified Barge Rigs |
| 5.07(B) | Specified Land Rigs |
| 5.14 | Subsidiaries; Other Equity Investments |
| 5.16 | Environmental Matters |
| 5.18 | UCC Filing Jurisdiction; United States Coast Guard Filing |
| 5.21 | OFAC |
| 6.11 | Deposit Accounts |
| 6.15 | Post-Closing Deliveries |
| 6.15(b) | Post-Closing Deliveries |
| 7.01 | Existing Liens |
| 7.03 | Existing Indebtedness |
| 7.08 | Transaction with Affiliates |
| 10.02 | Administrative Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B-l | U.S. Tax Compliance Certificate |
| B-2 | U.S. Tax Compliance Certificate |
| B-3 | U.S. Tax Compliance Certificate |
| B-4 | U.S. Tax Compliance Certificate |
| C | Note |
| D | Compliance Certificate |
| E-l | Assignment and Assumption |
| E-2 | Administrative Questionnaire |

4821-8648-8708 v23

## SECOND LIEN TERM LOAN CREDIT AGREEMENT

This SECOND LIEN TERM LOAN CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of [___], 2019, among PARKER DRILLING COMPANY, a Delaware corporation (the "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender"), and UMB Bank, National Association, as the Administrative Agent.

### PRELIMINARY STATEMENTS:

WHEREAS, on December 12, 2018, Borrower and certain of its direct and indirect Subsidiaries (collectively, the "Debtors"), as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the Southern District of Texas Houston Division (the "Bankruptcy Court"), which cases are being jointly administered (the "Cases");

WHEREAS, the joint chapter 11 plan of reorganization filed by the Loan Parties in the Cases with the Bankruptcy Court on [__] to implement the Restructuring Transactions (as defined in the RSA) (as amended, supplemented, or otherwise modified from time to time the "Plan of Reorganization") has been confirmed pursuant to the Confirmation Order;

WHEREAS, Borrower has requested, and the Lenders have agreed to make available to Borrower, a second lien senior secured term loan credit facility subject to the terms and conditions set forth in this Agreement, to consummate the Plan of Reorganization in accordance with its terms;

WHEREAS, under the second lien senior secured term loan credit facility, in exchange for good and valuable consideration the sufficiency of which is hereby acknowledged by the Borrower, Lenders shall be deemed to have made certain term loans;

WHEREAS, Borrower desires to secure all of its Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its personal property (subject to the limitations set forth herein and in the Collateral Documents); and

WHEREAS, subject to the terms hereof, each Guarantor is willing to guarantee all of the Obligations of Borrower and to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its personal property (subject to the limitations set forth herein and in the Collateral Documents).

NOW, THEREFORE, the Lenders are willing to extend such credit to Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

4821-8648-8708 v23

Section 1.01     Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"2019 Mortgage" means that certain 2019 Mortgage entered into in connection with this Agreement pursuant to the terms thereof.

"ABL Agent" means the administrative agent under the ABL Credit Agreement.

"ABL Credit Agreement" means that certain Credit Agreement, dated as of the Closing Date, among the Borrower, certain subsidiaries of the Borrower party thereto from time to time, each lender from time to time party thereto, and ABL Agent (as amended, amended and restated, supplemented or otherwise modified from time to time).

"ABL Loan Documents" means the "Loan Documents" as defined in the ABL Credit Agreement.

"ABL Obligations" means the "Obligations" as defined in the ABL Credit Agreement.

"Acquired Debt" means, with respect to any specified Person, (i) Indebtedness of any other Person existing at the time such other Person is merged with or into or becomes a Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Subsidiary of such specified Person, and (ii) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Administrative Agent" means UMB Bank, National Association in its capacity as administrative agent under this Agreement and the other Loan Documents to which it is a party, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02 or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit E-2 or any other form approved by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  Notwithstanding anything to the contrary contained herein, in no event shall any Lender or Administrative Agent be deemed an Affiliate of the Borrower or any of its subsidiaries solely by virtue of its capacity as a Lender or Administrative Agent hereunder.

"Agent" means, collectively, the Administrative Agent and any other agent appointed in accordance with the terms of this Agreement, if any.

"Agreement" has the meaning specified in the introductory paragraph hereto.

2

"All-In Yield" means, as to any Indebtedness, the yield thereof, whether in the form of interest rate, margin, original issue discount, upfront fees, or otherwise, in each case incurred or payable by the Borrower generally to the Lenders; provided that (i) original issue discount and upfront fees shall be equated to an interest rate assuming a four-year life to maturity (or, if less, the stated life to maturity at the time of its incurrence of the applicable Indebtedness), (ii) "All-In Yield" shall not include arrangement fees, structuring fees, commitment fees and underwriting fees or other fees not paid generally to all Lenders of such Indebtedness and (iii) if and to the extent such Indebtedness was originally issued with original issue discount or upfront fees and was subsequently repriced through an amendment in connection with which no additional original issue discount or upfront fees were incurred, the original issue discount or upfront fees with respect to the original issuance of such Indebtedness will be taken into account.

"Applicable Discount" has the meaning assigned to such term in the definition of "Dutch Auction".

"Applicable Discount Notice" has the meaning assigned to such term in the definition of "Dutch Auction".

"Applicable Order of Purchase" has the meaning assigned to such term in the definition of "Dutch Auction".

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Commitments and aggregate outstanding principal amount of Loans of any Class represented by such Lender's Commitment and outstanding principal amount of Loans of such Class at such time.  As of the Closing Date, the Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 and thereafter in the Assignment and Assumption (or such other instrument) pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Rate" means, (i) with respect to Initial Loans, 13% per annum and (ii) with respect to any Incremental Loan, the applicable percentages per annum set forth in the relevant Incremental Amendment.

"Appropriate Lender" means, at any time, with respect to Loans or Commitments of any Class, a Lender that has a Commitment or holds a Loan of such Class at such time.

"Approved Fund" means any Fund that is administered, managed, advised or sub-advised by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, manages, co-manages or advises a Lender.

"Asset Sale" means (i) the sale, lease, conveyance or other disposition of any assets or rights including by means of a merger, consolidation or similar transaction; provided that the sale, conveyance or other disposition of all or substantially all of the assets of the Borrower and its Subsidiaries taken as a whole will be governed by 2.05(b)(i) and/or Section 7.04 hereof and not by Section 7.05 hereof, and (ii) the issuance of Equity Interests in any of the Borrower's Subsidiaries or the sale of Equity Interests in any of its Subsidiaries (other than directors' qualifying shares).  Notwithstanding the preceding, the following items shall be deemed not to be Asset Sales: (i) any single transaction or series of related transactions that involves assets having

3

a fair market value of less than $10.0 million, (ii) a transfer of assets between or among the Loan Parties or between or among any Subsidiary that is not a Loan Party, (iii) an issuance of Equity Interests by a Subsidiary to the Borrower or to another Subsidiary, (iv) the sale or lease of equipment, inventory, accounts receivable, services or other assets in the Ordinary Course of Business or the sale of inventory to any joint venture in which the Borrower owns directly or indirectly at least 50% of the Equity Interests for resale by such joint venture to its customers in the Ordinary Course of Business, (v) the sale or other disposition of cash or Cash Equivalents, (vi) a Restricted Payment that is permitted by Section 7.06 hereof or a Permitted Investment, (vii) dispositions in connection with Permitted Liens, (viii) the sale of a rig built by the Borrower or any of its Subsidiaries for the purpose of sale to a customer where the sale proceeds are recorded in the Borrower's consolidated financial statements as operating income in accordance with generally accepted accounting principles in the United States, (ix) sales or other dispositions of damaged, worn-out or obsolete equipment or assets that, in the Borrower's reasonable judgment, are either (A) no longer used or (B) no longer useful in the business of the Borrower or its Subsidiaries, (x) any trade or exchange by the Borrower or any Subsidiary of one or more drilling rigs for one or more other drilling rigs owned or held by another Person, provided that (A) the fair market value of the drilling rig or rigs traded or exchanged by the Borrower or such Subsidiary (including any cash or Cash Equivalents to be delivered by the Borrower or such Subsidiary) is reasonably equivalent to the fair market value of the drilling rig or rigs (together with any cash or Cash Equivalents) to be received by the Borrower or such Subsidiary and (B) such exchange is approved by a majority of the disinterested members of the board of directors of the Borrower, (xi) any transfer by the Borrower or any Subsidiary to its customers of drill pipe, tools and associated drilling equipment utilized in connection with a drilling contract for the employment of a drilling rig in the Ordinary Course of Business, (xii) sales or grants of licenses or sublicenses to use the patents, trade secrets, know-how and other intellectual property, and licenses, leases or subleases of other assets, of the Borrower or any Subsidiary to the extent not materially interfering with the business of the Borrower and the Subsidiaries, (xiii) any surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind, (xiv) voluntary termination of any Hedging Obligations, and (xv) transfers of property subject to casualty and condemnation proceedings.

"Asset Sale Offer" has the meaning specified in Section 2.05(b)(ii).

"Asset Sale Payment Date" has the meaning specified in Section 2.05(b)(ii).

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds administered, managed, co-managed or advised by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)) and accepted by the Administrative Agent, in substantially the form of Exhibit E-l or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such

4

4821-8648-8708 v23

Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"Auction Amount" has the meaning assigned to such term in the definition of "Dutch Auction".

"Auction Expiration Time" has the meaning assigned to such term in the definition of "Dutch Auction".

"Auction Notice" has the meaning assigned to such term in the definition of "Dutch Auction".

"Auction Party" or "Auction Parties" has the meaning assigned to such term in the definition of "Dutch Auction" or as specified in Section 2.05 as the context may require.

"Audited Financial Statements" means the audited consolidated balance sheet of the Borrower and its Subsidiaries for each of the fiscal years ended on December 31, 2017 and, to the extent available on or prior to the Closing Date, December 31, 2018, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal years of the Borrower and its Subsidiaries, including the notes thereto.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank of America" means Bank of America, N.A. and its successors.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficially Owns" and "Beneficially Owned" have correlative meanings.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person

5

4821-8648-8708 v23

whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means a borrowing or deemed borrowing consisting of Loans.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York or the state where the Administrative Agent's Office is located.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Cases" has the meaning specified in the recitals hereto.

"Cash Equivalents" means any of the following:

(a)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; *provided* that the full faith and credit of the United States of America is pledged in support thereof;

(b)      time deposits, Euro time deposits or overnight bank deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)      commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-2" (or the then equivalent grade) by Moody's or at least "A-2" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)      repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government;

(e)      securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any

6

foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's;

       (f)     securities with maturities of 180 days or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition;

       (g)     Investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a) through (f) of this definition; and

       (h)     shares of any money market fund for which an affiliate of Bank of America provides investment advisory services.

    "Cash Interest" has the meaning specified in Section 2.08(a).

    "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and any successor statute.

    "CFC" means a "controlled foreign corporation" as defined in Section 957 of the Code.

    "CFC Holdco" means any direct or indirect Subsidiary that has no material assets (as determined in good faith by the Borrower in consultation with the Administrative Agent) other than (i) Equity Interests or debt instruments in (A) one or more CFCs that are not Excluded CFCs or (B) one or more other CFC Holdcos, [**and (ii) cash and cash equivalents incidental to the ownership of such assets**].

    "Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

    "Change of Control" means the occurrence of any of the following:

       (a)     the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation) in one or a series of related transactions, of all or

7

substantially all of the assets of the Borrower and its Subsidiaries, taken as a whole, to any "person" (as such term is used in Section 13(d)(3) of the Exchange Act);

(b)      the adoption of a plan by the stockholders of the Borrower relating to the liquidation or dissolution of the Borrower;

(c)      the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as the term is used in Section 13(d)(3) of the Exchange Act), other than a Permitted Holder, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the voting power of the Voting Stock of the Borrower; or

(d)      a "change of control", or like event, as defined in the ABL Credit Agreement.

"Change of Control Notice" has the meaning specified in Section 2.05(b)(i).

"Change of Control Offer" has the meaning specified in Section 2.05(b)(i).

"Change of Control Payment Date" has the meaning specified in Section 2.05(b)(i).

"Class" (a) when used with respect to any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments, (b) when used with respect to Commitments, refers to whether such Commitments are Initial Commitments or Incremental Commitments, and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Initial Loans or Incremental Loans.  Commitments (and in each case, the Loans made pursuant to such Commitments) that have different terms and conditions shall be construed to be in different Classes.  Commitments (and, in each case, the Loans made pursuant to such Commitments) that have the same terms and conditions shall be construed to be in the same Class.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the "Collateral" and "Vessels" referred to in the Collateral Documents and all of the other Property of the Loan Parties, now owned or hereafter acquired, that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties (and excluding, for the avoidance of doubt, any Excluded Assets (as defined in the Security Agreement)).

"Collateral Documents" means, collectively, the Security Agreement, the Mortgages, each of the supplements (or amendments and/or restatements, as applicable) to any of the foregoing, the Control Agreements, mortgages, collateral assignments, Security Agreement Supplements, security agreements (including intellectual property security agreements), pledge agreements or other similar agreements, instruments, filings or recordings (and amendments to the foregoing, as applicable) delivered to the Administrative Agent pursuant to Section 6.09, and

8

each of the other agreements, instruments, documents, filings or recordings that creates or purports to create (or continue) a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"Commitments" means the Initial Commitments and the Incremental Commitments.

"Committed Loan Notice" means a notice of a Borrowing, which shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent (including any form of an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.),* as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate duly executed by a Responsible Officer of the Borrower substantially in the form of Exhibit D.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan of Reorganization pursuant to Section 1129 of the Bankruptcy Code of the United States.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated EBITDA" means, at any date of determination, for any period, an amount equal to Consolidated Net Income of the Borrower and its Subsidiaries on a consolidated basis for such period plus (a) the following to the extent deducted in calculating such Consolidated Net Income: (i) Consolidated Interest Charges, amortization or writeoff of debt discount and debt issuance costs and commissions, discounts, and other fees and charges associated with Indebtedness for such period, (ii) the provision for Federal, state, local and foreign income taxes payable by the Borrower and its Subsidiaries for such period, (iii) depreciation and amortization expense, (iv) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (v) other extraordinary, unusual or non-recurring expenses or losses of the Borrower and its Subsidiaries reducing such Consolidated Net Income (including, whether or not otherwise includable as a separate item in the statement of Consolidated Net Income for such period, losses on sales of assets outside of the Ordinary Course of Business), *provided* that, in the case of such extraordinary, unusual or nonrecurring expenses or losses, such additions are found to be acceptable by the Required Lenders, acting reasonably, (vi) restructuring costs and any consulting or professional fees incurred in connection with the Cases, and (vii) other non-cash charges and minus (b) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax credits of the Borrower and its Subsidiaries for such period, (ii) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the Ordinary Course of Business), *provided* that, in the case of such extraordinary, unusual or non-recurring income or gains, such deductions are found to be acceptable by the Required Lenders, acting

9

reasonably, (iii) any other non-cash income, all as determined on a consolidated basis (iv) items of income or gain relating to the Cases, and (v) the amount of any cash expenditures during such period in respect of items that were added as non-cash charges in determining Consolidated EBITDA for a prior period.

"Consolidated Interest Charges" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, the sum of total interest expense (including that attributable under Capitalized Leases) for such period with respect to all outstanding Indebtedness of the Borrower and its Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges owed by the Borrower or its Subsidiaries with respect to letters of credit and bankers' acceptance financing and net costs under hedge agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP).

"Consolidated Leverage Ratio" means, as of the last day of any Measurement Period, the ratio of (a) Consolidated Total Debt as of such date to (b) Consolidated EBITDA for such Measurement Period.

"Consolidated Net Income" means, for any period, for the Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP, the consolidated net income (or loss) of the Borrower and its Subsidiaries for that period; *provided*, that in calculating Consolidated Net Income of the Borrower and its consolidated Subsidiaries for any period, there shall be excluded (a) the net income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries, (b) the net income (or deficit) of any Person (other than a Subsidiary of the Borrower) in which the Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such net income is actually received by the Borrower or such Subsidiary in the form of cash dividends or similar cash distributions and (c) the net income of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary (*provided* that, 100% of any net losses of such Subsidiary shall be included).

"Consolidated Tangible Assets" means, with respect to any Person as of any date of determination, the amount which, in accordance with GAAP, would be set forth under the caption "Total Assets" (or any like caption) on a consolidated balance sheet of such Person and its Subsidiaries, less all goodwill, patents, tradenames, trademarks, copyrights, franchises, experimental expenses, organization expenses and any other amounts classified as intangible assets in accordance with GAAP.

"Consolidated Total Debt" means, as of the date of determination, for the Borrower and its Subsidiaries on a consolidated basis, the aggregate principal amount of all Indebtedness of the Borrower and its Subsidiaries as of such date (other than Indebtedness of the type described in clause (iii) of the definition of "Indebtedness", except to the extent such facilities have been drawn and not reimbursed), determined on a consolidated basis in accordance with GAAP.

10

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means in respect of any deposit account, securities account, lockbox account, concentration account, collection account or disbursement account, a Control Agreement, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, pursuant to which the Loan Party that is the owner of such account irrevocably instructs the bank or securities intermediary that maintains such account that such bank or securities intermediary shall follow the instructions or entitlement orders, as the case may be, of the ABL Agent or the Administrative Agent, as applicable, without further consent of such Loan Party.  Each Control Agreement shall contain such other terms as shall be customary for agreements of such type.

"Credit Extension" means the making or deemed making of a Loan.

"Credit Facilities" means, one or more debt facilities (including, without limitation, the ABL Credit Agreement) or commercial paper facilities, in each case with banks or other institutional lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or letters of credit, including any related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time (and whether or not with the original lender or lenders or another lender or lenders and whether provided under the ABL Credit Agreement or any other credit or other agreement or indenture).

"Customary Intercreditor Agreement" means (a) in connection with the incurrence of Pari Passu Indebtedness that is to be secured by Liens on the Collateral securing such Pari Passu Indebtedness that shall rank equal in priority to the Liens on the Collateral securing the Obligations, the Senior Lien Intercreditor Agreement (and a joinder to such Senior Lien Intercreditor Agreement shall be executed with respect to such Pari Passu Indebtedness) and (b) to the extent executed in connection with the incurrence of Indebtedness secured by junior Liens, either (i) an intercreditor agreement substantially in the form of the Senior Lien Intercreditor Agreement where the Obligations shall be the senior obligations thereunder (with such modifications as may be necessary or appropriate in light of prevailing market conditions and are not materially adverse to the Lenders, taken as a whole) or (ii) a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent (at the direction of the Required Lenders) and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior in priority to the Liens on the Collateral securing the Obligations.

11

"Debt Issuance" means the incurrence by the Borrower or any Subsidiary of any Indebtedness or the issuances, offerings or placements of debt obligations (other than as permitted by Section 7.03).

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debtors" has the meaning specified in the recitals hereto.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to the interest rate (including any interest payable in kind) otherwise applicable to such Loan plus 2% per annum.

"Defaulting Lender" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder *(provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) becomes the subject of a Bail-In Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm

12

any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each other Lender promptly following such determination.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of comprehensive Sanctions (which, as of the date of this Agreement, are Crimea, Cuba, Iran, Syria and North Korea).

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any Property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interests that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Equity Interests), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder of the Equity Interests, in whole or in part, in each case, on or prior to the date that is 91 days after the date (a) which is the latest Maturity Date or (b) on which there are no Obligations outstanding; *provided* that only the portion of Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided, further,* that if such Equity Interests is issued to any employee or to any plan for the benefit of employees of the Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided, further,* that any class of Equity Interests of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Equity Interests that is not Disqualified Stock shall not be deemed to be Disqualified Stock.  Notwithstanding the preceding sentence, any Equity Interests that would constitute Disqualified Stock solely because the holders of the Equity Interests have the right to require the Borrower to repurchase such Equity Interests upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock if the terms of such Equity Interests provide that the Borrower may not repurchase or redeem any such Equity Interests pursuant to such provisions prior to obtaining any waiver or amendment to this Agreement required to permit such repurchase or redemption.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

13

4821-8648-8708 v23

"Dutch Auction" means an auction (an "Auction") conducted by the Borrower or one or more of its Subsidiaries (in such capacity, as applicable, the "Auction Party") in their sole discretion in order to purchase Loans in accordance with the following procedures:

(A)     Notice Procedures.  In connection with an Auction, the Auction Party will provide notification to the auction manager (for distribution to the Appropriate Lenders (the "Eligible Auction Lenders") and the Administrative Agent) of the principal amount of any Class of Loans that will be the subject of the Auction (an "Auction Notice").  Each Auction Notice shall contain (i) the total cash value of the bid (the "Auction Amount"), in a minimum amount of $1,000,000 with minimum increments of $500,000, (ii) the discount to par, which shall be a range (the "Discount Range") of percentages of the par principal amount of the Loans (i.e., a 5% to 10% Discount Range would represent $50,000 to $100,000 per $1,000,000 principal amount of Loans, with a 10% discount being deemed a "higher" discount than 5% for purposes of an Auction) at issue that represents the discounts applied to calculate the range of purchase prices that the Auction Party would be willing to accept in the Auction; provided that the Discount Range may, at the option of the Auction Party, be a single percentage, (iii) the date on which the Auction will conclude, on which date Return Bids will be due at the time provided in the Auction Notice (such time, the "Auction Expiration Time"), as such date and time may be extended upon notice by the Auction Party to the auction manager before any prior Auction Expiration Time, and (iv) the identity of the auction manager, and shall indicate if such auction manager is an Affiliate of the Borrower.  Each offer to purchase Loans of any Class in an Auction shall be offered on a pro rata basis to all the Eligible Auction Lenders.

(B)     Reply Procedures.  In connection with any Auction, each Eligible Auction Lender may, in its sole discretion, participate in such Auction and, if it elects to do so (any such participating Eligible Auction Lender, a "Participating Lender"), shall provide, prior to the Auction Expiration Time, the auction manager with a notice of participation (the "Return Bid") which shall be in a form and substance prepared by the auction manager and shall specify (i) a discount to par that must be expressed as a percentage of par principal amount of Loans expressed in percentages (the "Reply Discount"), which must be within the Discount Range, and (ii) a principal amount of Loans, which must be in increments of $500,000, that such Eligible Auction Lender is willing to offer for sale at its Reply Discount (the "Reply Amount").  An Eligible Auction Lender may avoid the minimum increment amount condition solely when submitting a Reply Amount equal to such Eligible Auction Lender's entire remaining amount of such Loans.  Eligible Auction Lenders may only submit one Return Bid per Auction but each Return Bid may contain up to three bids, only one of which can result in a Qualifying Bid (as defined below).  In addition to the Return Bid, each Participating Lender must execute and deliver, to be irrevocable during the pendency of the Auction and held in escrow by the auction manager, an assignment agreement pursuant to which such Participating Lender shall make the representations and agreements substantially consistent with the terms of Section 2.05(a)(iii)(C).  Any Eligible Auction Lender that fails to submit a Return Bid at or prior to the Auction Expiration Time shall be deemed to have declined to participate in the Auction.

14

4821-8648-8708 v23

(C)    Acceptance Procedures.    Based on the Reply Discounts and Reply Amounts received by the auction manager, the auction manager, with the consent of the Auction Party, will, within ten (10) Business Days of the Auction Expiration Time (or such other time agreed by the Borrower), determine the applicable discount (the "Applicable Discount") for the Auction, which will be the highest Reply Discount at which the Auction Party can complete the Auction at the Auction Amount; provided that, in the event that the Reply Amounts are insufficient to allow the Auction Party to complete a purchase of the entire Auction Amount, the Auction Party shall, at its election, either (i) withdraw the Auction or (ii) complete the Auction as set forth below.  Unless withdrawn, the Auction Party shall notify the Participating Lenders of the Applicable Discount no later than one (1) Business Day after it is determined (the "Applicable Discount Notice").   The Auction Party shall, within three (3) Business Days of the Applicable Discount Notice, purchase Loans from each Participating Lender with a Reply Discount that is equal to or higher than the Applicable Discount ("Qualifying Bids") at a discount to par equal to the Reply Discount of such Participating Lender, with the applicable Loans of the Participating Lender(s) with the highest Reply Discount being purchased first and then in descending order from such highest Reply Discount to and including the applicable Loans of the Participating Lenders with a Reply Discount equal to the Applicable Discount (the "Applicable Order of Purchase"); provided that if the aggregate proceeds required to purchase all Loans subject to Qualifying Bids would exceed the Auction Amount for such Auction, the Auction Party shall purchase such Loans of the Participating Lenders in the Applicable Order of Purchase, but with the Loans of Participating Lenders with Reply Discounts equal to the Applicable Discount being purchased pro rata until the Auction Amount has been so expended on such purchases.  If a Participating Lender has submitted a Return Bid containing multiple bids at different Reply Discounts, only the bid with the highest Reply Discount that is equal to or more than the Applicable Discount will be deemed the Qualifying Bid of such Participating Lender.  In no event shall any purchase of Loans in an Auction be made at a Reply Discount lower than the Applicable Discount for such Auction.

(D)    Additional Procedures.  Once initiated by an Auction Notice, the Auction Party may withdraw or modify an Auction only prior to the delivery of the Applicable Discount Notice (and if any Auction is withdrawn or modified, notice thereof shall be delivered to the Administrative Agent and the Eligible Auction Lenders no later than the first Business Day after such withdrawal).  Furthermore, in connection with any Auction, upon submission by a Participating Lender of a Qualifying Bid, such Lender will be obligated to sell the entirety or its allocable portion of the Reply Amount, as the case may be, at the Applicable Discount.

(E)    Any failure by such Loan Party or such Subsidiary to make any prepayment to a Lender, pursuant to this definition shall not constitute a Default or Event of Default under Section 8.01 or otherwise.

(F)    The Administrative Agent shall have no duty or obligation regarding any auction or related procedures, including without limitation no duty or obligations to act as auction manager.

15

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.06(b)(v) and Section 10.06(b)(vi) (subject to such consents, if any, as may be required under Section 10.06(b)(iii)).

"Eligible Auction Lenders" has the meaning assigned to such term in the definition of "Dutch Auction".

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, codes, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, governmental agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any **[Hazardous Materials]** into the environment, including those related to air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and

16

whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 or 430 of the Code or Section 302 or 303 of ERISA).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Euro" and "EUR" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Proceeds" has the meaning specified in Section 2.05(b)(ii)(B).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means (i) any deposit account, securities account or commodities account exclusively used for payroll, payroll taxes and other employee wage and benefit payment to or for the benefit of the Borrower's or any Subsidiary's salaried employees in each case as long as such account remains a zero-balance account or, with respect to any such account maintained in Louisiana, constitutes an Immaterial Account on each Business Day other than the Business Day immediately preceding the payment of payroll and (ii) any deposit accounts, trust accounts, escrow accounts or security deposits established pursuant to statutory obligations or for the payment of taxes or holding funds in trust for third parties not affiliated with the Borrower in the Ordinary Course of Business or in connection with acquisitions, investments or dispositions permitted under this Agreement, deposits in the Ordinary Course of Business in connection with workers' unemployment insurance and other types of social security and escrow accounts

17

established pursuant to Contractual Obligations to third parties not affiliated with the Borrower for casualty payments and insurance proceeds.

"Excluded CFC" means any CFC the primary assets of which are Domestic Subsidiaries.

"Excluded Subsidiaries" means: (a) Parker Drilling Investment Company, an Oklahoma corporation, (b) PKD Sales Corporation, an Oklahoma corporation, [**(c) any Domestic Subsidiary owned by any Foreign Subsidiary unless such Foreign Subsidiary is an Excluded CFC**], (d) any CFC other than any Excluded CFC, (e) any CFC Holdco, (f) any Domestic Subsidiary designated by the Borrower by written notice to the Administrative Agent as an "Excluded Subsidiary" and certified by a Responsible Officer of the Borrower to the Administrative Agent that (i) such Domestic Subsidiary has no material assets other than Equity Interests of one or more other Excluded Subsidiaries or (ii) substantially all of such Domestic Subsidiary's revenues for the fiscal year most recently ended were generated (or, in the case of a newly-formed or acquired Subsidiary, are intended by the Borrower to be generated in the current fiscal year) from assets, including rigs and equipment, located outside of the United States (including located outside the territorial waters of the United States) and/or contracts performed primarily outside of the United States (including performed outside of the territorial waters of the United States); *provided*, that a Subsidiary shall cease to be an Excluded Subsidiary if (and for so long as) either (x) it provides a guaranty of the ABL Obligations or obligations under any Permitted Ratio Debt, or (y) ceases to satisfy the requirements set forth in clause (e)(i) or (ii) above, (g) any Subsidiary that is prohibited by law, regulation or Contractual Obligation (provided that such Contractual Obligation existed at the time such Subsidiary was acquired and was not entered into in contemplation of such acquisition) from providing a Guarantee under the Guaranty or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such Guarantee or where the provision of such Guarantee would result in material adverse tax consequences as reasonably determined by the Borrower in consultation with the Administrative Agent, (h) special purpose entities used for permitted securitization facilities, if any, (i) any not for profit Subsidiaries and (j) any Subsidiary to the extent that the burden or cost of providing a Guarantee under the Guaranty outweighs the benefit afforded thereby as reasonably determined by the Administrative Agent and the Borrower.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Administrative Agent, any Lender or any other recipient of any payment or required to be withheld or deducted from a payment to such recipient, (a) Taxes imposed on or measured by net income (however denominated), branch profits Taxes, and franchise Taxes, in each case, (i) imposed as a result of such recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a)(ii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such recipient's

failure to comply with Section 3.01(e), and (d) any U.S. Federal withholding Taxes imposed by FATCA.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to the Administrative Agent by three Federal funds brokers on such day on such transaction.

"Fee Letter" means the letter agreement, dated **[__]**, 2019, among the Borrower and the Administrative Agent.

"First-Priority Lien Obligations" means (i) all Secured Credit Facilities Indebtedness that is secured by the Collateral on a senior basis to the Liens securing the Obligations and (ii) all other obligations of Borrower or any of its Subsidiaries in respect of Hedging Obligations or obligations in respect of cash management services in each case owing to a Person that is a holder of Secured Credit Facilities Indebtedness or an Affiliate of such holder at the time of entry into such Hedging Obligations or obligations in respect of cash management services.

"Fixed Charge Coverage Ratio" means, with respect to any specified Person for any four-quarter reference period, the ratio of the Consolidated EBITDA of such Person for such period to the Fixed Charges of such Person for such period.

"Fixed Charges" means, with respect to any specified Person for any period, the sum, without duplication, of (i) the consolidated interest expense of such Person and its Subsidiaries for such period, whether paid or accrued (including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capitalized Leases, imputed interest with respect to Attributable Indebtedness, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings), and net of the effect of all payments made or received pursuant to Hedging Obligations incurred with respect to Indebtedness; plus (ii) the consolidated interest of such

19

Person and its Subsidiaries that was capitalized during such period; plus (iii) any interest expense on Indebtedness of another Person that is Guaranteed by such Person or one of its Subsidiaries or secured by a Lien on assets of such Person or one of its Subsidiaries, whether or not such Guarantee or Lien is called upon; plus (iv) the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of Disqualified Stock or preferred stock of such Person or any of its Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests of the Borrower (other than Disqualified Stock) or to the Borrower or a Subsidiary of the Borrower, multiplied by (b) a fraction, the numerator of which is one and the denominator of which is one minus the then-current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, on a consolidated basis and in accordance with GAAP.   Notwithstanding the foregoing, if any lease or other liability is reclassified as Indebtedness or as a Capitalized Lease due to a change in accounting principles after the Closing Date, the interest component of all payments associated with such lease or other liability shall be excluded from Fixed Charges.

"Foreign Benefit Event" means, with respect to any Foreign Plan or Foreign Government Scheme or Arrangement, (i) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Plan or Foreign Government Scheme or Arrangement; (ii) the failure to register or loss of good standing (if applicable) with applicable regulatory authorities of any such Foreign Plan or Foreign Government Scheme or Arrangement required to be registered; or (iii) the failure of any Foreign Plan or Foreign Government Scheme or Arrangement to comply with any provisions of applicable law and regulations or with the terms of such Foreign Plan or Foreign Benefit Arrangement.

"Foreign Government Scheme or Arrangement" has the meaning specified in Section 5.12(c).

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Plan" has the meaning specified in Section 5.12(d).

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States, a State thereof or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

20

4821-8648-8708 v23

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided*, *however*, that the term Guarantee shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means the Borrower and the Subsidiary Guarantors.

"Guaranty" means that certain Guaranty Agreement dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time), together with each other guaranty or guaranty supplement delivered pursuant to the Loan Documents.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes regulated pursuant to, or could give rise to liability under, any Environmental Law due to their harmful or deleterious properties.

"Hedging Obligations" means, with respect to any specified Person, the obligations of such Person incurred under (i) interest rate swap agreements, interest rate cap agreements and interest rate collar agreements; (ii) foreign exchange contracts and currency protection agreements; (iii) any commodity futures contract, commodity option or other similar agreement or arrangements and (iv) other similar agreements or arrangement.

21

"Immaterial Account" means any account in which the aggregate amount on deposit (or, in the case of any securities account, the total fair market value of all securities held in such account) does not at any time exceed $25,000; *provided*, that if the aggregate amount on deposit (or, in the case of any securities account, the total fair market value of all securities held) at all such Immaterial Accounts exceeds $**[500,000]**, Borrower shall provide notice to the Administrative Agent identifying one or more of such Immaterial Accounts which shall no longer be considered an Immaterial Account such that after giving effect thereto, the aggregate amount on deposit (or, in the case of any securities account, the total fair market value of all securities held) at all such Immaterial Accounts is equal to or less than $**[500,000]**.

"Immaterial Subsidiary" means any Subsidiary designated by the Borrower, by written notice to the Administrative Agent, as an "Immaterial Subsidiary"; *provided*, that (a) no Subsidiary may be so designated unless such Subsidiary (i) generated less than 2.5% of Consolidated EBITDA for the last Measurement Period and (ii) owned assets that have an aggregate fair market value less than 2.5% of Consolidated Tangible Assets of the Borrower and its Subsidiaries as of the end of such Measurement Period and (b) any Subsidiary shall automatically cease to be an Immaterial Subsidiary if at the end of any subsequent Measurement Period such Subsidiary would not meet the requirements set forth in the foregoing clause (a).

"Incremental Amendment" has the meaning specified in Section 2.14(f).

"Incremental Commitments" has the meaning specified in Section 2.14(a).

"Incremental Facility Closing Date" has the meaning specified in Section 2.14(d).

"Incremental Lenders" has the meaning specified in Section 2.14(c).

"Incremental Loan" has the meaning specified in Section 2.14(b).

"Incremental Request" has the meaning specified in Section 2.14(a).

"Indebtedness" means, with respect to any Person, any indebtedness of such Person, whether or not contingent (i) in respect of borrowed money; (ii) evidenced by bonds, notes, debentures or similar instruments; (iii) representing reimbursement obligations in respect of banker's acceptances or letters of credit or similar instruments; (iv) representing Capitalized Leases; (v) representing the balance deferred and unpaid of the purchase price of any property, except any such balance that constitutes an accrued expense or trade payable or (vi) representing the net obligations of such Person under any Hedging Obligations (the amount of any such obligations to be equal at any time to the termination value of the agreement or arrangement giving rise to such obligation that would be payable by such Person at such time), if and to the extent any of the preceding items (other than Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes (i) all Indebtedness of others to the extent secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) in an amount equal to the lesser of (a) the fair market value of any asset subject to such Lien securing such Indebtedness of others on the date of determination and (b) the amount of the Indebtedness secured and (ii) to the extent not otherwise included, the Guarantee by the specified Person of any indebtedness of any other Person. Notwithstanding the foregoing, in no event

22

shall the reclassification of any lease or other liability as indebtedness due to a change in accounting principles after the Closing Date be deemed to be an incurrence of Indebtedness for purposes of this Agreement.  The amount of any Indebtedness outstanding as of any date will be (i) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; and (ii) the principal amount of the Indebtedness, together with any interest on the Indebtedness that is more than 30 days past due, in the case of any other Indebtedness.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Projections" has the meaning specified in Section 4.01(a)(xvi).

"Initial Commitment" means, as to each Lender, its obligation to make (or to be deemed to have made) Initial Loans to the Borrower pursuant to Section 2.01, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 as of the Closing Date under the caption "Initial Commitment" or opposite such caption in the Assignment and Assumption (or such other instrument) pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  As of the Closing Date, the aggregate principal amount of Initial Commitments is $210,000,000.

"Initial Loan" has the meaning specified in Section 2.01.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, trade dress, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date" means the first day of each January, April, July and October and the Maturity Date.

"Investment" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding (x) commission, travel and similar advances to officers and employees made in the Ordinary Course of Business and (y) advances to customers in the Ordinary Course of Business that are recorded as accounts receivable on the balance sheet of the lender), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The acquisition by the Company or any Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment made by the Company or such Subsidiary in

23

such third Person in an amount equal to the fair market value of the Investment held by the acquired Person in such third Person on the date of any such acquisition in an amount determined as provided in the final paragraph of Section 7.06 hereof.

"IRS" means the United States Internal Revenue Service.

"Junior Lien Obligations" means the obligations with respect to other Indebtedness permitted to be incurred under this Agreement, which is by its terms intended to be secured by the Collateral on a basis junior to the Loans; provided such Lien is permitted to be incurred under this Agreement.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements or determination of an arbitration with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto and, as the context requires, their respective successors and assigns as permitted hereunder, including, for the avoidance of doubt, any Incremental Lender.

**["Lender Claimant" means, until acknowledged as a known Lender in accordance with Section 2.15, a beneficial holder of an allowed Notes Claim the identity of which beneficial holder is unknown to the Borrower and/or the Administrative Agent.  To the extent a Person is, as of any date of determination, a known Lender but also an unknown beneficial holder of allowed Notes Claims that have not been declared a Lender in accordance with Section 2.15, such Person shall be deemed to be a Lender Claimant solely with respect to its ownership of Notes Claims and other Obligations relating thereto, and shall have all rights of a Lender hereunder with respect to any other Obligations due and owing by the Loan Parties to such Person.]**

**["Lender Claimant Reserve Account" means the account to be established by the Administrative Agent pursuant to Section 2.15.]**

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan Increase" has the meaning specified in Section 2.14(a).

<div align="center">24</div>

"Loan Documents" means, collectively, this Agreement, the Notes, the Guaranty, the Collateral Documents, the Fee Letter, any Incremental Amendment, the Senior Lien Intercreditor Agreement, any other intercreditor agreement with respect to this Agreement entered into on or after the Closing Date to which the Administrative Agent is a party on behalf of the Lenders (if and when the same exists) and, in each case, all other agreements and certificates (including, without limitation, any perfection certificates) executed by a Loan Party in connection with this Agreement.

"Loan Parties" means, collectively, the Borrower and each Subsidiary Guarantor.

"Loans" means the Initial Loans and the Incremental Loans.

"Management Stockholders" means the officers, directors or employees of the Borrower or its Subsidiaries or any direct or indirect parent company who are investors in Borrower or any direct or indirect parent company thereof.

"Material Adverse Effect" means any event, development or circumstance that has had or could reasonably be expected to have (a) a material adverse effect upon the business, assets, properties or financial condition of the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity or enforceability against any Loan Party of any material provision of any Loan Document to which it is a party.

"Material Subsidiary" means each Domestic Subsidiary that is not an Immaterial Subsidiary.

"Maturity Date" means (a) with respect to the Initial Loans, [___], 2024[1]; and (b) with respect to any Incremental Loans, the final maturity date as specified in the applicable Incremental Amendment; *provided*, *however*, that if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"Measurement Period" means, at any date of determination, the most recently completed four fiscal quarters of the Borrower and its Subsidiaries for which financial statements are required to have been delivered pursuant to Section 6.01(a) or Section 6.01(b).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means either (a) the 2019 Mortgage or (b) any other second preferred fleet mortgage on substantially the same terms as the 2019 Mortgage (as amended from time to time) executed and recorded after the date hereof over a Specified Barge Rig which is pledged to the Administrative Agent, for security of the Obligations, in each case, as applicable and as may be amended, restated, supplemented or otherwise modified from time to time.

---

[1][**Note to Draft**: Fifth anniversary of the Closing Date.]

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means (i) with respect to any Asset Sale, the aggregate cash proceeds received by the Borrower or any of its Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and any relocation expenses incurred as a result of the Asset Sale, taxes paid or payable as a result of the Asset Sale, in each case after taking into account any available tax credits or deductions and any tax sharing arrangements, any amounts required to be applied to the repayment of First-Priority Lien Obligations secured by a Lien on the asset or assets that were the subject of such Asset Sale and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP and (ii) with respect to any Debt Issuance, the aggregate cash proceeds received by the Borrower or any of its Subsidiaries in respect of any Debt Issuance, net of the direct costs relating to such Debt Issuance (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and taxes paid or payable as a result of the Debt Issuance, in each case after taking into account any available tax credits or deductions and any tax sharing arrangements.

"Non-Consenting Lender" has the meaning set forth in Section 10.01.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Recourse Debt" means Indebtedness and other obligations of the Borrower or any Subsidiary incurred for the purpose of financing all or any part of the purchase price or cost of construction, design, repair, replacement, installation, or improvement of property, plant or equipment used in the business of the Borrower or such Subsidiary with respect to which:

(a)     the holders of such Indebtedness and other obligations agree that they will look solely to the property so acquired or constructed and securing such Indebtedness (plus improvements, accessions, proceeds or distributions and directly related general intangibles) and other obligations, and neither the Borrower nor any Subsidiary (i) provides any direct or indirect credit support, including any undertaking, agreement or instrument that would constitute Indebtedness or (ii) is otherwise directly or indirectly liable for such Indebtedness; and

(b)     no default with respect to such Indebtedness or obligations would cause, or permit (after notice or passage of time or otherwise), according to the terms thereof, any holder (or any representative of any such holder) of any other Indebtedness of the Borrower or such Subsidiary equal to or in excess of the Threshold Amount to declare a default on such Indebtedness or cause the payment, repurchase, redemption, defeasance or other acquisition or retirement for value thereof to be accelerated or payable prior to any scheduled principal payment, scheduled sinking fund or scheduled maturity.

26

4821-8648-8708 v23

"Note" means a promissory note made by the Borrower in favor of a Lender or its registered assigns evidencing Loans made by such Lender to the Borrower, substantially in the form of Exhibit C or an amended, restated or replacement note otherwise reasonably satisfactory to the Administrative Agent.

"Notes Claims" shall have the meaning specified in the Plan of Reorganization.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, premium (including any Prepayment Premium) and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Ordinary Course of Business" means with respect to any transaction involving any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, limited partnership, joint venture, trust or other form of business entity, the partnership, limited partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Second-Lien Obligations" means other Indebtedness of Borrower and its Subsidiaries that is equally and ratably secured with the Loans as permitted by this Agreement and is designated by the Borrower as an Other Second-Lien Obligation.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, registration, filing or similar Taxes or any other excise or property or similar Taxes

27

arising from any payment made hereunder or under any other Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment pursuant to Section 3.06).

"Outstanding Amount" means with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date.

"Pari Passu Indebtedness" means (a) with respect to the Borrower, the Loans and any Indebtedness which ranks pari passu in right of payment to the Loans, and (b) with respect to any Subsidiary Guarantor, its Guarantee and any Indebtedness which ranks pari passu in right of payment to such Subsidiary Guarantor's Guarantee under the Loan Documents.

"Participant" has the meaning specified in Section 10.06(d).

"Participating Lender" has the meaning assigned to such term in the definition of "Dutch Auction".

"Participating Member State" means any member state of the European Union that has the Euro as its lawful currency in accordance with any EMU Legislation.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Business" means the lines of business conducted by the Borrower and its Subsidiaries on the date hereof and any business incidental or reasonably related thereto or which is a reasonable extension thereof as determined in good faith by the Borrower's managing body.

"Permitted Debt" has the meaning specified in Section 7.03.

"Permitted Holder" means any of (a) the Sponsors, (b) the Management Stockholders and (c) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; provided that, in the case of such group and without giving effect to the existence of such group or any other group, such Sponsors and Management Stockholders, collectively, have beneficial ownership of more than 50.0% of the total voting power of the Voting Stock of the Borrower or any of its direct or indirect parent companies.

"Permitted Investments" means (i) any Investment in the Borrower or in a Subsidiary Guarantor; (ii) any Investment in Cash Equivalents; (iii) any Investment by the Borrower or any

28

Subsidiary of the Borrower in a Person, if as a result of such Investment: (a) such Person becomes a Subsidiary; or (b) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Borrower or a Subsidiary; provided the aggregate amount of Investments made by Loan Parties in Persons that do not become Loan Parties shall not exceed an aggregate amount outstanding from time to time equal to $25.0 million; (iv) any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 7.05 hereof; (v) any acquisition of assets solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Borrower; (vi) any Investments received (a) in satisfaction of judgments or in compromise of obligations of trade creditors or customers that were incurred in the Ordinary Course of Business, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer or (b) as a result of a foreclosure by the Borrower or any of its Subsidiaries with respect to any secured Investment in default; (vii) guarantees (including Subsidiary Guarantees) of Indebtedness permitted under Section 7.03 hereof; (viii) Hedging Obligations permitted to be incurred under Section 7.03 hereof; (ix) payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the Ordinary Course of Business; (x) loans or advances to employees made in the Ordinary Course of Business of the Borrower or such Subsidiary not to exceed $2.0 million at any one time outstanding; (xi) other Investments in any Person having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (xi) that are at the time outstanding, not to exceed $35.0 million; and (xii) any Investment in a Project Financing or Project Financing Subsidiary in an amount not to exceed $25.0 million.

"Permitted Liens" means:

(a)     Liens securing Indebtedness and other obligations under any Credit Facility permitted to be incurred under clause (i) of the second paragraph of Section 7.03;

(b)     Liens securing Obligations;

(c)     Liens existing on the Closing Date listed on Schedule 7.01; provided that no such Lien is spread to cover any additional property or assets after the Closing Date other than all or part of the same property or assets (plus improvements, replacements, accessions, proceeds or distributions and directly related general intangibles in respect thereof) that secured or, under the written arrangements under which the original Lien arose, could secure the Indebtedness;

(d)     Liens in favor of the Borrower or any Subsidiary;

(e)     Liens to secure Indebtedness of any Foreign Subsidiary that is not a Subsidiary Guarantor; provided that the Indebtedness is permitted by the terms of this Agreement to be incurred and the Liens only extend to the assets of Foreign Subsidiaries;

(f)     Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Borrower or any Subsidiary or otherwise becomes a Subsidiary;

provided that such Liens were in existence prior to the contemplation of such merger or consolidation or such Person becoming a Subsidiary and do not extend to any assets other than those of such Person;

(g)     Liens on property existing at the time of acquisition of the property by the Borrower or any Subsidiary; provided that such Liens were in existence prior to the contemplation of such acquisition and do not extend to any assets other than such acquired property;

(h)     Liens to secure Indebtedness (including Capitalized Leases) permitted by clause (iv) of the second paragraph of Section 7.03 hereof covering only the assets acquired with such Indebtedness;

(i)     Liens securing Permitted Refinancing Indebtedness incurred to refinance Indebtedness that was previously so secured; provided that (x) any such Lien is limited to all or part of the same property or assets (plus improvements, accessions, proceeds or distributions in respect thereof) that secured or, under the written arrangements under which the original Lien arose, could secure the Indebtedness being refinanced, (y) if the Indebtedness being refinanced, refunded, extended, renewed or replaced is secured by a Lien that is junior to the Liens securing the Obligations, such new Lien shall be junior to the Liens securing the Obligations and (z) if the Indebtedness being refinanced, refunded, extended, renewed or replaced is secured by a lien that is pari passu to the Liens securing the Obligations, such new Lien shall be either pari passu or junior to the Liens securing the Obligations;

(j)     Liens that secure Non-Recourse Debt that encumber the property or assets financed by such Indebtedness (plus improvements, accessions, proceeds or distributions and directly related general intangibles in respect thereof);

(k)     Liens securing Hedging Obligations or Treasury Management Arrangements related to Indebtedness permitted under this Agreement;

(l)     Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the Ordinary Course of Business;

(m)     Liens in respect of property of the Borrower or any Subsidiary imposed by law or contract, which were not incurred or created to secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's, mechanics', maritime and salvage Liens and other Liens arising in the Ordinary Course of Business, and which do not in the aggregate materially detract from the value of the property of the Borrower or Subsidiary, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Borrower and its Subsidiaries, taken as a whole;

(n)     Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the payment or performance of tenders, statutory or regulatory obligations, surety and appeal bonds, bids, government contracts and leases, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

30

(o)      judgment Liens not giving rise to an Event of Default so long as any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired;

(p)      Liens upon specific items of inventory or other goods of any Person securing such Person's obligations in respect of bankers acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(q)      Liens securing reimbursement obligations with respect to commercial letters of credit that encumber documents and other property or assets relating to such letters of credit and products and proceeds thereof;

(r)      Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements of the Borrower or any Subsidiary, including rights of offset and set-off;

(s)      Liens for taxes, assessments or governmental charges or claims that are not yet delinquent for more than 60 days or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(t)      Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(u)      Liens with respect to obligations that do not exceed $30.0 million at any one time outstanding; provided that (i) such Liens encumber no assets that do not constitute Collateral and (ii) such Liens are pari passu or subordinated to the Liens securing the Obligations and the holders of the Indebtedness or other obligations secured thereby (or a representative or trustee on their behalf) shall enter into the Senior Lien Intercreditor Agreement or such other Customary Intercreditor Agreement which subordinates such Liens on the Collateral to the Liens on the Collateral securing the Obligations;

(v)      Liens on assets of any Project Finance Subsidiary to secure Indebtedness permitted by clause (xix) of the second paragraph of Section 7.03 hereof;

(w)      Liens on and pledges of the Equity Interests of any joint venture or Project Finance Subsidiary owed by the Borrower or any Subsidiary to the extent securing Indebtedness or obligations of such joint venture or Project Finance Subsidiary; and

(x)      Liens securing any Permitted Ratio Debt; provided that (i) such Liens encumber no assets that do not constitute Collateral and (ii) such Liens are pari passu or subordinated to the Liens securing the Obligations and the holders of the Indebtedness or other obligations secured thereby (or a representative or trustee on their behalf) shall enter into the Senior Lien Intercreditor Agreement or such other Customary Intercreditor Agreement which subordinated such Liens on the Collateral to the Liens on the Collateral securing the Obligations.

31

"Permitted Ratio Debt" means, at any time, Indebtedness, Disqualified Stock or preferred stock incurred or issued by the Borrower or any Subsidiary Guarantor if the Consolidated Leverage Ratio (following the incurrence or issuance of such Indebtedness, Disqualified Stock or preferred stock) for the Borrower's most recently ended four full fiscal quarters for which financial statements are required to have been delivered pursuant to Section 6.01(a) or (b) immediately preceding the date on which such Indebtedness is incurred would not exceed 2.0 to 1.0, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness, Disqualified Stock or preferred stock had been incurred or issued, as the case may be, at the beginning of such four-quarter period.

"Permitted Refinancing Indebtedness" means any Indebtedness of the Borrower or any Subsidiary issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Borrower or any of its Subsidiaries (other than intercompany Indebtedness); provided that:

(i)     the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness extended, refinanced, renewed, replaced, defeased or refunded (plus all accrued interest on the Indebtedness and the amount of all expenses and premiums incurred in connection therewith);

(ii)    such Permitted Refinancing Indebtedness has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(iii)   if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Loans, such Permitted Refinancing Indebtedness is subordinated in right of payment to, the Loans on terms at least as favorable to the Lenders (as reasonably determined by the Borrower) as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(iv)    such Permitted Refinancing Indebtedness is incurred either by (a) the Borrower or a Subsidiary Guarantor or (b) by the Subsidiary that is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(v)     if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is unsecured, the Permitted Refinancing Indebtedness in respect thereof is unsecured; and

(vi)    if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is secured, the Liens securing the Permitted Refinancing Indebtedness in respect thereof shall be no higher in priority relative to the Liens securing the

32

Obligations than the Liens securing such Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PIK Interest" has the meaning specified in Section 2.08(a).

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or any of its Subsidiaries or, with respect to any such plan that is subject to Section 412 or 430 of the Code or Section 302 or 303 or Title IV of ERISA, any ERISA Affiliate.

"Plan of Reorganization" has the meaning specified in the recitals hereto.

"Platform" has the meaning specified in Section 6.02.

"Pledged Equity Interests" has the meaning specified in the Security Agreement.

"Prepayment Premium" means in the event of a voluntary or mandatory repayment, prepayment or redemption, or an acceleration, of Initial Loans or the Initial Loans becoming due and payable pursuant to this Agreement: (a) on or prior to the date that is 6 months after the Closing Date, zero, (b) after the date that is six months after the Closing Date, but on or prior to the date that is two (2) years after the Closing Date, six and one-half percent (6.50%) of the principal amount of the Initial Loans so repaid, prepaid, redeemed or that has become or is declared accelerated pursuant to Section 8.02 or otherwise, (c) after the date that is two years after the Closing Date, but on or prior to the date that is three years after the Closing Date, three and a quarter percent (3.25%) of the principal amount of the Initial Loans so repaid, prepaid or that has become or is declared accelerated pursuant to Section 8.02 or otherwise, and (d) after the date that is three years after the Closing Date, zero.

"pro forma basis" or "pro forma effect" means with respect to any transaction, that such transaction shall be deemed to have occurred as of the first day of the period of four consecutive Fiscal Quarters, or such other applicable period, ending as of the end of the most recent Fiscal Quarter for which annual or quarterly financial statements shall have been delivered in accordance with the provisions hereof. Further, for purposes of making calculations on a "pro forma basis" hereunder, (x) in the case of any acquisition, merger or consolidation, (i) income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject thereof shall be included to the extent relating to any period prior to the date thereof and (ii) Indebtedness incurred in connection with such acquisition, merger or consolidation shall be deemed to have been incurred as of the first day of the applicable period, and (y) in the case of a Disposition of all or substantially all of the assets of, or all of the Equity Interests of, a Loan Party or any Subsidiary of the Borrower or any division or product line of a Loan Party or any of the Borrower's Subsidiaries, income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject thereof shall be excluded to the extent relating to any period prior to the date thereof.

33

"Project Finance Subsidiary" means a Subsidiary that is a special-purpose entity created solely to (i) construct or acquire any asset or project that will be or is financed solely with Project Financing for such asset or project and related equity investments in, loans to, or capital contributions in, such Subsidiary that are not prohibited hereby and/or (ii) own an interest in any such asset or project.

"Project Financing" means Indebtedness and other obligations that (a) are incurred by a Project Finance Subsidiary, (b) are secured by a Lien of the type permitted under clause (v) of the definition of Permitted Liens and (c) constitute Non-Recourse Debt (other than recourse to the assets of, and Equity Interests in, such Project Finance Subsidiary).

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Equity Interests.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning specified in Section 6.02.

"Qualifying Bids" has the meaning assigned to such term in the definition "Dutch Auction".

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, advisors and representatives of such Person and of such Person's Affiliates.

"Removal Effective Date" has the meaning specified in Section 9.06.

"Reply Amount" has the meaning assigned to such term in the definition "Dutch Auction".

"Reply Discount" has the meaning assigned to such term in the definition "Dutch Auction".

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Lenders" means, as of any date of determination, Lenders holding in the aggregate more than 50% of any unused Commitments and Total Outstandings; *provided* that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender or related to the Notes Claims of any Lender Claimant shall be excluded for purposes of making a determination of Required Lenders.

"Requirement of Law" means as to any Person, any Law applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Resignation Effective Date" has the meaning specified in Section 9.06.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, or controller of a Loan Party and (i) solely for purposes of delivery of incumbency certificates pursuant to Section 4.01 or any similar requirement under any Loan Document, the secretary or any assistant secretary of such Loan Party, (ii) with respect to financial matters, the chief financial officer of such Loan Party, (iii) in the case of Compliance Certificates, the chief financial officer, controller or the treasurer of such Loan Party, (iv) solely for purposes of executing this Agreement, the chief executive officer, president, chief financial officer, treasurer, controller or any vice president of a Loan Party, and (v) solely for purposes of notices given pursuant to Article II any other officer or employee of the applicable Loan Party designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent (and, in each case, for any Loan Party that is a limited partnership, the foregoing individuals of its general partner).  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Debt" has the meaning specified in Section 7.06.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payment" has the meaning specified in Section 7.06.

"Return Bid" has the meaning assigned to such term in the definition of "Dutch Auction".

"RSA" means that certain Restructuring Support Agreement (including the term sheets and any other attachments thereto), dated as of December 12, 2018, by and among the Debtors and the Consenting Stakeholders (as defined therein) from time to time party thereto.

"S&P" means S&P Global Ratings, a division of S&P Global, Inc. and any successor thereto.

"Sanctions" means any sanctions administered or enforced by the United States Government (including without limitation, OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other applicable jurisdictions.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Credit Facilities Indebtedness" means any Indebtedness under any Credit Facility that is secured by a Permitted Lien incurred or deemed incurred pursuant to clause (a) of the definition of Permitted Liens.

35

"Secured Parties" means, collectively, the Administrative Agent, each other Agent, the Lenders, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Agreement" means that certain Pledge and Security Agreement, dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time) made by the Loan Parties from time to time party thereto in favor of the Administrative Agent.

"Security Agreement Supplement" has the meaning specified in the Security Agreement.

"Senior Lien Intercreditor Agreement" means the intercreditor agreement, dated as of the Closing Date, among the Administrative Agent, the ABL Agent, the other parties from time to time party thereto and acknowledged by the Loan Parties, as amended restated, modified, supplemented, or replaced in any manner.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the Ordinary Course of Business.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Barge Rig" has the meaning set forth in the definition of Specified Rigs.

"Specified Land Rig" has the meaning set forth in the definition of Specified Rigs.

"Specified Personal Property" means any Property of a type in which a Lien is purported to be granted pursuant to the Security Agreement or any Mortgage.

"Specified Rigs" means (a) each of the barge rigs, located and operating in and along the inland waterways and coast of the continental United States or in Gulf of Mexico waters subject to U.S. state or federal jurisdiction, owned by the Borrower or any other Loan Party (each, a "Specified Barge Rig") and (b) each of the land rigs located and operating in the contiguous United States or Alaska, owned by the Borrower or any other Loan Party (each, a "Specified Land Rig").  Each Specified Barge Rig and each Specified Land Rig as of the Closing Date are set forth on Schedule 5.07(A) and Schedule 5.07(B) respectively.

36

**["Sponsors" means, individually or collectively, Brigade Capital Management, LLC, Highbridge Capital Management LLC, Whitebox Advisors LLC and Värde Partners and any of their respective Affiliates and accounts, funds or partnerships managed, advised or sub-advised by any of them or any of their respective Affiliates, but not including, however, any portfolio company of any of the foregoing.]**

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantors" means, collectively, at any time, (a) each Material Subsidiary of the Borrower other than any Excluded Subsidiary or Project Finance Subsidiary, in each case, to the extent such Person is a party to the Guaranty at such time and (b) any other Subsidiary otherwise party to the Guaranty at such time.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that

37

are intended to function primarily as a borrowing of funds but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Tax Distribution" means, with respect to any tax period (or portion thereof) in which the Borrower or any of its Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for income Tax purposes of which the Borrower (or one or more holding companies controlling Borrower) is the common parent (a "Tax Group"), distributions by any Subsidiary, directly or indirectly, to Borrower to pay the federal, state, and local income and similar Taxes of such Tax Group attributable to the Borrower and its Subsidiaries; provided, that each Subsidiary may also make distributions to Borrower (or any holding company) to enable the Borrower (or any such holding company) to pay licensing (and similar) expenses, franchise taxes, and other fees, taxes and expenses required to maintain the legal existence of such Person, to the extent incurred in the Ordinary Course of Business.

"Tax Group" has the meaning assigned to such term in the definition of "Tax Distribution".

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Threshold Amount" means $**[15,000,000]**.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Treasury Management Arrangement" means any agreement or other arrangement governing the provision of treasury or cash management services, including deposit accounts, overdraft, credit or debit card, funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

**["Unclaimed Loans" has the meaning specified in Section 2.15(b).]**

[**"Unclaimed Loans Termination Date"** has the meaning specified in **Section 2.15(b).**]

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e)(ii)(B)(3).

"Voting Stock" of any Person as of any date means the Equity Interest of such Person that is at the time entitled to vote in the election of the managing body of such Person.

"Weighted Average Life to Maturity" means when applied to any Indebtedness or Disqualified Stock or preferred stock of a Subsidiary Guarantor at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness or redemption or similar payment in respect of the Disqualified Stock or preferred stock of a Subsidiary Guarantor by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02   Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include." "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder." and words of similar import when used in any Loan

39

Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Required Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the Audited Financial Statements for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.  Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding

40

principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

Section 1.04    Rounding.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    [Reserved].

Section 1.06    [Reserved].

Section 1.07    [Reserved].

Section 1.08    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to [**Central time (daylight savings or standard, as applicable**)].

Section 1.09    [Reserved].

Section 1.10    Uniform Commercial Code.  Terms relating to Collateral used and not otherwise defined herein that are defined in the UCC shall have the meanings set forth in the UCC, as applicable and as the context requires.

Section 1.11    Divisions.  For all purposes under the Loan Documents, any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation) pursuant to Section 18-217 of the Delaware Limited Liability Company Act or any similar provision under the laws of any other applicable jurisdiction (any such division, allocation of assets or unwinding, a "Division"), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Notwithstanding anything to the contrary in this Agreement, any division of a limited liability company shall constitute a separate Person hereunder, and each resulting division of any limited liability company that, prior to such division, is a Loan Party shall remain a Loan Party after giving effect to such division, and any resulting divisions of such Persons shall remain subject to the same restrictions applicable to the pre-division predecessor of such divisions.

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    The Loans.  In accordance with the Plan of Reorganization, and subject to the terms and conditions set forth herein, each Lender shall be deemed to make a term loan (the "Initial Loans") to the Borrower on the Closing Date in an aggregate principal amount as set forth opposite such Lender's name on Schedule 2.01; provided that, with respect to Lender Claimants set forth on Schedule 2.01, Initial Loans in an aggregate principal amount set forth on

41

such Schedule 2.01 shall be deemed issued and outstanding for the benefit of such Lender Claimants on the Closing Date and held in the Lender Claimant Reserve Account to be administered in accordance with Section 2.15.  The Initial Loans shall be treated as a single Class of Loans for all purposes of this Agreement and any other Loan Documents.  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.  For the avoidance of doubt, notwithstanding that no cash is exchanged, the Borrower shall owe the aggregate principal amount of the Initial Loans to the Lenders under, and in accordance with the terms of, this Agreement.  The Initial Loans shall be denominated in Dollars and shall bear interest in accordance with Section 2.08.

Section 2.02    Borrowings.

(a)    Each Borrowing, other than the Initial Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which shall be given by a Committed Loan Notice.  Each such Committed Loan Notice must be received by the Administrative Agent not later than 11:00 a.m. one Business Day prior to the requested date of any Borrowing.  Each Committed Loan Notice shall specify (i) the requested date of the Borrowing (which shall be a Business Day), and (ii) the principal amount of Loans to be borrowed.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Class of Loans.  In the case of a Borrowing (other than the initial Credit Extension), each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to the Administrative Agent by the Borrower.

(c)    Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all of the portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent, and such Lender.

Section 2.03    [Reserved].

Section 2.04    [Reserved].

Section 2.05    Prepayments.

(a)    Optional.

(i)    Borrower may, upon notice from the Borrower to the Administrative Agent, at any time or from time to time voluntarily prepay any Class or Classes of Loans in whole or in part without premium or penalty (except as set forth in Section 2.05(a)(ii)); *provided* that (i) such notice must be received by the Administrative

42

Agent not later than 11:00 a.m. one Business Day prior to any date of prepayment of Loans; (ii) any prepayment of Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Class(es) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment.  The Borrower shall make such prepayment and the prepayment amount specified in such notice shall be due and payable on the date specified therein, *provided, however*, that notwithstanding anything to the contrary contained herein, any such prepayment notice may be conditioned upon the effectiveness of other credit facilities or the closing of one or more securities offerings or other transactions; *provided, further,* that, the Borrower must affirmatively rescind any such prepayment notice by a subsequent written notice to the Administrative Agent, if the condition in an original prepayment notice shall fail to be satisfied by the proposed effective date of such prepayment, and upon the Administrative Agent's receipt of such rescinding notice, shall have no obligation to make any prepayment in respect of such earlier prepayment notice.  Any prepayment of Loans shall be accompanied by all accrued interest on the amount prepaid and any other amounts due under the Loan Documents.

(ii)      Notwithstanding anything to the contrary contained in this Agreement, (x) in the event of each prepayment, repayment or redemption of any Initial Loans pursuant to Section 2.05(a)(i) and Section 2.05(b)(iii), as applicable, such prepayment, repayment or redemption shall be accompanied by, and there shall become due and payable automatically upon such event, an early prepayment premium payable in cash on the principal amount so prepaid, repaid or redeemed, in an amount equal to the Prepayment Premium, calculated on the aggregate principal amount of the Initial Loans so prepaid, repaid or redeemed, together with all accrued and unpaid interest on the amount being prepaid, repaid or redeemed and (y) each repayment of, redemption or distribution in respect of, the principal amount of the Initial Loans after acceleration thereof pursuant to Section 8.02 (including automatically as a result of a proceeding under any Debtor Relief Law), shall be accompanied by, and there shall become due and payable automatically upon acceleration, a payment premium payable in cash on the principal amount so repaid, redeemed or distributed or on the principal amount that has become or is declared accelerated pursuant to Section 8.02 (including automatically as a result of an insolvency proceeding), in an amount equal to the Prepayment Premium, calculated on the aggregate principal amount of the Initial Loans so repaid, redeemed, distributed or accelerated, together with all accrued and unpaid interest on such Initial Loans.

(iii)     Dutch Auctions.  Notwithstanding anything to the contrary contained in this Agreement, Borrower (in such case, the foregoing being herein referred to as the "Auction Party") may repurchase outstanding Loans of any Class on the following basis; provided that no Event of Default has occurred or is continuing or would result therefrom at the time the Auction Notice is distributed:

43

(A)     Auction Party may repurchase all or any portion of Loans (such Loans, "Subject Loans") pursuant to a Dutch Auction (or such other modified Dutch auction conducted pursuant to similar procedures as the Borrower and Administrative Agent may otherwise agree);

(B)     Following repurchase by Auction Party pursuant to this Section 2.05(a)(iii), the Loans so repurchased shall, without further action by any Person, be deemed cancelled for all purposes and no longer outstanding (and may not be resold by Auction Party), for all purposes of this Agreement and the principal amount of the Loans so repurchased shall reduce the aggregate principal amount of such Loans by the full par value of the Loans so repurchased.  In connection with any Loans repurchased and cancelled pursuant to this Section 2.05(a)(iii), the Auction Party shall notify the Administrative Agent of the cancellation and the Administrative Agent is authorized to make appropriate entries in the Register to reflect any such cancellation.  Any payment made by Auction Party in connection with a repurchase permitted by this Section 2.05(a)(iii) shall not be subject to any of the pro rata payment or sharing requirements of this Agreement. Notwithstanding anything in this Agreement or any other Loan Documents to the contrary, failure by Auction Party to make any payment to a Lender required by an agreement permitted by this Section 2.05(a)(iii) shall not constitute a Default or an Event of Default; and

(C)     Each Lender that sells its Loans pursuant to this Section 2.05(a)(iii) acknowledges and agrees that (i) the Auction Party may have, or may later come into possession of additional information regarding the Loans or the Loan Parties at any time after a repurchase has been consummated pursuant to an Auction hereunder, that may be information that would have been material to such Lender's decision to enter into an assignment of such Loans hereunder ("Excluded Information"), (ii) such Lender will independently make its own analysis and determination to enter into an assignment of its Loans and to consummate the transactions contemplated by an Auction notwithstanding such Lender's lack of knowledge of Excluded Information and (iii) none of the Loan Parties, the Sponsors or any of their respective Affiliates, or any other Person shall have any liability to such Lender with respect to the nondisclosure of the Excluded Information.  Each Lender that tenders Loans pursuant to an Auction agrees to the foregoing provisions of this clause (C).  The Administrative Agent and the Lenders hereby consent to the Auctions and the other transactions contemplated by this Section 2.05(a)(iii) and hereby waive the requirements of any provision of this Agreement (including, without limitation, any pro rata payment requirements) (it being understood and acknowledged that purchases of the Loans by Auction Party contemplated by this Section 2.05(a)(iii) shall not constitute Investments by Auction Party) or any other Loan Document that may otherwise prohibit any Auction or any other transaction contemplated by this Section 2.05(a)(iii).

44

    (b)    <u>Mandatory</u>.

        (i)    <u>Change of Control</u>.

        (A)    Upon the occurrence of a Change of Control or in accordance with <u>Section 2.05(b)(i)(D)</u>, each Lender will have the right, in accordance with the time periods set forth in this <u>Section 2.05(b)(i)</u>, to require Borrower to repurchase all or any part of that Lender's Loans pursuant to a change of control offer (a "<u>Change of Control Offer</u>") in an amount equal to 101% of the outstanding principal amount thereof, plus accrued and unpaid interest (if any) to the repayment date, except to the extent Borrower has previously or concurrently elected to prepay the Loans in accordance with <u>Section 2.05(a)(i)</u>.

        (B)    In the event that at the time of such Change of Control, the terms of First-Priority Lien Obligations or Pari Passu Indebtedness permitted to be incurred under this Agreement restrict or prohibit the repayment of Loans pursuant to this <u>Section 2.05(b)(i)</u>, then prior to the mailing of the notice to the Lenders provided for in <u>Section 2.05(b)(i)(C)</u> but in any event within 30 days following any Change of Control, the Borrower shall:

        (1)    repay in full all such First-Priority Lien Obligations or Pari Passu Indebtedness or, if doing so will allow the repayment of Loans, offer to repay in full all such First-Priority Lien Obligations or Pari Passu Indebtedness and repay such First-Priority Lien Obligations or Pari Passu Indebtedness of each lender and/or noteholder who has accepted such offer; or

        (2)    obtain the requisite consent under the agreements governing such First-Priority Lien Obligations or Pari Passu Indebtedness to permit the repayment of the Loans as provided for in <u>Section 2.05(b)(i)(C)</u>.

        (C)    No later than 30 days following any Change of Control, except to the extent Borrower has elected to prepay the Loans in accordance with <u>Section 2.05(a)(i)</u>, Borrower will give the Administrative Agent notice (the "<u>Change of Control Notice</u>") of the Change of Control, which the Administrative Agent shall promptly deliver to each Lender. The Change of Control Notice shall:

        (1)    state that a Change of Control has occurred and that each Lender has the right to require Borrower to repay such Lender's Loans in an amount equal to 101% of the outstanding principal amount thereof, plus accrued and unpaid interest to the repayment date;

<p style="text-align:center">45</p>

4821-8648-8708 v23

(2)     state the circumstances and the relevant facts regarding such Change of Control;

(3)     state the repayment date (which shall be no earlier than 15 days nor later than 30 days from the date on which the Administrative Agent is notified) (the "Change of Control Payment Date");

(4)     state that Lenders electing to have any Loans repaid pursuant to a Change of Control Offer will be required to notify the Administrative Agent prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(5)     state that Lenders will be entitled to withdraw their election to require Borrower to repay such Loans; provided that the Administrative Agent receives, not later than the close of business on the third Business Day prior to the Change of Control Payment Date, e-mail or letter setting forth the name of such Lender, the principal amount of Loans to be repaid, and a statement that such Lender is withdrawing its election to have such Loans repaid; and

(6)     provide the other instructions determined by Borrower or as reasonably requested by the Administrative Agent, consistent with this Section 2.05(b)(i), that a Lender must follow in order to have its Loans repaid.

The notice, if delivered in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Lender receives such notice, if (1) the notice is delivered in a manner herein provided and (2) any Lender fails to receive such notice or a Lender receives such notice but it is defective, such Lender's failure to receive such notice or such defect shall not affect the validity of the proceedings for the repayment of the Loans as to all other Lenders that properly received such notice without defect.

(D)     On or before the Change of Control Payment Date, Borrower will repay all Loans or portions of Loans properly elected to be repaid and not withdrawn pursuant to the Change of Control Offer in an amount equal to 101% of the outstanding principal amount thereof, plus accrued and unpaid interest (if any) to the repayment date.

(E)     A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

46

(F)     Borrower will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Agreement and repays all Loans properly elected to be repaid and not withdrawn under such Change of Control Offer and Borrower shall instruct the Administrative Agent to accept repayments made by such third party.

(ii)     Asset Sale Prepayment Offer.

(A)     Within 365 days after the receipt of any Net Proceeds from an Asset Sale, the Borrower may apply such Net Proceeds at its option (i) to repay, repurchase, redeem, defease or otherwise acquire or retire (v) Permitted Debt of the Borrower or Subsidiary constituting First-Priority Lien Obligations (and, if the Indebtedness repaid, repurchased, redeemed, defeased or otherwise acquired or retired is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto), (w) Indebtedness of a Subsidiary that is not a Subsidiary Guarantor (provided that the assets disposed of in such Asset Sale were not assets of a Borrower or a Subsidiary Guarantor and do not constitute Collateral), (x) Obligations under the Loans, (y) other Pari Passu Indebtedness (so long as the Net Proceeds from such Asset Sale are with respect to assets not constituting Collateral) or (z) Other Second-Lien Obligations (provided that if a Borrower or any Subsidiary Guarantor shall so reduce Other Second-Lien Obligations under this clause (z) (which for the avoidance of doubt will not constitute Indebtedness under clauses (v), (w), (x) or (y)), the Borrower will repay the Loans pursuant to Section 2.05(a)(i) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Lenders to repay Loans at par, plus accrued and unpaid interest on the pro rata principal amount of Loans); (ii) to acquire all or substantially all of the assets of, or a majority of the Voting Stock of, another Permitted Business; (iii) to make a capital expenditure in a Permitted Business; or (iv) to acquire other long-term assets that are used or useful in a Permitted Business.  Pending the final application of any such Net Proceeds, the Borrower may temporarily reduce revolving credit borrowings or otherwise invest such Net Proceeds in any manner that is not prohibited by this Agreement.

(B)     Any Net Proceeds from any Asset Sales that are not applied or invested as provided in Section 2.05(b)(ii)(A) will constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $25.0 million, the Borrower will be required to make an offer (an "Asset Sale Offer") to all Lenders and to the extent required, to all holders of any Other Second-Lien Obligations containing provisions similar to those set forth in this Agreement with respect to offers to purchase or redeem with the proceeds of sales of assets, to repay the maximum principal amount of Loans (and such Other Second-Lien Obligations) that may be repaid out of

47

4821-8648-8708 v23

the Excess Proceeds.  The offer price in any Asset Sale Offer will be equal to 100% of the principal amount of Loans and Other Second-Lien Obligations to be repaid or the lesser amount required under agreements governing such Other Second-Lien Obligations, plus accrued and unpaid interest, if any, to the date of repayment, and will be payable in cash.  To the extent that the aggregate principal amount of Loans (and such Other Second-Lien Obligations) accepted for repayment or tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Borrower may use any remaining Excess Proceeds for any purpose that is not prohibited by this Agreement.  If the aggregate principal amount of Loans and such Other Second-Lien Obligations accepted for repayment or surrendered by holders thereof pursuant to such Asset Sale Offer exceeds the amount of Excess Proceeds, the Administrative Agent shall apply the Excess Proceeds ratably to the repayment of the Loans and any other tendered Other Second-Lien Obligations based on the principal amount of the Loans or such Other Second-Lien Obligations accepted for repayment or tendered.  Upon completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero.

(C)     Within ten (10) Business Days of any date on which the aggregate amount of Excess Proceeds exceeds $25.0 million, the Borrower shall deliver written notice of such occurrence to the Administrative Agent, and the Administrative Agent shall promptly deliver notice to each Lender to the address of such Lender appearing in the Register or otherwise in accordance with Section 10.02 with the following information:

(1)     that that the Borrower is making an Asset Sale Offer pursuant to this Section 2.05(b)(ii) and that all Loans and Other Second-Lien Obligations properly accepted for repayment or tendered and not withdrawn pursuant to such Asset Sale Offer will be repaid by the Borrower;

(2)     the repayment date, which will be no earlier than twenty Business Days nor later than thirty Business Days from the date on which such notice is delivered to the Administrative Agent (the "Asset Sale Payment Date");

(3)     that any Loan not properly accepted for repayment will remain outstanding and continue to accrue interest;

(4)     that unless the Borrower defaults in making the payment, all Loans accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest on the Asset Sale Payment Date;

48

(5)     that Lenders electing to have Loans repaid pursuant to an Asset Sale Offer may only elect to have all of such Loans repaid and may not elect to have only a portion of such Loans repaid;

(6)     that Lenders electing to have any Loans repaid pursuant to an Asset Sale Offer will be required to notify the Administrative Agent in writing prior to the close of business on the third Business Day preceding the Asset Sale Payment Date;

(7)     that Lenders will be entitled to withdraw their election to require the Borrower to repay such Loans; *provided* that the Administrative Agent receives, not later than the close of business on the expiration date of the Asset Sale Offer, a facsimile transmission, electronic mail or letter setting forth the name of such Lender, the principal amount of Loans to be repaid, and a statement that such Lender is withdrawing its election to have such Loans repaid;

(8)     that, to the extent that the aggregate principal amount of Loans or the Other Second-Lien Obligations accepted for repayment or surrendered by holders thereof exceeds the amount of Excess Proceeds, the Administrative Agent will apply the Excess Proceeds as set forth in Section 2.05(b)(ii)(B); and

(9)     the other instructions, as determined by the Borrower or as reasonably requested by the Administrative Agent, consistent with this Section 2.05(b)(ii), that a Lender must follow in order to have its Loans repaid.

The notice, if delivered in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Lender receives such notice.  If (x) the notice is delivered in a manner herein provided and (y) any Lender fails to receive such notice or a Lender receives such notice but it is defective, such Lender's failure to receive such notice or such defect shall not affect the validity of the proceedings for the repayment of the Loans as to all other Lenders that properly received such notice without defect.

(D)     Notwithstanding the foregoing, no Asset Sale Offer nor any repayment of Loans under this Section 2.05(b)(ii) shall be made if such repayment is then prohibited under the terms of any Credit Facility evidencing First-Priority Lien Obligations.

(iii)     Debt Issuances.  In the event and on each occasion that any Net Proceeds are received by or on behalf of Borrower or any Subsidiary Guarantors in respect to any Debt Issuance, the Borrower shall, within (3) Business Days after such Net

49

Proceeds are received, prepay Loans on a pro rata basis, in each case in an aggregate amount equal to 100% of the amount of such Net Proceeds (which prepayment of principal shall be accompanied by payment of accrued and unpaid interest, premiums (including the Prepayment Premium) and fees and expenses associated with such principal amount prepaid).

Section 2.06   [Reserved].

Section 2.07   Repayment of Loans.  Borrower shall repay to the Appropriate Lenders on the applicable Maturity Date the aggregate principal amount of all Loans of any applicable Class outstanding on such date, together with all accrued and unpaid interest thereon and any outstanding fees, in each case, payable in accordance with the Loan Documents.

Section 2.08   Interest.

(a)   Subject to the provisions of Section 2.08(b), each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate. The Borrower shall pay interest on the Initial Loans at (x) eleven percent (11%) per annum in cash on each Interest Payment Date ("Cash Interest") *plus* (y) two percent (2%) per annum paid in kind and capitalized on each Interest Payment Date as set forth in Section 2.08(c) by adding such amount to the outstanding principal amount of such Initial Loans ("PIK Interest").

(b)

(i)   If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, all outstanding Loans (whether or not overdue) shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws until such amount is paid in full (after as well as before judgment).

(ii)   If any amount (other than principal of any Loan) payable by Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such overdue amount shall thereafter bear interest at the Default Rate to the fullest extent permitted by applicable Laws until such amount is paid in full (after as well as before judgment).

(iii)   Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)   Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Notwithstanding anything else to the contrary contained herein, interest hereunder shall be due no less frequently than quarterly.  PIK Interest shall be paid by increasing the principal amount of the outstanding Initial Loans, which increase shall be evidenced on the Register and, if such advance is evidenced by a Note with respect to any Lender, shall also be evidenced by a new Note if requested by such Lender.  PIK Interest shall accrue and be capitalized and added to the

50

outstanding principal balance of the Initial Loans on each Interest Payment Date. From and after each applicable Interest Payment Date, the outstanding principal amount of the Initial Loans shall without further action by any party hereto be deemed to be increased by the aggregate amount of PIK Interest so capitalized and added to the Initial Loans in accordance with the immediately preceding sentence, whereupon such amount of PIK Interest so capitalized and added shall also accrue interest in accordance with the terms of this Section 2.08. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law. Interest at the Default Rate shall be payable on demand.

Section 2.09    Fees.  Borrower shall pay to the Administrative Agent for its own account, in Dollars, fees in the amounts and at the times specified in the Fee Letter.

Section 2.10    Computation of Interest and Fees.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    Evidence of Debt.  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender, as applicable, and by the Register. Such accounts or records maintained by each Lender and the Register, as applicable, shall be conclusive absent manifest error of the amount of the applicable Credit Extensions to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the Register in respect of such matters, the Register shall control in the absence of manifest error. Upon the request of any Lender to the Borrower, the Borrower shall execute and deliver to such Lender a Note, which shall evidence such Lender's Loans to the Borrower in addition to such accounts or records. Each Lender may attach schedules to its Note and record thereon the date, amount, and maturity of its Loans and payments with respect thereto.

Section 2.12    Payments Generally; Administrative Agent's Clawback.

(a)    General.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Appropriate Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 1:00 p.m. shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee

51

shall continue to accrue.  If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)      (i) Funding by Lenders: Presumption by Administrative Agent.  Unless the Administrative Agent shall have received written notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with and at the time required by Section 2.02 and may (but shall not be obligated to), in reliance upon such assumption, make available to the applicable Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the applicable Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by Borrower, the interest rate applicable to Loans.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)      Payments by Borrower: Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received written notice from Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, the Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption, distribute to the Appropriate Lenders the amount due.  In such event, if Borrower has not in fact made such payment, then each of the Appropriate Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)      Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to Borrower as

52

4821-8648-8708 v23

provided in the foregoing provisions of this Article II and such funds are not made available to Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.04(c).

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Insufficient Funds.  Subject to Section 8.03, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.13   Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Administrative Agent and the Borrower of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may *be, provided* that:

53

(i)       if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this Section shall not be construed to apply to (A) any payment made by or on behalf of Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof by means other than pursuant to a Dutch Auction (as to which the provisions of this Section shall apply).

Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of Borrower in the amount of such participation.

Section 2.14    Incremental Facility.

(a)      Incremental Commitments.  The Borrower may at any time or from time to time after the Closing Date, by notice to the Administrative Agent (an "Incremental Request"), request one or more new commitments which shall be in the same Class as any outstanding Loans (a "Loan Increase") or a new Class of Loans (collectively with any Loan Increase, the "Incremental Commitments") under this Agreement, whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders.

(b)      Incremental Loans.  Any Incremental Loans (other than Loan Increases) effected through the establishment of one or more new Loans made on an Incremental Facility Closing Date shall be designated a separate Class of Incremental Loans for all purposes of this Agreement.  On any Incremental Facility Closing Date on which any Incremental Commitments of any Class are effected (including through any Loan Increase), subject to the satisfaction (or waiver) of the terms and conditions in this Section 2.14, (i) each Incremental Lender of such Class shall make a Loan to the Borrower (an "Incremental Loan") in an amount equal to its Incremental Commitment of such Class and (ii) each Incremental Lender of such Class shall become a Lender hereunder with respect to the Incremental Commitment of such Class and the Incremental Loans of such Class made pursuant thereto.  Notwithstanding the foregoing, Incremental Loans may have identical terms to any of the Loans and be treated as the same Class as any of such Loans.

(c)      Incremental Request.  Each Incremental Request from the Borrower pursuant to this Section 2.14 shall set forth the requested amount and proposed terms of the relevant Incremental Loans.  Incremental Loans may be made by any existing Lender (but no existing Lender will have an obligation to make any Incremental Commitment, nor will the Borrower have any obligation to approach any existing Lenders to request any Incremental

Commitment) or by any other bank or other financial institution (any such other bank or other financial institution being called an "Incremental Lender").

(d)     Effectiveness of Incremental Amendment.    The effectiveness of any Incremental Amendment, and the Incremental Commitments thereunder, shall be subject to the satisfaction on the date of such Incremental Amendment (the "Incremental Facility Closing Date") of each of the following conditions:

(i)     no Default or Event of Default shall exist after giving effect to such Incremental Commitments, and the representations and warranties in Article V of this Agreement shall be true and correct in all material respects (or, in the case of any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language, in all respects) on and as of the date of the incurrence of such Incremental Commitments (although any representations or warranties which expressly relate to a given date or period shall be required only to be true and correct in all material respects (or in all respects, as applicable) as of the respective date or for the respective period, as the case may be);

(ii)     each Incremental Commitment shall be in an aggregate principal amount that is not less than $5,000,000 and shall be in an increment of $1,000,000 (*provided* that such amount may be less than $5,000,000 if such amount represents all remaining availability under the limit set forth in clause (iii) below); and

(iii)     the aggregate amount of Incremental Loans shall not exceed an amount of Incremental Loans so long as on and as of the date of the incurrence of such Incremental Loans and following the incurrence or issuance of such Indebtedness, the Consolidated Leverage Ratio for the Borrower's most recently ended four full fiscal quarters for which financial statements have been delivered pursuant to Section 6.01(a) or (b) immediately preceding the date on which such Indebtedness is incurred would not exceed 2.0 to 1.0, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, as the case may be, at the beginning of such four-quarter period.

(e)     Required Terms.    The terms, provisions and documentation of the Incremental Loans and Incremental Commitments, as the case may be, of any Class, except as otherwise set forth herein, shall be as agreed between the Borrower and the applicable Incremental Lenders; *provided* that in no event will any Incremental Loans be permitted to be voluntarily or mandatorily prepaid prior to the repayment in full of the Initial Loans, unless accompanied by at least a ratable payment of the Initial Loans (*provided* that any Incremental Amendment may provide that the applicable Incremental Lenders shall receive a less than ratable payment); *provided*, *further*, that to the extent the terms of such Incremental Commitments are not consistent with the Initial Loans (except to the extent permitted by this Section 2.14), the terms of such Incremental Commitments shall be reasonably satisfactory to the Administrative Agent (it being understood that any terms which are not substantially identical to the Initial Loans and are applicable only after the then-existing Initial Loan Maturity Date are deemed to be reasonably acceptable to the Administrative Agent).  In any event:

55

(i)    the Incremental Loans:

(A)    shall rank *pari passu* in right of payment and of security with the Loans;

(B)    shall not mature earlier than the latest Maturity Date of the Initial Loans outstanding at the time of incurrence of such Incremental Loans;

(C)    shall have a Weighted Average Life to Maturity not shorter than the remaining Weighted Average Life to Maturity of then-existing Initial Loans (without giving effect to any prepayments thereof);

(D)    subject to clauses (B) and (C) above, amortization, if any, shall be determined by the Borrower and the applicable Incremental Lenders;

(E)    subject to clause (ii) below, shall have an Applicable Rate determined by the Borrower and the applicable Incremental Lenders; and

(F)    may participate on a *pro rata* basis or less than *pro rata* basis (but not on a greater than *pro rata* basis) in any voluntary or mandatory prepayments of Initial Loans hereunder, as specified in the applicable Incremental Amendment;

(ii)    with respect to any Incremental Loan, the All-In Yield applicable to such Incremental Loans, as applicable, of each Class shall be determined by the Borrower and the applicable Incremental Lenders, and shall be set forth in each applicable Incremental Amendment; provided, however, that if the All-In Yield in respect of such Incremental Loans exceeds the All-In Yield in respect of any then-existing Initial Loans by more than 0.50%, the Applicable Rate of such then-existing Initial Loans (including for all purposes of this Section any such Loans funded pursuant to a Loan Increase or that are Incremental Loans with the same terms as the Loans made (or deemed made) on the Closing Date) shall be adjusted such that the All-In Yield of such then-existing Initial Loans equals the All-In Yield of such Indebtedness minus 0.50%; *provided* that any amendments to the Applicable Rate in respect of any then-existing Loans that become effective subsequent to the Closing Date but prior to the time of such Indebtedness is incurred or borrowed shall also be included in such calculations, effective upon the making of loans under such Indebtedness;

(iii)    to the extent such Incremental Loan is secured, it is not secured by any property or assets of the Borrower or any other Loan Party other than the Collateral (it being agreed that such Incremental Loan shall not be required to be secured by all of the Collateral);

(iv)    such Incremental Loan shall not be Guaranteed by any Person other than any Loan Party and shall not have any obligors other than any Loan Party; and

56

(v)     the proceeds of any Incremental Loan may be used for any purpose not prohibited by this Agreement.

(f)     <u>Incremental Amendment</u>.  Commitments in respect of Incremental Loans shall become Commitments under this Agreement pursuant to an amendment (an "<u>Incremental Amendment</u>") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Incremental Lender providing such Commitments and the Administrative Agent. The Incremental Amendment may, without the consent of any Loan Party, the Administrative Agent or any Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Borrower, to effect the provisions of this <u>Section 2.14</u>. The Borrower will use the proceeds of the Incremental Loans as determined by the Borrower and the Lenders providing such Incremental Loans.  No Lender shall be obligated to provide any Incremental Loans unless it so agrees.  The Borrower shall certify to the Administrative Agent that all conditions contained in this Agreement, including this Section 2.14, to any Incremental Loans and any Incremental Amendments have been satisfied.

(g)     This <u>Section 2.14</u> shall supersede any provisions in <u>Section 2.13</u> or <u>10.01</u> to the contrary.

Section 2.15     <u>Lender Claimants</u>.

(a)     **[In order for a Lender Claimant to cease being a Lender Claimant and to be acknowledged as a known Lender hereunder, such Lender Claimant shall submit to the Administrative Agent (i) evidence of the Notes Claims beneficially owned by such Lender Claimant, (ii) an Administrative Questionnaire, (iii) duly completed IRS tax withholding forms pursuant to this Agreement and (iv) a signature page to this Agreement. Promptly following receipt of such evidence, the Administrative Agent shall forward such evidence to the Borrower.  The Borrower shall promptly direct in writing the Administrative Agent (i) whether the Person submitting such evidence should be added to the Register as a Lender, and (ii) the principal amount of Loans to be credited to such Lender Claimant.  [The principal amount of Loans to be credited to a Lender Claimant shall be [_____].]  Upon such Borrower direction and receipt by the Administrative Agent of a signature page to this Agreement executed by such Lender Claimant, (x) in respect of such Loans, such Lender Claimant shall cease to be a Lender Claimant and shall have all rights of a Lender for purposes of this Agreement and all other Loan Documents and (y) the Administrative Agent shall (i) revise the Register to credit such Loans to such Lender Claimant, (ii) increase the principal of such transferred Loans with all paid-in-kind interest allocable to such Loans and (iii) pay to such Lender Claimant the cash amounts held in the Lender Claimant Reserve Account allocable to such transferred Loans.**

(b)     **Notwithstanding anything in this Agreement to the contrary, neither the Administrative Agent, the Borrower nor any other Person shall be liable to any Lender Claimant or to any other Person for any amount paid to a public official pursuant to applicable abandoned property law, escheat law or similar Law.  Any portion of the Loans (together with all paid-in-kind interest allocable to such Loans) remaining unclaimed by Lender Claimants fifteen (15) Business Days prior to the Maturity Date (such Loans, the "<u>Unclaimed Loans</u>" and such date, the "<u>Unclaimed Loans Termination Date</u>") shall, on the**

57

4821-8648-8708 v23

**Unclaimed Loans Termination Date, be deemed to have been paid in full. Any cash amounts allocable to the Unclaimed Loans that are held in the Lender Claimant Reserve Account, to the extent permitted by applicable Law, shall be applied by the Administrative Agent on the Unclaimed Loans Termination Date in accordance with Section 2.15(c).**

**(c)     Any cash amounts allocable to the Loans held for the benefit of Lender Claimants that are held in the Lender Claimant Reserve Account, to the extent permitted by applicable Law, shall on the Unclaimed Loans Termination Date, after giving effect to the deemed repayment in full of the Unclaimed Loans in accordance with Section 2.15(b), be applied by the Administrative Agent to make a prepayment in accordance with Section 2.15(d).**

**(d)     All amounts paid pursuant to this Section 2.15 shall be applied in the following order of priority:**

**(i)     to pay all accrued and unpaid interest on the Loans as of the date of payment;**

**(ii)     to pay that portion of the Obligations constituting unpaid principal of the Loans;**

**(iii)     to pay any other outstanding Obligations; and**

**(iv)     the balance, if any, following the payment in full of such Obligations, to be retained by the Borrower or as otherwise required by Law.**

**(e)     The Borrower hereby directs the Administrative Agent to open and maintain a segregated, non-interest bearing account entitled "Lender Claimant Reserve Account" for the purpose of holding funds payable to Lender Claimants in accordance with this Agreement. Funds held in the Lender Claimant Reserve Account shall remain uninvested.][2]**

Section 2.16     Defaulting Lenders.

(a)     Amendments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)     Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii)     Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant

---

[2] Note to draft: Additional provisions to be included with respect to a refinancing of this Agreement.

58

to Section 10.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payments of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement, fourth, to the payment of any amounts owing to the Lenders as a result of any final and nonappealable judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any final and nonappealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans and funded by the Lenders *pro rata* in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this clause (ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.09 for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a *pro rata* basis by the Lenders in accordance with their Commitments, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided, further,* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

4821-8648-8708 v23

# ARTICLE III

# TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    Taxes.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.  If, however, applicable Laws require Borrower or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined in the good faith discretion of Borrower or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If Borrower or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) Borrower or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) Borrower or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount so withheld or deducted by it to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

60

(b)     Payment of Other Taxes by the Borrower.  Without limiting the provisions of Section 3.01(a) above, Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)     Tax Indemnifications.

(i)     Without limiting the provisions of subsection (a) or (b) above, Borrower shall, and does hereby, jointly and severally indemnify the Administrative Agent and each Lender, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Each Lender and L/C Issuer shall indemnify and hold harmless the Administrative Agent, on a several basis, (i) against any Indemnified Taxes attributable to such Lender or L/C Issuer (but only to the extent the Loan Parties have not already paid or reimbursed the Administrative Agent therefor and without limiting the Loan Parties' obligation to do so), (ii) against any Taxes attributable to such Lender's failure to maintain a Participant Register as required hereunder, and (iii) against any Excluded Taxes attributable to such Lender or L/C Issuer, in each case, that are payable or paid by the Administrative Agent in connection with any Obligations, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Each Lender and L/C Issuer shall make payment within 10 days after demand for any amount or liability payable under this Section.  A certificate as to the amount of such payment or liability delivered to any Lender or L/C Issuer by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).  The agreements in this clause (ii) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d)     Evidence of Payments.  As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority as provided in this Section 3.01, Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

61

(e)    Status of Lenders; Tax Documentation.

(i)    Each Lender shall deliver to the Borrower and to the Administrative Agent, [**at the time or times prescribed by applicable Laws or**] when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine

(A)    whether or not payments made by Borrower hereunder or under any other Loan Document are subject to Taxes, withholding (including backup withholding), or deduction and if applicable, the required rate of withholding or deduction,

(B)    whether or not such Lender is subject to information reporting requirements, and

(C)    such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by Borrower pursuant to this Agreement or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdictions.

Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B)(1)-(4), (iii) and (v) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, if Borrower is a U.S. Person,

(A)    any Lender or L/C Issuer that is a U.S. Person, shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon reasonable request of the Borrower or the Administrative Agent) executed copies of IRS Form W-9 certifying that such Lender is exempt from United States federal backup withholding; and

(B)    each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the

62

Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming benefits of any income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of United States federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(2)    executed copies of IRS Form W-8ECI,

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-l to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable),

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner, or

(5)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form

63

prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)     Each Lender shall promptly update and deliver any such form or certificate it previously delivered that has expired or become obsolete or inaccurate in any respect or notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(iv)     Borrower shall promptly deliver to the Administrative Agent or any Lender, as the Administrative Agent, such Lender shall reasonably request, on or prior to the Closing Date, and in a timely fashion thereafter, such documents and forms required by any relevant taxing authorities under the Laws of any jurisdiction, duly executed and completed by Borrower, as are required to be furnished by such Lender or the Administrative Agent under such Laws in connection with any payment by the Administrative Agent or any Lender of Taxes or Other Taxes, or otherwise in connection with the Loan Documents, with respect to such jurisdiction.

(v)     If a payment made to any Lender under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471 (b)(3 )(C)(i) of the Code), and such additional documentation reasonably requested by the Borrower or the Administrative Agent, in each case, as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. [**Solely for purposes of this clause (v), "FATCA" shall include any amendments made to FATCA after the Closing Date. For purposes of determining withholding Taxes imposed under FATCA, from and after the Closing Date, the Parent Borrower and the Administrative Agent shall treat (and the Lenders and L/C Issuers hereby authorize the Administrative Agent to treat) the Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i)**].

(vi)     [**If the Administrative Agent is a U.S. Person, it shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-9 or (2) if the Administrative Agent is not a U.S. Person, then it shall provide the Borrower with two properly completed IRS Form W-8ECI with respect to fees received on its own behalf and any such other documentation prescribed by applicable Law and reasonably requested by the**

**Borrower that would allow the applicable Borrower to make payments to such Lender without deduction or withholding of any U.S. federal withholding Taxes. If the Administrative Agent is not a U.S. Person, such Administrative Agent shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-8IMY (or successor form) certifying that it is either (i) a "qualified intermediary" and that it assumes primary withholding responsibility under Chapters 3 and 4 of the Code and primary Form 1099 reporting and backup withholding responsibility for payments it receives for the account of others or (ii) a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the U.S. and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by U.S. Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.** ]

[**Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so**.]

(f)     Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender, as the case may be.  If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section, it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses and net of any loss or gain realized in the conversion of such funds from or to another currency incurred by the Administrative Agent, such Lender or any L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 3.01(f), in no event will the Administrative Agent or any Lender be required to pay any amount to Borrower pursuant to this Section 3.01(f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be

65

4821-8648-8708 v23

construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

(g)     Survival.  Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 3.02     Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to perform any of its obligations hereunder or make, maintain or fund or charge interest with respect to any Credit Extension, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Credit Extension, shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.

Section 3.03     [Reserved].

Section 3.04     Increased Costs.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject the Administrative Agent or any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense affecting this Agreement;

and the result of any of the foregoing shall be to increase the cost to such Lender or to reduce the amount of any sum received or receivable by the Administrative Agent or such Lender hereunder (whether of principal, interest or any other amount) then, upon request of the Administrative Agent or such Lender, the Borrower will pay to the Administrative Agent or such Lender, as the case may be, such additional amount or amounts as will compensate the Administrative Agent or such Lender for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the

66

rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 3.04(b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that no Borrower shall be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.05     [Reserved].

Section 3.06     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or Borrower is required to pay [**Indemnified Taxes or**] any additional amount to any Lender, or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then, at the request of Borrower, such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or Section 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as the case may be.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if Borrower is required to [**pay Indemnified Taxes**] or any additional amount to

67

any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, and in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with Section 3.06(a), or if any Lender is a Non-Consenting Lender or a Defaulting Lender or otherwise gives notice pursuant to Section 3.02, the Borrower may replace such Lender in accordance with Section 10.13.

Section 3.07   Survival.  Each Loan Party's obligations under this Article III shall survive termination of the Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

Section 3.08   [Reserved].

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01   Conditions of Effectiveness.  This Agreement shall become effective on the date on which the following conditions precedent shall have been satisfied (or waived in compliance with Section 10.01):

(a)   The receipt of the following, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Required Lenders:

(i)   by the Lenders and the Administrative Agent, executed counterparts of this Agreement;

(ii)   a Note executed by the Borrower in favor of each Lender requesting a Note by such Lender;

(iii)   by the Lenders and the Administrative Agent, executed counterparts of the Collateral Documents, together with:

(A)   by the Lenders and the Administrative Agent, if any of the Pledged Equity Interests shall be uncertificated securities (as defined in Article 8 of the UCC), confirmation and evidence satisfactory to the Required Lenders that the security interest in such uncertificated securities has been transferred to and perfected for the Administrative Agent for the benefit of the Secured Parties in accordance with Section 9-106 of the Uniform Commercial Code;

(B)   by the Lenders and the Administrative Agent, proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Required Lenders may deem necessary or desirable in order to perfect the Liens created under the Security Agreement, covering the Collateral described therein;

68

(C)      by the Lenders, copies of any other Uniform Commercial Code, judgment, tax lien, Intellectual Property, or other searches reasonably requested by the Required Lenders with respect to the Collateral, together with copies of the financing statements (or similar documents) disclosed by such searches, and accompanied by evidence that any Liens indicated in any such financing statement that are not permitted by Section 7.01 have been or contemporaneously will be released or terminated (or otherwise provided for in a manner reasonably acceptable to the Required Lenders); and

(D)      by the Lenders, evidence that all other actions, recordings and filings that the Required Lenders may deem necessary or desirable in order to perfect the Liens created under the Collateral Documents have been taken or made (including receipt of duly executed payoff letters, UCC-3 termination statements and consent agreements, if applicable) or arrangements therefor satisfactory to the Required Lenders shall have been made;

(iv)      by the Lenders and the Administrative Agent, the **[2019 Mortgage]**, covering each of the Specified Barge Rigs listed on Schedule 5.07(A) **[(other than Parker Drilling 30-B)]**, duly executed by the appropriate Loan Party, together with:

(A)      by the Lenders and the Administrative Agent, evidence that counterparts of the 2019 Mortgage have been duly executed, acknowledged and delivered and are in form suitable for filing or recording with the United States Coast Guard and all other filing or recording offices that the Required Lenders may deem necessary or desirable in order to create a valid second and subsisting Lien on the Specified Barge Rigs described therein in favor of the Administrative Agent for the benefit of the Secured Parties and that all filing, documentary, stamp, intangible and recording taxes and fees have been paid (or arrangements for such payment satisfactory to the Required Lenders shall have been made); and

(B)      to the Lenders, evidence that all other actions that the Required Lenders may deem necessary or desirable in order to create valid second and subsisting Liens on the property described in the Mortgages has been taken, including delivery of an abstract of title, certificate of ownership, copy of certificate of documentation, and copy of certificate of financial responsibility (for each jurisdiction where applicable) with respect to each Specified Barge Rig;

(v)      to the Lenders and the Administrative Agent, such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Required Lenders may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act

69

as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(vi)    to the Lenders and the Administrative Agent, such documents, agreements and certifications as the Required Lenders may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of the Loan Parties is validly existing and in good standing in its jurisdiction of organization;

(vii)    to the Lenders and the Administrative Agent, a favorable opinion of Kirkland & Ellis LLP, counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, covering such customary matters concerning the Loan Parties and the Loan Documents as the Required Lenders may reasonably request;

(viii)    to the Lenders and the Administrative Agent, favorable opinions of local counsel to the Loan Parties in Delaware, Louisiana, Nevada and Oklahoma, addressed to the Administrative Agent and each Lender, covering such customary matters concerning the Loan Parties and the Loan Documents as the Required Lenders may reasonably request;

(ix)    to the Lenders, a certificate of a Responsible Officer of the Borrower either (1) attaching copies of all consents (including, without limitation, from any Governmental Authority, shareholder or other third-party), licenses and approvals required in connection with the execution, delivery and performance by any Loan Party and the validity against any Loan Party of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect (except that the following consents do not need to be attached to such certificate to the extent delivered as attachments to any other certificate delivered on the Closing Date: (A) any consents of a member or partner of a Loan Party that are required with respect to the pledge of equity under such Loan Party's Organization Documents and (B) any resolutions by each Loan Party's governing body authorizing and approving the Loan Documents), or (2) stating that no such consents, licenses or approvals are so required;

(x)    to the Lenders and the Administrative Agent, executed counterparts of the Senior Lien Intercreditor Agreement;

(xi)    to the Lenders and the Administrative Agent, executed copies of the ABL Credit Agreement and the other ABL Loan Documents;

(xii)    to the Lenders and the Administrative Agent, a certificate signed by a Responsible Officer of the Borrower certifying that the conditions specified in Section 4.02(a) and Section 4.02(b) have been satisfied;

(xiii)    to the Lenders and the Administrative Agent, a reasonably satisfactory opening balance sheet of the Borrower and its consolidated Subsidiaries giving pro forma effect to the transactions occurring on the effective date of the Plan of Reorganization and a customary funds flow memorandum;

4821-8648-8708 v23

(xiv)   to the Lenders, copies of the Audited Financial Statements and unaudited interim consolidated financial statements of the Borrower and its consolidated Subsidiaries for each fiscal quarterly period ended subsequent to December 31, 2018 as to which such financial statements are available, accompanied by a certificate of a Responsible Officer of the Borrower;

(xv)   a Solvency Certificate in the form attached hereto as Exhibit [_], executed by a Responsible Officer of Borrower;

(xvi)   to the Lenders and the Administrative Agent, all documentation and other information with respect to the Loan Parties required by regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act and the Beneficial Ownership Regulation at least five (5) Business Days prior to the Closing Date to the extent the same have been requested at least ten (10) Business Days prior to the Closing Date;

(xvii)   evidence and documentation in form and substance reasonably satisfactory to the Administrative Agent that, prior to or substantially concurrently with the Closing Date, Borrower has received cash proceeds of not less than $95,000,000 from the Rights Offering (as defined in the RSA), as such amount may be reduced to provide for netting of fees and expenses

(xviii)   to the Lenders and the Administrative Agent, projections of the consolidated balance sheets, results of operations, cash flow and unused Commitments for the Borrower and its consolidated Subsidiaries covering the period from January 1, 2019 through the Maturity Date, prepared on a quarterly basis for the fiscal year ending on December 31, 2019 and an annual basis for each fiscal year ending December 31, 2020, December 31, 2021 and December 31, 2022 (the "Initial Projections"), prepared by a Responsible Officer of the Borrower having responsibility over financial matters, all in form and substance reasonably satisfactory to the Administrative Agent; and

(xix)   to the Lenders, such other assurances, certificates (including a perfection certificate, if requested), documents, reports (including any environmental reports), consents or opinions as any Lender reasonably may require.

(b)   The Administrative Agent and Lenders shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, without limitation, all filing and recording fees and Taxes and, to the extent invoiced at least two Business Days prior to the Closing Date, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder (including all such reasonable fees, charges and disbursements of counsel to the Administrative Agent, paid directly to such counsel if requested by the Administrative Agent).

(c)   The Loan Parties' capital structure and financing plan shall be satisfactory to the Required Lenders (it being agreed and understood that the capital structure and financing plan as set forth in the RSA as in effect on the "RSA Effective Date" as defined in the RSA, and

71

as amended by any amendments consented to in writing by the Required Lenders, shall be deemed satisfactory to the Required Lenders).

(d)     The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Required Lenders, and all conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived in accordance therewith.

(e)     Prior to or substantially concurrently with the Closing Date, DIP Credit Agreement (as defined in the ABL Credit Agreement) shall have been terminated and all Obligations (as defined in the DIP Credit Agreement) shall have been paid in full in cash (other than (i) indemnification obligations and other contingent obligations not then due and payable and as to which no claim has been made and (ii) any letters of credit issued thereunder that constitute Existing Letters of Credit (as defined in the ABL Credit Agreement)).

Without limiting the generality of the provisions of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01 and Section 4.02 each Lender that has signed this Agreement and each Lender Claimant shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02     Conditions to all Credit Extensions.  The obligation of each Lender to make (to be deemed to make) any Credit Extension is subject to the following conditions precedent (or the waiver thereof in accordance with Section 10.01):

(a)     The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document, shall be true and correct in all material respects (except for such representations and warranties that have a materiality or Material Adverse Effect qualification, which shall be true and correct in all respects) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (except for such representations and warranties that have a materiality or Material Adverse Effect qualification, which shall be true and correct in all respects) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Section 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Section 6.01(a) and (b), respectively.

(b)     No Default then exists, or would result from such proposed Credit Extension or the application of the proceeds thereof.

(c)     The Administrative Agent shall have received a Committed Loan Notice, in accordance with the requirements hereof.

Each request for a Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Section 4.02(a) and Section 4.02(b) have been satisfied on and as of the date of the applicable Credit Extension.

72

4821-8648-8708 v23

# ARTICLE V

# REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01    Existence: Compliance with Law.  Each Loan Party (a) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of the jurisdiction of its organization or formation, (b) has the requisite power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified and licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02    Power: Authorization: Enforceable Obligations.  Each Loan Party has the requisite power and authority to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder.  Each Loan Party has taken all necessary corporate or other action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the borrowings on the terms and conditions of this Agreement.  No consent or authorization of, filing with, notice to, approval or other act by or in respect of, any Governmental Authority or any other Person is required in connection with (a) the borrowings hereunder or the consummation of the Plan of Reorganization, (b) the execution, delivery, performance, validity or enforceability against any Loan Party of this Agreement or any of the other Loan Documents, (c) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (d) the perfection or maintenance of the Liens created under the Collateral Documents (including the second priority nature thereof) or (e) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except, in each case, (i) consents, authorizations, filings and notices described in Schedule 5.02.  which consents, authorizations, filings and notices have been obtained or made and are in full force and effect (except as noted on Schedule 5.02), (ii) the filings referred to in Section 5.18, (iii) in the case of any authorization, approval, action, notice or filing from or with a Person other than a Governmental Authority, the failure to have could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (iv) for matters that may be required after the Closing Date in the ordinary course of conducting the business of the Borrower or any Subsidiary thereof.  Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto.  This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable Debtor Relief Laws and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4821-8648-8708 v23

Section 5.03   <u>No Legal Bar</u>.   The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law nor any material Contractual Obligation of the Borrower or any of its Subsidiaries, including, without limitation, arising under the ABL Loan Documents or other material debt instrument, and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Collateral Documents).   No Requirement of Law or Contractual Obligation applicable to the Borrower or any of its Subsidiaries could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04   <u>No Material Litigation</u>.   No litigation, investigation, claim or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower after due and diligent investigation, threatened by or against the Borrower or any of its Subsidiaries or against any of their respective properties or revenues that (a) purport to directly affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby or thereby, or (b) except as specifically disclosed in <u>Schedule 5.04</u> individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described in <u>Schedule 5.04</u>.

Section 5.05   <u>Financial Statements; No Material Adverse Effect</u>.   (a) The Audited Financial Statements, reported on by and accompanied by an unqualified report from an independent certified public accounting firm of national reputation, present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at December 31, 2017 and, to the extent available on the Closing Date, December 31, 2018, as applicable, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended.

(b)   The unaudited consolidated balance sheet of the Borrower and its Subsidiaries at **[January 31, 2019]**, and the related unaudited consolidated statements of income and cash flows for the period ended on such date, present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the period then ended (subject to the absence of footnotes and normal year-end audit adjustments).

(c)   All such financial statements described in <u>Section 5.05(a)</u> and <u>Section 5.05(b)</u> of this Section, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the applicable accounting firm and disclosed therein or, in the case of financial statements described in <u>Section 5.05(b)</u>, for the absence of footnotes and normal year-end adjustments).   As of the Closing Date, the Borrower and its Subsidiaries do not have any material Guarantees, contingent liabilities and liabilities for taxes (except for any such tax liabilities to taxing authorities outside of the United States which are not, in the aggregate, material to the Borrower and its Subsidiaries taken as a whole) or any long-term leases or unusual forward or long-term commitments, including, without limitation, any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the

4821-8648-8708 v23

unaudited consolidated balance sheet of the Borrower and its Subsidiaries at January 31, 2019, and the related unaudited consolidated statements of income and cash flows for the period ended on such date, and which should be so reflected in accordance with GAAP.  During the period from January 31, 2019 to and including the Closing Date, there has been no Disposition by the Borrower or any of its Subsidiaries of any material part of its business or Property, except as reflected in the financial statements described in Section 5.05(a) and Section 5.05(b) of this Section, which were delivered prior to the Closing Date.

(d)     Since December 31, 2017 there has been no event or circumstance, other than the Cases, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.06   No Default.   Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to any of its Contractual Obligations in any respect that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.07   Ownership of Property; Liens.   Each Loan Party has good record and marketable title in fee simple to, or a valid leasehold interest in, all its material real property, and good title to, or a valid leasehold interest in, all its other material Property, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and none of such Property is subject to any Lien except Liens permitted by Section 7.01.  Schedule 5.07 sets forth a complete and accurate list, as of the Closing Date, of all land rigs and barge rigs located and operating in the continental United States, Alaska or Gulf of Mexico waters subject to U.S. state or federal jurisdiction owned by each Loan Party and each of its Subsidiaries, showing as of the Closing Date the record owner and registration number as presented on any certificate of title or contained in the official records of the National Vessel Documentation Center of the United States Coast Guard, as applicable.

Section 5.08   Intellectual Property.   Each Loan Party owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted; no material claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower know of any valid basis for any such claim; and the use of such Intellectual Property by the Borrower and its Subsidiaries does not infringe on the rights of any Person in any material respect.

Section 5.09   Taxes.   Solely with respect to periods prior to the Closing Date, except to the extent excused or prohibited by the Bankruptcy Code of the United States or not otherwise authorized by the Bankruptcy Court, each of the Borrower and each of its Subsidiaries has filed or caused to be filed all material Federal, state and other Tax returns and reports that are required to be filed and has paid all Taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other material Taxes, fees or other charges imposed on it or any of its Property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings diligently conducted in each case, with respect to which adequate reserves in

75

conformity with GAAP have been provided on the books of the Borrower or its Subsidiaries, as the case may be)**[, and no material tax Lien has been filed (except for any Liens for taxes, the nonpayment of which is excused or prohibited by the Bankruptcy Code, or as permitted by Section 7.1(a))]**.

Section 5.10   <u>Federal Regulations</u>.  No part of the proceeds of any Loans will be used in violation of Regulation U issued by the FRB as now and from time to time hereafter in effect or for any purpose that violates the provisions of the regulations of the FRB.  No Loan Party is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB).

Section 5.11   <u>Labor Matters</u>.  There are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payment made to employees of the Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.  Except as could not (individually or in the aggregate) reasonably be expected to have a Material Adverse Effect, all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Borrower or the relevant Subsidiary.

Section 5.12   <u>ERISA Compliance</u>.

(a)   Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws, except where such non-compliance has not had and could not reasonably be expected to have a Material Adverse Effect.  The base prototype plan document which each Plan that is intended to qualify under Section 401(a) of the Code uses an opinion letter from the IRS, or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification.  Except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.  There are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)   Except to the extent such event could not reasonably be expected to have a Material Adverse Effect: (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Borrower nor any ERISA Affiliate has incurred, or

4821-8648-8708 v23

reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(c)     With respect to each scheme or arrangement mandated by a government other than the United States (a "Foreign Government Scheme or Arrangement") and with respect to each employee benefit plan maintained or contributed to by any Loan Party or any Subsidiary of any Loan Party that is not subject to United States law (a "Foreign Plan"), each Foreign Plan is in compliance in all material respects with the provisions of the applicable law or terms of the applicable Foreign Government Scheme or Arrangement and no Foreign Benefit Event has occurred or is reasonably expected to occur, except where such non-compliance or occurrence has not had and could not reasonably be expected to have a Material Adverse Effect.

(d)     The Borrower represents and warrants as of the Closing Date that none of the Borrower or its Subsidiaries, is or will be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments.

Section 5.13     Investment Company Act; Other Regulations.    No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.    No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the FRB) which limits its ability to incur Indebtedness.

Section 5.14     Subsidiaries.    The Subsidiaries listed on Schedule 5.14 constitute all of the Subsidiaries of the Borrower as of the Closing Date.    Schedule 5.14 sets forth as of the Closing Date the name and jurisdiction of incorporation and, in the case of each Loan Party, the U.S. taxpayer identification number of each such Subsidiary and, as to each, the percentage of each class of Equity Interest owned by each Loan Party.    All of the outstanding Equity Interests in the Subsidiaries of the Borrower have been validly issued, and (to the extent applicable) fully paid and non-assessable.    All of the outstanding Pledged Equity Interests that are Collateral are owned free and clear of all Liens except those created under the Collateral Documents and, if and when the same are executed and delivered, the ABL Loan Documents and any other documents with respect to any Indebtedness permitted to be incurred and secured on a senior, pari passu or junior basis pursuant to Sections 7.01 and 7.03.    As of the Closing Date, the Borrower does not directly or indirectly own any Equity Interest in any corporation, limited partnership or limited liability company (or other business entity) other than those specifically disclosed in Schedule 5.14. Schedule 5.14 identifies as of the Closing Date each Material Subsidiary, Immaterial Subsidiary, Project Finance Subsidiary and Excluded Subsidiary.    As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than Equity Interests granted to employees and/or directors) of any nature relating to any Equity Interests of the Borrower or any Subsidiary, except as disclosed on Schedule 5.14.

Section 5.15     Use of Proceeds.    The proceeds of the Loans shall be used to provide liquidity for capital expenditures, working capital and for ongoing general corporate purposes for the Borrower and its Subsidiaries not in contravention of any Law.

Section 5.16    Environmental Matters.    Other than as set forth on Schedule 5.16 and exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    the Borrower and its Subsidiaries: (i) are, and [**for the last five (5) years**] have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any property owned, leased, or otherwise operated by any of them; (iii) are, and [**for the last five (5) years**] have been, in compliance with all of their Environmental Permits; and (iv) reasonably believe that: each of their Environmental Permits will be timely renewed and complied with, without material expense; any additional Environmental Permits that may be required of any of them will be timely obtained and complied with, without material expense; and compliance with any Environmental Law that is or is expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)    Hazardous Materials are not present at, on, under, in, or about any real property now or formerly owned, leased, or operated by the Borrower or any of its Subsidiaries, or at any other location (including, without limitation, any location to which Hazardous Materials have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of the Borrower or any of its Subsidiaries under any applicable Environmental Law or otherwise result in costs to the Borrower or any of its Subsidiaries, (ii) interfere with the Borrower's or any of its Subsidiaries' continued operations, or (iii) impair the fair saleable value of any real property owned or leased by the Borrower or any of its Subsidiaries.

(c)    There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which the Borrower or any of its Subsidiaries is, or to the knowledge of the Borrower or any of its Subsidiaries will be, named as a party that is pending or, to the knowledge of the Borrower or any of its Subsidiaries, threatened in writing.

(d)    Neither the Borrower nor any of its Subsidiaries has received any written request for information, or been notified that it is a potentially responsible party under or relating to the CERCLA or any similar Environmental Law, or with respect to any Hazardous Material.

(e)    Neither the Borrower nor any of its Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)    Neither the Borrower nor any of its Subsidiaries has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Hazardous Material other than indemnity obligations in the Ordinary Course of Business.

Section 5.17    Accuracy of Information, etc.    No written statement or information contained in this Agreement, any other Loan Document or any other document, certificate or

78

4821-8648-8708 v23

written statement furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of any Loan Party for use in connection with the transactions contemplated hereby and the negotiation of this Agreement or the other Loan Documents or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished), contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, taken as a whole, not materially misleading in light of the circumstances under which made.

Section 5.18   Collateral Documents.  The provisions of the Collateral Documents are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on all right, title and interest of the respective Loan Parties in the Collateral described therein and proceeds thereof.  As applicable to Loan Parties on the Closing Date, when financing statements in appropriate form are filed in the offices specified on Schedule 5.18 the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (other than the Specified Barge Rigs covered by a Mortgage) and the proceeds thereof, as security for the Secured Obligations (as defined in the Security Agreement), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.01), to the extent such security interest can be perfected by any filing of UCC financing statements.  When any Mortgage is filed for recording in the National Vessel Documentation Center of the United States Coast Guard located in Falling Waters, West Virginia, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Specified Barge Rigs and such other Collateral described therein and the proceeds thereof, as security for the Secured Obligations (as defined in the applicable Mortgage), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.01).

Section 5.19   Solvency.  The Loan Parties, on a consolidated basis, are, and immediately after giving effect to the incurrence of all Indebtedness and obligations being incurred in connection herewith and to the transactions contemplated by the Plan of Reorganization will be, Solvent.

Section 5.20   Insurance.  The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates, except to the extent that reasonable self-insurance meeting the same standards is maintained with respect to such risks, and which insurance meets the requirements of the Mortgages.

Section 5.21   **[OFAC/Sanctions.  Except as described on Schedule 5.21, no Loan Party nor any of their respective Subsidiaries, nor, to the knowledge of any Loan Party, any of its or their respective directors, officers, employees, agents, controlled Affiliates or other Persons acting on its behalf with express authority to so act, is an individual or entity that is, or is owned or controlled by any individual or entity that is, (i) currently the subject of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals and Blocked Persons, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban**

**List, or (iii) located, organized or residing in any Designated Jurisdiction (provided, that with respect to an individual or entity that is owned or controlled by any individual or entity described in clauses (i), (ii) or (iii), only to the extent such ownership or control would cause all transactions to be similarly prohibited with such person pursuant to Sanctions). No loan, nor the proceeds from any Loan, has been used, directly or, with the knowledge of a Loan Party, indirectly, (i) to lend, contribute, provide or has otherwise been made available to fund any activity or business in any Designated Jurisdiction in violation of applicable Sanctions, or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the subject of any applicable Sanctions in violation of such applicable Sanctions, or (ii) in any other manner, that will result in any violation by any Person (including any individual, entity or other Person participating in the transaction, whether as underwriter, advisor, investor, Lender, Lender, the Administrative Agent or otherwise) of applicable Sanctions.]**

Section 5.22    [**Anti-Corruption Laws.   Except as previously disclosed by the Borrower and its Subsidiaries in public filings, the Loan Parties have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, or other similar and applicable anti-corruption legislation in other jurisdictions ("Anti-Corruption Laws") in all material respects and have instituted and maintained policies and procedures reasonably designed to promote compliance with such applicable Anti-Corruption Laws.**]

Section 5.23    [**Money Laundering.   Borrower and its Subsidiaries have conducted their respective businesses in material compliance with applicable anti-money laundering laws (collectively, the "Money Laundering Laws") and no material legal proceeding by or before any Governmental Entity or any arbitrator involving the Borrower or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the knowledge of the Borrower, threatened.**]

Section 5.24    EEA Financial Institution.  No Loan Party is an EEA Financial Institution.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Borrower covenants and agrees that until payment in full of the Obligations (other than unasserted contingent indemnification obligations), Borrower and each other Loan Party shall and shall cause their respective Subsidiaries to comply with each of the following:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent (which shall promptly furnish to each Lender), in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative

80

form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit (other than any such "going concern" or like qualification or exception resulting solely from an upcoming maturity date under any Indebtedness, including the Obligations and the ABL Obligations, by independent certified public accountants of nationally recognized standing;

(b)      as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer of the Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes); and

(c)      if a Cash Dominion Trigger Period (as defined in the ABL Credit Agreement) is in effect, as soon as available, but in any event not later than 30 days after the end of each month (or 45 days in the case of any month coinciding with the end of a fiscal quarter), the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such month and the related unaudited consolidated statement of income for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous fiscal year;

As to any information contained in materials furnished pursuant to Section 6.02(e), the Borrower shall not be separately required to furnish such information under clause (a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in Section 6.01(a) and (b) above at the times specified therein.

Section 6.02   Certificates; Other Information.   Deliver to the Administrative Agent (which shall promptly furnish to each Lender), or, in the case of clause (g), to the relevant Lender (and/or Administrative Agent if making such request itself), in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

(a)      concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public accountants are permitted to cover in such certificates pursuant to their professional standards and customs of the profession);

(b)      concurrently with the delivery of any financial statements pursuant to Section 6.01 a duly completed and executed Compliance Certificate; provided that, it is understood such Compliance Certificate shall, among other provisions, contain certifications of a

81

Responsible Officer of the Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(c)     [reserved];

(d)     no later than three (3) Business Day prior to the effectiveness thereof (or such shorter time period as may be agreed by the Administrative Agent in its sole discretion), copies of substantially final drafts of any proposed amendment, supplement, waiver or other modification with respect to the ABL Loan Documents;

(e)     within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(f)     concurrently with the delivery thereof, copies of any default notices received by the ABL Agent; and

(g)     promptly, such additional financial and other information as any Lender through the Administrative Agent or the Administrative Agent itself may from time to time reasonably request, including without limitation, information for purposes of compliance with applicable flood insurance regulations, applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and the Beneficial Ownership Regulation.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(e) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date   (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (i) if so requested by the Administrative Agent or any Lender, the Borrower shall deliver paper copies of such documents to the Administrative Agent or such Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  If so requested by the Administrative Agent or any Lender, the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Administrative Agent.  Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

82

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials, projections and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on SyndTrak, ClearPar, IntraLinks or a substantially similar electronic transmission system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to any of the Borrower or its respective Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or their respective securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent the Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (iv) the Administrative Agent shall be entitled to treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

Section 6.03    Notices.  Promptly notify the Administrative Agent (which shall promptly furnish such notice to each Lender) of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any Contractual Obligation of the Borrower or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect or (ii) litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Subsidiaries and any Governmental Authority that, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation, investigation by a third-party (excluding, for the avoidance of doubt, any internal investigations) or proceeding affecting the Borrower or any of its Subsidiaries (i) in which the amount involved is $5,000,000 or more and not covered by insurance or (ii) in which injunctive or similar relief is sought which could reasonably be expected to have a Material Adverse Effect;

(d)    as soon as possible and in any event within 10 days after the Borrower knows or has reason to know of the occurrence of any ERISA Event or Foreign Benefit Event that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)    any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower or relevant Subsidiary has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 6.04   Conduct of Business and Maintenance of Existence, etc. (a)(i) Preserve, renew and keep in full force and effect its legal existence (except as otherwise permitted under this Agreement) and (ii) take all reasonable action to maintain all rights, privileges and franchises useful and necessary in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.04 and except, in the case of the foregoing clause (ii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Contractual Obligations and Requirements of Law, except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.05   Maintenance of Property; Insurance.  (a) Keep all material Property and systems useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and against at least such risks (but including in any event public liability and product liability) as are usually insured against in the same general area by companies engaged in the same or a similar business.  The Borrower shall furnish certificates, policies and endorsements to Administrative Agent as Administrative Agent shall reasonably require as proof of such insurance, and, if the Borrower fails to do so, Administrative Agent is authorized, but not required, to obtain such insurance at the expense of the Borrower.  All policies shall provide for at least thirty (30) days prior written notice to Administrative Agent of any cancellation or reduction of coverage.  The Borrower shall cause Administrative Agent to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and the Borrower shall obtain non-contributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Administrative Agent.  Any such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Administrative Agent, for the ratable benefit of the Secured Parties, as its interests may appear and further specify that Administrative Agent shall be paid regardless of any act or omission by the Borrower or any of its Affiliates.  Subject to the terms of the Senior Lien Intercreditor Agreement and any Customary Intercreditor Agreement, the Administrative Agent, at its option, may apply any insurance proceeds received by Administrative Agent at any time while any Event of Default shall have occurred and be continuing to the cost of repairs or replacement of Collateral and/or, to payment of the Obligations, whether or not then due, in any order and in such manner as Administrative Agent may determine or hold such proceeds as cash collateral for the Obligations.

Section 6.06   Inspection of Property; Books and Records; Discussions.  (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit the Administrative Agent and any Lender (accompanied by any other Lender that so elects) to visit and inspect any of its properties [**(other than any invasive or intrusive investigations or other testing, analysis or sampling)]** and examine and

make abstracts from any of its books and records at any reasonable time, upon reasonable prior notice, and to discuss the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with officers and employees of the Borrower and its Subsidiaries and with its independent certified public accountants (it being understood that all such notices shall be given through the Administrative Agent and shall be coordinated with any other such notices to the extent reasonably possible) provided that, absent a Default or Event of Default, only two such visits per calendar year shall be at the Loan Parties' expense.

Section 6.07   Environmental Laws.   (a) Comply in all respects with, and take all reasonable action to ensure compliance in all respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and (b) obtain and comply in all respects with and maintain, and take all reasonable action to ensure that all tenants and subtenants obtain and comply in all respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except in each case of (a) and (b), to the extent that any failures to so comply, obtain or maintain could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 6.08   Payment of Obligations.   Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary; (b) all other lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, in each case, where non-payment thereof could reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 6.09   Additional Collateral; Additional Guarantors.

(a)   With respect to any Specified Personal Property acquired after the Closing Date as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly following such acquisition (i) execute and deliver to the Administrative Agent such amendments or supplements to the Security Agreement or Mortgages or such other documents as the Administrative Agent reasonably deems necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a Lien in such Property, (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected second priority Lien in such Property, subject to Permitted Liens, including without limitation, the filing of UCC financing statements (or equivalent documentation) in such jurisdictions as may be required by the Security Agreement or by Law or as may be requested by the Administrative Agent and the recording of such amendment or supplement with the United States Coast Guard, if applicable, and (iii) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.  Notwithstanding anything herein to the contrary, (i) if the Borrower or any Subsidiary Guarantor grants a lien on any assets to secure any Secured Credit Facilities Indebtedness, the Borrower or the applicable Subsidiary Guarantor

shall be required to provide a perfected second-priority security interest in such assets, subject only to Permitted Liens, to secure the Obligations and (ii) if the Borrower or any Subsidiary Guarantor grants a lien on any assets to secure any Other Second-Lien Obligations, the Borrower or the applicable Subsidiary Guarantor shall be required to provide a perfected second-priority security interest in such assets, pari passu with such Other Second-Lien Obligations, subject only to Permitted Liens, to secure the Obligations.

(b)     With respect to any new Material Subsidiary (other than an Excluded Subsidiary or a Project Finance Subsidiary) created or acquired after the Closing Date by the Borrower or any other Loan Parties (which, for the purposes of this paragraph, shall include (1) any existing Material Subsidiary that ceases to be an Excluded Subsidiary or a Project Finance Subsidiary, (2) any existing Subsidiary (that is not an Excluded Subsidiary or a Project Finance Subsidiary) that ceases to be an Immaterial Subsidiary and (3) any Subsidiary that guarantees or becomes an obligor under any Indebtedness of the Borrower or any Guarantor), promptly (and in any event within 30 days, or such longer period as the Administrative Agent may agree in its sole discretion) following such creation, acquisition or the guaranteeing of any such Indebtedness, (i) cause such Subsidiary (A) to become a party to the Guaranty and the Security Agreement (or enter into other similar documents in form and substance satisfactory to the Administrative Agent), (B) in the case of any such Subsidiary owning a Specified Barge Rig, to execute and deliver a new Mortgage or an amendment to any existing Mortgage to include as covering such Specified Barge Rig, and (C) in the case of any Domestic Subsidiary, to take such actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected second priority Lien in the Collateral described in the Security Agreement (or other similar document referred to in (i)(A) above) or the applicable Mortgage (or amendment to an existing Mortgage), as the case may be, with respect to such Subsidiary (subject to Permitted Liens), including, without limitation, the filing of UCC financing statements (or equivalent documentation) in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent and the recording of such Mortgage or amendment to a Mortgage with the United States Coast Guard, if applicable, and (ii) if reasonably requested by the Administrative Agent deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c)     If, as of the end of any Measurement Period, Immaterial Subsidiaries collectively (i) generated more than 5.0% of Consolidated EBITDA for the Measurement Period most recently ended for which financial statements of the Borrower and its Subsidiaries are available or (ii) own assets that have an aggregate fair market value equal to or greater than 5.0% of Consolidated Tangible Assets of the Borrower and its Subsidiaries, then in each case the Borrower shall cause one or more of such Immaterial Subsidiaries to execute a joinder agreement (or agreements) such that after giving effect thereto, (A) all such remaining Immaterial Subsidiaries that are not Loan Parties generated less than 5.0% of Consolidated EBITDA for such Measurement Period and (B) the total assets owned by all such remaining Immaterial Subsidiaries that are not Loan Parties will have an aggregate fair market value of less than 5.0% of the Consolidated Tangible Assets of the Borrower and its Subsidiaries.

Section 6.10     [Reserved].

86

Section 6.11    Control Agreements.

(a)    Schedule 6.11 sets forth all deposit accounts maintained by the Loan Parties as of the Closing Date.  Before or concurrently with the opening by the Borrower or any other Loan Party of (i) any deposit account, securities account, lockbox account, concentration account, collection account or disbursement account, and (ii) any account which is not subject to a Control Agreement that previously constituted an Immaterial Account or an Excluded Account ceasing to constitute an Immaterial Account or an Excluded Account, in each case, the Borrower shall deliver to the Administrative Agent a schedule (a "Supplemental Account Identification Schedule") which provides, in respect of each such account (A) the name and location of each bank and securities intermediary at which the Borrower or such Loan Party maintains a deposit account, securities account, lockbox account, concentration account, collection account or disbursement account in the United States and (B) the account number and account name or other relevant descriptive data with respect to each such account and such other information with respect to each such account as the Administrative Agent shall reasonably request.

(b)    Subject to Section 6.15(a) with respect to accounts in existence on the Closing Date, on or before the date any Loan Party deposits any funds or permits any funds to be deposited in or credited to any account (other than an Excluded Account or an Immaterial Account) not currently subject to a Control Agreement, Borrower shall cause to be delivered to the Administrative Agent a Control Agreement with respect to such account, in each case duly executed and delivered by the Borrower or the relevant Loan Party and by the bank or securities intermediary that maintains such account.  The applicable Loan Party shall be the sole account holder of each deposit account, securities account, lockbox account, concentration account, collection account or disbursement account on Schedule 6.11 or a Supplemental Account Identification Schedule and shall not allow any other Person (other than the ABL Agent, the Administrative Agent **[or any agent or similar representative of Secured Credit Facilities and Permitted Ratio Debt permitted hereunder]**) to have control over a deposit account, securities account, lockbox account, concentration account, collection account or disbursement account or any property deposited therein.

Section 6.12    [Reserved].

Section 6.13    [Reserved].

Section 6.14    **[Anti-Corruption Laws; Sanctions; Money Laundering Laws.  Except as previously disclosed by the Borrower and its Subsidiaries in public filings, ensure that the Borrower and its Subsidiaries have conducted and will continue to conduct, their respective businesses in compliance with applicable (i) Anti-Corruption Laws; (ii) Sanctions; and (iii) Money Laundering Laws. Borrower and its Subsidiaries have instituted and maintained, and will continue to maintain, policies and procedures reasonably designed to promote compliance with such Laws.]**

Section 6.15    Further Assurances; Post-Closing Deliveries.    (a) **[Deliver all of the Collateral Documents, and any other document, instrument, agreement, recording or filing listed on Schedule 6.15 within the timeframe indicated therein]** and (b) from time to time execute and deliver, or cause to be executed and delivered, such additional instruments,

certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Loan Party which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from the Borrower or any of its Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

Section 6.16   Ratings.  Use commercially reasonable efforts to maintain (i) a public corporate credit rating (but not any specific rating) from S&P and a public corporate family rating (but not any specific rating) from Moody's, in each case in respect of the Borrower and (ii) a public rating (but not any specific rating) in respect of the Loans from each of S&P and Moody's.

## ARTICLE VII

## NEGATIVE COVENANTS

Borrower covenants and agrees that until payment in full of the Obligations (other than unasserted contingent indemnification obligations), Borrower and each other Loan Party shall not, nor shall it permit any Subsidiary [(**other than any Immaterial Subsidiary**)] to, directly or indirectly:

Section 7.01   Liens.  Create, incur, assume or otherwise cause or suffer to exist or become effective any Lien of any kind (other than Permitted Liens) securing Indebtedness (including Attributable Indebtedness) upon any property or assets, now owned or hereafter acquired.

Section 7.02   [Reserved].

Section 7.03   Incurrence of Indebtedness and Issuance of Preferred Stock.  Create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness (including Acquired Debt), and the Borrower shall not issue any Disqualified Stock and shall not permit any of its Subsidiaries to issue any shares of preferred stock.

The first paragraph of this covenant will not prohibit the incurrence of any of the following items of Indebtedness or issuances of Disqualified Stock or preferred stock, as applicable (collectively, "Permitted Debt"):

(i)      the incurrence by the Borrower and any Subsidiary of Indebtedness and letters of credit under one or more Credit Facilities in an aggregate principal amount

88

at any one time outstanding under this clause (i) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Borrower and its Subsidiaries thereunder) not to exceed the greater of (a) $100.0 million and (b) [_]% of the Borrower's Consolidated Tangible Assets, determined at the time of incurrence;

(ii)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03;

(iii)    the incurrence by the Borrower and the Subsidiary Guarantors of Indebtedness represented by the Loans and the related Guarantees under the Loan Documents;

(iv)    the incurrence by the Borrower and any of its Subsidiaries (other than Project Finance Subsidiaries) of Indebtedness represented by Capitalized Leases, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of construction, design, installation or improvement of property, plant or equipment used in the business of the Borrower or such Subsidiary, in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance or replace any Indebtedness incurred pursuant to this clause (iv), not to exceed at any time outstanding the greater of (a) $50.0 million and (b) **[_]**% of the Borrower's Consolidated Tangible Assets, determined at the time of incurrence on a pro forma basis to give effect to the assets purchased, constructed, installed or improved;

(v)    the incurrence by the Borrower or any of its Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, defease, discharge or replace Indebtedness (other than intercompany Indebtedness) or preferred stock of any Subsidiary, in each case that was permitted to be incurred under clauses (ii), (iii), (iv), (v), (xiii), (xiv), (xviii), or (xx) of this paragraph;

(vi)    the incurrence by the Borrower or any of its Subsidiaries (other than an Excluded Subsidiary or a Project Finance Subsidiary) of intercompany Indebtedness between or among the Borrower and any of its Subsidiaries (other than an Excluded Subsidiary or a Project Finance Subsidiary); provided that: (a) if the Borrower or any Subsidiary Guarantor is the obligor on any such Indebtedness that is owing to a Subsidiary that is not a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all Obligations with respect to the Loans, in the case of the Borrower, or the Guarantee pursuant to the Loan Documents, in the case of a Subsidiary Guarantor; and (b) (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Borrower or a Subsidiary of the Borrower and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Borrower or a Subsidiary of the Borrower will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Borrower or a Subsidiary, as the case may be, that was not permitted by this clause (vi);

89

(vii)    the incurrence by the Borrower or any of its Subsidiaries of Hedging Obligations in the Ordinary Course of Business and not for speculative purposes;

(viii)    the Guarantee by the Borrower or any of its Subsidiaries of Indebtedness of the Borrower or any Subsidiary Guarantors that was permitted to be incurred by another provision of this covenant; provided that if the Indebtedness that is being Guaranteed is subordinated in right of payment to the Loans or a Guarantee pursuant to the Loan Documents, then the Guarantee of that Indebtedness by the Borrower or its Subsidiary shall be subordinated in right of payment to the Loans or the Subsidiary Guarantor's Guarantee pursuant to the Loan Documents, as the case may be;

(ix)    the incurrence by the Borrower's Subsidiaries of Non-Recourse Debt; provided that if any such Indebtedness ceases to be Non-Recourse Debt of such entity, such event will be deemed to constitute an incurrence of Indebtedness by a Subsidiary of the Borrower that was not permitted by this clause (ix);

(x)    the incurrence by the Borrower or any of its Subsidiaries of Indebtedness in respect of workers' compensation claims, public liability insurance, unemployment insurance, property, casualty or liability insurance, self-insurance obligations, bankers' acceptances, or customs, completion, advance payment, performance, bid performance, appeal or surety bonds and other similar obligations in the Ordinary Course of Business, including guarantees or obligations with respect to letters of credit supporting the foregoing;

(xi)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument (except in the case of daylight overdrafts) drawn against insufficient funds in the Ordinary Course of Business; provided that such Indebtedness is extinguished within five Business Days of incurrence;

(xii)    Indebtedness represented by agreements of the Borrower or its Subsidiaries providing for indemnification, adjustment of purchase price, earn outs or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or Equity Interests of the Borrower or its Subsidiary; provided that the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Borrower and its Subsidiaries in connection with such disposition;

(xiii)    Indebtedness of (x) the Borrower or any Subsidiary incurred to finance an acquisition or (y) a Subsidiary incurred and outstanding on the date on which such Subsidiary was acquired by the Borrower (other than Indebtedness incurred in connection with, or in contemplation of, such acquisition); provided that after giving effect to such acquisition or at the time such Subsidiary is acquired by the Borrower, (A) the Fixed Charge Coverage Ratio for the Borrower's most recently ended four full fiscal quarters for which financial statements have been delivered pursuant to Section 6.01(a) or (b) immediately preceding the date on which such additional Indebtedness is incurred or such Subsidiary is acquired would have been at least 2.0 to 1.0, determined on a pro

90

forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, as the case may be, at the beginning of such four-quarter period or (B) the Fixed Charge Coverage Ratio of the Borrower would be no less than immediately prior to such acquisition;

(xiv)   Indebtedness of Foreign Subsidiaries (other than Project Finance Subsidiaries) in an aggregate amount at any time outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance or replace any Indebtedness incurred pursuant to this clause (xiv), not to exceed $**[100]** million;

(xv)   the issuance by any of the Borrower's Subsidiaries to the Borrower or to any of its Subsidiaries of shares of preferred stock; provided, however, that: (a) any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Borrower or a Subsidiary thereof and (b) any sale or other transfer of any such preferred stock to a Person that is not either the Borrower or a Subsidiary thereof, will be deemed, in each case, to constitute an issuance of such preferred stock (as of the date of such sale or transfer) by such Subsidiary that was not permitted by this clause (xv);

(xvi)   Indebtedness of the Borrower or any of its Subsidiaries consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in ordinary course supply arrangements;

(xvii)   Indebtedness of the Borrower or any of its Subsidiaries in respect of Treasury Management Arrangements;

(xviii) the incurrence by the Borrower or any of its Subsidiaries of additional unsecured Indebtedness or Indebtedness secured on a pari passu or junior basis, in each case, in an aggregate principal amount (or accreted value, as applicable) at any time outstanding, including all Permitted Refinancing Indebtedness incurred to refund, refinance or replace any Indebtedness incurred pursuant to this clause (xviii), in an aggregate principal amount not to exceed at any time outstanding $30.0 million;

(xix)   the incurrence by Project Finance Subsidiaries of Project Financings; and

(xx)   the incurrence of Indebtedness and the issuance of Disqualified Stock or preferred stock, in each case constituting Permitted Ratio Debt and any Permitted Refinancing Indebtedness incurred to refund, refinance or replace any Indebtedness so incurred, or Disqualified Stock or preferred stock so issued, pursuant to this clause (xx).

For purposes of determining compliance with this Section 7.03, if an item of Indebtedness (including Acquired Debt) at any time meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (xx) above, the Borrower will be permitted to classify (and later reclassify) in whole or in part, in its sole discretion such item of Indebtedness in any manner that complies with this Section 7.03.   Indebtedness under the ABL Credit Agreement or any refinancings or replacements thereof, whether existing on the Closing Date or

91

4821-8648-8708 v23

incurred thereafter, shall be classified under clause (i) of the second paragraph of this Section 7.03.

The accrual of interest or preferred stock dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, and the payment of dividends on preferred stock or Disqualified Stock in the form of additional shares of the same class of preferred stock or Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of preferred stock or Disqualified Stock for purposes of this covenant; provided, in each such case, that the amount thereof is included in Fixed Charges of the Borrower as accrued.  Further, the reclassification of any lease or other liability of the Borrower or any of its Subsidiaries as Indebtedness due to a change in accounting principles after the Closing Date will not be deemed to be an incurrence of Indebtedness for purposes of this covenant.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the incurrence of Indebtedness, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term Indebtedness, or first committed, in the case of revolving credit Indebtedness; provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in the same foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, the U.S. Dollar-denominated restriction will be deemed not to have been exceeded so long as the principal amount of the refinancing Indebtedness does not exceed the principal amount of the Indebtedness being refinanced.  Notwithstanding any other provision of this Section 7.03, the maximum amount of Indebtedness that the Borrower may incur pursuant to this covenant will not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies.

Section 7.04   Fundamental Changes.   Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all its Property or business except that:

(a)    any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (*provided* that the Borrower shall be the continuing or surviving Person), or with or into any other Loan Party (*provided* that (i) a Loan Party shall be the continuing or surviving Person or (ii) simultaneously with such transaction, the continuing or surviving Person shall become a Loan Party and the Borrower shall comply with Section 6.09 in connection therewith);

(b)    any Subsidiary may merge with any other Subsidiary (or any Person that becomes a Subsidiary contemporaneously with such merger) so long as, in the case of any merger involving a Guarantor, the surviving Person shall be (or shall contemporaneously become) the Guarantor;

(c)    any Subsidiary of the Borrower may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any Subsidiary (so long as, in the

92

case of any such Disposition by a Guarantor, the Subsidiary to whom such assets are disposed of is a Guarantor) and may be dissolved following such Disposition;

(d)      any Excluded Subsidiary[, Project Finance Subsidiary] or Immaterial Subsidiary may Dispose of any or all of its assets and may be dissolved following such Disposition;

(e)      the Equity Interests of any Excluded Subsidiary[, Project Finance Subsidiary] or Immaterial Subsidiary may be Disposed of or issued to any other Person;

(f)      the Borrower and any Subsidiary may merge or consolidate with any other Person (other than the Borrower or any Subsidiary) *provided* that, with respect to each merger or consolidation made pursuant to this Section 7.04(f):

(i)      on the date of execution of the purchase agreement, no Default exists or would result therefrom;

(ii)      the merger or consolidation is not hostile;

(iii)      the lines of business of the Person to be (or the property of which is to be) so purchased or otherwise acquired shall be substantially the same as, or complimentary to, or an expansion of, lines of business then conducted by the Borrower and its Subsidiaries in the ordinary course;

(iv)      the requirements of Section 6.09 are satisfied;

(v)      the Borrower or such Subsidiary shall be the survivor (or, with respect to any Subsidiary Guarantor, such merger or consolidation shall be made to effect a Disposition permitted by Section 7.05); and

(vi)      the Borrower shall have delivered to the Administrative Agent, at least one Business Day prior to the date on which any such merger or consolidation is to be consummated (or such shorter period of time as may be agreed to by the Administrative Agent in its sole discretion), a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that all of the requirements set forth in this Section 7.04(f) have been satisfied or will be satisfied on or prior to the date on which such merger or consolidation is consummated;

(g)      any merger, consolidation, amalgamation, dissolution or Disposition of any Subsidiary that constitutes an Investment permitted under Section 7.06 or a Disposition permitted under Section 7.05; and

(h)      any change in the form or jurisdiction of organization of any Subsidiary if the Borrower determined in good faith that such change is in the best interest of the Borrower and is not materially disadvantageous to the Lenders; *provided* that all necessary actions are taken to ensure that the security interests in the Collateral shall remain in full force and effect.

4821-8648-8708 v23

Section 7.05   Dispositions.  Consummate any Asset Sale unless (i) the Borrower (or any of its Subsidiaries, as the case may be) receives consideration at the time of such Asset Sale at least equal to the fair market value of the assets or Equity Interests issued or sold or otherwise disposed of; (ii) the fair market value is determined by (a) an executive officer of the Borrower if the value is less than $20.0 million and evidenced by an officers' certificate delivered to the Administrative Agent or (b) the Borrower's board of directors if the value is $20.0 million or more and evidenced by a resolution of such board of directors delivered to the Administrative Agent; and (iii) at least 75% of the consideration received in the Asset Sale by the Borrower or such Subsidiary is in the form of cash or Cash Equivalents or any combination thereof.  For purposes of this Section 7.05 each of the following shall be deemed to be cash: (a) any liabilities (as shown on the Borrower's or such Subsidiary's most recent balance sheet) of the Borrower or any Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Loans or any Guarantee pursuant to the Loan Documents) that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Borrower or such Subsidiary from further liability and (b) any securities, notes or other obligations received by the Borrower or such Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Cash Equivalents within 180 days following the closing of such Asset Sale, to the extent of the cash or Cash Equivalents received in that conversion.

Section 7.06   Restricted Payments.  (i) declare or pay any dividend or make any other payment or distribution on account of any Equity Interests of the Borrower or any of its Subsidiaries (including, without limitation, any payment in connection with any merger or consolidation involving the Borrower or any of its Subsidiaries) or to the direct or indirect holders of any Equity Interests of the Borrower or any of its Subsidiaries in their capacity as such (in each case, other than (A) dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Borrower or to the Borrower or a Subsidiary of the Borrower or (B) Tax Distributions); (ii) purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Borrower) any Equity Interests of the Borrower or any direct or indirect parent of the Borrower; (iii) make any principal payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Borrower or any of the Guarantors that is contractually subordinated to the Loans or the Subsidiary Guarantor's Guarantee of the Obligations, any Junior Lien Obligations of the Borrower or any Subsidiary Guarantor and any unsecured Indebtedness of the Borrower or any Subsidiary Guarantor ("Restricted Debt"), except a payment of principal within six months of or at the stated Maturity Date thereof; or (iv) make any Restricted Investment (all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments"), unless, at the time of and immediately after giving effect to such Restricted Payment:

(a)   no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof; and

(b)   immediately after giving effect to such transactions on a pro forma basis, the Consolidated Leverage Ratio would not exceed 2.0 to 1.0; and

94

(c)      such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Borrower and its Subsidiaries after the Closing Date (excluding Restricted Payments permitted by clauses (ii) through (xi) of the next succeeding paragraph) is less than, at the date of determination, the sum, without duplication, of

(i)      50% of the Consolidated Net Income of the Borrower for the period (taken as one accounting period) from the first day of the fiscal quarter beginning after the Closing Date to the end of the Borrower's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit), plus

(ii)      100% of (a) the aggregate net cash proceeds and (b) the fair market value of (x) marketable securities (other than marketable securities of the Borrower) and (y) any Permitted Business or assets used or useful in a Permitted Business to the extent acquired in consideration of Equity Interests (other than Disqualified Stock) of the Borrower received by the Borrower since the Closing Date as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Borrower (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Borrower that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Borrower), plus

(iii)      to the extent that any Restricted Investment that was made after the Closing Date is sold for cash or otherwise cancelled, liquidated or repaid for cash, the lesser of (i) the cash return of capital with respect to such Restricted Investment, including without limitation repayment of principal of any Restricted Investment constituting a loan or advance (less the cost of disposition, if any) and (ii) the initial amount of such Restricted Investment.

The preceding provisions shall not prohibit:

(i)      the payment of any dividend or distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or redemption payment or distribution would have complied with the provisions of this Agreement;

(ii)      the making of any Restricted Payment in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Borrower) of, Equity Interests of the Borrower (other than Disqualified Stock) or from the substantially concurrent contribution of common equity capital to the Borrower; provided that the amount of any such net cash proceeds that are utilized for any such Restricted Payment shall be excluded from clause (c)(B) of the preceding paragraph and clause (v) of this paragraph;

95

(iii)     the defeasance, redemption, repurchase or other acquisition of subordinated Indebtedness or Disqualified Stock of the Borrower or any Guarantor with the net cash proceeds from an incurrence of Permitted Refinancing Indebtedness;

(iv)     the payment of any dividend or distribution by a Subsidiary of the Borrower to the holders of its Equity Interests on a pro rata basis or on a basis more favorable to the Borrower or a Subsidiary of the Borrower than to the other holders;

(v)     so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Borrower or any Subsidiary of the Borrower held by any existing or former officer, director or employee (or their transferees, estates or beneficiaries under their estates) of the Borrower (or any of its Subsidiaries) pursuant to any equity subscription agreement, stock option agreement or similar agreement; provided that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed (a) $5.0 million during any calendar year (with unused amounts in any calendar year being carried forward to the next succeeding calendar year but not any subsequent years); plus (b) the amount of any net cash proceeds received by or contributed to the Borrower from the issuance and sale after the Closing Date of Equity Interests (other than Disqualified Stock) of the Borrower or any of its Subsidiaries to its officers, directors or employees that have not been applied to the payment of Restricted Payments pursuant to this clause (v); provided that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from clause (c)(ii) of the preceding paragraph and clause (ii) of this paragraph; plus (c) the net cash proceeds of any "key-man" life insurance policies that have not been applied to the payment of Restricted Payments pursuant to this clause (v);

(vi)     so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, the declaration and payment of dividends to holders of any class or series of Disqualified Stock of the Borrower or any preferred stock of any Subsidiary of the Borrower issued in accordance with the terms of this Agreement to the extent such dividends are included in the definition of "Fixed Charges";

(vii)     (a) the repurchase, redemption, defeasance or other acquisition or retirement for value of Equity Interests in connection with the exercise or conversion of stock options, warrants, rights to acquire Equity Interests or other convertible securities or stock appreciation rights, to the extent such Equity Interests represent a portion of the exercise price therefor and (b) any repurchase, redemption, defeasance or other acquisition or retirement of Equity Interests in connection with the satisfaction of withholding tax obligations;

(viii)     the payment of cash in lieu of the issuance of fractional shares of Equity Interests upon the exercise or conversion of securities exercisable or convertible into Equity Interests of the Borrower;

(ix)     the purchase, redemption, defeasance or other acquisition or retirement of any Restricted Debt (a) at a purchase price not greater than 101.0% of the

96

principal amount of such Indebtedness in the event of a Change of Control in accordance with provisions similar to Section 2.05(b)(i) hereof or (b) at a purchase price not greater than 100.0% of the principal amount of such Indebtedness in the event of an Asset Sale in accordance with provisions similar to Section 7.05 hereof; provided that, prior to or simultaneously with such purchase, redemption, defeasance or other acquisition or retirement, the Borrower (or a third party to the extent permitted by this Agreement) has made the Change of Control Offer or Asset Sale Offer, as applicable, with respect to the Loans as a result of such Change of Control or Asset Sale, as applicable, and has completed the repayment of all Loans properly elected to be repaid and not withdrawn in connection with such Change of Control Offer or Asset Sale Offer, as applicable;

(x)     the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Borrower or any direct or indirect parent of the Borrower not to exceed $25.0 million in the aggregate; and

(xi)     so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, other Restricted Payments in an aggregate amount since the Closing Date not to exceed $25.0 million.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date of the Restricted Payment (or, in the case of a dividend, on the date of declaration thereof) of the asset(s) or securities proposed to be transferred or issued by the Borrower or such Subsidiary, as the case may be, pursuant to the Restricted Payment.

For purposes of determining compliance with this "Restricted Payments" covenant, if a Restricted Payment meets the criteria of more than one of the categories of Restricted Payments described in the preceding clauses (i) - (xi), the Borrower will be permitted to divide or classify (or later divide, classify or reclassify in whole or in part in its sole discretion) such Restricted Payment in any manner that complies with this Section 7.06.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on Restricted Payments denominated in a foreign currency, the U.S. Dollar-equivalent amount of such Restricted Payment shall be calculated based on the relevant currency exchange rate in effect on the date that such Restricted Payment was made.

Section 7.07   Modifications of Debt Instruments, etc. (a) Amend, modify or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of the documentation governing Restricted Debt to the extent that any such amendment, modification, waiver or other change would be materially adverse to the Administrative Agent or the Lenders (in their capacities as such), or (b) amend its Organization Documents in any manner materially adverse to the Administrative Agent or the Lenders (in their capacities as such); *provided* that, for purposes of clarity, it is understood and agreed that the foregoing limitation shall not otherwise prohibit (a) any Permitted Refinancing Indebtedness or any other replacement, refinancing, amendment, supplement, modification, extension, renewal, restatement or refunding of any Restricted Debt, in each case, that is permitted under Section 7.03 in respect thereof or (b) any amendment or change to the terms of any agreement governing

97

the ABL Credit Agreement or any other Credit Facility that is permitted under the Senior Lien Intercreditor Agreement.

Section 7.08   Transactions with Affiliates.   Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property (including by way of Division), the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower or any other Loan Party or in the case of any Excluded Subsidiary, any other Excluded Subsidiary) unless such transaction is (a) otherwise permitted under this Agreement, and (b) upon fair and reasonable terms no less favorable to the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, except for transactions permitted by the following sentence.   This Section 7.08 shall not apply to the following transactions: (i) any employment agreement entered into by the Borrower or any of its Subsidiaries in the Ordinary Course of Business and consistent with past practices, (ii) payment of reasonable directors' fees to Persons, (iii) sales of Equity Interests of the Borrower to Affiliates of the Borrower, (iv) any Restricted Payment otherwise permitted under Section 7.06, (v) indemnification agreements with, and payments made, to officers, directors, and employees of the Borrower or any Subsidiary pursuant to charter, bylaw, statutory, or contractual provisions, (vi) the performance of obligations of the Borrower or any Subsidiary under the terms of any agreement to which the Borrower or any Subsidiary is a party as of the Closing Date and that is set forth on Schedule 7.08, and any amendments, modifications, supplements, extensions, or renewals of such agreements; provided that any such amendments, modifications, supplements, extensions, or renewals of such agreements are not materially more disadvantageous, taken as a whole, to the Administrative Agent and the Lenders than the terms of such agreements as in effect on the Closing Date, (vii) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements or stock option or stock ownership plans approved by the board of directors of the Borrower, (viii) loans or advances to employees in the Ordinary Course of Business and consistent with past practices, but in any event not to exceed $2,000,000 in the aggregate outstanding at any one time, (ix) any transaction in which the Borrower or any of its Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an accounting, appraisal or investment banking firm of national standing stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or that such transaction meets the requirements of the first sentence of this paragraph, (x) dividends and distributions to the Borrower and its Subsidiaries by any Affiliate, (xi) (a) guarantees of performance by the Borrower and its Subsidiaries of Subsidiaries in the Ordinary Course of Business, except for guarantees of Indebtedness; (xii) any transaction where the only consideration paid by the Borrower or Subsidiary is Equity Interests of the Borrower (other than Disqualified Stock); (xiii) transactions contemplated hereunder and by the other Loan Documents; and (xiv) transactions contemplated by or to effectuate the Plan of Reorganization.

Section 7.09   Changes in Fiscal Periods.   Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

Section 7.10   Negative Pledge Clauses.   Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of the Borrower or any of its Material

98

Subsidiaries (other than Excluded Subsidiaries and Project Finance Subsidiaries) to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Guarantor, its obligations under the Guaranty, other than (a) this Agreement and the other Loan Documents, (b) the ABL Credit Agreement or any other Credit Facility or Permitted Refinancing Indebtedness thereof, (c) any agreements governing any purchase money Liens or Capitalized Leases or other secured Indebtedness otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby or securing such Indebtedness), (d) customary non-assignment provisions in any contract or lease entered into in the Ordinary Course of Business and consistent with past practices, (e) applicable law or any applicable rule, regulation, or order of any Governmental Authority, (f) provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, stock sale agreements, and other similar agreements, (g) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the Ordinary Course of Business, (h) any agreement in effect at the time such Subsidiary becomes a Subsidiary of Borrower, so long as such agreement was -not entered into in connection with or in contemplation of such Person becoming a Subsidiary of Borrower and is not applicable to any Person, or the properties or assets of any Person, other than such Subsidiary or such Subsidiary's properties and assets, and (i) any instrument governing Indebtedness assumed in connection with any acquisition of any Person or asset and not incurred in contemplation of such acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired.

Section 7.11   <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>.  Create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary **[(other than Excluded Subsidiaries and Project Finance Subsidiaries)]** to (i) pay dividends or make any other distributions on its Equity Interest to the Borrower or any of its Subsidiaries or pay any Indebtedness owed to the Borrower or any of its Subsidiaries; (ii) make loans or advances to the Borrower or any of its Subsidiaries; or (iii) transfer any of its properties or assets to the Borrower or any of its Subsidiaries.

However, the preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

> (1)    agreements governing Indebtedness and Credit Facilities as in effect on the Closing Date and any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of those agreements, provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the Closing Date, as determined by the Borrower in its reasonable and good faith judgment,

> (2)    this Agreement, the Loans and the Guarantees of the Obligations provided by the Subsidiary Guarantors;

(3)     applicable law or any applicable rule, regulation or order of any court or Governmental Authority;

(4)     agreements or instruments with respect to a Person acquired by the Borrower or any of its Subsidiaries as in effect at the time of such acquisition or as may be amended, restated, modified, renewed, extended, supplemented, refunded, replaced or refinanced from time to time (so long as the encumbrances and restrictions in any such amendment, restatement, modification, renewal, extension, supplement, refunding, replacement or refinancing are, in the reasonable and good faith judgment of the Borrower, not materially more restrictive, taken as a whole, than those in effect on the date of the acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; provided that, in the case of agreements or instruments governing Indebtedness, such Indebtedness was permitted by the terms of this Agreement to be incurred;

(5)     customary non-assignment provisions in any contract, license or lease entered into in the Ordinary Course of Business;

(6)     purchase money obligations for property acquired in the Ordinary Course of Business and Capitalized Leases that impose restrictions on that property of the nature described in clause (iii) of this Section 7.11;

(7)     any agreement for the sale or other disposition of a Subsidiary that imposes restrictions of the nature described in clauses (i) and/or (iii) of this Section 7.11;

(8)     Permitted Refinancing Indebtedness; provided that the encumbrances or restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced, as determined by the Borrower in its reasonable and good faith judgment;

(9)     Liens securing Indebtedness otherwise permitted to be incurred under the provisions of Section 7.01 hereof that limit the right of the debtor to Dispose of the assets subject to such Liens;

(10)     provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, stock sale agreements and other similar agreements entered into (a) in the Ordinary Course of Business or (b) with the approval of the Borrower's board of directors, which limitation is applicable only to the assets that are the subject of such agreements;

(11)     restrictions on cash or other deposits or net worth imposed by customers, suppliers or landlords under contracts entered into in the Ordinary Course of Business;

(12)     any encumbrance or restrictions existing under Hedging Obligations permitted under this Agreement;

100

(13)    any agreement or instrument relating to any property or assets acquired after the Closing Date, so long as such encumbrance or restriction relates only to the property or assets so acquired and is not and was not created in anticipation of such acquisition;

(14)    with respect to any Foreign Subsidiary, any encumbrance or restriction contained in the terms of any Indebtedness or any agreement pursuant to which such Indebtedness was incurred pursuant to Section 7.03 hereof if either (a) the encumbrance or restriction applies only in the event of a payment default or a default with respect to a financial covenant in such Indebtedness or agreement or (b) the Borrower determines in good faith that any such encumbrance or restriction will not materially affect the Borrower's ability to make principal or interest payments on the Loans; and

(15)    secured Indebtedness otherwise permitted to be incurred pursuant to the provisions of Section 7.01 hereof that limit the right of the debtor to Dispose of the assets securing the Indebtedness.

Section 7.12    Lines of Business.  Enter into any material business except for those businesses directly relating to the oil services industry in which the Borrower and its Subsidiaries have previously engaged or are engaged on the Closing Date or that are incidental or reasonably related thereto or that are a reasonable extension thereof, as determined in good faith by the Borrower or applicable Subsidiary.

Section 7.13    Swap Contracts.  Enter into any Swap Contract other than Swap Contracts entered into in the Ordinary Course of Business, and not for speculative purposes, to protect against changes in interest rates or foreign exchange rates.

Section 7.14    Anti-Corruption Laws.  (a) Directly or indirectly use the proceeds of any Credit Extension for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable anti-corruption legislation in other jurisdictions in any material respects, (b) cause or permit any of the funds of any Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Law.

Section 7.15    **[Sanctions.   Directly or, with the knowledge of a Loan Party, indirectly, use the proceeds of any Credit Extension, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture or other individual, entity or other Person, (i) for the purpose of financing or funding any [unauthorized] activity of or business in any Designated Jurisdiction or any activity or business of any individual, entity or other Person located, organized or residing in any Designated Jurisdiction or who is the subject or target of any applicable Sanctions, or (ii) in any other manner that will, in the case of clause (i) or (ii), result in any violation by any Person (including any individual, entity or other Person participating in the transaction, whether as underwriter, advisor, investor, Lender, Administrative Agent or otherwise) of applicable Sanctions.]**

101

# ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default.  Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to (i) pay when and as required to be paid herein, and in the currency required hereunder, any amount of principal of any Loan, or (ii) pay within three Business Days after the same becomes due, any interest on any Loan, any premium (including, without limitation, any Prepayment Premium), any fee due hereunder, or any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants, (i) Any Loan Party shall default in the observance or performance of any agreement contained in Section 6.04(a)(i) or (ii) (with respect to the Borrower), Section 6.03(a), Section 6.11, Section 6.15(a) or Article VII**[, or in Article IV of the Security Agreement]**; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or Section 8.01(b) above or (d) below) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) written notice thereof from the Administrative Agent to the Borrower (which notice shall be given by the Administrative Agent at the direction of the Required Lenders) or (ii) a Responsible Officer of the Borrower or any other Loan Party otherwise becoming aware of such default or any "Event of Default" under any Loan Document (other than this Agreement) shall occur and continue to exist beyond any applicable grace period set forth in such Loan Document; or

(d)    Representations and Warranties.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Cross-Default, (i) the Borrower or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required and after giving effect to the running of any grace periods applicable thereto, such Indebtedness to be demanded or to

become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Borrower or any Subsidiary is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which the Borrower or any Subsidiary is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Borrower or such Subsidiary as a result thereof is greater than the Threshold Amount; *provided*, *however*, this clause (e) shall not apply to (1) voluntary prepayments and redemptions, (2) any Non-Recourse Debt or Project Financing or (3) any repurchase or redemption of Indebtedness in connection with a change of control offer or asset sale offer or other similar mandatory prepayment; *provided, further*, that with respect to any of the defaults described in subclause (i) above in respect of Indebtedness outstanding under the First-Priority Lien Obligations, such default shall only constitute an Event of Default under this Agreement if (x) Indebtedness under the First-Priority Lien Obligations has been accelerated in accordance with its terms, or (y) such default arises from the failure to pay when due (after giving effect to any applicable grace periods and any extensions thereof) the stated principal amount of Indebtedness under the First-Priority Lien Obligations; or

(f)    Insolvency Proceedings, Etc.  Any Loan Party or any of its Subsidiaries (other than any Immaterial Subsidiary) institutes or consents to the institution of any proceeding under any Debtor Relief Law (other than the Cases), or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)    Inability to Pay Debts; Attachment, (i) the Borrower or any Subsidiary (other than any Immaterial Subsidiary) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(h)    Judgments.  One or more judgments or decrees shall be entered against the Borrower or any of its Subsidiaries involving, for the Borrower and its Subsidiaries taken as a whole, a liability (not paid or fully covered by independent third party insurance as to which the relevant insurance company has acknowledged coverage) in an aggregate amount in excess of the Threshold Amount, and all such judgments or decrees shall not have been paid, vacated, discharged, stayed or bonded pending appeal by the earlier of (i) the date which 60 days from the entry thereof and (ii) the date on which the relevant judgment creditor(s) has begun to enforce such judgment(s) or decree(s); or

(i)        ERISA, (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount that could reasonably be expected to have a Material Adverse Effect, (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to have a Material Adverse Effect or (iii) a Foreign Benefit Event occurs which has resulted or could reasonably be expected to result in liability of the Borrower or one of its Subsidiaries in an aggregate amount that could reasonably be expected to have a Material Adverse Effect; or

(j)        Invalidity of Loan Documents.  Any Loan Document (including, for the avoidance of doubt, the Senior Lien Intercreditor Agreement or any Customary Intercreditor Agreement if and when the same has been executed and delivered by the parties thereto), at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the occurrence of the Maturity Date, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any Loan Document (including, for the avoidance of doubt, the Senior Lien Intercreditor Agreement or any Customary Intercreditor Agreement if and when the same has been executed and delivered by the parties thereto); or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (including, for the avoidance of doubt, the Senior Lien Intercreditor Agreement or any Customary Intercreditor Agreement if and when the same has been executed and delivered by the parties thereto), or purports to revoke, terminate or rescind any Loan Document (including, for the avoidance of doubt, the Senior Lien Intercreditor Agreement or any Customary Intercreditor Agreement if and when the same has been executed and delivered by the parties thereto); or

(k)        [Reserved]; or

(l)        Collateral Documents.  Any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected second priority Lien (subject to Liens permitted by Section 7.01) on (i) Collateral purported to be covered thereby having an aggregate fair market value in excess of $5,000,000, that is purported to be covered thereby unless such occurrence results solely from action of the Administrative Agent or any Lender (or any failure of the Administrative Agent or any Lender to file or record any financing statements (or amendments or continuations thereof), intellectual property security agreements (or amendments, restatements or supplements thereto) and/or mortgages (or amendments, restatements or supplements thereto)) and involves no Default by the Borrower or any other Loan Party hereunder or under any Collateral Document.

Section 8.02   Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the direction of the Required Lenders, take any or all of the following actions:

(a)        declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

4821-8648-8708 v23

(b)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, premiums (including, without limitation, any Prepayment Premium), fees and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)      terminate this Agreement and the other Loan Documents as to any future liability or obligation of the Loan Parties, but without affecting any of the Administrative Agent's Liens in the Collateral and without affecting the Obligations; and

(d)      exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents;

*provided*, *however*, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States or other Debtor Relief Law or upon the occurrence of any Event of Default described in Section 8.01(f), in addition to the remedies set forth above, without any notice to the Borrower or any other Person or any act by the Required Lenders, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest, fees, premiums (including any Prepayment Premium) and other amounts as aforesaid shall automatically become due and payable as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender and Borrower shall automatically be obligated to repay all of such Obligations in full, without presentment, demand, protest, or notice or other requirements of any kind, all of which are expressly waived by the Loan Parties.

Upon an acceleration of the Loans as a result of an Event of Default (including an acceleration upon the occurrence of an actual or deemed entry of an order for relief with respect to any Loan Party under the Bankruptcy Code of the United States or other Debtor Relief Law or upon the occurrence of any Event of Default described in Section 8.01(f)), the amount of principal of, and premium on (if any), the Loans that becomes due and payable shall include the Prepayment Premium (if any), determined as of such date, shall become immediately due and payable by the Loan Parties and shall constitute part of the Obligations as if the Loans were being voluntarily prepaid or repaid as of such date, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof.  Any Prepayment Premium payable pursuant to this Agreement shall be presumed to be the liquidated damages sustained by each Lender as the result of the early repayment or prepayment of the Loans and each of the Borrower and the Guarantors agrees that it is reasonable under the circumstances currently existing. EACH OF THE BORROWER AND THE GUARANTORS EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUMS IN CONNECTION WITH ANY SUCH ACCELERATION.  Each of the Borrower and the Guarantors expressly agrees (to the fullest extent it may lawfully do so) that: (A) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment Premium shall be payable notwithstanding the then prevailing

105

market rates at the time payment or redemption is made; (C) there has been a course of conduct between Lenders, the Borrower and the Guarantors giving specific consideration in this transaction for such agreement to pay the Prepayment Premium and (D) the Borrower and the Guarantors shall be estopped hereafter from claiming differently than as agreed to in this paragraph.  Each of the Borrower and the Guarantors expressly acknowledges that its agreement to pay or guarantee the payment of the Prepayment Premium, to the Lenders as herein described is a material inducement to Lenders to make (or be deemed to make) the Loans.

Section 8.03    Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), subject to the terms of the Senior Lien Intercreditor Agreement and any Customary Intercreditor Agreement, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III but excluding any principal and interest) payable to the Administrative Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities, premiums (including any Prepayment Premium) and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders arising under the Loan Documents and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations arising under the Loan Documents, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of all other Obligations ratably among the Secured Parties; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

## ARTICLE IX

## ADMINISTRATIVE AGENT

Section 9.01    Appointment and Authority.

(a)    Each of the Lenders hereby appoints UMB Bank, National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents to which the Administrative Agent is a party (including, for the avoidance of doubt, the Senior Lien Intercreditor Agreement or any Customary Intercreditor Agreement) and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof (including, for the

106

avoidance of doubt, the execution and delivery of the other Loan Documents (including the Senior Lien Intercreditor Agreement or any Customary Intercreditor Agreement)), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article, other than the final sentence of Section 9.10, are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.  The Administrative Agent shall not be an agent for the Lender Claimants and shall not have any duties or obligations with respect to the Loans attributed to such Lender Claimants, other than (i) maintenance of the Lender Claimant Reserve Account and (ii) the crediting of their Loans in accordance with Section 2.15(a).

(b)      The Administrative Agent shall also act as the "collateral agent" under the Loan Documents (including, for the avoidance of doubt, the Senior Lien Intercreditor Agreement or any Customary Intercreditor Agreement), and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations.  In furtherance thereon, each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent (or any sub-agent of the Administrative Agent appointed pursuant to Section 9.05), as "collateral agent" to act on their behalf solely for the purpose of acting as mortgagee under Mortgages and holding the second preferred mortgage interest in each Specified Rig granted to the Administrative Agent, as "collateral agent", pursuant to the respective Mortgage.  The Administrative Agent hereby accepts and declares that it will hold each Mortgage for the sole use and benefit of the Lenders and shall perform its obligations hereunder, but only upon the terms and conditions of this Agreement.  In connection with all of the foregoing, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in- fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder, shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02   Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity, if applicable.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

4821-8648-8708 v23

Section 9.03 Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents to which the Administrative Agent is a party, and the Administrative Agent's duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c) shall not, except as expressly set forth herein and in the other Loan Documents to which Administrative Agent is a party, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent by the Borrower or a Lender and such notice references this Agreement and is labelled a "notice of default" or "notice of event of default".

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Notwithstanding anything contained in the Loan Documents or otherwise to the contrary, the Administrative Agent Agent shall not have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any Lien or security interest created under the Loan Documents; (ii) take any necessary steps to preserve rights against any parties with respect to any Collateral; or (iii) take any action to protect against any diminution in value of the Collateral. The Borrower shall make any and all filings and recordations.

Notwithstanding any provision of this Agreement or the other Loan Documents to the contrary, before taking or omitting any action to be taken or omitted by the Administrative Agent under the terms of this Agreement and the other Loan Documents, the Administrative Agent may seek the written direction of the Required Lenders, and the Administrative Agent is entitled to rely (and is fully protected in so relying) upon such direction. The Administrative Agent is not liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If the Administrative Agent requests such direction with respect to any action, the Administrative Agent is entitled to refrain from such action unless and until the Administrative Agent has received such direction, and the Administrative Agent does not incur liability to any Person by reason of so refraining. In the absence of an express statement in the Loan Documents regarding which Lenders shall direct in any circumstance, the direction of the Required Lenders shall apply and be sufficient for all purposes. Any provision of this Agreement or the other Loan Documents authorizing the Administrative Agent to take any action does not obligate the Administrative Agent to take such action.

The Administrative Agent shall never be required to use, risk or advance its own funds or otherwise incur liability in the performance of any of its duties or the exercise of any of its rights and powers hereunder (including, but not limited to, no obligation to grant any credit extension or to make any advance hereunder). In no event shall the Administrative Agent be liable, directly or indirectly, for any special, indirect, punitive or consequential damages, even if the Administrative Agent has been advised of the possibility of such damages and regardless of the form of action. The Administrative Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control. Such acts shall include, but not be limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes, terrorist attacks or other disasters.

The Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing. The Administrative Agent will not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law.

Notwithstanding anything else to the contrary herein or in the other Loan Documents, whenever reference is made in this Agreement or any other Loan Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to

109

be made (or not to be made) by the Administrative Agent, it is understood that the Administrative Agent shall be acting at the direction of the Required Lenders and shall be fully protected in acting pursuant to such directions.

Each Lender authorizes and directs the Administrative Agent to enter into the Loan Documents to which it is a party on the date hereof on behalf of and for the benefit of the Lenders.

Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under pursuant to, the Loan Documents, the Administrative Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

The Administrative Agent shall have no responsibility for interest or income on any funds held by it hereunder and any funds so held shall be held uninvested pending distribution thereof.

Section 9.04   Reliance by Administrative Agent.   The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.   The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.   In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05   Delegation of Duties.   The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.   The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.   The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.   The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06   Resignation of Administrative Agent.

110

4821-8648-8708 v23

(a)       The Administrative Agent may at any time, or upon the request of the Required Lenders, shall promptly give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall, in consultation with the Borrower, appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above, *provided* that in no event shall any such successor Administrative Agent be a Defaulting Lender.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security as bailee until such time as a successor Administrative Agent is appointed) but the Administrative Agent may petition a court of competent jurisdiction, at the expense of Borrower, for the appointment of a successor).

(b)       If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security as bailee until such time as a successor Administrative Agent is appointed) but the Administrative Agent may petition a court of competent jurisdiction, at the expense of Borrower, for the appointment of a successor).

(c)       With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security as bailee until such time as a successor Administrative Agent is appointed) but the Administrative Agent may petition a court of competent jurisdiction, at the expense of Borrower, for the appointment of a successor) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the

111

retiring (or removed) Administrative Agent (other than as provided in Section 3.01(g) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (a) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (b) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

(d)     Any Person into which the Administrative Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Administrative Agent shall be a party, or any Person succeeding to the business of the Administrative Agent shall be the successor of the Administrative Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto.

Section 9.07     Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08     No Other Duties Etc.  Anything herein to the contrary notwithstanding, Administrative Agent shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

Section 9.09     Administrative Agent May File Proofs of Claim; Credit Bidding.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise.

112

(a)	at the direction of the Required Lenders, to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under the Loan Documents) allowed in such judicial proceeding; and

(b)	to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid and to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on

113

actions by the Required Lenders contained in Section 10.01), (ii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 9.10   Collateral and Guaranty Matters.   Each of the Lenders irrevocably authorizes the Administrative Agent, at the discretion of the Required Lenders, to (a) release any and all Collateral from the Liens created by the Collateral Documents, subordinate any Lien on any and all such Collateral and/or release any and all Guarantors (other than Borrower) from their respective obligations under the Guaranty at any time and from time to time in accordance with the provisions of the Collateral Documents and Section 10.21, (b) execute and deliver, and take any action referred to in Section 10.21 to evidence any such release or subordination and (c) enter into any amendments of the Collateral Documents dated on and as of even date herewith deemed reasonably necessary or appropriate by the Required Lenders in order to evidence the Obligations secured by such Collateral Documents and for any other related purpose.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under the Guaranty pursuant to Section 9.10 or Section 10.21. The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable for any failure to monitor or maintain any portion of the Collateral.  In addition, the Administrative Agent will have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities of the Borrower, or any other party, or opine or advise on any related Solvency issues.

## ARTICLE X

## MISCELLANEOUS

Section 10.01   Amendments.  Any provision of the Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by (I) in the case of this Agreement, the Borrower and the Required Lenders and acknowledged by the Administrative Agent, and (II) in the case of any other Loan Document, each party thereto and the Administrative Agent (at the direction of the Required Lenders), and each such waiver or

114

consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that no such amendment, waiver or consent shall:

(a)     extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(b)     postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees, premiums (including any Prepayment Premium) or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(c)     reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (ii) of the third proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; *provided*, *however*, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)     change the definition of "Applicable Percentage", Section 2.12(a), Section 2.12(f), Section 2.13 or Section 8.03 in a manner that would alter the *pro rata* sharing of payments required thereby without the written consent of each Lender affected thereby; provided that modifications of Section 2.12(a), Section 2.12(f), Section 2.13 or Section 8.03 or the definition of "Applicable Percentage" in connection with (x) any buy back of Loans by the Borrower pursuant to Section 2.05(a)(iii), or (y) any Incremental Amendment, in each case, shall only require approval (to the extent any such approval is otherwise required) of the Administrative Agent;

(e)     [reserved];

(f)     change any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder, without the written consent of each Lender;

(g)     release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender (except any such release in accordance with a transaction permitted under the Loan Documents);

(h)     release all or substantially all of the value of the Guaranty without the written consent of each Lender (except any such release in accordance with a transaction permitted under the Loan Documents);

(i)     amend the penultimate paragraph of Section 9.09 without the written consent of each Lender; or

(j)     affect the rights or duties of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) without

115

the written consent of the requisite percentage of interest of the affected Class of Lenders that would be required to consent thereto if such Class of Lenders was the only Class;

and, *provided further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document, (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto and (iii) no Lender consent is required to effect an Incremental Amendment.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (x) the Commitment of such Lender may not be increased or extended, nor the principal owed to such Lender reduced or the final maturity thereof extended, without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each affected Lender, each Lender of a Class in accordance with the terms of Section 10.01 or each Lender and that has been approved by the Required Lenders (and, in the case of a proposed amendment, waiver, consent or release involving all of an affected Class, at least 50.1% of such affected Class) (a "Non-Consenting Lender"), the Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; *provided* that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

Section 10.02  Notices; Effectiveness; Electronic Communication.

(a)  Notices Generally.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)  if to the Borrower or the Administrative Agent, to the address, telecopier number or electronic mail address specified for such Person on Schedule 10.02; and

(ii)  if to any other Lender, to the address, telecopier number or electronic mail address specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

116

(b)      Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FpML messaging and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)      Change of Address, Etc.  Each of the Borrower and the Administrative Agent may change its address (including its address for electronic communications) or telecopier for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address (including its address for electronic communications) or telecopier for notices and other communications hereunder by notice to the Borrower and the

117

4821-8648-8708 v23

Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)        Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including electronic notices or Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03 No Waiver; Cumulative Remedies; Enforcement.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Secured Parties; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then  (i) the

118

Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04   Expenses; Indemnity; Damage Waiver.

(a)      Costs and Expenses.   [**The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates including the reasonable and documented out-of-pocket legal fees and expenses (but limited in the case of legal fees to the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for each of the Administrative Agent and the Lenders, taken as a whole and, if reasonably necessary, of one or more regulatory counsels and one local counsel in any relevant jurisdiction to all such persons, taken as a whole), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent and any counsel for the Lenders (and one counsel for each of the Administrative Agent and the Lenders in any relevant foreign jurisdiction), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made, including all such documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans**.]

(b)      Indemnification by the Borrower.   [**The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each other Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, fees and expenses (but limited in the case of legal fees, to the reasonable and documented out-of-pocket fees, charges and disbursements of one counsel for Agent and one counsel for Lenders, taken as a whole, and, solely in the case of an actual or reasonably perceived conflict of interest, one additional counsel to all affected Indemnitees, taken as a whole and, if reasonably necessary, of one local counsel in any relevant jurisdiction to each of Lenders and Administrative Agent, taken as a whole, in each such relevant material jurisdiction), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of  (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including fees and expenses incurred in enforcing this indemnity and including in respect of any matters addressed in Section 3.01), (ii) any Loan or the use or proposed use of the proceeds**

4821-8648-8708 v23

**therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, or by any other Person and regardless of whether any Indemnitee is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE;** *provided* **that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) other than with respect to the Administrative Agent, result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such other Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) result from any dispute solely among the Indemnitees (other than claims against an Indemnitee in its capacity as the Administrative Agent or a similar role) and not arising out of any act or omission of the Borrower or any of its Subsidiaries.  This Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, liabilities or related expenses arising from any non-Tax claim**].

(c)     Reimbursement by Lenders.  To the extent that Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section or under Section 2.09 to be paid by it to the Administrative Agent (or any sub-agent thereof), each other Agent or any Related Party of any of the foregoing (and without limiting Borrower's obligation to do so), each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), such other Agent or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or any other Agent in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or any other Agent in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by

120

unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)   Payments.  All amounts due under this Section shall be payable not later than thirty days after written demand therefor (or such later time as the applicable payee shall agree to in writing in its sole discretion).

(f)   Survival.  The agreements in this Section shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 10.05   Payments Set Aside.  To the extent that any payment by or on behalf of Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect, in the applicable currency of such recovery or payment.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.06   Successors and Assigns.

(a)   Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent

121

and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans of any Class at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in Section 10.06(b)(i)(A), the aggregate amount of the Commitment and the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)     Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written

122

4821-8648-8708 v23

notice to the Administrative Agent within 5 Business Days after having received notice thereof; and

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment or Loans if such assignment is to a Person that is not a Lender with a Commitment or Loan, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)      <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption; together with a processing and recordation fee in the amount of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; provided further, that such fee shall be payable only once in the event of simultaneous assignments to or by two or more Approved Funds that are administered, managed, advised or sub-advised by the same entity or entities that are Affiliates of each other.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)      <u>No Assignment to Borrower or Defaulting Lender</u>.  No such assignment shall be made to the Borrower or any of the Borrower's Subsidiaries or to any Defaulting Lender or any of a Defaulting Lender's Affiliates or Subsidiaries.

(vi)      <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person).

**(vii)      [<u>Conversion of Lender Claimants</u>.  For the purposes of this Agreement, the conversion of a Lender Claimant to a Lender pursuant to <u>Section 2.15</u> shall not be deemed an assignment.]**

Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>subsection (c)</u> of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Section 3.01</u>, <u>Section 3.04</u>, and <u>Section 10.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>subsection (d)</u> of this Section.

(c)      Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy (or the equivalent thereof in electronic form) of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  [**No assignment shall be effective unless recorded in the Register. The parties hereto agree and intend that the Loans shall be treated as being in "registered form" for purposes of the Code (included Sections 163(f), 871(h)(2), and 881(c)(2) of the Code), and the Register shall be maintained in accordance with such intention.**]

(d)      Participations.  Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries or to any Defaulting Lender or any of a Defaulting Lender's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender)), Section 3.04 and Section 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, *provided* such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any

124

commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-l(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or Section 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(f)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 10.07 Treatment of Certain Information; Confidentiality.     Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors, independent auditors, legal counsel and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal or administrative process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or its obligations hereunder, (g) with the consent of the Borrower, (h) for purposes of establishing a "due diligence" defense or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, (y) becomes available to the Administrative Agent, any other Agent, any Lender or any of their respective Affiliates (and the successors and assigns of the foregoing) on a nonconfidential basis from a source other than the Borrower or (z) is independently developed by the Administrative Agent, any other Agent, any Lender or any of their respective Affiliates (and the successors and assigns of the foregoing).  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and

125

information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Loans.

For purposes of this Section, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or any of their respective businesses, other than any such information that is available to the Administrative Agent, any other Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, *provided* that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 10.08 Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency), [**other than trust and tax withholding accounts**], at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or any other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff hereunder, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

4821-8648-8708 v23

Section 10.09 <u>Interest Rate Limitation</u>.   Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").   If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.   In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.10 <u>Counterparts; Integration; Effectiveness</u>.   This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.   Except as provided in <u>Section 4.01</u> this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (e.g., ".pdf" or ".tiff") shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.11 <u>Survival of Representations and Warranties</u>.   All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.   Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until the Maturity Date.

Section 10.12 <u>Severability</u>.   If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.13 <u>Replacement of Lenders</u>.   If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u> and in each case,

127

4821-8648-8708 v23

such Lender has declined or is unable to designate a different Lending Office in accordance with Section 3.06(a).  If any Lender is a Non-Consenting Lender or a Defaulting Lender, or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(a)     the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.06(b):

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01 such assignment will result in a reduction in such compensation or payments thereafter;

(d)     such assignment does not conflict with applicable Laws; and

(e)     in connection with any such replacement, if any such Non-Consenting Lender or Defaulting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Non-Consenting Lender or Defaulting Lender, then such Non-Consenting Lender or Defaulting Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Non-Consenting Lender or Defaulting Lender.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 10.14  Governing Law; Jurisdiction; Etc.

(a)     GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)     SUBMISSION TO JURISDICTION.  THE BORROWER IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR

OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)  WAIVER OF VENUE.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)  SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN Section 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.15 Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B)

129

ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.16 <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the services regarding this Agreement provided by the Administrative Agent is arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person and (B) the Administrative Agent does not have any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents to which the Administrative Agent is a party; and (iii) the Administrative Agent and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and the Administrative Agent does not have any obligation to disclose any of such interests to the Borrower or its Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.17 <u>Electronic Execution of Assignments and Certain Other Documents</u>.  The words "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation any Assignment and Assumption, any amendment or other modification hereof (including waivers and consents), amendments or other modifications or Committed Loan Notices) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided* that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and *provided further* without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

Section 10.18 <u>USA PATRIOT Act</u>.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies

<div align="center">130</div>

the Borrower and each other Loan Party that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act and the Beneficial Ownership Regulation.

Section 10.19 Judgment Currency.   If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or any Lender from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or any Lender in such currency, the Administrative Agent or such Lender, as the case may be, agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

Section 10.20  [Reserved].

Section 10.21  Release of Collateral and Loan Parties.

(a)     Any Lien on any Collateral granted to or held by the Administrative Agent under any Loan Document shall automatically be released, terminated and discharged in full (as used in this Section 10.21 "released") without the need for any further action by any Person: (i) upon the payment in full of the principal of, together with accrued and unpaid interest on, all of the Loans and all other Obligations under this Agreement and the other Loan Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, are paid, (ii) with respect to any such Lien, in the event that any asset constituting Collateral is, or is to be, Disposed of as part of, or in connection with, any transaction not prohibited hereunder or under any other Loan Document or (iii) if approved, authorized or ratified in writing in accordance with Section 10.01.

131

(b)     The Administrative Agent, as applicable, shall, without the need for any further action by any Person, subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (a), (h) or (j) of the definition of "Permitted Lien".

(c)     Any Loan Party (other than the Borrower) shall be automatically released from its obligations under the Guaranty and Collateral Documents upon (i) such Person ceasing to be a Subsidiary as a result of a transaction permitted hereunder or otherwise in accordance with the terms hereof and (ii) written notice received by the Administrative Agent executed by a Responsible Officer of the Borrower describing the circumstances giving rise to such claim for release.  In addition, (i) if a Subsidiary Guarantor has become an Excluded Subsidiary or (ii) if a Subsidiary Guarantor ceases to be a Material Subsidiary, in each case, as a result of a transaction permitted hereunder or otherwise in accordance with the terms hereof, then automatically upon the receipt by the Administrative Agent of written notice from a Responsible Officer of the Borrower (providing sufficient factual detail supporting a claim for release consistent with this sentence) such Subsidiary Guarantor shall be released from the Guaranty.

(d)     In the case of any release or subordination described in this Section 10.21 the Administrative Agent shall, at the Borrower's expense, execute and deliver to the relevant Borrower such documents or evidence of such release or subordination as Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to substantiate its interest in such item, in each case in accordance with the terms of the Loan Documents and this Section 10.21.

Section 10.22 **ENTIRE AGREEMENT**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

Section 10.23 Acknowledgment and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

132

133

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 10.24 <u>Senior Lien Intercreditor Agreement</u>. Anything herein to the contrary notwithstanding, the liens and security interests securing the obligations evidenced by this Agreement or any other Loan Document, the exercise of any right or remedy with respect thereto and certain of the rights of the obligees hereof are subject to the provisions of the Senior Lien Intercreditor Agreement and in the event of any conflict between the terms of the Senior Lien Intercreditor Agreement and this Agreement or any other Loan Document with respect to such liens, security interest, rights or remedies, the terms of the Senior Lien Intercreditor Agreement shall govern and control.

(Signature pages begin on following page)

133

4821-8648-8708 v23

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**PARKER DRILLING COMPANY,**
as the Borrower

By:  _____
    Name:
    Title:

**UMB BANK, NATIONAL ASSOCIATION**, as
Administrative Agent


By: _____

       Name:

       Title:

4821-8648-8708 v23

[_____], as a Lender

By: _____

Name:

Title:

4821-8648-8708 v23

## Annex I

## Credit Agreement Schedules

(see attached)

4821-8648-8708 v23

**Annex II**

**Credit Agreement Exhibits**
(see attached)

**Exhibit D(iii)**

**Intercreditor Agreement**

The Intercreditor Agreement remains subject to continuing negotiations among the Debtors, the Exit Facility Agent and the Consenting Stakeholders.

*K&E Comments 2/12/19*

## INTERCREDITOR AGREEMENT

**INTERCREDITOR AGREEMENT** (this "**Agreement**"), is dated as of _____ _____, 2019, by and between BANK OF AMERICA, N.A., in its capacity as administrative agent for the holders of the First Lien Obligations (as defined below), including its successors and permitted assigns from time to time (the "**First Lien Agent**"), UMB BANK, NATIONAL ASSOCIATION, in its capacity as administrative agent for the holders of the Initial Second Lien Obligations (as defined below), including its successors and permitted assigns from time to time (the "**Initial Second Lien Agent**") and each Additional Second Lien Agent from time to time party hereto pursuant to Section 8.22, and acknowledged and agreed to by PARKER DRILLING COMPANY, a Delaware corporation (the "**Parent Borrower**"), and the subsidiaries of Parent Borrower identified on the signature pages hereof.  Capitalized terms used in this Agreement have the meanings assigned to them in <u>Section 1</u> below.

## RECITALS

A.    The Parent Borrower and certain subsidiaries of Parent Borrower, as borrowers (such subsidiaries, together with any future subsidiaries of Parent Borrower that become borrowers and the Parent Borrower, collectively the "**Borrowers**"), the lenders party thereto (the "**First Lien Lenders**") and the First Lien Agent have entered into that certain Credit Agreement dated as of the date hereof providing for an asset-based revolving credit facility (as amended, restated, amended and restated, supplemented, modified, replaced, renewed, extended or refinanced from time to time, the "**Initial First Lien Loan Agreement**").

B.    The Parent Borrower, certain subsidiaries of Parent Borrower from time to time party thereto, as guarantors, the lenders party thereto (the "**Initial Second Lien Lenders**") and the Initial Second Lien Agent have entered into that certain Second Lien Term Loan Credit Agreement dated as of the date hereof providing for term loans (as amended, restated, amended and restated, supplemented, modified, replaced, renewed, extended or refinanced from time to time, the "**Initial Second Lien Loan Agreement**").

C.    The Parent Borrower and the other Obligors have granted to the First Lien Agent, for the benefit of the First Lien Creditors, a Lien on substantially all of their personal property assets, all as more particularly described in the First Lien Documents.  The Parent Borrower and the other Obligors have granted to the Initial Second Lien Agent, for the benefit of the Initial Second Lien Creditors, a Lien on substantially all of their personal property assets, all as more particularly described in the Initial Second Lien Documents.

D.    The Initial Second Lien Agent, on behalf of the Initial Second Lien Creditors, and the First Lien Agent, on behalf of the First Lien Creditors, wish to set forth their agreements as to their respective rights and priorities with respect to the assets of the Parent Borrower and the other Obligors.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

US 6041217v.7

Section 1.      **Definitions.**

1.1      General Terms.  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and the plural forms of the terms defined:

"**Additional Second Lien Agent**": the trustee, agent or similar representative under any Additional Second Lien Loan Agreement.

"**Additional Second Lien Collateral Documents**": any Additional Second Lien Loan Agreement, the "Collateral Documents" (or such similar or equivalent term) as defined in any Additional Second Lien Loan Agreement, and any other documents or instruments granting or purporting to grant a Lien on real or personal property to secure a Second Lien Obligation under an Additional Second Lien Loan Agreement or granting rights or remedies with respect to such Liens.

"**Additional Second Lien Creditors**": any Additional Second Lien Agent, the Additional Second Lien Lenders and the other Persons from time to time holding a Second Lien Obligation under any Additional Second Lien Loan Agreement.

"**Additional Second Lien Debt**": any indebtedness that is issued, incurred or guaranteed by any Obligor (other than indebtedness constituting Initial Second Lien Obligations), which indebtedness and guarantees are secured by the Collateral (or a portion thereof) on a pari passu basis (but without regard to control of remedies) with the Initial Second Lien Obligations or the other Second Lien Obligations then outstanding; provided, however, that (i) such indebtedness is permitted to be incurred, secured and guaranteed on such basis by the First Lien Documents and each Second Lien Document and (ii) the Additional Second Lien Agent for the holders or lenders of such indebtedness shall have become a party to this Agreement.

"**Additional Second Lien Documents**": any Additional Second Lien Loan Agreement, all Loan Documents (as such term or similar term is defined in such Additional Second Lien Loan Agreement) and all other agreements, instruments and other documents at any time executed or delivered by any Obligor or any other Person with, to or in favor of an Additional Second Lien Agent or any Additional Second Lien Creditor in connection therewith or related thereto, including such documents evidencing successive Refinancings of the applicable Additional Second Lien Obligations, in each case, as the same may be amended, amended and restated, supplemented, modified, replaced, substituted or renewed from time to time.

"**Additional Second Lien Lender**": any lender or holder under an Additional Second Lien Loan Agreement.

"**Additional Second Lien Loan Agreement**": any agreement documenting Additional Second Lien Debt.

"**Additional Second Lien Obligations**": all Obligations of the Obligors under (a) any Additional Second Lien Loan Agreement and the any Additional Second Lien Documents, (b) the guaranties under the Additional Second Lien Documents, or (c) any other agreement or

2

instrument granting or providing for the perfection of a Lien securing any of the foregoing. Notwithstanding any other provision hereof, the term "Additional Second Lien Obligations" will include accrued premiums, interest, fees, costs, and other charges incurred under any Additional Second Lien Loan Agreement and any other Additional Second Lien Documents, whether incurred before or after the commencement of an Insolvency Proceeding, and whether or not allowed or allowable in an Insolvency Proceeding. To the extent that any payment with respect to the Additional Second Lien Obligations (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off or recoupment, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, avoided, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Affiliate**": with respect to any Person, each officer, director, general partner or joint venturer of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.  For purpose of this definition, "control" means the possession of either (a) the power to vote, or the beneficial ownership of, 15% or more of the Voting Stock of such Person or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"**Agreement**": as defined in the preamble hereof.

"**Assignment and Acceptance**": as defined in the First Lien Loan Agreement.

"**Bankruptcy Code**": the provisions of Title 11 of the United States Code, 11 U.S.C. §101, et seq..

"**Bankruptcy Law**": the Bankruptcy Code and any other federal, state or foreign bankruptcy, insolvency, receivership or similar law affecting creditors' rights or any other or similar proceedings seeking any stay, reorganization, arrangement, composition or readjustment of obligations or indebtedness.

"**Borrower**": the Parent Borrower or any other borrower with respect to the First Lien Obligations.

"**Business Day**": any day of the year that is not a Saturday, a Sunday or a day on which banks are required or authorized to close in New York City.

"**Collateral**": all property and interests in property and proceeds thereof now owned or hereafter acquired by any Obligor in or upon which a Lien (including any Liens granted in an Insolvency Proceeding) is now or hereafter granted or required or purported to be granted by such Obligor in favor of any Secured Creditor as security for all or any part of the Obligations whether or not such Lien is valid, perfected or enforceable.

"**Controlling Second Lien Loan Agreement**": (a) the Initial Second Lien Loan Agreement until such time as the Discharge of Initial Second Lien Obligations has occurred and (b) at any time thereafter, the Second Lien Loan Agreement evidencing and/or governing the Second Lien Loan Obligations that constitute the largest principal amount of all outstanding Second Lien Obligations at such time.

3

"**Debt Action**": (a) the filing of a lawsuit by any Secured Creditor solely to collect the Obligations owed to such Secured Creditor and not to exercise its secured creditor remedies in respect of the Collateral, (b) the demand by any Secured Creditor for accelerated payment of any and all of the Obligations owed to such Secured Creditor, (c) the filing of any notice of claim and the voting of any such claim in any Insolvency Proceeding involving an Obligor, (d) the filing of any motion in any Insolvency Proceeding permitted under this Agreement or (e) the filing of any defensive pleading in any Insolvency Proceeding consistent with the terms of this Agreement.

"**Defaulting Creditor**": as defined in Section 5.6(c).

"**Designated Second Lien Agent**: (a) the Initial Second Lien Agent until such time as the Discharge of Initial Second Lien Obligations has occurred and (b) thereafter, the Second Lien Agent designated by the Second Lien Instructing Group.

"**DIP Financing**": the obtaining of credit or incurring debt secured by Liens on all or any portion of the Collateral pursuant to section 364 of the Bankruptcy Code (or similar Bankruptcy Law).

"**DIP Liens**": as defined in Section 6.2.

"**Discharge of First Lien Obligations**": (a) actual payment in full in cash of the principal of and any premium and interest (including interest accruing on or after the commencement of an Insolvency Proceeding, whether or not such interest would be allowed or allowable in such proceeding) on all outstanding Obligations (or such similar or equivalent term) (as defined in the First Lien Loan Agreement) included in the First Lien Obligations in an amount, as to principal, that is limited to the Maximum First Lien Principal Amount, (b) actual payment or, in the case of contingent obligations, cash collateralization in full in cash, or as otherwise provided in clause (d) below with respect to First Lien Letters of Credit, of all other First Lien Obligations (including, without duplication of clause (d) below, First Lien Letter of Credit Obligations and including indemnification obligations in respect of known contingencies and fees, costs or charges accruing on or after the commencement of an Insolvency Proceeding, whether or not such fees, costs or charges would be allowed or allowable in the proceeding) that are due and payable or otherwise accrued and owing at or prior to the time the amounts referenced in clause (a) above  are paid (other than contingent indemnification Obligations for which no claim or demand for payment, whether oral or written, has been made at such time) other than the portion of accrued and unpaid interest and fees on account of principal in excess of the Maximum First Lien Principal Amount, (c) termination or expiration of all commitments to extend credit that would be First Lien Obligations (other than with respect to Secured Bank Product Obligations as to which satisfactory arrangements have been made with the applicable party in interest), (d) termination and return for cancellation or cash collateralization (in an amount and manner required by the First Lien Loan Documents (but in no event, cash collateralization greater than 105% of the aggregate undrawn face amount) or otherwise reasonably satisfactory to the First Lien Agent, including by means of back to back letters of credit) of all First Lien Letters of Credit, and (e) no Person has any further right to obtain any loans, First Lien Letters of Credit, or other extensions of credit under the documents relating to such First Lien Obligations.

4

"**Discharge of Initial Second Lien Obligations**": the Discharge of Second Lien Obligations consisting of the Initial Second Lien Obligations.

"**Discharge of Second Lien Obligations**": with respect to any class or series of Second Lien Obligations or with respect to all Second Lien Obligations, as context requires, (a) actual payment in full in cash of the principal of and any premium and interest (including interest accruing on or after the commencement of an Insolvency Proceeding, whether or not such interest would be allowed or allowable in such proceeding) on all outstanding Obligations (or such similar or equivalent term) (as defined in the applicable Second Lien Loan Agreement) included in the Second Lien Obligations, (b) actual payment in full in cash of all other Second Lien Obligations (including indemnification obligations in respect of known contingencies and fees, costs or charges accruing on or after the commencement of an Insolvency Proceeding, whether or not such fees, costs or charges would be allowed or allowable in the proceeding) that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than contingent indemnification Obligations for which no claim or demand for payment, whether oral or written, has been made at such time), (c) termination or expiration of all commitments to extend credit that would be Second Lien Obligations, and (d) no Person has any further right to obtain any loans or other extensions of credit under the documents relating to such Second Lien Obligations.

"**Disposition**": any sale, lease, exchange, transfer or other disposition, and "**Dispose**" and "**Disposed of**" shall have correlative meanings.

"**Distribution**": with respect to any indebtedness or obligation, (a) any payment or distribution by any Person of cash, securities or other property, by setoff or otherwise, on account of such indebtedness or obligation or (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person.

"**Documents**": the First Lien Documents and the Second Lien Documents, or any of them.

"**Enforcement Action**": (a) to take any action to foreclose, execute, levy, or collect on, take possession or control (other than for the sole purpose of perfecting a Secured Party's Lien on such Collateral) of, sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), any Collateral, or otherwise exercise or enforce remedial rights with respect to any Collateral under the First Lien Documents or the Second Lien Documents, as applicable (including by way of set-off, recoupment, notification of a public or private sale or other disposition pursuant to the UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, securities intermediaries under securities accounts or commodities intermediaries under commodities accounts, or exercise of rights under landlord consents, bailee waivers or similar agreements, if applicable, but excluding notifications to depository banks under deposit account control agreements or notifications to securities intermediaries under securities account control agreement, if applicable, in each case by the First Lien Agent or the Designated Second Lien Agent, as applicable), (b) to, or to enter into any agreement in order to have a third party to, solicit bids to effect the liquidation or disposition of Collateral or to engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of   marketing,

5

promoting, or selling any Collateral, (c) to receive a transfer of any Collateral (other than a payment in respect of Obligations initiated by any Borrower while no Event of Default is continuing) in satisfaction of any Obligation secured thereby or make a credit bid for the purpose of doing so (whether or not in an Insolvency Proceeding), (d) to otherwise enforce a security interest or exercise another right or remedy, as a secured creditor, pertaining to the Collateral at law, in equity, or pursuant to the First Lien Documents or Second Lien Documents, as applicable (including exercising voting rights in respect of equity or debt interests comprising any of the Collateral), (e) to effect the Disposition of any Collateral by any Obligor after the occurrence and during the continuation of an Event of Default, (f) to commence any legal proceedings or actions against or with respect to any Obligor or any of such Obligor's assets for the purpose of effecting or facilitating any of the actions described in clauses (a) through (e) above, or (g) to commence any Insolvency Proceeding against any Obligor. For the avoidance of doubt, the term "Enforcement Action" does not include (i) any non-judicial procedural actions that may be required or desired as a precondition to acceleration or relating to preservation of rights (such as giving a notice of default or reservation of rights (including reservation of acceleration rights)), (ii) any action relating to the perfection or preservation of a Lien (but not enforcement), subject to the terms of this Agreement, in Collateral (such as filing a financing statement), (iii) any imposition of a default rate of interest up to a rate permitted pursuant to the terms of this Agreement, (iv) any action to enforce the terms of any subordination agreement with respect to any indebtedness or other obligation that is subordinated to the Second Lien Obligations to the extent such action is not otherwise inconsistent with the terms or provisions of this Agreement or (v) any Debt Action.

"**Event of Default**": each "Event of Default" or similar term, as such term is defined in any First Lien Document or any Second Lien Document, as applicable.

"**Excess First Lien Obligations**": the principal amount of any First Lien Obligations in excess of the Maximum First Lien Principal Amount.

"**Excess Second Lien Obligations**": the principal amount of any Second Lien Obligations in excess of the Maximum Second Lien Principal Amount.

"**Exigent Circumstances**": circumstances that the First Lien Agent reasonably believes in good faith render necessary or appropriate an Enforcement Action to prevent or mitigate the imminent destruction of, physical harm to, impairment of or decrease in value of the Collateral or the rights and interests of the First Lien Creditors therein (including without limitation any loss of priority of the Liens of the First Lien Creditors).

"**Final Order**": an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for new trial, reconsideration, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or from which certiorari, reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for new trial, reconsideration, reargument or rehearing shall have expired; provided that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil

6

Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

"**First Lien Agent**": as defined in the preamble to this Agreement (including any New First Lien Agent that is deemed to be the First Lien Agent pursuant to Section 4.5).

"**First Lien Collateral Documents**"**:** the First Lien Loan Agreement, the "Collateral Documents" as defined in the First Lien Loan Agreement, and any other documents or instruments granting or purporting to grant a Lien on real or personal property to secure a First Lien Obligation or granting rights or remedies with respect to such Liens.

"**First Lien Creditors**": the First Lien Agent, the First Lien Lenders and the other Persons from time to time holding First Lien Obligations (including each Cash Management Bank and Hedge Bank as such terms are defined in the First Lien Loan Agreement).

"**First Lien Documents**": the First Lien Loan Agreement, all Loan Documents (as such term is defined in the First Lien Loan Agreement) and all other agreements, instruments and other documents at any time executed or delivered by any Obligor or any other Person with, to or in favor of the First Lien Agent or any other First Lien Creditor in connection therewith or related thereto, including any New First Lien Documents and any other documents evidencing initial and subsequent Refinancings of the First Lien Obligations, in each case, as the same may be amended, amended and restated, supplemented, modified, replaced, substituted, extended or renewed from time to time.

"**First Lien Lenders**": as defined in the recitals hereto.

"**First Lien Letter of Credit**": any letter of credit issued by a First Lien Creditor pursuant to the First Lien Documents.

"**First Lien Letter of Credit Obligations**": all outstanding Obligations incurred by or owing to the First Lien Creditors, whether direct or indirect, contingent or otherwise, due or not due, in connection with First Lien Letters of Credit or the purchase of a participation with respect to First Lien Letters of Credit, including any unpaid reimbursement obligations in respect thereof and obligations to provide cash collateral in respect of First Lien Letters of Credit.  The amount of such First Lien Letter of Credit Obligations shall equal the maximum amount, without duplication, that may be payable at any time to the issuer and the First Lien Creditors pursuant thereto.

"**First Lien Loan Agreement**": (a) the Initial First Lien Loan Agreement and (b) each loan or credit agreement evidencing any replacement, substitution, renewal, or initial or subsequent Refinancing of the Obligations under the Initial First Lien Loan Agreement, including any New First Lien Loan Agreement, in each case, as the same may be amended, amended and restated, supplemented, modified, replaced, substituted, extended or renewed from time to time or Refinanced in accordance with the terms of this Agreement.

"**First Lien Loans**": any loans or advances outstanding under the First Lien Documents.

7

"**First Lien Obligations**": all Obligations of the Obligors under (a) the First Lien Loan Agreement and the other First Lien Documents, including the guaranties under the First Lien Documents and any First Lien Letter of Credit Obligations, (b) any agreements evidencing or securing Secured Bank Product Obligations, or (c) any other agreement or instrument granting or providing for the perfection of a Lien securing any of the foregoing.  Notwithstanding any other provision hereof, the term "First Lien Obligations" will include accrued premiums, interest, fees, costs, and other charges incurred under the First Lien Loan Agreement or the other First Lien Documents and agreements evidencing or securing the Secured Bank Product Obligations, whether incurred before or after the commencement of an Insolvency Proceeding, and whether or not allowed or allowable in an Insolvency Proceeding.  To the extent that any payment with respect to the First Lien Obligations (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, avoided, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Governmental Authority**": any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Guarantor**":  any guarantor with respect to the Second Lien Obligations or any guarantor with respect to the First Lien Obligations.

"**Indemnified First Lien Person**": as defined in <u>Section 5.1</u>.

"**Initial First Lien Loan Agreement**": as defined in the recitals hereto.

"**Initial Requisite Second Lien Creditors**": the "Required Lenders" or similar term as defined in the Initial Second Lien Loan Agreement.

"**Initial Second Lien Agent**": as defined in the preamble (including any New Second Lien Agent that is deemed to be the Second Lien Agent pursuant to <u>Section 4.5</u>).

"**Initial Second Lien Collateral Documents**": the Initial Second Lien Loan Agreement, the "Collateral Documents" as defined in the Initial Second Lien Loan Agreement, and any other documents or instruments granting or purporting to grant a Lien on real or personal property to secure a Second Lien Obligation under the Initial Second Lien Loan Agreement or granting rights or remedies with respect to such Liens.

"**Initial Second Lien Creditors**": the Initial Second Lien Agent, the Initial Second Lien Lenders and the other Persons from time to time holding Second Lien Obligations under the Initial Second Lien Loan Agreement.

"**Initial Second Lien Lender**": as defined in the recitals hereto.

8

"**Initial Second Lien Loan Agreement**": as defined in the recitals hereto.

"**Initial Second Lien Documents**": the Initial Second Lien Loan Agreement, all Loan Documents (as such term or similar term is defined in the Initial Second Lien Loan Agreement) and all other agreements, instruments and other documents at any time executed or delivered by any Obligor or any other Person with, to or in favor of the Initial Second Lien Agent or any Initial Second Lien Creditor in connection therewith or related thereto, including such documents evidencing successive Refinancings of the Initial Second Lien Obligations, in each case, as the same may be amended, amended and restated, supplemented, modified, replaced, substituted or renewed from time to time.

"**Initial Second Lien Obligations**": all Obligations of the Obligors under (a) the Initial Second Lien Loan Agreement and the other Initial Second Lien Documents, (b) the guaranties under the Initial Second Lien Documents, or (c) any other agreement or instrument granting or providing for the perfection of a Lien securing any of the foregoing. Notwithstanding any other provision hereof, the term "Initial Second Lien Obligations" will include accrued premiums, interest, fees, costs, and other charges incurred under any Initial Second Lien Loan Agreement and the other Initial Second Lien Documents, whether incurred before or after the commencement of an Insolvency Proceeding, and whether or not allowed or allowable in an Insolvency Proceeding. To the extent that any payment with respect to the Initial Second Lien Obligations (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off or recoupment, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, avoided, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Insolvency Proceeding**": as to any Obligor, any of the following:  (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in (a) and (b) above, undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"**Junior Adequate Protection Liens**": as defined in Section 6.3(b).

"**Lien**": any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a capital lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"**Maximum First Lien Principal Amount**": the sum of (a) the excess of (x) the sum of (1) $[115,000,000],[1] plus (2) the amount of increases in Commitments (as defined in the First Lien Loan Agreement) incurred under the First Lien Loan Agreement after the date hereof

---

[1] NTD: 115% of the commitments as of the closing date.

without giving effect to any amendment, waiver or modification of the terms and conditions set forth in the First Lien Loan Agreement (as in effect on the date hereof) to the extent such amendment, waiver or modification would permit an increase in the aggregate principal amount of Commitments that would not otherwise be permitted to be incurred under the First Lien Loan Agreement (as in effect on the date hereof), plus (3) 15% of the amount described in clause (2) above; over (y) the sum of permanent reductions of the Commitments under the First Lien Loan Agreement (excluding any permanent reductions in such commitments resulting from the commencement of any Insolvency Proceeding or resulting from the exercise by any or all of the First Lien Creditors of their right to reduce or terminate such commitments following the occurrence and during the continuance of any First Lien Default), so long as the principal amount of any First Lien Loans in excess of the Commitments as so reduced, and accrued, unpaid interest thereon, have been paid in full, excluding, in the case of this clause (y), reductions resulting from a Refinancing permitted hereunder or a "roll-up" of such Obligations in connection with a DIP Financing, plus (b) amounts in respect of interest, fees, costs and premium (if any), in each case above accruing in respect of or attributable to, but only accruing in respect of or attributable to, the aggregate principal amount of the First Lien Obligations (including the undrawn amount of all First Lien Letters of Credit constituting First Lien Obligations)) at any one time not to exceed the amount referred to in clause (a) above, in each case that have been paid in-kind or capitalized, plus (c) Secured Bank Product Obligations owing by Obligors to the First Lien Creditors.

"**Maximum Second Lien Principal Amount**": the sum of: (a) the excess of (x) the sum of (1) $250,000,000, plus (2) the principal amount of (A) additional pari passu second lien debt incurred under the Initial Second Lien Loan Agreement and (B) any Additional Second Lien Debt incurred after the date hereof, in each case, to the extent the incurrence of such additional pari passu second lien debt would be permitted to be incurred by the Initial Second Lien Loan Agreement (as in effect on the date hereof),  over (y) principal payments applied to Second Lien Loans (including voluntary and mandatory prepayments but specifically excluding prepayments occurring in connection with Refinancings permitted hereunder or a "roll-up" of such Obligations in connection with a DIP Financing), plus (b) amounts in respect of interest, fees, costs and premium (if any), in each case above accruing in respect of or attributable to, but only accruing in respect of or attributable to, the aggregate principal amount of the Second Lien Obligations (including the aggregate original principal amount of any Second Lien Loan that is a Second Lien Obligation) at any one time not to exceed the amount referred to in clause (a) above, in each case that have been paid-in-kind or capitalized.

"**New First Lien Agent**": as defined in Section 4.5(a).

"**New First Lien Documents**": as defined in Section 4.5(a).

"**New First Lien Loan Agreement**": any loan or credit agreement evidencing New First Lien Obligations.

"**New First Lien Obligations**": as defined in Section 4.5(a).

"**New Second Lien Agent**": as defined in Section 4.5(b).

"**New Second Lien Documents**": as defined in Section 4.5(b).

"**New Second Lien Loan Agreement**": any loan or credit agreement evidencing New Second Lien Obligations.

"**New Second Lien Obligations**": as defined in <u>Section 4.5(b)</u>.

"**Obligations**": with respect to any Obligor, all amounts, obligations, liabilities, covenants and duties of every type and description owing by such Obligor to any Secured Creditor (including any Cash Management Bank or Hedge Bank as such terms are defined in the First Lien Loan Agreement) arising out of, under, or in connection with, any agreement, whether direct or indirect (regardless of whether acquired by assignment), absolute or contingent, due or to become due, whether liquidated or not, now existing or hereafter arising and however acquired, and whether or not evidenced by any instrument or for the payment of money (including all interest, fees, costs and charges whether incurred before or after the commencement of any Insolvency Proceeding with respect to any Obligations, whether or not a claim for any post-filing or post-petition interest, fees, and charges is allowed or allowable in any such proceeding), including all other fees, expenses (including fees, charges and disbursement of counsel), interest, commissions, charges, costs, disbursements, indemnities and reimbursement of amounts paid and other sums chargeable to such Obligor under any agreement (including those payable in connection with First Lien Letters of Credit).

"**Obligor**": each Borrower, each Guarantor and each other Person that is a subsidiary of the Parent Borrower liable on or in respect of the First Lien Obligations or Second Lien Obligations or that has granted or purported to grant a Lien on any assets as Collateral to secure the First Lien Obligations or Second Lien Obligations, together with such Person's successors and assigns, including a receiver, trustee or debtor-in-possession on behalf of such Person.

"**Parent Borrower**":  as defined in the preamble hereof.

"**Party**": a party to this Agreement (other than the Obligors).

"**Permitted Second Lien Disposition**" a Disposition (excluding any collection of any Collateral consisting of an obligation) of any Collateral in connection with an Enforcement Action by any one or more Second Lien Creditors after the expiration of the Standstill Period and subject to the terms of <u>Section 3.1</u> of this Agreement, which Disposition is undertaken on an arm's-length basis with parties that are not Affiliates of any of the Second Lien Creditors.

"**Person**": an individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture, other entity or Governmental Authority.

"**Pledged Collateral**": any Collateral in the possession or control (as defined in Section 3.3) of the First Lien Agent or a Second Lien Agent.

"**Proceeds**": (a) all "proceeds," as defined in Article 9 of the UCC, of the Collateral, and (b) whatever is recovered when any Collateral is sold, exchanged, collected or Disposed of, whether voluntarily or involuntarily, including any additional or replacement Collateral provided during any Insolvency Proceeding and any payment or property received in

11

an Insolvency Proceeding on account of, or from, Collateral, an interest in Collateral or the value of any Collateral.

"**Purchase Date**": as defined in Section 5.2.

"**Purchase Event**": as defined in Section 5.1.

"**Purchase Notice**": as defined in Section 5.2.

"**Purchase Obligations**": as defined in Section 5.1.

"**Purchase Price**": as defined in Section 5.3.

"**Purchasing Creditors**": as defined in Section 5.2.

"**Recovery**": as defined in Section 6.8.

"**Refinance**": in respect of any First Lien Obligations or Second Lien Obligations or the commitments related thereto, to refinance, replace, refund, or repay, or to issue other Obligations or commitments in exchange or replacement for such Obligations or commitments relating thereto (whether or not fully utilized) in whole or in part, whether with the same or different lenders, agents, or arrangers. "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Release Documents**": termination statements, releases, and other documents reasonably necessary or advisable to release, release of record, or evidence the release of a Lien or, in the case of the disposition of Stock of an Obligor, of a guaranty obligation.

"**Requisite Second Lien Creditors**": (a) the Initial Requisite Second Lien Creditors until the Discharge of Initial Second Lien Obligations has occurred and (b) thereafter, the "Requisite Lenders" or "Required Lenders" (or any similar term) as defined under the Controlling Second Lien Loan Agreement, as applicable.

"**Second Lien Agent**": (i) with respect to the Initial Second Lien Documents, the Initial Second Lien Agent, (ii) with respect to any Additional Second Lien Documents, the applicable Additional Second Lien Agent, or (iii) with respect to any New Second Lien Document, the applicable New Second Lien Agent that is deemed to be a Second Lien Agent pursuant to Section 4.5.  For the avoidance of doubt, any reference to the Second Lien Agent shall mean each Second Lien Agent party hereto.

"**Second Lien Class Debt**": as defined in Section 8.22.

"**Second Lien Class Debt Parties**": as defined in Section 8.22.

"**Second Lien Class Debt Agent**": as defined in Section 8.22.

"**Second Lien Collateral Documents**": the Initial Second Lien Collateral Documents and any Additional Second Lien Collateral Documents.

12

"**Second Lien Creditors**": any Initial Second Lien Creditors and any Additional Second Lien Creditors.

"**Second Lien Default**": any "Event of Default" or similar term, as such term is defined under the Second Lien Documents.

"**Second Lien Default Notice**": with respect to any Second Lien Default, a written notice from the Designated Second Lien Agent to the First Lien Agent, with a copy to the Obligors, stating that such notice is a "Second Lien Default Notice," indicating that such Second Lien Default has occurred, describing such Second Lien Default in reasonable detail and stating that the Designated Second Lien Agent or Requisite Second Lien Creditors have commenced the Standstill Period as a result of any such Second Lien Default.

"**Second Lien Documents**": (a) any Initial Second Lien Documents, (b) any Additional Second Lien Documents and (c) any New Second Lien Documents that are deemed to be Second Lien Documents pursuant to Section 4.5.

"**Second Lien Instructing Group**": (a) the Initial Second Lien Creditors until the Discharge of Initial Second Lien Obligations has occurred and (b) thereafter, the Second Lien Creditors with respect to the Controlling Second Lien Loan Agreement.

"**Second Lien Lender**": (a) any Initial Second Lien Lender and (b) any Additional Second Lien Lender.

"**Second Lien Loan Agreement**": (a) the Initial Second Lien Loan Agreement, (b) any Additional Second Lien Loan Agreement, or (c) each loan or credit agreement, indenture or other agreement evidencing any increase, replacement, substitution, renewal, or initial or subsequent Refinancing of the Obligations under a Second Lien Loan Agreement, including any New Second Lien Loan Agreement, in each case as the same may be amended, amended and restated, supplemented, modified, replaced, substituted or renewed from time to time or Refinanced in accordance with the terms of this Agreement.

"**Second Lien Loans**": the loans or advances outstanding under any Second Lien Loan Agreement.

"**Second Lien Obligations**": (a) any Initial Second Lien Obligations and (b) any Additional Second Lien Obligations.

"**Secured Bank Product Obligations**": all obligations and other liabilities owing by any Obligor to any First Lien Creditor under or in connection with any Secured Cash Management Agreement or Secured Hedge Agreement (as such terms are defined in the First Lien Loan Agreement).

"**Secured Creditors**": the First Lien Creditors and the Second Lien Creditors, or any of them.

"**Senior Adequate Protection Liens**": as defined in Section 6.2.

13

"**Standstill Period**": the period commencing on the date of a Second Lien Default and ending upon the date which is the earlier of (a) 150 days after the First Lien Agent has received a Second Lien Default Notice with respect to such Second Lien Default and (b) the date on which the Discharge of First Lien Obligations shall have occurred; provided that in the event that as of any day during such 150 days, no Second Lien Default is continuing, then the Standstill Period shall be deemed not to have commenced.

"**Stock**": all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"**UCC**": the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect in the State of New York.

"**Voting Stock**": Stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees or other controlling Persons of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the occurrence of any contingency).

1.2    **Certain Matters of Construction.**  Unless otherwise stated or the context clearly requires otherwise: (a) references to the First Lien Agent or the Second Lien Agent will refer to the First Lien Agent or the Second Lien Agent acting on behalf of itself and on behalf of all of the other First Lien Creditors or Second Lien Creditors, respectively; (b) definitions of terms apply equally to the singular and plural forms; pronouns will include the corresponding masculine, feminine, and neuter forms; (c) "will" and "shall" have the same meaning; (d) in computing periods from a specified date to a later specified date, (i) the words "from" and "commencing on" (and the like) mean "from and including," (ii) the words "to," "until" and "ending on" (and the like) mean "to but excluding" and (iii) the word "through" means "to and including"; (e) "including" means "including, but not limited to"; (f) references to a statute refer to the statute and all regulations promulgated under or implementing the statute as in effect at the relevant time, and references to a specific provision of a statute or regulation include successor provisions; (g) references to a section of the Bankruptcy Code also refer to any similar provision of other Bankruptcy Law; (h) section references refer to sections of this Agreement, references to numbered sections refer to all included sections (for example, a reference to Section 6 also refers to Sections 6.1, 6.1(a), etc.), and references to a section or article in an agreement, statute, or regulation include successor and renumbered sections and articles of that or any successor agreement, statute, or regulation; (i) references to a Person include the Person's permitted successors and assigns; (j) "herein," "hereof," "hereunder," and words of similar import refer to this Agreement in its entirety and not to any particular provision; and (k) "asset" and "property" have the same meaning and refer to both real and personal, tangible and intangible assets and property, including cash, securities, accounts, and general intangibles, wherever located.

Section 2.    **Security Interests; Priorities.**

14

2.1     Priorities.   Each Secured Creditor hereby acknowledges that other Secured Creditors have been granted Liens upon the Collateral to secure their respective Obligations.   A Lien on Collateral securing or purporting to secure any First Lien Obligation (other than Excess First Lien Obligations) will at all times be senior and prior in all respects to a Lien on such Collateral securing or purporting to secure any Second Lien Obligation, and a Lien on Collateral securing or purporting to secure any Second Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing or purporting to secure any First Lien Obligation (other than Excess First Lien Obligations).   A Lien on Collateral securing or purporting to secure any Second Lien Obligation (other than Excess Second Lien Obligations) will at all times be senior and prior in all respects to a Lien on such Collateral securing or purporting to secure any Excess First Lien Obligation, and a Lien on Collateral securing or purporting to secure any Excess First Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing or purporting to secure any Second Lien Obligation (other than Excess Second Lien Obligations).   A Lien on Collateral securing or purporting to secure any Excess First Lien Secured Obligation will at all times be senior and prior in all respects to a Lien on such Collateral securing or purporting to secure any Excess Second Lien Obligation, and a Lien on Collateral securing or purporting to secure any Excess Second Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing or purporting to secure any Excess First Lien Obligation.

2.2     No Alteration of Priority.   Except as otherwise expressly provided herein, the priority of the Liens securing the First Lien Obligations and Second Lien Obligations, and the rights and obligations of the Parties under this Agreement, will remain in full force and effect irrespective of   (a) how a Lien was acquired (whether by grant, possession, control, statute, operation of law, subrogation, judgment or otherwise), (b) the time, manner, or order of the grant, attachment, filing, recordation, or perfection of a Lien, (c) any conflicting provision of the UCC or other applicable law, (d) any defect or deficiencies in, or non-perfection (including any failure to perfect or lapse in perfection), setting aside, recharacterization, or avoidance of, any Lien or a First Lien Document or a Second Lien Document, (e) the modification, subordination or recharacterization of a First Lien Obligation or a Second Lien Obligation, (f) the modification of a First Lien Document or the modification of a Second Lien Document, (g) the voluntary or involuntary subordination of a Lien on Collateral securing a First Lien Obligation or Second Lien Obligation to a Lien securing another obligation of an Obligor or other Person, (h) the exchange of a security interest in any Collateral for a security interest in other Collateral, (i) the commencement of an Insolvency Proceeding, or (j) any other circumstance whatsoever, including a circumstance that might be a defense available to, or a discharge of, an Obligor in respect of a First Lien Obligation or a Second Lien Obligation or holder of such Obligation and notwithstanding any conflicting terms or conditions which may be contained in any of the Documents.

2.3     Perfection; Contesting Liens.   Except as provided in Section 3.3 as between the First Lien Creditors and Second Lien Creditors, (a) the First Lien Agent will be solely responsible for perfecting and maintaining the perfection of its Liens on the Collateral, and (b) subject to Section 3.3, each Second Lien Agent (acting at the written direction of the applicable Second Lien Creditors) will be solely responsible for perfecting and

15

maintaining the perfection of its Liens on the Collateral.  This Agreement is intended solely to govern the respective Lien priorities as between the First Lien Creditors and the Second Lien Creditors and does not impose on the First Lien Creditors or the Second Lien Creditors any obligations in respect of the disposition of Proceeds of foreclosure on any Collateral that would conflict with a prior perfected claim in favor of another Person, an order or decree of a court or other Governmental Authority, or applicable law.  The First Lien Agent and the First Lien Creditors will have no liability to any Second Lien Creditor for (and each Second Lien Agent hereby waives, on behalf of itself and the other Second Lien Creditors, any claim arising from) any action or inaction by a First Lien Creditor with respect to any First Lien Document, First Lien Obligations or Collateral, including (1) the maintenance, preservation, or collection of the First Lien Obligations or any Collateral, and (2) the foreclosure upon, or the sale, liquidation, maintenance, preservation, or other disposition of, any Collateral, including any such action or inaction that results in a default or event of default under the Second Lien Documents.  After the Discharge of First Lien Obligations and the Excess First Lien Obligations, the Second Lien Agent and the Second Lien Creditors will have no liability to any First Lien Creditor for (and the First Lien Agent hereby waives, on behalf of itself and the other First Lien Creditors, any claim arising from) any action or inaction by a Second Lien Creditor with respect to any Second Lien Document, Second Lien Obligations or Collateral, including (1) the maintenance, preservation, or collection of the Second Lien Obligations or any Collateral, and (2) the foreclosure upon, or the sale, liquidation, maintenance, preservation, or other disposition of, any Collateral, including any such action or inaction that results in a default or event of default under the First Lien Documents.  Neither the First Lien Agent nor any Second Lien Agent will have by reason of this Agreement or any other document a fiduciary relationship with any First Lien Creditor or any Second Lien Creditor.  The parties recognize that the interests of the First Lien Agent and one or more of the Second Lien Agents may differ, and (a) the First Lien Agent may act in its own interest or in the interest of the First Lien Creditors without taking into account the interests of any Second Lien Creditor and (b) each Second Lien Agent may act in its own interest or in the interest of the Second Lien Creditors without taking into account the interests of any First Lien Creditor but in any event in compliance with, and subject to the terms of, this Agreement.  The First Lien Agent will not contest, or support any Person in contesting, directly or indirectly, in any proceeding (including an Insolvency Proceeding) the validity, enforceability, perfection, characterization or priority of any Lien securing or purportedly securing a Second Lien Obligation.  No Second Lien Agent will contest, or support any Person in contesting, directly or indirectly, in any proceeding (including an Insolvency Proceeding) the validity, enforceability, perfection, characterization or priority of any Lien securing or purportedly securing a First Lien Obligation.  Nothing in this Agreement shall be construed to prevent or impair the rights of any Secured Creditor to enforce this Agreement.

2.4     Payment Over; Application of Proceeds of Collateral.

(a)     Until the Discharge of First Lien Obligations, whether or not an Insolvency Proceeding has commenced, any Collateral or Proceeds thereof received by any Second Lien Creditor, including any such Collateral constituting Proceeds, or any payment or Distribution, that may be received by any Second Lien Creditor (i) in connection with the exercise of any right or remedy (including any right of set-off or recoupment) with respect to the Collateral, (ii) in

connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation) in respect of the Collateral, (iii) from the collection or other Disposition of, or realization on, the Collateral in any Enforcement Action or (except as provided in Section 6.10) pursuant to any Insolvency Proceeding or (iv) in violation of this Agreement, shall be segregated and held in trust and promptly paid over to the First Lien Agent, for the benefit of the First Lien Creditors, in the same form as received, with any necessary endorsements, to be applied to the First Lien Obligations (other than Excess First Lien Obligations).  The First Lien Agent is authorized to make such endorsements as agent for each Second Lien Agent.  This authorization is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations.

(b)      Upon the Discharge of First Lien Obligations and until the Discharge of Second Lien Obligations (other than Excess Second Lien Obligations), whether or not an Insolvency Proceeding has commenced, any Collateral or Proceeds thereof received by any First Lien Creditor, including any such Collateral constituting Proceeds, or any payment or Distribution, that may be received by any First Lien Creditor (i) in connection with the exercise of any right or remedy (including any right of set-off or recoupment) with respect to the Collateral, (ii) in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation) in respect of the Collateral, (iii) from the collection or other Disposition of, or realization on, the Collateral in any Enforcement Action or (except as provided in Section 6.10) pursuant to any Insolvency Proceeding or (iv) in violation of this Agreement, shall be segregated and held in trust and promptly paid over to the Designated Second Lien Agent, for the benefit of the Second Lien Creditors, in the same form as received, with any necessary endorsements, to be applied to the Second Lien Obligations other than Excess Second Lien Obligations.  The Designated Second Lien Agent is authorized to make such endorsements as agent for the First Lien Agent.  This authorization is coupled with an interest and is irrevocable until the Discharge of Second Lien Obligations (other than Excess Second Lien Obligations).

(c)      All Collateral and all Proceeds thereof received (i) after the Discharge of First Lien Obligations, shall be forthwith paid over, in the kind of funds and currency received, to the Designated Second Lien Agent for application to the Second Lien Obligations (other than the Excess Second Lien Obligation) unless otherwise required by law or court order), (ii) after the Discharge of Second Lien Obligations (other than the Excess Second Lien Obligations), shall be forthwith paid over, in the kind of funds and currency received, to the First Lien Creditors for application to the Excess First Lien Obligations, (iii) if there are no Excess First Lien Obligations outstanding, shall be forthwith paid over, in the kind of funds and currency received, to the Second Lien Creditors for application to the Excess Second Lien Obligations, and (iv) if there are no Excess Second Lien Obligations outstanding, to whomever may be lawfully entitled thereto.

(d)      The parties hereto intend that this Agreement shall establish and govern the subordination of solely (i) the Liens on the Collateral held by the Second Lien Creditors to the Liens on the Collateral held by the First Lien Creditors securing the First Lien Obligation (other than Excess First Lien Obligations), (ii) the Liens on the Collateral held by the First Lien Creditors securing the Excess First Lien Obligations to the Liens on the Collateral held by the Second Lien Creditors securing the Second Lien Obligation (other than Excess Second Lien Obligations), and (iii) the Liens on the Collateral held by the Second Lien Creditors securing the Excess Second Lien Obligations to the Liens on the Collateral held by the First Lien Creditors securing the Excess First Lien Obligations, and this Agreement shall not effectuate (or be

17

interpreted to effectuate) any other subordination of the rights, claims and/or interests of the Second Lien Creditors in respect of the Second Lien Obligations.

2.5     Release of Collateral Upon Enforcement Action or Permitted Sale or Disposition. If the First Lien Agent releases a Lien on all or any portion of the Collateral in connection with:  (a) an Enforcement Action, or (b) a Disposition of any Collateral other than pursuant to an Enforcement Action (whether or not there is an Event of Default under the First Lien Documents), then any Lien of a Second Lien Agent on such Collateral will be, except as otherwise provided below, automatically and simultaneously released to the same extent, and each Second Lien Agent will be deemed to have consented under the Second Lien Documents to such transaction free and clear of such Second Lien Agent's Lien (it being understood that each Second Lien Agent shall still, subject to the terms of this Agreement, have a security interest with respect to the Proceeds of such Collateral except to the extent applied to First Lien Obligations) and to have waived the provisions of the Second Lien Documents (but not any existing Event of Default under the Second Lien Documents) to the extent necessary to permit such transaction and will promptly execute and deliver to the First Lien Agent such Release Documents as the First Lien Agent reasonably requests to effectively release or confirm the release of such Lien of such Second Lien Agent and take such further actions as the First Lien Agent shall reasonably require in order to release or terminate such Second Lien Agent's Liens on such Collateral (or release any applicable Obligor, including any Obligor that is an issuer of the equity that is the subject of such transaction and any subsidiary thereof); provided that such release will not occur without the consent of the Designated Second Lien Agent for (x) an Enforcement Action, as to any Collateral the net cash Proceeds of the Disposition of which will not be applied to permanently repay (or otherwise reduce in the case of a "credit bid") the First Lien Obligations or any DIP Financing, or (y) a Disposition (other than a Disposition described in (a) above), if the Disposition is prohibited by a provision of any Second Lien Loan Agreement other than solely as the result of the existence of a default or Second Lien Default under the Second Lien Documents.

2.6     Power of Attorney.  Each Second Lien Agent, on behalf of the applicable Second Lien Creditors, hereby appoints the First Lien Agent and any officer or agent of the First Lien Agent, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of such Second Lien Agent and the other Second Lien Creditors or in the First Lien Agent's own name from time to time, in the First Lien Agent's discretion to take any action and to execute any and all documents and instruments that may be reasonable and appropriate solely for the purpose of carrying out the terms of Section 2.5 in accordance with the terms of Section 2.5, including any endorsements or other instruments of transfer or release. This appointment is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations or such time as this Agreement is terminated in accordance with its terms.  No Person to whom this power of attorney is presented, as authority for the First Lien Agent (or any officer or agent of the First Lien Agent) to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from any Second Lien Creditor as to the authority of the First Lien Agent (or any such officer or agent) to take any action described herein, or as to the existence of or fulfillment of any condition to this power of attorney, which is intended to grant to the First Lien Agent (or any officer or agent of the

18

First Lien Agent) the authority to take and perform the actions contemplated herein. Each Second Lien Agent irrevocably waives any right to commence any suit or action, in law or equity, against any Person which acts in reliance upon or acknowledges the authority granted under this power of attorney.  Each Second Lien Agent hereby ratifies all that said attorneys shall do or cause to be done in accordance with the power of attorney granted in this Section 2.6.

2.7     Waiver.  Each of the Secured Creditors (a) waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations under the Documents and notice of or proof of reliance by the Secured Creditors upon this Agreement and protest, demand for payment or notice except to the extent otherwise specified herein and (b) acknowledges and agrees that the other Secured Creditors have relied upon the Lien priority and other provisions hereof in entering into the Documents and in making funds available to any Borrower thereunder.

2.8     Notice of Interest In Collateral.  This Agreement is intended, in part, to constitute an authenticated notification of a claim by each Secured Creditor to the other Secured Creditors of an interest in the Collateral in accordance with the provisions of Sections 9-611 and 9-621 of the UCC.

2.9     New Liens.

(a)     So long as the Discharge of First Lien Obligations shall not have occurred, the Parties agree that no additional Liens shall be granted or permitted on any asset of the Parent Borrower or any other Obligor to secure any Second Lien Obligation unless, subject to the terms of this Agreement, immediately after giving effect to such grant or concurrently therewith, a Lien shall be granted on such asset to secure the First Lien Obligations subject to the terms of this Agreement.  To the extent that the foregoing provisions of this subsection (a) are not complied with for any reason, without limiting any other rights and remedies available to the First Lien Agent or the First Lien Creditors, each Second Lien Agent, on behalf of the Second Lien Creditors, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.9 shall be subject to the terms of this Agreement, including the turnover provisions of Section 2.4.

(b)     So long as the Discharge of Second Lien Obligations shall not have occurred, the Parties agree that no additional Liens shall be granted or permitted on any asset of the Parent Borrower or any other Obligor to secure any First Lien Obligation unless, subject to the terms of this Agreement, immediately after giving effect to such grant or concurrently therewith, a Lien shall be granted on such asset to secure the Second Lien Obligations subject to the terms of this Agreement.  To the extent that the foregoing provisions of this subsection (b) are not complied with for any reason, without limiting any other rights and remedies available to each Second Lien Agent or the Second Lien Creditors, the First Lien Agent, on behalf of the First Lien Creditors, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.9 shall be subject to the terms of this Agreement, including the turnover provisions of Section 2.4.

2.10    Similar Liens and Agreements.  The Parties intend that the Collateral securing the First Lien Obligations  and  the  Collateral  securing  the  Second  Lien  Obligations  be

19

identical (other than cash and other assets specifically securing only First Lien Letter of Credit Obligations).  Accordingly, subject to the other provisions of this Agreement, the Parties will use commercially reasonable efforts:

(a)       to cooperate in good faith in determining, upon the reasonable written request of the First Lien Agent or a Second Lien Agent, the specific assets included in the Collateral securing their respective Obligations, the steps taken to perfect the Liens thereon and the identity of the Obligors;

(b)       to make the forms, documents, and agreements creating or evidencing the Liens of the Parties in the Collateral materially the same, other than with respect to the relative priority of the Liens created or evidenced thereunder, the identity of the Secured Parties benefitted thereby and other matters contemplated by this Agreement; and

(c)       to provide that any Lien obtained by any Secured Creditor in respect of any judgment obtained in respect of any Obligations shall be subject in all respects to the terms of this Agreement.

Section 3.     **Enforcement of Security.**

3.1     <u>Exercise of Remedies against Collateral</u>.  (a)  Subject to subsection (b) below, until the Discharge of First Lien Obligations, the First Lien Creditors will have the exclusive right to (1) commence and maintain Enforcement Actions (including the rights to set-off or "credit bid" their debt except as otherwise provided in <u>Section 3.2</u> below), (2) subject to <u>Section 2.5</u>, make determinations regarding the release of, or restrictions with respect to, the Collateral, (3) manage, perform and enforce the terms of the First Lien Documents with respect to the Collateral, exercise and enforce all privileges and rights thereunder according to their sole discretion and the exercise of their sole business judgment, including the exclusive right to take or retake control or possession of the Collateral and to hold, prepare for sale, process, Dispose of, or liquidate the Collateral and to incur expenses in connection with such Disposition, and (4) otherwise enforce the rights and remedies of a secured creditor under the UCC and other applicable law and the Bankruptcy Laws of any applicable jurisdiction, all in such order and in such manner as the First Lien Creditors may determine in their sole discretion without consulting with or obtaining the consent of any Second Lien Creditor and regardless of whether any such exercise is adverse to the interests of any Second Lien Creditor, except as otherwise required pursuant to the UCC and applicable law, subject to the relative priorities described in <u>Section 2.1</u> and the terms of <u>Section 2.4(c)</u>.  In conducting any public or private sale under the UCC, 10 days' notice shall be deemed to be commercially reasonable notice.  Except as provided in this <u>Section 3.1</u> and <u>Section 3.2</u> below, notwithstanding any rights or remedies available to a Second Lien Creditor under any of the Second Lien Documents, applicable law or otherwise, a Second Lien Creditor shall not take any Enforcement Action.  Until the Discharge of First Lien Obligations (and subject to clause (b) below), each Second Lien Creditor (1) shall not take any action that would hinder any exercise of remedies or the taking of any Enforcement Action under the First Lien Documents, and (2) waives any right it may have as a junior lien creditor or otherwise to object to the manner in which the First Lien Agent or the First Lien Creditors may seek to take any Enforcement Action, regardless of whether any action or

20

omission by or on behalf of the First Lien Agent and the First Lien Creditors is adverse to the interest of the Second Lien Creditors.

(b)     Notwithstanding the preceding Section 3.1(a), the Designated Second Lien Agent and the Second Lien Instructing Group may commence and may continue an Enforcement Action with respect to a Second Lien Default if and provided that all of the following have occurred: (1) the Standstill Period with respect thereto shall have elapsed; (2) the First Lien Agent is not then diligently pursuing an Enforcement Action with respect to all or a material portion of the Collateral or attempting with commercially reasonable diligence to vacate any stay or prohibition against such exercise; (3) the Designated Second Lien Agent has provided the First Lien Agent at least 3 Business Days prior written notice of its intention to take such Enforcement Action, which notice (A) may be given during, but not prior to, the pendency of any Standstill Period, and (B) if such Enforcement Action will include any Disposition, such Disposition shall be a Permitted Second Lien Disposition, will specify the principal proposed terms of the sale, identity of the expected purchasers (if known) and the type and amount of consideration expected to be received; and (4) the applicable Obligor is not then a debtor in an Insolvency Proceeding.

3.2     Permitted Actions.  Notwithstanding Section 3.1(a), a Second Lien Creditor may (a) file a proof of claim or statement of interest, (b) vote on a plan of reorganization (including a vote to accept or reject a plan of partial or complete liquidation, reorganization, arrangement, composition, or extension), and make other filings, arguments, and motions, with respect to the Second Lien Obligations and the Collateral in any Insolvency Proceeding commenced by or against any Obligor in a manner not inconsistent with the other terms of this Agreement; (c) take action to create, prove, perfect, preserve, or protect (but not enforce) its Lien on the Collateral or establish the priority (subject to the prior ranking of the First Lien Obligations up to the Maximum First Lien Principal Amount), so long as such actions are not adverse to the priority status in accordance with this Agreement of Liens on the Collateral securing the First Lien Obligations or the First Lien Creditors' rights to exercise remedies or otherwise not in accordance with this Agreement; (d) file necessary pleadings, objections, motions or agreements in opposition to a motion, claim, adversary proceeding, or other pleading objecting to or otherwise seeking the disallowance of a Second Lien Obligation or a Lien securing the Second Lien Obligations; (e) join (but not exercise any control over) a judicial foreclosure or Lien enforcement proceeding with respect to the Collateral initiated by the First Lien Agent, to the extent that such action could not reasonably be expected to interfere materially with the Enforcement Action, but no Second Lien Creditor may receive any Proceeds thereof unless expressly permitted herein; (f) bid for or purchase Collateral at any public, private, or judicial foreclosure upon such Collateral initiated by any First Lien Creditor, or any sale of Collateral during an Insolvency Proceeding; provided that such bid may not include a "credit bid" in respect of any Second Lien Obligations unless the net cash Proceeds of such bid are otherwise sufficient to cause the Discharge of First Lien Obligations and are applied to cause the Discharge of First Lien Obligations, in each case, at the closing of such bid; (g) accelerate any Second Lien Obligations in accordance with the provisions of the Second Lien Documents; (h) seek adequate protection, and exercise other rights and remedies, during an Insolvency Proceeding to the extent expressly permitted by Section 6; (i) exercise its rights and remedies as an unsecured creditor in a manner not inconsistent with the other terms of

21

this Agreement, including taking any action, filing any pleading, appearing in any proceeding and exercising any rights and remedies that could be exercised by an unsecured creditor in accordance with applicable law; and (j) deliver any notice of default in respect of the Second Lien Obligations, reservation of rights, or similar letters or notices to any Obligors under any Second Lien Debt Document.  No provision hereof shall be construed to prohibit the payment by any Borrower of regularly scheduled principal, interest and other amounts owed in respect of the Second Lien Obligations so long as the receipt thereof is not the direct or indirect result of any Enforcement Action.

3.3     Collateral In Possession.

(a)     If the First Lien Agent has any Pledged Collateral in its possession or control, then, subject to Section 2.1 and this Section 3.3, the First Lien Agent will possess or control such Pledged Collateral as bailee or agent for perfection for the benefit of each Second Lien Agent as secured parties, so as to satisfy the requirements of sections 8-106(d)(3), 8-301(a)(2), and 9-313(c) of the UCC.  The First Lien Agent will have no obligation to any Second Lien Creditor to ensure that any Pledged Collateral is genuine or owned by any of the Obligors or to preserve rights or benefits of any Person except as expressly set forth in this Section 3.3.  In this Section 3.3, "control" has the meaning given that term in sections 8-106 and 9-314 of the UCC.

(b)     The duties or responsibilities of the First Lien Agent under this Section 3.3 will be limited solely to possessing or controlling the applicable Pledged Collateral as bailee or agent for perfection in accordance with this Section 3.3 and delivering such Pledged Collateral upon a Discharge of First Lien Obligations as provided in subsection (e) below.  Each Second Lien Agent hereby waives and releases the First Lien Agent from all claims and liabilities arising out of the First Lien Agent's role under this Section 3.3 as bailee or agent with respect to any Pledged Collateral.  The First Lien Agent makes no representation or warranty as to whether the provision of this Section 3.3 are sufficient to perfect the security interest in any Collateral in which the First Lien Agent has such possession or control.

(c)     Until the Discharge of First Lien Obligations, if any Second Lien Agent has any Pledged Collateral in its possession or control, then, subject to Section 2.1 and this Section 3.3, such Second Lien Agent will promptly notify the First Lien Agent of its possession or control of such Pledged Collateral and if requested by the First Lien Agent, deliver or transfer such Pledged Collateral in its possession or control, together with any necessary endorsements (which endorsements will be without recourse and without any representation or warranty), to the First Lien Agent in such manner as the First Lien Agent shall reasonably direct.  Until such delivery or transfer is complete, the applicable Second Lien Agent shall possess or control such Pledged Collateral as bailee or agent for perfection for the benefit of the First Lien Agent as secured party, so as to satisfy the requirements of sections 8-106(d)(3), 8-301(a)(2), and 9-313(c) of the UCC.  No Second Lien Agent will have any obligation to any First Lien Creditor or Second Lien Creditor to ensure that any Pledged Collateral is genuine or owned by any of the Obligors or to preserve rights or benefits of any Person except as expressly set forth in this Section 3.3.

(d)     The duties or responsibilities of each Second Lien Agent under this Section 3.3 will be limited solely to possessing or controlling the Pledged Collateral as bailee or agent for perfection in accordance with this Section 3.3 and delivering the Pledged Collateral to the First Lien Agent promptly upon the request by the First Lien Agent therefor.  The First Lien Agent

22

hereby waives and releases each Second Lien Agent from all claims and liabilities arising out of such Second Lien Agent's role under this Section 3.3 as bailee or agent with respect to any Pledged Collateral.  No Second Lien Agent makes any representation or warranty as to whether the provision of this Section 3.3 are sufficient to perfect the security interest in any Collateral in which such Second Lien Agent has such possession or control.

(e)     Upon the Discharge of First Lien Obligations, First Lien Agent will deliver or transfer (subject to the terms of any control agreement) control of any Pledged Collateral in its possession or control, together with any necessary endorsements (which endorsements will be without recourse and without any representation or warranty), *first,* to the Designated Second Lien Agent if any Second Lien Obligations remain outstanding, *second*, in accordance with Section 2.4 and *third,* to the applicable Obligor or Obligors or, in the case of clauses *first*, *second* and *third*, as a court of competent jurisdiction may otherwise direct.

3.4     Waiver of Marshalling and Similar Rights.  Until the Discharge of First Lien Obligations, each Second Lien Agent and each other Second Lien Creditor, to the fullest extent permitted by applicable law, waives as to the First Lien Agent and each other First Lien Creditor any requirement regarding, and agrees not to demand, request, plead or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law.

3.5     Insurance and Condemnation Awards.  Until the Discharge of First Lien Obligations, and subject to the rights of the Obligors under the First Lien Documents, First Lien Agent will have the exclusive right to adjust settlement for any losses covered by an insurance policy covering the Collateral, and to approve an award granted in a condemnation or similar proceeding (or a deed in lieu of condemnation) affecting the Collateral, and all proceeds of such policy, award, or deed will be applied in accordance with Section 2.4 and thereafter, if no Second Lien Obligations are outstanding, to the payment to the owner of the subject property, such other Person as may be entitled thereto, or as a court of competent jurisdiction may otherwise direct.

Section 4.     **Covenants**

4.1     Amendments to First Lien Documents.  The First Lien Creditors may at any time and from time to time and without consent of or notice to any Second Lien Creditor, without incurring any liability to any Second Lien Creditor and without impairing or releasing any rights or obligations hereunder or otherwise, amend, restate, supplement, extend, modify, waive, substitute, renew or replace any or all of the First Lien Documents; provided that without the consent of the Initial Requisite Second Lien Creditors (or, after the Discharge of Initial Second Lien Obligations, each Second Lien Agent), the First Lien Creditors shall not amend, restate, supplement, extend, modify substitute, renew or (except as provided in Section 6.2) Refinance any or all of the First Lien Documents to (a) directly or indirectly increase the applicable interest rate margins on the First Lien Obligations to an amount greater than 3.0% per annum above the applicable interest rate margins on the First Lien Obligations in effect on the date hereof (excluding, without limitation, fluctuations in underlying rate indices and imposition of a default rate of 2% per annum), (b) restrict the amendment of the Second Lien Documents except as set forth in Section 4.2, (c) increase the principal portion of the First Lien

23

Obligations in excess of the Maximum First Lien Principal Amount in effect at such time (it being agreed to and understood that loans or commitments funded or incurred under the First Lien Documents at any time in compliance with this clause (c) shall be deemed permitted First Lien Obligations at all times thereafter) (and other than subject to clause (a) above, as a result of interest thereon having been paid in-kind or capitalized), or (d) modify or add any covenant, agreement or event of default under the First Lien Documents which directly restricts one or more Obligors from making payments under the Second Lien Documents which would otherwise be permitted under the First Lien Documents as in effect on the date hereof.

4.2     Amendments to Second Lien Documents.   Until the Discharge of First Lien Obligations has occurred, and notwithstanding anything to the contrary contained in the Second Lien Documents, the Second Lien Creditors shall not, without the prior written consent of the First Lien Agent, amend, restate, supplement, modify, substitute, renew or Refinance any or all of the Second Lien Documents to (a) directly or indirectly increase the applicable cash pay interest rate margin on the Second Lien Obligations to an amount greater than 3.0% per annum above the applicable interest rate margin on the Second Lien Obligations in effect on the date hereof (excluding, without limitation, fluctuations in underlying rate indices and imposition of a default rate of 2% per annum), (b) (i) shorten the maturity or weighted average life to maturity of the Second Lien Obligations as in effect on the date hereof, (ii) require that any scheduled payment on the Second Lien Obligations be made earlier than the date originally scheduled for such payment as in effect on the date hereof, or (iii) add or make more restrictive any mandatory prepayment, redemption, repurchase, sinking fund or similar requirement as any such requirements are in effect as of the date hereof, (c) modify or add any covenant, agreement or event of default under the Second Lien Documents which directly restricts one or more Obligors from making payments under the First Lien Documents which would otherwise be permitted under the Second Lien Documents as in effect on the date hereof, (d) restrict the amendment of the First Lien Documents except as set forth in Section 4.1, or (e) increase the principal amount of the Second Lien Obligations in excess of the Maximum Second Lien Principal Amount in effect at such time (it being agreed to and understood that loans or commitments funded or incurred under the Second Lien Documents at any time in compliance with this clause (e) shall be deemed permitted Second Lien Obligations at all times thereafter) (and other than subject to clause (a) above, as a result of interest thereon having been paid in-kind or capitalized).

4.3     Amendments to Collateral Documents.   If a First Lien Creditor and an Obligor modify a First Lien Collateral Document, the modification will apply automatically to any comparable provision of a Second Lien Collateral Document, without the consent of any Second Lien Creditor and without any action by any Second Lien Agent or any Obligor; provided that no such modification will (a) remove or release the Lien of the Second Lien Creditors on the Collateral, except to the extent that (1) the release is permitted hereunder and (2) there is a corresponding release of the Lien of the First Lien Creditors on the Collateral, (b) impose duties on any Second Lien Agent without its consent, (c) permit other Liens on the Collateral not permitted under the terms of the Second Lien Documents other than as provided in Section 6, or (d) by its terms be adverse to the interest of the Second Lien Creditors to a greater extent than the First Lien

24

Creditors (other than by virtue of their relative priorities and rights and obligations hereunder).

4.4    Additional Second Lien Loans.  Without the prior written consent of the First Lien Agent, in no event shall Second Lien Loans be funded after the date hereof, or the principal amount of the Second Lien Obligations otherwise be increased after the date hereof, except (i) subject to clause (a) of Section 4.2 above, as a result of interest thereon having been paid in-kind or capitalized, and (ii) additional Second Lien Loans may be funded after the date hereof in an aggregate principal amount not to exceed, when combined with the aggregate principal amount of all other outstanding Second Lien Obligations, the sum of (A) Maximum Second Lien Principal Amount, plus (B) solely in connection with a DIP Financing funded in accordance with all of the terms and conditions relating thereto set forth in clause (3) of the second paragraph of Section 6.2 below, $15,000,000.

4.5    Effect of Refinancing.

(a)    If the Discharge of First Lien Obligations is being effected through a Refinancing; provided that (1) the First Lien Agent or the Parent Borrower gives a notice of such Refinancing to each Second Lien Agent at least 2 Business Days prior to such Refinancing (except as otherwise provided in Section 6.2) and (2) the credit agreement and the other documents evidencing such new First Lien Obligations (the "**New First Lien Documents**") do not effect an amendment, supplement or other modification of the terms of the First Lien Obligations in a manner that is prohibited by Section 4.1, then (A) such Discharge of First Lien Obligations shall be deemed not to have occurred for all purposes of this Agreement, (B) the indebtedness under such Refinancing and all other obligations under the New First Lien Documents (the "**New First Lien Obligations**") shall be treated as First Lien Obligations for all purposes of this Agreement, (C) the New First Lien Documents shall be treated as the First Lien Documents for all purposes of this Agreement and (D) the agent under the New First Lien Documents (the "**New First Lien Agent**") shall be deemed to be the First Lien Agent for all purposes of this Agreement.  Upon receipt of a notice of Refinancing under the preceding sentence, which notice shall include the identity of the New First Lien Agent, each Second Lien Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the New First Lien Agent may reasonably request in order to provide to the New First Lien Agent and the holders of the New First Lien Obligations the rights and powers set forth herein; provided, that the failure of any Second Lien Agent to enter into such documents and agreements shall not affect the rights of the party that consummates the Refinancing to rely on and enforce the terms of this Agreement.

(b)    If any Discharge of Second Lien Obligations is being effected through a Refinancing; provided that (1) the applicable Second Lien Agent or the Parent Borrower gives a notice of such Refinancing to the First Lien Agent at least 2 Business Days prior to such Refinancing and (2) the credit agreement and the other documents evidencing such New Second Lien Obligations (the "**New Second Lien Documents**") do not effect an amendment, supplement or other modification of the terms of the Second Lien Obligations in a manner that is prohibited by Section 4.2, then (A) such Discharge of Second Lien Obligations shall be deemed not to have occurred for all purposes of this Agreement, (B) the indebtedness under such Refinancing and all other obligations under such New Second Lien Documents (the "**New Second Lien**

25

**Obligations**") shall be treated as Second Lien Obligations for all purposes of this Agreement, (C) the New Second Lien Documents shall be treated as Second Lien Documents for all purposes of this Agreement and (D) the agent under the New Second Lien Documents (the "**New Second Lien Agent**") shall be deemed to be a Second Lien Agent for all purposes of this Agreement. Upon receipt of a notice of Refinancing under the preceding sentence, which notice shall include the identity of the New Second Lien Agent, the First Lien Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the New Second Lien Agent may reasonably request in order to provide to the New Second Lien Agent the rights and powers set forth herein; provided, that the failure of the First Lien Agent to enter into such documents and agreements shall not affect the rights of the party that consummates the Refinancing to rely on and enforce the terms of this Agreement.

(c)       By their acknowledgement hereto, Obligors agree to cause the agreement, document or instrument pursuant to which any New First Lien Agent or any New Second Lien Agent is appointed to provide that the New First Lien Agent or New Second Lien Agent, as applicable, agrees to be bound by the terms of this Agreement.

Section 5.       **Second Lien Creditors' Purchase Option**.

5.1      Purchase Option.  If there is (a) an acceleration of the First Lien Obligations in accordance with the First Lien Loan Agreement or the commencement of any Enforcement Action by the First Lien Agent (or any of the First Lien Creditors) against all or any material portion of the Collateral following the occurrence and during the continuance of an Event of Default under the First Lien Documents (other than to exercise dominion over, or to sweep funds held in, any Obligor's deposit or securities account), (b) an Event of Default arising from the failure of any Borrower to make any payment in respect of principal, interest or fees under the First Lien Loan Agreement that is not waived by the First Lien Creditors, within 30 days of its occurrence, or (c) the commencement of an Insolvency Proceeding (each a **"Purchase Event"**), then Second Lien Creditors may, within 30 Business Days following the occurrence of such Purchase Event, and not afterwards, deliver a Purchase Notice (as defined below) to purchase all, but not less than all, of the First Lien Obligations and unfunded commitments under the First Lien Documents that if funded would constitute First Lien Obligations (collectively, the "**Purchase Obligations**") for the Purchase Price.  Notwithstanding anything in the First Lien Documents to the contrary, no consent of any Obligor to such purchase shall be required.  Such purchase will (1) include all principal of, and all accrued and unpaid interest, fees, and expenses in respect of, all First Lien Obligations, and all other First Lien Obligations and unfunded commitments under the First Lien Documents that if funded would constitute First Lien Obligations, outstanding at the time of purchase, (2) be made pursuant to an Assignment and Acceptance, but including only those representations and warranties of the Assignor thereunder as are specified in Section 5.6), whereby the Second Lien Creditors will assume all funding commitments and Obligations of First Lien Creditors under the First Lien Documents, and (3) otherwise be subject to the terms and conditions of this Section 5.  Each First Lien Creditor will retain all rights to indemnification provided in the relevant First Lien Documents for all claims and other amounts relating to facts and circumstances relating to such First Lien Creditor's holdings of the First Lien Obligations (except to the extent such claims and other amounts were included in the Purchase Price), and such rights shall be secured by

the Liens securing the First Lien Obligations.  No amendment, modification or waiver following any purchase under this Section 5 of any indemnification provisions under the First Lien Documents shall be effective as to any First Lien Creditor or any Affiliate or officer, director, employee or other related indemnified person of such First Lien Creditor ("**Indemnified First Lien Person**") without the prior written consent of such Indemnified First Lien Person, and such indemnification provisions shall continue in full force and effect for the benefit of the Indemnified First Lien Persons whether or not any First Lien Documents otherwise remain in effect.

5.2     Purchase Notice.

(a)     The Second Lien Creditors desiring to purchase all of the Purchase Obligations (the "**Purchasing Creditors**") will deliver a written notice (the "**Purchase Notice**") to the First Lien Agent in accordance with Section 5.1 above that (1) is signed by the Purchasing Creditors, (2) states that it is a Purchase Notice under this Section 5, (3) states that each Purchasing Creditor is irrevocably electing to purchase, in accordance with this Section 5, the percentage of all of the Purchase Obligations stated in the Purchase Notice for that Purchasing Creditor, which percentages must aggregate exactly 100% for all Purchasing Creditors, and (4) designates a purchase date (the "**Purchase Date**") on which the purchase will occur, that is (x) at least 5 but not more than 10 Business Days after the First Lien Agent's receipt of the Purchase Notice and (y) not more than 40 Business Days after the Purchase Event.  A Purchase Notice will be ineffective if it is received by the First Lien Agent after the occurrence giving rise to a Purchase Event under clause (b) of such definition is waived, cured or otherwise ceases to exist.

(b)     Upon the First Lien Agent's receipt of an effective Purchase Notice conforming to this Section 5.2, the Purchasing Creditors will be irrevocably obligated to purchase, and the First Lien Creditors will be irrevocably obligated to sell, the Purchase Obligations in accordance with and subject to this Section 5.  If so instructed by the Second Lien Creditors in the Purchase Notice, the First Lien Creditors shall not complete any Enforcement Action (other than (1) the exercise of dominion over any Obligor's deposit or securities accounts, (2) the collection of proceeds of accounts and payment intangibles, and (3) Enforcement Actions taken under Exigent Circumstances), as long as the purchase and sale of the Purchase Obligations provided for in this Section 5 shall have closed within 10 Business Days of the Second Lien Creditor's delivery of a Purchase Notice to the First Lien Creditors and the First Lien Creditors shall have received payment in full of the First Lien Obligations as provided for in Section 5.3 within such 10 Business Day period.

5.3     Purchase Price.   The purchase price ("**Purchase Price**") for the Purchase Obligations will equal the sum of (a) the principal amount of all loans, advances, or similar extensions of credit included in the Purchase Obligations (including unreimbursed amounts drawn on First Lien Letters of Credit, but excluding the undrawn amount of outstanding First Lien Letters of Credit), and all accrued and unpaid fees and interest thereon through the Purchase Date (including any breakage costs that would be required to be paid to the First Lien Creditors if the Obligations were prepaid on the Purchase Date), (b) the net aggregate amount then owing to counterparties with respect to Secured Bank Product Obligations, including any amounts owing to the counterparties as a result of the termination (or early termination) of any agreements with respect thereto, (c) all accrued and unpaid fees, expenses, indemnities, and other amounts owed to the First Lien

27

Creditors under the First Lien Documents on the Purchase Date and (d) amounts according to the good faith estimate of the First Lien Agent of contingent obligations in respect of claims which are known to the First Lien Agent or First Lien Creditors.  On the Purchase Date, (a) the Purchasing Creditors will execute and deliver the Assignment and Acceptance, (b) the Purchasing Creditors will pay the Purchase Price to First Lien Agent by wire transfer of immediately available funds, (c) the Purchasing Creditors will deposit with First Lien Agent or its designee, by wire transfer of immediately available funds, 105% of the aggregate undrawn amount of all then outstanding First Lien Letters of Credit or deliver back to back letters of credit issued by a bank or similar financial institution acceptable to the First Lien Agent, and (d) each of the Purchasing Creditors will execute and deliver to the First Lien Agent a waiver and release of, and covenant not to sue in respect of, all claims arising out of this Agreement and the transactions contemplated hereby as a result of exercising the purchase option contemplated by this Section 5.

5.4     Actions After Purchase Closing.  Promptly after the closing of the purchase of all Purchase Obligations, the First Lien Agent will distribute the Purchase Price to the First Lien Creditors in accordance with the terms of the First Lien Documents. The First Lien Agent will apply cash collateral to reimburse First Lien Letter of Credit issuers for drawings under First Lien Letters of Credit, any customary fees charged by the issuer in connection with such draws, and facing or similar fees.  After giving effect to each such payment, any remaining cash collateral that exceeds 105% of the sum of the aggregate undrawn amount of all then outstanding Letters of Credit and the aggregate facing and similar fees that will accrue thereon through the stated maturity of such Letters of Credit (assuming no drawings thereon before stated maturity) will be returned to the Purchasing Creditors (as their interests appear). When all Letters of Credit have been cancelled with the consent of the beneficiary thereof, expired, or been fully drawn, and after all payments from the account described above have been made, any remaining cash collateral will be returned to the Purchasing Creditors, as their interests appear. If for any reason the cash collateral is less than the amount owing with respect to any First Lien Letter of Credit, then the Purchasing Creditors will, in proportion to their interests determined as of the time of demand for such reimbursement, promptly reimburse the First Lien Agent (who will then pay the applicable First Lien Creditors) the amount of the deficiency.

5.5     No Recourse or Warranties; Defaulting Creditors.

(a)     The First Lien Creditors will be entitled to rely on the statements, representations, and warranties in the Purchase Notice without investigation, even if the First Lien Creditors are notified that any such statement, representation, or warranty is not or may not be true.

(b)     The purchase and sale of the Purchase Obligations under this Section 5 will be without recourse and without any representation or warranty whatsoever by the First Lien Creditors, except that the First Lien Creditors shall represent and warrant that on the Purchase Date, immediately before giving effect to the purchase, (i) the First Lien Creditors own the Purchase Obligations free and clear of all Liens and (ii) the First Lien Creditors have the right to assign the Purchase Obligations being sold by it and the assignment is duly authorized.

28

(c)      The obligations of the First Lien Creditors to sell their respective Purchase Obligations under this Section 5 are several and not joint and several. If a First Lien Creditor breaches its obligation to sell its Purchase Obligations under this Section 5 (a "**Defaulting Creditor**"), no other First Lien Creditor will be obligated to purchase the Defaulting Creditor's Purchase Obligations for resale to the holders of the Second Lien Obligations.  A First Lien Creditor that complies with this Section 5 will not be in default of this Agreement or otherwise be deemed liable for any action or inaction of any Defaulting Creditor, provided that nothing in this subsection (c) will affect the Purchasing Creditors' obligation to purchase all of the Purchase Obligations.

(d)      Each Obligor hereby consents to any assignment effected to one or more Purchasing Creditors pursuant to this Section 5.

Section 6.      **Bankruptcy Matters.**

6.1      Bankruptcy.  This Agreement shall be applicable both before and after the filing of any petition by or against any Obligor under the Bankruptcy Code or any other Insolvency Proceeding and all converted or succeeding cases in respect thereof.  The relative rights of the First Lien Creditors and the Second Lien Creditors in respect of any Collateral or Proceeds thereof shall continue after the filing of such petition on the same basis as prior to the date of such filing.  All references in this Agreement to any Obligor will include such Person as a debtor-in-possession and any receiver, trustee or other estate representative for such Person in an Insolvency Proceeding.  This Agreement is a "subordination agreement" under section 510(a) of the Bankruptcy Code and shall be enforceable in any Insolvency Proceeding.

6.2      Post-Petition Financing.  Until the Discharge of First Lien Obligations, if an Insolvency Proceeding has commenced, no Second Lien Creditor will, directly or indirectly, contest, protest, or object to, and each Second Lien Creditor will be deemed to have consented to, and hereby consents in advance to, (1) any use of "cash collateral" (as defined in section 363(a) of the Bankruptcy Code), and (2) the Parent Borrower or any other Obligor obtaining DIP Financing if the First Lien Agent consents to such use or DIP Financing; provided that (A) in the case of a DIP Financing or use of cash collateral, each Second Lien Agent is not required as a condition to such DIP Financing or use of cash collateral to release its Lien on the Collateral as the same may exist at the time of such DIP Financing, (B) any Second Lien Creditor may seek adequate protection as permitted by Section 6.3, (C) any Second Lien Creditor may object to the amount of any DIP Financing if, after taking into account the principal amount of such DIP Financing (after giving effect to any Refinancing or "roll-up" of First Lien Obligations) on any date, the sum of the then outstanding principal amount of any First Lien Obligations and the then outstanding principal amount of any DIP Financing (including the unfunded commitments under such DIP Financing) would exceed the Maximum First Lien Principal Amount in effect at such time plus $15,000,000, (D) in the case of a DIP Financing, the Liens securing such DIP Financing are pari passu with, or superior in priority to, the then outstanding First Lien Obligations and the Liens securing such First Lien Obligations, respectively, (E) such DIP Financing or use of cash collateral does not require any Obligor to seek confirmation of a specific plan of reorganization, and (F) such DIP Financing (including any Liens related to such DIP Financing) does not purport

29

to govern or control the timing or terms of any sale of Collateral (other than a customary asset sale covenant) or assets of Parent Borrower or any Guarantor as part of such Insolvency Proceeding, including, without limitation, any requirement for Parent Borrower or any Guarantor involved in such Insolvency Proceeding to sell assets under Section 363 of Title 11 of the Bankruptcy Code.  The Second Lien Creditors further agree that: (i) adequate notice to the Second Lien Creditors for such DIP Financing or use of cash collateral shall be deemed to have been given to the Second Lien Creditors if each Second Lien Agent receives notice in advance of the hearing to approve such DIP Financing or use of cash collateral on an interim basis and at least 5 Business Days in advance of the hearing to approve such DIP Financing or use of cash collateral on a final basis, (ii) such DIP Financing (and any First Lien Obligations) may be secured by Liens on all or a part of the assets of the Obligors that shall be superior in priority to the Liens on the assets of the Obligors held by any other Person, and (iii) the Second Lien Creditors consent to, and will, subordinate (and will be deemed hereunder to have subordinated) their Liens (A) to the Liens securing such DIP Financing (the "**DIP Liens**") on the same terms (but on a basis junior to the Liens of the First Lien Creditors subject to the maximum cap for First Lien Obligations permitted by this Section 6.2) as the Liens of the First Lien Creditors are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (B) to any "replacement Liens" or Liens on additional collateral granted to the First Lien Creditors as adequate protection of their interests in the Collateral (the "**Senior Adequate Protection Liens**") and (C) to any customary "carve-out" or other similar administrative priority expense or claim agreed to by the First Lien Agent or the other First Lien Creditors.

Nothing in this Section 6.2 shall be deemed to waive any rights of the Second Lien Creditors to (1) object to any motion regarding DIP Financing to the extent that such DIP Financing expressly contravenes the requirements of this Section 6.2, (2) seek a valuation of the Collateral in excess of the valuation determined by the First Lien Creditors or (3) propose, or support any other Person in proposing, any DIP Financing so long as (i) the First Lien Agent has provided written notice to the Second Lien Creditors that each First Lien Creditor has declined to provide any DIP Financing and the First Lien Agent shall not have consented to any use of cash collateral or (ii) within ten (10) Business Days after the first day hearing, none of the First Lien Creditors have proposed any DIP Financing that satisfies the requirements in the proviso to the first sentence of the immediately preceding paragraph and the First Lien Agent shall not have consented to any use of cash collateral; provided, that (A) the aggregate principal amount of loans and letter of credit accommodations outstanding or available under any such DIP Financing, together with the outstanding principal amount of the pre-petition Second Lien Obligations, does not exceed the maximum principal amount of Second Lien Obligations permitted to be outstanding pursuant to Section 4.4, (B) such DIP Financing does not require any Obligor to propose a specific plan of reorganization, (C) such DIP Financing is not secured by Liens equal or senior in priority to the Liens securing the First Lien Obligations and does not afford the lenders thereunder a claim that is equal or senior in priority to any adequate protection claims of the First Lien Creditors in respect of their interests in the Collateral, (D) such DIP Financing (including any Liens related to such DIP Financing) does not purport to govern or control the timing or terms of any sale of Collateral (other than a customary asset sale covenant) or assets of Parent Borrower or any Guarantor as part of such Insolvency Proceeding including, without limitation, any requirement for Parent Borrower or any Guarantor involved in such Insolvency Proceeding to sell assets under Section 363 of Title 11 of the Bankruptcy Code, (E)

30

such DIP Financing expressly provides that the claims arising thereunder may be paid under a plan of reorganization in any form having a value on the effective date of such plan equal to the allowed amount of such claims (provided, such DIP Financing may provide that the claims thereunder may be paid in cash under a plan of reorganization on the effective date thereof if, as a condition precedent to such payment in cash, a Discharge of First Lien Obligations shall have occurred), and (F) the terms of the DIP Financing do not contain any other provision that is inconsistent with the terms of this Agreement.

6.3     Adequate Protection

(a)     No Second Lien Creditor will contest, protest, or object to (1) any request by a First Lien Creditor for "adequate protection" under any Bankruptcy Law, (2) an objection by a First Lien Creditor to a motion, relief, action, or proceeding based on a First Lien Creditor claiming a lack of adequate protection, or (3) any request by the First Lien Agent for relief from any stay or other relief based upon a lack of adequate protection or any other reason; provided a Second Lien Creditor may raise any objections that could be raised by any creditor of the Obligors whose claims were not secured by any Liens, so long as such objections are not inconsistent with any other term or provision of this Agreement and are not based on the status of the Second Lien Creditors as secured creditors.

(b)     Notwithstanding the preceding Section 6.2, in an Insolvency Proceeding: (1) except as permitted in this Section 6.3, no Second Lien Creditors may seek or request adequate protection or relief from the automatic stay imposed by section 362 of the Bankruptcy Code, (2) if a First Lien Creditor is granted Senior Adequate Protection Liens, then each Second Lien Agent may seek or request adequate protection in the form of a Lien on the Collateral subject to the Senior Adequate Protection Liens (the "**Junior Adequate Protection Liens**"), which Junior Adequate Protection Liens will be subordinated to (A) the Liens securing the First Lien Obligations on the same basis as the other Liens securing the Second Lien Obligations are subordinated to the Liens securing First Lien Obligations under this Agreement, (B) to the DIP Liens on the same terms (but on a basis junior to the Liens of the First Lien Creditors) as the Liens of the First Lien Creditors are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), and (C) any "carve-out" or other similar administrative priority expense or claim agreed to by the First Lien Agent or the other First Lien Creditors; provided that any failure of the Second Lien Creditors to obtain such Junior Adequate Protection Liens shall not impair or otherwise affect the agreements, undertakings and consents of the Second Lien Creditors hereunder; and (3) if a First Lien Creditor is granted adequate protection in the form of a claim under section 507(b) of the Bankruptcy Code, then each Second Lien Agent may seek or request adequate protection in the form of a subordinate claim under section 507(b) of the Bankruptcy Code.  Any claim by a Second Lien Creditor under section 507(b) of the Bankruptcy Code will be subordinate to any claim of the First Lien Creditors (and the lenders under any DIP Financing) under section 507(b) of the Bankruptcy Code and any payment thereof will be deemed to be Proceeds of Collateral, and the Second Lien Creditors hereby consent and agree, pursuant to section 1129(a)(9) of the Bankruptcy Code, that such section 507(b) claims may be paid under a plan of reorganization in any form having a value on the effective date of such plan equal to the allowed amount of such claims.  Except as expressly set forth above, the Second Lien Creditors shall not seek or request adequate protection in any Insolvency Proceeding, and the First Lien Creditors may oppose any adequate protection proposed to be made by any Obligor to the Second Lien Creditors; provided, that if any one or

31

more of the First Lien Creditors are granted adequate protection in the form of cash payments, the Second Lien Creditors may seek, subject to objection from the First Lien Creditors, adequate protection with respect to the Collateral in the form of periodic cash payments in an amount not to exceed the amount of interest accruing post-petition at the non-default contract rate under the applicable Second Lien Loan Agreement plus the amount of any Second Lien Agent's fees and expenses.  In the event that any Second Lien Creditor actually receives any payment of (or through) adequate protection in any Insolvency Proceeding not expressly permitted hereunder (including any payment in respect of a claim granted under Section 507(b) of the Bankruptcy Code), the same shall be segregated and held in trust and promptly paid over to the First Lien Agent, for the benefit of the First Lien Creditors, in the same form as received, with any necessary endorsements, and each Second Lien Creditor hereby authorizes the First Lien Agent to make any such endorsements as agent for each Second Lien Agent (which authorization, being coupled with an interest, is irrevocable) to be held or applied by the First Lien Agent in accordance with the terms of the First Lien Documents until the Discharge of First Lien Obligations shall have occurred before any of the same may be retained by one or more of the Second Lien Creditors.  Each Second Lien Creditor irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, trustee, liquidator, custodian, conservator or other Person having authority to pay or otherwise deliver all such payments to the First Lien Agent.

6.4     Sale of Collateral; Waivers.  Notwithstanding anything to the contrary contained herein, the Second Lien Creditors will not contest, protest, or object, and will be deemed to have consented pursuant to section 363(f) of the Bankruptcy Code, to a Disposition of Collateral (including the right of the First Lien Creditors to credit bid and the retention by the Obligors of professionals in connection with any potential Disposition), or any motion or order in connection with any such Disposition under section 363 of the Bankruptcy Code (or any other provision of the Bankruptcy Code or applicable Bankruptcy Law), if the First Lien Agent consents to such Disposition or such motion or order; provided that (a) either (i) pursuant to court order, the Liens of the Second Lien Creditors attach to the net Proceeds of the Disposition with the same priority and validity as the Liens held by the Second Lien Creditors on such Collateral, and the Liens remain subject to the terms of this Agreement, or (ii) the net Proceeds of a Disposition of Collateral received by First Lien Agent in excess of those necessary to achieve the Discharge of First Lien Obligations are distributed in accordance with the UCC and applicable law, and (b) the net cash Proceeds of any Disposition under Section 363(b) of the Bankruptcy Code or other provision thereof are applied to the DIP Financing or to the First Lien Obligations in permanent reduction thereof, and (iii) the Second Lien Creditors retain the right to credit bid their claims in connection with any such Disposition so long as such credit bid provides cash for the Discharge of First Lien Obligations and otherwise complies with the terms of this Agreement.  Notwithstanding the foregoing, the Second Lien Agents, on behalf of itself and the other Second Lien Creditors, may raise any objections to any such Disposition that could be raised by any creditor of the Obligors whose claims were not secured by any Liens on such Collateral, provided such objections are not inconsistent with any other term or provision of this Agreement and are not based on the status of any Second Lien Agent or the Second Lien Creditors as secured creditors (without limiting the foregoing, neither any Second Lien Agent nor the Second Lien Creditors may raise any objections based on rights afforded by Sections 363(e) and (f) of the Bankruptcy Code to secured creditors (or by any comparable provision of any Bankruptcy Law)) with respect to the Liens granted to any Second Lien Agent.

6.5     No Waiver.  Subject to Section 6.11, nothing in this Section 6 limits a First Lien Creditor from objecting in an Insolvency Proceeding or otherwise to any action taken by a Second Lien Creditor, including a Second Lien Creditor seeking adequate protection (other than adequate protection for the Second Lien Creditors expressly contemplated by Section 6.3), proposing a DIP Financing or asserting any of its rights and remedies under the Second Lien Documents or otherwise.

6.6     Relief From the Automatic Stay.  Until the Discharge of First Lien Obligations, no Second Lien Creditor may seek relief from the automatic stay or any other stay in an Insolvency Proceeding in respect of the Collateral without the First Lien Agent's prior written consent.

6.7     Waiver.  Each Second Lien Agent and the Second Lien Creditors waive (a) any claim they may now or hereafter have arising out of the First Lien Creditors' election in any proceeding instituted under Chapter 11 of the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code, out of any cash collateral or financing arrangement or out of any grant of security interest in the Collateral in any Insolvency Proceeding, or (b) any claim arising under Sections 506(c) or 552 of the Bankruptcy Code as against as a First Lien Creditor or any of the Collateral.

6.8     Avoidance Issues; Reinstatement.  If a First Lien Creditor or a Second Lien Creditor receives payment or property on account of a First Lien Obligation or Second Lien Obligation, and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside, or otherwise required to be transferred to a trustee, receiver, or an Obligor or an the estate of an Obligor (a "**Recovery**"), then, to the extent of the Recovery, the First Lien Obligations or Second Lien Obligations intended to have been satisfied by the payment will be reinstated as First Lien Obligations or Second Lien Obligations, as applicable, on the date of the Recovery, and no Discharge of First Lien Obligations or Discharge of Second Lien Obligations, as applicable, will be deemed to have occurred for all purposes hereunder. If this Agreement is terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from the date of reinstatement.  Upon any such reinstatement of First Lien Obligations, each Second Lien Creditor will deliver to First Lien Agent any Collateral or Proceeds thereof received between the date of Discharge of First Lien Obligations and the Recovery.  No Second Lien Creditor may benefit from a Recovery in a manner inconsistent with this Agreement, and any distribution made to a Second Lien Creditor as a result of a Recovery that such Second Lien Creditor is not otherwise entitled to receive in accordance with this Agreement will be paid over to the First Lien Agent for application to the First Lien Obligations in accordance with this Agreement.  No First Lien Creditor may benefit from a Recovery in a manner inconsistent with this Agreement, and any distribution made to a First Lien Creditor as a result of a Recovery that such First Lien Creditor is not otherwise entitled to receive in accordance with this Agreement will be paid over to the Designated Second Lien Agent for application to the Second Lien Obligations in accordance with this Agreement.

6.9     Certain Voting Rights.  No Second Lien Creditor shall, without the consent of the First Lien Agent, directly or indirectly propose, support or vote in favor of any a plan of

reorganization or similar dispositive restructuring plan in connection with an Insolvency Proceeding that provides for treatment of the First Lien Creditors, the First Lien Obligations, the Second Lien Creditors or the Second Lien Obligations in a manner, or that is otherwise, inconsistent with this Agreement.  No First Lien Creditor shall, without the consent of the Second Lien Agent, directly or indirectly propose, support or vote in favor of any a plan of reorganization or similar dispositive restructuring plan in connection with an Insolvency Proceeding that provides for treatment of the First Lien Creditors, the First Lien Obligations, the Second Lien Creditors or the Second Lien Obligations in a manner, or that is otherwise, inconsistent with this Agreement.

6.10    Reorganization Securities.  If, in any Insolvency Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization, arrangement, compromise or liquidation or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

6.11    Post-Petition Interest.

(a)    Neither any Second Lien Agent nor any other Second Lien Creditor shall oppose or seek to challenge any claim by the First Lien Agent or any other First Lien Creditor for allowance in any Insolvency Proceeding of First Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien on the Collateral of the First Lien Creditors, without regard to the existence of the Lien of any Second Lien Agent and the other Second Lien Creditors.

(b)    Neither the First Lien Agent nor any other First Lien Creditor shall oppose or seek to challenge any claim by any Second Lien Agent or any other Second Lien Creditor for allowance in any Insolvency Proceeding of Second Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien on the Collateral of the Second Lien Creditors (after taking into account the Lien of the First Lien Creditors on the Collateral and the extent of the First Lien Obligations, including any post-petition interest, fees or expenses included in such First Lien Obligations).

6.12    Separate Grants of Security and Separate Classification.  Each Second Lien Creditor acknowledges and agrees that (a) the grants of Liens pursuant to the First Lien Documents and the Second Lien Documents constitute two separate and distinct grants of Liens and (b) because of their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  The Second Lien Creditors shall not seek in any Insolvency Proceeding to be treated as part of the same class of creditors as the First Lien Creditors and shall not oppose any pleading or motion by the First Lien Creditors for the First Lien Creditors and the Second Lien Creditors to be treated as separate classes of creditors.  Notwithstanding the foregoing, if it is held that the First Lien Obligations and the Second Lien Obligation

34

constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Lien Creditors hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Obligors in respect of the Collateral, with the effect being that, to the extent that the aggregate value of the Collateral exceeds the amount of the First Lien Obligations incurred and accrued before the commencement of any Insolvency Proceeding, the First Lien Creditors shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, and fees, costs and charges incurred subsequent to the commencement of the applicable Insolvency Proceeding before any distribution is made in respect of any of the claims held by the Second Lien Creditors. The Second Lien Creditors hereby agree to turn over to the First Lien Creditors amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Creditors.

6.13    Rights as Unsecured Lenders.  Notwithstanding anything to the contrary in this Agreement, each Second Lien Agent and the Second Lien Creditors may exercise rights and remedies as unsecured creditors against the Parent Borrower or the Guarantors in accordance with the terms of the Second Lien Documents and applicable law so long as the exercise of such rights and remedies does not violate any terms of this Agreement.

Section 7.    **Representations and Warranties**

7.1    Representations and Warranties of Each Party.  Each Party represents and warrants to the other Parties as follows:

(a)    Such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to execute and deliver this Agreement and perform its obligations hereunder.

(b)    This Agreement has been duly executed and delivered by such Party and constitutes a legal, valid and binding obligation of such Party, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(c)    The execution, delivery and performance by such Party of this Agreement (i) do not require any consent or approval of, registration or filing with or any other action by any Governmental Authority and (ii) will not violate any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of such party or any order of any Governmental Authority.

7.2    Representations and Warranties of First Lien Agent, Second Lien Agents.  Each of the First Lien Agent and each Second Lien Agent represents and warrants to the other Parties that it has been authorized by the Lenders under and as defined in the First Lien Loan Agreement or the Second Lien Loan Agreements, as applicable, to enter into this Agreement.

Section 8.    **Miscellaneous.**

8.1    <u>Termination</u>.   Subject to <u>Section 4.5</u> and <u>Section 6.8</u>, this Agreement shall terminate and be of no further force and effect upon the first to occur of (a) the Discharge of First Lien Obligations and no Excess First Lien Obligations remain outstanding or (b) the Discharge of Second Lien Obligations no Excess Second Lien Obligations remain outstanding.

8.2    <u>Successors and Assigns</u>; <u>No Third Party Beneficiaries</u>.

(a)    This Agreement shall be binding upon each Secured Creditor and its respective successors and assigns and shall inure to the benefit of each Secured Creditor and its respective successors, participants and assigns. However, no provision of this Agreement shall inure to the benefit of any other Person, including a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of the Parent Borrower, or any other Obligor, including where such estate or creditor representative is the beneficiary of a Lien on Collateral by virtue of the avoidance of such Lien in an Insolvency Proceeding, except as set forth in <u>Section 8.8</u> and <u>Section 8.17</u>.  If either the First Lien Agent or any Second Lien Agent resigns or is replaced pursuant to the First Lien Loan Agreement or any Second Lien Loan Agreement, as applicable, its successor will be a party to this Agreement with all the rights, and subject to all the obligations, of this Agreement.  Notwithstanding any other provision of this Agreement, this Agreement may not be assigned to any Person except as expressly contemplated herein.

(b)    Each Secured Creditor reserves the right to grant participations in, or otherwise sell, assign, transfer or negotiate all or any part of, or any interest in, their respective Obligations. No Secured Creditor shall be obligated to give any notices to or otherwise in any manner deal directly with any participant in the Obligations and no participant shall be entitled to any rights or benefits under this Agreement, except through the Secured Creditor with which it is a participant.

(c)    In connection with any participation or other transfer or assignment, a Secured Creditor shall disclose to such participant or other transferee or assignee the existence and terms and conditions of this Agreement and require that such participant or other transferee or assignee agree in writing to be bound by the terms of this Agreement.  The Parent Borrower agrees that each Second Lien Loan Agreement and each Second Lien Collateral Document will include the following legend (or language to a similar effect approved by the First Lien Agent):

> "Notwithstanding anything herein to the contrary, the lien and security interest granted to the [Second Lien Agent][Additional Second Lien Agent] pursuant to or in connection with this Agreement or any Collateral Document, and the exercise of any right or remedy by the [Second Lien Agent][Additional Second Lien Agent] hereunder or thereunder are subject to the provisions of that certain Intercreditor Agreement dated as of _____ ____, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), between Bank of America, N.A., as the First Lien Agent[, ____, as Additional Second Lien Agent] and UMB Bank, National Association, as the Initial Second Lien Agent, and acknowledged by the Obligors.  In the event of any conflict between

36

the terms of the Intercreditor Agreement and this agreement or any Collateral Document, the terms of the Intercreditor Agreement shall control."

8.3     <u>Notices</u>. All notices and other communications provided for hereunder shall be in writing and shall be mailed, sent by overnight courier, telecopied or delivered, as follows:

(a)     if to the First Lien Agent, to it at the following address:

> Bank of America, N.A.
> 901 Main Street, 11th Floor
> Mail Code:  TX1-492-11-23
> Dallas TX 75202-3714
> Attn:  Asset Based Portfolio Specialist for Parker Drilling
> Facsimile:  (214) 209-4766
>
> With a copy to:
>
> Vinson & Elkins LLP
> 2001 Ross Avenue, Suite 3900
> Dallas, TX  75201-2975
> Attn:  James A. Markus
> Facsimile:  (214) 999-7836

(b)     if to the Initial Second Lien Agent, to it at the following address:

> UMB Bank, National Association, as Administrative Agent
> 2 South Broadway, Suite 600
> St. Louis, MO 63102
> Attention:    Julius Zamora
> Facsimile:    (314) 612-8499
> Email:    Julius.Zamora@umb.com

(c)     if to any Additional Second Lien Agent, to it at the address specified in the joinder agreement delivered pursuant to Section 8.22.

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this <u>Section 8.3</u>. All such notices and other communications shall be effective (1) if sent by mail when received, (2) if sent by facsimile, when transmitted and a confirmation is received, <u>provided</u> that the same is on a Business Day and, if not, on the next Business Day or (3) if delivered by messenger or overnight courier, upon delivery, <u>provided</u> that the same is on a Business Day and, if not, on the next Business Day.

8.4     <u>Counterparts</u>. This Agreement may be executed by the parties hereto in several counterparts, and each such counterpart shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

8.5     GOVERNING LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

8.6     CONSENT TO JURISDICTION AND VENUE.   ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE FIRST LIEN AGENT ON BEHALF OF THE FIRST LIEN CREDITORS AND EACH SECOND LIEN AGENT ON BEHALF OF THE SECOND LIEN CREDITORS HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS IN CONNECTION WITH THIS AGREEMENT.   THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, THAT ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTIONS.

8.7     MUTUAL WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR RELATED HERETO (WHETHER FOUNDED IN CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, AS APPLICABLE, BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.7.

8.8     Amendments.   [**No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Person from the terms hereof, shall in any event be effective unless it is in writing and signed by the Initial Second Lien Agent (with the consent of the Initial Requisite Second Lien Creditors), each other applicable Second Lien Agent and the First Lien Agent, and no consent of any Obligor shall be required in connection therewith; provided, however, that if any amendment or waiver of any provision of this Agreement, or any departure by any Person from the terms hereof, would adversely affect any of the Obligors (which, for the avoidance of doubt, shall include any amendment or modification to this proviso or the definitions of "Maximum First Lien Principal Amount" and "Maximum Second Lien Principal Amount" or Section 4) or impose any new obligation on any Obligor, in each case, the prior written consent of the Obligors shall be required for any such amendment, waiver or departure to be effective.**]

38

Notwithstanding the foregoing, without the consent of any First Lien Creditor or Second Lien Creditor, any Second Lien Agent may become a party hereto by execution and delivery of a joinder agreement in accordance with Section 8.22 and upon such execution and delivery, such Second Lien Agent and the Second Lien Creditors for which such Second Lien Agent is acting shall be subject to all the terms hereof.

8.9     No Waiver.  No failure or delay on the part of any Secured Creditor in exercising any power or right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.

8.10    Severability.   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction.

8.11    Further Assurances.  Each party hereto agrees to cooperate fully with each other party hereto to effectuate the intent and provisions of this Agreement and, from time to time, to take such further action and to execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Agent or any Second Lien Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

8.12    Headings.  The section headings contained in this Agreement are and shall be without meaning or content whatsoever and are not part of this Agreement.

8.13    Credit Analysis.  The First Lien Creditors and the Second Lien Lenders shall each be responsible for keeping themselves informed of (a) the financial condition of the Obligors and all other endorsers, obligors or guarantors of the Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Obligations, and have made and shall continue to make, independently and without reliance upon each other, their own credit analysis and decision in entering into the First Lien Documents and Second Lien Documents to which they are parties and taking or not taking any action thereunder.  No Secured Creditor shall have any duty to advise any other Secured Creditor of information known to it regarding such condition or any such other circumstances, and no disclosure of any such information shall create any obligation to provide any further information or be deemed to constitute or require any representation or warranty from the disclosing Secured Party regarding that or any other information. No Secured Creditor assumes any liability to any other Secured Creditor or to any other Person with respect to:  (i) the financial or other condition of Obligors and all other endorsers, obligors or guarantors of the  Obligations, (ii) the enforceability, validity, value or collectibility of the Obligations, any Collateral therefor or any guarantee or security which may have been granted in connection with any of the Obligations,  (iii) any Obligor's title or right to transfer any Collateral or security or (iv) any other circumstance that might bear on the risk of nonpayment of any Obligations.

39

8.14    Waiver of Claims.  To the maximum extent permitted by law, each party hereto waives any claim it might have against any Secured Creditor with respect to, or arising out of, any action or failure to act or any error of judgment or negligence, mistake or oversight whatsoever on the part of any other party hereto or their respective directors, officers, employees or agents with respect to any exercise of rights or remedies under the Documents or any transaction relating to the Collateral in accordance with this Agreement.  None of the Secured Creditors, nor any of their respective directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or, except as specifically provided in this Agreement, shall be under any obligation to Dispose of any Collateral upon the request of any Obligor or any Secured Creditor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

8.15    Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of the Documents, the provisions of this Agreement shall govern.

8.16    Specific Performance.  Each of the First Lien Agent and each Second Lien Agent may demand specific performance of this Agreement and, on behalf of itself and the respective other Secured Creditors, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action which may be brought by the respective Secured Creditors.  The rights and remedies provided in this Agreement will be cumulative and not exclusive of other rights or remedies provided by law.

8.17    Provisions to Define Relative Rights.  The provisions of this Agreement are and are intended for the purpose of defining the relative rights of the Secured Creditors.  None of the Obligors or any other creditor thereof shall have any rights hereunder, except as set forth in this Section 8.17 and Section 8.8.  Nothing in this Agreement is intended to or shall impair the obligations of Obligors, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their respective terms, or to affect the relative rights of the lenders of any Obligor, other than the relative rights between the First Lien Agent and the First Lien Creditors, on the one hand, and the Second Lien Agents and the Second Lien Creditors, on the other hand.

8.18    Subrogation.  If a Second Lien Creditor pays or distributes cash, property, or other assets to a First Lien Creditor under this Agreement, the Second Lien Creditor will be subrogated to the rights of the First Lien Creditor with respect to the value of the payment or distribution, provided that the Second Lien Creditor waives its right to enforce all rights of subrogation arising hereunder or otherwise in respect of any such payment or distribution until the Discharge of First Lien Obligations.  Such payment or distribution will not reduce the Second Lien Obligations.

8.19    Entire Agreement.  This Agreement and the Documents embody the entire agreement of the Obligors, the First Lien Agent, the First Lien Creditors, the Second Lien Agents, and the Second Lien Creditors with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to the subject matter hereof and thereof and any draft agreements, negotiations or discussions involving

40

any Obligor and any of the First Lien Agent, the First Lien Creditors, the Second Lien Agents and the Second Lien Creditors relating to the subject matter hereof.

8.20     Survival.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceeding.

8.21     Second Lien Agent.

(a)       The parties acknowledge that all of the rights, protections, immunities and powers (including, without limitation, the right to indemnification) applicable to the Initial Second Lien Agent as administrative agent under the Initial Second Lien Loan Agreement are hereby incorporated by reference and shall be applicable to the Initial Second Lien Agent under this Agreement.

(b)       It is understood that any reference to the Initial Second Lien Agent taking any action, making any determinations, requests, directions, consents or elections, deeming any action or document reasonable, appropriate or satisfactory, exercising discretion, or exercising any rights or duties under this Agreement shall be pursuant to written direction from the Initial Requisite Second Lien Creditors.

8.22     Additional Debt Facilities

(a)       To the extent, but only to the extent, permitted by the provisions of the First Lien Documents and the Second Lien Documents, the Obligors may incur or issue and sell one or more series or classes of Additional Second Lien Debt.  Any such class or series of Additional Second Lien Debt (a "**Second Lien Class Debt**") may be secured by a second priority Lien on the Collateral, in each case under and pursuant to the relevant Second Lien Collateral Documents for such Second Lien Class Debt, if and subject to the condition that the Second Lien Agent with respect to any such Second Lien Class Debt (each, a "**Second Lien Class Debt Agent**"), acting on behalf of the holders of such Second Lien Class Debt (such Second Lien Agent and holders in respect of any Second Lien Class Debt being referred to as the "**Second Lien Class Debt Parties**"), becomes a party to this Agreement by satisfying conditions (i) through (iii), as applicable, in this Section 8.22.  In order for a Second Lien Class Debt Agent to become a party to this Agreement: (i) such Second Lien Class Debt Agent shall have executed and delivered a joinder agreement substantially in the form of Annex I (with such changes as may be reasonably approved by the First Lien Agent and such Second Lien Class Debt Agent) pursuant to which it becomes a Second Lien Agent hereunder, and the Second Lien Class Debt in respect of which such Second Lien Class Debt Agent is the Second Lien Agent and the related Second Lien Class Debt Parties become subject hereto and bound hereby; (ii) the Parent Borrower shall have delivered to the First Lien Agent and Designated Second Lien Agent an officer's certificate (x) stating that the conditions set forth in this Section 8.22 have been satisfied with respect to such Second Lien Class Debt and, if requested, true and complete copies of each of the Second Lien Documents relating to such Second Lien Class Debt, certified as being true and correct by an officer of the Parent Borrower and (y) designating such indebtedness as Additional Second Lien Debt hereunder (and if the agreement under which such indebtedness is to be incurred

41

Refinances the Initial Second Lien Loan Agreement and is intended to become a New Second Lien Agreement, such agreement shall be so designated as such in such certificate); and (iii) the Second Lien Documents relating to such Second Lien Class Debt shall provide that each Second Lien Class Debt Party with respect to such Second Lien Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Second Lien Class Debt.

      8.23    <u>Additional Intercreditor Agreements</u>

      (a)    Each Party hereto agrees that the Second Lien Creditors and/or the Second Lien Agents (as among themselves) may each enter into such intercreditor arrangements governing the rights, benefits and privileges as among the Second Lien Creditors, as the case may be, in respect of the Collateral, this Agreement and the other Second Lien Collateral Documents, as the case may be, including as to application of proceeds of the Collateral, voting rights, control of the Collateral and waivers with respect to the Collateral, in each case so long as the terms thereof do not violate or conflict with the provisions of this Agreement, the First Lien Documents or Second Lien Documents, as the case may be.

      [THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**FIRST LIEN AGENT:**

**BANK OF AMERICA, N.A.**, as First Lien Agent

By: _____
Name: _____
Title: _____

**INITIAL SECOND LIEN AGENT:**

**UMB BANK, NATIONAL ASSOCIATION**, as Second Lien Agent

By: _____
Name: _____
Title: _____

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions.

**PARENT BORROWER:**

**PARKER DRILLING COMPANY**

By:       _____
Name:   _____
Title:    _____

**OTHER OBLIGORS:**

_____

By:       _____
Name:   _____
Title:    _____

Intercreditor Agreement (Parker Drilling Company)

**Exhibit E**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

**Exhibit E(i)** lists the Assumed Executory Contracts and Unexpired Leases.

On the Confirmation Date, and in accordance with the Plan, each Executory Contract and Unexpired Lease (including those set forth in the Assumed Executory Contract and Unexpired Lease List) shall be deemed assumed as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was previously assumed, assumed and assigned, or rejected by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is identified on the Rejected Executory Contracts and Unexpired Leases List (if any); or (4) is the subject of a motion to reject that is pending on the Effective Date.  No damages shall accrue on account of those Executory Contracts or Unexpired Leases that are not assumed by the Debtors.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Confirmation Order.  Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms.

Nothing contained in the Plan or this Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.  Furthermore, such parties reserve the right to contest any claim or other action that asserts that any contract or lease is not executory.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 15 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing.  Any such objection will

be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

**Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

For the avoidance of doubt, the Debtors reserve the right, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders, to change determinations with respect to the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Lease.

**Exhibit E(i)**

**Assumed Executory Contracts and Unexpired Leases List**

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| 2M-TEK, Inc. | RFI Properties, LLC<br>Attn: Steve Robbins<br>13603 Cardinal Cove Court<br>Cypress, TX  77429<br>United States | Industrial Building Lease, Dated: 06/14/2013 | $0.00 |
| Anachoreta, Inc. | PT Daya Alam Tehnik Inti<br>Attn: General Counsel<br>Beltway Office Park, Tower A, Level 3A<br>Jl. Ampera Raya No. 09-10<br>Cilandak<br>Jakarta Selatan, 12550<br>Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 | $0.00 |
| Anachoreta, Inc. | PT Kinanti Satya Karsa (Kinanti), The Parent Company of Dati<br>Attn: General Counsel<br>A Jl Adityawarman 40<br>Jakarta, 12160<br>Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | ABM Janitorial Services - Northwest Inc<br>Attn: General Counsel<br>5001D Eagle Street<br>Anchorage, AK  99503<br>United States | Janitorial Service Agreement, Dated: 08/20/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Afognak Leasing, LLC<br>Attention: Ana Fisk<br>3909 Arctic Blvd.<br>Suite 500<br>Anchorage, AK  99503<br>United States | Agreement to Amend Sublease of Crazy Horse Parcel, Dated: 08/27/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | Afognak Leasing, LLC Attention: Ana Fisk 3909 Arctic Blvd. Suite 500 Anchorage, AK  99503 United States | Fourth Amendment to Sublease, Dated: 12/01/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Attn: General Counsel BP Building 200 Chertsey Road Middlesex Sunbury On Thames, TW16 7BP United Kingdom | Electronic Record and Signature Disclosure, Dated: 04/11/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment 5 to Drilling Rig Contract, Dated: 06/10/2015 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 02 Extending Agreement, Dated: 05/31/2011 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 1 - Project Execution Schedule, Dated: 08/06/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 1 - Project Execution Schedule, Dated: 08/06/2012 | $0.00 |

17

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 1 to Drilling and Workover/Completion Services Release, Dated: 04/01/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 1 to Release No. 12581, Dated: 08/06/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 1 to Release No. 12582, Dated: 08/06/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 1 to Release No. CW2140036, Dated: 12/15/2017 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: Supply Chain Manager 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 1 to Release No. CW2140036, Dated: 12/15/2017 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 1, Dated: 06/14/2010 | $0.00 |

18

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: Supply Chain Manager 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 1, Dated: 06/14/2010 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 10 to Release No. 12582, Dated: 01/01/2017 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 12 to Release No. 12582, Dated: 02/20/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 2 to Drilling and Workover/Completion Service Release, Dated: 12/28/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 2 to Drilling and Workover/Completion Services Agreement, Dated: 01/06/2013 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 2 to Release No. 12581, Dated: 12/28/2012 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 2 to Release No. 12582, Dated: 01/06/2013 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 2 to Release No. CW2140036, Dated: 02/20/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 2 to Supply and Operating Agreement, Dated: 08/06/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 3 - Project Drilling Rig Service Contract, Dated: 02/21/2013 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 3 to Drilling and Workover/Completion Services Agreement, Dated: 02/21/2013 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 3 to Release No. 12581, Dated: 01/01/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 3 to Release No. CW2140036, Dated: 04/05/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 3, Dated: 01/01/2014 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 4 to Drilling and Workover/Completion Services Agreement, Dated: 01/01/2014 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 4 to Release No. 12581, Dated: 08/22/2014 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 4 to Release No. 12582, Dated: 01/01/2014 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 4 to Release No. CW2140036, Dated: 05/10/2018 | $0.00 |

21

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 5 to Release No. 12581, Dated: 04/01/2015 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 5 to Release No. 12582, Dated: 08/22/2014 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 6 to Drilling and Workover/Completion Services Release, Dated: 04/01/2015 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 6 to Release No. 12581, Dated: 06/10/2015 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 6 to Release No. 12582, Dated: 04/01/2015 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 6 to Release, Dated: 06/10/2015 | $0.00 |

22

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 7 to Drilling and Workover/Completion Services Release, Dated: 06/10/2015 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 7 to Release No. 12581, Dated: 03/01/2016 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No. 8 to Drilling and Workover/Completion Services Release, Dated: 03/01/2016 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 8 to Release No. 12581, Dated: 05/11/2016 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 8 to Release No. 12582, Dated: 03/01/2016 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No. 9 to Release No. 12582, Dated: 05/23/2016 | $0.00 |

23

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Amendment No.3 to Release No. 12582, Dated: 02/21/2013 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: Liberty Project- Sheri Cole PO Box 196611 Anchorage, AK  99519-6611 United States | Contract Release Under Liberty Project - Drilling Rig Operations, Dated: 06/01/2009 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: Fred Fitzhugh, PSCM Representative PO Box 196612 900 E. Benson Blvd. Anchorage, AK  99519-6612 United States | General Consulting Services Contract, Dated: 07/01/2011 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: Ryan Johnson 900 East Benson Boulevard Anchorage, AK  99508 United States | Letter Re: Cold Stack Parker Rig 273 , Dated: 03/02/2016 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Liberty Project - Drilling Rig Operations Contract , Dated: 06/01/2009 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Termination Notice of Parker 273 – Release 12581, Dated: 04/11/2016 | $0.00 |

24

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard Anchorage, AK  99508 United States | Termination Notice of Parker 273 - Revised Alternative Option Agreement, Dated: 05/09/2016 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Termination Notice, Dated: 05/09/2016 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration Alaska, Inc. Attn: Rebecca Schikora, Pscm Regional Director, Alaska 900 East Benson Boulevard Anchorage, AK  99508 United States | Master Contract for Provision and Operation of Onshore Drilling Units, Dated: 11/29/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BP Exploration Alaska, Inc. Attn: Edm/Alaska PO Box 696533 San Antonio, TX  78269 United States | Work Release Against Master Onshore Drilling Unit Contact, Dated: 11/29/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Brown, Jr., Jonathan D. 403 Clarke Road Morgan City, LA  70380 United States | Independent Contractor Agreement, Dated: 03/29/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | BVG, Inc. Attn: General Counsel C/O Realty Executives Alaska, Inc. 341 West Tudor Road Suite 103 Anchorage, AK  99503 United States | Building Space Lease, Dated: 07/22/2008 | $0.00 |

25

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BVG, Inc. Attn: General Counsel C/O Realty Executives Alaska, Inc. 341 West Tudor Road Suite 103 Anchorage, AK  99503 United States | First Amendment to Lease, Dated: 07/22/2008 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Calais Company, Inc. Attn: General Counsel 425 G Street, Suite 200 Anchorage, AK  99501 United States | Memorandum of Sublease and Subordination, Nondisturbance and Attornment Agreement, Dated: 03/27/2014 | $0.00 |
| Parker Drilling Arctic Operating, LLC | CH2M Hill Alaska, Inc. Attn: General Counsel 949 East 36th Avenue Suite 500 Anchorage, AK  99508 United States | Tenant and Landlord Release and Novation Agreement, Dated: 10/01/2018 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Crown Plaza Anchorage Attn: General Counsel 109 West International Airport Road Anchorage, AK  99518 United States | 2014 Local Volume Rate Agreement, Dated: 01/21/2014 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Doyon Universal Services LLC Attn: Vice President Facility Services 11500 C Street Anchorage, AK  99515 United States | Camp Management Services Agreement, Dated: 07/22/2011 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Kiska Properties, LLC C/O Pfeffer Development, LLC 425 G Street, Suite 10 Anchorage, AK  99501 United States | Second Amendment to Lease, Dated: 12/22/2014 | $0.00 |

26

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | Nana Management Services, LLC Attn: VP of Operations - Camp Services 5600 B Street Anchorage, AK  99518 United States | Camp Services Agreement, Dated: 02/18/2010 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Price, Watson PO Box 363 Deville, LA  71328 United States | Independent Contractor Agreement, Dated: 03/29/2012 | $0.00 |
| Parker Drilling Arctic Operating, LLC | Stoneland Global Logistics, Inc. Attn: General Counsel 11601 Spring Cypress Road Tomball, TX  77377 United States | Standard Contract Terms and Conditions for Merchandise Warehousemen, Dated: 04/28/2011 | $0.00 |
| Parker Drilling Company | Accenture Strategy Energy Attn: General Counsel 1255 Treat Blvd Suite 250 Walnut Creek, CA  94597 United States | Letter Re Parker Drilling O&M Go-to-Market Strategy, Dated: 10/25/2016 | $0.00 |
| Parker Drilling Company | Aceunico Attn: General Counsel 4519 W Hwy 90 PO Box 10065 New Iberia, LA  70562 United States | Purchase Agreement, Dated: 01/24/2006 | $0.00 |
| Parker Drilling Company | Acuity Advisors, LLC, Dba Strategic Services Attn: General Counsel Houston Lane PO Box 27885 Houston, TX  77227 United States | Consulting Agreement , Dated: 03/26/2013 | $0.00 |

27

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Aegis Defence Services Limited Attn: General Counsel 39 Victoria Street London, SW1H 0EU United Kingdom | Provision to the Parker Drilling Company of Iraqi Security Conditions, Market intelligence and other services. , Dated: 02/16/2009 | $0.00 |
| Parker Drilling Company | Al Bahar & Associates, Advocates and Legal Consultants Attn: General Counsel PO Box 49408 Dubai, United Arab Emirates | Letter Re: Company's Compliance Terms and Conditions and Engagement Policy, Dated: 06/15/2013 | $0.00 |
| Parker Drilling Company | American Express Travel Related Services Company, Inc. C/O American Express Company, Corporate Services Operations, AESC-P Attn: General Counsel 20022 North 31 St, Ave. Mail Code AZ-08-03-11 Phoenix, AZ  85027 United States | Corporate Services Commercial Account Agreement, Dated: 12/08/2010 | $0.00 |
| Parker Drilling Company | Ascende Wealth Advisers, Inc. Attn: General Counsel 2700 Post Oak Blvd., 25th Floor Houston, TX  77056 United States | Retirement Plan Advisory Services Agreement, Dated: 11/01/2012 | $0.00 |
| Parker Drilling Company | Bank of Utah as Trustee for Bowery Air, LLC Attn: General Counsel 83 Wooster Heights Road Suite 503 Danbury, CT  06810 United States | Amendment No. 2 to Aircraft Lease Agreement, Dated: 08/01/2019 | $0.00 |

28

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Bigge Crane and Rigging Co. Attn: General Counsel 10700 Bigge Ave PO Box 1657 San Leandro, CA  94577 United States | Bare Equipment Lease Agreement, Dated: 08/09/2010 | $0.00 |
| Parker Drilling Company | Bluesky It Partners LLC Attn: General Counsel 2429 Bissonnet Street Suite 483 Houston, TX  77005 United States | Telecom and Cloud Consulting Agreement, Dated: 03/22/2017 | $0.00 |
| Parker Drilling Company | Boardvantage,Inc. Attn: Contract Administration 4300 Bohannon Drive, Suite 110 Menlo Park, CA  94025 United States | Services Agreement Standard Terms and Conditions, Dated: 03/21/2013 | $0.00 |
| Parker Drilling Company | Bud Griffin Customer Support Attn: General Counsel 5101 Terminal Street Bellaire, TX  77401 United States | Preventative Maintenance Agreement, Dated: 06/01/2018 | $0.00 |
| Parker Drilling Company | Cameron Drilling Systems Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Company | Cameron Drilling Systems Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2016 | $0.00 |

29

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Catamaran PBM Services, LLC (Soon To Be Known As Optumrx Pbm Of Wisconsin, LLC) Attn: General Counsel 1600 McConnor Parkway Schaumburg, IL  60173 United States | Client Services Agreement, Dated: 02/25/2016 | $0.00 |
| Parker Drilling Company | Cleverbridge, Inc. Attn: General Counsel 350 N Clark Street Suite 700 Chicago, IL  60654 United States | General Terms for Software License, Not dated | $0.00 |
| Parker Drilling Company | Codetwo Sp. Zo.O. Sp. K. Attn: General Counsel Ul. Wolnosci 16 Jelenia Gora, 58-500 Poland | Terms and Conditions and Invoice for Software , Dated: 05/09/2018 | $0.00 |
| Parker Drilling Company | Compliance Wave LLC Attn: General Counsel 241 Maple Avenue, Suite 201 Red Bank, NJ  07701 United States | License Agreement, Dated: 09/03/2016 | $0.00 |
| Parker Drilling Company | Control Empresarial S.A. Attn: General Counsel Calle Donatello 206 Urb. San Borja Lima, Peru | Contract of Location of Services, Dated: 04/01/2012 | $0.00 |
| Parker Drilling Company | Core Services Company Attn: General Counsel 130 Belmont Drive Somerset, NJ  08873 United States | Ordering Document for Oracle License and Service Agreement, Dated: 05/29/2015 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Core Services Corporation Attn: General Counsel 130 Belmont Drive Somerset, NJ 08873 United States | Hosting Engagement Contract, Dated: 09/01/2011 | $0.00 |
| Parker Drilling Company | Data Foundry Attn: General Counsel 1044 Liberty Park Drive Austin, TX 78746-6943 United States | Description of Services Order, Dated: 08/06/2014 | $0.00 |
| Parker Drilling Company | Data Foundry Attn: General Counsel 1044 Liberty Park Drive Austin, TX 78746-6943 United States | Description of Services, Dated: 08/06/2014 | $0.00 |
| Parker Drilling Company | Data Foundry, Inc. Attn: General Counsel 2500 Bee Cave Rd. Building 1, Suite 400 Austin, TX 78746 United States | Description of Services, Dated: 06/06/2017 | $0.00 |
| Parker Drilling Company | Data Foundry, Inc. Attn: General Counsel 2500 Bee Cave Rd. Building 1, Suite 400 Austin, TX 78746 United States | Description of Services, Dated: 06/06/2017 | $0.00 |
| Parker Drilling Company | De LA Morena, Doug Address On File | Change in Control Severance Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Company | Deutsche Bank Securities Inc. Attn: General Counsel 60 Wall Street New York, NY 10005 United States | Letter Re: Investment Banking Services, Dated: 08/23/2011 | $0.00 |

31

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Digitech Office Machines, Inc. Attn: General Counsel 2423 South College Road Lafayette, LA  70508 United States | Copier Lease and Maintenance Agreement, Dated: 09/05/2017 | $0.00 |
| Parker Drilling Company | Digitech Office Machines, Inc. Attn: General Counsel 2423 South College Road Lafayette, LA  70508 United States | Copier Maintenance Agreement, Dated: 04/13/2016 | $0.00 |
| Parker Drilling Company | Djendou, Abdou Address On File | Change in Control Severance Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Company | Dockray, Nathaniel C. Address On File | Change in Control Severance Agreement, Dated: 01/01/2018 | $0.00 |
| Parker Drilling Company | Dooley Tackaberry Attn: General Counsel Houston Corporate Headquarters 1515 West 13th Street Deer Park, TX  77536 United States | Letter Requesting Withdrawal of Items for Sale, Dated: 03/28/2016 | $0.00 |
| Parker Drilling Company | Edgewater Technology - Ranzal, LLC Attn: General Counsel 1025 Westchester Avenue, Suite 10 White Plains, NY  10604 United States | Statement of Work - Support Agreement, Dated: 07/05/2018 | $0.00 |
| Parker Drilling Company | Egonzehnder International Inc Attn: General Counsel 700 Louisiana Street Suite 2850 Houston, TX  77002 United States | Letter of Proposal for Hiring Services, Dated: 07/18/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Egonzehnder International Inc. Attn: General Counsel 700 Lousisiana Street Suite 2850 Houston, TX  77046 United States | Employment Agency Engagement Letter, Dated: 07/18/2013 | $0.00 |
| Parker Drilling Company | EiS Technologies, Inc. Attn: General Counsel 3067 Peachtree Industrial Blvd. Suite 200 Duluth, GA  30097 United States | Change Request, Dated: 08/11/2016 | $0.00 |
| Parker Drilling Company | Employee Benefit Solutions Attn: Vice President, Operations 2700 Post Oak Blvd., 25th Floor Houston, TX  77056-5784 United States | Business Associate Agreement, Dated: 03/01/2009 | $0.00 |
| Parker Drilling Company | Employee Benefit Solutions, Inc. Attn: Vice President Operations 2700 Post Oak Boulevard, 25th Floor Houston, TX  77056 United States | Consulting and Brokerage Agreement, Dated: 03/02/2009 | $0.00 |
| Parker Drilling Company | Employee Benefit Solutions, Inc. Attn: General Counsel 2700 Post Oak Boulevard 25th Floor Houston, TX  77056-5784 United States | Letter RE: Employee Benefit Solutions, Inc. Compensation for Services, Dated: 03/01/2009 | $0.00 |
| Parker Drilling Company | Employer Direct Healthcare, LLC Attn: Plan Management 2100 Ross Avenue, Suite 3200 Dallas, TX  75201 United States | Plan Agreement, Dated: 01/01/2018 | $0.00 |

33

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Experis Us, Inc. Attn: General Counsel 100 Manpower Place Milwaukee, WI 53212 United States | Direct Hire Agreement - Professional, Dated: 07/14/2014 | $0.00 |
| Parker Drilling Company | Exxonmobil Global Services Company Attn: General Counsel 22777 Springwoods Village Parkway Spring, TX 77389 United States | Email re: Executed Change Order No. 24, Dated: 08/31/2018 | $0.00 |
| Parker Drilling Company | Exxonmobil Global Services Company Attn: General Counsel 16945 Northchase Drive Houston, TX 77060 United States | Emails re: Proposed Amendments to the Agreement, Dated: 05/02/2014 | $0.00 |
| Parker Drilling Company | Fleet Supply Warehouse, LLC Attn: General Counsel 205 Venture P.O. Box 9055 Houma, LA 70361 United States | Price Changes Letter, Dated: 06/30/2010 | $0.00 |
| Parker Drilling Company | Foster LLP Attn: General Counsel 600 Travis Street 20th Floor Houston, TX 77002 United States | Engagement Letter for Immigration Legal Services, Dated: 09/29/2017 | $0.00 |
| Parker Drilling Company | Frontiermedex Inc Attn: General Counsel 8501 Lasalle Road Suite 200 Towson, MD 21286 United States | Amendment No. 1 to Participation Agreement, Dated: 06/12/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Frontiermedex Inc<br>Attn: General Counsel<br>8501 Lasalle Road<br>Suite 200<br>Towson, MD  21286<br>United States | Amendment No. 2 to Participation Agreement, Dated: 12/11/2013 | $0.00 |
| Parker Drilling Company | Frontiermedex,Inc<br>Attn: General Counsel<br>8501 Lasalle Road<br>Suite 200<br>Towson, MD  21286<br>United States | Participation Agreement, Dated: 01/01/2012 | $0.00 |
| Parker Drilling Company | Gaffney Kroese Corp.<br>Attn: General Counsel<br>14149 Interdrive West<br>Houston, TX  77032<br>United States | Purchase Agreement, Dated: 10/10/2006 | $0.00 |
| Parker Drilling Company | Geach, Jason<br>Address On File | Change in Control Severance Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Company | Global Jet Capital, Inc.<br>Attn: General Counsel<br>83 Wooster Heights<br>Suite 503<br>Danbury, CT  06810<br>United States | Lease Financing Proposal, Dated: 06/04/2018 | $0.00 |
| Parker Drilling Company | Greatamerica Financial Services Corporation<br>Attn: General Counsel<br>625 First Street SE<br>Cedar Rapids, IA  52401<br>United States | Agreement for Lease of Equipment , Dated: 04/15/2016 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Groupe Sharegate Inc. Attn: General Counsel 1751 Richardson Street Suite 5400 Montreal, QC  H3K 1G6 Canada | End User License, Maintenance and Support Agreement, Dated: 10/19/2018 | $0.00 |
| Parker Drilling Company | Hashim Al Timimi & Partner For Audit Co Attn: General Counsel Al-Ameen Building First Floor Arasat Al Hindia Baghdad, Iraq | Engagement Letter for Audit Services , Dated: 01/08/2014 | $0.00 |
| Parker Drilling Company | Henley, Robert Allen Address On File | Employment Agreement First Amendment, Dated: 10/31/2011 | $0.00 |
| Parker Drilling Company | Henley, Robert Allen Address On File | Employment Agreement, Dated: 4/1/2011 | $0.00 |
| Parker Drilling Company | Hewlett-Packard Financial Services Company Attn: General Counsel 200 Connell Drive Suite 5000 Berkeley Heights, NJ  07922 United States | Business Lease Agreement, Dated: 07/21/2017 | $0.00 |
| Parker Drilling Company | Hewlett-Packard Financial Services Company Attn: General Counsel 200 Connell Drive Suite 5000 Berkeley Heights, NJ  07922 United States | Business Lease Agreement, Dated: 07/21/2017 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Hightail, Inc. Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA  94403 United States | Software License Agreement, Dated: 04/30/2018 | $0.00 |
| Parker Drilling Company | Hightail, Inc. Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA  94403 United States | Software License Agreement, Dated: 05/25/2016 | $0.00 |
| Parker Drilling Company | Hightail, Inc. Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA  94403 United States | Software Subscription Agreement, Dated: 04/30/2018 | $0.00 |
| Parker Drilling Company | Hightail, Inc. Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA  94403 United States | Software Subscription Agreement, Dated: 05/20/2015 | $0.00 |
| Parker Drilling Company | Hightail, Inc. Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA  94403 United States | Subscription Agreement, Dated: 06/19/2014 | $0.00 |
| Parker Drilling Company | Hotel Le Germain Calgary Attn: General Counsel 899, Central Street SW Calgary, AB  T2G 1B8 Canada | Hotel Services Corporate Rate Agreement 2014, Dated: 02/17/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Infocon-Sakhalin LLC<br>Attn: General Counsel<br>52 Bld., Nevel'skogo Street<br>Office 7<br>Yuzhno-Sakhalinsk, 693000<br>Russia | Information (Consulting) Services Contract, Dated: 09/28/2008 | $0.00 |
| Parker Drilling Company | Intercontinental Hotels Group<br>Attn: General Counsel<br>Three Ravinia Drive<br>Suite 100<br>Atlanta, GA  30346<br>United States | Mid-Market Account Program Agreement, Dated: 05/20/2011 | $0.00 |
| Parker Drilling Company | IT Convergence Inc.<br>Attn: General Counsel<br>5370 Kietzke Lane<br>Suite 200<br>Reno, NV  89511<br>United States | Statement of Work, Dated: 08/16/2018 | $0.00 |
| Parker Drilling Company | IT Convergence, Inc.<br>Attn: General Counsel<br>5370 Kietzke Lane<br>Suite 200<br>Reno, NV  89511<br>United States | Consulting Services Statement of Work, Dated: 08/16/2018 | $0.00 |
| Parker Drilling Company | Kirkland & Ellis LLP<br>Attn: General Counsel<br>609 S Main St<br>Houston, TX  77002<br>United States | Active Engagement Letter Re: Outside Counsel Representation, Dated: 09/07/2018 | $0.00 |
| Parker Drilling Company | Kirkland & Ellis LLP<br>Attn: General Counsel<br>609 South Main Street<br>Houston, TX  77002<br>United States | Letter Re: Engagement of Outside Counsel, Dated: 09/07/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Knowbe4 Attn: General Counsel 33 North Garden Avenue Suite 1200 Clearwater, FL  33755 United States | Executed Quote for Software Training Subscription, Dated: 02/14/2018 | $0.00 |
| Parker Drilling Company | Knowbe4 Attn: General Counsel 33 North Garden Avenue Suite 1200 Clearwater, FL  33755 United States | Executed Quote for Subscription Upgrade, Dated: 10/12/2018 | $0.00 |
| Parker Drilling Company | Konica Minolta Business Solutions U.S.A., Inc. Attn: Contracts Department 500 Day Hill Rd. Windsor, CT  09095 United States | Copier Maintenance Agreement, Dated: 03/06/2015 | $0.00 |
| Parker Drilling Company | Konica Minolta Business Solutions U.S.A., Inc. Attn: General Counsel 100 Williams Drive Ramsey, NJ  07446 United States | Copier Premier Lease Agreement, Dated: 03/06/2015 | $0.00 |
| Parker Drilling Company | Korn/Ferry International Attn: General Counsel 700 Louisiana Suite 3900 Houston, TX  77002 United States | Engagement Letter Re: Board of Director Recruitment, Dated: 04/10/2013 | $0.00 |
| Parker Drilling Company | Korn/Ferry International Attn: General Counsel 700 Louisiana Suite 3900 Houston, TX  77002 United States | Engagement Letter, Dated: 01/07/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Kroll Associates, Inc. Attn: General Counsel 11440 Commerce Park Drive, Suite 501 Reston, VA  20191 United States | Engagement Confirmation, Dated: 03/16/2017 | $0.00 |
| Parker Drilling Company | Kroll Associates, Inc. Attn: General Counsel 11440 Commerce Park Drive, Suite 501 Reston, VA  20191 United States | Engagement Confirmation, Dated: 08/10/2016 | $0.00 |
| Parker Drilling Company | Kuwait Drilling Company Attn: Mr. Abdul Azeez R. Al-Rashed 582 E. 36th Ave Ahmadi, 61001 Kuwait | Letter of Agreement for Additional Personnel and Rates, Dated: 06/16/2003 | $0.00 |
| Parker Drilling Company | Logmein USA, Inc. Attn: General Counsel 320 Summer Street Boston, MA  02210 United States | Software Purchase, Dated: 08/24/2011 | $0.00 |
| Parker Drilling Company | Melton & Melton, L.L.P. Attn: General Counsel 6002 Rogeroadale Suite 200 Houston, TX  77072 United States | Objective and Scope of the Audit Letter, Dated: 06/18/2018 | $0.00 |
| Parker Drilling Company | Menger, John Edward Address On File | Change in Control Severance Agreement, Dated: 01/01/2018 | $0.00 |
| Parker Drilling Company | Menger, John Edward Address On File | First Amendment to Separation Letter Agreement, Dated: 12/18/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Menger, John Edward Address On File | Separation Letter Agreement, Dated: 06/01/2018 | $0.00 |
| Parker Drilling Company | Ms Crescent Greenway Plaza Spv, LLC Attn: General Counsel 777 Main Street Suite 2100 Fort Worth, TX  76102 United States | Second Amendment to Office Lease, Dated: 09/25/2009 | $0.00 |
| Parker Drilling Company | National Car Rental/Enterprise Holdings, Inc. Attn: General Counsel 600 Coporate Park Drive St. Louis, MO  63105 United States | Corporate Services Agreement, Dated: 07/01/2010 | $0.00 |
| Parker Drilling Company | Nitro Software, Inc. Attn: General Counsel 225 Bush Street 7th Floor San Francisco, CA  94104 United States | Order Form and License Agreement, Dated: 03/23/2018 | $0.00 |
| Parker Drilling Company | Oracle Credit Corporation Attn: General Counsel, Legal Department 500 Oracle Parkway Redwood City, CA  94065 United States | Amendment No. 1 to Payment Schedule No. 42070, Dated: 08/31/2011 | $0.00 |
| Parker Drilling Company | Oracle Credit Corporation Attn: General Counsel 500 Oracle Parkway Redwood Shores, CA  94065 United States | Amendment One Oracle Contract Information, Dated: 08/25/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Oracle Credit Corporation Attn: General Counsel, Legal Department 500 Oracle Parkway Redwood City, CA  94065 United States | Payment Plan Agreement, Dated: 08/31/2011 | $0.00 |
| Parker Drilling Company | Pitney Bowes Attn: General Counsel 3001 Summer St. Stamford, CT  06926 United States | Lease Agreement, Dated: 03/31/2016 | $0.00 |
| Parker Drilling Company | Prime Capital Investment Advisors, LLC Attn: General Counsel 950 Echo Lane Suite #200 Houston, TX  77024 United States | Notification of Assignment of Advisory Agreement, Dated: 03/23/2018 | $0.00 |
| Parker Drilling Company | PT Daya Alam Tehnik Inti Attn: General Counsel Beltway Office Park, Tower A, Level 3A Jl. Ampera Raya No. 09-10 Cilandak Jakarta Selatan, 12550 Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 | $0.00 |
| Parker Drilling Company | PT Kinanti Satya Karsa (Kinanti), The Parent Company of Dati Attn: General Counsel A Jl Adityawarman 40 Jakarta, 12160 Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Putnam Investor Services, Inc., Attn: Paul Dewey Defined Contribution Regulatory Services Department Putnam Investments 7 Shattuck Road Andover, MA  01810 United States | Administrative Services Agreement, Dated: 05/15/2012 | $0.00 |
| Parker Drilling Company | SAI Global Compliance Inc. Attn: General Counsel 309 Waverley Oaks Road Waltham, MA  02452 United States | Amendment and Renewal Order Form, Dated: 09/30/2016 | $0.00 |
| Parker Drilling Company | Sheraton Grand Hotel Attn: General Counsel No. 3 Sheikh Zayed Road PO Box 123979 Dubai, United Arab Emirates | Special Rate Agreement, Dated: 08/07/2016 | $0.00 |
| Parker Drilling Company | Spencer Stuart Attn: General Counsel 255 California Street, Suite 1400 San Francisco, CA  94111 United States | Letter RE: Professional Arrangements, Dated: 01/15/2011 | $0.00 |
| Parker Drilling Company | Star Managed Services Attn: General Counsel 4700 Blalock Houston, TX  77041 United States | Software Agreement, Dated: 06/07/2013 | $0.00 |
| Parker Drilling Company | Star Managed Services Attn: General Counsel 4700 Blalock Houston, TX  77041 United States | Software Agreement, Dated: 06/11/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | Stargel Office Solutions Attn: General Counsel 4700 Blalock Houston, TX  77041 United States | Cost Per Copy Copier Maintenance Agreement, Dated: 11/18/2016 | $0.00 |
| Parker Drilling Company | Stratfor Attn: General Counsel 700 Lavaca Street Suite 900 Austin, TX  78701 United States | Amendment No. 1 to Contract, Dated: 05/03/2010 | $0.00 |
| Parker Drilling Company | Stratfor Attn: General Counsel 700 Lavaca Street Suite 900 Austin, TX  78701 United States | Proposal for Services, Dated: 07/27/2009 | $0.00 |
| Parker Drilling Company | The Four Point By Sheraton Ventura Harbor Resort Attn: General Counsel 1050 Schooner Drive Ventura, CA  93001 United States | Preferred Corporate Program 2013-2014 - Discounted Guestroom Rate, Dated: 04/04/2013 | $0.00 |
| Parker Drilling Company | The Goodland Attn: General Counsel 5650 Calle Real Goleta, CA  93117 United States | Negotiated Corporate Rate Agreement 2014, Dated: 09/29/2014 | $0.00 |
| Parker Drilling Company | The H Hotel Dubai Attn: General Counsel No. 1 Sheikh Zayed Road Dubai, United Arab Emirates | Corporate Rate Agreement for Hotel Services, Dated: 01/01/2016 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | The Westin Galleria & Westin Oaks, Houston<br>Attn: General Counsel<br>5060 West Alabama<br>Houston, TX  77056<br>United States | 2011 Volume Rate Agreement, Dated: 01/12/2012 | $0.00 |
| Parker Drilling Company | The Westin Galleria & Westin Oaks, Houston<br>Attn: General Counsel<br>5060 West Alabama<br>Houston, TX  77056<br>United States | 2011 Volume Rate Agreement, Dated: 06/27/2011 | $0.00 |
| Parker Drilling Company | Thompson Reuters<br>Attn: General Counsel<br>2395 Midway Road<br>Carrollton, TX  75006<br>United States | Platform and Restricted Party Screening Enhancement Proposal, Dated: 09/01/2018 | $0.00 |
| Parker Drilling Company | Toshiba Financial Services<br>Attn: General Counsel<br>PO Box 3072<br>Cedar Rapids, IA  52406-3072<br>United States | Equipment Lease Agreement, Dated: 09/13/2016 | $0.00 |
| Parker Drilling Company | Tucker, David<br>Address On File | Change in Control Severance Agreement, Dated: 01/27/2011 | $0.00 |
| Parker Drilling Company | Tucker, David<br>Address On File | First Amendment to Change in Control Severance Agreement, Dated: 10/01/2011 | $0.00 |
| Parker Drilling Company | UMR, Inc.<br>Attn: General Counsel<br>PO Box 88822<br>Milwaukee, WI  53288-0822<br>United States | Amendment to Administrative Services Agreement, Dated: 01/01/2016 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | UMR, Inc.<br>Attn: General Counsel<br>UMR Cobra Administration<br>PO Box 1206<br>Milwaukee, WI 54402<br>United States | Dental Benefit Summary Plan Description Revised 01-01-2018, Not dated | $0.00 |
| Parker Drilling Company | UMR, Inc.<br>Attn: General Counsel<br>PO Box 88822<br>Milwaukee, WI 53288-0822<br>United States | Financial Renewal Amendment, Dated: 05/18/2017 | $0.00 |
| Parker Drilling Company | UMR, Inc.<br>Attn: General Counsel<br>Cobra Administration<br>PO Box 1206<br>Milwaukee, WI 54402-1206<br>United States | Summary Plan Description For the Parker Drilling Company Flexible Benefit Plan for Rig-Based and Quail Tools Employees Revised 01-01-2018, Dated: 01/01/2018 | $0.00 |
| Parker Drilling Company | Unum Life Insurance Company of America<br>Attn: General Counsel<br>221 Congress Street<br>Portland, ME 04122<br>United States | Amendment No 13 Part of Group Policy issued to Policyholder, Dated: 10/06/2017 | $0.00 |
| Parker Drilling Company | Unum Life Insurance Company of America<br>Attn: General Counsel<br>2211 Congress Street<br>Portland, ME 04122<br>United States | Short Term Disability Income Protection Plan - Class 2, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Company | Vertex, Inc.<br>Attn: General Counsel<br>1041 Old Cassalt Road<br>Berwyn, PA 19312<br>United States | Software License Agreement, Dated: 12/06/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company | White, Keith<br>Address On File | Sale Event and Transition Agreement, Dated: 12/11/2018 | $0.00 |
| Parker Drilling Company | White, Marc<br>Address On File | Sale Event and Transition Agreement, Dated: 12/11/2018 | $0.00 |
| Parker Drilling Company | White, Wayne<br>Address On File | Sale Event and Transition Agreement, Dated: 12/11/2018 | $0.00 |
| Parker Drilling Company | Woodside Browse Pty Ltd<br>Attn: General Counsel<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 | $0.00 |
| Parker Drilling Company | Woodside Energy Ltd<br>Attn: General Counsel<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 | $0.00 |
| Parker Drilling Company | Yousendit<br>Attn: General Counsel<br>2950 S. Delaware Street<br>Suite 400<br>San Mateo, CA  94403<br>United States | Software Subscription Renewal, Dated: 06/06/2012 | $0.00 |
| Parker Drilling Company | Yousendit, Inc.<br>Attn: General Counsel<br>2950 S. Delaware Street<br>Suite 400<br>San Mateo, CA  94403<br>United States | Software Subscription Agreement, Dated: 05/10/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Company North America, Inc. | Exxon Mobil Corporation Attn: General Counsel 16495 Northchase Boulevard Houston, TX  77060 United States | Drilling Operation and Maintenance Agreement, Dated: 02/13/2013 | $0.00 |
| Parker Drilling Company North America, Inc. | Exxon Mobil Corporation Attn: General Counsel Corporation Service Company Princeton South Corporate Center Suite 160 100 Charles Ewing Boulevard Ewing, NJ  08628 United States | Drilling Operations & Maintenance Agreement, Dated: 08/06/2018 | $0.00 |
| Parker Drilling Company North America, Inc. | MBL Sturgis LLC Attn: General Counsel 2250 Overland Ave #200 Los Angeles, CA  90064 United States | Standard Industrial/Commercial Multi-Tenant Lease - Gross, Dated: 01/17/2013 | $0.00 |
| Parker Drilling Company North America, Inc. | Sansum Clinic, Occupational Medicine Attn: General Counsel/Sam Taylor, Manager 101 South Patterson Ave Santa Barbara, CA  93111 United States | Medical Service Agreement, Dated: 06/01/2013 | $0.00 |
| Parker Drilling Company North America, Inc. | Total Safety U.S. Inc Attn: General Counsel 11111 Wilcrest Green Drive, Suite 300 Houston, TX  77042 United States | Service Contract, Dated: 09/08/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Action Specialties Of Lafayette, LLC Attn: General Counsel 7915 Hwy 90 West New Iberia, LA  70560 United States | Buy-Sell and Manufacturing Agreement, Dated: 10/20/2008 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Aker Solutions Inc Attn: General Counsel 3010 Briar Park Drive Suite 500 Houston, TX  77042 United States | Novation to Purchase Agreement, Dated: 06/30/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Akhiya LLC Attn: Kamala Kanaka Sundaram 11400 Monet Dr Austin, TX  78726 United States | Consulting Services Agreement, Dated: 04/28/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Alitalia Attn: Don C. Hare, V.P. of Administration 51 Madison Avenue Suite 2000 New York, NY  10010 United States | Corporate Incentive Agreement, Dated: 10/01/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | American International Relocation Services LLC Attn: General Counsel 6 Penn Center West Suite 200 Pittsburgh, PA  15275 United States | Relocation Services Agreement, Dated: 03/12/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Axceler Attn: General Counsel 600 Unicorn Park Drive Woburn, MA  01801 United States | License Agreement for Software, Dated: 09/27/2010 | $0.00 |
| Parker Drilling Management Services, Ltd. | Benefits Science LLC Attn: General Counsel 745 Atlantic Ave., 8th Floor Boston, MA  02111 United States | Business Associate Agreement, Dated: 05/01/2016 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Best Western Premier Incheon Airport Hotel Attn: General Counsel 48-27 Gonghang-Ro 424beon-Gil Unseo-Dong Jung-Gu Incheon, Republic Of Korea | Corporate Rate Agreement, Dated: 04/13/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Bitsofcode Software Systems, Inc. Attn: General Counsel 10777 Westheimer Road Suite 808A Houston, TX  77042 United States | SP Services Upgrade, Dated: 11/15/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Bluesky It Partners LLC Attn: General Counsel 2429 Bissonnet Street Suite 483 Houston, TX  77005 United States | Telecom and Cloud Consulting Agreement, Dated: 03/22/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Cameron A Schlumberger Company Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Cameron A Schulmberger Company Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems Attn: General Counsel 4601 Westway Park Drvive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Challenger, Gray & Christmas Inc. Attn: General Counsel 150 South Wacker Drive Suite 2800 Chicago, IL  60606 United States | Independent Contractor Agreement, Dated: 10/05/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Cogent Communications, Inc. Attn: General Counsel 1015 31st Street Washington, DC  20007 United States | Internet Access Subscriber Agreement, Dated: 12/05/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Connolly, Lisa Address On File | Employment Agreement, Dated: 04/16/2015 | $0.00 |

51

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Control Risks Services Limited Attn: General Counsel DIFC Currency House Level 3, Office 7 PO Box 125739, Sheikh Zayed Road Dubai, United Arab Emirates | Letter of Engagement, Dated: 04/25/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Core Services Corporation Attn: General Counsel 130 Belmont Drive Somerset, NJ  08873 United States | Hosting Engagement Contract, Dated: 09/01/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Core Services Corporation Attn: General Counsel 130 Belmont Drive Somerset, NJ  08873 United States | Service Hosting Engagement Contract, Dated: 09/01/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Courtyard By Marriott Brownsville Attn: General Counsel 3955 North Expressway Brownsville, TX  78520 United States | Volume Discount Rate Agreement, Dated: 01/01/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Courtyard Marriott West University Attn: General Counsel 2929 Westpark Drive Houston, TX  77005 United States | Corporate Sales Agreement, Dated: 10/12/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Cousins Greenway East Parent LLC Attn: Vp, Property Management 191 Peachtree Street, Ne Suite 500 Atlanta, GA  30303-1740 United States | Third Amendment to Office Lease, Dated: 04/04/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Cousins Greenway East Parent LLC C/O Counsins Properties Incorporated Attn: Corporate Secretary 191 Peachtree Street, Ne Suite 500 Atlanta, GA  30303-1740 United States | Third Amendment to Office Lease, Dated: 04/04/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Couture, Justin Address On File | Employment Agreement, Dated: 04/16/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Crescent Real Estate Equities LP Attn: General Counsel 1 Greenway Plaza, Suite #725 Houston, TX  77046 United States | Short-Term Lease, Dated: 10/19/2010 | $0.00 |
| Parker Drilling Management Services, Ltd. | Crowne Plaza Attn: General Counsel Houston River Oaks Near the Galleria 2712 Southwest Freeway Houston, TX  77098 United States | Room Rate Agreement, Dated: 01/04/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | De LA Morena, Doug Address On File | Change in Control Severance Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Delta, KLM, Air France Attn: Antonio Temporini, Senior Vice President, North America 1030 Delta Blvd. Atlanta, GA  30320 United States | Corporate Incentive Agreement, Dated: 10/01/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Direct Connect Solutions LLC Attn: Edward Burnham 9595 Six Pines, Suite 8210 The Woodlands, TX 77380 United States | Independent Contractor Agreement, Dated: 12/01/2010 | $0.00 |
| Parker Drilling Management Services, Ltd. | Djendou, Abdou Address On File | Change in Control Severance Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Dockray, Nathaniel C. Address On File | Change in Control Severance Agreement, Dated: 01/01/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Dos Ranchos, Ltd, Dba Los Ranchos Attn: General Counsel 2509 Tarryhill Place Austin, TX 78703 United States | Amendment No. 01 to the Grant of Profit A Prendre ( Three-Year Hunting and Fishing Lease), Dated: 03/27/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Dos Ranchos, Ltd. Dba Los Ranchos Attn: General Counsel PO Box 428 Hondo, TX 78861 United States | Bill of Sale, Dated: 08/30/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX 77046 United States | Corporate Hotel Rate Agreement, Dated: 12/10/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX 77046 United States | Preferred Client Rate Agreement, Dated: 07/19/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 10/31/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/13/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/13/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/17/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/19/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 12/03/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 12/21/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Drilling Systems (UK) Limited Attn: General Counsel Hurn View House 5 Aviation Park West Bournemouth International Airport Dorset, BH23 6EW United Kingdom | Maintenance & Technical Support Agreement, Dated: 12/19/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Edgewater Technology - Ranzal, LLC Attn: General Counsel 1025 Westchester Avenue, Suite 10 White Plains, NY  10604 United States | Statement of Work - Support Agreement, Dated: 07/05/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | EiS Technologies, Inc. Attn: General Counsel 3067 Peachtree Industrial Blvd. Suite 200 Duluth, GA  30097 United States | Change Request, Dated: 08/11/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | EiS Technologies, Inc. Attn: General Counsel, Legal Department 3067 Peachtree Industrial Blvd. Duluth, GA  30097 United States | EiS Software Evaluation License Agreement, Dated: 08/01/2012 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | EiS Technology Services Inc. Attn: General Counsel 3067 Peachtree Industrial Blvd. Suite 200 Duluth, GA  30097 United States | Software Evaluation License Agreement, Dated: 11/29/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Emirates Attn: General Counsel 5th Floor 55 East 59th Street New York, NY  10022 United States | Corporate Travel Agreement, Dated: 10/01/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Enaxis Consulting LP Attn: General Counsel 9 Greenway Plaza Suite 3005 Houston, TX  77046 United States | Mater Services Consulting Agreement, Dated: 08/22/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services Inc. Attn: General Counsel 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Business Associate Agreement, Dated: 03/01/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services, Inc. Attn: Jill Watson 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Consulting Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services, Inc. Attn: Jill Watson 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Consulting Agreement, Dated: 03/01/2015 | $0.00 |

57

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services, Inc. Attn: Jill Watson 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Consulting Agreement, Dated: 12/18/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Geach, Jason Address On File | Change in Control Severance Agreement, Dated: 01/01/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Genuent Attn: Matt Eckert 1400 Post Oak Blvd., #200 Houston, TX  77056 United States | Statement of Work No. 2 to Consulting Services Agreement, Dated: 09/15/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Gherardi, Andrew Address On File | Employment Agreement, Dated: 04/16/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Global Transaction Group ,LLC Attn: General Counsel 3646 Greenbriar Houston, TX  77046 United States | Travel Services Agreement, Dated: 05/11/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Global Transportation Group, LLC dba Griffin Americas Attn: General Counsel 2211 Norfolk Suite 300 Houston, TX  77098 United States | Amendment No. 1 To the Corporate Travel Agreement, Dated: 08/19/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Global Transportation Group, LLC dba Griffin Americas Attn: General Counsel 2211 Norfolk Suite 300 Houston, TX  77098 United States | Amendment No. 3 to Travel Services Agreement, Dated: 07/01/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Global Transportation Group, LLC, dba Griffin Americas Attn: General Counsel 2211 Norfolk Suite 300 Houston, TX  77098 United States | Amendment No. 2 To the Travel Services Agreement, Dated: 03/17/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Global Transportation Group, Ltd. dba Griffin Americas Attn: General Counsel 3646 Greenbriar Houston, TX  77098 United States | Travel Services Agreement, Dated: 05/11/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Globalserve, Inc. Attn: General Counsel 200 Summit Lake Drive 1st Floor Valhalla, NY  10595 United States | Acquisition Management Services, Dated: 10/11/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Globalserve, Inc. Attn: General Counsel 440 Sylvan Avenue Suite 400 Englewood Cliffs, NJ  07632 United States | Addendum to Acquisition Management Services Statement of Work, Dated: 01/01/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | GWP East, LLC Attn: Managing Director, Texas 2103 City West Blvd., Suite 130 Houston, TX  77042 United States | Fourth Amendment to Office Lease, Dated: 11/07/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | GWP East, LLC Attn: Managing Director, Texas 2103 City West Blvd Suite 130 Houston, TX  77042 United States | Fourth Amendment to Office Lease, Dated: 11/07/2017 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Hampton Inn & Suites St. John's Airport<br>Attn: General Counsel<br>411 Stavanger Drive<br>St. John's, NL  A1A 0A1<br>Canada | Hotel Services Agreement, Dated: 10/19/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Henley, Robert Allen<br>Address On File | Employment Agreement First Amendment, Dated: 10/31/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Henley, Robert Allen<br>Address On File | Employment Agreement, Dated: 4/1/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Hermes Datacommunications International Ltd<br>Attn: Kay Ravenscroft<br>Hermes House<br>Oxon Business Park<br>Shrewsbury,  SY3 5DD<br>United Kingdom | Contract for Provision of Services, Dated: 03/01/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Hitachi Consulting Corporation<br>Attn: Andre Butler<br>10370 Richmond Ave<br>Suite 1150<br>Houston, TX  77042<br>United States | Master Consulting Agreement, Dated: 04/12/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Holiday Inn London Gatwik Airport & Heathrow M4 J4<br>Attn: General Counsel<br>Shepiston Lane<br>Hayes,  UB3 1RW<br>United Kingdom | Hotel Corporate Rate Agreement, Dated: 10/19/2012 | $0.00 |

60

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Homewood Suites Hilton Brownsville, TX Attn: General Counsel 3759 N Expressway Brownsville, TX  78520 United States | Letter: Extension of Rates for Hotel Services, Dated: 05/04/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Hotels Le Germain Attn: General Counsel 899 Centre Street SW Calgary, AB T2G 1B8 Canada | Hotel Corporate Rates 2012, Dated: 03/01/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | HSE Training Solutions SaS Attn: General Counsel Calle 151B, 115-92 Int. 301 Bogota, Cundinamarca, Colombia | Permission to Use Copyrighted Material, Dated: 12/15/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Hyatt Regency Houston Galleria Attn: General Counsel 2626 Sage Road Houston, TX  77056 United States | Hotel Services Preferred Rate Agreement, Dated: 04/16/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | International Business Machines Corporation (IBM) Attn: General Counsel PO Box 643600 Pittsburgh, PA  15264 United States | Proof of Entitlement, Dated: 08/03/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | IT Convergence, Inc. Attn: Clay Collins, Manager 805 Veterans Blvd, Suite 216 Redwood City, CA  94063 United States | Statement of Work Re: Services and Rates, Dated: 04/22/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Kelsey-Seybold Medical Group, PA<br>Attn: General Counsel<br>2715 Cypress Point Dr.<br>Missouri City, TX  77459<br>United States | Healthcare Provider Letter of Agreement, Dated: 03/31/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Knowbe4<br>Attn: General Counsel<br>33 North Garden Avenue<br>Suite 1200<br>Clearwater, FL  33755<br>United States | Executed Quote for Software Training Subscription, Dated: 02/14/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Knowbe4<br>Attn: General Counsel<br>33 North Garden Avenue<br>Suite 1200<br>Clearwater, FL  33755<br>United States | Executed Quote for Subscription Upgrade, Dated: 10/12/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Kuehne + Nagel, Inc.<br>Attn: General Counsel<br>10 Exchange Place<br>19th Floor<br>Jersey City, NJ  07302<br>United States | Freight Forwarding and Customs Agent Service Agreement, Dated: 11/25/2008 | $0.00 |
| Parker Drilling Management Services, Ltd. | Lbisat LLC<br>C/O Lyman Bros Inc.<br>10288 South Jordan Gateway #K<br>South Jordan, UT  84095<br>United States | Service Agreement Re Collocation and Teleport Services, Dated: 11/24/2004 | $0.00 |
| Parker Drilling Management Services, Ltd. | Le Germain Boutique-Hotels<br>Attn: General Counsel<br>899, Central Street SW<br>Calgary, AB  T2G 1B8<br>Canada | Hotel Corporate Rates 2013, Dated: 12/12/2012 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Leyyn Consulting Attn: Francois Robert 1, Rue Merzak Ouargli Hydra, 16000 Algeria | Engagement Letter of Leyyn Consulting, Dated: 03/04/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Maritime Management Services PTE Ltd Attn: General Counsel 152 Beach Road 04-07 Gateway East 189721 Singapore | Direct Placement Services Agreement, Dated: 04/30/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Maryville Data Systems , Inc., dba Maryville Technologies Attn: VP and CFO 540 Maryville Centre Drive Suite 300 Saint Louis, MO  63141 United States | Consulting Services Agreement, Dated: 06/03/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Maryville Technologies Attn: General Counsel 7777 Bonhomme Avenue Suite 2300 Clayton, MO  63105 United States | Technology Service Management Statement of Work, Dated: 11/16/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Menger, John Edward Address On File | Change in Control Severance Agreement, Dated: 01/01/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Menger, John Edward Address On File | First Amendment to Separation Letter Agreement, Dated: 12/18/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Menger, John Edward Address On File | Separation Letter Agreement, Dated: 06/01/2018 | $0.00 |

63

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Microsoft Corporation Attn: General Counsel Department 551, Volume Licensing 6100 Neil Road Suite 210 Reno, NV  89511-1137 United States | Products and Services Agreement, Dated: 04/28/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | MS Crescent Greenway Plaza SPV, LLC Attn: General Counsel 777 Main Street Suite 2100 Fort Worth, TX  76102 United States | First Amendment to Office Lease, Dated: 10/07/2008 | $0.00 |
| Parker Drilling Management Services, Ltd. | MS Crescent Greenway Plaza SPV, LLC Attn: General Counsel 777 Main Street Suite 2100 Fort Worth, TX  76102 United States | First Amendment to Office Lease, Dated: 10/07/2008 | $0.00 |
| Parker Drilling Management Services, Ltd. | MS Crescent Greenway Plaza SPV, LLC Attn: Legal Department 777 Main Street Suite 2100 Fort Worth, TX  76102 United States | Office Lease Agreement, Dated: 04/24/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | MS Crescent Greenway Plaza SPV, LLC Attn: Legal Department 777 Main Street Suite 2100 Fort Worth, TX  76102 United States | Office Lease, Dated: 04/24/2008 | $0.00 |

64

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | MS Crescent Greenway Plaza SPV, LLC<br>Attn: General Counsel<br>777 Main Street<br>Suite 2100<br>Fort Worth, TX  76102<br>United States | Second Amendment to Office Lease, Dated: 09/25/2009 | $0.00 |
| Parker Drilling Management Services, Ltd. | NOV Distribution<br>Attn: General Counsel<br>7909 Parkwood Circle Drive<br>Houston, TX  77036<br>United States | Amendment No. 5, Dated: 06/17/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | NOV Distribution, A Division Of National Oilwell Varco, L.P.<br>Attn: General Counsel<br>7909 Parkwood Circle Drive<br>Houston, TX  77036<br>United States | Amendment No. 4, Dated: 05/31/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | NOV National Oilwell Varco/Brandt<br>Attn: General Counsel<br>4310 North Sam Houston Parkway E<br>Houston, TX  77032<br>United States | Letter Re: Discount pricing, Dated: 08/03/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Oilwell Tubular Consultants Inc.<br>Attn: Wilton Schexnayder<br>14630 Bohemian Hall<br>Crosby, TX  77532<br>United States | Independent Contractor Agreement, Dated: 02/24/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Oracle America, Inc.<br>Attn: General Counsel<br>PO Box 203448<br>Dallas, TX  75320-3448<br>United States | Technical Support Services Renewal Order, Dated: 11/14/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Oracle America, Inc. Attn: General Counsel PO Box 203448 Dallas, TX  75320-3448 United States | Technical Support Services Renewal Order, Dated: 11/18/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Oracle America, Inc. Attn: General Counsel PO Box 203448 Dallas, TX  75320-3448 United States | Technical Support Services Renewal Order, Dated: 12/10/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Orasys Consulting LLC Attn: Kushi Reddy 110 Turnpike Road Suite 212 Westborough, MA  05181 United States | Consulting Services Agreement, Dated: 11/07/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Pentagon Freight Services, Inc. Attn: General Counsel 1211 East Richey Road Houston, TX  77073 United States | Code of Conduct, Not dated | $0.00 |
| Parker Drilling Management Services, Ltd. | Pentagon Freight Services, Inc. Attn: General Counsel 1211 East Richey Road Houston, TX  77073 United States | Customs Power of Attorney, Dated: 03/17/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Pentagon Freight Services, Inc., A Texas Corporation Attn: General Counsel 1211 Richey Road Houston, TX  77073 United States | Power of Attorney for Customs and Export Forwarding Agent, Dated: 03/05/2009 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Qatar Airways Q.C.S.C. Attn: General Counsel Ground Floor Qatar Airways Tower 1 PO Box 22550 Doha, Qatar | Corporate Travel Incentive Agreement, Dated: 04/01/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 01/04/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 01/05/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 02/21/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 02/23/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Residence Inn By Marriott West University Attn: General Counsel 2939 Westpark Dr. Houston, TX  77005 United States | Corporate Sales Agreement, Dated: 10/16/2017 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Residence Inn McAllen Attn: General Counsel 3975 N. Expressway 83 Brownsville, TX  75520 United States | Rate and Service Agreement, Dated: 05/07/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Resource International Attn: Robert Pennington And Stephanie Haslam 6119, Bankside Dr Houston, TX  77096 United States | Consulting Services Agreement, Dated: 02/02/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | RPS Solutions Attn: General Counsel 726 Donald Preston Drive Wolfforth, TX  79382 United States | Purchase Agreement, Dated: 07/17/2008 | $0.00 |
| Parker Drilling Management Services, Ltd. | Safway Services, LLC Attn: General Counsel 1960 NW Marine Drive Troutdale, OR  97060 United States | Service Contract, Dated: 02/16/2010 | $0.00 |
| Parker Drilling Management Services, Ltd. | Scalable Path, Inc. Attn: General Counsel 500 Westover Dr #9092 Sanford, NC  27330 United States | Master Agreement, Dated: 09/02/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Scalisi, Joe Address On File | Employment Agreement, Dated: 04/16/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. Attn: General Counsel 2225 Lawson Lane Santa Clara, CA  95054 United States | Order Form, Dated: 06/29/2016 | $0.00 |

68

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. Attn: General Counsel 2225 Lawson Lane Santa Clara, CA  95054 United States | Renewals Order Form, Dated: 08/12/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. Attn: General Counsel 2225 Lawson Lane Santa Clara, CA  95054 United States | Software Order Form, Dated: 01/29/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. Attn: General Counsel 2225 Lawson Lane Santa Clara, CA  95054 United States | Software Order Form, Dated: 01/29/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. Attn: General Counsel 2225 Lawson Lane Santa Clara, CA  95054 United States | Software Order Form, Dated: 03/25/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. Attn: General Counsel 2225 Lawson Lane Santa Clara, CA  95054 United States | Software Order Form, Dated: 08/12/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. Attn: General Counsel 2225 Lawson Lane Santa Clara, CA  95054 United States | Software Order Form, Dated: 11/18/2016 | $0.00 |
| Parker Drilling Management Services, Ltd. | Shekerdemian, Ruben 5 Greenway Plaza, Suite 100 Houston, TX  77046 United States | Independent Contractor Agreement, Dated: 01/31/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Shuman Consulting Services LLC Attn: Sherry K. Shiflet 2625 Bay Area Blvd, #301 Houston, TX  77058 United States | Software License and Technical Support Agreement, Dated: 02/02/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | Simcore LLC Attn: General Counsel 2500 Plaza 5 Harborside Financial Center Jersey City, NJ  07311 United States | Essbase Application Proposal, Dated: 05/22/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Skillsoft Corporation Attn: General Counsel 107 Northestern Blvd Nashua, NH  03062 United States | Master License Agreement, Dated: 10/31/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Skillsoft Corporation Attn: Contracts Department Admin 107 Northeastern Blvd Nashua, NH  03062 United States | Master License Agreement, Dated: 10/31/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Smoothstone IP Communications Attn: General Counsel 200 Smoothstone Center 401 S. Fourth St. Louisville, KY  40202 United States | Customer Service Agreement, Dated: 03/30/2012 | $0.00 |
| Parker Drilling Management Services, Ltd. | Sparkhound, Inc. Attn: Shawn Usher 2900 Westfork Drive, Suite 600 Baton Rouge, LA  70827 United States | Consulting Services Agreement, Dated: 10/27/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Sparkhound, Inc. Attn: Shawn Usher 2900 Westfork Drive Suite 600 Baton Rouge, LA  70827 United States | Consulting Services Agreement, Dated: 10/27/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Sparkhound, LLC Attn: General Counsel 2900 Westfork Drive Suite 600 Baton Rouge, LA  70827 United States | Statement of Work, Dated: 10/11/2018 | $0.00 |
| Parker Drilling Management Services, Ltd. | Tag Resources, L.L.C. Attn: General Counsel 11011 Richmond Avenue, Suite 250 Houston, TX  77042 United States | Letter RE: Terms of Engagement, Dated: 05/19/2009 | $0.00 |
| Parker Drilling Management Services, Ltd. | The Broadleaf Group, LLC D/B/A Broadleaf Group Attn: General Counsel 13100 Wortham Center, Suite 150 Houston, TX  77065 United States | Service Contract, Dated: 02/07/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | The Westin Galleria & Westin Oaks, Houston Attn: General Counsel 5060 West Alabama Houston, TX  77056 United States | Local Volume Rate Agreement, Dated: 01/01/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Thomson Reuters (GRC) Inc. Attn: General Counsel PO Box 417175 Boston, MA  02241-7175 United States | Order Form, Dated: 10/20/2017 | $0.00 |

71

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Total Visa Solutions Attn: General Counsel 2211 Norfolk Drive, Suite 300 Houston, TX  77046 United States | Passport and Visa Agreement, Dated: 10/31/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Total Visa Solutions LLC Attn: Dana Thibeaux 2211 Norfolk Drive Suite 300 Houston, TX  77098 United States | Passport and Visa Services Agreement, Dated: 10/31/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Transportation Resource Associates, Inc. Attn: General Counsel 1608 Walnut Street Suite 1602 Philadelphia, PA  19103 United States | Proposal for Safety Management Software, Dated: 09/25/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Tucker, David Address On File | Change in Control Severance Agreement, Dated: 01/27/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Tucker, David Address On File | First Amendment to Change in Control Severance Agreement, Dated: 10/01/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Turk Hava Yollari A.O. ("Turkish Airlines") Attn: General Counsel General Management Building Ataturk Airport Yesilkoy Stambul,  34830 Turkey | Turkish Corporate Club Premium Benefits, Dated: 01/30/2018 | $0.00 |

72

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | United Air Lines, Inc. Attn: General Counsel 233 S. Wacker Drive 16th Floor Chicago, IL  60606 United States | Corporate Discount Agreement, Dated: 09/01/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | United Air Lines, Inc. Attn: General Counsel 233 S. Wacker Drive 16th Floor Chicago, IL  60606 United States | Corporate Discount Agreement, Dated: 09/01/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | United Air Lines, Inc. Attn: General Counsel 233 South Wacker Drive 16th Floor Chicago, IL  60606 United States | Corporate Discount Agreement, Dated: 09/01/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Vantage Solutions LLC Attn: Jared Schulz 5680 Highway 6 #184 Missouri City, TX  77459-4188 United States | Consulting Services Agreement, Dated: 05/20/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Verno Group East, LLC Attn: General Counsel Bld. 59 Krasnogo Znameni Av. Vladivostok, 690002 Russia | Act of Acceptance of Services, Dated: 10/04/2017 | $0.00 |
| Parker Drilling Management Services, Ltd. | Vision Service Plan Insurance Company Attn: General Counsel 3333 Quality Drive Rancho Cordova, CA  95670 United States | Evidence of Coverage (Client Vision Care Plan), Dated: 01/01/2016 | $0.00 |

73

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Viziya Corp. Attn: Operations Manager Suite 203 50 Dundas Street East Hamilton, ON  L9H 7K9 Canada | Annual Maintenance Agreement, Dated: 04/30/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Viziya Corp. Attn: General Counsel 50 Dundas Street East, Suite 201 Hamilton, ON  L9H 7K6 Canada | Master Software License Agreement, Dated: 04/30/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Viziya Corp. Attn: General Counsel Suite 201 50 Dundas St East Hamilton, ON  L9H 7K6 Canada | WorkAlign Scheduler License Agreement, Dated: 04/28/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Walls Industries, Inc. Attn: General Counsel 125 South Jennings Fort Worth, TX  76104 United States | Buy-Sell and Manufacturing Agreement, Dated: 10/20/2008 | $0.00 |
| Parker Drilling Management Services, Ltd. | Web.Com Attn: Legal Department 12808 Gran Bay Parkway West Jacksonville, FL  32258 United States | Transfer of Registrant Agreement, Dated: 02/01/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | West IP Communications Attn: General Counsel 401 S. Fourth St. Suite 200 Louisville, KY  40202 United States | Customer Service Agreement, Dated: 01/21/2015 | $0.00 |

74

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | West IP Communications<br>Attn: General Counsel<br>401 S. Fourth St.<br>Suite 200<br>Louisville, KY  40202<br>United States | Customer Service Agreement, Dated: 01/21/2015 | $0.00 |
| Parker Drilling Management Services, Ltd. | West IP Communications, Inc.<br>Attn: General Counsel<br>401 S. Fourth St.<br>Suite 200<br>Louisville, KY  40202<br>United States | Service Level Agreement, Not dated | $0.00 |
| Parker Drilling Management Services, Ltd. | Westin Galleria & Westin Oaks Houston at the Galleria<br>Attn: General Counsel<br>5011 Westheimer At Post Oak Blvd.<br>Houston, TX  77056<br>United States | Local Volume Rate Agreement, Dated: 01/04/2013 | $0.00 |
| Parker Drilling Management Services, Ltd. | Yousendit, Inc.<br>Attn: General Counsel<br>2950 S. Delaware Street<br>Suite 400<br>San Mateo, CA  94403<br>United States | Corporate Subscriber Agreement, Dated: 06/30/2011 | $0.00 |
| Parker Drilling Management Services, Ltd. | Ziegler Cooper Architects<br>Attn: General Counsel<br>700 Louisiana, Suite 350<br>Houston, TX  77002<br>United States | Services Authorization, Dated: 03/13/2014 | $0.00 |
| Parker Drilling Management Services, Ltd. | Ziegler Cooper Inc.<br>Attn: General Counsel<br>600 Travis, Suite 1200<br>Houston, TX  77002-2911<br>United States | Agreement for Interior Design Services, Dated: 01/26/2009 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Offshore Company, LLC | Pastor, Behling & Wheeler, LLC<br>Attn: General Counsel<br>2201 Double Creek Drive<br>Suite 4004<br>Round Rock, TX  78664<br>United States | Gulfco Marine Maintenance Freeport, Texas Consulting Services Agreement, Dated: 03/07/2011 | $0.00 |
| Parker Drilling Offshore USA, L.L.C. | B & W Realty Holdings, L.L.C.<br>Attn: Robert M. Boyce<br>645 Highlandia Drive<br>Baton Rouge, LA  70810<br>United States | Net Commercial Lease Agreement, Dated: 08/02/2013 | $0.00 |
| Parker Drilling Offshore USA, L.L.C. | Badger Oil Corp.<br>Attn: Mr. Arthur Price - President<br>3861 Ambassador Caffery Parkway<br>Suite 400<br>Lafayette, LA  70508<br>United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 07/16/2018 | $0.00 |
| Parker Drilling Offshore USA, L.L.C. | Byron Energy Inc.<br>Attn: Mr. Prent H. Kallenberger - President<br>201 Rue Iberville<br>Suite 604<br>Lafayette, LA  70508<br>United States | Daywork Drilling Contract - US, Dated: 08/06/2018 | $0.00 |
| Parker Drilling Offshore USA, L.L.C. | Chevron Usa, Inc.<br>Attn: General Counsel<br>100 Northpark Boulevard<br>Covington, LA  70433<br>United States | Amendment No. 2 to Worldwide Master Drilling Contract, Dated: 06/03/2011 | $0.00 |
| Parker Drilling Offshore USA, L.L.C. | Chevron Usa, Inc.<br>Attn: CTOP General Counsel<br>6001 Bollinger Canyon Road<br>Room B2500<br>San Ramon, CA  94583<br>United States | Worldwide Master Drilling Contract, Dated: 12/22/2003 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Drilling Offshore USA, L.L.C. | Mack Energy Co. Attn: Mr. Chris Fowler - VP Expl. & Prod. 3861 Ambassador Caffery Parkway Suite 500 Lafayette, LA  70508 United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 07/16/2018 | $0.00 |
| Parker Drilling Offshore USA, L.L.C. | Sabine Storage & Operations, Inc. Attn: Mr. Ken Roane - Sr. VP of Drilling and Workovers 5718 Westheimer Suite 1251 Huston, TX  77057-5704 United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 07/17/2018 | $0.00 |
| Parker Drilling Offshore USA, L.L.C. | Texas Petroleum Investment Corp. Attn: Mr. Fred Stein 5850 San Felipe Suite 250 Houston, TX  77057 United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 05/31/2018 | $0.00 |
| Parker Technology, Inc. | Acadiana Inspection & Consulting, LLC Attn: General Counsel 10109 Lake Peigneur Road New Iberia, LA  70560 United States | Engineering Services Subcontract, Dated: 02/01/2011 | $0.00 |
| Parker Technology, Inc. | Athens Group Attn: General Counsel 950 Threadneedle, Suite 275 Houston, TX  77079 United States | MPDR Engineering Services Subcontract, Dated: 09/06/2011 | $0.00 |

77

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 1 - Extension of Project Authorization, Dated: 11/15/2006 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 10, Dated: 01/28/2011 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 2 to Contract, Dated: 01/31/2007 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 3 for Procurement of Long Lead Materials Agreement, Dated: 12/18/2007 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 4 to Extend Agreement, Dated: 02/28/2008 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 5, Dated: 04/16/2008 | $0.00 |

78

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No 6 to Energy Services Contract, Dated: 12/15/2009 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Amendment No 7 to Extend Agreement, Dated: 06/30/2010 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: Supply Chain Management 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Drilling Services Contract, Dated: 02/04/2013 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: Supply Chain Manager 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Engineering Services Contract, Dated: 06/01/2006 | $0.00 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. Attn: General Counsel/ Supply Chain Manager 900 East Benson Boulevard PO Box 196612 Anchorage, AK  99519-6612 United States | Field Services Contract (Single Project), Dated: 08/12/2013 | $0.00 |
| Parker Technology, Inc. | Bronco Manufacturing, Inc. Attn: Max Mantooth 4448 South Jackson Tulsa, OK  74107-7168 United States | License Agreement, Dated: 06/12/2000 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | ConocoPhillips Alaska, Inc. Attn: General Counsel 700 G Street Anchorage, AK  99501 United States | Drilling Agreement - Limited Services, Dated: 12/16/2014 | $0.00 |
| Parker Technology, Inc. | Crowley Marine Services, Inc. Attn: Jim Van De Veen, Project Manager 201 Arctic Slope Avenue Anchorage, AK  99518 United States | Lease Agreement - Canning River Camp (CRC), Dated: 08/29/2011 | $0.00 |
| Parker Technology, Inc. | Crowley Marine Services, Inc. Attn: General Counsel 1102 SW Massachusetts Street Seattle, WA  98134 United States | The Baltic and International Maritime Council Standard Transportation Contract for Heavy and Voluminous Cargoes, Dated: 02/02/2010 | $0.00 |
| Parker Technology, Inc. | Essex Crane Rental Corp Attn: General Counsel 1110 Lake Cook Road, Suite 220 Buffalo Grove, IL   60089 United States | Equipment Rental Agreement, Dated: 10/02/2009 | $0.00 |
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk,  693000 Russia | Amendment # 1, Dated: 05/17/2011 | $0.00 |
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk,  693000 Russia | Amendment # 1, Dated: 07/21/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk,  693000 Russia | Amendment # 2, Dated: 05/17/2011 | $0.00 |
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Amendment No 1 Goods and Services Agreement Covering Engineering, Procurement, and Construction Management Services, Dated: 12/16/2014 | $0.00 |
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Consulting Agreement Covering Engineering Consulting Services, Dated: 05/17/2011 | $0.00 |
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: Geary Bane 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Consulting Agreement for Sakhlin-1 Project, Dated: 01/26/2009 | $0.00 |
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Consulting Agreement for Sakhlin-1 Project, Sakhalin Island, Dated: 10/09/2012 | $0.00 |
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Goods and Services Agreement Covering Feed and Equipment, Dated: 09/13/2013 | $0.00 |

81

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Third Amendment to Supply Agreement, Dated: 01/27/2016 | $0.00 |
| Parker Technology, Inc. | Genesis Engineering Attn: General Counsel 11111 Richmond Avenue Suite 101 Houston, TX  77082 United States | MPDR Engineering Services Subcontract, Dated: 02/01/2011 | $0.00 |
| Parker Technology, Inc. | Khan Co Ltd Attn: General Counsel 4th Floor Khan Building 915 Aju-Dong Geoje-Si Gyeongnam, Republic of Korea | Lease Agreement for Office Space, Dated: 10/04/2012 | $0.00 |
| Parker Technology, Inc. | Korea Inspection & Testing Co Ltd Attn: General Counsel 396-5 Hakseong-Dong Jung-Gu Ulsan, 681-822 Republic of Korea, | Lease Agreement (9 units) for Shine Vill II (KITCO VILL), Dated: 10/25/2012 | $0.00 |
| Parker Technology, Inc. | Korn/ Ferry International Attn: General Counsel 700 Louisiana Suite 3900 Houston, TX  77002 United States | Engagement Letter Re: CEO Search, Dated: 03/13/2012 | $0.00 |
| Parker Technology, Inc. | Kvaerner Field Development Inc. Attn: President 11757 Katy Freeway Suite 1200 Houston, TX  77079 United States | Consulting Agreement Principal Document, Dated: 02/11/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | Peak Oilfield Service Company, LLC<br>Attn: General Counsel<br>2525 C Street, Suite 201<br>Anchorage, AK  99503<br>United States | Lease Agreement - Canning River Camp (CRC), Dated: 06/20/2012 | $0.00 |
| Parker Technology, Inc. | Porta-Kamp<br>Attn: Chris Braun<br>555 Gelhorn<br>Houston, TX  77029<br>United States | Mobile Camp Facilities Construction Agreement, Dated: 10/16/2009 | $0.00 |
| Parker Technology, Inc. | RDC Services, Inc.<br>Attn: Bui Dao<br>5315 Cherokee<br>Houston, TX  77005<br>United States | MPSETADS Engineering Services Subcontract Re Basic Design Package Development for Woodside Energy Ltd, Dated: 05/11/2011 | $0.00 |
| Parker Technology, Inc. | SNC-Lavalin Inc.<br>Attn: General Counsel<br>20 Maverick Place<br>Paradise, NL  AIL 0J1<br>Canada | Memorandum of Understanding and Preliminary Subcontract White Rose Extension Project (WREP) Wellhead Platform, Dated: 10/24/2011 | $0.00 |
| Parker Technology, Inc. | Thurman, Kenneth Vern<br>77468 Dugan Land<br>Cottage Grove, OR  97424<br>United States | Contractor Agreement, Dated: 02/08/2011 | $0.00 |
| Parker Technology, Inc. | Tidal Power Systems<br>Attn: General Counsel<br>4202 Chance Lane<br>Rosharon, TX  77583<br>United States | Service Contract, Dated: 10/05/2010 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | Woodside Browse Pty Ltd<br>Attn: General Counsel<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 | $0.00 |
| Parker Technology, Inc. | Woodside Energy Ltd<br>Attn: Gareth Holmes<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | Development of Natural Gas Agreement, Dated: 05/12/2011 | $0.00 |
| Parker Technology, Inc. | Woodside Energy Ltd<br>Attn: General Counsel<br>St Georges Terrace<br>Perth, WA 6000<br>Australia | Memorandum of Agreement, Dated: 02/25/2011 | $0.00 |
| Parker Technology, Inc. | Woodside Energy Ltd<br>Attn: Clark Brannin<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | MPSETADS Basic Design Package Development Agreement, Dated: 04/19/2011 | $0.00 |
| Parker Technology, Inc. | Woodside Energy Ltd<br>Attn: General Counsel<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | MPSETADS Basic Design Package Development Agreement, Dated: 04/19/2011 | $0.00 |
| Parker Technology, Inc. | Woodside Energy Ltd<br>Attn: General Counsel<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | MP-SETADS Phase II Concept Development, Dated: 01/12/2010 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Parker Technology, Inc. | Woodside Energy Ltd<br>Attn: General Counsel<br>Woodside Plaza<br>240 St. Georges Terrace<br>Perth, WA 6000<br>Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 | $0.00 |
| Parker Technology, Inc. | World Total Care Service Ltd<br>Attn: General Counsel<br>536-1, Okpo 1-Dong<br>Geoje City, Gyeongnam, 656-904<br>Republic of Korea | Lease Agreement, Dated: 01/15/2013 | $0.00 |
| Parker Technology, Inc. | Worleyparsons Group Inc.<br>Attn: General Counsel<br>5 Greenway Plaza<br>Houston, TX  77046<br>United States | Engineering, Design, Procurement and Technical Support Services Subcontract, Dated: 07/10/2008 | $0.00 |
| Parker Technology, Inc. | Worleyparsons International, Inc.<br>Attn: General Counsel<br>5 Greenway Plaza<br>Houston, TX  77046<br>United States | Subcontract No. 15644411-8001, Dated: 07/10/2008 | $0.00 |
| Parker Technology, L.L.C. | Dixie Electric, Inc<br>Attn: General Counsel<br>PO Box 9784<br>New Iberia, LA  70562-9784<br>United States | Service Agreement, Dated: 06/08/2007 | $0.00 |
| Quail Tools, L.P. | A.P. Moller - Maersk A/S<br>Attn: General Counsel<br>Esplanaden 50<br>Copehagen K<br>Copenhagen, 1098<br>Denmark | GRC Framework Agreement, Dated: 11/20/2012 | $0.00 |

85

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Aguas Profundas Limitada<br>Attn: General Counsel<br>Rua Mae Isabel<br>Bungo No. 6<br>Luanda,<br>Angola | Service Agreement -<br>Angola Operations-<br>Onshore and/or Offshore,<br>Dated: 05/01/2012 | $0.00 |
| Quail Tools, L.P. | Benterra Corporation<br>Attn: General Counsel<br>4900 California Ave.<br>Suite A135<br>Bakersfield, CA  93309<br>United States | Services Contract, Dated:<br>06/13/2002 | $0.00 |
| Quail Tools, L.P. | BP America Production<br>Company<br>Attn: General Counsel<br>501 Westlake Park Bouleva Road<br>Houston, TX  77079<br>United States | Well Services Contract ,<br>Dated: 01/31/2009 | $0.00 |
| Quail Tools, L.P. | BP American Production<br>Company<br>Attn: Scanning Depart<br>BP Upstream, General<br>PO Box 696494<br>San Antonio, TX  78269<br>United States | Amendment No. 7 to<br>Contract for Rental Tools ,<br>Dated: 02/01/2014 | $0.00 |
| Quail Tools, L.P. | BP Exploration Operating<br>Company Limited<br>Attn: General Counsel<br>3 road Fl., Joroadan Dubai<br>Capital Building<br>PO Box 850863<br>Airport Road<br>Amman, 11185<br>Jordan | Limited Service Order,<br>Dated: 11/02/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Bravo Pipeline Company Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 | $0.00 |
| Quail Tools, L.P. | Bravo Pipeline Company Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 | $0.00 |
| Quail Tools, L.P. | Bravo Pipeline Company Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 | $0.00 |
| Quail Tools, L.P. | Bravo Pipeline Company Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 | $0.00 |
| Quail Tools, L.P. | Burlington Resources Oil & Gas Company LP Attn: Accounts Payable 717 Texas Avenue Suite 2100 Houston, TX  77002-2712 United States | Special Purchasing Contract, Dated: 06/01/2005 | $0.00 |
| Quail Tools, L.P. | Cantium, LLC Attn: General Counsel 111 Park Place Suite 100 Covington, LA  70433 United States | Safety and Environmental Management System Bridging Agreement, Dated: 05/03/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Castex Offshore, Inc & Castex Energy, Inc.<br>Attn: General Counsel<br>333 North Sam Houston Pkwy, E Suite 1060<br>Houston, TX  77060<br>United States | First Amendment to Agreement, Dated: 10/26/2015 | $0.00 |
| Quail Tools, L.P. | Chevron North America Exploration And Production Company<br>Attn: General Counsel<br>1500 Louisiana Street<br>Houston, TX  77002<br>United States | Amendment No. 1 To Equipment Lease , Dated: 03/31/2014 | $0.00 |
| Quail Tools, L.P. | Chevron North America Exploration And Production Company<br>Attn: General Counsel<br>1500 Louisiana Street<br>Houston, TX  77002<br>United States | Amendment No. 5 to Equipment Lease Contract, Dated: 08/04/2014 | $0.00 |
| Quail Tools, L.P. | Chevron North America Exploration And Production Company<br>Attn: Stanley Lew<br>1500 Louisiana Street<br>Houston, TX  77002<br>United States | Equipment Rental Contract, Dated: 01/01/2017 | $0.00 |
| Quail Tools, L.P. | Chevron U.S.A. Inc.<br>Attn: Contracts Administration<br>100 Northpark Boulevaroad<br>Covington, LA  70433<br>United States | Amendment No. 1 To Equipment Lease , Dated: 02/15/2016 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Chevron U.S.A. Inc.<br>Attn: General Counsel<br>1400 Smith<br>Houston, TX  77002<br>United States | Amendment No. 1 to Equipment Lease, Dated: 12/13/2012 | $0.00 |
| Quail Tools, L.P. | Chevron U.S.A. Inc.<br>Attn: Carol Hector<br>700 Cherrington Parkway<br>Coraopolis, PA  15108<br>United States | Amendment No. 1 to Service Order , Dated: 05/24/2018 | $0.00 |
| Quail Tools, L.P. | Chevron U.S.A. Inc.<br>Attn: General Counsel<br>1500 Louisiana Street<br>Houston, TX  77002<br>United States | Amendment No. 2 to Equipment Lease, Dated: 03/01/2015 | $0.00 |
| Quail Tools, L.P. | Chevron U.S.A. Inc.<br>Attn: General Counsel<br>1400 Smith<br>Houston, TX  77002<br>United States | Amendment No. 6 to Equipment Lease Contract, Dated: 10/01/2016 | $0.00 |
| Quail Tools, L.P. | Chevron U.S.A. Inc.<br>Attn: General Counsel<br>1400 Smith<br>Houston, TX  77002<br>United States | Equipment Lease , Dated: 04/01/2012 | $0.00 |
| Quail Tools, L.P. | Chevron U.S.A. Inc.<br>Attn: General Counsel<br>1400 Smith<br>Houston, TX  77002<br>United States | Equipment Lease, Dated: 07/07/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Chevron U.S.A. Inc., Acting Through Its Division, Chevron North America Exploration and Production Company Attn: General Counsel 1500 Louisiana Street Houston, TX  77002 United States | Amendment No. 4 to Equipment Lease Contract, Dated: 03/31/2016 | $0.00 |
| Quail Tools, L.P. | Chevron U.S.A., Inc. Through Its Division Chevron North America Exploration And Production Company Attn: General Counsel PO Box 2100 Houston, TX  77252-2100 United States | Amendment No. 1 to Service Order, Dated: 03/04/2016 | $0.00 |
| Quail Tools, L.P. | ConocoPhillips Attn: Hannah Pena 935 North Eldridge Parkway Ec3-18-E086 Houston, TX  77079 United States | Scope of Work and OLA Compensation Agreement, Dated: 10/01/2016 | $0.00 |
| Quail Tools, L.P. | ConocoPhillips Alaska, Inc. Attn: Ato 1020A 700 G Street Anchorage, AK  99501-0360 United States | Downhole Equipment Lease Agreement, Dated: 02/21/2014 | $0.00 |
| Quail Tools, L.P. | ConocoPhillips Company Attn: General Counsel PO Box 2197 Houston, TX  77252-2197 United States | Amendment No. 301799 to Agreement No. 290152, Dated: 02/01/2015 | $0.00 |
| Quail Tools, L.P. | ConocoPhillips Company Attn: Lindsey Broadwell PO Box 2197 Houston, TX  77252-2197 United States | Scope of Work and Compensation Agreement, Dated: 07/01/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|--------|--------------------------------------|----------------------|----------------------|
| Quail Tools, L.P. | Continental Resources, Inc. Attn: General Counsel PO Box 268870 Oklahoma City, OK 73126 United States | Amendment 1 Commercial Pricing Agreement/Scope of Work, Dated: 06/16/2015 | $0.00 |
| Quail Tools, L.P. | Continental Resources, Inc. Attn: General Counsel PO Box 268870 Oklahoma City, OK 73126 United States | Amendment 2 Commercial Pricing Agreement/ Scope of Work, Dated: 12/19/2017 | $0.00 |
| Quail Tools, L.P. | Continental Resources, Inc. Attn: General Counsel PO Box 268870 Oklahoma City, OK 73126 United States | Commercial Pricing Agreement/Scope of Work, Dated: 06/16/2015 | $0.00 |
| Quail Tools, L.P. | Cortex Business Solutions USA, LLC Attn: Sandra Weiler 3404 25 Street NE Calgary, AB T1Y 6C1 Canada | Integration Services Agreement, Dated: 06/23/2014 | $0.00 |
| Quail Tools, L.P. | Drilling Info Inc. Attn: Shawn M Shillington Secretary And Assistant General Counsel 2901 Via Fortuna Building 6 Suite 700 Austin, TX 78746 United States | Drilling Info Order Form , Dated: 04/06/2018 | $0.00 |
| Quail Tools, L.P. | Eagle Consulting, L.L.C. and Facilities, Inc. Attn: General Counsel 850 Engineers Road Belle Chasse, LA 70037 United States | Mutual Indemnity Agreement and Waiver of Recourse, Dated: 01/21/2004 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Energy XXI<br>Attn: Manager-Logistics<br>1021 Main Street<br>Suite 2626<br>Houston, TX  77002<br>United States | Special Pricing Agreement Between Energy XXI and Quail Tools, LLC, Dated: 07/01/2014 | $0.00 |
| Quail Tools, L.P. | Eni Us Operating Co. Inc.<br>Attn: General Counsel<br>Two Allen Center<br>1200 Smith Street<br>Suite 1700<br>Houston, TX  77002<br>United States | Blanket Order Amendment , Dated: 04/01/2017 | $0.00 |
| Quail Tools, L.P. | EQT Production Texas, LLC<br>C/O EQT Corporation<br>Attn: Lisa Spaniel<br>625 Liberty Avenue<br>Suite 1700<br>Pittsburgh, PA  15222<br>United States | Letter regarding EQT Production Texas, LLC, Dated: 06/23/2014 | $0.00 |
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda<br>Attn: General Counsel<br>Rua Lauro Muller, 116, Sala 3001 - Parte<br>Rio De Janeiro,  RJ 22290-160<br>Brazil | Amendment No. 1 to Order, Dated: 01/23/2009 | $0.00 |
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda<br>Attn: General Counsel<br>Rua Lauro Muller, 116, Sala 3001 - Parte<br>Rio De Janeiro, RJ 22290-160<br>Brazil | Amendment No. 2 to Order, Dated: 04/13/2009 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira LTDA C/O Exxonmobil Development Company Attn: General Counsel PO Box 4876 Dev-Gp4-1296 Houston, TX  77010-4876 United States | Order under Goods and Services Agreement, Dated: 12/06/2008 | $0.00 |
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda Attn: General Counsel Rua Lauro Muller, 116, Sala 3001 - Parte Rio De Janeiro, RJ 22290-160 Brazil | Order, Dated: 07/27/2009 | $0.00 |
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda Attn: General Counsel Rua Lauro Muller, 116, Sala 3001 - Parte Rio De Janeiro, 22290-160 Brazil | Order, Dated: 12/06/2008 | $0.00 |
| Quail Tools, L.P. | Exco Resources Attn: General Counsel 3000 Ericsson Drive Suite 200 Warrendale, PA  15086 United States | Letter Re: Awarding of Drill Pipe Rental Contract, Dated: 05/27/2014 | $0.00 |
| Quail Tools, L.P. | Exxon Neftegas Limited Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Amendment No. 1 to Sub agreement , Dated: 02/19/2016 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Exxonmobil Development Company<br>Attn: General Counsel<br>16495 Northchase Boulevaroad<br>Houston, TX  77060<br>United States | Amendment 11 to the Continuing Services Agreement , Dated: 10/01/2000 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 1, Dated: 10/04/2016 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 2 , Dated: 11/21/2008 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 3 , Dated: 03/31/2009 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 4, Dated: 07/01/2009 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 5, Dated: 03/28/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 6 to Sub agreement, Dated: 11/07/2011 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 7 to Sub agreement, Dated: 03/24/2016 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: General Counsel<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Amendment No. 8 to Sub agreement, Dated: 07/18/2016 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: Richard D. Brown, Procurement Specialist<br>16945 Northchase Drive<br>Houston, TX  77060<br>United States | Form of Sub agreement, Dated: 03/24/2008 | $0.00 |
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: Daniel J. Babik<br>16945 Northchase Drive<br>Room 916<br>Houston, TX  77060<br>United States | Standard Procurement Agreement for Equipment Rental with Incidental Services, Dated: 01/24/2006 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Exxonmobil Global Services Company<br>Attn: Lauren English<br>22777 Springwoods Village Parkway<br>Spring, TX  77389<br>United States | Sub agreement, Dated: 10/04/2016 | $0.00 |
| Quail Tools, L.P. | Gaither Petroleum Corp.<br>Attn: General Counsel<br>18000 Groeschke Road<br>Suite A1<br>Houston, TX  77084<br>United States | Quail Tools Prepayment Agreement, Dated: 05/25/2007 | $0.00 |
| Quail Tools, L.P. | Gaither Petroleum Corp.<br>Attn: General Counsel<br>18000 Groeschke Road<br>Suite A1<br>Houston, TX  77084<br>United States | Quail Tools Prepayment Agreement, Dated: 07/09/2007 | $0.00 |
| Quail Tools, L.P. | Golden Eagle Exploration, LLC<br>Attn: General Counsel<br>PO Box 1204<br>Moab, UT  84532<br>United States | Quail Tools Prepayment Agreement , Dated: 02/09/2018 | $0.00 |
| Quail Tools, L.P. | Grant Prideco, LP<br>Attn: General Counsel<br>10100 Houston Oaks Drive<br>Houston, TX  77064<br>United States | Amendment No. 4 to Technology Licensing Agreement, Dated: 11/19/2017 | $0.00 |
| Quail Tools, L.P. | Grant Prideco, LP<br>Attn: General Counsel<br>7909 Parkwood Circle Drive<br>Houston, TX  77036<br>United States | First Amendment to Technology License Agreement, Dated: 06/25/2015 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Grant Prideco, LP<br>Attn: General Counsel<br>10100 Houston Oaks Drive<br>Houston, TX  77064<br>United States | Technology License Agreement Second Amendment, Dated: 10/20/2016 | $0.00 |
| Quail Tools, L.P. | Grant Prideco, LP<br>Attn: General Counsel<br>10100 Houston Oaks Drive<br>Houston, TX  77064<br>United States | Technology License Agreement Third Amendment, Dated: 07/31/2017 | $0.00 |
| Quail Tools, L.P. | Grant Prideco, LP<br>Attn: General Counsel<br>400 N. Sam Houston Parkway East<br>Suite 900<br>Houston, TX  77060<br>United States | Technology License Agreement, Dated: 04/04/2013 | $0.00 |
| Quail Tools, L.P. | Halliburton Energy Services, Inc.<br>Attn: General Counsel<br>10200 Bellaire Boulevaroad<br>Houston, TX  77072-5299<br>United States | Amendment Number 01 to Contract , Dated: 12/04/2009 | $0.00 |
| Quail Tools, L.P. | Hess Corporation<br>Attn: Cheryl Pressley Global Supply Chain<br>1501 Mckinney Street<br>Houston, TX  77010<br>United States | Amendment No. 1 to Commercial Agreement, Dated: 07/15/2014 | $0.00 |
| Quail Tools, L.P. | Hess Corporation<br>Attn: General Counsel<br>1501 Mckinney Street<br>Houston, TX  77010<br>United States | Letter of Award for Provision of Drilling and Completion Rental Tools, Dated: 09/12/2011 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Hess Corporation<br>Attn: Cheryl Pressley Global Supply Chain<br>1501 McKinney Street<br>Houston, TX 77010<br>United States | Rental Tool Equipment and Services Eagle Ford, Dated: 11/10/2011 | $0.00 |
| Quail Tools, L.P. | Hornet-Permian 1, L.P.<br>Attn: Peter H. Billipp<br>6925 Portwest Drive<br>Houston, TX 77024<br>United States | Lease Agreement, Dated: 10/01/2018 | $0.00 |
| Quail Tools, L.P. | Laguana Petroleum Corporation<br>Attn: Jody Garcia<br>#6 Desta Drive<br>Suite 6000<br>Midland, TX 79705<br>United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 | $0.00 |
| Quail Tools, L.P. | Laguana Petroleum Corporation<br>Attn: Mark S. Roberts<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX 77046<br>United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 | $0.00 |
| Quail Tools, L.P. | Laguana Petroleum Corporation<br>Attn: Janah Hemphill<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX 77048<br>United States | Statement No. SCT-21000033227, Dated: 11/01/2012 | $0.00 |
| Quail Tools, L.P. | Laguna Petroleum Corporation<br>Attn: Courtney Hermes<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX 77046<br>United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 | $0.00 |

98

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Lime Rock Resources II-A, LP Attn: Mr. C Tim Miller Heritage Plaza 1111 Bagby Stree 46th Floor Houston, TX  77002 United States | Service Contract, Dated: 05/25/2016 | $0.00 |
| Quail Tools, L.P. | Lime Rock Resources III-A, LP Attn: Mr. C Tim Miller Heritage Plaza 1111 Bagby Stree 46th Floor Houston, TX  77002 United States | Service Contract, Dated: 05/25/2016 | $0.00 |
| Quail Tools, L.P. | Lime Rock Resources IV-A, LP Attn: Mr. C Tim Miller Heritage Plaza 1111 Bagby Stree 46th Floor Houston, TX  77002 United States | Service Contract, Dated: 05/25/2016 | $0.00 |
| Quail Tools, L.P. | Martin Resource Management Corporation Attn: General Counsel PO Box 191 Kilgore, TX  75663 United States | Facility Access and Indemnity Agreement (Revised), Dated: 06/10/2010 | $0.00 |
| Quail Tools, L.P. | NBL Permian LLC C/O Noble Energy, Inc. Attn: Global Contracts Manager 1001 Noble Energy Way Houston, TX  77070 United States | Adoption and Ratification Agreement , Dated: 09/02/2017 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Nexem Petroleum U.S.A. Inc.<br>Attn: General Counsel<br>12790 Merit Drive<br>Suite 800<br>Dallas, TX  75251<br>United States | Vendor Pricing Arrangement, Dated: 08/01/2006 | $0.00 |
| Quail Tools, L.P. | Noble Drilling (U.S.) LLC<br>Attn: General Counsel<br>13135 S, Dairy Ashford Road<br>Suite 800<br>Sugar Land, TX  77057<br>United States | Mutual Indemnity and Hold Harmless Agreement, Dated: 11/09/2017 | $0.00 |
| Quail Tools, L.P. | Noble Drilling, LLC<br>Attn: General Counsel<br>13135 S, Dairy Ashford Road<br>Suite 800<br>Sugar Land, TX  77470<br>United States | Quail Tools , Dated: 07/30/2013 | $0.00 |
| Quail Tools, L.P. | Occidental Permian Ltd.<br>Attn: Courtney Hermes<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77046<br>United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 | $0.00 |
| Quail Tools, L.P. | Occidental Permian Ltd.<br>Attn: Supply Chain Management<br>P.O. Box 50250<br>Midland, TX  79710<br>United States | Amendment No.2 to Commercial Terms, Dated: 04/01/2014 | $0.00 |
| Quail Tools, L.P. | Occidental Permian Ltd.<br>Attn: Supply Chain Management<br>P.O. Box 50250<br>Midland, TX  79710<br>United States | Amendment to Commercial Terms, Dated: 03/23/2015 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Occidental Permian Ltd. Attn: Supply Chain Management P.O. Box 50250 Midland, TX  79710 United States | Commercial Terms, Dated: 06/30/2014 | $0.00 |
| Quail Tools, L.P. | Occidental Permian Ltd. Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 | $0.00 |
| Quail Tools, L.P. | Occidental Permian Ltd. Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 | $0.00 |
| Quail Tools, L.P. | Occidental Permian Ltd. Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc. Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc. Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 3 to MSA Statement of Commercial Terms , Dated: 07/08/2013 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Oxy USA Inc.<br>Attn: Catherine Lococo<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77046<br>United States | Amendment No. 4 to Commercial Terms, Dated: 01/11/2018 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc.<br>Attn: Catherine Lococo<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77046<br>United States | Amendment No. 5 to Commercial Terms, Dated: 03/08/2018 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc.<br>Attn: Catherine Lococo<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77046<br>United States | Amendment No.3 to Commercial Terms, Dated: 06/29/2017 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc.<br>Attn: Courtney Hermes<br>5 Greenway Plaza<br>Suite110<br>Houston, TX  77046<br>United States | Amendment to Commercial Terms, Dated: 03/16/2012 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc.<br>Attn: General Counsel<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77046<br>United States | Amendment To Commercial Terms, Dated: 05/25/2018 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc.<br>Attn: General Counsel<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77046<br>United States | MSA Statement of Commercial Terms , Dated: 03/25/2011 | $0.00 |

102

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Oxy USA Inc. Attn: Aminah Rodriguez-Ammirato 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | MSA Statement of Commercial Terms, Dated: 09/18/2012 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc. Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc. Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 | $0.00 |
| Quail Tools, L.P. | Oxy USA Inc. Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 | $0.00 |
| Quail Tools, L.P. | Oxy USA WTP LP Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 | $0.00 |
| Quail Tools, L.P. | Oxy USA WTP LP Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 | $0.00 |

103

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Oxy USA WTP LP<br>Attn: Mark S. Roberts<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77046<br>United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 | $0.00 |
| Quail Tools, L.P. | Oxy USA WTP LP<br>Attn: Janah Hemphill<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77048<br>United States | Statement No. SCT-21000033227, Dated: 11/01/2012 | $0.00 |
| Quail Tools, L.P. | Parker Drilling Company International Limited<br>Attn: General Counsel<br>Azattyk Av. 7<br>3 Floor<br>Atyrau,<br>Kazakhstan | Rental Agreement, Dated: 12/24/2013 | $0.00 |
| Quail Tools, L.P. | Permian-Skyhawk 1, LLC<br>Attn: General Counsel<br>6925 Portwest Drive, Suite 130<br>Houston, TX  77024<br>United States | Commercial Contract - Unimproved Property, Dated: 10/15/2018 | $0.00 |
| Quail Tools, L.P. | Petro Harvester Operating Company, LLC<br>Attn: General Counsel<br>5851 Legacy Circle<br>Suite 500<br>Plano, TX  75024<br>United States | Petro Harvester Operating Company, LLC, Dated: 08/09/2017 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Petrobras America Inc. Attn: Procurement/US Supervisors 10350 Richmond Avenue Suite 1400 Houston, TX  77042 United States | Equipment Lease Agreement - Drill Pipe, Dated: 10/14/2009 | $0.00 |
| Quail Tools, L.P. | Petrobras America Inc. Attn: Procurement/US Supervisors 10350 Richmond Avenue Suite 1400 Houston, TX  77042 United States | Equipment Lease Agreement - Handling Equipment, Dated: 10/14/2009 | $0.00 |
| Quail Tools, L.P. | Pioneer Natural Resources USA, Inc. Attn: General Counsel 5205 North O'Connor Boulevard Suite 200 Irving, TX  75039 United States | Contract Award Letter, Dated: 08/28/2017 | $0.00 |
| Quail Tools, L.P. | Placid Oil Company Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 | $0.00 |
| Quail Tools, L.P. | Placid Oil Company Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 | $0.00 |

105

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Placid Oil Company Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 | $0.00 |
| Quail Tools, L.P. | Placid Oil Company and Vintage Petroleum, LLC Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 | $0.00 |
| Quail Tools, L.P. | Probe Resources US Ltd Attn: General Counsel 21 Waterway Suite 300 The Woodlands, TX  77380 United States | Interim Creditor Agreement, Dated: 07/21/2009 | $0.00 |
| Quail Tools, L.P. | Probe St 214 Ltd Attn: General Counsel 21 Waterway Suite 300 The Woodlands, TX  77380 United States | Interim Creditor Agreement, Dated: 07/21/2009 | $0.00 |
| Quail Tools, L.P. | Procurement (A Division of Exxonmobil Global Services Company) Attn: General Counsel 5959 Las Colinas Blvd. Irving, TX  75039 United States | Amendment No. 18, Dated: 01/31/2006 | $0.00 |

106

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Procurement (A Division of Exxonmobil Global Services Company) Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 20, Dated: 07/11/2007 | $0.00 |
| Quail Tools, L.P. | Procurement (A Division of Exxonmobil Global Services Company Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 1 to Sub agreement A2136369, Dated: 07/15/2008 | $0.00 |
| Quail Tools, L.P. | Procurement (A Division of Exxonmobil Global Services Company) Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 17, Dated: 11/01/2005 | $0.00 |
| Quail Tools, L.P. | Procurement (A Division of Exxonmobil Global Services Company) Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 19, Dated: 01/01/2007 | $0.00 |
| Quail Tools, L.P. | Procurement (A Division of Exxonmobil Global Services Company) Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 21, Dated: 01/18/2008 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Questar Exploration and Production Company Attn: General Counsel Independence Plaza 1050 17th Street Suite 500 Denver, CO  80265 United States | General Agreement, Dated: 02/18/2003 | $0.00 |
| Quail Tools, L.P. | Questar Exploration and Production Company Attn: General Counsel Independence Plaza 1050 17th Street Suite 500 Denver, CO  80265 United States | General Services Agreement, Dated: 02/18/2003 | $0.00 |
| Quail Tools, L.P. | Risco LA Sara Operating Attn: General Counsel Two Riverway Suite 1700 Houston, TX  77056 United States | Risco LA Sara Operating, Dated: 02/14/2013 | $0.00 |
| Quail Tools, L.P. | Shell Exploration & Production Company Attn: General Counsel 701 Poydras Street Suite 802 New Orleans, LA  70139 United States | Contract of Rental Tools, Dated: 10/11/2010 | $0.00 |
| Quail Tools, L.P. | Shell Offshore Inc. Attn: General Counsel 150 North Dairy Ashford Rd Houston, TX  77079 United States | Contract for the Provision of Tubular and Downhole Rental Tools Services, Dated: 07/24/2017 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Shell Offshore, Inc.<br>Attn: General Counsel<br>150 North Dairy Ashford Rd<br>Houston, TX  77079<br>United States | Agreement for Provision of Tubular and Downhole Rental Tools Services ,<br>Dated: 07/21/2017 | $0.00 |
| Quail Tools, L.P. | Slatoil Tanzania AS (Statoil TZ)<br>Attn: General Counsel<br>C/O Equinor ASA<br>Forusbeen 50<br>Stavanger, 4035<br>Norway | Assignment and Amendment No. 6 to Drill Pipe and Rental Tools Contract , Dated:<br>10/01/2013 | $0.00 |
| Quail Tools, L.P. | Southwestern Energy Production Company And Seeco, Co.<br>Attn: General Counsel<br>2350 North Sam Houston Parkway East<br>Suite 125<br>Houston, TX  77032<br>United States | Equipment, Materials & Supplies Agreement,<br>Dated: 03/01/2009 | $0.00 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC<br>Attn: General Counsel<br>C/O Equinor ASA<br>Forusbeen 50<br>Stavanger, 4035<br>Norway | Amendment No. 1 to SAP Contract, Dated:<br>03/26/2009 | $0.00 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC<br>Attn: General Counsel<br>C/O Equinor ASA<br>Forusbeen 50<br>Stavanger, 4035<br>Norway | Amendment No. 5 to Drill Pipe and Rental Tools Contract , Dated:<br>03/18/2013 | $0.00 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC<br>Attn: General Counsel<br>C/O Equinor ASA<br>Forusbeen 50<br>Stavanger, 4035<br>Norway | Amendment No.3 to Drill Pipe and Rental Tools Contract , Dated:<br>11/13/2009 | $0.00 |

109

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC<br>Attn: General Counsel<br>C/O Equinor ASA<br>Forusbeen 50<br>Stavanger, 4035<br>Norway | Notice of Exercising SAP Contract Option, Dated: 06/10/2014 | $0.00 |
| Quail Tools, L.P. | Statoil Gulf of Mexico LLC<br>Attn: General Counsel<br>C/O Equinor ASA<br>Forusbeen 50<br>Stavanger, 4035<br>Norway | STANDARD CONTRACT FOR RENTAL EQUIPMENT BETWEEN STATOIL GULF OF MEICO LLC AND QUAIL TOOLS, LP, Dated: 07/01/2008 | $0.00 |
| Quail Tools, L.P. | Statoil Gulf of Mexico LLC<br>(Statoil LLC)<br>C/O Equinor ASA<br>Attn: General Counsel<br>Forusbeen 50<br>Stavanger, 4035<br>Norway | Assignment and Amendment No. 6 to Drill Pipe and Rental Tools Contract , Dated: 10/01/2013 | $0.00 |
| Quail Tools, L.P. | Statoil Oil & Gas Mozambique AS<br>Attn: Finance Department<br>Avenida 25 De Setembro Nr. 270<br>Time Square Building 2nd Floor, Office 19<br>Maputo,<br>Mozambique | Amendment no. 4 to Contract no. 4600011352 Drill Pipe and Rental Tools, Dated: 01/02/2013 | $0.00 |
| Quail Tools, L.P. | Statoil Texas Onshore Properties, LLC<br>Attn: General Counsel<br>2103 City West Boulevaroad<br>Suite 800<br>Houston, TX  77042<br>United States | Letter Re: Contract No. 4600018481, Exercising Option, Dated: 03/01/2014 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Statoil USA E&P Inc. Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger, 4035 Norway | SAP14600011352 - Drill Pipe and Rental Tools Amendment No. 04 KIWI, Dated: 09/13/2010 | $0.00 |
| Quail Tools, L.P. | Stone Energy Corporation Attn: General Counsel 625 E Kalisuite Saloom Road Lafayette, LA  70508 United States | First Amendment of Agreement, Dated: 11/03/2016 | $0.00 |
| Quail Tools, L.P. | Stone Energy Corporation Attn: General Counsel 625 E Kalisuite Saloom Road Lafayette, LA  70508 United States | Non Exclusive Pricing Agreement, Dated: 12/17/2015 | $0.00 |
| Quail Tools, L.P. | Swift Energy Operating, LLC Attn: General Counsel 575 North Dairy Ashford Rd Suite 1200 Houston, TX  77079 United States | Rate Sheet, Dated: 03/01/2002 | $0.00 |
| Quail Tools, L.P. | Talisman Energy Usa Inc. Attn: Mike Weekley 4 Waterway Square Plaza Suite 600 The Woodlands, TX  77380 United States | Contract for Goods, Lease Goods and/or Services, Dated: 03/13/2012 | $0.00 |
| Quail Tools, L.P. | Talisman Energy USA Inc. Attn: Calvin Walker 337 Daniel Zenker Drive Horseheads, NY  14845 United States | Well-Related Goods and/or Services, Dated: 05/20/2010 | $0.00 |

111

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Tetra Technologies, Inc. Attn: General Counsel 309 Dickson Road Houma, LA  70363 United States | Equipment Lease, Not dated | $0.00 |
| Quail Tools, L.P. | Unit Corporation Attn: Neil W. Swanson, Insurance Department 1000 Kensington Tower I 7130 South Lewis Tulsa, OK  74136 United States | Unit Master Contract, Dated: 06/20/2003 | $0.00 |
| Quail Tools, L.P. | Unum Life Insurance Company Of America Attn: General Counsel 2211 Congress Street Portland, ME  04122 United States | Short Term Disability Income Protection Plan - Class 2, Dated: 01/01/2016 | $0.00 |
| Quail Tools, L.P. | Vintage Petroleum, LLC Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 | $0.00 |
| Quail Tools, L.P. | Vintage Petroleum, LLC Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 | $0.00 |
| Quail Tools, L.P. | Vintage Petroleum, LLC Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 | $0.00 |

112

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail Tools, L.P. | Vintage Petroleum, LLC<br>Attn: Janah Hemphill<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX  77048<br>United States | Statement No. SCT-21000033227, Dated: 11/01/2012 | $0.00 |
| Quail Tools, L.P. | Vitruvian Exploration Ii, LLC<br>Attn: Reese R. Mitchell<br>4 Waterway Square Place<br>Suite 400<br>The Woodlands, TX  77380<br>United States | Vitruvian Exploration II, LLC., Dated: 09/25/2013 | $0.00 |
| Quail Tools, L.P. | Wapiti Operating, LLC<br>Attn: General Counsel<br>800 Gessner<br>Suite 1100<br>Houston, TX  77024<br>United States | Equipment Rental Agreement , Dated: 10/02/2017 | $0.00 |
| Quail Tools, L.P. | Wexpro Company<br>Attn: General Counsel<br>Independence Plaza<br>1050 17th Street<br>Suite 500<br>Denver, CO  80265<br>United States | General Agreement , Dated: 05/05/2003 | $0.00 |
| Quail Tools, L.P. | White, Keith<br>Address On File | Sale Event and Transition Agreement, Dated: 12/11/2018 | $0.00 |
| Quail Tools, L.P. | White, Marc<br>Address On File | Sale Event and Transition Agreement, Dated: 12/11/2018 | $0.00 |
| Quail Tools, L.P. | White, Wayne<br>Address On File | Sale Event and Transition Agreement, Dated: 12/11/2018 | $0.00 |

| Debtor | Contract Counterparty Name & Address | Contract Description | Contract Cure Amount |
|---|---|---|---|
| Quail USA, LLC | All Coast LLC<br>Attn: General Counsel<br>151 Southpark<br>3rd Floor<br>Lafayette, LA  70508<br>United States | Access Agreement, Not dated | $0.00 |
| Quail USA, LLC | Esso Exploration and Production Guyana Limited<br>Attn: General Counsel<br>99 New Market Street<br>Georgetown,<br>Guyana | Amendment 01 to Agreement , Dated: 11/11/2014 | $0.00 |
| Quail USA, LLC | Esso Exploration And Production Guyana Limited<br>Attn: Jeff H Simons<br>99 New Market Street<br>Georgetown,<br>Guyana | Sub agreement, Dated: 01/27/2015 | $0.00 |
| Quail USA, LLC | Esso Exploration And Production Guyana Limited (EEPGL)<br>Attn: General Counsel<br>99 New Market Street<br>North Cummingsburg<br>Georgetown,<br>Guyana | Call Off to Drill Pipe, Dated: 06/02/2015 | $0.00 |

114

## **Exhibit F**

### **Rejected Executory Contracts and Unexpired Leases**

Parker Drilling Company and its Debtor affiliates do not anticipate rejecting any Executory Contracts or Unexpired Leases.

For the avoidance of doubt, the Debtors reserve the right, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders, to change determinations with respect to the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases.

## EXHIBIT G

### Schedule of Retained Causes of Action

Article IV.T of the Plan provides as follows:

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.T include any claim or Cause of Action with respect to, or against, a Released Party that is released under Article VIII of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.T that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article IV.T of the Plan, the following **Exhibit G(i)** through **Exhibit G(viii)** (each of which is attached hereto) include specific types of causes of actions expressly preserved by the Debtors and the Reorganized Debtors, including:

- **Exhibit G(i)**:          Claims Related to Contracts and Leases

- **Exhibit G(ii)**:         Claims Related to Insurance Policies

- **Exhibit G(iii)**:       Claims Related to Liens

- **Exhibit G(iv)**:       Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Potential Litigation

- **Exhibit G(v)**:          Claims Related to Accounts Receivable and Accounts Payable

- **Exhibit G(vi)**:       Claims Related to Escrow Amounts, Security Deposits, Trust Accounts, Annuities, and Other Collateral Postings

- **Exhibit G(vii)**:      Claims Related to Tax Refunds

- **Exhibit G(viii)**:     Claims Related to Customer Obligations

Certain documents, or portions thereof, contained in this **Exhibit G** and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors and the Consenting Stakeholders. The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

## EXHIBIT G(i)

### Claims Related to Contracts and Leases

The following **Exhibit G(i)** includes contracts and leases to which one or more Debtors are a party. Unless otherwise specifically released under Article VIII the Plan, the Debtors expressly reserve the Causes of Actions, based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or lease is included on **Exhibit G(i)**, including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors. The claims and Causes of Actions reserved include, without limitation, Causes of Action against vendors, suppliers of goods or services, customers, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) for environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims. The Debtors further incorporate by reference the Assumed Executory Contracts and Unexpired Lease List filed contemporaneously as part of the Plan Supplement.

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| 2M-TEK, Inc. | RFI Properties, LLC | Attn: Steve Robbins 13603 Cardinal Cove Court Cypress, TX  77429 United States | Industrial Building Lease, Dated: 06/14/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Anachoreta, Inc. | PT Daya Alam Tehnik Inti. | Attn: General Counsel Beltway Office Park, Tower A, Level 3a Jl. Ampera Raya No. 09-10 Cilandak Jakarta Selatan, 12550 Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 |
| Anachoreta, Inc. | PT Kinanti Satya Karsa (Kinanti), The Parent Company Of Dati | Attn: General Counsel A Jl Adityawarman 40 Jakarta, 12160 Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 |
| Parker Drilling Arctic Operating, LLC | ABM Janitorial Services - Northwest Inc. | Attn: General Counsel 5001D Eagle Street Anchorage, AK 99503 United States | Janitorial Service Agreement, Dated: 08/20/2012 |
| Parker Drilling Arctic Operating, LLC | Afognak Leasing, LLC | Attention: Ana Fisk 3909 Arctic Blvd. Suite 500 Anchorage, AK 99503 United States | Agreement to Amend Sublease of Crazy Horse Parcel, Dated: 08/27/2018 |
| Parker Drilling Arctic Operating, LLC | Afognak Leasing, LLC | Attention: Ana Fisk 3909 Arctic Blvd. Suite 500 Anchorage, AK 99503 United States | Fourth Amendment to Sublease, Dated: 12/01/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP | Attn: General Counsel BP Building 200 Chertsey Road Middlesex Sunbury On Thames, TW16 7BP United Kingdom | Electronic Record and Signature Disclosure, Dated: 04/11/2018 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment 5 to Drilling Rig Contract, Dated: 06/10/2015 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 02 Extending Agreement, Dated: 05/31/2011 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 1 - Project Execution Schedule, Dated: 08/06/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 1 - Project Execution Schedule, Dated: 08/06/2012 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 1 to Drilling and Workover/Completion Services Release, Dated: 04/01/2012 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 1 to Release No. 12581, Dated: 08/06/2012 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 1 to Release No. 12582, Dated: 08/06/2012 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 1 to Release No. CW2140036, Dated: 12/15/2017 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: Supply Chain Manager 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 1 to Release No. CW2140036, Dated: 12/15/2017 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 1, Dated: 06/14/2010 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: Supply Chain Manager 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 1, Dated: 06/14/2010 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 10 to Release No. 12582, Dated: 01/01/2017 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 12 to Release No. 12582, Dated: 02/20/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 2 to Drilling and Workover/Completion Service Release, Dated: 12/28/2012 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 2 to Drilling and Workover/Completion Services Agreement, Dated: 01/06/2013 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 2 to Release No. 12581, Dated: 12/28/2012 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 2 to Release No. 12582, Dated: 01/06/2013 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 2 to Release No. CW2140036, Dated: 02/20/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 2 to Supply and Operating Agreement, Dated: 08/06/2012 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 3 - Project Drilling Rig Service Contract, Dated: 02/21/2013 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 3 to Drilling and Workover/Completion Services Agreement, Dated: 02/21/2013 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 3 to Release No. 12581, Dated: 01/01/2014 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 3 to Release No. CW2140036, Dated: 04/05/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 3, Dated: 01/01/2014 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 4 to Drilling and Workover/Completion Services Agreement, Dated: 01/01/2014 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 4 to Release No. 12581, Dated: 08/22/2014 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 4 to Release No. 12582, Dated: 01/01/2014 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 4 to Release No. CW2140036, Dated: 05/10/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 5 to Release No. 12581, Dated: 04/01/2015 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 5 to Release No. 12582, Dated: 08/22/2014 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 6 to Drilling and Workover/Completion Services Release, Dated: 04/01/2015 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 6 to Release No. 12581, Dated: 06/10/2015 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 6 to Release No. 12582, Dated: 04/01/2015 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|--------|----------------------------|-------------------------------|----------------------|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 6 to Release, Dated: 06/10/2015 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 7 to Drilling and Workover/Completion Services Release, Dated: 06/10/2015 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 7 to Release No. 12581, Dated: 03/01/2016 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No. 8 to Drilling and Workover/Completion Services Release, Dated: 03/01/2016 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 8 to Release No. 12581, Dated: 05/11/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 8 to Release No. 12582, Dated: 03/01/2016 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No. 9 to Release No. 12582, Dated: 05/23/2016 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Amendment No.3 to Release No. 12582, Dated: 02/21/2013 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: Liberty Project-Sheri Cole PO Box 196611 Anchorage, AK 99519-6611 United States | Contract Release Under Liberty Project - Drilling Rig Operations, Dated: 06/01/2009 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: Fred Fitzhugh, Pscm Representative PO Box 196612 900 E. Benson Blvd. Anchorage, AK 99519-6612 United States | General Consulting Services Contract, Dated: 07/01/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: Ryan Johnson 900 East Benson Boulevard Anchorage, AK 99508 United States | Letter Re: Cold Stack Parker Rig 273 , Dated: 03/02/2016 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Liberty Project - Drilling Rig Operations Contract , Dated: 06/01/2009 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Termination Notice of Parker 273 – Release 12581, Dated: 04/11/2016 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard Anchorage, AK 99508 United States | Termination Notice of Parker 273 - Revised Alternative Option Agreement, Dated: 05/09/2016 |
| Parker Drilling Arctic Operating, LLC | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Termination Notice, Dated: 05/09/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BP Exploration Alaska, Inc. | Attn: Rebecca Schikora, PSCM Regional Director, Alaska 900 East Benson Boulevard Anchorage, AK 99508 United States | Master Contract for Provision and Operation of Onshore Drilling Units, Dated: 11/29/2018 |
| Parker Drilling Arctic Operating, LLC | BP Exploration Alaska, Inc. | Attn: EDM/Alaska PO Box 696533 San Antonio, TX 78269 United States | Work Release Against Master Onshore Drilling Unit Contact, Dated: 11/29/2018 |
| Parker Drilling Arctic Operating, LLC | Brown, Jr., Jonathan D. | 403 Clarke Road Morgan City, LA 70380 United States | Independent Contractor Agreement, Dated: 03/29/2012 |
| Parker Drilling Arctic Operating, LLC | BVG, Inc. | Attn: General Counsel C/O Realty Executives Alaska, Inc. 341 West Tudor Road Suite 103 Anchorage, AK 99503 United States | Building Space Lease, Dated: 07/22/2008 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | BVG, Inc. | Attn: General Counsel C/O Realty Executives Alaska, Inc. 341 West Tudor Road Suite 103 Anchorage, AK 99503 United States | First Amendment to Lease, Dated: 07/22/2008 |
| Parker Drilling Arctic Operating, LLC | Calais Company, Inc. | Attn: General Counsel 425 G Street, Suite 200 Anchorage, AK 99501 United States | Memorandum of Sublease and Subordination, Non-disturbance and Attornment Agreement, Dated: 03/27/2014 |
| Parker Drilling Arctic Operating, LLC | CH2M Hill Alaska, Inc. | Attn: General Counsel 949 East 36th Avenue Suite 500 Anchorage, AK 99508 United States | Tenant and Landlord Release and Novation Agreement, Dated: 10/01/2018 |
| Parker Drilling Arctic Operating, LLC | Crown Plaza Anchorage | Attn: General Counsel 109 West International Airport Road Anchorage, AK 99518 United States | 2014 Local Volume Rate Agreement, Dated: 01/21/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Arctic Operating, LLC | Doyon Universal Services LLC | Attn: Vice President Facility Services 11500 C Street Anchorage, AK 99515 United States | Camp Management Services Agreement, Dated: 07/22/2011 |
| Parker Drilling Arctic Operating, LLC | Kiska Properties, LLC | C/O Pfeffer Development, LLC 425 G Street, Suite 10 Anchorage, AK 99501 United States | Second Amendment to Lease, Dated: 12/22/2014 |
| Parker Drilling Arctic Operating, LLC | Nana Management Services, LLC | Attn: VP of Operations - Camp Services 5600 B Street Anchorage, AK 99518 United States | Camp Services Agreement, Dated: 02/18/2010 |
| Parker Drilling Arctic Operating, LLC | Price, Watson | PO Box 363 Deville, LA  71328 United States | Independent Contractor Agreement, Dated: 03/29/2012 |
| Parker Drilling Arctic Operating, LLC | Stoneland Global Logistics, Inc. | Attn: General Counsel 11601 Spring Cypress Road Tomball, TX  77377 United States | Standard Contract Terms and Conditions for Merchandise Warehousemen, Dated: 04/28/2011 |
| Parker Drilling Company | Accenture Strategy Energy | Attn: General Counsel 1255 Treat Blvd Suite 250 Walnut Creek, CA 94597 United States | Letter Re Parker Drilling O&M Go-to-Market Strategy, Dated: 10/25/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Aceunico | Attn: General Counsel 4519 W Hwy 90 PO Box 10065 New Iberia, LA 70562 United States | Purchase Agreement, Dated: 01/24/2006 |
| Parker Drilling Company | Acuity Advisors, LLC, Dba Strategic Services | Attn: General Counsel Houston Lane PO Box 27885 Houston, TX 77227 United States | Consulting Agreement , Dated: 03/26/2013 |
| Parker Drilling Company | Aegis Defence Services Limited | Attn: General Counsel 39 Victoria Street London, SW1H 0EU United Kingdom | Provision to the Parker Drilling Company of Iraqi Security Conditions, Market intelligence and other services. , Dated: 02/16/2009 |
| Parker Drilling Company | Al Bahar & Associates, Advocates And Legal Consultants | Attn: General Counsel PO Box 49408 Dubai, United Arab Emirates | Letter Re: Company's Compliance Terms and Conditions and Engagement Policy, Dated: 06/15/2013 |
| Parker Drilling Company | American Express Travel Related Services Company, Inc. | C/O American Express Company, Corporate Services Operations, Aesc-P Attn: General Counsel 20022 North 31 St, Ave. Mail Code AZ-08-03-11 Phoenix, AZ 85027 United States | Corporate Services Commercial Account Agreement, Dated: 12/08/2010 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Ascende Wealth Advisers, Inc. | Attn: General Counsel 2700 Post Oak Blvd., 25th Floor Houston, TX  77056 United States | Retirement Plan Advisory Services Agreement, Dated: 11/01/2012 |
| Parker Drilling Company | Bank Of Utah As Trustee For Bowery Air, LLC | Attn: General Counsel 83 Wooster Heights Road Suite 503 Danbury, CT  06810 UNITED STATES | Amendment No. 2 to Aircraft Lease Agreement, Dated: 08/01/2019 |
| Parker Drilling Company | Bigge Crane And Rigging Co. | Attn: General Counsel 10700 Bigge Ave PO Box 1657 San Leandro, CA 94577 United States | Bare Equipment Lease Agreement, Dated: 08/09/2010 |
| Parker Drilling Company | Bluesky IT Partners LLC | Attn: General Counsel 2429 Bissonnet Street Suite 483 Houston, TX  77005 United States | Telecom and Cloud Consulting Agreement, Dated: 03/22/2017 |
| Parker Drilling Company | Boardvantage, Inc. | Attn: Contract Administration 4300 Bohannon Drive, Suite 110 Menlo Park, CA 94025 United States | Services Agreement Standard Terms and Conditions, Dated: 03/21/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Bud Griffin Customer Support | Attn: General Counsel 5101 Terminal Street Bellaire, TX  77401 United States | Preventative Maintenance Agreement, Dated: 06/01/2018 |
| Parker Drilling Company | Cameron Drilling Systems | Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2016 |
| Parker Drilling Company | Cameron Drilling Systems | Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2016 |
| Parker Drilling Company | Catamaran PBM Services, LLC ( Soon to be known as OptumRX PBM of Wisconsin, LLC) | Attn: General Counsel 1600 McConnor Parkway Schaumburg, Il 60173 United States | Client Services Agreement, Dated: 02/25/2016 |
| Parker Drilling Company | Cleverbridge, Inc. | Attn: General Counsel 350 N Clark Street Suite 700 Chicago, Il  60654 United States | General Terms for Software License, Not dated |
| Parker Drilling Company | CodeTwo Sp. Zo.O. Sp. K. | Attn: General Counsel UL. Wolnosci 16 Jelenia Gora,   58-500 Poland | Terms and Conditions and Invoice for Software , Dated: 05/09/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Compliance Wave LLC | Attn: General Counsel 241 Maple Avenue, Suite 201 Red Bank, NJ  07701 United States | License Agreement, Dated: 09/03/2016 |
| Parker Drilling Company | Control Empresarial S.A. | Attn: General Counsel Calle Donatello 206 URB. San Borja Lima, Peru | Contract of Location of Services, Dated: 04/01/2012 |
| Parker Drilling Company | Core Services Company | Attn: General Counsel 130 Belmont Drive Somerset, NJ  08873 United States | Ordering Document for Oracle License and Service Agreement, Dated: 05/29/2015 |
| Parker Drilling Company | Core Services Corporation | Attn: General Counsel 130 Belmont Drive Somerset, NJ  08873 United States | Hosting Engagement Contract, Dated: 09/01/2011 |
| Parker Drilling Company | Data Foundry | Attn: General Counsel 1044 Liberty Park Drive Austin, TX  78746-6943 United States | Description of Services Order, Dated: 08/06/2014 |
| Parker Drilling Company | Data Foundry | Attn: General Counsel 1044 Liberty Park Drive Austin, TX  78746-6943 United States | Description of Services, Dated: 08/06/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Data Foundry, Inc. | Attn: General Counsel 2500 Bee Cave Rd. Building 1, Suite 400 Austin, TX  78746 United States | Description of Services, Dated: 06/06/2017 |
| Parker Drilling Company | Data Foundry, Inc. | Attn: General Counsel 2500 Bee Cave Rd. Building 1, Suite 400 Austin, TX  78746 United States | Description of Services, Dated: 06/06/2017 |
| Parker Drilling Company | De La Morena, Doug | Address on File | Change in Control Severance Agreement, Dated: 01/01/2016 |
| Parker Drilling Company | Deutsche Bank Securities Inc. | Attn: General Counsel 60 Wall Street New York, NY 10005 United States | Letter Re: Investment Banking Services, Dated: 08/23/2011 |
| Parker Drilling Company | Digitech Office Machines, Inc. | Attn: General Counsel 2423 South College Road Lafayette, LA  70508 United States | Copier Lease and Maintenance Agreement, Dated: 09/05/2017 |
| Parker Drilling Company | Digitech Office Machines, Inc. | Attn: General Counsel 2423 South College Road Lafayette, LA  70508 United States | Copier Maintenance Agreement, Dated: 04/13/2016 |
| Parker Drilling Company | Djendou, Abdou | Address on File | Change in Control Severance Agreement, Dated: 01/01/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Dockray, Nathaniel C. | Address on File | Change in Control Severance Agreement, Dated: 01/01/2018 |
| Parker Drilling Company | Dooley Tackaberry | Attn: General Counsel Houston Corporate Headquarters 1515 West 13th Street Deer Park, TX 77536 United States | Letter Requesting Withdrawal of Items for Sale, Dated: 03/28/2016 |
| Parker Drilling Company | Edgewater Technology - Ranzal, LLC | Attn: General Counsel 1025 Westchester Avenue, Suite 10 White Plains, NY 10604 United States | Statement of Work - Support Agreement, Dated: 07/05/2018 |
| Parker Drilling Company | Egonzehnder International Inc. | Attn: General Counsel 700 Louisiana Street Suite 2850 Houston, TX  77002 United States | Letter of Proposal for Hiring Services, Dated: 07/18/2013 |
| Parker Drilling Company | Egonzehnder International Inc. | Attn: General Counsel 700 Lousiana Street Suite 2850 Houston, TX  77046 United States | Employment Agency Engagement Letter, Dated: 07/18/2013 |
| Parker Drilling Company | EiS Technologies, Inc. | Attn: General Counsel 3067 Peachtree Industrial Blvd. Suite 200 Duluth, Ga  30097 United States | Change Request, Dated: 08/11/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Employee Benefit Solutions | Attn: Vice President, Operations 2700 Post Oak Blvd., 25th Floor Houston, TX  77056-5784 United States | Business Associate Agreement, Dated: 03/01/2009 |
| Parker Drilling Company | Employee Benefit Solutions, Inc. | Attn: Vice President Operations 2700 Post Oak Boulevard, 25th Floor Houston, TX  77056 United States | Consulting and Brokerage Agreement, Dated: 03/02/2009 |
| Parker Drilling Company | Employee Benefit Solutions, Inc. | Attn: General Counsel 2700 Post Oak Boulevard 25th Floor Houston, TX  77056-5784 United States | Letter RE: Employee Benefit Solutions, Inc. Compensation for Services, Dated: 03/01/2009 |
| Parker Drilling Company | Employer Direct Healthcare, LLC | Attn: Plan Management 2100 Ross Avenue, Suite 3200 Dallas, TX  75201 United States | Plan Agreement, Dated: 01/01/2018 |
| Parker Drilling Company | Experis Us, Inc. | Attn: General Counsel 100 Manpower Place Milwaukee, WI 53212 United States | Direct Hire Agreement - Professional, Dated: 07/14/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | ExxonMobil Global Services Company | Attn: General Counsel 22777 Springwoods Village Parkway Spring, TX  77389 United States | Email re: Executed Change Order No. 24, Dated: 08/31/2018 |
| Parker Drilling Company | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Emails re: Proposed Amendments to the Agreement, Dated: 05/02/2014 |
| Parker Drilling Company | Fleet Supply Warehouse, LLC | Attn: General Counsel 205 Venture P.O. Box 9055 Houma, LA  70361 United States | Price Changes Letter, Dated: 06/30/2010 |
| Parker Drilling Company | Foster LLP | Attn: General Counsel 600 Travis Street 20th Floor Houston, TX  77002 United States | Engagement Letter for Immigration Legal Services, Dated: 09/29/2017 |
| Parker Drilling Company | Frontiermedex Inc. | Attn: General Counsel 8501 Lasalle Road Suite 200 Towson, MD  21286 United States | Amendment No. 1 to Participation Agreement, Dated: 06/12/2013 |
| Parker Drilling Company | Frontiermedex Inc. | Attn: General Counsel 8501 Lasalle Road Suite 200 Towson, MD  21286 United States | Amendment No. 2 to Participation Agreement, Dated: 12/11/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Frontiermedex,Inc. | Attn: General Counsel 8501 Lasalle Road Suite 200 Towson, MD  21286 United States | Participation Agreement, Dated: 01/01/2012 |
| Parker Drilling Company | Gaffney Kroese Corp. | Attn: General Counsel 14149 Interdrive West Houston, TX  77032 United States | Purchase Agreement, Dated: 10/10/2006 |
| Parker Drilling Company | Geach, Jason | Address on File | Change in Control Severance Agreement, Dated: 01/01/2016 |
| Parker Drilling Company | Global Jet Capital, Inc. | Attn: General Counsel 83 Wooster Heights Suite 503 Danbury, Ct  06810 United States | Lease Financing Proposal, Dated: 06/04/2018 |
| Parker Drilling Company | Greatamerica Financial Services Corporation | Attn: General Counsel 625 First Street SE Cedar Rapids, IA 52401 UNITED STATES | Agreement for Lease of Equipment , Dated: 04/15/2016 |
| Parker Drilling Company | Groupe Sharegate Inc. | Attn: General Counsel 1751 Richardson Street Suite 5400 Montreal, QC  H3K 1G6 Canada | End User License, Maintenance and Support Agreement, Dated: 10/19/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Hashim Al Timimi & Partner For Audit Co | Attn: General Counsel Al-Ameen Building First Floor Arasat Al Hindia Baghdad, Iraq | Engagement Letter for Audit Services , Dated: 01/08/2014 |
| Parker Drilling Company | Henley, Robert Allen | Address on File | Employment Agreement First Amendment, Dated: 10/31/2011 |
| Parker Drilling Company | Henley, Robert Allen | Address on File | Employment Agreement, Dated: 4/1/2011 |
| Parker Drilling Company | Hewlett-Packard Financial Services Company | Attn: General Counsel 200 Connell Drive Suite 5000 Berkeley Heights, NJ 07922 United States | Business Lease Agreement, Dated: 07/21/2017 |
| Parker Drilling Company | Hewlett-Packard Financial Services Company | Attn: General Counsel 200 Connell Drive Suite 5000 Berkeley Heights, NJ 07922 United States | Business Lease Agreement, Dated: 07/21/2017 |
| Parker Drilling Company | Hightail, Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Software License Agreement, Dated: 04/30/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
| --- | --- | --- | --- |
| Parker Drilling Company | Hightail, Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Software License Agreement, Dated: 05/25/2016 |
| Parker Drilling Company | Hightail, Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Software Subscription Agreement, Dated: 04/30/2018 |
| Parker Drilling Company | Hightail, Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Software Subscription Agreement, Dated: 05/20/2015 |
| Parker Drilling Company | Hightail, Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Subscription Agreement, Dated: 06/19/2014 |
| Parker Drilling Company | Hotel Le Germain Calgary | Attn: General Counsel 899, Central Street SW Calgary, AB  T2G 1B8 Canada | Hotel Services Corporate Rate Agreement 2014, Dated: 02/17/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Infocon-Sakhalin LLC | Attn: General Counsel 52 Bld., Nevel'skogo Street Office 7 Yuzhno-Sakhalinsk, 693000 Russia | Information (Consulting) Services Contract, Dated: 09/28/2008 |
| Parker Drilling Company | Intercontinental Hotels Group | Attn: General Counsel Three Ravinia Drive Suite 100 Atlanta, Ga  30346 United States | Mid-Market Account Program Agreement, Dated: 05/20/2011 |
| Parker Drilling Company | It Convergence Inc. | Attn: General Counsel 5370 Kietzke Lane Suite 200 Reno, NV  89511 United States | Statement of Work, Dated: 08/16/2018 |
| Parker Drilling Company | It Convergence, Inc. | Attn: General Counsel 5370 Kietzke Lane Suite 200 Reno, NV  89511 United States | Consulting Services Statement of Work, Dated: 08/16/2018 |
| Parker Drilling Company | Kirkland & Ellis LLP | Attn: General Counsel 609 S Main St Houston, TX  77002 United States | Active Engagement Letter Re: Outside Counsel Representation, Dated: 09/07/2018 |
| Parker Drilling Company | Kirkland & Ellis LLP | Attn: General Counsel 609 South Main Street Houston, TX  77002 United States | Letter Re: Engagement of Outside Counsel, Dated: 09/07/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Knowbe4 | Attn: General Counsel 33 North Garden Avenue Suite 1200 Clearwater, FL 33755 United States | Executed Quote for Software Training Subscription, Dated: 02/14/2018 |
| Parker Drilling Company | Knowbe4 | Attn: General Counsel 33 North Garden Avenue Suite 1200 Clearwater, FL 33755 United States | Executed Quote for Subscription Upgrade, Dated: 10/12/2018 |
| Parker Drilling Company | Konica Minolta Business Solutions U.S.A., Inc. | Attn: Contracts Department 500 Day Hill Rd. Windsor, CT  09095 United States | Copier Maintenance Agreement, Dated: 03/06/2015 |
| Parker Drilling Company | Konica Minolta Business Solutions U.S.A., Inc. | Attn: General Counsel 100 Williams Drive Ramsey, NJ  07446 United States | Copier Premier Lease Agreement, Dated: 03/06/2015 |
| Parker Drilling Company | Korn/Ferry International | Attn: General Counsel 700 Louisiana Suite 3900 Houston, TX  77002 United States | Engagement Letter Re: Board of Director Recruitment, Dated: 04/10/2013 |
| Parker Drilling Company | Korn/Ferry International | Attn: General Counsel 700 Louisiana Suite 3900 Houston, TX  77002 United States | Engagement Letter, Dated: 01/07/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Kroll Associates, Inc. | Attn: General Counsel 11440 Commerce Park Drive, Suite 501 Reston, Va  20191 United States | Engagement Confirmation, Dated: 03/16/2017 |
| Parker Drilling Company | Kroll Associates, Inc. | Attn: General Counsel 11440 Commerce Park Drive, Suite 501 Reston, VA  20191 United States | Engagement Confirmation, Dated: 08/10/2016 |
| Parker Drilling Company | Kuwait Drilling Company | Attn: Mr. Abdul Azeez R. Al-Rashed 582 E. 36th Ave Ahmadi,   61001 Kuwait | Letter of Agreement for Additional Personnel and Rates, Dated: 06/16/2003 |
| Parker Drilling Company | Logmein USA, Inc. | Attn: General Counsel 320 Summer Street Boston, Ma  02210 United States | Software Purchase, Dated: 08/24/2011 |
| Parker Drilling Company | Melton & Melton, L.L.P. | Attn: General Counsel 6002 Rogeroadale Suite. 200 Houston, TX  77072 United States | Objective and Scope of the Audit Letter, Dated: 06/18/2018 |
| Parker Drilling Company | Menger, John Edward | Address on File | Change in Control Severance Agreement, Dated: 01/01/2018 |
| Parker Drilling Company | Menger, John Edward | Address on File | First Amendment to Separation Letter Agreement, Dated: 12/18/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Menger, John Edward | Address on File | Separation Letter Agreement, Dated: 06/01/2018 |
| Parker Drilling Company | Ms Crescent Greenway Plaza SPV, LLC | Attn: General Counsel 777 Main Street Suite 2100 Fort Worth, TX 76102 United States | Second Amendment to Office Lease, Dated: 09/25/2009 |
| Parker Drilling Company | National Car Rental/Enterprise Holdings, Inc. | Attn: General Counsel 600 Corporate Park Drive St. Louis, Mo  63105 United States | Corporate Services Agreement, Dated: 07/01/2010 |
| Parker Drilling Company | Nitro Software, Inc. | Attn: General Counsel 225 Bush Street 7th Floor San Francisco, CA 94104 United States | Order Form and License Agreement, Dated: 03/23/2018 |
| Parker Drilling Company | Oracle Credit Corporation | Attn: General Counsel, Legal Department 500 Oracle Parkway Redwood City, CA 94065 United States | Amendment No. 1 to Payment Schedule No. 42070, Dated: 08/31/2011 |
| Parker Drilling Company | Oracle Credit Corporation | Attn: General Counsel 500 Oracle Parkway Redwood Shores, CA 94065 United States | Amendment One Oracle Contract Information, Dated: 08/25/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Oracle Credit Corporation | Attn: General Counsel, Legal Department 500 Oracle Parkway Redwood City, CA 94065 United States | Payment Plan Agreement, Dated: 08/31/2011 |
| Parker Drilling Company | Pitney Bowes | Attn: General Counsel 3001 Summer St. Stamford, Ct  06926 United States | Lease Agreement, Dated: 03/31/2016 |
| Parker Drilling Company | Prime Capital Investment Advisors, LLC | Attn: General Counsel 950 Echo Lane Suite #200 Houston, TX  77024 United States | Notification of Assignment of Advisory Agreement, Dated: 03/23/2018 |
| Parker Drilling Company | PT Daya Alam Tehnik Inti | Attn: General Counsel Beltway Office Park, Tower A, Level 3A Jl. Ampera Raya No. 09-10 Cilandak Jakarta Selatan, 12550 Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 |
| Parker Drilling Company | PT Kinanti Satya Karsa (Kinanti), The Parent Company Of Dati | Attn: General Counsel A JL Adityawarman 40 Jakarta,   12160 Indonesia | Memorandum of Understanding on Status or Relationship, Dated: 03/01/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Putnam Investor Services, Inc., | Attn: Paul Dewey Defined Contribution Regulatory Services Department Putnam Investments 7 Shattuck Road Andover, Ma  01810 United States | Administrative Services Agreement, Dated: 05/15/2012 |
| Parker Drilling Company | Sai Global Compliance Inc. | Attn: General Counsel 309 Waverley Oaks Road Waltham, Ma  02452 United States | Amendment and Renewal Order Form, Dated: 09/30/2016 |
| Parker Drilling Company | Sheraton Grand Hotel | Attn: General Counsel No. 3 Sheikh Zayed Road PO Box 123979 Dubai, United Arab Emirates | Special Rate Agreement, Dated: 08/07/2016 |
| Parker Drilling Company | Spencer Stuart | Attn: General Counsel 255 California Street, Suite 1400 San Francisco, CA 94111 United States | Letter RE: Professional Arrangements, Dated: 01/15/2011 |
| Parker Drilling Company | Star Managed Services | Attn: General Counsel 4700 Blalock Houston, TX  77041 United States | Software Agreement, Dated: 06/07/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Star Managed Services | Attn: General Counsel 4700 Blalock Houston, TX  77041 United States | Software Agreement, Dated: 06/11/2013 |
| Parker Drilling Company | Stargel Office Solutions | Attn: General Counsel 4700 Blalock Houston, TX  77041 United States | Cost Per Copy Copier Maintenance Agreement, Dated: 11/18/2016 |
| Parker Drilling Company | Stratfor | Attn: General Counsel 700 Lavaca Street Suite 900 Austin, TX  78701 United States | Amendment No. 1 to Contract, Dated: 05/03/2010 |
| Parker Drilling Company | Stratfor | Attn: General Counsel 700 Lavaca Street Suite 900 Austin, TX  78701 United States | Proposal for Services, Dated: 07/27/2009 |
| Parker Drilling Company | The Four Point By Sheraton Ventura Harbor Resort | Attn: General Counsel 1050 Schooner Drive Ventura, CA  93001 United States | Preferred Corporate Program 2013-2014 - Discounted Guestroom Rate, Dated: 04/04/2013 |
| Parker Drilling Company | The Goodland | Attn: General Counsel 5650 Calle Real Goleta, CA  93117 United States | Negotiated Corporate Rate Agreement 2014, Dated: 09/29/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | The H Hotel Dubai | Attn: General Counsel No. 1 Sheikh Zayed Road Dubai, United Arab Emirates | Corporate Rate Agreement for Hotel Services, Dated: 01/01/2016 |
| Parker Drilling Company | The Westin Galleria & Westin Oaks, Houston | Attn: General Counsel 5060 West Alabama Houston, TX  77056 United States | 2011 Volume Rate Agreement, Dated: 01/12/2012 |
| Parker Drilling Company | The Westin Galleria & Westin Oaks, Houston | Attn: General Counsel 5060 West Alabama Houston, TX  77056 United States | 2011 Volume Rate Agreement, Dated: 06/27/2011 |
| Parker Drilling Company | Thompson Reuters | Attn: General Counsel 2395 Midway Road Carrollton, TX 75006 United States | Platform and Restricted Party Screening Enhancement Proposal, Dated: 09/01/2018 |
| Parker Drilling Company | Toshiba Financial Services | Attn: General Counsel PO Box 3072 Cedar Rapids, Ia 52406-3072 United States | Equipment Lease Agreement, Dated: 09/13/2016 |
| Parker Drilling Company | Tucker, David | Address on File | Change in Control Severance Agreement, Dated: 01/27/2011 |
| Parker Drilling Company | Tucker, David | Address on File | First Amendment to Change in Control Severance Agreement, Dated: 10/01/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Umr, Inc. | Attn: General Counsel PO Box 88822 Milwaukee, WI 53288-0822 United States | Amendment to Administrative Services Agreement, Dated: 01/01/2016 |
| Parker Drilling Company | Umr, Inc. | Attn: General Counsel Umr Cobra Administration PO Box 1206 Milwaukee, WI 54402 United States | Dental Benefit Summary Plan Description Revised 01-01-2018, Not dated |
| Parker Drilling Company | Umr, Inc. | Attn: General Counsel PO Box 88822 Milwaukee, WI 53288-0822 United States | Financial Renewal Amendment, Dated: 05/18/2017 |
| Parker Drilling Company | Umr, Inc. | Attn: General Counsel Cobra Administration PO Box 1206 Milwaukee, WI 54402-1206 United States | Summary Plan Description For the Parker Drilling Company Flexible Benefit Plan for Rig-Based and Quail Tools Employees Revised 01-01-2018, Dated: 01/01/2018 |
| Parker Drilling Company | Unum Life Insurance Company Of America | Attn: General Counsel 221 Congress Street Portland, Me  04122 United States | Amendment No 13 Part of Group Policy issued to Policyholder, Dated: 10/06/2017 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Unum Life Insurance Company Of America | Attn: General Counsel 2211 Congress Street Portland, Me  04122 United States | Short Term Disability Income Protection Plan - Class 2, Dated: 01/01/2016 |
| Parker Drilling Company | Vertex, Inc. | Attn: General Counsel 1041 Old Cassalt Road Berwyn, Pa  19312 United States | Software License Agreement, Dated: 12/06/2011 |
| Parker Drilling Company | White, Keith | Address on File | Sale Event and Transition Agreement, Dated: 12/11/2018 |
| Parker Drilling Company | White, Marc | Address on File | Sale Event and Transition Agreement, Dated: 12/11/2018 |
| Parker Drilling Company | White, Wayne | Address on File | Sale Event and Transition Agreement, Dated: 12/11/2018 |
| Parker Drilling Company | Woodside Browse Pty Ltd | Attn: General Counsel Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 |
| Parker Drilling Company | Woodside Energy Ltd | Attn: General Counsel Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company | Yousendit Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Software Subscription Renewal, Dated: 06/06/2012 |
| Parker Drilling Company | Yousendit, Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Software Subscription Agreement, Dated: 05/10/2013 |
| Parker Drilling Company North America, Inc. | Exxon Mobil Corporation | Attn: General Counsel 16495 Northchase Boulevard Houston, TX  77060 United States | Drilling Operation and Maintenance Agreement, Dated: 02/13/2013 |
| Parker Drilling Company North America, Inc. | Exxon Mobil Corporation | Attn: General Counsel Corporation Service Company Princeton South Corporate Center Suite 160 100 Charles Ewing Boulevard Ewing, NJ  08628 United States | Drilling Operations & Maintenance Agreement, Dated: 08/06/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Company North America, Inc. | MBL Sturgis LLC | Attn: General Counsel 2250 Overland Ave #200 Los Angeles, CA 90064 United States | Standard Industrial/Commercial Multi-Tenant Lease - Gross, Dated: 01/17/2013 |
| Parker Drilling Company North America, Inc. | Sansum Clinic, Occupational Medicine | Attn: General Counsel/Sam Taylor, Manager 101 South Patterson Ave Santa Barbara, CA 93111 United States | Medical Service Agreement, Dated: 06/01/2013 |
| Parker Drilling Company North America, Inc. | Total Safety U.S. Inc. | Attn: General Counsel 11111 Wilcrest Green Drive, Suite 300 Houston, TX  77042 United States | Service Contract, Dated: 09/08/2014 |
| Parker Drilling Management Services, Ltd. | Action Specialties Of Lafayette, LLC | Attn: General Counsel 7915 Hwy 90 West New Iberia, LA 70560 United States | Buy-Sell and Manufacturing Agreement, Dated: 10/20/2008 |
| Parker Drilling Management Services, Ltd. | Aker Solutions Inc. | Attn: General Counsel 3010 Briar Park Drive Suite 500 Houston, TX  77042 United States | Novation to Purchase Agreement, Dated: 06/30/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Akhiya LLC | Attn: Kamala Kanaka Sundaram 11400 Monet Dr. Austin, TX  78726 United States | Consulting Services Agreement, Dated: 04/28/2016 |
| Parker Drilling Management Services, Ltd. | Alitalia | Attn: Don C. Hare, V.P. Of Administration 51 Madison Avenue Suite 2000 New York, NY 10010 United States | Corporate Incentive Agreement, Dated: 10/01/2011 |
| Parker Drilling Management Services, Ltd. | American International Relocation Services LLC | Attn: General Counsel 6 Penn Center West Suite 200 Pittsburgh, Pa  15275 United States | Relocation Services Agreement, Dated: 03/12/2013 |
| Parker Drilling Management Services, Ltd. | Axceler | Attn: General Counsel 600 Unicorn Park Drive Woburn, Ma  01801 United States | License Agreement for Software, Dated: 09/27/2010 |
| Parker Drilling Management Services, Ltd. | Benefits Science LLC | Attn: General Counsel 745 Atlantic Ave., 8th Floor Boston, Ma  02111 United States | Business Associate Agreement, Dated: 05/01/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Best Western Premier Incheon Airport Hotel | Attn: General Counsel 48-27 Gonghang-Ro 424beon-Gil Unseo-Dong Jung-Gu Incheon, Korea, Republic Of | Corporate Rate Agreement, Dated: 04/13/2017 |
| Parker Drilling Management Services, Ltd. | BitsOfCode Software Systems, Inc. | Attn: General Counsel 10777 Westheimer Road Suite 808a Houston, TX  77042 United States | SP Services Upgrade, Dated: 11/15/2017 |
| Parker Drilling Management Services, Ltd. | Bluesky IT Partners LLC | Attn: General Counsel 2429 Bissonnet Street Suite 483 Houston, TX  77005 United States | Telecom and Cloud Consulting Agreement, Dated: 03/22/2017 |
| Parker Drilling Management Services, Ltd. | Cameron A Schlumberger Company | Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2017 |
| Parker Drilling Management Services, Ltd. | Cameron A Schulmberger Company | Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems | Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2014 |
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems | Attn: General Counsel 4601 Westway Park Drvive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2015 |
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems | Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2015 |
| Parker Drilling Management Services, Ltd. | Cameron Drilling Systems | Attn: General Counsel 4601 Westway Park Drive Houston, TX  77041 United States | Supplier Pricing Agreement, Dated: 01/01/2016 |
| Parker Drilling Management Services, Ltd. | Challenger, Gray & Christmas Inc. | Attn: General Counsel 150 South Wacker Drive Suite 2800 Chicago, Il  60606 United States | Independent Contractor Agreement, Dated: 10/05/2012 |
| Parker Drilling Management Services, Ltd. | Cogent Communications, Inc. | Attn: General Counsel 1015 31st Street Washington, Dc 20007 United States | Internet Access Subscriber Agreement, Dated: 12/05/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Connolly, Lisa | Address on File | Employment Agreement, Dated: 04/16/2015 |
| Parker Drilling Management Services, Ltd. | Control Risks Services Limited | Attn: General Counsel Difc Currency House Level 3, Office 7 PO Box 125739, Sheikh Zayed Road Dubai, United Arab Emirates | Letter of Engagement, Dated: 04/25/2012 |
| Parker Drilling Management Services, Ltd. | Core Services Corporation | Attn: General Counsel 130 Belmont Drive Somerset, NJ  08873 United States | Hosting Engagement Contract, Dated: 09/01/2015 |
| Parker Drilling Management Services, Ltd. | Core Services Corporation | Attn: General Counsel 130 Belmont Drive Somerset, NJ  08873 United States | Service Hosting Engagement Contract, Dated: 09/01/2015 |
| Parker Drilling Management Services, Ltd. | Courtyard By Marriott Brownsville | Attn: General Counsel 3955 North Expressway Brownsville, TX 78520 United States | Volume Discount Rate Agreement, Dated: 01/01/2015 |
| Parker Drilling Management Services, Ltd. | Courtyard Marriott West University | Attn: General Counsel 2929 Westpark Drive Houston, TX  77005 United States | Corporate Sales Agreement, Dated: 10/12/2017 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Cousins Greenway East Parent LLC | Attn: VP, Property Management 191 Peachtree Street, Ne Suite 500 Atlanta, Ga  30303-1740 United States | Third Amendment to Office Lease, Dated: 04/04/2014 |
| Parker Drilling Management Services, Ltd. | Cousins Greenway East Parent LLC | C/O Counsins Properties Incorporated Attn: Corporate Secretary 191 Peachtree Street, Ne Suite 500 Atlanta, Ga  30303-1740 United States | Third Amendment to Office Lease, Dated: 04/04/2014 |
| Parker Drilling Management Services, Ltd. | Couture, Justin | Address on File | Employment Agreement, Dated: 04/16/2015 |
| Parker Drilling Management Services, Ltd. | Crescent Real Estate Equities LP | Attn: General Counsel 1 Greenway Plaza, Suite #725 Houston, TX  77046 United States | Short-Term Lease, Dated: 10/19/2010 |
| Parker Drilling Management Services, Ltd. | Crowne Plaza | Attn: General Counsel Houston River Oaks Near The Galleria 2712 Southwest Freeway Houston, TX  77098 United States | Room Rate Agreement, Dated: 01/04/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | De La Morena, Doug | Address on File | Change in Control Severance Agreement, Dated: 01/01/2016 |
| Parker Drilling Management Services, Ltd. | Delta, KLM, Air France | Attn: Antonio Temporini, Senior Vice President, North America 1030 Delta Blvd. Atlanta, Ga  30320 United States | Corporate Incentive Agreement, Dated: 10/01/2011 |
| Parker Drilling Management Services, Ltd. | Direct Connect Solutions LLC | Attn: Edward Burnham 9595 Six Pines, Suite 8210 The Woodlands, TX 77380 United States | Independent Contractor Agreement, Dated: 12/01/2010 |
| Parker Drilling Management Services, Ltd. | Djendou, Abdou | Address on File | Change in Control Severance Agreement, Dated: 01/01/2016 |
| Parker Drilling Management Services, Ltd. | Dockray, Nathaniel C. | Address on File | Change in Control Severance Agreement, Dated: 01/01/2018 |
| Parker Drilling Management Services, Ltd. | Dos Ranchos, Ltd, Dba Los Ranchos | Attn: General Counsel 2509 Tarryhill Place Austin, TX  78703 United States | Amendment No. 01 to the Grant of Profit A Prendre ( Three-Year Hunting and Fishing Lease), Dated: 03/27/2014 |
| Parker Drilling Management Services, Ltd. | Dos Ranchos, Ltd. Dba Los Ranchos | Attn: General Counsel PO Box 428 Hondo, TX  78861 United States | Bill of Sale, Dated: 08/30/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 UNITED STATES | Corporate Hotel Rate Agreement, Dated: 12/10/2018 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 07/19/2013 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 10/31/2016 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/13/2017 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/13/2017 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/17/2017 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 11/19/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 12/03/2014 |
| Parker Drilling Management Services, Ltd. | Doubletree By Hilton Houston Greenway Plaza | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 12/21/2015 |
| Parker Drilling Management Services, Ltd. | Drilling Systems (UK) Limited | Attn: General Counsel Hurn View House 5 Aviation Park West Bournemouth International Airport Dorset,   BH23 6EW United Kingdom | Maintenance & Technical Support Agreement, Dated: 12/19/2012 |
| Parker Drilling Management Services, Ltd. | Edgewater Technology - Ranzal, LLC | Attn: General Counsel 1025 Westchester Avenue, Suite 10 White Plains, NY 10604 United States | Statement of Work - Support Agreement, Dated: 07/05/2018 |
| Parker Drilling Management Services, Ltd. | EiS Technologies, Inc. | Attn: General Counsel 3067 Peachtree Industrial Blvd. Suite 200 Duluth, Ga  30097 United States | Change Request, Dated: 08/11/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | EiS Technologies, Inc. | Attn: General Counsel, Legal Department 3067 Peachtree Industrial Blvd. Duluth, Ga  30097 United States | EiS Software Evaluation License Agreement, Dated: 08/01/2012 |
| Parker Drilling Management Services, Ltd. | EiS Technology Services Inc. | Attn: General Counsel 3067 Peachtree Industrial Blvd. Suite 200 Duluth, Ga  30097 United States | Software Evaluation License Agreement, Dated: 11/29/2012 |
| Parker Drilling Management Services, Ltd. | Emirates | Attn: General Counsel 5th Floor 55 East 59th Street New York, NY 10022 United States | Corporate Travel Agreement, Dated: 10/01/2017 |
| Parker Drilling Management Services, Ltd. | Enaxis Consulting LP | Attn: General Counsel 9 Greenway Plaza Suite 3005 Houston, TX  77046 United States | Mater Services Consulting Agreement, Dated: 08/22/2014 |
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services Inc. | Attn: General Counsel 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Business Associate Agreement, Dated: 03/01/2015 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services, Inc. | Attn: Jill Watson 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Consulting Agreement, Dated: 01/01/2016 |
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services, Inc. | Attn: Jill Watson 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Consulting Agreement, Dated: 03/01/2015 |
| Parker Drilling Management Services, Ltd. | Gallagher Benefit Services, Inc. | Attn: Jill Watson 1900 West Loop South Suite 1600 Houston, TX  77027 United States | Consulting Agreement, Dated: 12/18/2015 |
| Parker Drilling Management Services, Ltd. | Geach, Jason | Address on File | Change in Control Severance Agreement, Dated: 01/01/2016 |
| Parker Drilling Management Services, Ltd. | Genuent | Attn: Matt Eckert 1400 Post Oak Blvd., #200 Houston, TX  77056 United States | Statement of Work No. 2 to Consulting Services Agreement, Dated: 09/15/2015 |
| Parker Drilling Management Services, Ltd. | Gherardi, Andrew | Address on File | Employment Agreement, Dated: 04/16/2015 |
| Parker Drilling Management Services, Ltd. | Global Transaction Group ,LLC | Attn: General Counsel 3646 Greenbriar Houston, TX  77046 United States | Travel Services Agreement, Dated: 05/11/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Global Transportation Group, LLC Dba Griffin Americas | Attn: General Counsel 2211 Norfolk Suite 300 Houston, TX  77098 United States | Amendment No. 1 To the Corporate Travel Agreement, Dated: 08/19/2013 |
| Parker Drilling Management Services, Ltd. | Global Transportation Group, LLC Dba Griffin Americas | Attn: General Counsel 2211 Norfolk Suite 300 Houston, TX  77098 United States | Amendment No. 3 to Travel Services Agreement, Dated: 07/01/2018 |
| Parker Drilling Management Services, Ltd. | Global Transportation Group, LLC, Dba Griffin Americas | Attn: General Counsel 2211 Norfolk Suite 300 Houston, TX  77098 United States | Amendment No. 2 To the Travel Services Agreement, Dated: 03/17/2015 |
| Parker Drilling Management Services, Ltd. | Global Transportation Group, Ltd. Dba Griffin Americas | Attn: General Counsel 3646 Greenbriar Houston, TX  77098 United States | Travel Services Agreement, Dated: 05/11/2012 |
| Parker Drilling Management Services, Ltd. | Globalserve, Inc. | Attn: General Counsel 200 Summit Lake Drive 1st Floor Valhalla, NY  10595 United States | Acquisition Management Services, Dated: 10/11/2013 |
| Parker Drilling Management Services, Ltd. | Globalserve, Inc. | Attn: General Counsel 440 Sylvan Avenue Suite 400 Englewood Cliffs, NJ 07632 United States | Addendum to Acquisition Management Services Statement of Work, Dated: 01/01/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | GWP East, LLC | Attn: Managing Director, Texas 2103 City West Blvd., Suite 130 Houston, TX  77042 United States | Fourth Amendment to Office Lease, Dated: 11/07/2017 |
| Parker Drilling Management Services, Ltd. | GWP East, LLC | Attn: Managing Director, Texas 2103 City West Blvd Suite 130 Houston, TX  77042 United States | Fourth Amendment to Office Lease, Dated: 11/07/2017 |
| Parker Drilling Management Services, Ltd. | Hampton Inn & Suites St. John's Airport | Attn: General Counsel 411 Stavanger Drive St. John's, NL  A1A 0AL Canada | Hotel Services Agreement, Dated: 10/19/2016 |
| Parker Drilling Management Services, Ltd. | Henley, Robert Allen | Address on File | Employment Agreement First Amendment, Dated: 10/31/2011 |
| Parker Drilling Management Services, Ltd. | Henley, Robert Allen | Address on File | Employment Agreement, Dated: 4/1/2011 |
| Parker Drilling Management Services, Ltd. | Hermes Datacommunications International Ltd | Attn: Kay Ravenscroft Hermes House Oxon Business Park Shrewsbury,  SY3 5DD United Kingdom | Contract for Provision of Services, Dated: 03/01/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Hitachi Consulting Corporation | Attn: Andre Butler 10370 Richmond Ave Suite 1150 Houston, TX  77042 United States | Master Consulting Agreement, Dated: 04/12/2011 |
| Parker Drilling Management Services, Ltd. | Holiday Inn London Gatwik Airport & Heathrow M4 J4 | Attn: General Counsel Shepiston Lane Hayes,   Ub3 1rw United Kingdom | Hotel Corporate Rate Agreement, Dated: 10/19/2012 |
| Parker Drilling Management Services, Ltd. | Homewood Suites Hilton Brownsville, TX | Attn: General Counsel 3759 N Expressway Brownsville, TX 78520 United States | Letter: Extension of Rates for Hotel Services, Dated: 05/04/2015 |
| Parker Drilling Management Services, Ltd. | Hotels Le Germain | Attn: General Counsel 899 Centre Street SW Calgary, Ab  T2G 1B8 Canada | Hotel Corporate Rates 2012, Dated: 03/01/2012 |
| Parker Drilling Management Services, Ltd. | HSE Training Solutions SaS | Attn: General Counsel Calle 151B, 115-92 Int. 301 Bogota, Cundinamarca, Colombia | Permission to Use Copyrighted Material, Dated: 12/15/2012 |
| Parker Drilling Management Services, Ltd. | Hyatt Regency Houston Galleria | Attn: General Counsel 2626 Sage Road Houston, TX  77056 United States | Hotel Services Preferred Rate Agreement, Dated: 04/16/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | International Business Machines Corporation (IBM) | Attn: General Counsel<br>PO Box 643600<br>Pittsburgh, Pa  15264<br>United States | Proof of Entitlement, Dated: 08/03/2015 |
| Parker Drilling Management Services, Ltd. | It Convergence, Inc. | Attn: Clay Collins, Manager<br>805 Veterans Blvd, Suite 216<br>Redwood City, CA 94063<br>United States | Statement of Work Re: Services and Rates, Dated: 04/22/2014 |
| Parker Drilling Management Services, Ltd. | Kelsey-Seybold Medical Group, Pa | Attn: General Counsel<br>2715 Cypress Point Dr.<br>Missouri City, TX 77459<br>United States | Healthcare Provider Letter of Agreement, Dated: 03/31/2014 |
| Parker Drilling Management Services, Ltd. | Knowbe4 | Attn: General Counsel<br>33 North Garden Avenue<br>Suite 1200<br>Clearwater, FL 33755<br>United States | Executed Quote for Software Training Subscription, Dated: 02/14/2018 |
| Parker Drilling Management Services, Ltd. | Knowbe4 | Attn: General Counsel<br>33 North Garden Avenue<br>Suite 1200<br>Clearwater, FL 33755<br>United States | Executed Quote for Subscription Upgrade, Dated: 10/12/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Kuehne + Nagel, Inc. | Attn: General Counsel 10 Exchange Place 19th Floor Jersey City, NJ 07302 United States | Freight Forwarding and Customs Agent Service Agreement, Dated: 11/25/2008 |
| Parker Drilling Management Services, Ltd. | Lbisat LLC | C/O Lyman Bros Inc. 10288 South Jordan Gateway #K South Jordan, Ut 84095 United States | Service Agreement Re Collocation and Teleport Services, Dated: 11/24/2004 |
| Parker Drilling Management Services, Ltd. | Le Germain Boutique-Hotels | Attn: General Counsel 899, Central Street SW Calgary, Ab  T2G 1B8 Canada | Hotel Corporate Rates 2013, Dated: 12/12/2012 |
| Parker Drilling Management Services, Ltd. | Leyyn Consulting | Attn: Francois Robert 1, Rue Merzak Ouargli Hydra,   16000 Algeria | Engagement Letter of Leyyn Consulting, Dated: 03/04/2012 |
| Parker Drilling Management Services, Ltd. | Maritime Management Services PTE Ltd | Attn: General Counsel 152 Beach Road 04-07 Gateway East   189721 Singapore | Direct Placement Services Agreement, Dated: 04/30/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Maryville Data Systems , Inc., Dba Maryville Technologies | Attn: VP And CFO 540 Maryville Centre Drive Suite 300 Saint Louis, Mo 63141 United States | Consulting Services Agreement, Dated: 06/03/2016 |
| Parker Drilling Management Services, Ltd. | Maryville Technologies | Attn: General Counsel 7777 Bonhomme Avenue Suite 2300 Clayton, Mo 63105 United States | Technology Service Management Statement of Work, Dated: 11/16/2018 |
| Parker Drilling Management Services, Ltd. | Menger, John Edward | Address on File | Change in Control Severance Agreement, Dated: 01/01/2018 |
| Parker Drilling Management Services, Ltd. | Menger, John Edward | Address on File | First Amendment to Separation Letter Agreement, Dated: 12/18/2018 |
| Parker Drilling Management Services, Ltd. | Menger, John Edward | Address on File | Separation Letter Agreement, Dated: 06/01/2018 |
| Parker Drilling Management Services, Ltd. | Microsoft Corporation | Attn: General Counsel Department 551, Volume Licensing 6100 Neil Road Suite 210 Reno, NV 89511-1137 United States | Products and Services Agreement, Dated: 04/28/2017 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Ms Crescent Greenway Plaza SPV, LLC | Attn: General Counsel 777 Main Street Suite 2100 Fort Worth, TX 76102 United States | First Amendment to Office Lease, Dated: 10/07/2008 |
| Parker Drilling Management Services, Ltd. | Ms Crescent Greenway Plaza SPV, LLC | Attn: General Counsel 777 Main Street Suite 2100 Fort Worth, TX 76102 United States | First Amendment to Office Lease, Dated: 10/07/2008 |
| Parker Drilling Management Services, Ltd. | Ms Crescent Greenway Plaza SPV, LLC | Attn: Legal Department 777 Main Street Suite 2100 Fort Worth, TX 76102 United States | Office Lease Agreement, Dated: 04/24/2018 |
| Parker Drilling Management Services, Ltd. | Ms Crescent Greenway Plaza SPV, LLC | Attn: Legal Department 777 Main Street Suite 2100 Fort Worth, TX 76102 United States | Office Lease, Dated: 04/24/2008 |
| Parker Drilling Management Services, Ltd. | Ms Crescent Greenway Plaza SPV, LLC | Attn: General Counsel 777 Main Street Suite 2100 Fort Worth, TX 76102 United States | Second Amendment to Office Lease, Dated: 09/25/2009 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Nov Distribution | Attn: General Counsel 7909 Parkwood Circle Drive Houston, TX  77036 United States | Amendment No. 5, Dated: 06/17/2016 |
| Parker Drilling Management Services, Ltd. | Nov Distribution, A Division Of National Oilwell Varco, L.P. | Attn: General Counsel 7909 Parkwood Circle Drive Houston, TX  77036 United States | Amendment No. 4, Dated: 05/31/2015 |
| Parker Drilling Management Services, Ltd. | Nov National Oilwell Varco/Brandt | Attn: General Counsel 4310 North Sam Houston Parkway E Houston, TX  77032 United States | Letter Re: Discount pricing, Dated: 08/03/2011 |
| Parker Drilling Management Services, Ltd. | Oilwell Tubular Consultants Inc. | Attn: Wilton Schexnayder 14630 Bohemian Hall Crosby, TX  77532 United States | Independent Contractor Agreement, Dated: 02/24/2012 |
| Parker Drilling Management Services, Ltd. | Oracle America, Inc. | Attn: General Counsel PO Box 203448 Dallas, TX  75320-3448 United States | Technical Support Services Renewal Order, Dated: 11/14/2018 |
| Parker Drilling Management Services, Ltd. | Oracle America, Inc. | Attn: General Counsel PO Box 203448 Dallas, TX  75320-3448 United States | Technical Support Services Renewal Order, Dated: 11/18/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Oracle America, Inc. | Attn: General Counsel PO Box 203448 Dallas, TX  75320-3448 United States | Technical Support Services Renewal Order, Dated: 12/10/2018 |
| Parker Drilling Management Services, Ltd. | Orasys Consulting LLC | Attn: Kushi Reddy 110 Turnpike Road Suite 212 Westborough, Ma 05181 United States | Consulting Services Agreement, Dated: 11/07/2016 |
| Parker Drilling Management Services, Ltd. | Pentagon Freight Services, Inc. | Attn: General Counsel 1211 East Richey Road Houston, TX  77073 United States | Code of Conduct, Not dated |
| Parker Drilling Management Services, Ltd. | Pentagon Freight Services, Inc. | Attn: General Counsel 1211 East Richey Road Houston, TX  77073 United States | Customs Power of Attorney, Dated: 03/17/2015 |
| Parker Drilling Management Services, Ltd. | Pentagon Freight Services, Inc., A Texas Corporation | Attn: General Counsel 1211 Richey Road Houston, TX  77073 United States | Power of Attorney for Customs and Export Forwarding Agent, Dated: 03/05/2009 |
| Parker Drilling Management Services, Ltd. | Qatar Airways Q.C.S.C. | Attn: General Counsel Ground Floor Qatar Airways Tower 1 PO Box 22550 Doha, Qatar | Corporate Travel Incentive Agreement, Dated: 04/01/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 01/04/2012 |
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 01/05/2011 |
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 02/21/2013 |
| Parker Drilling Management Services, Ltd. | Renaissance Houston Hotel | Attn: General Counsel 6 E Greenway Plaza Houston, TX  77046 United States | Preferred Client Rate Agreement, Dated: 02/23/2013 |
| Parker Drilling Management Services, Ltd. | Residence Inn By Marriott West University | Attn: General Counsel 2939 Westpark Dr. Houston, TX  77005 United States | Corporate Sales Agreement, Dated: 10/16/2017 |
| Parker Drilling Management Services, Ltd. | Residence Inn McAllen | Attn: General Counsel 3975 N. Expressway 83 Brownsville, TX 75520 United States | Rate and Service Agreement, Dated: 05/07/2015 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Resource International | Attn: Robert Pennington And Stephanie Haslam 6119, Bankside Dr Houston, TX  77096 United States | Consulting Services Agreement, Dated: 02/02/2015 |
| Parker Drilling Management Services, Ltd. | RPS Solutions | Attn: General Counsel 726 Donald Preston Drive Wolfforth, TX 79382 United States | Purchase Agreement, Dated: 07/17/2008 |
| Parker Drilling Management Services, Ltd. | Safway Services, LLC | Attn: General Counsel 1960 NW Marine Drive Troutdale, Or  97060 United States | Service Contract, Dated: 02/16/2010 |
| Parker Drilling Management Services, Ltd. | Scalable Path, Inc. | Attn: General Counsel 500 Westover Dr. #9092 Sanford, NC  27330 United States | Master Agreement, Dated: 09/02/2014 |
| Parker Drilling Management Services, Ltd. | Scalisi, Joe | Address on File | Employment Agreement, Dated: 04/16/2015 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. | Attn: General Counsel 2225 Lawson Lane Santa Clara, CA 95054 United States | Order Form, Dated: 06/29/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. | Attn: General Counsel 2225 Lawson Lane Santa Clara, CA 95054 United States | Renewals Order Form, Dated: 08/12/2016 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. | Attn: General Counsel 2225 Lawson Lane Santa Clara, CA 95054 United States | Software Order Form, Dated: 01/29/2016 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. | Attn: General Counsel 2225 Lawson Lane Santa Clara, CA 95054 United States | Software Order Form, Dated: 01/29/2016 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. | Attn: General Counsel 2225 Lawson Lane Santa Clara, CA 95054 United States | Software Order Form, Dated: 03/25/2018 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. | Attn: General Counsel 2225 Lawson Lane Santa Clara, CA 95054 United States | Software Order Form, Dated: 08/12/2016 |
| Parker Drilling Management Services, Ltd. | Servicenow, Inc. | Attn: General Counsel 2225 Lawson Lane Santa Clara, CA 95054 United States | Software Order Form, Dated: 11/18/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Shekerdemian, Ruben | 5 Greenway Plaza, Suite 100 Houston, TX  77046 United States | Independent Contractor Agreement, Dated: 01/31/2013 |
| Parker Drilling Management Services, Ltd. | Shuman Consulting Services LLC | Attn: Sherry K. Shiflet 2625 Bay Area Blvd, #301 Houston, TX  77058 United States | Software License and Technical Support Agreement, Dated: 02/02/2015 |
| Parker Drilling Management Services, Ltd. | Simcore LLC | Attn: General Counsel 2500 Plaza 5 Harborside Financial Center Jersey City, NJ 07311 United States | Essbase Application Proposal, Dated: 05/22/2014 |
| Parker Drilling Management Services, Ltd. | Skillsoft Corporation | Attn: General Counsel 107 Northeastern Blvd Nashua, NH  03062 United States | Master License Agreement, Dated: 10/31/2011 |
| Parker Drilling Management Services, Ltd. | Skillsoft Corporation | Attn: Contracts Department Admin 107 Northeastern Blvd Nashua, NH  03062 United States | Master License Agreement, Dated: 10/31/2011 |
| Parker Drilling Management Services, Ltd. | Smoothstone IP Communications | Attn: General Counsel 200 Smoothstone Center 401 S. Fourth St. Louisville, KY 40202 United States | Customer Service Agreement, Dated: 03/30/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Sparkhound, Inc. | Attn: Shawn Usher 2900 Westfork Drive, Suite 600 Baton Rouge, LA 70827 United States | Consulting Services Agreement, Dated: 10/27/2014 |
| Parker Drilling Management Services, Ltd. | Sparkhound, Inc. | Attn: Shawn Usher 2900 Westfork Drive Suite 600 Baton Rouge, LA 70827 United States | Consulting Services Agreement, Dated: 10/27/2014 |
| Parker Drilling Management Services, Ltd. | Sparkhound, LLC | Attn: General Counsel 2900 Westfork Drive Suite 600 Baton Rouge, LA 70827 United States | Statement of Work, Dated: 10/11/2018 |
| Parker Drilling Management Services, Ltd. | Tag Resources, L.L.C. | Attn: General Counsel 11011 Richmond Avenue, Suite 250 Houston, TX  77042 United States | Letter RE: Terms of Engagement, Dated: 05/19/2009 |
| Parker Drilling Management Services, Ltd. | The Broadleaf Group, LLC D/B/A Broadleaf Group | Attn: General Counsel 13100 Wortham Center, Suite 150 Houston, TX  77065 United States | Service Contract, Dated: 02/07/2014 |
| Parker Drilling Management Services, Ltd. | The Westin Galleria & Westin Oaks, Houston | Attn: General Counsel 5060 West Alabama Houston, TX  77056 United States | Local Volume Rate Agreement, Dated: 01/01/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Thomson Reuters (GRC) Inc. | Attn: General Counsel PO Box 417175 Boston, Ma 02241-7175 United States | Order Form, Dated: 10/20/2017 |
| Parker Drilling Management Services, Ltd. | Total Visa Solutions | Attn: General Counsel 2211 Norfolk Drive, Suite 300 Houston, TX 77046 United States | Passport and Visa Agreement, Dated: 10/31/2017 |
| Parker Drilling Management Services, Ltd. | Total Visa Solutions LLC | Attn: Dana Thibeaux 2211 Norfolk Drive Suite 300 Houston, TX 77098 United States | Passport and Visa Services Agreement, Dated: 10/31/2017 |
| Parker Drilling Management Services, Ltd. | Transportation Resource Associates, Inc. | Attn: General Counsel 1608 Walnut Street Suite 1602 Philadelphia, Pa 19103 United States | Proposal for Safety Management Software, Dated: 09/25/2013 |
| Parker Drilling Management Services, Ltd. | Tucker, David | Address on File | Change in Control Severance Agreement, Dated: 01/27/2011 |
| Parker Drilling Management Services, Ltd. | Tucker, David | Address on File | First Amendment to Change in Control Severance Agreement, Dated: 10/01/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Turk Hava Yollari A.O. ("Turkish Airlines") | Attn: General Counsel General Management Building Ataturk Airport Yesilkoy Stambul,   34830 Turkey | Turkish Corporate Club Premium Benefits, Dated: 01/30/2018 |
| Parker Drilling Management Services, Ltd. | United Air Lines, Inc. | Attn: General Counsel 233 S. Wacker Drive 16th Floor Chicago, Il  60606 United States | Corporate Discount Agreement, Dated: 09/01/2011 |
| Parker Drilling Management Services, Ltd. | United Air Lines, Inc. | Attn: General Counsel 233 S. Wacker Drive 16th Floor Chicago, Il  60606 United States | Corporate Discount Agreement, Dated: 09/01/2011 |
| Parker Drilling Management Services, Ltd. | United Air Lines, Inc. | Attn: General Counsel 233 South Wacker Drive 16th Floor Chicago, Il  60606 United States | Corporate Discount Agreement, Dated: 09/01/2013 |
| Parker Drilling Management Services, Ltd. | Vantage Solutions LLC | Attn: Jared Schulz 5680 Highway 6 #184 Missouri City, TX 77459-4188 United States | Consulting Services Agreement, Dated: 05/20/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Verno Group East, LLC | Attn: General Counsel Bld. 59 Krasnogo Znameni Av. Vladivostok, 690002 Russia | Act of Acceptance of Services, Dated: 10/04/2017 |
| Parker Drilling Management Services, Ltd. | Vision Service Plan Insurance Company | Attn: General Counsel 3333 Quality Drive Rancho Cordova, CA 95670 United States | Evidence of Coverage (Client Vision Care Plan), Dated: 01/01/2016 |
| Parker Drilling Management Services, Ltd. | Viziya Corp. | Attn: Operations Manager Suite 203 50 Dundas Street East Hamilton, ON  L9H 7K9 Canada | Annual Maintenance Agreement, Dated: 04/30/2014 |
| Parker Drilling Management Services, Ltd. | Viziya Corp. | Attn: General Counsel 50 Dundas Street East, Suite 201 Hamilton, ON  L9H 7K6 Canada | Master Software License Agreement, Dated: 04/30/2014 |
| Parker Drilling Management Services, Ltd. | Viziya Corp. | Attn: General Counsel Suite 201 50 Dundas St East Hamilton, On  L9H 7K6 Canada | WorkAlign Scheduler License Agreement, Dated: 04/28/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Walls Industries, Inc. | Attn: General Counsel 125 South Jennings Fort Worth, TX 76104 United States | Buy-Sell and Manufacturing Agreement, Dated: 10/20/2008 |
| Parker Drilling Management Services, Ltd. | Web.Com | Attn: Legal Department 12808 Gran Bay Parkway West Jacksonville, FL 32258 United States | Transfer of Registrant Agreement, Dated: 02/01/2015 |
| Parker Drilling Management Services, Ltd. | West IP Communications | Attn: General Counsel 401 S. Fourth St. Suite 200 Louisville, KY 40202 United States | Customer Service Agreement, Dated: 01/21/2015 |
| Parker Drilling Management Services, Ltd. | West IP Communications | Attn: General Counsel 401 S. Fourth St. Suite 200 Louisville, KY 40202 United States | Customer Service Agreement, Dated: 01/21/2015 |
| Parker Drilling Management Services, Ltd. | West IP Communications, Inc. | Attn: General Counsel 401 S. Fourth St. Suite 200 Louisville, KY 40202 United States | Service Level Agreement, Not dated |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Westin Galleria & Westin Oaks Houston At The Galleria | Attn: General Counsel 5011 Westheimer at Post Oak Blvd. Houston, TX  77056 United States | Local Volume Rate Agreement, Dated: 01/04/2013 |
| Parker Drilling Management Services, Ltd. | Yousendit, Inc. | Attn: General Counsel 2950 S. Delaware Street Suite 400 San Mateo, CA 94403 United States | Corporate Subscriber Agreement, Dated: 06/30/2011 |
| Parker Drilling Management Services, Ltd. | Ziegler Cooper Architects | Attn: General Counsel 700 Louisiana, Suite 350 Houston, TX  77002 United States | Services Authorization, Dated: 03/13/2014 |
| Parker Drilling Management Services, Ltd. | Ziegler Cooper Inc. | Attn: General Counsel 600 Travis, Suite 1200 Houston, TX  77002-2911 United States | Agreement for Interior Design Services, Dated: 01/26/2009 |
| Parker Drilling Offshore Company, LLC | Pastor, Behling & Wheeler, LLC | Attn: General Counsel 2201 Double Creek Drive Suite 4004 Round Rock, TX 78664 United States | Gulfco Marine Maintenance Freeport, Texas Consulting Services Agreement, Dated: 03/07/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Offshore USA, L.L.C. | B & W Realty Holdings, L.L.C. | Attn: Robert M. Boyce 645 Highlandia Drive Baton Rouge, LA 70810 United States | Net Commercial Lease Agreement, Dated: 08/02/2013 |
| Parker Drilling Offshore USA, L.L.C. | Badger Oil Corp. | Attn: Mr. Arthur Price - President 3861 Ambassador Caffery Parkway Suite 400 Lafayette, LA  70508 United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 07/16/2018 |
| Parker Drilling Offshore USA, L.L.C. | Byron Energy Inc. | Attn: Mr. Prent H. Kallenberger - President 201 Rue Iberville Suite 604 Lafayette, LA  70508 United States | Daywork Drilling Contract - US, Dated: 08/06/2018 |
| Parker Drilling Offshore USA, L.L.C. | Chevron USA, Inc. | Attn: General Counsel 100 Northpark Boulevard Covington, LA 70433 United States | Amendment No. 2 to Worldwide Master Drilling Contract, Dated: 06/03/2011 |
| Parker Drilling Offshore USA, L.L.C. | Chevron USA, Inc. | Attn: CTOP General Counsel 6001 Bollinger Canyon Road Room B2500 San Ramon, CA 94583 United States | Worldwide Master Drilling Contract, Dated: 12/22/2003 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Drilling Offshore USA, L.L.C. | Mack Energy Co. | Attn: Mr. Chris Fowler - VP Expl. & Prod. 3861 Ambassador Caffery Parkway Suite 500 Lafayette, LA  70508 United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 07/16/2018 |
| Parker Drilling Offshore USA, L.L.C. | Sabine Storage & Operations, Inc. | Attn: Mr. Ken Roane - Sr. VP of Drilling And Workovers 5718 Westheimer Suite 1251 Huston, TX  77057-5704 United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 07/17/2018 |
| Parker Drilling Offshore USA, L.L.C. | Texas Petroleum Investment Corp. | Attn: Mr. Fred Stein 5850 San Felipe Suite 250 Houston, TX  77057 United States | Drilling Bid Proposal and Daywork Drilling Contract - US, Dated: 05/31/2018 |
| Parker Technology, Inc. | Acadiana Inspection & Consulting, LLC | Attn: General Counsel 10109 Lake Peigneur Road New Iberia, LA 70560 United States | Engineering Services Subcontract, Dated: 02/01/2011 |
| Parker Technology, Inc. | Athens Group | Attn: General Counsel 950 Threadneedle, Suite 275 Houston, TX  77079 United States | MPDR Engineering Services Subcontract, Dated: 09/06/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 1 - Extension of Project Authorization, Dated: 11/15/2006 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 10, Dated: 01/28/2011 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 2 to Contract, Dated: 01/31/2007 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 3 for Procurement of Long Lead Materials Agreement, Dated: 12/18/2007 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 4 to Extend Agreement, Dated: 02/28/2008 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 5, Dated: 04/16/2008 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 6 to Energy Services Contract, Dated: 12/15/2009 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Amendment No 7 to Extend Agreement, Dated: 06/30/2010 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: Supply Chain Management 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Drilling Services Contract, Dated: 02/04/2013 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: Supply Chain Manager 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Engineering Services Contract, Dated: 06/01/2006 |
| Parker Technology, Inc. | BP Exploration (Alaska) Inc. | Attn: General Counsel/ Supply Chain Manager 900 East Benson Boulevard PO Box 196612 Anchorage, AK 99519-6612 United States | Field Services Contract (Single Project), Dated: 08/12/2013 |
| Parker Technology, Inc. | Bronco Manufacturing, Inc. | Attn: Max Mantooth 4448 South Jackson Tulsa, Ok  74107-7168 United States | License Agreement, Dated: 06/12/2000 |
| Parker Technology, Inc. | ConocoPhillips Alaska, Inc. | Attn: General Counsel 700 G Street Anchorage, AK 99501 United States | Drilling Agreement - Limited Services, Dated: 12/16/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | Crowley Marine Services, Inc. | Attn: Jim Van De Veen, Project Manager 201 Arctic Slope Avenue Anchorage, AK 99518 United States | Lease Agreement - Canning River Camp (CRC), Dated: 08/29/2011 |
| Parker Technology, Inc. | Crowley Marine Services, Inc. | Attn: General Counsel 1102 SW Massachusetts Street Seattle, WA  98134 United States | The Baltic and International Maritime Council Standard Transportation Contract for Heavy and Voluminous Cargoes, Dated: 02/02/2010 |
| Parker Technology, Inc. | Essex Crane Rental Corp | Attn: General Counsel 1110 Lake Cook Road, Suite 220 Buffalo Grove, Il 60089 United States | Equipment Rental Agreement, Dated: 10/02/2009 |
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Amendment # 1, Dated: 05/17/2011 |
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Amendment # 1, Dated: 07/21/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Amendment # 2, Dated: 05/17/2011 |
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Amendment No 1 Goods and Services Agreement Covering Engineering, Procurement, and Construction Management Services, Dated: 12/16/2014 |
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Consulting Agreement Covering Engineering Consulting Services, Dated: 05/17/2011 |
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: Geary Bane 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Consulting Agreement for Sakhlin-1 Project, Dated: 01/26/2009 |
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Consulting Agreement for Sakhlin-1 Project, Sakhalin Island, Dated: 10/09/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Goods and Services Agreement Covering Feed and Equipment, Dated: 09/13/2013 |
| Parker Technology, Inc. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Third Amendment to Supply Agreement, Dated: 01/27/2016 |
| Parker Technology, Inc. | Genesis Engineering | Attn: General Counsel 11111 Richmond Avenue Suite 101 Houston, TX  77082 United States | MPDR Engineering Services Subcontract, Dated: 02/01/2011 |
| Parker Technology, Inc. | Khan Co Ltd | Attn: General Counsel 4th Floor Khan Building 915 Aju-Dong Geoje-Si Gyeongnam, Korea, Republic Of | Lease Agreement for Office Space, Dated: 10/04/2012 |
| Parker Technology, Inc. | Korea Inspection & Testing Co Ltd | Attn: General Counsel 396-5 Hakseong-Dong Jung-Gu Ulsan,   681-822 Korea, Republic Of | Lease Agreement (9 units) for Shine Vill II (KITCO VILL), Dated: 10/25/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | Korn/ Ferry International | Attn: General Counsel 700 Louisiana Suite 3900 Houston, TX  77002 United States | Engagement Letter Re: CEO Search, Dated: 03/13/2012 |
| Parker Technology, Inc. | Kvaerner Field Development Inc. | Attn: President 11757 Katy Freeway Suite 1200 Houston, TX  77079 United States | Consulting Agreement Principal Document, Dated: 02/11/2013 |
| Parker Technology, Inc. | Peak Oilfield Service Company, LLC | Attn: General Counsel 2525 C Street, Suite 201 Anchorage, AK 99503 United States | Lease Agreement - Canning River Camp (CRC), Dated: 06/20/2012 |
| Parker Technology, Inc. | Porta-Kamp | Attn: Chris Braun 555 Gelhorn Houston, TX  77029 United States | Mobile Camp Facilities Construction Agreement, Dated: 10/16/2009 |
| Parker Technology, Inc. | RDC Services, Inc. | Attn: Bui Dao 5315 Cherokee Houston, TX  77005 United States | MPSETADS Engineering Services Subcontract Re Basic Design Package Development for Woodside Energy Ltd, Dated: 05/11/2011 |
| Parker Technology, Inc. | SNC-Lavalin Inc. | Attn: General Counsel 20 Maverick Place Paradise, NL  Ail 0JL Canada | Memorandum of Understanding and Preliminary Subcontract White Rose Extension Project (WREP) Wellhead Platform, Dated: 10/24/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | Thurman, Kenneth Vern | 77468 Dugan Land Cottage Grove, Or 97424 United States | Contractor Agreement, Dated: 02/08/2011 |
| Parker Technology, Inc. | Tidal Power Systems | Attn: General Counsel 4202 Chance Lane Rosharon, TX  77583 United States | Service Contract, Dated: 10/05/2010 |
| Parker Technology, Inc. | Woodside Browse Pty Ltd | Attn: General Counsel Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 |
| Parker Technology, Inc. | Woodside Energy Ltd | Attn: Gareth Holmes Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | Development of Natural Gas Agreement, Dated: 05/12/2011 |
| Parker Technology, Inc. | Woodside Energy Ltd | Attn: General Counsel St Georges Terrace Perth,   WA 6000 Australia | Memorandum of Agreement, Dated: 02/25/2011 |
| Parker Technology, Inc. | Woodside Energy Ltd | Attn: Clark Brannin Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | MPSETADS Basic Design Package Development Agreement, Dated: 04/19/2011 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, Inc. | Woodside Energy Ltd | Attn: General Counsel Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | MPSETADS Basic Design Package Development Agreement, Dated: 04/19/2011 |
| Parker Technology, Inc. | Woodside Energy Ltd | Attn: General Counsel Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | MP-SETADS Phase II Concept Development, Dated: 01/12/2010 |
| Parker Technology, Inc. | Woodside Energy Ltd | Attn: General Counsel Woodside Plaza 240 St. Georges Terrace Perth,   WA 6000 Australia | Novation Agreement to Letter of Intent, Dated: 03/31/2011 |
| Parker Technology, Inc. | World Total Care Service Ltd | Attn: General Counsel 536-1, Okpo 1-Dong Geoje City, Gyeongnam,   656-904 Korea, Republic Of | Lease Agreement, Dated: 01/15/2013 |
| Parker Technology, Inc. | Worleyparsons Group Inc. | Attn: General Counsel 5 Greenway Plaza Houston, TX  77046 United States | Engineering, Design, Procurement and Technical Support Services Subcontract, Dated: 07/10/2008 |
| Parker Technology, Inc. | Worleyparsons International, Inc. | Attn: General Counsel 5 Greenway Plaza Houston, TX  77046 United States | Subcontract No. 15644411-8001, Dated: 07/10/2008 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Parker Technology, L.L.C. | Dixie Electric, Inc. | Attn: General Counsel PO Box 9784 New Iberia, LA 70562-9784 United States | Service Agreement, Dated: 06/08/2007 |
| Quail Tools, L.P. | A.P. Moller - Maersk A/S | Attn: General Counsel Esplanaden 50 Copehagen K Copenhagen,   1098 Denmark | GRC Framework Agreement, Dated: 11/20/2012 |
| Quail Tools, L.P. | Aguas Profundas Limitada | Attn: General Counsel Rua Mae Isabel Bungo No. 6 Luanda, Angola | Service Agreement - Angola Operations- Onshore and/or Offshore, Dated: 05/01/2012 |
| Quail Tools, L.P. | Benterra Corporation | Attn: General Counsel 4900 California Ave. Suite A135 Bakersfield, CA 93309 United States | Services Contract, Dated: 06/13/2002 |
| Quail Tools, L.P. | BP America Production Company | Attn: General Counsel 501 Westlake Park Bouleva Road Houston, TX  77079 United States | Well Services Contract , Dated: 01/31/2009 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | BP American Production Company | Attn: Scanning Depart BP Upstream, General PO Box 696494 San Antonio, TX 78269 United States | Amendment No. 7 to Contract for Rental Tools , Dated: 02/01/2014 |
| Quail Tools, L.P. | BP Exploration Operating Company Limited | Attn: General Counsel 3 Road Fl., Joroadan Dubai Capital Building PO Box 850863 Airport Road Amman,  11185 Jordan | Limited Service Order, Dated: 11/02/2011 |
| Quail Tools, L.P. | Bravo Pipeline Company | Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 |
| Quail Tools, L.P. | Bravo Pipeline Company | Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 |
| Quail Tools, L.P. | Bravo Pipeline Company | Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Bravo Pipeline Company | Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 |
| Quail Tools, L.P. | Burlington Resources Oil & Gas Company LP | Attn: Accounts Payable 717 Texas Avenue Suite 2100 Houston, TX  77002-2712 United States | Special Purchasing Contract, Dated: 06/01/2005 |
| Quail Tools, L.P. | Cantium, LLC | Attn: General Counsel 111 Park Place Suite 100 Covington, LA 70433 United States | Safety and Environmental Management System Bridging Agreement, Dated: 05/03/2018 |
| Quail Tools, L.P. | Castex Offshore, Inc. & Castex Energy, Inc. | Attn: General Counsel 333 North Sam Houston Pkwy, E Suite 1060 Houston, TX  77060 United States | First Amendment to Agreement, Dated: 10/26/2015 |
| Quail Tools, L.P. | Chevron North America Exploration And Production Company | Attn: General Counsel 1500 Louisiana Street Houston, TX  77002 United States | Amendment No. 1 To Equipment Lease , Dated: 03/31/2014 |
| Quail Tools, L.P. | Chevron North America Exploration And Production Company | Attn: General Counsel 1500 Louisiana Street Houston, TX  77002 United States | Amendment No. 5 to Equipment Lease Contract, Dated: 08/04/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Chevron North America Exploration And Production Company | Attn: Stanley Lew 1500 Louisiana Street Houston, TX  77002 United States | Equipment Rental Contract, Dated: 01/01/2017 |
| Quail Tools, L.P. | Chevron U.S.A. Inc. | Attn: Contracts Administration 100 Northpark Boulevard Covington, LA 70433 United States | Amendment No. 1 To Equipment Lease , Dated: 02/15/2016 |
| Quail Tools, L.P. | Chevron U.S.A. Inc. | Attn: General Counsel 1400 Smith Houston, TX  77002 United States | Amendment No. 1 to Equipment Lease, Dated: 12/13/2012 |
| Quail Tools, L.P. | Chevron U.S.A. Inc. | Attn: Carol Hector 700 Cherrington Parkway Coraopolis, Pa 15108 United States | Amendment No. 1 to Service Order , Dated: 05/24/2018 |
| Quail Tools, L.P. | Chevron U.S.A. Inc. | Attn: General Counsel 1500 Louisiana Street Houston, TX  77002 United States | Amendment No. 2 to Equipment Lease, Dated: 03/01/2015 |
| Quail Tools, L.P. | Chevron U.S.A. Inc. | Attn: General Counsel 1400 Smith Houston, TX  77002 United States | Amendment No. 6 to Equipment Lease Contract, Dated: 10/01/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Chevron U.S.A. Inc. | Attn: General Counsel 1400 Smith Houston, TX  77002 United States | Equipment Lease , Dated: 04/01/2012 |
| Quail Tools, L.P. | Chevron U.S.A. Inc. | Attn: General Counsel 1400 Smith Houston, TX  77002 United States | Equipment Lease, Dated: 07/07/2011 |
| Quail Tools, L.P. | Chevron U.S.A. Inc., Acting Through Its Division, Chevron North America Exploration And Production Company | Attn: General Counsel 1500 Louisiana Street Houston, TX  77002 United States | Amendment No. 4 to Equipment Lease Contract, Dated: 03/31/2016 |
| Quail Tools, L.P. | Chevron U.S.A., Inc. Through Its Division Chevron North America Exploration And Production Company | Attn: General Counsel PO Box 2100 Houston, TX  77252-2100 United States | Amendment No. 1 to Service Order, Dated: 03/04/2016 |
| Quail Tools, L.P. | ConocoPhillips | Attn: Hannah Pena 935 North Eldridge Parkway Ec3-18-E086 Houston, TX  77079 United States | Scope of Work and OLA Compensation Agreement, Dated: 10/01/2016 |
| Quail Tools, L.P. | ConocoPhillips Alaska, Inc. | Attn: ATO 1020A 700 G Street Anchorage, AK 99501-0360 United States | Downhole Equipment Lease Agreement, Dated: 02/21/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | ConocoPhillips Company | Attn: General Counsel PO Box 2197 Houston, TX 77252-2197 United States | Amendment No. 301799 to Agreement No. 290152, Dated: 02/01/2015 |
| Quail Tools, L.P. | ConocoPhillips Company | Attn: Lindsey Broadwell PO Box 2197 Houston, TX 77252-2197 United States | Scope of Work and Compensation Agreement, Dated: 07/01/2014 |
| Quail Tools, L.P. | Continental Resources, Inc. | Attn: General Counsel PO Box 268870 Oklahoma City, Ok 73126 United States | Amendment 1 Commercial Pricing Agreement/Scope of Work, Dated: 06/16/2015 |
| Quail Tools, L.P. | Continental Resources, Inc. | Attn: General Counsel PO Box 268870 Oklahoma City, Ok 73126 United States | Amendment 2 Commercial Pricing Agreement/ Scope of Work, Dated: 12/19/2017 |
| Quail Tools, L.P. | Continental Resources, Inc. | Attn: General Counsel PO Box 268870 Oklahoma City, Ok 73126 United States | Commercial Pricing Agreement/Scope of Work, Dated: 06/16/2015 |
| Quail Tools, L.P. | Cortex Business Solutions USA, LLC | Attn: Sandra Weiler 3404 25 Street Ne Calgary, Ab T1Y 6CL Canada | Integration Services Agreement, Dated: 06/23/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Drilling Info Inc. | Attn: Shawn M Shillington Secretary And Assistant General Counsel 2901 Via Fortuna Building 6 Suite 700 Austin, TX  78746 United States | Drilling Info Order Form , Dated: 04/06/2018 |
| Quail Tools, L.P. | Eagle Consulting, L.L.C. And Facilities, Inc. | Attn: General Counsel 850 Engineers Road Belle Chasse, LA 70037 United States | Mutual Indemnity Agreement and Waiver of Recourse, Dated: 01/21/2004 |
| Quail Tools, L.P. | Energy Xxi | Attn: Manager-Logistics 1021 Main Street Suite 2626 Houston, TX  77002 United States | Special Pricing Agreement Between Energy XXI and Quail Tools, LLC, Dated: 07/01/2014 |
| Quail Tools, L.P. | Eni Us Operating Co. Inc. | Attn: General Counsel Two Allen Center 1200 Smith Street Suite 1700 Houston, TX  77002 United States | Blanket Order Amendment , Dated: 04/01/2017 |
| Quail Tools, L.P. | EQT Production Texas, LLC | C/O EQT Corporation Attn: Lisa Spaniel 625 Liberty Avenue Suite 1700 Pittsburgh, Pa  15222 United States | Letter regarding EQT Production Texas, LLC, Dated: 06/23/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda | Attn: General Counsel Rua Lauro Muller, 116, Sala 3001 - Parte Rio De Janeiro,   Rj 22290-160 Brazil | Amendment No. 1 to Order, Dated: 01/23/2009 |
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda | Attn: General Counsel Rua Lauro Muller, 116, Sala 3001 - Parte Rio De Janeiro,   Rj 22290-160 Brazil | Amendment No. 2 to Order, Dated: 04/13/2009 |
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda | C/O ExxonMobil Development Company Attn: General Counsel PO Box 4876 Dev-Gp4-1296 Houston, TX  77010-4876 United States | Order under Goods and Services Agreement, Dated: 12/06/2008 |
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda | Attn: General Counsel Rua Lauro Muller, 116, Sala 3001 - Parte Rio De Janeiro,   RJ 22290-160 Brazil | Order, Dated: 07/27/2009 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Esso Exploracao Santos Brasileira Ltda | Attn: General Counsel Rua Lauro Muller, 116, Sala 3001 - Parte Rio De Janeiro, 22290-160 Brazil | Order, Dated: 12/06/2008 |
| Quail Tools, L.P. | Exco Resources | Attn: General Counsel 3000 Ericsson Drive Suite 200 Warrendale, PA 15086 United States | Letter Re: Awarding of Drill Pipe Rental Contract, Dated: 05/27/2014 |
| Quail Tools, L.P. | Exxon Neftegas Limited | Attn: General Counsel 28 Sakhalinskaya Street Yuzhno-Sakhalinsk, 693000 Russia | Amendment No. 1 to Sub agreement , Dated: 02/19/2016 |
| Quail Tools, L.P. | ExxonMobil Development Company | Attn: General Counsel 16495 Northchase Boulevard Houston, TX  77060 United States | Amendment 11 to the Continuing Services Agreement , Dated: 10/01/2000 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 1, Dated: 10/04/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 2 , Dated: 11/21/2008 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 3 , Dated: 03/31/2009 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 4, Dated: 07/01/2009 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 5, Dated: 03/28/2011 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 6 to Sub agreement, Dated: 11/07/2011 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 7 to Sub agreement, Dated: 03/24/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 8 to Sub agreement, Dated: 07/18/2016 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: Richard D. Brown, Procurement Specialist 16945 Northchase Drive Houston, TX  77060 United States | Form of Sub agreement, Dated: 03/24/2008 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: Daniel J. Babik 16945 Northchase Drive Room 916 Houston, TX  77060 United States | Standard Procurement Agreement for Equipment Rental with Incidental Services, Dated: 01/24/2006 |
| Quail Tools, L.P. | ExxonMobil Global Services Company | Attn: Lauren English 22777 Springwoods Village Parkway Spring, TX  77389 United States | Sub agreement, Dated: 10/04/2016 |
| Quail Tools, L.P. | Gaither Petroleum Corp. | Attn: General Counsel 18000 Groeschke Road Suite A1 Houston, TX  77084 United States | Quail Tools Prepayment Agreement, Dated: 05/25/2007 |
| Quail Tools, L.P. | Gaither Petroleum Corp. | Attn: General Counsel 18000 Groeschke Road Suite A1 Houston, TX  77084 United States | Quail Tools Prepayment Agreement, Dated: 07/09/2007 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Golden Eagle Exploration, LLC | Attn: General Counsel PO Box 1204 Moab, Ut  84532 United States | Quail Tools Prepayment Agreement , Dated: 02/09/2018 |
| Quail Tools, L.P. | Grant Prideco, LP | Attn: General Counsel 10100 Houston Oaks Drive Houston, TX  77064 United States | Amendment No. 4 to Technology Licensing Agreement, Dated: 11/19/2017 |
| Quail Tools, L.P. | Grant Prideco, LP | Attn: General Counsel 7909 Parkwood Circle Drive Houston, TX  77036 United States | First Amendment to Technology License Agreement, Dated: 06/25/2015 |
| Quail Tools, L.P. | Grant Prideco, LP | Attn: General Counsel 10100 Houston Oaks Drive Houston, TX  77064 United States | Technology License Agreement Second Amendment, Dated: 10/20/2016 |
| Quail Tools, L.P. | Grant Prideco, LP | Attn: General Counsel 10100 Houston Oaks Drive Houston, TX  77064 United States | Technology License Agreement Third Amendment, Dated: 07/31/2017 |
| Quail Tools, L.P. | Grant Prideco, LP | Attn: General Counsel 400 N. Sam Houston Parkway East Suite 900 Houston, TX  77060 United States | Technology License Agreement, Dated: 04/04/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Halliburton Energy Services, Inc. | Attn: General Counsel 10200 Bellaire Boulevard Houston, TX  77072-5299 United States | Amendment Number 01 to Contract , Dated: 12/04/2009 |
| Quail Tools, L.P. | Hess Corporation | Attn: Cheryl Pressley Global Supply Chain 1501 McKinney Street Houston, TX  77010 United States | Amendment No. 1 to Commercial Agreement, Dated: 07/15/2014 |
| Quail Tools, L.P. | Hess Corporation | Attn: General Counsel 1501 McKinney Street Houston, TX  77010 United States | Letter of Award for Provision of Drilling and Completion Rental Tools, Dated: 09/12/2011 |
| Quail Tools, L.P. | Hess Corporation | Attn: Cheryl Pressley Global Supply Chain 1501 McKinney Street Houston, TX  77010 United States | Rental Tool Equipment and Services Eagle Ford, Dated: 11/10/2011 |
| Quail Tools, L.P. | Hornet-Permian 1, L.P. | Attn: Peter H. Billipp 6925 Portwest Drive Houston, TX  77024 United States | Lease Agreement, Dated: 10/01/2018 |
| Quail Tools, L.P. | Laguana Petroleum Corporation | Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Laguana Petroleum Corporation | Attn: Mark S. Roberts<br>5 Greenway Plaza Suite 110<br>Houston, TX  77046<br>United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 |
| Quail Tools, L.P. | Laguana Petroleum Corporation | Attn: Janah Hemphill<br>5 Greenway Plaza Suite 110<br>Houston, TX  77048<br>United States | Statement No. SCT-21000033227, Dated: 11/01/2012 |
| Quail Tools, L.P. | Laguna Petroleum Corporation | Attn: Courtney Hermes<br>5 Greenway Plaza Suite 110<br>Houston, TX  77046<br>United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 |
| Quail Tools, L.P. | Lime Rock Resources Ii-A, LP | Attn: Mr. C Tim Miller<br>Heritage Plaza<br>1111 Bagby Street<br>46th Floor<br>Houston, TX  77002<br>United States | Service Contract, Dated: 05/25/2016 |
| Quail Tools, L.P. | Lime Rock Resources Iii-A, LP | Attn: Mr. C Tim Miller<br>Heritage Plaza<br>1111 Bagby Street<br>46th Floor<br>Houston, TX  77002<br>United States | Service Contract, Dated: 05/25/2016 |
| Quail Tools, L.P. | Lime Rock Resources Iv-A, LP | Attn: Mr. C Tim Miller<br>Heritage Plaza<br>1111 Bagby Street<br>46th Floor<br>Houston, TX  77002<br>United States | Service Contract, Dated: 05/25/2016 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Martin Resource Management Corporation | Attn: General Counsel PO Box 191 Kilgore, TX  75663 United States | Facility Access and Indemnity Agreement (Revised), Dated: 06/10/2010 |
| Quail Tools, L.P. | NBL Permian LLC | C/O Noble Energy, Inc. Attn: Global Contracts Manager 1001 Noble Energy Way Houston, TX  77070 United States | Adoption and Ratification Agreement , Dated: 09/02/2017 |
| Quail Tools, L.P. | Nexem Petroleum U.S.A. Inc. | Attn: General Counsel 12790 Merit Drive Suite 800 Dallas, TX  75251 United States | Vendor Pricing Arrangement, Dated: 08/01/2006 |
| Quail Tools, L.P. | Noble Drilling (U.S.) LLC | Attn: General Counsel 13135 S, Dairy Ashford Road Suite 800 Sugar Land, TX 77057 United States | Mutual Indemnity and Hold Harmless Agreement, Dated: 11/09/2017 |
| Quail Tools, L.P. | Noble Drilling, LLC | Attn: General Counsel 13135 S, Dairy Ashford Road Suite 800 Sugar Land, TX 77470 United States | Quail Tools , Dated: 07/30/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Occidental Permian Ltd. | Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 |
| Quail Tools, L.P. | Occidental Permian Ltd. | Attn: Supply Chain Management P.O. Box 50250 Midland, TX  79710 United States | Amendment No.2 to Commercial Terms, Dated: 04/01/2014 |
| Quail Tools, L.P. | Occidental Permian Ltd. | Attn: Supply Chain Management P.O. Box 50250 Midland, TX  79710 United States | Amendment to Commercial Terms, Dated: 03/23/2015 |
| Quail Tools, L.P. | Occidental Permian Ltd. | Attn: Supply Chain Management P.O. Box 50250 Midland, TX  79710 United States | Commercial Terms, Dated: 06/30/2014 |
| Quail Tools, L.P. | Occidental Permian Ltd. | Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 |
| Quail Tools, L.P. | Occidental Permian Ltd. | Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 |
| Quail Tools, L.P. | Occidental Permian Ltd. | Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 3 to MSA Statement of Commercial Terms , Dated: 07/08/2013 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Catherine Lococo 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 4 to Commercial Terms, Dated: 01/11/2018 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Catherine Lococo 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 5 to Commercial Terms, Dated: 03/08/2018 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Catherine Lococo 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No.3 to Commercial Terms, Dated: 06/29/2017 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Courtney Hermes 5 Greenway Plaza Suite110 Houston, TX  77046 United States | Amendment to Commercial Terms, Dated: 03/16/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Oxy USA Inc. | Attn: General Counsel 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment To Commercial Terms, Dated: 05/25/2018 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: General Counsel 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | MSA Statement of Commercial Terms , Dated: 03/25/2011 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Aminah Rodriguez-Ammirato 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | MSA Statement of Commercial Terms, Dated: 09/18/2012 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 |
| Quail Tools, L.P. | Oxy USA Inc. | Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Oxy USA WTP LP | Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX 77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 |
| Quail Tools, L.P. | Oxy USA WTP LP | Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX 79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 |
| Quail Tools, L.P. | Oxy USA WTP LP | Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX 77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 |
| Quail Tools, L.P. | Oxy USA WTP LP | Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX 77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 |
| Quail Tools, L.P. | Parker Drilling Company International Limited | Attn: General Counsel Azattyk Av. 7 3 Floor Atyrau, Kazakhstan | Rental Agreement, Dated: 12/24/2013 |
| Quail Tools, L.P. | Permian-Skyhawk 1, LLC | Attn: General Counsel 6925 Portwest Drive, Suite 130 Houston, TX 77024 United States | Commercial Contract - Unimproved Property, Dated: 10/15/2018 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Petro Harvester Operating Company, LLC | Attn: General Counsel 5851 Legacy Circle Suite 500 Plano, TX 75024 United States | Petro Harvester Operating Company, LLC, Dated: 08/09/2017 |
| Quail Tools, L.P. | Petrobras America Inc. | Attn: Procurement/Us Supervisors 10350 Richmond Avenue Suite 1400 Houston, TX 77042 United States | Equipment Lease Agreement - Drill Pipe, Dated: 10/14/2009 |
| Quail Tools, L.P. | Petrobras America Inc. | Attn: Procurement/Us Supervisors 10350 Richmond Avenue Suite 1400 Houston, TX 77042 United States | Equipment Lease Agreement - Handling Equipment, Dated: 10/14/2009 |
| Quail Tools, L.P. | Pioneer Natural Resources USA, Inc. | Attn: General Counsel 5205 North O'Connor Boulevard Suite 200 Irving, TX 75039 United States | Contract Award Letter, Dated: 08/28/2017 |
| Quail Tools, L.P. | Placid Oil Company | Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX 79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Placid Oil Company | Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 |
| Quail Tools, L.P. | Placid Oil Company | Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 |
| Quail Tools, L.P. | Placid Oil Company And Vintage Petroleum, LLC | Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 |
| Quail Tools, L.P. | Probe Resources Us Ltd | Attn: General Counsel 21 Waterway Suite 300 The Woodlands, TX 77380 United States | Interim Creditor Agreement, Dated: 07/21/2009 |
| Quail Tools, L.P. | Probe St 214 Ltd | Attn: General Counsel 21 Waterway Suite 300 The Woodlands, TX 77380 United States | Interim Creditor Agreement, Dated: 07/21/2009 |
| Quail Tools, L.P. | Procurement ( A Division Of ExxonMobil Global Services Company) | Attn: General Counsel 5959 Las Colinas Blvd. Irving, TX  75039 United States | Amendment No. 18, Dated: 01/31/2006 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Procurement ( A Division Of ExxonMobil Global Services Company) | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 20, Dated: 07/11/2007 |
| Quail Tools, L.P. | Procurement (A Division Of ExxonMobil Global Services Company | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 1 to Sub agreement A2136369, Dated: 07/15/2008 |
| Quail Tools, L.P. | Procurement (A Division Of ExxonMobil Global Services Company) | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 17, Dated: 11/01/2005 |
| Quail Tools, L.P. | Procurement (A Division Of ExxonMobil Global Services Company) | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 19, Dated: 01/01/2007 |
| Quail Tools, L.P. | Procurement (A Division Of ExxonMobil Global Services Company) | Attn: General Counsel 16945 Northchase Drive Houston, TX  77060 United States | Amendment No. 21, Dated: 01/18/2008 |
| Quail Tools, L.P. | Questar Exploration And Production Company | Attn: General Counsel Independence Plaza 1050 17th Street Suite 500 Denver, Co  80265 United States | General Agreement, Dated: 02/18/2003 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Questar Exploration And Production Company | Attn: General Counsel Independence Plaza 1050 17th Street Suite 500 Denver, Co  80265 United States | General Services Agreement, Dated: 02/18/2003 |
| Quail Tools, L.P. | Risco La Sara Operating | Attn: General Counsel Two Riverway Suite 1700 Houston, TX  77056 United States | Risco LA Sara Operating, Dated: 02/14/2013 |
| Quail Tools, L.P. | Shell Exploration & Production Company | Attn: General Counsel 701 Poydras Street Suite 802 New Orleans, LA 70139 United States | Contract of Rental Tools, Dated: 10/11/2010 |
| Quail Tools, L.P. | Shell Offshore Inc. | Attn: General Counsel 150 North Dairy Ashford Houston, TX  77079 United States | Contract for the Provision of Tubular and Downhole Rental Tools Services, Dated: 07/24/2017 |
| Quail Tools, L.P. | Shell Offshore, Inc. | Attn: General Counsel 150 North Dairy Ashford Houston, TX  77079 United States | Agreement for Provision of Tubular and Downhole Rental Tools Services , Dated: 07/21/2017 |
| Quail Tools, L.P. | Slatoil Tanzania As (Statoil TZ) | Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger,  4035 Norway | Assignment and Amendment No. 6 to Drill Pipe and Rental Tools Contract , Dated: 10/01/2013 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Southwestern Energy Production Company And Seeco, Co. | Attn: General Counsel 2350 North Sam Houston Parkway East Suite 125 Houston, TX  77032 United States | Equipment, Materials & Supplies Agreement, Dated: 03/01/2009 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC | Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger,   4035 Norway | Amendment No. 1 to SAP Contract, Dated: 03/26/2009 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC | Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger,   4035 Norway | Amendment No. 5 to Drill Pipe and Rental Tools Contract , Dated: 03/18/2013 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC | Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger,   4035 Norway | Amendment No.3 to Drill Pipe and Rental Tools Contract , Dated: 11/13/2009 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC | Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger,   4035 Norway | Notice of Exercising SAP Contract Option, Dated: 06/10/2014 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC | Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger,   4035 Norway | STANDARD CONTRACT FOR RENTAL EQUIPMENT BETWEEN STATOIL GULF OF MEICO LLC AND QUAIL TOOLS, LP, Dated: 07/01/2008 |
| Quail Tools, L.P. | Statoil Gulf Of Mexico LLC (Statoil LLC) | C/O Equinor Asa Attn: General Counsel Forusbeen 50 Stavanger,   4035 Norway | Assignment and Amendment No. 6 to Drill Pipe and Rental Tools Contract , Dated: 10/01/2013 |
| Quail Tools, L.P. | Statoil Oil & Gas Mozambique As | Attn: Finance Department Avenida 25 De Setembro Nr. 270 Time Square Building 2nd Floor, Office 19 Maputo, Mozambique | Amendment no. 4 to Contract no. 4600011352 Drill Pipe and Rental Tools, Dated: 01/02/2013 |
| Quail Tools, L.P. | Statoil Texas Onshore Properties, LLC | Attn: General Counsel 2103 City West Boulevard Suite 800 Houston, TX  77042 United States | Letter Re: Contract No. 4600018481, Exercising Option, Dated: 03/01/2014 |
| Quail Tools, L.P. | Statoil USA E&P Inc. | Attn: General Counsel C/O Equinor Asa Forusbeen 50 Stavanger,   4035 Norway | SAP14600011352 - Drill Pipe and Rental Tools Amendment No. 04 KIWI, Dated: 09/13/2010 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Stone Energy Corporation | Attn: General Counsel<br>625 E Kalisuite Saloom Road<br>Lafayette, LA  70508<br>United States | First Amendment of Agreement, Dated: 11/03/2016 |
| Quail Tools, L.P. | Stone Energy Corporation | Attn: General Counsel<br>625 E Kalisuite Saloom Road<br>Lafayette, LA  70508<br>United States | Non Exclusive Pricing Agreement, Dated: 12/17/2015 |
| Quail Tools, L.P. | Swift Energy Operating, LLC | Attn: General Counsel<br>575 North Dairy Ashford<br>Suite 1200<br>Houston, TX  77079<br>United States | Rate Sheet, Dated: 03/01/2002 |
| Quail Tools, L.P. | Talisman Energy USA Inc. | Attn: Mike Weekley<br>4 Waterway Square Plaza<br>Suite 600<br>The Woodlands, TX 77380<br>United States | Contract for Goods, Lease Goods and/or Services, Dated: 03/13/2012 |
| Quail Tools, L.P. | Talisman Energy USA Inc. | Attn: Calvin Walker<br>337 Daniel Zenker Drive<br>Horseheads, NY 14845<br>United States | Well-Related Goods and/or Services, Dated: 05/20/2010 |
| Quail Tools, L.P. | Tetra Technologies, Inc. | Attn: General Counsel<br>309 Dickson Road<br>Houma, LA  70363<br>United States | Equipment Lease, Not dated |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Unit Corporation | Attn: Neil W. Swanson, Insurance Department 1000 Kensington Tower I 7130 South Lewis Tulsa, Ok  74136 United States | Unit Master Contract, Dated: 06/20/2003 |
| Quail Tools, L.P. | Unum Life Insurance Company Of America | Attn: General Counsel 2211 Congress Street Portland, Me  04122 United States | Short Term Disability Income Protection Plan - Class 2, Dated: 01/01/2016 |
| Quail Tools, L.P. | Vintage Petroleum, LLC | Attn: Courtney Hermes 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | Amendment No. 2 to Commercial Terms, Dated: 06/08/2016 |
| Quail Tools, L.P. | Vintage Petroleum, LLC | Attn: Jody Garcia #6 Desta Drive Suite 6000 Midland, TX  79705 United States | MSA Statement of Commercial Terns - Statement No. SCT-OPL-2010-12736, Dated: 11/08/2010 |
| Quail Tools, L.P. | Vintage Petroleum, LLC | Attn: Mark S. Roberts 5 Greenway Plaza Suite 110 Houston, TX  77046 United States | OXY - MSA Statement of Commercial Terms, Dated: 05/01/2009 |
| Quail Tools, L.P. | Vintage Petroleum, LLC | Attn: Janah Hemphill 5 Greenway Plaza Suite 110 Houston, TX  77048 United States | Statement No. SCT-21000033227, Dated: 11/01/2012 |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail Tools, L.P. | Vitruvian Exploration Ii, LLC | Attn: Reese R. Mitchell 4 Waterway Square Place Suite 400 The Woodlands, TX 77380 United States | Vitruvian Exploration II, LLC., Dated: 09/25/2013 |
| Quail Tools, L.P. | Wapiti Operating, LLC | Attn: General Counsel 800 Gessner Suite 1100 Houston, TX 77024 United States | Equipment Rental Agreement , Dated: 10/02/2017 |
| Quail Tools, L.P. | Wexpro Company | Attn: General Counsel Independence Plaza 1050 17th Street Suite 500 Denver, Co 80265 United States | General Agreement , Dated: 05/05/2003 |
| Quail Tools, L.P. | White, Keith | Address on File | Sale Event and Transition Agreement, Dated: 12/11/2018 |
| Quail Tools, L.P. | White, Marc | Address on File | Sale Event and Transition Agreement, Dated: 12/11/2018 |
| Quail Tools, L.P. | White, Wayne | Address on File | Sale Event and Transition Agreement, Dated: 12/11/2018 |
| Quail USA, LLC | All Coast LLC | Attn: General Counsel 151 Southpark 3rd Floor Lafayette, LA 70508 United States | Access Agreement, Not dated |

| Debtor | Contract Counterparty Name | Contract Counterparty Address | Contract Description |
|---|---|---|---|
| Quail USA, LLC | Esso Exploration And Production Guyana Limited | Attn: General Counsel 99 New Market Street Georgetown, Guyana | Amendment 01 to Agreement , Dated: 11/11/2014 |
| Quail USA, LLC | Esso Exploration And Production Guyana Limited | Attn: Jeff H Simons 99 New Market Street Georgetown, Guyana | Sub agreement, Dated: 01/27/2015 |
| Quail USA, LLC | Esso Exploration And Production Guyana Limited (Eepgl) | Attn: General Counsel 99 New Market Street North Cummingsburg Georgetown, Guyana | Call Off to Drill Pipe, Dated: 06/02/2015 |

**EXHIBIT G(ii)**

**Claims Related to Insurance Policies**

       **Exhibit G(ii)** includes insurance contracts and policies to which one or more Debtors are a party. Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, and occurrence contracts to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is included on **Exhibit G(ii)**, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  Additionally, on January 9, 2019, each of the Debtors filed its Schedules of Assets and Liabilities, which included, among other things, claims and Causes of Action each of the Debtors had reflected as a liability on its books and records (collectively, the "Schedules"). The Debtors expressly reserve all claims and Causes of Action related to the insurance contracts and policies listed on the Schedules for each of the Debtors to the extent the Debtors or the Reorganized Debtors may have claims and Causes of Action against such insurance contracts and policies now or in the future.

| Counterparty Name | Counterparty Address | Insurance Policy Description |
|---|---|---|
| Ace American Insurance Company | Chubb, Financial Lines Attention: Chief Underwriting Officer 1133 Avenue Of The Americas, 32nd Floor New York, NY  10036 United States | BroadForm Side A - D&O ($10M xs $70M) From 9/15/2018-2019, Policy Number DOX G23654830011 |
| AIG | 175 Water Street 18th Floor New York, NY  10038 United States | Automobile Liability - Domestic From 5/1/2018-2019, Policy Number CA 7269824 |
| AIG | 175 Water Street 18th Floor New York, NY  10038 United States | Workers' Compensation/ Employer's Liability - Domestic From 5/1/2018-2019, Policy Number WC 031132229 (AOS) |

| Counterparty Name | Counterparty Address | Insurance Policy Description |
|---|---|---|
| AIG | 175 Water Street 18th Floor New York, NY  10038 United States | Workers' Compensation/ Employer's Liability - Domestic From 5/1/2018-2019, Policy Number WC 031132230 (OK, PA) |
| AIG | 175 Water Street 18th Floor New York, NY  10038 United States | Workers' Compensation/ Employer's Liability - Domestic From 5/1/2018-2019, Policy Number WC 031132231 (CA) |
| AIG | 175 Water Street 18th Floor New York, NY  10038 United States | Workers' Compensation/ Employer's Liability - Domestic From 5/1/2018-2019, Policy Number WC 031132232 (AK) |
| Allied World National Assurance Company | 55 Water Street New York, NY  10041 United States | BroadForm Side A - D&O ($10M xs $50M) From 9/15/2018-2019, Policy Number 0304-9572 |
| Aspen Consortium 9511/9623 | Aspen Insurance 840 W. Sam Houston Parkway N. Suite 420 Houston, TX  77024 United States | Umbrella Liability Primary $20M xs $5M From 5/1/2018-2019, Policy Number B1263EG0151818 |
| Aspen Consortium 9511/9623 | Aspen Insurance 840 W. Sam Houston Parkway N. Suite 420 Houston, TX  77024 United States | Umbrella Liability Primary $5M From 5/1/2018-2019, Policy Number B1263EG0151818 |

| Counterparty Name | Counterparty Address | Insurance Policy Description |
|---|---|---|
| Berkshire Hathaway Specialty Insurance Company | 1314 Douglas Street Suite 1400 Omaha, Ne 68102-1944 United States | Excess D&O ($10M xs 20M) From 9/15/2018-2019, Policy Number 47-EPC-301798-03 |
| Federal Insurance Company (Chubb) | 15 Mountainview Rd Warren, NJ 07059 United States | Commercial Crime ($10M) From 9/15/2018-2019, Policy Number 8158-2468 |
| Federal Insurance Company (Chubb) | 15 Mountainview Rd Warren, NJ 07059 United States | Employed Lawyers Professional Liability ($5M) From 9/15/2018-2019, Policy Number 8248-2657 |
| Federal Insurance Company (Chubb) | 15 Mountainview Rd Warren, NJ 07059 United States | Employment Practices Liability ($5M) From 9/15/2018-2019, Policy Number 8248-2579 |
| Federal Insurance Company (Chubb) | 15 Mountainview Rd Warren, NJ 07059 United States | Primary Directors & Officers Liability ($10M) From 9/15/2018-2019, Policy Number 8146-1352 |
| Federal Insurance Company (Chubb) | 15 Mountainview Rd Warren, NJ 07059 United States | Primary Fiduciary Liability ($10M) From 9/15/2018-2019, Policy Number 8158-2468 |
| Hiscox Insurance Company Inc. | 104 South Michigan Avenue Suite 600 Chicago, Il 60603 United States | Special Crime ($25M) From 12/20/2015 - 2018, Policy Number UKA3005134.15 |

| Counterparty Name | Counterparty Address | Insurance Policy Description |
|---|---|---|
| Illinois National Insurance Company (AIG) | 175 Water Street P.O. Box 25947 Shawnee Mission, Ks 66225 United States | Excess D&O ($10M xs $10M) From 9/15/2018-2019, Policy Number 01-888-37-80 |
| Lexington Insurance Company | 99 High St, Floor 24 Boston, Ma 02110-2378 United States | A&E Errors and Omissions From 1/27/2018-2019, Policy Number 34233979 |
| Lexington Insurance Company | 99 High St, Floor 24 Boston, Ma 02110-2378 United States | Commercial Property From 5/1/2018-2019, Policy Number 23175957 |
| Liberty Insurance Underwriters | 55 Water Street New York, NY 10041 United States | BroadForm Side A - D&O ($10M xs $60M) From 9/15/2018-2019, Policy Number 204295-217 |
| Lloyd's Syndicate No. 4711 | C/O Aspen Managing Agency Limited, As Managing Agent 30 Fenchurch Street London, 0 Ec3m 3bd United Kingdom | Commercial General Liability - Domestic From 5/1/2018-2019, Policy Number B1263EG0168618 |
| Lloyd's Syndicate No. 4711 | C/O Aspen Managing Agency Limited, As Managing Agent 30 Fenchurch Street London, 0 Ec3m 3bd United Kingdom | P&I / Maritime Employers Liability From 5/1/2018-2019, Policy Number B1263EG0161818 |
| Lloyd's Syndicates | 42 West 54th Street 14th Floor New York, NY 10019 United States | Political Risk From 9/1/2016-2019, Policy Number FP0135516 |

| Counterparty Name | Counterparty Address | Insurance Policy Description |
|---|---|---|
| Lloyd's Syndicates | 42 West 54th Street 14th Floor New York, NY  10019 United States | Excess Liability $100M xs $25M From 5/1/2018-2019, Policy Number B1263EG0153118 |
| Lloyd's Syndicates | 42 West 54th Street 14th Floor New York, NY  10019 United States | Excess Liability $75M xs $125M From 5/1/2018-2019, Policy Number B1263EG0642118 |
| Qbe Insurance Corporation | 55 Water Street New York, NY  10041 United States | Excess D&O ($10M xs $30M) From 9/15/2018-2019, Policy Number QPL0246563 |
| Qbe Insurance Corporation | 55 Water Street New York, NY  10041 United States | Excess Fiduciary ($10M xs $10M) From 9/15/2018-2019, Policy Number QPL0370085 |
| Safe Harbor | 5550 Merrick Road Suite 202 Massapequa, NY 11758 United States | Vessel Pollution  From 5/1/2018-2019, Policy Number V-13774-18 |
| Scottsdale Insurance Company | One Nationwide Plaza Columbus, Oh  43215 United States | Hunting Liability From 7/11/2018-2019, Policy Number CPS3064169 |
| Starr Indemnity & Liability Company | Park Avenue, 7th Floor New York, NY  10016 United States | Aviation Liability From 5/1/2018-2019, Policy Number 1000221320-03 |
| Starr Indemnity & Liability Company | Park Avenue, 7th Floor New York, NY  10016 United States | Non-Owned Aircraft From 5/1/2018-2019, Policy Number 1000231795-02 |

| Counterparty Name | Counterparty Address | Insurance Policy Description |
|---|---|---|
| Syndicate 2623/623 At Lloyd's (Beazley) | 55 Water Street New York, NY  10041 United States | BroadForm Side A - D&O ($10M xs $40M) From 9/15/2018-2019, Policy Number W1698E170401 |
| The Insurance Company Of The State Of Pennsylvania | 175 Water Street New York, NY  10038 United States | Auto Liability From 5/1/2018-2019, Policy Number 80-0276229 |
| The Insurance Company Of The State Of Pennsylvania | 175 Water Street New York, NY  10038 United States | General Liability From 5/1/2018-2019, Policy Number 80-0276228 |
| The Insurance Company Of The State Of Pennsylvania | 175 Water Street New York, NY  10038 United States | Voluntary Compensation/ Employer's Liability From 5/1/2018-2019, Policy Number 83-73565 |
| Various Lloyds, London And North American Markets | 42 West 54th Street 14th Floor New York, NY  10019 United States | Package w/ Excess $150M xs $200M (100%) From 5/1/2018-2019 |
| Various Lloyds, London And North American Markets | 42 West 54th Street 14th Floor New York, NY  10019 United States | Package - Kazakhstan From 5/1/2018-2019 |
| Various Lloyds, London And North American Markets | 42 West 54th Street 14th Floor New York, NY  10019 United States | Package - Indonesia From 5/1/2018-2019 |

## EXHIBIT G(iii)

### Claims Related to Liens

Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.  There is no schedule to this **Exhibit G(iii)**.

## EXHIBIT G(iv)

### Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Potential Litigation

**Exhibit G(iv)** includes Entities that are party to or that the Debtors believe may become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, regardless of whether such Entity is included on **Exhibit G(iv)**.

In addition, **Exhibit G(iv)** includes claims and Causes of Action the Debtors expressly retain based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever. Notwithstanding the foregoing, the Debtors retain all such claims and Causes of Action regardless of whether such contract or lease is included on **Exhibit G(iv)**. The claims and Causes of Actions reserved include, without limitation, Causes of Action against vendors, suppliers of goods or services, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counter-claims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims. Additionally, on January 9, 2019, each of the Debtors filed its Schedules, which included, among other things, claims and Causes of Action each of the Debtors had reflected as a liability on its books and records, and its Statement of Financial Affairs, which details certain information regarding each Debtor's property (collectively, the "SoFAs"). Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all claims and Causes of Action against any Entity listed on (a) the Schedule of each Debtor and (b) the SoFA of each Debtor, in each case to the extent such Entities owe or may in the future owe money to the Debtors or the Reorganized Debtors.

| Debtor | Caption of Suit | Case Number | Name and Location of Court/Agency | Type of Claim |
|---|---|---|---|---|
| Parker Drilling Company | Corporation Income and Franchise Tax Audit | | Louisiana Department of Revenue | Tax Audit |
| Parker Drilling Company | G.C. Cooley vs. Phillips 66 Company, et al. | Civil Action No. 2007-132-CV9 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Company | Gary Barton Stiles vs. Phillips 66 Company, et al. | 2007-212-CV9 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Company | Sales and Use Tax Audit | | Iberville Parish | Tax Audit |
| Parker Drilling Company | Sales and Use Tax Audit | | Lafourche Parish | Tax Audit |
| Parker Drilling Company | Sales and Use Tax Audit | | Louisiana Department of Revenue | Tax Audit |
| Parker Drilling Company | Sales and Use Tax Audit | | St. Martin Parish | Tax Audit |
| Parker Drilling Company | Sales and Use Tax Audit | | Terrebonne Parish | Tax Audit |
| Parker Drilling Company | Sales and Use Tax Audit | | Vermilion Parish | Tax Audit |
| Parker Drilling Management Services, Ltd. | Jeff Hunter v. Parker Drilling Management Services, Ltd., Larry Washington, John Does Business Entities 1-4, and John Does 1-4 | 01-17-0000-7196 | International Centre For Dispute Resolution (ICDR), NY | Arbitration - Personal Injury |
| Parker Drilling Management Services, Ltd. | Wayne Rockwell v. Parker Drilling Services Ltd. and Parker Drilling Global Employment | | American Arbitration Association, TX | Arbitration - Personal Injury |

| Debtor | Caption of Suit | Case Number | Name and Location of Court/Agency | Type of Claim |
|---|---|---|---|---|
| | Company (Management Office) LLC | | | |
| Parker Drilling Offshore Company, LLC | Barney Ballard, Jr., vs. Phillips 66 Company, et al. | 2007-111-CV9 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | David C. Conerly vs. Phillips 66 Company, et al. | 34CI2:06-cv-00461 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Donald Ray Berry vs. Phillips 66 Company, et al. | 2007-258 | Circuit Court of Smith County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | James Terry Atwood vs. Phillips 66 Company, et al. | 34CI2:06-cv-00455 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Jerry Toby Grimes vs. Phillips 66 Company, et al. | 34CI2:06-cv-00185 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Leonardo Juardo Hernandez vs. Austin Industries, Inc., et al. | 2017-16080 | 133rd Judicial District Court of Harris County, TX | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Neal G. Smith, Jr., vs. Phillips 66 Company, et al. | 2007-207-CV9 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Ronald C McMaster vs. Union Carbide Corp., et al. | 00064393 | 25th Judicial District Court, Parish of | Litigation - Personal Injury |

| Debtor | Caption of Suit | Case Number | Name and Location of Court/Agency | Type of Claim |
|---|---|---|---|---|
| | | | Plaquemines, LA | |
| Parker Drilling Offshore Company, LLC | Ronald Conerly vs. Phillips 66 Company, et al. | Civil Action No. 2006-590-CV11 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Terry B. Teston vs. Phillips 66 Company, et al. | 34CI2:06-cv-00118 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | The Dow Chemical Company, et al. v. Anglers E & C, Inc., f/k/a Fish Engineering & Construction, Inc., et al. | C.A. No. 3:13-cv-387 | U.S. District Court, Southern District of Texas, Galveston Division, TX | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Vester Lee vs. Phillips 66 Company, Individually, and D/B/A Drilling Specialties Company, et al. | 16-0019 | Circuit Court of Jasper County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Wardelle Marshall vs. Phillips 66 Company, et al. | 34CI2:06-cv-00412 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | William Ray Trott vs. Phillips 66 Company, et al. | 34CI2:06-cv-00187 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore Company, LLC | Willie L. Statham vs. Phillips 66 Company, et al. | | Circuit Court of Smith County, MS | Litigation - Personal Injury |

| Debtor | Caption of Suit | Case Number | Name and Location of Court/Agency | Type of Claim |
|---|---|---|---|---|
| Parker Drilling Offshore USA, L.L.C. | Aaron Richard v. Premiere, Inc., et al. | 131351-B | 16th Judicial District Court, Parish of Iberia, LA | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Barney Ballard, Jr., vs. Phillips 66 Company, et al. | 2007-111-CV9 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | David C. Conerly vs. Phillips 66 Company, et al. | 34CI2:06-cv-00461 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Donald Ray Berry vs. Phillips 66 Company, et al. | 2007-258 | Circuit Court of Smith County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | James Terry Atwood vs. Phillips 66 Company, et al. | 34CI2:06-cv-00455 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Jerry Toby Grimes vs. Phillips 66 Company, et al. | 34CI2:06-cv-00185 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Neal G. Smith, Jr., vs. Phillips 66 Company, et al. | 2007-207-CV9 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Ronald Conerly vs. Phillips 66 Company, et al. | Civil Action No. 2006-590-CV11 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Terry B. Teston vs. Phillips 66 Company, et al. | 34CI2:06-cv-00118 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Vester Lee vs. Phillips 66 Company, Individually, and D/B/A Drilling Specialties Company, et al. | 16-0019 | Circuit Court of Jasper County, MS | Litigation - Personal Injury |

| Debtor | Caption of Suit | Case Number | Name and Location of Court/Agency | Type of Claim |
|---|---|---|---|---|
| Parker Drilling Offshore USA, L.L.C. | Wardelle Marshall vs. Phillips 66 Company, et al. | 34CI2:06-cv-00412 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | William Ray Trott vs. Phillips 66 Company, et al. | 34CI2:06-cv-00187 | Circuit Court of Jones County, MS | Litigation - Personal Injury |
| Parker Drilling Offshore USA, L.L.C. | Willie L. Statham vs. Phillips 66 Company, et al. | | Circuit Court of Smith County, MS | Litigation - Personal Injury |
| Quail Tools, L.P. | Lopez v. Quail and Lyndon Bolen | 2017-34228 | District Court of Harris County, TX | Litigation - Personal Injury |
| Quail Tools, L.P. | Mississippi Resources, LLC v. Quail Tools, L.P. | 00128881 | 16th Judicial District Court, Parish of Iberia, LA | Litigation - Contract Claim |

## EXHIBIT G(v)

### Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or the Reorganized Debtors.  Additionally, on January 9, 2019, each of the Debtors filed its Schedules, which included, among other things, claims and Causes of Action each of the Debtors had reflected as a liability on its books and records. The Debtors expressly reserve all claims and Causes of Action against any Entity listed on the Schedule of each Debtor to the extent such Entities owe or may in the future owe money to the Debtors or the Reorganized Debtors. Furthermore, unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or the Reorganized Debtors owe money to them.  There is no schedule to this **Exhibit G(v)**.

## EXHIBIT G(vi)

### Claims Related to Escrow Amounts, Security Deposits, Trust Accounts, Annuities, and Other Collateral Postings

Unless otherwise released by Article VIII of the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or other type of deposit or collateral is specifically identified herein. Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Exhibit G(vi)** attached hereto.

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| 2M-TEK, Inc. | Coiling Technologies Inc. | 7777 Wright Rd Houston, TX  77041 United States | Prepayment for Goods |
| 2M-TEK, Inc. | Cortec Properties LLC | 208 Equity Blvd Houma, LA  70360 United States | Deposit for New Facility |
| 2M-TEK, Inc. | Lafayette Utilities System (LUS) | 1875 W Pinhook Rd St B Lafayette, LA  70508 United States | Deposit for Utility Connection Fee |
| Parker Drilling Company North America, Inc. | Portola Market LLC | 2550 Overland Ave. Suite 200 Los Angeles, CA 90064-3346 United States | Prepayment for Rent |
| Parker Drilling Company North America, Inc. | Portola Market LLC | 2550 Overland Ave. Suite 200 Los Angeles, CA 90064-3346 United States | Real Property Security Deposit |
| Parker Drilling Company North America, Inc. | Santa Barbara Real Estate Investors LLC | 7127 Hollister Ave Suite 25a-231 | Real Property Security Deposit |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| | | Goleta, CA 93117 United States | |
| Parker Drilling Company North America, Inc. | Southern California Edison | Po Box 600 Rosemead, CA 91771-0001 United States | Utility Deposit |
| Parker Drilling Company of Oklahoma, Incorporated | Guillermo Contreras Maldonado - Mercury Peru | Av Republica De Panama No 350 Dpto 1809 Barranco, Lima, Peru | Prepayment for Accounting Services for the Peru Branch |
| Parker Drilling Management Services, Ltd. | Agilepoint | 1916 B Old Middlefield Way Mountain View, CA 94043 United States | SharePoint and Office 365 Subscription |
| Parker Drilling Management Services, Ltd. | Avinash Ashok Sachdev (Landlord) | Address Unknown | Housing Advance for US Employee on Expat Assignment in Dubai, UAE |
| Parker Drilling Management Services, Ltd. | Baker Communications | 10333 Richmond Ave Suite 400 Houston, TX 77042 United States | Prepayment for Custom Presentations |
| Parker Drilling Management Services, Ltd. | Bank of America | Po Box 15731 400 Delaware Ave Wilmington, De 19801 United States | Prepayment for Loan Fees |
| Parker Drilling Management Services, Ltd. | Bloomberg Bna | 1801 South Bell Street Arlington, VA 22202 United States | Global EHS Resource Center Subscription |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Boardvantage | 4300 Bohannon Dr Suite 110 Menlo Park, CA 94025 United States | Annual Board Portal Package Subscription |
| Parker Drilling Management Services, Ltd. | Broadleaf Group | 13100 Wortham Center Drive Suite 150 Houston, TX 77065 United States | Prepayment for Hardware and Software |
| Parker Drilling Management Services, Ltd. | Capital Investment International | Post506775 United Arab Emirates | Prepayment for Rent |
| Parker Drilling Management Services, Ltd. | Citrix | File 50264 Los Angeles, CA 90074-0264 United States | Annual CSS Citrix Virtual Apps Subscription |
| Parker Drilling Management Services, Ltd. | Compliance Wave | 241 Maple Ave Red Bank, NJ 07701 United States | Prepayment for Services |
| Parker Drilling Management Services, Ltd. | Drilling Systems UK Ltd | Kevin Franklin, Ceo Hurn View House 5 Aviation Park West Bournemouth Int. Airport Dorset, BH23 6EW United Kingdom | Annual Maintenance Contract |
| Parker Drilling Management Services, Ltd. | Drum Cussac | Avalon, 26-32 Oxford Road Bournemouth Dorset, BH8 8EZ United Kingdom | Prepayment for RiskMonitor Service |
| Parker Drilling Management Services, Ltd. | Dubai English Speaking College | Academic City Road Dubai, United Arab Emirates | Prepayment for Tuition |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Dun & Bradstreet | Po Box 742138 Los Angeles, CA 90074-2138 United States | Prepayment for Credit Reporter Platinum Service |
| Parker Drilling Management Services, Ltd. | EiS Technologies Inc. | 3067 Peachtree Industrial Blvd Duluth, Ga 30097 United States | Annual eXpress Reporting Subscription |
| Parker Drilling Management Services, Ltd. | Hightail | 1919 S Bascom Ave Suite 650 Campbell, CA 95008 United States | Prepayment for Software |
| Parker Drilling Management Services, Ltd. | Houston Astros Baseball Team | Po Box 288 Houston, TX 77001-0288 United States | Prepayment for Tickets |
| Parker Drilling Management Services, Ltd. | HP | Po Box 934176 Atlanta, Ga 31193-4176 United States | Prepayment for Hardware and Software |
| Parker Drilling Management Services, Ltd. | Hytec Hydraulic Engineering | Netherton Industrial Estate Wishaw, UK, Ml2 0eg United Kingdom | Prepayment for Equipment |
| Parker Drilling Management Services, Ltd. | IBM | Po Box 676673 Dallas, TX 75267-6673 United States | Prepayment for IBM MaaS360 Essentials Suite |
| Parker Drilling Management Services, Ltd. | Ipreo | Po Box 26886 New York, Ny 10087-6886 United States | Global Markets Intelligence, Research, and Estimates Subscription |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Knowbe4 | 33 N Garden Ave Suite 1200 Clearwater, FL 33755 United States | Security Awareness Training Subscription |
| Parker Drilling Management Services, Ltd. | Leasequery | 3003 Lawson Drive Marietta, Ga  30064 United States | Annual Subscription |
| Parker Drilling Management Services, Ltd. | Lockton Companies, LLC | Lockton Place 3657 Briarpark Dr, Ste 700 Houston, TX  77042 United States | Prepayment for Insurance |
| Parker Drilling Management Services, Ltd. | Metalogix | Po Box 83304 Woburn, Ma  01813-3304 United States | Prepayment for Sharepoint Software |
| Parker Drilling Management Services, Ltd. | Moody's | Po Box 102597 Atlanta, Ga  30368-0597 United States | Prepayment for Services |
| Parker Drilling Management Services, Ltd. | Mr. Ibrahim Rashid Abdelmunem Aljubeh | Address Unknown | Real Property Security Deposit |
| Parker Drilling Management Services, Ltd. | Msdsonline | 27185 Network Place Chicago, Il  60673-1271 United States | MSDSonline Account Subscription |
| Parker Drilling Management Services, Ltd. | National Association Of Corporate Directors (Nacd) | 2001 Pennsylvania NW STE 500 Washington, Dc 20006 United States | Prepayment for Board Fees |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Navex | 333 Research Court Norcross, Ga  30092 United States | Prepayment for Suite Incident Management and Hotline Services |
| Parker Drilling Management Services, Ltd. | New York Stock Exchange (Nyse) | 11 Wall St New York, NY 10005 United States | Annual Fees Related to Common Stock |
| Parker Drilling Management Services, Ltd. | Newsbase | Centrum House, 108-114 Edinburgh, Scotland, Eh3 5dq United Kingdom | Prepayment for Oil & Gas Monitoring Services |
| Parker Drilling Management Services, Ltd. | Nitro Software, Inc | 225 Bush Street Suite 700 San Francisco, CA 94104 United States | Nitro Pro Subscription |
| Parker Drilling Management Services, Ltd. | Oracle | Po Box 203448 Dallas, TX  75320-3448 United States | Prepayment for Oracle and Hyperion Software |
| Parker Drilling Management Services, Ltd. | Pts Bv | Kanaalpark 145 2321 JV Leiden  Netherlands | Prepayment for SkillsVX Hosting |
| Parker Drilling Management Services, Ltd. | Revel Technology | 5535 Memorial Dr STE F-105 Houston, TX  77007 United States | Appsense Subscription |
| Parker Drilling Management Services, Ltd. | Revel Technology | 5535 Memorial Dr STE F-105 Houston, TX  77007 United States | Prepayment for DesktopNOW Software |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Rigzone | 14531 FM 529 STE 225 Houston, TX 60693 United States | Prepayment for Services |
| Parker Drilling Management Services, Ltd. | Rockwell Collins | Dept 0875 Po Box 120875 Dallas, TX 75312-0875 United States | CASP Service Contract |
| Parker Drilling Management Services, Ltd. | S&P Global | 2542 Collection Center Dr Chicago, Il 60693 United States | Prepayment for Analytical Services |
| Parker Drilling Management Services, Ltd. | Sai Global | Forrest Road Office Centre 210 Route 4 East - Suite 103 Paramus, NJ 07652 United States | Prepayment for Customization and Translation Services |
| Parker Drilling Management Services, Ltd. | Salesforce | Po Box 203141 Dallas, TX 75320-3141 United States | Prepayment for Sales Lightning Cloud CRM Software |
| Parker Drilling Management Services, Ltd. | Servicenow - Hr | Po Box 731647 Dallas, TX 75373-1647 United States | Prepayment for ServiceNow HR Service and Performance Analytics |
| Parker Drilling Management Services, Ltd. | Servicenow - It | Po Box 731647 Dallas, TX 75373-1647 United States | Prepayment for ServiceNow Software |
| Parker Drilling Management Services, Ltd. | Skillsoft | Po Box 743049 Atlanta, Ga 30374-3049 United States | Prepayment for Compliance User Based Library Software |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Software One | Dept Ch 10768 Palatine, Il 60055-0768 United States | Prepayment for Software |
| Parker Drilling Management Services, Ltd. | Spears & Associates, Inc. | 8908 S Yale Suite 440 Tulsa, Ok 74137 United States | Prepayment for Drilling and Production Outlook Services |
| Parker Drilling Management Services, Ltd. | Talbot Premium Financing | 3657 Briarpark Dr, Ste 700 Houston, TX 77042 United States | Prepayment for Insurance |
| Parker Drilling Management Services, Ltd. | Taproot | 238 South Peters Road Suite 301 Knoxville, TN 37923 United States | Prepayment for AMF Client Software |
| Parker Drilling Management Services, Ltd. | Thomson Reuters | Tax & Accounting Inc R&G Po Box 71687 Chicago, IL 60694-1687 United States | Prepayment for Tax Provision Software |
| Parker Drilling Management Services, Ltd. | United Healthcare Global | 22703 Network Place Chicago, IL 60673-1227 United States | Prepayment for Insurance |
| Parker Drilling Management Services, Ltd. | Vertex | Lockbox# 25528 25528 Network Place Chicago, IL 60673-1255 United States | Prepayment for Payroll Tax Q Series Solution |
| Parker Drilling Management Services, Ltd. | Vt Idirect | Po Box 741168 Atlanta, GA 30374-1168 United States | Prepayment for VT iSupport |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Parker Drilling Management Services, Ltd. | Workiva | 2900 University Blvd Ames, IA 50010 United States | Prepayment for Support Services |
| Parker Drilling Management Services, Ltd. | Wortham Insurance And Risk Management | 2727 Allen Parkway Houston, TX 77019 United States | Prepayment for Insurance |
| Parker Drilling Offshore USA, L.L.C. | B&W Realty | 645 Highlandia Drive Baton Rouge, LA 70810 United States | Prepayment for Port of Iberia, Louisiana Access |
| Parker Drilling Offshore USA, L.L.C. | Martin Energy Services | Po Box 95363 Grapevine, TX 76099-9733 United States | Prepayment for Fuel for Gulf of Mexico Rigs |
| Parker Drilling Offshore USA, L.L.C. | Port Of Iberia, Louisiana | Po Box 9986 New Iberia, LA 70562-9986 United States | Prepayment for Lease Payment |
| Parker Technology, Inc. | Ecad Inc. | Po Box 51507 Midland, TX 79710-1507 United States | Prepayment for Product and Suite Maintenance |
| Parker Technology, Inc. | Mlc Cad Systems | 4625 W William Cannon Dr Building 5 Austin, TX 78749 United States | SolidWorks Premium Subscription |
| Parker Technology, Inc. | Structural Engineering Technologies (Safi) | 3393 Chemin Ste-Foy, Qc G1x 1s7 Canada | Prepayment for PSE Petroleum Structural Engineering License |
| Quail Tools, L.P. | Bowie County Appraisal District | 710 James Bowie Drive New Boston, TX 75570-2328 United States | Prepayment for Taxes |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Quail Tools, L.P. | Bri 1841 Energy Plaza | C/O Hartman Energy, LLC Po Box 571017 Houston, TX  77257 United States | Rental Deposit |
| Quail Tools, L.P. | CCP BCP 410 Property, LLC | C/O 410 17th St Property Owner, LLC Po Box 912878 Denver, Co  80291 United States | Rental Deposit |
| Quail Tools, L.P. | Comdata | Po Box 100647 Atlanta, GA  30384-0647 United States | Fuel Card Deposit |
| Quail Tools, L.P. | Commerce Bank | P. O. Box 846451 Kansas City, MO 64184-6451 United States | Prepayment for Enterprise Rental Car Account |
| Quail Tools, L.P. | D3 Technologies | 4600 W Kearney Street Suite 100 Springfield, MO 65803 United States | Prepayment for Services |
| Quail Tools, L.P. | Data Foundry | Attn: General Counsel 1044 Liberty Park Drive Austin, TX  78746-6943 United States | Prepayment for Rent |
| Quail Tools, L.P. | Drillinginfo | P. O. Box 679093 Dallas, TX  75267-9093 United States | Prepayment for Services |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Quail Tools, L.P. | Entergy | P. O. Box 61009<br>New Orleans, LA 70161-1009<br>United States | Utility Deposit |
| Quail Tools, L.P. | Executive Promotions, LLC | P.O. Box 81916<br>Lafayette, LA 70598-1916<br>United States | Prepayment for Promotional Products |
| Quail Tools, L.P. | Fremin Climate Control | 1203 Center Street<br>New Iberia, LA 70560<br>United States | Prepayment for Rent |
| Quail Tools, L.P. | Gulotta's | P. O. Box 9808<br>New Iberia, LA 70562-9808<br>United States | Prepayment for Apparel |
| Quail Tools, L.P. | Houston Texans Football Team | NRG Pkwy<br>Houston, TX 77054<br>United States | Prepayment for Tickets |
| Quail Tools, L.P. | Iberia Parish Government, Louisiana | Occupational License Dept.<br>300 Iberia St. - Suite 400<br>New Iberia, LA 70560-4587<br>United States | Prepayment for Occupational License |
| Quail Tools, L.P. | Iberia Parish Parks And Recreation Department | 113 Willow Wood Drive<br>New Iberia, LA 70563<br>United States | Prepayment for 2019 Parks Access |
| Quail Tools, L.P. | Iconvergence | 2020 W. Pinhook Rd, Ste. 100<br>Lafayette, LA 70508<br>United States | Prepayment for Services |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Quail Tools, L.P. | Intercontinental Partners | C/O Tarantino Properties, Inc. 7887 San Felipe Suite 237 Houston, TX  77063 United States | Prepayment for Rent |
| Quail Tools, L.P. | Intercontinental Partners | C/O Tarantino Properties, Inc. 7887 San Felipe Suite 237 Houston, TX  77063 United States | Rental Deposit |
| Quail Tools, L.P. | Isn Software Corporation | P. O. Box 841808 Dallas, TX  75284-1808 United States | Prepayment for Services |
| Quail Tools, L.P. | Isolved Hcm | Dept. LA 23650 Pasadena, CA  91185-3650 United States | Prepayment for Services |
| Quail Tools, L.P. | Jensenit | 1689 Elk Blvd. Des Plaines, Il  60016 United States | Prepayment for Services |
| Quail Tools, L.P. | Jsb Northpark | Po Box 1979 Hammond, LA 70404 United States | Rental Deposit |
| Quail Tools, L.P. | Landmark Graphics Corporation | Po Box 301341 Dallas, TX  75303-1341 United States | Prepayment for Services |
| Quail Tools, L.P. | Louisiana Department Of Public Safety | Office Of Motor Vehicles P.O. Box 64848 Baton Rouge, LA | Prepayment for Truck Registration |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| | | 70896-6409 United States | |
| Quail Tools, L.P. | Louisiana State University Athletics Department | Attn: Season Ticket Renewals P. O. Box 25095 Baton Rouge, LA 70894 United States | Prepayment for Tickets |
| Quail Tools, L.P. | Lpg Land & Development Corporation | 629 Fairchance Road Morgantown, Wv 26508 United States | Rental Deposit |
| Quail Tools, L.P. | Monongalia County, West Virginia | 243 High Street Tax Office Morgantown, Wv 26505-5492 United States | Prepayment for Property Taxes |
| Quail Tools, L.P. | Nelson Architectural Engineers | 2740 Dallas Parkway, Suite 220 Plano, TX 75093 United States | Retainer for Professional Services |
| Quail Tools, L.P. | New Orleans Saints Football Team | P. O. Box 61057 New Orleans, LA 70161-1057 United States | Prepayment for Tickets |
| Quail Tools, L.P. | Nextlevel Information Solutions | 3145 Shadows Lake Drive Baton Rouge, LA 70816 United States | Prepayment for Services |
| Quail Tools, L.P. | Nicholas Commercial Real Estate | Attn: Randy Miller Po Box 1227 Enid, Ok 73702 United States | Rental Deposit |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Quail Tools, L.P. | North Dakota Workforce Safety & Insurance | P. O. Box 5585 Bismarck, ND 58506-5585 United States | Prepayment for Workers' Compensation |
| Quail Tools, L.P. | Pinon Ranch | Po Box 118 Burnet, TX 78611-0118 United States | Prepayment for Rent |
| Quail Tools, L.P. | Sage Accpac | 6700 Koll Center Parikway Pleasanton, CA 94566 United States | Prepayment for Services |
| Quail Tools, L.P. | Softwareone | 20875 Crossroads Circle Suite 1 Waukesha, WI 53186 United States | Prepayment for Services |
| Quail Tools, L.P. | Sparkhound | 11207 Proverbs Avenue Baton Rouge, LA 70816 United States | Prepayment for Software Development |
| Quail Tools, L.P. | Stdm Management Company | Stadium Management 1701 Bryant St, Ste 100 Denver, Co 80204 United States | Prepayment for Denver Broncos Football Team Tickets |
| Quail Tools, L.P. | Tepeguaje Ranch | P. O. Box 146 Encino, TX 78353 United States | Prepayment for Rent |
| Quail Tools, L.P. | Unit Drilling Company | Department 247 Tulsa, OK 74182 United States | Prepayment for Rent |

| Debtor | Counterparty Name | Counterparty Address | Deposit / Prepayment Description |
|---|---|---|---|
| Quail Tools, L.P. | United States Treasury Department | 1500 Pennsylvania Avenue, NW Washington, Dc 20220 United States | Prepayment for Taxes |
| Quail Tools, L.P. | Zoho Corporation | 4141 Hacienda Drive Pleasanton, CA 94588 United States | Prepayment for Services |

**EXHIBIT G(vii)**

**Claims Related to Tax Refunds**

Unless otherwise released by Article VIII the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or Reorganized Debtors, regardless of whether such Entity is specifically identified herein. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe taxes to them. Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Exhibit G(vii)** attached hereto.

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Louisiana Secretary of State | 8585 Archives Ave<br><br>BATON ROUGE, LA 70809 | Franchise and Other Tax |
| Oklahoma Secretary of State | 2300 N. Lincoln Blvd.<br><br>ROOM 101<br><br>OKLAHOMA CITY, OK 73105 | Franchise and Other Tax |
| Wyoming Secretary of State | Corporations Division<br><br>STATE CAPITAL BUILDING<br><br>CHEYENNE, WY 82002-0020 | Franchise and Other Tax |
| West Virginia Secretary of State | 1900 Kanawha Blvd. E<br><br>BLDG 1. STE 157-5<br><br>CHARLESTON, WV 25305 | Franchise and Other Tax |
| Alabama Department of Revenue | Alabama Business Privilege Tax | Franchise and Other Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | 50 N. RIPLEY STREET MONTGOMERY AL, 36104 | |
| Oklahoma Tax Commission | P.O. Box 26890 OKLAHOMA CITY, OK 73126-0920 | Franchise and Other Tax |
| Texas Comptroller of Public Accounts | Lyndon B. Johnson State Office Building 1011 HIGHWAY 6 S STE 120 HOUSTON TX, 78774 | Franchise and Other Tax |
| Delaware Secretary of State | Division of Corporations, John G. Townsend Bldg. 401 FEDERAL STREET, SUITE 4 DOVER, DE 19901 | Franchise and Other Tax |
| Alabama Department of Revenue | Individual & Corporate Tax 50 N. RIPLEY STREET MONTGOMERY, AL 36104 | Income Tax |
| Alaska Department of Revenue | Tax Division 550 W. SEVENTH AVE, SUITE 500 ANCHORAGE, AK 99501-3555 | Income Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Alaska Department of Revenue | Tax Division<br><br>333 W. WILLOUGHBY AVE<br><br>11TH FLOOR, SIDE B<br><br>JUNEAU, AK 99811-0420 | Income Tax |
| Arkansas Department of Finance And Administration | Corporation Income Tax<br><br>STATE CAPITAL BUILDING<br><br>1509 W. 7TH ST # 401<br><br>LITTLE ROCK, AR 72201 | Income Tax |
| California Franchise Tax Board | Corporation Franchise Or Income Tax<br><br>9646 BUTTERFIELD WAY<br><br>SACRAMENTO, CA 95827 | Income Tax |
| Idaho State Tax Commission | P.O. Box 36<br><br>BOISE, ID 83722-0410 | Income Tax |
| Kentucky Department of Revenue | Main Office<br><br>501 HIGH STREET<br><br>FRANKFORT, KY 40601 | Income Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Mississippi Department of Revenue | 500 Clinton Center Drive<br><br>CLINTON, MS 39056 | Income Tax |
| Montana Department of Revenue | Mitchell Building<br><br>125 N. ROBERTS, 3RD FLOOR<br><br>HELENA, MT 59601 | Income Tax |
| New Mexico Taxation And Revenue Department | 1100 South St. Francis Drive<br><br>SANTA FE, NM 87504 | Income Tax |
| New York Department of Taxation And Finance | Attn: Office of Counsel<br><br>BUILDING 9, W A HARRIMAN CAMPUS<br><br>ALBANY, NY 12227 | Income Tax |
| Oregon Department of Revenue | 955 Center St Ne<br><br>SALEM, OR 97301 | Income Tax |
| Utah State Tax Commission | 210 North 1950 West<br><br>SALT LAKE CITY, UT 84134 | Income Tax |
| Colorado Department of Revenue | Corporation Income Tax<br><br>1375 SHERMAN STREET<br><br>DENVER, CO 80261 | Income Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Florida Department of Revenue | 5050 West Tennessee Street<br><br>TALLAHASSEE, FL 32399 | Income Tax |
| Indiana Department of Revenue | 100 N Senate Ave Room N 248<br><br>INDIANAPOLIS, IN 46204 | Income Tax |
| Kansas Department of Revenue | Corporate Tax<br><br>PO BOX 750680<br><br>TOPEKA, KS 66675-0680 | Income Tax |
| Louisiana Department of Revenue | Baton Rouge Headquarters<br><br>617 NORTH THIRD STREET<br><br>BATON ROUGE, LA 70802 | Income Tax |
| Michigan Department of Treasury | Customer Contact Division, Cit Unit<br><br>P.O. BOX 30059<br><br>LANSING, MI 48922 | Income Tax |
| North Dakota Office of State Tax Commissioner | Office of State Commissioner<br><br>600 E. BOULEVARD AVE, DEPT. 127<br><br>BISMARCK, ND 58505-0599 | Income Tax |
|  | Main Office | Income Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Oklahoma Tax Commission | 2501 N LINCOLN BLVD<br><br>OKLAHOMA CITY, OK 73194 | |
| Pennsylvania Department of Revenue | 1854 Brookwood St.<br><br>HARRISBURG, PA 17104 | Income Tax |
| West Virginia State Tax Department | The Revenue Center<br><br>1001 LEE ST. E<br><br>CHARLESTON, WV 25301 | Income Tax |
| Iberia Parish Sheriff | Iberia Parish Courthouse<br><br>300 IBERIA ST., STE 120<br><br>NEW IBERIA, LA 70560-4584 | Property Tax |
| Rena Sherer | Victoria County Tax Collector<br><br>205 N BRIDGE ST. #101<br><br>VICTORIA, TX 77901 | Property Tax |
| Ector County Appraisal District | 1301 East 8th Street<br><br>ODESSA, TX 79761 | Property Tax |
| Midland Central Appraisal District | 4631 Andrews Hwy<br><br>MIDLAND, TX 79703 | Property Tax |
| | 122 Plaza W | Property Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Tax Assessor-Collector | TEXARKANA, TX 75501 | |
| Uinta County Assessor | 225 9th St.<br><br>EVANSTON, WY 82930 | Property Tax |
| Williams County Treasurer | 206 E Broadway<br><br>WILLISTON, ND 58801 | Property Tax |
| Aldine Independent School District | 14909 Aldine Westfield<br><br>HOUSTON, TX 77032 | Property Tax |
| Harris County Tax Assessor-Collector | 1001 S Sgt Macario Garcia Dr<br><br>HOUSTON, TX 77011 | Property Tax |
| Harris County Tax Assessor - Collector | 1001 Preston St<br><br>HOUSTON, TX 77002 | Property Tax |
| Mesa County Treasurer | 544 Rood Ave<br><br>GRAND JUNCTION, CO 81501 | Property Tax |
| Monongalia County Sheriff's Tax Office | 243 High Street<br><br>MORGANTOWN, WV 26505-5492 | Property Tax |
| Kimberly Alexander | 204 West Blind Rd<br><br>MONTGOMERY, PA 17752 | Property Tax |
| Garfield County Treasurer | 114 W. Broadway<br><br>ROOM 104 | Property Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | ENID, OK 73701 | |
| Alaska Assessor | Attn: Marty Mcgee, State Assessor<br><br>550 W. 7TH AVE, SUITE 1640<br><br>ANCHORAGE, AK 99501-3510 | Property Tax |
| City of Anchorage | Finance, Property Appraisal<br><br>632 W 6TH AVENUE, SUITE 300<br><br>ANCHORAGE, AK 99501 | Property Tax |
| North Slope Borough | Attn: Mari Mooer, Deputy Assessor<br><br>P.O BOX 69<br><br>BARROW, AK 99723 | Property Tax |
| Iberia Parish | Attn: Ricky J. Huval Sr, Assessor<br><br>121 W. PERSHING ST., STE 100<br><br>NEW IBERIA, LA 70560 | Property Tax |
| St. Mary Parish | Courthouse Building<br><br>500 MAIN ST, 2ND FLOOR<br><br>FRANKLIN, LA 70538 | Property Tax |
| Lafourche Parish | 403 St. Louis St. | Property Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | THIBODAUX, LA 70301 | |
| Lafayette Parish | 1010 Lafayette Street, SUITE 402 LAFAYETTE, LA 70501 | Property Tax |
| St. Martin Parish | 415 St. Martin Street SUITE 103 ST. MARTINVILLE, LA 70582 | Property Tax |
| Jefferson Davis Parish | 300 N. State Street SUITE 103 JENNINGS, LA 70546 | Property Tax |
| Ector County | Attn: Barbara J. Horn, County Tax Assessor/Collector 1010 EAST EIGHT STREET, SUITE 100 ODESSA, TX 79761 | Property Tax |
| Grimes County | Attn: Mary Ann Waters, Tax Assessor COURTHOUSE ANNEX 114 W. BUFFINGTON P.O. BOX 455 ANDERSON, TX 77830 | Property Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Harris County | Attn: Ann Harris Bennett, Tax Assessor<br><br>1001 PRESTON ST.<br><br>HOUSTON, TX 77002 | Property Tax |
| Cy-Fair Isd | 10300 Jones Road<br><br>HOUSTON, TX 77065 | Property Tax |
| Aldine Isd | Property Tax<br><br>2520 W.W. THORNE BLVD.<br><br>HOUSTON, TX 77073 | Property Tax |
| Klein Isd | Tax Office<br><br>7200 SPRING CYPRESS ROAD<br><br>KLEIN, TX 77379 | Property Tax |
| Nw Harris County Mud #24 | 2800 Post Oak Blvd.<br><br>STE 4100<br><br>HOUSTON, TX 77056 | Property Tax |
| Sheldon Isd | Sheldon Isd Dr. Donald Ney Administration Complex<br><br>ATTN: SUSANA GONZALES, TAX DEPUTY<br><br>11411 C.E. KING PARKWAY, STE. A<br><br>HOUSTON, TX 77044 | Property Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Fort Bend County-Aviation Assets | Tax Assessor-Collector<br><br>1317 EUGENE HEIMANN CIRCLE<br><br>RICHMOND, TX 77469-3623 | Property Tax |
| Nw Harris County Mud #06 | C/O Inframark, Llc<br><br>2002 WEST GRAND PARKWAY NORTH, SUITE 100<br><br>KATY, TX 77449 | Property Tax |
| Louisiana Department of Revenue And Taxation | 617 North Third St<br><br>BATON ROUGE, LA 70802 | Sales & Use Tax |
| Lafayette Parish School Board | 411 E Vermilion St<br><br>LAFAYETTE, LA 70501 | Sales & Use Tax |
| Iberia Parish School Board | 1500 Jane St<br><br>NEW IBERIA, LA 70563 | Sales & Use Tax |
| St. Martin Parish School Board | 600 Corporate Blvd<br><br>BREAUX BRIDGE, LA 70517 | Sales & Use Tax |
| St. Mary Parish Sales & Use Tax Office | 301 3rd St<br><br>MORGAN CITY, LA 70380 | Sales & Use Tax |
| Terrebonne Parish | 8026 Main St, Suite 601 | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | HOUMA, LA 70360 | |
| California State Board of Equalization | 450 N Street<br><br>SACRAMENTO, CA 95814 | Sales & Use Tax |
| Assumption Parish Tax Collector | 4895 Highway 308<br><br>NAPOLEONVILLE, LA 70390 | Sales & Use Tax |
| Iberville Parish Sales Tax Office | 58050 Meriam St, 2nd Floor<br><br>PLAQUEMINE, LA 70764 | Sales & Use Tax |
| Jefferson Parish Tax Collector | 200 Derbigny St, Suite 1200<br><br>GRETNA, LA 70053 | Sales & Use Tax |
| Lafourche Parish School Board | 701 East 7th St<br><br>THIBODAUX, LA 70301 | Sales & Use Tax |
| St. Charles Parish School Board | 13855 River Rd<br><br>LULING, LA 70070 | Sales & Use Tax |
| Plaquemines Parish Sales Tax Office | 8056 Hwy 23, Suite 201c<br><br>BELLE CHASSE, LA 70037 | Sales & Use Tax |
| Texas Comptroller | 111 East 17th St<br><br>AUSTIN, TX 78774 | Sales & Use Tax |
| | 223 S Jefferson | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Vermilion Parish School Board | ABBEVILLE, LA 70510 | |
| Alabama Department of Revenue | 50 North Ripley Street<br><br>MONTGOMERY, AL 36117 | Sales & Use Tax |
| Baldwin County Sales/Use Tax | 22070 Highway 59<br><br>ROBERTSDALE, AL 36567 | Sales & Use Tax |
| Clarke County | 114 Court Street<br><br>GROVE HILL, AL 36451 | Sales & Use Tax |
| Chocktaw County | 117 S Mulberry Ave # 13<br><br>BUTLER, AL 36904 | Sales & Use Tax |
| Colorado Department of Revenue | 1375 Sherman St<br><br>DENVER, CO 80203 | Sales & Use Tax |
| Escambia County, Al | 8600 Us-31<br><br>ATMORE, AL 36502 | Sales & Use Tax |
| Florida Department of Revenue | 5050 W. Tennessee St.<br><br>TALLAHASSEE, FL 32399 | Sales & Use Tax |
| Kansas Retailers' Sales Tax | 915 S.W. Harrison St.<br><br>TOPEKA, KS 66625-5000 | Sales & Use Tax |
| Lamar County | 44690 Al-17<br><br>VERNON, AL 35592 | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| State of Michigan | 3060 W Grand Blvd DETROIT, MI 48202 | Sales & Use Tax |
| Mississippi State Tax Comm. | 500 Clinton Center Dr CLINTON, MS 39056 | Sales & Use Tax |
| Mobile County | 3925 Michael Blvd MOBILE, AL 36609 | Sales & Use Tax |
| State of Nevada Sales/Use Tax | 2550 Paseo Verde Pkwy #180 HENDERSON, NV 89074 | Sales & Use Tax |
| State of New Mexico | Taxation & Revenue Dept. 1100 S ST FRANCIS DR # 3011 SANTA FE, NM 87505 | Sales & Use Tax |
| State of North Dakota | Office of State Tax Commissioner 600 EAST BOULEVARD AVE., DEPT. 127 BISMARCK, ND 58505-5623 | Sales & Use Tax |
| Ohio Department of Taxation | 4485 Northland Ridge Blvd COLUMBUS, OH 43224 | Sales & Use Tax |
|  | 2501 N Lincoln Blvd | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Oklahoma Tax Commission | OKLAHOMA CITY, OK 73194 | |
| Pa Department of Revenue | 1846 Brookwood St<br><br>HARRISBURG, PA 17104 | Sales & Use Tax |
| Utah State Tax Commission | Sales -Tax Spb<br><br>210 NORTH 1950 WEST<br><br>SALT LAKE CITY, UT 84134-0400 | Sales & Use Tax |
| State of Wyoming | Department of Revenue<br><br>HERSCHLER BUILDING<br><br>CHEYENNE, WY 82002-0110 | Sales & Use Tax |
| Bossier Parish | Sales & Use Tax Dept<br><br>620 BENTON RD<br><br>BOSSIER CITY, LA 71111 | Sales & Use Tax |
| Caddo Parish | Sales And Use Tax Commission<br><br>3300 DEE ST<br><br>SHREVEPORT, LA 71105 | Sales & Use Tax |
| Desoto Parish | Sales And Use Tax Comm.<br><br>211 CROSBY ST. | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | MANSFIELD, LA 71052 | |
| St. Helena Parish Sheriff's Office | Sales Tax Division<br><br>53 N 2ND ST<br><br>GREENSBURG, LA 70441 | Sales & Use Tax |
| State of Arkansas | 1900 W 7th St<br><br>LITTLE ROCK, AR 72201 | Sales & Use Tax |
| Idaho State Tax Commission | 800 E Park Blvd #500<br><br>BOISE, ID 83707 | Sales & Use Tax |
| Indiana Department of Revenue | 2217, 100 N Senate Ave # N248<br><br>INDIANAPOLIS, IN 46204 | Sales & Use Tax |
| Kentucky State Treasurer | 501 High St<br><br>FRANKFORT, KY 40620-0003 | Sales & Use Tax |
| State of New York | Harriman Campus Rd<br><br>ALBANY, NY 12226 | Sales & Use Tax |
| South Dakota Dept. of Revenue | 445 E Capitol Ave<br><br>PIERRE, SD 57501 | Sales & Use Tax |
| State of California | 3321 Power Inn Rd., Ste. 210<br><br>SACRAMENTO, CA 95826 | Sales & Use Tax |
| | Sales Tax Division | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Kenai Peninsula Borough | 144 NORTH BINKLEY ST. <br><br> SOLDOTNA, AK 99669-7520 | |
| West Virginia State Tax Dept. | 1124 Smith St <br><br> CHARLESTON, WV 25301 | Sales & Use Tax |
| Acadia Parish School Board | Sales And Use Tax Department <br><br> 2402 NORTH PARKERSON AVE <br><br> CROWLEY, LA 70526 | Sales & Use Tax |
| Allen Parish School Board | Sales And Use Tax Dept. <br><br> 1111 W 7TH AVE <br><br> OBERLIN, LA 70655 | Sales & Use Tax |
| Ascension Parish | Sales And Use Tax Auth. <br><br> 1124 S BURNSIDE, SUITE 300-A <br><br> GONZALES, LA 70737 | Sales & Use Tax |
| Assumption Parish School Board | Sales And Use Tax Department <br><br> 4895 HWY 308 <br><br> NAPOLEONVILLE, LA 70390 | Sales & Use Tax |
| Avoyelles Parish | Sales & Use Tax Dept | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | 221 TUNICA DRIVE WEST<br><br>MARKSVILLE, LA 71351 | |
| Calcasieu Parish | Sales And Use Tax Dept.<br><br>2439 SIXTH ST<br><br>LAKE CHARLES, LA 70601 | Sales & Use Tax |
| East Feliciana Parish | Sales And Use Tax Dept.<br><br>12732 SILLIMAN ST<br><br>CLINTON, LA 70722 | Sales & Use Tax |
| Evangeline Parish | Sales And Use Tax Dept.<br><br>405 W MAGNOLIA ST<br><br>VILLE PLATTE, LA 70586 | Sales & Use Tax |
| Lasalle Parish | Sales And Use Tax Dept.<br><br>508 JOHN DALE DR<br><br>VIDALIA, LA 71373 | Sales & Use Tax |
| Plaquemines Parish | Sales Tax Division<br><br>8056 HWY 23, STE. 301A<br><br>BELLE CHASSE, LA 70037 | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Pointe Coupee Parish | Sales And Use Tax Department<br><br>160 E MAIN ST<br><br>NEW ROADS, LA 70760 | Sales & Use Tax |
| St. Bernard Parish | Sales & Use Tax Department<br><br>2 COURTHOUSE SQUARE<br><br>CHALMETTE, LA 70043 | Sales & Use Tax |
| St. Landry Parish School Board | Sales And Use Tax Department<br><br>1013 CRESWELL LANE<br><br>OPELOUSAS, LA 70570 | Sales & Use Tax |
| Parish of Terrebonne | Sales And Use Tax Department<br><br>8206 MAIN ST, SUITE 601<br><br>HOUMA, LA 70360 | Sales & Use Tax |
| Vermilion Parish School Board | Sales Tax Division<br><br>223 S JEFFERSON<br><br>ABBEVILLE, LA 70510 | Sales & Use Tax |
| West Baton Rouge Parish | Sales And Use Tax Dept.<br><br>883 7TH ST | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | PORT ALLEN, LA 70767 | |
| Winn Parish School Board | Sales Tax Department<br><br>304 E COURT ST<br><br>WINNFIELD, LA 71483 | Sales & Use Tax |
| Jefferson Davis Parish | Sales And Use Tax Department<br><br>203 E. PLAQUEMINE ST<br><br>JENNINGS, LA 70546 | Sales & Use Tax |
| Beauregard Parish | Sales & Use Tax Dept<br><br>120 S STEWART ST<br><br>DERIDDER, LA 70634 | Sales & Use Tax |
| Bienville Parish School Board | Sales & Use Tax Dept<br><br>1956 1ST ST<br><br>ARCADIA, LA 71001 | Sales & Use Tax |
| Claiborne Parish | Sales And Use Tax Dept.<br><br>415 EAST MAIN ST<br><br>HOMER, LA 71040 | Sales & Use Tax |
| Concordia Parish Sales Tax Fund | Sales And Use Tax Dept.<br><br>508 JOHN DALE DR<br><br>VIDALIA, LA 71373 | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| East Baton Rouge Parish | Parish And City Treasurer<br><br>222 ST. LOUIS ST, ROOM 404<br><br>BATON ROUGE, LA 70802 | Sales & Use Tax |
| Parish of Jefferson | Harry Lee (Sheriff/Tax Coll.)<br><br>200 DERBIGNY ST<br><br>GRETNA, LA 70053 | Sales & Use Tax |
| Lincoln Parish | Sales And Use Tax Commission<br><br>201 NORTH VIENNA<br><br>RUSTON, LA 71270 | Sales & Use Tax |
| Livingston Parish School Board | Sales Tax & Use Tax Dept.<br><br>13909 FLORIDA BLVD<br><br>LIVINGSTON, LA 70754 | Sales & Use Tax |
| Morehouse Parish | Morehouse Sale/Use Tax Commission<br><br>123 E MADISON AVE<br><br>BASTROP, LA 71220 | Sales & Use Tax |
| Natchitoches Tax Commission | Sales Tax & Use Tax Dept.<br><br>220 E 5TH ST | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | NATCHITOCHES, LA 71457 | |
| Ouachita Parish | Taxation And Revenue Dept. <br><br> 316 BERARD ST <br><br> MONROE, LA 71201 | Sales & Use Tax |
| Parish of Rapides | Sales & Use Tax Department <br><br> 5606 COLISEUM BLVD <br><br> ALEXANDRIA, LA 71303 | Sales & Use Tax |
| Red River Parish | Red River Tax Agency <br><br> 2015 REDOAK RD <br><br> COUSHATTA, LA 71019 | Sales & Use Tax |
| Sabine Parish | Sales And Use Tax Comm. <br><br> 670 SAN ANTONIO AVE <br><br> MANY, LA 71449 | Sales & Use Tax |
| St. James Parish | Sales And Use Tax Dept. <br><br> 1876 W MAIN ST <br><br> LUTCHER, LA 70071 | Sales & Use Tax |
| Tangipahoa Parish | Sales And Use Tax Dept. | Sales & Use Tax |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | 59656 PULSETON RD<br><br>AMITE, LA 70422 | |
| Tensas Parish | Sales And Use Tax Dept.<br><br>508 JOHN DALE DR<br><br>VIDALIA, LA 71373 | Sales & Use Tax |
| Union Parish School Board | Sales And Use Tax Commission<br><br>100 W TEXAS AVE<br><br>RUSTON, LA 71270 | Sales & Use Tax |
| Vernon Parish Sales Tax Dept. | Sales And Use Tax Dept.<br><br>117 BELVIEW ROAD<br><br>LEESVILLE, LA 71446 | Sales & Use Tax |
| Webster Parish | Sales And Use Tax Comm.<br><br>1128 HOMER RD<br><br>MINDEN, LA 71055 | Sales & Use Tax |
| West Feliciana Parish | Sales And Use Tax Dept.<br><br>4785 PROSPERITY ST<br><br>ST. FRANCISVILLE, LA 70775 | Sales & Use Tax |
| United States Treasury | Internal Revenue Service | Regulatory Taxes and Fees |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | 1901 CROSS BEAM DR <br><br> CHARLOTTE, NC 28217 | |
| Louisiana Dept. of Public Safety | Office of Motor Vehicles <br><br> 7979 INDEPENDENCE BLVD <br><br> BATON ROUGE, LA 70806 | Regulatory Taxes and Fees |
| St. Martin Parish | C/O Broussard Partners And Associates <br><br> ATTN: JENNIFER BEEKHOO-JAGDEO AND/OR DANA L. HANKS <br><br> 12301 KURLAND DRIVE, SUITE 150 <br><br> HOUSTON, TX 77034 | Regulatory Taxes and Fees |
| Iberville Parish | C/O Broussard Partners And Associates <br><br> ATTN: JENNIFER BEEKHOO-JAGDEO AND/OR DANA L. HANKS <br><br> 12301 KURLAND DRIVE, SUITE 150 <br><br> HOUSTON, TX 77034 | Regulatory Taxes and Fees |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Terrebonne Parish | C/O Broussard Partners And Associates<br><br>ATTN: JENNIFER BEEKHOO-JAGDEO AND/OR DANA L. HANKS<br><br>12301 KURLAND DRIVE, SUITE 150<br><br>HOUSTON, TX 77034 | Regulatory Taxes and Fees |
| Lafourche Parish | C/O Broussard Partners And Associates<br><br>ATTN: JENNIFER BEEKHOO-JAGDEO AND/OR DANA L. HANKS<br><br>12301 KURLAND DRIVE, SUITE 150<br><br>HOUSTON, TX 77034 | Regulatory Taxes and Fees |
| Vermilion Parish | C/O Broussard Partners And Associates<br><br>ATTN: JENNIFER BEEKHOO-JAGDEO AND/OR DANA L. HANKS<br><br>12301 KURLAND DRIVE, SUITE 150<br><br>HOUSTON, TX 77034 | Regulatory Taxes and Fees |
| Town of Erie | 645 Holbrook St. | |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | ERIE, CO 80516 | Regulatory Taxes and Fees |
| Ute Indian Tribe | 6964 E 1000 S. <br><br> FORT DUCHESNE, UT 84026 | Regulatory Taxes and Fees |
| Three Affiliated Tribes | 304 Main Street <br><br> NEW TOWN, ND 58763 | Regulatory Taxes and Fees |
| Jcarilla Apache Nation | #6 Dulce Rock Road <br><br> DULCE, NM 87528 | Regulatory Taxes and Fees |
| City of Evanston | 1200 Main St. <br><br> EVANSTON, WY 82930 | Regulatory Taxes and Fees |
| Iberia Parish Government | Occupational License Dept. <br><br> 300 IBERIA ST., STE 400 <br><br> NEW IBERIA, LA 70560-4587 | Regulatory Taxes and Fees |
| City of Mobile | 3925 Michael Blvd <br><br> MOBILE, AL 36609 | Regulatory Taxes and Fees |
| Ohio Department of Taxation | 4485 Northland Ridge Blvd <br><br> COLUMBUS, OH 43224 | Regulatory Taxes and Fees |
| Alabama Secretary of State | Corporations Division <br><br> ATTN: BUSINESS ENTITIES | Regulatory Taxes and Fees |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| | 770 WASHINGTON AVENUE<br><br>MONTGOMERY, AL 36104 | |
| Alaska Secretary of State | Department of Commerce, Community And Economic Development<br><br>DIVISION OF CORPORATIONS, BUSINESS AND PROFESSIONAL LICENSING<br><br>550 W. 7TH AVENUE, SUITE 1500<br><br>ANCHORAGE, AK 99501-3667 | Regulatory Taxes and Fees |
| California Secretary of State | Business Programs<br><br>1500 11TH STREET<br><br>SACRAMENTO, CA 95816 | Regulatory Taxes and Fees |
| Colorado Department of State | Secretary of State<br><br>1700 BROADWAY, SUITE 200<br><br>DENVER, CO 80290 | Regulatory Taxes and Fees |
| Delaware Division of Corporations | Secretary of State<br><br>401 FEDERAL STREET, SUITE 4<br><br>DOVER, DE 19901 | Regulatory Taxes and Fees |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Florida Department of State | Division of Corporations<br><br>CLIFTON BUILDING<br><br>2661 EXECUTIVE CENTER CIRCLE<br><br>TALLAHASSEE, FL 32301 | Annual Regulatory Taxes and Fees |
| Louisiana Secretary of State | Commercial Division<br><br>CORPORATIONS SECTION<br><br>8585 ARCHIVES AVE<br><br>BATON ROUGE, LA 70809 | Regulatory Taxes and Fees |
| Mississippi Secretary of State | Business Services Division<br><br>125 S. CONGRESS STREET<br><br>JACKSON, MS 39201 | Regulatory Taxes and Fees |
| Montana Secretary of State | State Capitol, Room 260<br><br>1301 6TH AVENUE<br><br>HELENA, MT 59620 | Regulatory Taxes and Fees |
| Nevada Secretary of State | Commercial Recordings<br><br>202 NORTH CARSON STREET<br><br>CARSON CITY, NV 89701-4201 | Regulatory Taxes and Fees |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| New Mexico Secretary of State | New Mexico Capitol Annex<br><br>325 DON GASPAR, SUITE 300<br><br>SANTA FE, NM 87501 | Regulatory Taxes and Fees |
| Oklahoma Secretary of State | 421 Nw 13th St, Suite 210<br><br>OKLAHOMA CITY, OK 73103 | Regulatory Taxes and Fees |
| Pennsylvania Department of State | Bureau of Corporations And Charitable Organizations<br><br>401 NORTH STREET<br><br>206 NORTH OFFICE BUILDING<br><br>HARRISBURG, PA 17120 | Regulatory Taxes and Fees |
| Texas Secretary of State | Statutory Filings Division<br><br>CORPORATIONS SECTION<br><br>JAMES EARL RUDDER OFFICE<br><br>REPORTS UNIT<br><br>1019 BRAZOS<br><br>AUSTIN, TX 78701 | Regulatory Taxes and Fees |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Utah Department of Commerce | Division of Corporations & Commercial Code<br><br>160 E. 300 S., 2ND FLOOR<br><br>SALT LAKE CITY, UT 84111 | Regulatory Taxes and Fees |
| Washington Office of The Secretary of State | Corporations & Charities<br><br>DOLLIVER BUILDING<br><br>801 CAPITOL WAY SOUTH<br><br>OLYMPIA, WA 98501 | Regulatory Taxes and Fees |
| West Virginia Secretary of State | One-Stop Business Center<br><br>1615 WASHINGTON STREET EAST<br><br>CHARLESTON, WV 25311 | Regulatory Taxes and Fees |
| Wyoming Secretary of State | 2020 Carey Avenue<br><br>CHEYENNE, WY 82002-0020 | Regulatory Taxes and Fees |
| Financial Industry Regulatory Authority (Finra) | 1735 K Street, Nw<br><br>WASHINGTON, D.C. 20006 | Regulatory Taxes and Fees |
| | 401 Merritt 7, P.O. Box 5116 | Regulatory Taxes and Fees |

| Authority Name | Authority Address | Tax Type(s) |
|---|---|---|
| Financial Accounting Standards Board (Fasb) | NORWALK, CT 06856-5116 | |
| Louisiana Department of Environmental Quality | 602 North Fifth Street<br><br>BATON ROUGE, LA 70802 | Regulatory Taxes and Fees |
| New York Stock Exchange | 11 Wall St<br><br>NEW YORK, NY 10005 | Regulatory Taxes and Fees |
| Public Company Accounting Oversight Board (Pcaob) | 1666 K Street NW<br><br>WASHINGTON, D.C. 20006-2803 | Regulatory Taxes and Fees |
| State of Louisiana Board For Contractors | 2525 Quail Drive<br><br>BATON ROUGE, LA 70808 | Regulatory Taxes and Fees |
| California Contractors State License Board | 9821 Business Park Drive<br><br>SACRAMENTO, CA 95827 | Regulatory Taxes and Fees |
| Texas Commission of Environmental Quality | 12100 Park 35 Circle<br><br>AUSTIN, TX 78753 | Regulatory Taxes and Fees |
| Wyoming Department of Environmental Quality | 200 West 17th Street<br><br>CHEYENNE, WY 82002 | Regulatory Taxes and Fees |
| U.S. Environmental Protection Agency | 1200 Pennsylvania Avenue, N.W.<br><br>WASHINGTON, D.C. 20460 | Regulatory Taxes and Fees |

## EXHIBIT G(viii)

### Claims Related to Customer Obligations

Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action against or related to all former and current customers that owe or may in the future owe money to the Debtors or the Reorganized Debtors, whether for unpaid invoices or any other matter whatsoever, including contracts.  There is no schedule to this **Exhibit G(viii)**.

**Exhibit H**

**Members of the New Boards and Section 1129(a)(5) of the Bankruptcy Code Disclosures**

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the Reorganized Parker Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.

As set forth in the Restructuring Support Agreement (including the Governance Term Sheet), the initial Reorganized Parker Board shall consist of seven members, consisting of (i) six members selected by the Required Consenting Stakeholders in their sole discretion and (ii) the Chief Executive Officer of Reorganized Parker.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the Reorganized Parker Board, as well as those Persons that will serve as officers of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the Reorganized Parker Board will be disclosed in the New Organizational Documents.

The Reorganized Parker Board shall include the following seven members:

| Name | Biography and Affiliations |
| --- | --- |
| Patrick Bartels | Patrick Bartels is a senior investment professional with 20 years of experience and currently serves as the Managing Member of Redan Advisors LLC.  His professional experience includes investing in complex financial restructurings and process intensive situations in North America, Latin America, Asia, and Europe in a broad universe of industries.  Mr. Bartels has led creditors' committees and served as a director on numerous public and private boards of directors with an extensive track-record of driving value added returns for all stakeholders through governance, incentive alignment, capital markets transactions and mergers and acquisitions.<br><br>Mr. Bartels currently serves on the board of directors of Arch Coal, Inc., Sungard Availability Services, LifeCare Holdings, and Vanguard Natural Resources, Inc.  Mr. Bartels also served on the board of directors of WCI Communities, Inc. and TOUSA Liquidation Trust. Mr. Bartels was previously a Managing Principal of Monarch Alternative Capital LP in New York, a private investment firm that focuses primarily on distressed companies. Prior to joining Monarch Alternative Capital LP, Mr. Bartels was a high-yield investments analyst at Invesco Ltd.  He began his career at PricewaterhouseCoopers LLP, where he was a Certified Public |

| | |
|---|---|
| | Accountant.   Mr. Bartels received a Bachelor of Science in Accounting with a concentration in Finance from Bucknell University.   He also holds the Chartered Financial Analyst designation. |
| Eugene Davis | Eugene Davis is Chairman and Chief Executive Officer of PIRINATE Consulting Group, LLC, a privately held consulting firm specializing in turnaround management, merger and acquisition consulting, hostile and friendly takeovers, proxy contests, and strategic planning advisory services for domestic and international public and private business entities.  Since forming PIRINATE in 1997, Mr. Davis has advised, managed, sold, liquidated, and served as a chief executive officer, chief restructuring officer, director, chairman or committee chairman of a number of businesses operating in diverse sectors.  He was an outside director of Emerson Radio Corporation, a consumer electronics company, beginning in 1990, and became the President, Vice Chairman and continued as a director of Emerson Radio Corporation, from mid-1992 to 1997.  He was also the Chief Executive Officer and Vice Chairman of Sport Supply Group, Inc., a direct-mail marketer of sports equipment, from 1996 to 1997.  Mr. Davis began his career in 1980 as an attorney and international negotiator with Exxon Corporation and Standard Oil Company (Indiana) and was in private practice from 1984 to 1998. <br><br> Mr. Davis currently serves as a director of Verso Corporation; Sanchez Energy; Seadrill Limited; and VICI Properties Inc.  During the past five years, Mr. Davis has been a director of the following public or formerly public companies: ALST Casino Holdco, LLC; Atlas Air Worldwide Holdings, Inc.; Atlas Iron Limited (which is subject to an off-market takeover bid expected to be completed on or about August 31, 2018, following which Mr. Davis will no longer be a director); The Cash Store Financial Services, Inc.; Dex One Corp.; Genco Shipping & Trading Limited, Global Power Equipment Group, Inc.; Goodrich Petroleum Corp.; Great Elm Capital Corp.; GSI Group, Inc.; Hercules Offshore, Inc.; HRG Group, Inc.; Knology, Inc.; SeraCare Life Sciences, Inc.; Spansion, Inc.; Spectrum Brands Holdings, Inc.; Titan Energy LLC (which filed a Form 15 on June 6, 2018 that will become effective on or before September 6, 2018); Trump Entertainment Resorts, Inc.; U.S. Concrete, Inc.; and WMIH Corp.  In addition, Mr. Davis is and has been a director of several private companies in various industries. |
| Michael Faust | Mr. Faust has 34 years of industry, financial and leadership experience within the oil and gas sector, including diverse geological, geophysical and technical reservoir experience spanning many different basins and formations throughout the world. |

| | |
|---|---|
| | Mr. Faust is a consultant with Quartz Geophysical LLC, a geophysical consulting business. Mike is Lead Independent Director of SAExploration, Inc., and an Independent director of Obsidian Energy. Prior to these governance positions, Mr. Faust was the Vice President, Exploration and Land at ConocoPhillips Alaska, Inc., where he oversaw and managed the company's exploration organization and strategy in Alaska. Prior to that, he was Vice President, Exploration and Land at ConocoPhillips Canada Ltd.<br><br>Mr. Faust earned his Master of Arts degree in Geophysics from the University of Texas at Austin in 1984, after receiving his Bachelor of Science degree in Geology from the University of Washington in 1981. Mr. Faust is a Certified Petroleum Geologist and a member of the American Association of Petroleum Geologists, the Society of Exploration Geophysicists, and served as the President of the Geophysical Society of Alaska from 2001 to 2002. |
| Barry L. McMahan | Barry L. McMahan retired as Senior Vice President of Seneca Resources, a wholly owned subsidiary of National Fuel Gas Company, and was responsible for Seneca's Operations in the US. Mr. McMahan joined Seneca in 1988 and managed Seneca's California assets before being promoted to manage all company assets. Mr. McMahan has more than 34 years' experience in oil and gas production development and management. As a member of Seneca's senior management, Mr. McMahan was engaged in all aspects of both conventional and shale development.<br><br>Mr. McMahan attended California Lutheran University where he majored in Finance. He was a member of the American Petroleum Institute, the Society of Petroleum Engineers and the Western States Petroleum Association, where he served on the Board of Directors. Mr. McMahan was named the Western States Petroleum Association's Man of the Year in 1994 for his efforts in regulatory reform. In addition, he serves on the Board of Trustees and the endowment committee for Pyle's Boys Camp, an organization serving at-risk disadvantaged young men in Southern California. Mr. McMahan joined the board of U.S. Well Services, a private equity backed pure play hydraulic fracturing services company with operations in the Appalachian basin and Texas. Mr. McMahan's board service was concluded with a successful IPO in November of 2018. Mr. McMahan currently serves of the Board of Tribune Resources, where he chairs the compensation committee and serves on the audit committee. |
| Gary G. Rich | Gary G. Rich is the current Chairman, President and Chief Executive Officer of Parker Drilling. He was elected President and Chief Executive Officer on October 1, 2012 and Chairman on May 1, 2014. An industry veteran with over 30 years of global technical, |

| | |
|---|---|
| | commercial and operations experience, Mr. Rich joined Parker Drilling after a 25 year career with Baker Hughes Incorporated where he successfully managed several of the company's businesses, regions, and initiatives. Over his career he has held a progressive series of roles across a broad spectrum of focus areas including global sales and strategic marketing and business development; new technology, product and commercialization strategies; and operations, finance and business management.

Prior to joining Parker Drilling, Mr. Rich served as Vice President of global sales for Baker Hughes, and prior to this role, he served as President of that company's European operations. Previously, Mr. Rich was President of Hughes Christensen Company (HCC), a division of Baker Hughes primarily focused on the production and distribution of drilling bits for the petroleum industry. Mr. Rich holds a B.S. in accounting from Brigham Young University and an M.S. in science and technology commercialization from the University of Texas. |
| Zaki Selim | Zaki Selim is a member of the Board of Directors of Parker Drilling Company and serves as Chairman of the Compensation Committee and a member of the Corporate Governance Committee. Mr. Selim is the Non-Executive Chairman and a member of the Board of Directors of Glasspoint, Inc., a manufacturer of solar steam generators for use in the oil and gas industry, a position he has held since 2013. He has also served as a senior advisor with First Reserve, a private equity investment firm focused on global energy and infrastructure investments, from 2013 to 2014. Mr. Selim also served as a Director of the Board of Total Safety U.S., Inc., a privately held industrial safety service provider from 2012 to 2017. In 2017, Mr. Selim joined the Board of Directors of Paragon Offshore, a provider of offshore drilling services. An oil and gas industry veteran, Mr. Selim retired from Schlumberger in 2010 after a 29-year career with the company. From 1983 until 2010, he held progressive management positions within Schlumberger Limited, retiring as the Area President for Oilfield Services – Middle East/Asia. From 2010 to 2012, Mr. Selim served as Chief Executive Officer of PetroPro, an energy consulting business based in Dubai, U.A.E.

Mr. Selim is a member of the Society of Petroleum Engineers (SPE), holds a bachelor's degree in mechanical engineering from Cairo University's Faculty of Engineering and attended the management program at Harvard Business School. |
| L. Spencer Wells | L. Spencer Wells has over 15 years of experience as an investor and financial analyst and is a founding Partner of Drivetrain Advisors, a provider of fiduciary services to the alternative investment |

| | community.  Prior to founding Drivetrain Advisors, Mr. Wells served as a Senior Advisor at TPG Special Situations Partners.  Mr. Wells currently serves on the Boards of several public and private companies, among them Town Sports International, Inc., NextDecade Corporation, and Jones Energy, Inc.  From 2010 to 2012, Mr. Wells was a partner of TPG Special Situations Partners, during which time he helped create and manage an investment portfolio approximated at $2.5 billion.  From 2002 until 2009, Mr. Wells served as a Partner and a Portfolio Manager at Silver Point Capital.  While at Silver Point, he covered the energy, chemicals, and building products sectors and managed an investment portfolio estimated at $1.3 billion.<br><br>Mr. Wells holds a B.A. in Psychology from Wesleyan University and a Master of Business Administration from Columbia Business School. |
|---|---|

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

**Exhibit I**

**Restructuring Transaction Exhibit**

Certain documents, or portions thereof, contained in this **Exhibit I** and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors and the Consenting Stakeholders.  The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

**Description of Restructuring Transactions**

In accordance with **Exhibit I** of this Plan Supplement, the Debtors intend to implement and effectuate the following Restructuring Transactions.

This Description of Restructuring Transactions is intended only as a draft summary of the Restructuring Transactions and represents a simplified and illustrative set of steps.  For the avoidance of doubt, although this **Exhibit I** reflects the Debtors' current intentions with respect to the Restructuring Transactions and the post-Effective Date organizational structure of the Reorganized Debtors, nothing in this **Exhibit I** shall be viewed as the final version of the Restructuring Transactions, nor shall it limit or modify in any way any section of the Plan Supplement or any related provisions in the Confirmation Order, or any authority or discretion granted to the Debtors and/or Reorganized Debtors thereby.  The Debtors and its advisors will continue to review the Restructuring Transactions from a legal, operational, and tax perspective.

The Restructuring Transactions are intended to allow the Debtors and Reorganized Debtors to structurally realign their international and U.S. operations.  This realignment will allow the Debtors and Reorganized Debtors to (1) reduce the complexity of the Debtors' and Reorganized Debtors' legal ownership structure, (2) substantially reduce the number of intercompany balances existing between legal entity groups, and (3) consolidate the Debtors' existing business operations into two primary holding companies.

The Restructuring Transactions are separated into two parts.  The first part of the Restructuring Transactions focuses on the Debtors' U.S. business operations.  In addition to eliminating numerous intercompany balances existing between members of the Debtors' U.S. operating group, the Debtors' U.S. business operations are intended to be consolidated into a Luxembourg corporation (treated as a corporation for U.S. tax purposes) that will be the owner of these business operations and will be subject to U.S. taxation on the income from its U.S. business activities.

The second part of the Restructuring Transactions focuses on the elimination of intercompany balances between legal entities in the United States and the Debtors' international operating group as well as the consolidation of the Debtors' international operations within a single holding company structure.  The Debtors' international operations will be contributed to a new international holding company formed in Hungary and will be owned within a single holding company structure.  This consolidation is intended to significantly simplify the Debtors' legal entity structure and also to reduce the complexity of the Debtors' international and U.S. reporting and tax compliance burdens.

The parties reserve all rights to amend, revise, or supplement the Plan Supplement, including the Restructuring Transactions in this Exhibit, subject to the applicable consent rights under the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders, at any time prior to the Effective Date, or any other such date as may be provided for by the Plan or by order of the Bankruptcy Court.

In furtherance of the Plan and the Restructuring Transactions, the following transaction steps shall substantially occur on or before the Effective Date as described in this **Exhibit I**.

# Legend

Case 18-36958   Document 355   Filed in TXSB on 02/12/19   Page 770 of 1046



1

# Alignment of Business Operations
## Current Relevant Structure

Case 18-36958   Document 355   Filed in TXSB on 02/12/19



Note:  Full structure intentionally not depicted.

2

# Domestic Operations

Copyright © 2018 Deloitte Development LLC. All rights reserved.

# Domestic Operations
## Step 1 – Formation of Lux HoldCo



**Steps**

1.1. NA Ops forms New Lux HoldCo, a new Luxembourg holding company.

1.2. New Lux HoldCo forms New U.S. LLC.

**Legend:**

| |
|---|
| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Rigs |

Note: Full structure intentionally not depicted.

4

# Domestic Operations
## Step 2 – Arctic Intercompany Settlement



**Steps**

2.1. Alaska distributes its intercompany receivable from PDC to Arctic.

2.2. Arctic distributes the following intercompany receivables to NA Ops:
- Arctic's receivable from Parker Tech
- Arctic's receivable from PDC
- Alaska's receivable from PDC

2.3. NA Ops distributes the intercompany receivables from Parker Tech received in Step 2.2 to PDC.

2.4. PDC contributes the intercompany receivable received from Step 2.3 to Parker Tech. The intercompany receivable is extinguished after this step.

**Legend:**

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Rigs** |

Note: Full structure intentionally not depicted.

# Domestic Operations
## Step 3 – Contribution of Arctic



Case 18-36958   Document 355   Filed in TXSB on 02/12/19   Page 775 of 1046

**Steps**

3.1. NA Ops contributes its 100% ownership in Arctic to New Lux HoldCo in exchange for equity and newly issued intercompany debt.

3.2. New Lux HoldCo contributes .01% ownership of Arctic to New U.S. LLC.

**Legend:**

| |
|---|
| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Rigs |

Note:  Full structure intentionally not depicted.

6

# Domestic Operations
## Step 4 – PKD Offshore USA Intercompany Settlement



**Steps**

4.1. Enex distributes its intercompany receivable from PDC to PKD Offshore USA.

4.2. PKD Mexico distributes its intercompany receivable from PDC to PKD Offshore USA.

4.3. PKD Offshore USA distributes the following intercompany receivables to PKD Offshore:
- ◦ Enex's receivable from PDC
- ◦ PKD Mexico's receivable from PDC
- ◦ PKD Offshore USA's receivable from PDC

4.4. PKD Offshore distributes the intercompany receivables received in Step 4.3 to NA Ops.

Legend:

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Rigs** |

Note:  Full structure intentionally not depicted.

7



**Steps (continued)**

4.5. Parker Tech distributes its intercompany receivable from Enex to PDC.

4.6. PDC contributes the following intercompany notes to NA Ops:
- ◦ Intercompany receivable from Enex received in Step 4.5
- ◦ Intercompany receivable from NA Ops
- ◦ NA Ops assumes intercompany payable from PDC to CV3

The intercompany accounts between PDC and NA Ops are extinguished after this step.

**Legend:**

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Rigs** |

Note: Full structure intentionally not depicted.

Case 16-36958   Document 355   Filed in TXSB on 02/12/19   Page 777 of 1046

8



**Legend:**

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Rigs** |

### Steps (continued)

4.7. NA Ops contributes the intercompany receivable from Enex received in Step 4.6 to PKD Offshore.

4.8. PKD Offshore contributes the intercompany receivable received in Step 4.7 to PKD Offshore USA.

4.9. PKD Offshore USA contributes the intercompany receivable received in Step 4.8 to Enex. The intercompany account is extinguished after this step.

Note: Full structure intentionally not depicted.

Case 18-36958   Document 355   Filed in TXSB on 02/12/19   Page 778 of 1046

# Domestic Operations

## Step 5 – Transfer of Enex / Rig 270 to PDC



**Steps**

5.1. PKD Offshore USA distributes Enex to PKD Offshore.

5.2. PKD Offshore distributes Enex to NA Ops.

5.3. NA Ops distributes Enex to PDC.

**Legend:**

| |
|---|
| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Rigs |

Note: Full structure intentionally not depicted.

10

Case 18-36958   Document 355   Filed in TXSB on 02/12/19

# Domestic Operations
## Step 6 – PDC Int'l Ltd Intercompany Settlement



**Steps**

6.1. PDC Int'l Ltd distributes its intercompany receivable from PDC to PKD Eurasia.
  ◦ Step not depicted.

6.2. PKD Eurasia distributes the intercompany receivable received in Step 6.1 to LE247.
  ◦ Step not depicted.

6.3. LE247 distributes the intercompany receivable received in Step 6.2 to PDC. The intercompany receivable is extinguished after this step.

**Legend:**

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Rigs** |

Note: Full structure intentionally not depicted.

11

## Step 7 – Distribution of PDC Int'l Ltd

**Steps**

7.1. PKD Eurasia makes a pro-rata distribution of its ownership in PKD Int'l Ltd to its direct owners (PKD Offshore & LE247).
  ◦ Step not depicted.

7.2. LE247 distributes its ownership in PKD Int'l Ltd received in step 7.1 to PDC.
  ◦ Step not depicted.

7.3. PKD Offshore distributes its ownership in PKD Int'l received in step 7.1 Ltd to NA Ops.

7.4. NA Ops distributes its ownership in PKD Int'l Ltd received in step 7.3 to PDC.

Legend:

| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Rigs |

Note:  Full structure intentionally not depicted.

12

# Domestic Operations
## Step 8 – Contribution of PKD Offshore USA



Case 16-36958   Document 355   Filed in TXSB on 02/12/19   Page 782 of 1046

**Steps**

8.1. PKD Offshore distributes its ownership in PKD Offshore USA to NA Ops.

8.2. NA Ops contributes PKD Offshore USA to New Lux HoldCo in exchange for equity and newly issued intercompany debt.

8.3. New Lux HoldCo contributes .01% ownership in PKD Offshore USA to New U.S. LLC.

**Legend:**

| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Rigs |

Note:  Full structure intentionally not depicted.

13

# Domestic Operations
## Step 9 – Contribution of Quail Tools



**Steps**

9.1. PKD Offshore distributes its ownership in Parker Tools to NA Ops.

9.2. NA Ops contributes Parker Tools to New Lux HoldCo in exchange for equity and newly issued intercompany debt.

9.3. New Lux HoldCo contributes .01% ownership in Parker Tools to New U.S. LLC.

**Legend:**

| Domestic Entities |
| Domestic Entities |

| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Rigs |

Note:  Full structure intentionally not depicted.

14



**Steps**

10.1. PDC enters into a secondment arrangement of U.S.-based employees with respective U.S. LLC subsidiaries of New Lux HoldCo for an indefinite period including an adoption agreement with PDC to handle the employees' benefits of Arctic, Quail and PKD Offshore.

10.2. PDC enters into a service agreement with respective U.S. LLC subsidiaries of New Lux HoldCo to provide support payroll services.

**Legend:**

| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Rigs |

Note:  Full structure intentionally not depicted.

15

Copyright © 2018 Deloitte Development LLC. All rights reserved.

# Foreign Operations

Project Drake

16

# Foreign Operations
## Step 1 – Settlement of Intercompany Notes

Case 18-36958 Document 355 Filed in TXSB on 02/12/19 Page 786 of 1046



**Legend:**
| |
|---|
| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |

### Steps

1.1. PDC contributes the stock of PKD Eurasia to NA Ops as a capital contribution.

1.2. NA Ops contributes its net intercompany receivable from PKD Eurasia to PKD Eurasia as a capital contribution. The intercompany accounts between NA Ops and Eurasia are extinguished after this step.

1.3. NA Ops nets the intercompany payable to CV3 (Domestic Step 4.6) with its net intercompany receivable from CV3 to arrive at a net receivable position, and contributes such amount to PKD Eurasia.

1.4. PKD Eurasia contributes the net intercompany receivable from CV3 and a receivable from CV4 to CV4. The intercompany accounts between CV4 and Eurasia are extinguished.

1.5. CV4 contributes the net intercompany receivable from CV3 to CV3. The intercompany accounts between CV4 and CV3 are extinguished after this step.

1.6. NA Ops cancels all debt it has from CV2.

Note: Full structure intentionally not depicted.

17

# Foreign Operations
## Step 2 – Settlement of Intercompany Notes

Case 18-36958 Document 355 Filed in TXSB on 02/12/19 Page 787 of 1046



**<u>Steps</u>**
2.1. If practicable, remaining intercompany receivables and payables between U.S. and Foreign legal entities are legally cancelled or contributed to the capital of the respective entity groups.

Note:  Full structure intentionally not depicted.

18

# Foreign Operations
## Step 3 – Realignment of ITS Structure

Case 18-36958 Document 355 Filed in TXSB on 02/12/19 Page 788 of 1046



**Steps**

3.1. CV5 forms New Hungarian HoldCo ("New HoldCo").

3.2. CV5 contributes LE501 to New HoldCo.

3.3. LE501 makes a valid entity classification election to be treated as a disregarded entity for U.S. federal income tax purposes.

Note: Full structure intentionally not depicted.

19

# Foreign Operations
## Step 4 – Transfer of CV2 Assets to New HoldCo

Case 18-36958 Document 355 Filed in TXSB on 02/12/19 Page 789 of 1046



**Steps**

4. CV2 contributes its ownership in its active DRE's to New HoldCo in exchange for non-qualified preferred shares.

**Legend:**

| Domestic Entities |
|---|
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |

| Non-Qualified Preferred Shares |
|---|

Note: Full structure intentionally not depicted.

20

Case 18-36958 Document 355 Filed in TXSB on 02/12/19 Page 790 of 1046

**Steps**

5. CV3 contributes its ownership in its active DRE's to New HoldCo in exchange for non-qualified preferred shares.

PDC
LE001

Pacific Rim
LE237

NA Ops
LE065

Parker
Rigsource, LLC
LE209

PKD Eurasia
LE236

.04%

99.88%

.04%

CV1
(NL)

CV4
(NL)

CV2
(NL)

CV5
(NL)

5

CV3
(NL)

LE026
(Kazakhstan)

New HoldCo
(Hungary)

CFCs

DREs
(U.S. &
Foreign)

LE040
(NL)

LE501
(UK)

CV2 DREs
(Foreign)

DREs
(Foreign)

CV3 DREs
(Foreign)

**Legend:**

Domestic Entities

First-Tier Foreign Entities

Lower-Tier Foreign Entities

Non-Qualified Preferred
Shares

Note: Full structure intentionally not depicted.

21

# Foreign Operations
## Step 6 – CV1 Reorganization

Case 18-36958  Document 355  Filed in TXSB on 02/12/19  Page 791 of 1046



**Steps**

6.1. LE211 distributes its .04% ownership in CV1 to PDC .
- ◦ Step not depicted.

6.2. PDC contributes its .08% ownership in CV1 to LE246.
- ◦ Step not depicted.

6.3. LE246 contributes its .08% ownership in CV1 to Pacific Rim.

**Legend:**

| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Non-Qualified Preferred Shares |

Note:  Full structure intentionally not depicted.

22

# Foreign Operations
## Step 7 – Transfer of U.S.-Owned Foreign-Used Assets



**Steps**

7.1. PDC contributes its 100% ownership in LE031, Enex, and PDC Int'l Ltd to LE246.
- Step not depicted.

7.2. LE246 contributes its 100% ownership in LE031, Enex, and PDC Int'l Ltd to Pacific Rim.
- Step not depicted.

7.3. Pacific Rim contributes its 100% ownership in LE031, Enex, and PDC Int'l Ltd to CV1.

7.4. CV1 contributes its 100% ownership in LE031, Enex, and PDC Int'l Ltd to CV5.

7.5. CV5 contributes its 100% ownership in LE031, Enex, and PDC Int'l Ltd to New HoldCo.

**Legend:**

| | |
|---|---|
| Domestic Entities | |
| First-Tier Foreign Entities | |
| Lower-Tier Foreign Entities | |
| Non-Qualified Preferred Shares | |

Note: Full structure intentionally not depicted.

Case 18-36958   Document 355   Filed in TXSB on 02/12/19

23

# Foreign Operations
## Step 8 – Transfer of PDC Canada



**Steps**

8.1. Parker Tech distributes its 100% ownership in PDC Canada to PDC.
- ◦ Step not depicted.

8.2. PDC contributes 74% of its ownership in PDC Canada to LE246.
- ◦ Step not depicted.

8.3. PDC contributes 26% of its ownership in PDC Canada to NA Ops.

8.4. NA Ops contributes 26% of its ownership in PDC Canada to PKD Offshore.

8.5. LE246 contributes its 74% ownership in PDC Canada to Pacific Rim.

**Legend:**

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Non-Qualified Preferred Shares** |

Note:  Full structure intentionally not depicted.

24

# Step 8 – Transfer of PDC Canada (continued)



## Steps (continued)

8.6. PKD Offshore contributes its 26% ownership in PDC Canada to Pacific Rim.

8.7. Pacific Rim contributes its 100% ownership in PDC Canada to CV1.

8.8. CV1 contributes its 100% ownership in PDC Canada to CV5.

8.9. CV5 contributes its 100% ownership in PDC Canada to New HoldCo.

### Legend:

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Non-Qualified Preferred Shares** |

Note: Full structure intentionally not depicted.

25

Case 18-36958 Document 355 Filed in TXSB on 02/12/19 Page 794 of 1046

# Foreign Operations
## Step 9 – CV2 & CV5 Reorganization

Case 18-36958   Document 355   Filed in TXSB on 02/12/19   Page 795 of 1046



**Steps**

9.1. CV1 forms U.S. NewCo 1 ("NewCo1") and U.S. NewCo 2 ("NewCo2"), new U.S. LLCs.

9.2. NewCo1 and NewCo2 make valid entity classification elections to be treated as corporation for U.S. federal income tax purposes.

9.3. CV1 contributes its 100% ownership in CV2 to NewCo1 as a capital contribution.

9.4. CV1 contributes its 100% ownership in CV5 to NewCo2 as a capital contribution.

9.5. CV2 & CV5 make valid entity classification elections to be treated as disregarded entities for U.S. federal income tax purposes.



**Legend:**

| Domestic Entities |
| --- |

| First-Tier Foreign Entities |
| --- |

| Lower-Tier Foreign Entities |
| --- |

| Non-Qualified Preferred Shares |
| --- |

*Includes CFC PDC Canada

Note:  Full structure intentionally not depicted.

26

# Foreign Operations
## Step 10 – CV4 Reorganization



**Steps**

10.1. PKD Eurasia forms U.S. NewCo 3 ("NewCo3"), a new U.S. LLC.

10.2. NewCo3 makes a valid entity classification elections to be treated as a corporation for U.S. federal income tax purposes.

10.3. PKD Eurasia contributes its 100% ownership in CV4 to NewCo3 as a capital contribution.

10.4. CV4 makes a valid entity classification elections to be treated as a disregarded entity for U.S. federal income tax purposes.

**Legend:**

| |
|---|
| Domestic Entities |
| First-Tier Foreign Entities |
| Lower-Tier Foreign Entities |
| Non-Qualified Preferred Shares |

*Includes CFC PDC Canada

Note:  Full structure intentionally not depicted.

27

# Foreign Operations
## Step 11 – CV3 Reorganization

Case 18-36958   Document 355   Filed in TXSB on 02/12/19   Page 797 of 1046



**Steps**

11.1. CV4 forms U.S. NewCo 4 ("NewCo4"), a new U.S. LLC.

11.2. NewCo4 makes a valid entity classification elections to be treated as a corporation for U.S. federal income tax purposes.

11.3. CV4 contributes its 100% ownership in CV3 to NewCo4 as a capital contribution.

11.4. CV3 makes a valid entity classification elections to be treated as a disregarded entity for U.S. federal income tax purposes.

**Legend:**

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Non-Qualified Preferred Shares** |

*Includes CFC PDC Canada

Note: Full structure intentionally not depicted.

28

Case 18-36958 Document 355 Filed in TXSB on 02/12/19 Page 798 of 1046



**Steps**

12.1. CV3's Board of Directors formally resolves to liquidate CV3.

12.2. CV4's Board of Directors formally resolves to liquidate CV3.

12.3. CV2's Board of Directors formally resolves to liquidate CV2.

12.4. CV5's Board of Directors formally resolves to liquidate CV5.

12.5. CV1's Board of Directors formally resolves to liquidate CV1.

**Legend:**

| |
|---|
| **Domestic Entities** |
| **First-Tier Foreign Entities** |
| **Lower-Tier Foreign Entities** |
| **Non-Qualified Preferred Shares** |

*Includes CFC PDC Canada

Note: Full structure intentionally not depicted.

29

# Proposed Relevant Structure

Case 18-36058 Document 355 Filed in TXSB on 02/12/19 Page 799 of 1046



Note: Full structure intentionally not depicted. 30

# Entity Legal Name Abbreviations

| Entity | Abbreviation |
| --- | --- |
| PD International Holdings C.V. | ("CV1") |
| PD Dutch Holdings C.V. | ("CV2") |
| PD Selective Holdings C.V. | ("CV3") |
| PD Offshore Holdings, C.V. | ("CV4") |
| PD ITS Holdings C.V. | ("CV5") |
| Aral Parker LLP | ("LE026") |
| SaiPar Drilling Co BV | ("LE040") |
| KDN Drilling Limited | ("LE045") |
| Parker Drilling Tengiz, Ltd. | ("LE053") |
| Parker Drilling (Nigeria) Limited | ("LE105") |
| International Tubular Services Limited | ("LE501") |
| Parker Drilling Company | ("PDC") |
| Parker North America Operations LLC | ("NA Ops") |
| Parker Technology Inc. | ("Parker Tech") |
| Parker Drilling Offshore Company LLC | ("PKD Offshore") |
| Parker Drilling Offshore USA LLC | ("PKD Offshore USA") |
| Parker Tools, LLC | ("Parker Tools") |
| Quail Tools, L.P. | ("Quail") |
| Parker Drilling de Mexico, S. de R.L. de C.V. | ("PKD Mexico") |
| Parker Drilling Company of Mexico LLC | ("PDC Mexico") |
| Parker Enex, LLC | ("Enex") |
| Parker Drilling Arctic Operating, LLC | ("Arctic") |
| Parker Drilling Alaska Services, Ltd | ("Alaska") |
| Parker Drilling Alaska Svcs U.S. PE | ("Alaska Branch") |
| Parker Drilling Pacific Rim, Inc. | ("Pacific Rim") |
| Parker Drilling Eurasia, Inc. | ("PKD Eurasia") |
| Parker Drilling Canada | ("PDC Canada") |

31

<u>**Exhibit J**</u>

**Form of Management Incentive Plan and Related Documents**

This <u>**Exhibit J**</u> includes the following organizational documents for the Reorganized Debtors:

- <u>**Exhibit J(i)**</u>: Form Employment Agreement

- <u>**Exhibit J(ii)**</u>: 2019 Long-Term Incentive Plan

- <u>**Exhibit J(iii)**</u>: Restricted Stock Unit Incentive Agreement

- <u>**Exhibit J(iv)**</u>: Stock Option Incentive Agreement

Certain documents, or portions thereof, contained in this <u>**Exhibit J**</u> and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors and the Consenting Stakeholders.  The final versions of such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

The Debtors reserve all rights to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

**<u>Exhibit J(i)</u>**

**Form Employment Agreement**

K&E Draft 2/12/19

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "**Agreement**") is made and entered into as of [●] [●], [2019] (the "**Effective Date**"), by and between PARKER DRILLING COMPANY, a Delaware corporation and PARKER DRILLING MANAGEMENT SERVICES LTD., a [Delaware] corporation, and [●] ("**Executive**"). For the purposes of this Agreement, Parker Drilling Company and Parker Drilling Management Services Ltd., together with any Successor Entity, shall be collectively referred to as the "**Company**". The Company and Executive may sometimes hereafter be referred to singularly as a "**Party**" or collectively as the "**Parties**." Defined terms shall have the meanings ascribed to them in Appendix A of the Agreement.

### W I T N E S S E T H:

WHEREAS, the Company desires to continue to employ Executive subject to the terms and conditions hereafter set forth; and

WHEREAS, Executive is willing to enter into the Agreement upon the terms and conditions set forth;

NOW, THEREFORE, in consideration of Executive's continued employment with the Company, and the mutual promises and agreements contained herein, the Parties hereto agree as follows:

1.      **Employment**. During the Employment Period, the Company shall employ Executive, and Executive shall serve as [●] of the Company. Executive's principal place of employment shall be at the corporate offices of the Company in Houston, Texas. Executive understands and agrees that Executive may be required to travel from time to time for purposes of the Company's business.

2.      **Compensation**. Compensation shall be paid or provided to Executive during the Employment Period as follows:

(a)      *Base Salary*. The Company shall pay to Executive a base salary of $[●] per year, payable in accordance with the Company's normal payroll schedule and procedures for its executives. Executive's Base Salary shall be subject to at least annual review and may be increased (but not decreased during the Employment Period without Executive's express written consent). Nothing contained herein shall preclude the payment of any other compensation to Executive at any time.

(b)      *Annual Incentive Cash Compensation*. The Executive shall be eligible to participate in an annual incentive cash compensation plan. The annual incentive cash compensation target shall be not less than [●]% of Executive's Base Salary and shall be subject to review and may be increased (but not decreased during the Employment Period without Executive's express written consent (such amount, the "**Target Bonus**")). For years commencing after 2019, the annual incentive cash compensation will be paid based on meeting reasonably potentially attainable performance goals established by the Compensation Committee of the Board

in good faith after consultation with [Executive][1] [the Company's Chief Executive Officer][2] no later than 60 days after the commencement of (a) the applicable fiscal year or (b) the applicable target period.][3] The annual incentive cash compensation, if any, will be paid in cash form in accordance with the terms of the applicable annual incentive cash compensation plan as in effect from time to time, and in no event later than 90 days following close of the target period.

(c)     *Long-Term Incentives*. Executive shall be eligible to receive grants of long-term incentives, all as commensurate with Executive's position, and to the extent permitted by and in accordance with the terms of the Company's long-term incentive plan or plans as in effect from time to time.

(1)     Initial Equity Grant. Effective as of the Effective Date, Executive shall receive an initial award (the "**Initial RSU Award**") pursuant to the terms and conditions of the RESTRICTED STOCK UNIT INCENTIVE AGREEMENT between Company and Executive dated on the Effective Date, a form of which is attached hereto as Exhibit A.

(2)     Initial Options Grant.  Effective as of the Effective Date, Executive shall receive an initial award (the "**Initial Option Award**") pursuant to the terms and conditions of the STOCK OPTION INCENTIVE AGREEMENT between Company and Executive dated on the Effective Date, a form of which is attached hereto as Exhibit B.

3.     **Duties and Responsibilities of Executive**. Executive shall have responsibilities, duties and authorities customarily associated with Executive's position in companies that are of similar size and nature to the Company. During the Employment Period, Executive shall devote substantially all of Executive's full business time and attention to the Company's business. This Section 3 shall not be construed as preventing Executive from (a) serving on advisory committees or boards with the written permission of the Reporting Authority, such permission not to be unreasonably withheld or delayed; (b) engaging in reasonable volunteer services for charitable, educational or civic organizations; or (c) managing Executive's personal investments in a form or manner that will not require Executive's services in the operation of the entities in which such investments are made.

4.     **Term of Employment**. Executive's initial term of employment with the Company under the Agreement shall be for the period from the Effective Date through the one-year anniversary of the Effective Date (the "**Initial Term of Employment**"). Thereafter, the Initial Term of Employment shall be automatically extended repetitively for one-year period(s) unless written notice is given by either the Company or Executive to the other Party at least 60 days prior to the end of the Initial Term of Employment, or any one-year extension thereof, as applicable, that the term of employment will not be renewed (such notice, a "**Notice of Non-Renewal**"). The Initial Term of Employment and any extension of the Initial Term of Employment hereunder shall each and collectively be referred to herein as a "**Term of Employment**." The Term of Employment

---

[1] NTD: For CEO.

[2] NTD: For Executives other than the CEO.

[3] NTD: Parties to discuss 2019 bonus.

2

shall also be extended upon a Change in Control as provided in <u>Section 7</u>. The Term of Employment shall automatically end in the event of the death or Disability of Executive. The Company and Executive shall each have the right to give Notice of Termination (pursuant to <u>Section 8)</u> at will, with or without cause, at any time, subject however to the terms and conditions of the Agreement regarding the rights and duties of the Parties upon termination of employment. The period from the Effective Date through the earlier of the date of Executive's termination of employment for whatever reason or the end of the Term of Employment shall be referred to herein as the "**Employment Period**."

5. **Benefits**. Subject to the terms and conditions of the Agreement, Executive shall be entitled to the following:

(a) ***Ongoing Benefits***. During the Employment Period, Executive shall be entitled to the following:

(1) ***Reimbursement of Expenses***. The Company shall pay or reimburse Executive for all reasonable travel, entertainment and other expenses paid or incurred by Executive in the performance of Executive's duties hereunder. The Company shall also provide Executive with suitable office space, including staff support, as reasonably determined by the Company.

(2) ***Other Employee Benefits***. Executive shall be eligible to participate in any pension, retirement, 401(k), and profit-sharing, non-qualified deferred compensation and other group retirement plans or programs of the Company, to the same extent as available to Senior Officers under the terms of such plans or programs. Executive shall also be entitled to participate in any medical, dental, life, accident, disability and other group insurance plans or programs of the Company, to the same extent as available to Senior Officers under the terms of such plans or programs.  For the purposes of this Agreement, "**Senior Officers**" means includes the Chief Executive Officer of the Company and all managerial personnel reporting directly to the Chief Executive Officer.

(3) ***Paid Time Off***. Executive shall be entitled to the number of hours of paid time off each year that is accorded under the Company's paid time policy for other Senior Officers, but not less than [●][4] hours of paid time off annually.

(b) ***Payments Upon Termination***. Upon termination of employment during the Term of Employment and without requirement of execution of a Waiver and Release, Executive shall be entitled to the following minimum payments, in addition to any other payments or benefits Executive is entitled to receive under the terms of the Agreement and any employee benefit plan or program:

(1) unpaid Base Salary which has accrued through the Termination Date;

---

[4] NTD: Number of PTO hours to be included as applicable on employee-by-employee basis to align with current entitlements.

3

(2)    unpaid vacation pay for that year which has accrued through the Termination Date; and

(3)    reimbursement of incurred business expenses in accordance with the Company's normal procedures.

Any such accrued and unpaid salary and vacation pay shall be paid to Executive in a cash lump sum within five business days following the Termination Date.

6.    **Severance Benefits Upon Certain Terminations Outside the Change in Control Protection Period**. Subject to the Waiver and Release requirement described in Section 6(c), Executive's right to compensation and benefits for periods after the Termination Date (but not within the Change in Control Period defined in Section 7) shall be determined in accordance with this Section 6, as follows:

(a)    *Cash Payments*. In the event that (i) Executive's employment is terminated during the Term of Employment by the Company without Cause (other than due to death or Disability), (ii) Executive's employment with the Company is terminated upon the expiration of the Term of Employment and following the date the Company provides a Notice of Non-Renewal as contemplated by Section 4, or (iii) Executive terminates Executive's employment hereunder during the Term of Employment for Good Reason (each, a "**Qualifying Termination**"), then the following cash payments shall be provided to Executive or, in the event of Executive's death before receiving such benefits, to Executive's Designated Beneficiary:

(1)    the Company shall pay to Executive as additional compensation (the "**Additional Payment**") an amount which is equal to [●] (the "**Severance Multiplier**") multiplied by the sum of (x) Executive's Base Salary as in effect on the date Notice of Termination is given or on the date immediately prior to the Termination Date, whichever is greater and (y) Executive's Target Bonus. The Additional Payment shall be paid to Executive in a cash lump sum payment on the 60th day following the Termination Date, but only if the Waiver and Release has been timely executed and returned and the revocation period has expired;

(2)    a portion of Executive's annual incentive cash compensation equal to the annual incentive cash compensation as provided in Section 2(b) based on actual performance, multiplied by a fraction, the numerator of which equals the number of days from the commencement of the incentive compensation plan year in which such termination occurs through the Termination Date, and the denominator of which equals 365. Any such annual incentive cash compensation shall be paid in a cash lump sum on the normal annual incentive cash compensation payment date for Senior Officers whose employment has continued, and in no event later than the later of (i) March 15 of the year following the year in which the Termination Date occurs or (ii) the 60th day following the Termination Date, but only if the Waiver and Release has been timely executed and returned and the revocation period has expired;

(3)    if the Termination Date occurs after the end of the Company's fiscal year and prior to the payment of the annual incentive cash compensation for such year, the same annual incentive cash compensation to which Executive would have been entitled had Executive's employment continued through the normal annual incentive cash compensation payment date, if

4

any. Such annual incentive cash compensation shall be paid in a cash lump sum on the normal annual incentive cash compensation payment date for Senior Officers whose employment has continued, and in no event later than the later of March 15 of the year in which the Termination Date Occurs or (ii) the 60th day following the Termination Date, but only if the Waiver and Release has been timely executed and returned and the revocation period has expired; and

(4)      payment for Executive's (and Executive's eligible dependents') health care continuation premiums ("**COBRA**") for the number of years equal to the Severance Multiple (the "**COBRA Payment**"), any such amount shall be paid to Executive in a cash lump sum payment on the 60th day following the Termination Date, but only if the Waiver and Release has been timely executed and returned and the revocation period has expired.

(b)      *No Benefits*. In the event that (i) Executive voluntarily resigns or otherwise voluntarily terminates Executive's employment at any time, in either case, without Good Reason, (ii) Executive's employment is terminated by the Company for Cause, or (iii) Executive's employment is terminated due to death or Disability, then the Company shall have no obligation to provide any severance payments and benefits under Section 6(a). In any such event, Executive and Executive's covered dependents, if any, shall be entitled to only elect continuation coverage under the Company's group health plan and group dental plan pursuant to COBRA and the Company's procedures for COBRA administration after the Termination Date.

(c)      *Waiver and Release*. Notwithstanding any provision of the Agreement to the contrary, in order to receive the severance payments and benefits payable under Section 6 or Section 7, as applicable, Executive must first execute an appropriate waiver and release agreement (substantially in the form attached hereto as Appendix B) (the "**Waiver and Release**"). Executive shall have 45 days after receipt of the Waiver and Release to consider and timely execute and return it to the Company. After return, Executive shall have an additional seven days in which Executive can revoke the Waiver and Release; thereafter, the Waiver and Release shall be irrevocable. The Company shall provide the Waiver and Release to Executive no later than five days after the Termination Date. If the Waiver and Release is not timely executed and returned, or it is revoked within the seven-day revocation period, no benefits shall be paid under any of Section 6 or Section 7.

(d)      *No Duplication*. The severance payments provided under the Agreement shall supersede and replace any severance payments or benefits under any severance plan, agreement, arrangement, program or policy (whether written or unwritten) that the Company or any Affiliate maintains and under which the Executive may be eligible to participate. Notwithstanding the preceding sentence, in the event that a severance payment or benefit under the Agreement would constitute a change in the form or timing of payment under Code Section 409A of any severance payment or benefit otherwise payable to Executive under any other plan, agreement, arrangement, program or policy, then the portion of the severance payment or benefit payable under the Agreement that is equal to the amount payable under such other severance plan, arrangement shall be paid in the form, and at the time, applicable under such other severance agreement, arrangement, program or policy, and, in such event, any excess severance payment or benefit as determined under the Agreement shall be paid in the time and form as specified in the Agreement.

5

7.      **Severance Benefits Upon Certain Terminations During the Change in Control Protection Period**. Subject to the Waiver and Release requirement described in Section 6, Executive's right to compensation and benefits after the Termination Date for the Executive's Qualifying Termination during (x) the Term of Employment and (y) the period that commences upon the occurrence of a Change in Control and terminates 18 months thereafter (the "**Change in Control Protection Period**") shall be determined in accordance with this Section 7, as follows:

(a)      Executive shall be entitled to the payments and benefits set forth in Section 6, provided that the Severance Multiplier for purposes of determining the amount of the Additional Payment under Section 6(a)(1) shall instead be [●].

(b)      *No Benefits*. In the event that (i) Executive voluntarily resigns or otherwise voluntarily terminates employment at any time without Good Reason (other than a termination of employment at the end of the Term of Employment following an Notice of Non-Renewal given by the Company), (ii) Executive's employment is terminated by the Company for Cause or (iii) employment is terminated due to death or Disability, then the Company shall have no obligation to provide any severance benefits under Section 7. In any such event, Executive and Executive's covered dependents, if any, shall be entitled to only elect continuation coverage under the Company's group health plan and group dental plan pursuant to COBRA and the Company's procedures for COBRA administration after the Termination Date

(c)      *Potential Reduction in Payments.* Notwithstanding any other provision of the Agreement to the contrary, if any Payment would be subject to the Excise Tax, then the Payment shall be either (i) delivered in full pursuant to the terms of this Agreement, or (ii) reduced in accordance with this Section 7(c) to the extent necessary to avoid the Excise Tax, based on which of (i) or (ii) would result in the greater Net After-Tax Receipt to Executive.

If Payments are reduced, the reduction shall be accomplished first by reducing cash Payments under this Agreement, in the order in which such cash Payments otherwise would be paid and then by forfeiting any equity-based awards that vest as a result of the Change in Control, starting with the most recently granted equity-based awards, to the extent necessary to accomplish such reduction.

All determinations under this Section 7(c) shall be made by the Company's independent accountants or compensation consultants (the "**Third Party**") and all such determinations shall be conclusive, final and binding on the parties hereto. The Company and Executive shall furnish to the Third Party such information and documents as the Third Party may reasonably request in order to make a determination under this Section 7(c). The Company shall bear all reasonable fees and costs of the Third Party with respect to determinations under or contemplated by this Section 7(c).

8.      **Notice of Termination**. Any termination by the Company or Executive of employment with the Company shall be communicated by means of a written notice which indicates the specific termination provision of the Agreement relied upon and sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated (the "**Notice of Termination**").

6

9.    **Mitigation**. Executive shall not be required to mitigate the amount of any payment provided for under the Agreement by seeking other employment or in any other manner.

10.    **[Confidential Information**.

(a)    *Access to Confidential Information and Specialized Training*. Continuing on an ongoing basis during employment, the Company agrees to give Executive access to Confidential Information (as defined below) (including, without limitation, Confidential Information of the Company's Affiliates and Subsidiaries), which Executive did not have access to or knowledge of before Executive's employment with the Company. Executive acknowledges and agrees that, as between the Parties, all Confidential Information is and shall remain the exclusive property of the Company and that all Confidential Information is confidential and a valuable, special and unique asset of the Company that gives the Company an advantage over its actual and potential, current and future competitors. Executive further acknowledges and agrees that Executive shall preserve and protect all Confidential Information from unauthorized disclosure or unauthorized use, that certain Confidential Information may constitute "trade secrets" under applicable laws, and that unauthorized disclosure or unauthorized use of the Company's Confidential Information would irreparably injure the Company.

(b)    The Company agrees to provide Executive with ongoing Specialized Training, which Executive does not have access to or knowledge of before the execution of the Agreement, and the Company agrees to continue providing such Specialized Training on an ongoing basis during employment. "**Specialized Training**" includes the training the Company provides to Executive that is unique to its business and enhances Executive's ability to perform Executive's job duties effectively, which includes, without limitation, orientation training; sales methods/techniques training; operation methods training; and computer and systems training.

(c)    *Agreement Not to Use or Disclose Confidential Information*. Both during the term of Executive's employment and after the termination of Executive's employment for any reason (including wrongful termination), Executive shall hold all Confidential Information in strict confidence, and shall not use any Confidential Information except for the benefit of the Company, in accordance with the duties assigned to Executive. Executive shall not, at any time (either during or after the term of Executive's employment), disclose any Confidential Information to any person or entity (except other employees of the Company who have a need to know the information in connection with the performance of their employment duties), without the prior written consent of the Board, or permit any other person in the Executive's immediate family (which shall mean the spouse and children of the Executive) to do so; provided, however, Executive may make such disclosures to third parties where the disclosure is made during the Employment Period to third parties who have executed confidentiality agreements acceptable to the Company. Executive shall take reasonable precautions to protect the physical security of all documents and other material containing Confidential Information (regardless of the medium on which the Confidential Information is stored). The Agreement applies to all Confidential Information, whether now known or later to become known to Executive.

(d)    *Agreement to Refrain from Derogatory Statements*. Executive shall refrain, both during the employment relationship and for a two-year period after the Termination Date, from publishing any oral or written statements about the Company or any of its Affiliates' directors,

7

officers, employees, agents, investors or representatives that are untruthful and harmful to the business interest or reputation of the Company or any of its Affiliates; or that disclose private or confidential information about the Company or any of its Affiliates' business affairs, directors, officers, employees, agents, investors or representatives; or that constitute an intrusion into the seclusion or private lives of the Company's or any of its Affiliates' directors, officers, employees, agents, investors or representatives; or that give rise to negative publicity about the private lives of such directors, officers, employees, agents, investors or representatives; or that place such directors, officers, employees, agents, investors or representatives in a false light before the public; or that constitute a misappropriation of the name or likeness of such directors, officers, employees, agents, investors or representatives. A violation or threatened violation of this prohibition may be enjoined. This Section does not apply to communications with regulatory authorities or other communications protected or required by law.

(e)     Nothing in the Agreement will prohibit or restrict the Company, its Affiliates, Executive or Executive's respective attorneys from: (i) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding relating to the Agreement, or as required by law or legal process, including with respect to possible violations of law; (ii) participating, cooperating, or testifying in any action, investigation, or proceeding with, or providing information to, any governmental agency or legislative body, any self-regulatory organization, and/or pursuant to the Sarbanes-Oxley Act; or (iii) accepting any U.S. Securities and Exchange Commission awards.  In addition, nothing in the Agreement prohibits or restricts the Company, its Affiliates or Executive from initiating communications with, or responding to any inquiry from, any regulatory or supervisory authority regarding any good faith concerns about possible violations of law or regulation.

(f)     Pursuant to 18 U.S.C. § 1833(b), Executive will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret of the Company or its Affiliates that (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to Executive's attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  If Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney and use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal and does not disclose the trade secret except under court order.  Nothing in the Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such section.

11.     **Duty to Return Company Documents and Property**. Upon the termination of Executive's employment with the Company, for any reason whatsoever, Executive shall immediately return and deliver to the Company any and all papers, books, records, documents, memoranda and manuals, e-mail, electronic or magnetic recordings or data, including all copies thereof, belonging to the Company, containing Confidential Information, in Executive's possession, whether prepared by Executive or others. If at any time after the Employment Period, Executive determines that Executive has any Confidential Information in Executive's possession or control, Executive shall immediately return to the Company all such Confidential Information in Executive's possession or control, including all copies and portions thereof.

8

12. **Employee Developments**.

(a) *Assignment of Employee Developments*. Executive hereby assigns to the Company, without additional compensation, all right, title and interest Executive has in and to any Employee Developments. If copyright protection is available for any Employee Development, such Employee Development will be considered a "work for hire" as that term is defined under copyright law and will be the exclusive property of the Company.

(b) *Executive Duties*. During and after Executive's employment with the Company or any of its Subsidiaries, Executive shall, without additional compensation: (i) promptly disclose to the Company any Employee Development, specifically identifying any inventions, improvements or other portions of the Employee Development that are potential patentable or susceptible to protection as a trade secret; (ii) execute and deliver any and all applications, assignments, documents, and other instruments that the Company shall deem necessary to protect the right, title and interest of the Company or its designee in or to any Employee Development; (iii) reasonably cooperate and assist in providing information for making and completing regulatory and other filings in connection with any Employee Development; (iv) reasonably cooperate and assist in providing information for or participating in any action, threatened action, or considered action relating to any Employee Development; and (v) take any and all other actions as the Company may otherwise require with respect to any Employee Development.

(c) *Third Party Obligations*. Executive acknowledges that the Company from time to time may have agreements with other persons or entities which impose obligations or restrictions on the Company regarding development-related work made during the course of work thereunder or regarding the confidential nature of such work. Executive agrees to be bound by all such obligations and restrictions and to take all action necessary to discharge the obligations of the Company.

(d) Executive recognizes that all ideas, inventions, and discoveries of the type described in this Section 12, conceived or made by Executive alone or with others within one year after termination of employment with the Company or any of its Subsidiaries (voluntary or otherwise), are likely to have been conceived in significant part either while employed by the Company or as a direct result of knowledge Executive had of proprietary information or Confidential Information. Accordingly, Executive agrees that such ideas, inventions or discoveries shall be presumed to have been conceived during Executive's employment with the Company, unless and until the contrary is clearly established by Executive, and shall be treated as Employee Developments hereunder.

13. **Non-Solicitation Restriction**. To protect the Confidential Information, and in the event of Executive's termination of employment for any reason whatsoever, whether by Executive or the Company, it is necessary to enter into the following restrictive covenants, which are ancillary to the enforceable promises between the Company and Executive in Sections 10 through 12 of the Agreement. Executive hereby covenants and agrees that Executive will not, directly or indirectly, either individually or as a principal, partner, agent, consultant, contractor, employee, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of the Company or an Affiliate, solicit business, or attempt to solicit business, in products or services competitive with any products or services sold (or offered for sale) by the

9

Company or any Affiliate, from the Company's or its Affiliate's customers or prospective customers, or those individuals or entities with whom the Company or its Affiliate did business during the Employment Period, including, without limitation, the Company's or its Affiliate's prospective or potential customers. Subject to Section 17, the prohibition set forth in this Section 13 shall remain in effect for a period of one year from termination of Executive's employment for any reason whatsoever.

14.     **Non-Competition Restriction**. Executive hereby covenants and agrees that during Executive's employment with the Company or any of its Affiliates, and for a period of one year following the Termination Date, Executive will not, without the prior written consent of the Board, participate in any capacity in which Executive would perform any duties similar to those performed while at the Company or an Affiliate, directly or indirectly (whether as proprietor, stockholder, director, partner, employee, agent, independent contractor, consultant, trustee, beneficiary, or in any other capacity), with any Competitor; *provided*, *however*, Executive shall not be deemed to be participating with a Competitor solely by virtue of Executive's ownership of not more than one percent (1%) of any class of stock or other securities which are publicly traded on a national securities exchange or in a recognized over-the-counter market.

15.     **Non-Recruitment Restriction**. Executive hereby covenants and agrees that during Executive's employment with the Company or any of its Affiliates, and for a period of two years following the Termination Date, Executive will not, either directly or indirectly, or by acting in concert with others, solicit or influence any employee of the Company or any Affiliate to terminate or reduce his or her employment with the Company or any Affiliate.

16.     **Tolling**. If Executive violates any of the restrictions contained in Sections 10 through 15, the restrictive period will be suspended and will not run in favor of Executive from the time of the commencement of any violation until the time when Executive cures the violation to the Company's reasonable satisfaction.

17.     **Reformation**. If a court or arbitrator concludes that any time period or the geographic area specified in any restrictive covenant in Sections 10 through 15 is unenforceable, then the time period will be reduced by the number of months, or the geographic area will be reduced by the elimination of the overbroad portion, or both, so that the restrictions shall be enforced in the geographic area and for the time to the full extent permitted by law.

18.     **Remedies**. Executive acknowledges that the restrictions contained in Sections 10 through 15, in view of the nature of the Company's business, are reasonable and necessary to protect the Company's legitimate business interests, and that any violation of the Agreement would result in irreparable injury to the Company. In the event of a breach or a threatened breach by Executive of any provision of Sections 10 through 15, the Company shall be entitled to a temporary restraining order and injunctive relief restraining Executive from the commission of any breach. Nothing contained in the Agreement shall be construed as prohibiting the Company from pursuing any other remedies available to it for any such breach or threatened breach, including, without limitation, the recovery of money damages. These covenants and disclosures shall each be construed as independent of any other provisions in the Agreement, and the existence of any claim or cause of action by Executive against the Company, whether predicated on the Agreement or

10

otherwise, shall not constitute a defense to the enforcement by the Company of such covenants and agreements.][5]

19.     **Withholdings**. The Company may withhold and deduct from any benefits and payments made or to be made pursuant to the Agreement (a) all federal, state, local and other taxes as may be required pursuant to any law or governmental regulation or ruling and (b) all other normal employee deductions made with respect to the Company's employees generally.

20.     **Nonalienation**. The right to receive payments under the Agreement shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge or encumbrance by Executive, Executive's dependents or beneficiaries, or to any other person who is or may become entitled to receive such payments hereunder. The right to receive payments hereunder shall not be subject to or liable for the debts, contracts, liabilities, engagements or torts of any person who is or may become entitled to receive such payments, nor may the same be subject to attachment or seizure by any creditor of such person under any circumstances, and any such attempted attachment or seizure shall be void and of no force and effect.

21.     **Incompetent or Minor Payees**. Should the Reporting Authority determine, in its discretion, that any person to whom any payment is payable under the Agreement has been determined to be legally incompetent or is a minor, any payment due hereunder, notwithstanding any other provision of the Agreement to the contrary, may be made in any one or more of the following ways: (a) directly to such minor or person; (b) to the legal guardian or other duly appointed personal representative of the person or estate of such minor or person; or (c) to such adult or adults as have, in the good faith knowledge of the Reporting Authority, assumed custody and support of such minor or person; and any payment so made shall constitute full and complete discharge of any liability under the Agreement in respect to the amount paid.

22.     **Indemnification**. THE COMPANY SHALL, TO THE FULL EXTENT PERMITTED BY LAW, INDEMNIFY AND HOLD HARMLESS EXECUTIVE FROM AND AGAINST ANY AND ALL LIABILITY, COSTS AND DAMAGES ARISING FROM EXECUTIVE'S SERVICE AS AN EMPLOYEE, OFFICER OR DIRECTOR OF THE COMPANY OR ITS AFFILIATES, SPECIFICALLY INCLUDING LIABILITY, COSTS AND DAMAGES THAT ARISE IN WHOLE OR IN PART FROM ANY NEGLIGENCE OR ALLEGED NEGLIGENCE OF EXECUTIVE, EXCEPT, HOWEVER, TO THE EXTENT THAT ANY SUCH LIABILITY, COST OR DAMAGE RESULTED FROM AN ACT OR OMISSION BY EXECUTIVE THAT CONSTITUTES GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON EXECUTIVE'S PART. Executive shall also be provided directors' and officers' liability insurance and any contractual indemnification provided to Senior Officers at any given time. To the full extent permitted by Texas law, the Company shall retain counsel to defend Executive, or shall advance legal fees and expenses to Executive for counsel selected by Executive, in connection with any litigation or proceeding related to Executive's service as an employee, officer and director of the Company or any Affiliate within 20 days after receipt by the Company of a written request for such advance. Such request shall include an itemized list of the costs and expenses and an undertaking by Executive to repay the amount of such advance if it shall

---

[5] Note to Draft: Parties to discuss restrictive covenants.

11

ultimately be determined that Executive is not entitled to be indemnified against such costs and expenses. This Section 22 shall be in addition to, and shall not limit in any way, the rights of Executive to any other indemnification from the Company, as a matter of law, contract or otherwise. Notwithstanding the foregoing, the provisions in this Section 22 may be superseded and replaced by a separate indemnification agreement entered into between the Company and Executive.

23.     **Severability**. It is the desire of the parties hereto that the Agreement be enforced to the maximum extent permitted by law, and should any provision contained herein be held unenforceable by a court of competent jurisdiction or arbitrator (pursuant to Section 26), the parties hereby agree and consent that such provision shall be reformed to create a valid and enforceable provision to the maximum extent permitted by law; provided, however, if such provision cannot be reformed, it shall be deemed ineffective and deleted here from without affecting any other provision of the Agreement. The Agreement should be construed by limiting and reducing it only to the minimum extent necessary to be enforceable under then applicable law.

24.     **Title and Headings; Construction**. Titles and headings to Sections hereof are for reference only and shall in no way limit, define or otherwise affect the provisions hereof. The words "herein", "hereof", "hereunder" and other compounds of the word "here" shall refer to the entire Agreement and not to any particular provision hereof. The masculine gender is intended to include the feminine gender.

25.     **Choice of Law**. EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN, THE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW.

26.     **[Arbitration**. Subject to Section 18, any dispute or other controversy (hereafter a "**Dispute**") arising under or in connection with the Agreement, whether in contract, in tort, statutory or otherwise, shall be finally and solely resolved by binding arbitration in Harris County, Texas, administered by the American Arbitration Association (the "**AAA**") in accordance with the Employment Dispute Resolution Rules of the AAA, this Section 26 and, to the maximum extent applicable, the Federal Arbitration Act. Such arbitration shall be conducted by a single arbitrator (the "**Arbitrator**"). If the parties cannot agree on the choice of an Arbitrator within 30 days after the Dispute has been filed with the AAA, then the Arbitrator shall be selected pursuant to the Employment Dispute Resolution Rules of the AAA. The Arbitrator may proceed to an award notwithstanding the failure of any party to participate in such proceedings. The costs of the arbitration shall be borne equally by the parties. If Executive is the prevailing party on a material issue in the arbitration proceeding, the Company shall reimburse Executive for reasonable attorneys' fees incurred in connection with the arbitration.

To the maximum extent practicable, an arbitration proceeding hereunder shall be concluded within 180 days of the filing of the Dispute with the AAA. The Arbitrator may allow discovery in its discretion but shall be mindful of the Parties' goal of settling disputes in the most efficient manner possible. The Arbitrator shall be empowered to impose sanctions and to take such other actions as the Arbitrator deems necessary to the same extent a judge could impose sanctions or take such other actions pursuant to the Federal Rules of Civil Procedure and applicable law. Each party

12

agrees to keep all Disputes and arbitration proceedings strictly confidential except for disclosure of information required by applicable law which cannot be waived.

(a)      The award of the Arbitrator shall be (a) the sole and exclusive remedy of the parties, and (b) final and binding on the parties hereto except for any appeals provided by the Federal Arbitration Act. Only the district courts of Texas shall have jurisdiction to enter a judgment upon any award rendered by the Arbitrator, and the parties hereby consent to the personal jurisdiction of such courts and waive any objection that such forum is inconvenient. This Section 26 shall not preclude (i) the parties at any time from agreeing to pursue non-binding mediation of the Dispute prior to arbitration hereunder or (ii) the Company from pursuing the remedies available under Section 18 in any court of competent jurisdiction.][6]

27.      **Binding Effect: Third Party Beneficiaries**. The Agreement shall be binding upon and inure to the benefit of the parties hereto, and to their respective heirs, executors, beneficiaries, personal representatives, successors and permitted assigns hereunder, but otherwise the Agreement shall not be for the benefit of any third parties.

28.      **Entire Agreement; Amendment and Termination**. The Agreement contains the entire agreement of the parties with respect to Executive's employment and the other matters covered herein; moreover, the Agreement supersedes all prior and contemporaneous agreements and understandings, oral or written, between the Parties hereto concerning the subject matter hereof. Notwithstanding the foregoing, any indemnity agreement between the Company and Executive as of the Effective Date shall continue in effect until otherwise amended or superseded. The Agreement may be amended, waived or terminated only by a written instrument that is identified as an amendment or termination hereto and that is executed on behalf of both Parties.

29.      **Survival of Certain Provisions**. Wherever appropriate to the intention of the Parties, the respective rights and obligations of the Parties hereunder, including but not limited to the rights and obligations set out in Sections 2, 5 through 7, 10 through 18, 22,  25, 26 and 32 shall survive any termination or expiration of the Agreement.

30.      **Waiver of Breach**. No waiver by either Party hereto of a breach of any provision of the Agreement by any other Party, or of compliance with any condition or provision of the Agreement to be performed by such other Party, will operate or be construed as a waiver of any subsequent breach by such other Party or any similar or dissimilar provision or condition at the same or any subsequent time. The failure of either Party hereto to take any action by reason of any breach will not deprive such Party of the right to take action at any time while such breach continues.

31.      **Successors and Assigns**. The Agreement shall be binding upon and inure to the benefit of the Company and its Affiliates, and its and their successors, and upon any person or entity acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the business and/or assets of the Company or its successor. The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company to expressly assume and agree

---

[6] Note to Draft: Parties to Discuss.

13

to perform the Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place; provided, however, no such assumption shall relieve the Company of its obligations hereunder.

The Agreement shall inure to the benefit of and be enforceable by Executive's personal or legal representative, executors, administrators, successors, and heirs. In the event of the death of Executive while any amount is payable hereunder including, without limitation, pursuant to Sections 2, 5, 6, and 7, all such amounts, unless otherwise specifically provided herein, shall be paid in accordance with the terms of the Agreement to the beneficiary designated by Executive in a writing delivered to the Company, or if none, to Executive's surviving spouse if any, or if not, then to the personal representative of Executive's estate.

32.      **Notices**. Each notice or other communication required or permitted under the Agreement shall be in writing and transmitted, delivered, or sent by personal delivery, prepaid courier or messenger service (whether overnight or same-day), or prepaid certified United States mail (with return receipt requested), addressed (in any case) to the other Party at the address for that Party set forth below that Party's signature on the Agreement, or at such other address as the recipient has designated by notice to the other Party. Either party may change the address for notice by notifying the other party of such change in accordance with this Section 32.

Each notice or communication so transmitted, delivered, or sent (a) in person, by courier or messenger service, or by certified United States mail shall be deemed given, received, and effective on the date delivered to or refused by the intended recipient (with the return receipt, or the equivalent record of the courier or messenger, being deemed conclusive evidence of delivery or refusal), or (b) by telecopy or facsimile shall be deemed given, received, and effective on the date of actual receipt (with the confirmation of transmission being deemed conclusive evidence of receipt, except where the intended recipient has promptly notified the other Party that the transmission is illegible). Nevertheless, if the date of delivery or transmission is not a business day, or if the delivery or transmission is after 5:00 p.m. on a business day, the notice or other communication shall be deemed given, received, and effective on the next business day.

33.      **Executive Acknowledgment**. Executive acknowledges that (a) Executive is knowledgeable and sophisticated as to business matters, including the subject matter of the Agreement, (b) Executive has read the Agreement and understands its terms and conditions, (c) Executive has had ample opportunity to discuss the Agreement with Executive's legal counsel prior to execution, and (d) no strict rules of construction shall apply for or against the drafter or any other Party. Executive represents that Executive is free to enter into the Agreement including, without limitation, that Executive is not subject to any covenant not to compete that would conflict with Executive's duties under the Agreement.

34.      [**Code Section 409A**. The Agreement is intended to comply with, or be exempt from, Code Section 409A. Executive acknowledges that if any provision of the Agreement (or of any award of compensation or benefits) would cause Executive to incur any additional tax, interest

14

or penalties under Code Section 409A, such additional tax, interest or penalties shall solely be Executive's responsibility.][7]

Pursuant to Code Section 409A, any reimbursement of expenses made under the Agreement (including payments related to health and dental expenses under Sections 5 through 7), shall only be made for eligible expenses incurred during the Term of Employment, and no reimbursement of any expense shall be made by the Company after December 31st of the year following the calendar year in which the expense was incurred. The amount eligible for reimbursement under the Agreement during a taxable year may not affect expenses eligible for reimbursement in any other taxable year, and the right to reimbursement under the Agreement is not subject to liquidation or exchange for another benefit.

For purposes of Code Section 409A, each payment under this Agreement shall be deemed to be a separate payment. Except as permitted under Code Section 409A, any deferred compensation (within the meaning of Code Section 409A) payable to Executive under the Agreement may not be reduced by, or offset against, any amount owing by Executive to the Company or any of its Affiliates.

Notwithstanding anything in this Agreement or elsewhere to the contrary, payments and benefits provided upon the termination of Executive's employment with the Company or any of its Affiliates may only be made upon a "separation from service" as determined under Code Section 409A.

Notwithstanding any provision in the Agreement to the contrary, if the payment or provision of any payment or benefit herein would be subject to additional taxes, penalties and interest under Code Section 409A because the timing of such payment or benefit is not delayed as provided in Code Section 409A for a "specified employee" (within the meaning of Code Section 409A), then if Executive is a "specified employee," any such payment or benefit that Executive would otherwise be entitled to receive during the first six months following the Termination Date shall be accumulated and paid or provided, as applicable, within ten days after the date that is six months following the Termination Date, or such earlier date upon which such amount can be paid or provided under Code Section 409A without being subject to such additional taxes, penalties and interest such as upon the death of Executive.

35.     **Counterparts**. The Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by one party hereto, but together signed by both parties.

IN WITNESS WHEREOF, Executive has executed and Company has caused the Agreement to be executed in its name and on its behalf by its duly authorized officer, to be effective as of the Effective Date.

---

[7] Note to Draft: Parties to discuss.

15

**EXECUTIVE:**


Signature: _____
            [●]

Date:     _____

*Address for Notices:*

[●]


**PARKER DRILLING COMPANY:**



By:   _____
      [NAME]
      [TITLE]


Date: _____

*Address for Notices*:

Parker Drilling Company
Attn: Chairman, Compensation Committee of the Board of Directors
5 Greenway Plaza
Suite 100
Houston, TX 77046

## APPENDIX A

## DEFINITIONS

For purposes of the Agreement:

(1)      "**Affiliate**" means any entity which owns or controls, is owned or controlled by, or is under common control with, the Company.

(2)      "**Board**" means the Board of Directors of the Company.

(3)      "**Cause**" means any of the following:

(A)      the refusal to perform Executive's material job duties that continues after written notice from the Company;

(B)      Executive's material violation of a material policy of the Company that causes, or is reasonably likely to cause, material harm to the business or reputation of the Company that is not cured within 15 days of written notice from the Company;

(C)      Executive's willful misconduct in the course of Executive's duties that causes, or is reasonably likely to cause, material harm to the business or reputation of the Company;

(D)      Executive's conviction of a felony; or

(E)      Executive's  material breach of any of any restrictive covenants (including Sections 10 through 15), but Cause shall not exist under this clause (E) until after written notice from the Reporting Authority has been given to Executive of such material breach or nonperformance (which notice specifically identifies the manner and sets forth specific facts, circumstances and examples in which the Reporting Authority reasonably believes that Executive has breached the Agreement or not substantially performed Executive's duties) and Executive has failed to cure such alleged breach or nonperformance within 15 business days after Executive's receipt of such notice; and, for purposes of this clause (E), no act or failure to act on Executive's part shall be deemed "willful" unless it is done or omitted by Executive not in good faith and without Executive's reasonable belief that such action or omission was in the best interest of the Company (assuming disclosure of the pertinent facts, any action or omission done by Executive after consultation with, and in accordance with the advice of, legal counsel reasonably acceptable to the Company shall be deemed to have been taken in good faith and to not be willful under the Agreement).

Executive shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to Executive a letter from the Reporting Authority stating that, in the good faith opinion of the Reporting Authority, Executive was guilty of actions or omissions constituting Cause and specifying the particulars thereof in detail.

A-1

(4)     "**Change in Control**" shall have the meaning set forth in the Parker Drilling Company 2019 Long-Term Incentive Plan as in effect on the date hereof (the "LTIP").

(5)     "**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations and other authority promulgated thereunder by the appropriate governmental authority. References herein to any Code Section shall include any successor provisions of the Code.

(6)     ["**Competitor**" means an individual, partnership, firm, corporation or other business organization or entity that materially competes with a significant business owned or operated by the Company or one of its Affiliates.

(7)     "**Confidential Information**" means any information or material known to or used by or for the Company or an Affiliate (whether or not owned or developed by the Company or an Affiliate and whether or not developed by Executive) that is not generally known to any person not employed by or acting as a director or consultant to the Company or its Affiliates. Confidential Information includes, but is not limited to, the following: all trade secrets of the Company or an Affiliate; all non-public information that the Company or an Affiliate has marked as confidential or has otherwise described to Executive (either in writing or orally) as confidential; all non-public information concerning the Company's or Affiliate's products, services, prospective products or services, research, product designs, prices, discounts, costs, marketing plans, marketing techniques, market studies, test data, customers, customer lists and records, suppliers and contracts; all business records and plans; all personnel files; all financial information of or concerning the Company or an Affiliate; all information relating to the Company's operating system software, application software, software and system methodology, hardware platforms, technical information, inventions, computer programs and listings, source codes, object codes, copyrights and other intellectual property; all technical specifications; any proprietary information belonging to the Company or an Affiliate; all computer hardware or software manuals of the Company or an Affiliate; all Company or Affiliate training or instruction manuals; and all Company or Affiliate data and all computer system passwords and user codes.][8]

(8)     "**Designated Beneficiary**" means such beneficiary as designated in writing by Executive and delivered to the Company; or if none, Executive's surviving spouse, if any. If there is no written beneficiary designation or surviving spouse at the time of Executive's death, then the Designated Beneficiary hereunder shall be the legal representative of Executive's estate for the benefit of such estate.

(9)     ["**Disability**" means, upon expiration of any applicable waiting/elimination period, a disability of Executive that qualifies Executive for long-term disability benefits.][9]

---

[8] NTD: Parties to discuss.

[9] NTD: To confirm with business parties.

(10)     "**Dispute**" means any dispute or controversy arising under or in connection with the Agreement, whether in contract, in tort, statutory or otherwise.

(11)     "**Excise Tax**" means the excise imposed by Section 4999 of the Code or any similar or successor provision thereto.

(12)     "**Employee Developments**" means all inventions, ideas, and discoveries (whether patentable or not), designs, products, processes, procedures, methods, developments, formulae, techniques, analyses, drawings, notes, documents, information, materials, and improvements, including, but not limited to, computer programs and related documentation, and all intellectual property rights therein, made, conceived, developed, or prepared, in whole or in part, by Executive during the course of employment with the Company, alone or with others, whether or not during work hours or on Company premises, which are (a) within the scope of business operations of the Company, or a reasonable or contemplated expansion thereof, (b) related to any Company or Affiliate work or project, present, past or contemplated, (c) created with the aid of Company materials, equipment, facilities or personnel, or (d) based upon information to which Executive has access as a result of or in connection with Executive's employment with the Company.

(13)     "**Good Reason**" means the occurrence of any of the following events or conditions without Executive's express written consent:

(A)     a material diminution in Executive's titles, duties or authorities;

(B)     a material diminution in Executive's Base Salary or annual incentive cash compensation target amount;

(C)     the Company's material violation of the Agreement; or

(D)     a relocation of Executive's primary office location by more than 50 miles if such relocation materially increases Executive's commute.

Notwithstanding the definition of "Good Reason" for purposes of the Agreement, Executive may not terminate Executive's employment hereunder for Good Reason unless Executive (i) first notifies the Board in writing of the event or condition (or events or conditions) which Executive believes constitutes a Good Reason event or condition and the specific paragraph of the Agreement under which such event or condition has occurred, within 45 days from the date of such event or condition arising, (ii) provides the Company with at least 15 days to cure the Good Reason event or condition so that it either (1) does not constitute a Good Reason event or condition hereunder or (2) Executive reasonably agrees, in writing, that after any such modification or accommodation made by the Company that such event shall not constitute a Good Reason event or condition hereunder, and (iii) in the event the Company fails to so cure the Good Reason event or condition, Executive actually terminates employment with the Company within 15 days following the expiration of such cure period.

A-3

(14)    "**Net After-Tax Receipt**" means the present value (as determined in accordance with Section 280G of the Code) of the Payments net of all applicable federal, state and local income, employment, and other applicable taxes and the Excise Tax.

(15)    "**Outstanding Company Common Stock**" means the then outstanding shares of common stock of the Company.

(16)    "**Outstanding Company Voting Securities**" means the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors.

(17)    "**Reporting Authority**" means the Chief Executive Officer of the Company or with respect to the Chief Executive Officer, the Board.

(18)    "**Subsidiary**" means any corporation, partnership, trust or other entity controlled by the Company.

(19)    "**Termination Date**" means the date on which Executive's employment with the Company terminates, whether during the Term of Employment or at any time thereafter, for whatever reason, and such termination constitutes a "separation from service" within the meaning of Code Section 409A.

A-4

## APPENDIX B

## <u>FORM WAIVER AND RELEASE</u>

Pursuant to the terms of the Employment Agreement made as of _____, ____, between Parking Drilling Company (the "Company") and me (the "Employment Agreement"), and in consideration of the payments made to me and other benefits to be received by me pursuant thereto, I, _____, do freely and voluntarily enter into this WAIVER AND RELEASE (the "Release"), which shall become effective and binding on the eighth day following my signing the Release as provided herein (the "Effective Date"). It is my intent to be legally bound, according to the terms set forth below.

In exchange for the payments and other benefits to be provided to me by the Company pursuant to Section ___ of the Employment Agreement (the "Separation Payment" and "Separation Benefits"), I hereby agree and state as follows:

1.      I, individually and on behalf of my heirs, personal representatives, successors, and assigns, release, waive, and discharge Company, its predecessors, successors, parents, subsidiaries, merged entities, operating units, affiliates, divisions, insurers, administrators, trustees, and the agents, representatives, officers, directors, shareholders, employees and attorneys of each of the foregoing (hereinafter the "Released Parties"), from all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs, expenses, damages, actions, and causes of action, whether in law or in equity, whether known or unknown, suspected or unsuspected, arising from my employment and termination from employment with Company, including but not limited to any and all claims pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 (42 U.S.C. § 2000e, *et seq.*), which prohibits discrimination in employment based on race, color, national origin, religion or sex; the Civil Rights Act of 1866 (42 U.S.C. §§1981, 1983 and 1985), which prohibits violations of civil rights; the Age Discrimination in Employment Act of 1967, as amended, and as further amended by the Older Workers Benefit Protection Act (29 U.S.C. §621, *et seq.*), which prohibits age discrimination in employment; the Employee Retirement Income Security Act of 1974, as amended (29 U.S.C. § 1001, *et seq.* ), which protects certain employee benefits; the Americans with Disabilities Act of 1990, as amended (42 U.S.C. § 12101, *et seq.*), which prohibits discrimination against the disabled; the Family and Medical Leave Act of 1993 (29 U.S.C. § 2601, *et seq.*), which provides medical and family leave; the Fair Labor Standards Act (29 U.S.C. § 201, *et seq.*), including the wage and hour laws relating to payment of wages; and all other federal, state and local laws and regulations prohibiting employment discrimination. This Release also includes, but is not limited to, a release of any claims for breach of contract, mental pain, suffering and anguish, emotional upset, impairment of economic opportunities, unlawful interference with employment rights, defamation, intentional or negligent infliction of emotional distress, fraud, wrongful termination, wrongful discharge in violation of public policy, breach of any express or implied covenant of good faith and fair dealing, that Company has dealt with me unfairly or in bad faith, and all other common law contract and tort claims.

B-1

Notwithstanding the foregoing, I am not waiving any rights or claims that may arise after this Release is signed by me. Moreover, this Release does not apply to any claims or rights which, by operation of law, cannot be waived, including the right to file an administrative charge or participate in an administrative investigation or proceeding. I agree that I will not, without the Company's express prior approval or unless required by law, furnish information to or cooperate with any non-governmental entity or person in connection with any proceeding or legal action involving the Company. However, nothing in this Release prohibits me from filing a charge with, or reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the U.S. Equal Opportunity Commission, the Department of Justice, the Securities and Exchange Commission, Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. This Release does not limit my ability to communicate with any government agencies or participate in any investigation or proceeding that may be conducted by any government agency, including providing documents or other information, without notice to the Company. In addition, this Release does not limit my right to receive an award for information provided to any government agencies. Further, I acknowledge that I have been advised that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (I) files any document containing the trade secret under seal; and (II) does not disclose the trade secret, except pursuant to court order.

2.     Nothing in this Release shall affect in any way (a) any right to indemnification (or advancement of legal fees) and directors and officers liability insurance coverage provided to me pursuant to the Company's bylaws, my Employment Agreement, and/or pursuant to any other agreements or policies in effect prior to the effective date of my termination, which shall continue in full force and effect, in accordance with their terms, following the Effective Date; (b) any right that cannot be waived by private agreement under law; (c) any right to any earned and accrued base salary, vacation or benefits that are earned, but not yet paid or incurred, unreimbursed business expense reimbursements or any severance or other benefits under the Employment Agreement; or (d) my rights as an equity or security holder in the Company or its affiliates, including, without limitation, any applicable sale, merger or transaction agreement with respect thereto.

3.     I forever waive and relinquish any right or claim to reinstatement to active employment with Company, its affiliates, subsidiaries, divisions, parent, and successors. I further acknowledge that Company has no obligation to rehire or return me to active duty at any time in the future.

4.     I acknowledge that all agreements applicable to my employment respecting noncompetition, nonsolicitation, nonrecruitment, derogatory statements, and the

confidential or proprietary information of the Company shall continue in full force and effect as described in the Employment Agreement.

5.     I hereby acknowledge and affirm as follows:

   a.   I have been advised to consult with an attorney prior to signing this Release.

   b.   I have been extended a period of 45 days in which to consider this Release.

   c.   I understand that for a period of seven days following my execution of this Release, I may revoke the Release by notifying the Company, in writing, of my desire to do so.

   d.   I understand that after the seven-day period has elapsed and I have not revoked the Release, it shall then become effective and enforceable.

   e.   I understand that the Separation Payment will not be made and I will not be entitled to the Severance Benefits made under the Employment Agreement until after the seven-day period has elapsed and I have not revoked the Release.

   f.   I acknowledge that I have received payment for all wages due at the time of my employment termination, including any reimbursement for any and all business related expenses.

   g.   I further acknowledge that the Separation Payment and the Separation Benefits include consideration to which I am not otherwise entitled under any Company plan, program, or prior agreement.

   h.   I certify that I have returned all property of the Company, including but not limited to, keys, credit and fuel cards, files, lists, and documents of all kinds regardless of the medium in which they are maintained.

   i.   I have carefully read the contents of this Release and I understand its contents. I am executing this Release voluntarily, knowingly, and without any duress or coercion.

6.     Other than certain matters for which I was responsible and that were properly resolved in the course of my employment with the Company, I have reported all matters, to the best of my knowledge and as part of my Separation Payment, that may potentially violate the law, the Company's Code of Conduct or its policies to the Company's Chief Compliance Officer, to its internal legal counsel or through its ethics helpline. To the best of my knowledge, all matters that I have reported have been, or are in the process of being, properly examined and addressed by the Company, or, to the extent I believe they have not been, I have identified those matters that I do not believe to have been properly examined and addressed by the Company to its Chief Compliance Officer or to its internal legal counsel.

7.     I acknowledge that this Release shall not be construed as an admission by any of the Released Parties of any liability whatsoever, or as an admission by any of the Released

B-3

Parties of any violation of my rights or of any other person, or any violation of any order, law, statute, duty or contract.

8.     I agree that the terms and conditions of this Release are confidential and that I will not, directly or indirectly, disclose the existence of or terms of this Release to anyone other than my attorney or tax advisor, except to the extent such disclosure may be required for accounting or tax reporting purposes or otherwise be required by law or direction of a court. Nothing in this provision shall be construed to prohibit me from disclosing this Release to the Equal Employment Opportunity Commission in connection with any complaint or charge submitted to that agency.

9.     In the event that any provision of this Release should be held void, voidable, or unenforceable, the remaining portions shall remain in full force and effect.

10.    I hereby declare that this Release constitutes the entire and final settlement between me and the Company, superseding any and all prior agreements, and that the Company has not made any promise or offered any other agreement, except those expressed in this Release, to induce or persuade me to enter into this Release.

IN WITNESS WHEREOF, I have signed this Release on the ___ day of _____, 20__.

_____
[NAME]

## Exhibit A

## INCENTIVE AGREEMENT FOR EMERGENCE AWARD - RESTRICTED STOCK UNIT

**Exhibit B**

**INCENTIVE AGREEMENT FOR EMERGENCE AWARD - STOCK OPTION**

**Exhibit J(ii)**

**2019 Long-Term Incentive Plan**

**K&E DRAFT: 2/12/19**

# PARKER DRILLING COMPANY

## 2019 LONG-TERM INCENTIVE PLAN

### TABLE OF CONTENTS

**Page**

SECTION 1 - PLAN GOVERNANCE, COVERAGE AND BENEFITS ..................................... 1
    1.1    Establishment and Purpose ....................................................... 1
    1.2    Definitions.................................................................. 1
    1.3    Plan Administration ........................................................ 6
    1.4    Common Stock Available .................................................... 8

SECTION 2 - STOCK OPTIONS AND STOCK APPRECIATION RIGHTS ......................... 9
    2.1    Grant of Stock Options ..................................................... 9
    2.2    Stock Option Terms ....................................................... 9
    2.3    Stock Option Exercises .................................................... 10
    2.4    Stock Appreciation Rights ................................................. 11

SECTION 3 - RESTRICTED STOCK ................................................................. 13
    3.1    Grant of Restricted Stock.................................................. 13
    3.2    Restrictions .............................................................. 13
    3.3    Delivery of Shares of Common Stock ....................................... 14

SECTION 4 - OTHER STOCK-BASED AWARDS ................................................. 14
    4.1    Grant of Other Stock-Based Awards ....................................... 14
    4.2    Other Stock-Based Award Terms .......................................... 14

SECTION 5 - PLAN PARTICIPATION ............................................................. 15
    5.1    Incentive Agreement ...................................................... 15
    5.2    No Right to Employment ................................................... 16
    5.3    Transferability............................................................ 16
    5.4    Rights as a Stockholder.................................................... 16
    5.5    Adjustments .............................................................. 16

SECTION 6 - GENERAL............................................................................. 18
    6.1    Conflicts with Plan........................................................ 18
    6.2    Unfunded Plan ........................................................... 18
    6.3    Withholding Taxes........................................................ 18
    6.4    Deferrals; Dividend Equivalents............................................ 19
    6.5    No Guarantee of Tax Consequences........................................ 19
    6.6    Securities Requirements.................................................... 19

**Error! Unknown document property name.**

6.7      Designation of Beneficiary by Grantee .................................................... 19
6.8      Amendment and Termination .................................................................. 20
6.9      Successors to Company .......................................................................... 20
6.10    Miscellaneous ........................................................................................ 20
6.11    Severability ........................................................................................... 20
6.12    Gender, Tense and Headings .................................................................. 21
6.13    Governing Law ...................................................................................... 21
6.14    Effective Date; Expiration of Plan .......................................................... 21
6.15    Code Section 409A ................................................................................ 21

## SECTION 1 - PLAN GOVERNANCE, COVERAGE AND BENEFITS

### 1.1 Establishment and Purpose

Parker Drilling Company (the "Company"), hereby establishes as of the Effective Date the Parker Drilling Company 2019 Long-Term Incentive Plan (as the same may be amended from time to time, the "Plan").

The purpose of this Plan is to foster and promote the long-term financial success of the Company and to increase stockholder value by: (a) encouraging the commitment of Employees and Outside Directors, (b) motivating superior performance of key Employees and Outside Directors by means of long-term performance related incentives, (c) encouraging and providing Employees and Outside Directors with a program for obtaining ownership interests in the Company which link and align their personal interests to those of the Company's stockholders, (d) attracting and retaining Employees and Outside Directors by providing competitive compensation opportunities, and (e) enabling Employees and Outside Directors to share in the long-term growth and success of the Company.

### 1.2 Definitions

The following terms shall have the meanings set forth below:

(a)     "Affiliate" means an "affiliate" of the Company, as such term is described in Rule 12b-2 under the Exchange Act.

(b)     "Board" means the Board of Directors of the Company.

(c)     "Cause" means, in the case where there is no employment agreement in effect between the Company or an Affiliate and the Grantee at the grant date (or where there is such an agreement but it does not define "Cause"), when used in connection with the termination of a Grantee's Employment, the termination of the Grantee's Employment by the Company or any Subsidiary by reason of:

(i)     the refusal to perform Grantee's material job duties that continues after written notice from the Company;

(ii)     material violation of a material policy of the Company that causes, or is reasonably likely to cause, material harm to the business or reputation of the Company that is not cured within fifteen (15) days of written notice from the Company;

(iii)     willful misconduct in the course of Grantee's duties that causes, or is reasonably likely to cause, material harm to the business or reputation of the Company;

(iv)     Grantee's conviction of a felony; or

(v)     the material breach of any confidentiality, non-solicitation, non-competition or similar restrictive covenant between the Company or one of its Affiliates and such Grantee, but Cause shall not exist under this clause (v) until after written notice from the Board

1

has been given to Grantee of such material breach (which notice specifically identifies the manner and sets forth specific facts, circumstances and examples in which the Board believes that Grantee has breached the agreement) and Grantee has failed to cure such alleged breach or nonperformance within 15 business days after his receipt of such notice; and, for purposes of this clause (v), no act or failure to act on Grantee's part shall be deemed "willful" unless it is done or omitted by Grantee not in good faith and without his reasonable belief that such action or omission was in the best interest of the Company.

(d)      "Change in Control" means the occurrence of any of the following events:

(i)      There occurs an acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of fifty percent (50%) or more of either (i) the Outstanding Company Common Stock or (ii) the Outstanding Company Voting Securities;

provided, however, that the following acquisitions shall not constitute a Change in Control: (W) any acquisition directly from the Company or any Subsidiary, (X) any acquisition by the Company or any Subsidiary or by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Subsidiary, or (Y) any acquisition by any corporation or other entity pursuant to a reorganization, merger, consolidation or similar business combination involving the Company (a "Merger"), unless, following such Merger, the conditions described in (iii) (below) are satisfied;

(ii)      Individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of either an actual or threatened election contest (as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board;

(iii)      A consummation by the Company of a reorganization, merger or consolidation (a "Business Combination"), or a Business Combination in which securities of the Company are issued, in each case, with respect to which all or substantially all of the individuals and entities who were the respective beneficial owners of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination do not, immediately following such Business Combination, beneficially own, directly or indirectly, more than fifty percent (50%) of, respectively, the then-outstanding shares of common equity and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors or comparable governing persons, as the case may be, of the entity surviving or resulting from such Business Combination in substantially the same proportion as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

2

(iv)     A sale or other disposition of all or substantially all of the assets of the Company occurs, unless immediately following such sale or other disposition, (i) substantially all of the holders of the Outstanding Company Voting Securities immediately prior to the consummation of such sale or other disposition beneficially own, directly or indirectly, more than fifty percent (50%) of the common stock of the corporation acquiring such assets in substantially the same proportions as their ownership of Outstanding Company Voting Securities immediately prior to the consummation of such sale or disposition, and (ii) at least a majority of the members of the board of directors of such corporation (or its parent corporation) were members of the Incumbent Board at the time of execution of the initial agreement or action of the Board providing for such sale or other disposition of assets of the Company; or

(v)     A consummation of any plan or proposal for the complete liquidation or dissolution of the Company occurs.

Notwithstanding the foregoing, with respect to any Incentive Award that is characterized as "nonqualified deferred compensation" within the meaning of Section 409A of the Code, payment of such Incentive Award will not be adjusted or changed unless such event is also a "change in ownership," a "change in effective control" or a "change in the ownership of a substantial portion of the assets" of the Company within the meaning of Section 409A of the Code.

Notwithstanding the foregoing, any acquisition by Varde, Whitebox, Highbridge, Brigade, or their respective Affiliates (the "Excluded Buyers") shall not constitute a Change in Control; provided, that, the Excluded Buyer or Excluded Buyers agree to provide Grantees with customary security holder rights with respect to Emergence Awards.

(e)     "Code" means the Internal Revenue Code of 1986, as amended, and the regulations and other authority promulgated thereunder by the appropriate governmental authority. References herein to any provision of the Code shall refer to any successor provision thereto.

(f)     "Committee" means the Compensation Committee of the Board; provided, however, the term "Committee" as used in this Plan with respect to any Incentive Award for an Outside Director shall refer to the entire Board. In the case of an Incentive Award for an Outside Director, the Board shall have all the powers and responsibilities of the Committee hereunder as to such Incentive Award, and any actions as to such Incentive Award may be acted upon only by the Board (unless it otherwise designates in its discretion).

(g)     "Common Stock" means the common stock of the Company, $[●] par value per share, and any class of common stock into which such common shares may hereafter be converted, reclassified or recapitalized.

(h)     "Company" means Parker Drilling Company, a Delaware corporation or any successor entity.

(i)     "Disability" means, in the case where there is no employment agreement in effect between the Company or an Affiliate and the Grantee at the grant date (or where there is such an agreement but it does not define "Disability"), when used in connection with the termination of a Grantee's Employment, the termination of the Grantee's Employment by the Company or any Affiliate or Subsidiary upon expiration of any applicable waiting/elimination

3

period, a total and permanent disability of Grantee that qualifies Grantee for long-term disability benefits.

(j)  "Effective Date" shall have the meaning set forth in Section 6.14.

(k)  "Employee" means any employee of the Company (or any Subsidiary) within the meaning of Code Section 3401(c) and any prospective employee conditioned upon, and effective not earlier than, such person becoming an employee of the Company (or any Subsidiary), who, in the opinion of the Committee, is in a position to contribute to the growth, development or financial success of the Company (or any Subsidiary), including, without limitation, officers who are members of the Board.

(l)  "Employment" means that the individual is employed as an Employee or by any corporation issuing or assuming an Incentive Award in any transaction described in Code Section 424(a), or by a parent corporation or a subsidiary corporation of such corporation issuing or assuming such Incentive Award, as the parent-subsidiary relationship shall be determined at the time of the corporate action described in Code Section 424(a). In this regard, the transfer of a Grantee from Employment by the Company to Employment by any Subsidiary, the transfer of a Grantee from Employment by any Subsidiary to Employment by the Company, or the transfer of a Grantee from employment by any Subsidiary to Employment by another Subsidiary, shall not be deemed to be a termination of Employment of the Grantee. Moreover, the Employment of a Grantee shall not be deemed to have been terminated because of an approved leave of absence from active Employment on account of temporary illness, authorized vacation or granted for reasons of professional advancement, education, or health, or during any period required to be treated as a leave of absence by virtue of any applicable statute, Company personnel policy or written agreement. The term "Employment" for all purposes of this Plan shall include current service on the Board by an Outside Director.

(m)  "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(n)  "Fair Market Value" means, with respect to a Share as of a particular date, (i) if Shares are listed on a national securities exchange, the closing sales price per Share on the consolidated transaction reporting system for the principal national securities exchange on which Shares are listed on the day before such date, or, if there shall have been no such sale so reported on that date, on the last preceding date on which such a sale was so reported, (ii) if the Shares are not so listed, the average of the closing bid and asked price on the day before such date, or, if there are no quotations available for such date, on the last preceding date on which such quotations shall be available, as reported by an inter-dealer quotation system, (iii) if Shares are not publicly traded, the most recent value determined by an independent appraiser appointed by the Committee for such purpose, or (iv) if none of the above are applicable, the fair market value of a Share as determined in good faith by the Committee. Fair Market Value shall mean, with respect to any property other than Shares, the market value of such property determined by such methods or procedures as shall be established from time to time by the Committee.

(o)  "Freestanding Stock Appreciation Right" shall have the meaning set forth in Section 2.4(a).

4

(p)      "Grantee" means any Employee or Outside Director who is granted an Incentive Award under this Plan.

(q)      "Incentive Agreement" means the written or electronic notice setting forth the terms and conditions pursuant to which an Incentive Award is granted under this Plan, as such agreement is further defined in Section 5.1.

(r)      "Incentive Award" means a grant of an award under this Plan to a Grantee, including any Non-statutory Stock Option, Stock Appreciation Right, Restricted Stock Award, Performance-Based Award, Other Stock-Based Award or Other Cash Award.

(s)      "Non-statutory Stock Option" means a Stock Option granted by the Committee to a Grantee under Section 2.

(t)      "Option Price" means the exercise price at which a Share may be purchased by the Grantee of a Stock Option.

(u)      "Other Cash Award" means an Incentive Award granted by the Committee to a Grantee under Section 5.2 that is valued by reference to, or is otherwise based upon, cash.

(v)      "Other Stock-Based Award" means an Incentive Award granted by the Committee to a Grantee under Section 4.1 that is valued in whole or in part by reference to, or is otherwise based upon, Common Stock.

(w)      "Outside Director" means a member of the Board who is not, at the time of grant of an Incentive Award, an Employee, and any prospective director conditioned upon, and effective not earlier than, such person becoming a member of the Board who is not an Employee.

(x)      "Outstanding Company Common Stock" means the then outstanding shares of Common Stock.

(y)      "Outstanding Company Voting Securities" means the then outstanding voting securities of the Company entitled to vote generally in the election of directors.

(z)      "Performance-Based Award" means a grant of an Incentive Award under this Plan that is either payable in Common Stock or cash.

(aa)      "Performance Criteria" means the performant objectives underlying a Performance-Based Award, as determined in the sole discretion of the Board.

(bb)      "Permitted Assignee" shall have the meaning set forth in Section 5.3.

(cc)      "Phantom Share" shall have the meaning set forth in Section 4.1.

(dd)      "Restricted Stock" means shares of Common Stock issued or transferred to a Grantee pursuant to Section 3.

5

(ee)   "Restricted Stock Award" means an authorization by the Committee to issue or transfer Restricted Stock to a Grantee pursuant to Section 3.

(ff)   "Restricted Stock Unit" shall have the meaning set forth in Section 4.1.

(gg)   "Restriction Period" means the period of time determined by the Committee and set forth in the Incentive Agreement during which the transfer of an Incentive Award by the Grantee is restricted.

(hh)   "Senior Officers" are the employees of the Company, at the relevant time, holding one or more of the following positions or equivalent thereof of the Company: Chief Executive Officer, President, General Counsel, Senior Vice President, Chief Operating Officer, Chief Financial Officer, and Chief Administrative Officer.

(ii)   "Share" means a share of Common Stock of the Company.

(jj)   "Stock Appreciation Right" or "SAR" shall have the meaning set forth in Section 2.4(a).

(kk)   "Stock Award" means an Incentive Award granted under the Plan in the form of Shares or units denominated in Shares, and includes Restricted Stock, Restricted Stock Units and Other Stock-Based Awards. Stock Awards do not include Stock Options and Stock Appreciation Rights.

(ll)   "Stock Option" or "Option" means, pursuant to Section 2, a Non-statutory Stock Option granted to an Employee or Outside Director, which Option provides the Grantee with the right to purchase Shares of Common Stock upon specified terms.

(mm)   "Subsidiary" means any entity (whether a corporation, limited liability company, partnership, joint venture or other form of entity) in which the Company or an entity in which the Company owns greater than fifty percent (50%) of equity interests, directly or indirectly, owns a greater than fifty percent (50%) equity interest, the term "Subsidiary" shall have the same meaning as the term "subsidiary corporation" as defined in Code Section 424(f) as required by Code Section 422.

(nn)   "Substitute Awards" shall mean Incentive Awards granted or Shares issued by the Company in assumption of, or in substitution or exchange for, awards previously granted, or the right or obligation to make future awards, by an entity acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines.

(oo)   "Tandem Stock Appreciation Right" shall have the meaning set forth in Section 2.4(a).

**1.3   Plan Administration**

(a)   Committee. The Plan shall be administered by the Committee. The Committee shall have full power and authority, subject to the provisions of the Plan and subject to such orders or resolutions not inconsistent with the provisions of the Plan as may from time to time

be adopted by the Board, to: (i) select the Grantees to whom Incentive Awards may from time to time be granted hereunder; (ii) determine the type or types of Incentive Awards, not inconsistent with the provisions of the Plan, to be granted to each Grantee hereunder; (iii) determine the number of Shares to be covered by each Incentive Award granted hereunder; (iv) determine the terms and conditions, not inconsistent with the provisions of the Plan, of any Incentive Award granted hereunder; (v) determine whether, to what extent and under what circumstances Incentive Awards may be settled in cash, Shares or other property; (vi) determine whether, to what extent, and under what circumstances cash, Shares, other property and other amounts payable with respect to an Incentive Award made under the Plan shall be deferred either automatically or at the election of the Grantee; (vii) determine whether, to what extent and under what circumstances any Incentive Award shall be canceled or suspended; (viii) interpret and administer the Plan and any instrument or agreement entered into under or in connection with the Plan, including any Incentive Agreement; (ix) correct any defect, supply any omission or reconcile any inconsistency in the Plan or any Incentive Award in the manner and to the extent that the Committee shall deem desirable to carry it into effect; (x) establish such rules and regulations and appoint such agents as it shall deem appropriate for the proper administration of the Plan; (xi) determine whether any Incentive Award will have Dividend Equivalents; and (xii) make any other determination and take any other action that the Committee deems necessary or desirable for administration of the Plan. Subject to Section 2.2(c) and Section 2.4(b)(i) hereof, the Committee may, in its discretion, (1) provide for the extension of the exercisability of an Incentive Award, or (2) accelerate the vesting or exercisability of an Incentive Award, (3) eliminate or make less restrictive any restrictions contained in an Incentive Award, (4) waive any restriction or other provision of this Plan or an Incentive Award or (5) otherwise amend or modify an Incentive Award in any manner that is, in each case, (A) not adverse to the Grantee to whom such Incentive Award was granted, (B) consented to by such Grantee or (C) authorized by Section 5.5 hereof; provided, however, that no such action shall permit the term of any Option to be greater than ten (10) years from its grant date.

Incentive Awards may be awarded either: alone, or in addition to, or in conjunction with any other Incentive Awards.

(b)     Decisions. Decisions of the Committee shall be final, conclusive and binding on all persons and entities, including the Company, any Grantee, and any Subsidiary. A majority of the members of the Committee may determine its actions and fix the time and place of its meetings.

(c)     Delegation of Authority. The Committee may delegate any of its authority to grant Incentive Awards to Employees who are not subject to Section 16(b) of the Exchange Act, subject to Section 1.3(a) above, to the Board, to any other committee of the Board, or to any Senior Officer, provided such delegation is made in writing and specifically sets forth such delegated authority. The Committee may also delegate to a Senior Officer authority to execute on behalf of the Company any Incentive Agreement. The Committee and the Board, as applicable, may engage or authorize the engagement of a third party administrator to carry out administrative functions under this Plan. Any such delegation hereunder shall only be made to the extent permitted by applicable law.

Incentive Awards to be granted on behalf of any Outside Director shall be reviewed and approved by the Board (which functions as the Committee for this purpose).

7

(d)        [Reserved].

(e)        <u>Electronic Writings</u>. Any instrument or notice required to be in writing hereunder will be considered to be in writing if effected electronically.

(f)        <u>Minimum Vesting Period</u>. Notwithstanding anything to the contrary in this Plan, except in the case of specified terminations of Employment or Change in Control, each Incentive Agreement will require that an Incentive Award shall not become one hundred percent (100%) vested until at least one (1) year from the date of grant. The foregoing vesting requirements shall not apply to Stock Awards made to Outside Directors and Employees not exceeding five percent (5%) of the total Shares available for Incentive Awards as of the Effective Date.

(g)        <u>Clawback</u>. Notwithstanding any other provisions of this Plan, Incentive Awards are subject to forfeiture or clawback to the extent required by applicable law, government regulation or stock exchange listing requirement.

### 1.4    Common Stock Available

The Common Stock available for issuance or transfer under this Plan shall be made available from Shares now or hereafter: (i) held in the treasury of the Company; (ii) authorized but unissued; or (iii) purchased or acquired by the Company. No fractional shares shall be issued under this Plan; payment for fractional shares shall be made in cash.

(a)        <u>Shares Available</u>. On or after the Effective Date, the Shares authorized for grant under the Plan shall equal [●][1], subject to <u>Section 1.4(b)</u>, <u>Section 1.4(c)</u> and adjustment under <u>Section 5.5.</u>

(b)        <u>Forfeitures; Expirations; Withholding Shares; Payment in Shares</u>. If any Shares subject to an Incentive Award are forfeited, an Incentive Award expires or an Incentive Award is settled for cash (in whole or in part), then in each such case the Shares subject to such Incentive Award shall, to the extent of such forfeiture, expiration or cash settlement, again be available for grant under paragraph (a) of this Section. In the event that withholding tax liabilities arising from an Incentive Award are satisfied by the tendering of Shares (either actually or by attestation) or by the withholding of Shares by the Company, the Shares so tendered or withheld shall again be available for grant under paragraph (a) of this Section. Notwithstanding anything to the contrary contained herein, the following Shares shall not be added to the Shares authorized for grant under paragraph (a) of this Section: (i) Shares tendered by the Grantee or withheld by the Company in payment of the Option Price of an Option, (ii) Shares subject to a Stock Appreciation Right that are not issued in connection with its stock settlement on exercise thereof, and (iii) Shares reacquired by the Company on the open market or otherwise using cash proceeds from the exercise of Options.

(c)        <u>Emergence Awards</u>. Notwithstanding any provision in this Plan to the contrary, the Committee or its delegee shall grant fifty percent (50%) of the Shares available pursuant to <u>Section 1.4(a)</u> as of the Effective Date (the "<u>Emergence Awards</u>"). No less than forty

---

[1]    Representing no less than 9% of common stock of the Company on a fully diluted and fully distributed basis.

percent (40%) of the Emergence Awards will be issued in the form of Restricted Stock Units and no more than sixty percent (60%) of the Emergence Awards will be issued in the form of Non-statutory Stock Options. The Emergence Awards will be (i) subject to the terms and conditions of Exhibit 5 to Exhibit A of that certain Restructuring Support Agreement, dated as of December 12, 2018, by and among the Company and the "Company Parties" and the "Consenting Stakeholders" (as such terms are defined therein) (the "Compensation Term Sheet") and (ii) allocated to Employees in accordance with Annex A to the Compensation Term Sheet.

Grants of subsequent of Incentive Awards will be granted at the discretion of the Committee with respect to Shares subject to Incentive Awards not granted as Emergence Awards or any Incentive Awards that are forfeited prior to vesting or exercise, as applicable.

(d)　Substitute Awards. Substitute Awards shall not reduce the Shares authorized for grant under the Plan or authorized for grant to a Grantee in any calendar year. Additionally, in the event that a company acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, a number of Shares equal to the number of shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) shall be available for grant under paragraph (a) of this Section; provided that Incentive Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not Employees or Outside Directors prior to such acquisition or combination.

(e)　Limitations on Incentive Awards to Outside Directors. The aggregate grant date fair value of Incentive Awards to an Outside Director in any calendar year shall not exceed five hundred thousand dollars ($500,000), subject to adjustment in accordance with Section 5.5 hereof.

## SECTION 2 - STOCK OPTIONS AND STOCK APPRECIATION RIGHTS

### 2.1　Grant of Stock Options

The Committee is authorized to grant Non-statutory Stock Options to Employees and Outside Directors only in accordance with the terms and conditions of this Plan, and with such additional terms and conditions, not inconsistent with this Plan, as the Committee shall determine in its discretion. Successive grants may be made to the same Grantee regardless of whether any Stock Option previously granted to such person remains unexercised.

### 2.2　Stock Option Terms

(a)　Incentive Agreement. Each Incentive Agreement with respect to a Stock Option shall set forth the extent to which the Grantee shall have the right to exercise the Stock Option following termination of the Grantee's Employment. Such provisions shall be determined

9

in the discretion of the Committee, shall be included in the Grantee's Incentive Agreement, and need not be uniform among all Stock Options issued pursuant to this Plan.

(b)      Number of Shares. Each Stock Option shall specify the number of Shares of Common Stock to which it pertains.

(c)      Option Price. The Option Price per Share of Common Stock under each Stock Option shall be determined by the Committee; provided, however, that such Option Price shall not be less than one hundred percent (100%) of the Fair Market Value per Share on the date the Option is granted. Each Stock Option shall specify the method of exercise which shall be consistent with the requirements of Section 2.3(a). [Other than pursuant to Section 5.5, the Committee shall not, without the approval of the Company stockholders, (i) lower the Option Price of an Option after it is granted, (ii) cancel an Option when the Option Price exceeds the Fair Market Value of the underlying Shares in exchange for cash or another Incentive Award (other than in connection with Substitute Awards), and (iii) take any other action with respect to an Option that may be treated as a repricing under the rules and regulations of the national securities exchange on which Shares are listed.][2]

(d)      Term. In the Incentive Agreement, the Committee shall fix the term of each Stock Option, which shall not exceed ten (10) years from the date of grant.

(e)      Exercise. The Committee shall determine the time or times at which a Stock Option may be exercised, in whole or in part. Each Stock Option may specify the required period of continuous Employment and/or the Performance Criteria to be achieved before the Stock Option or portion thereof will become exercisable. Each Stock Option, the exercise of which, or the timing of the exercise of which, is dependent, in whole or in part, on the achievement of designated Performance Criteria, may specify a minimum level of achievement in respect of the specified Performance Criteria below which no Stock Options will be exercisable and a method for determining the number of Stock Options that will be exercisable if performance is at or above such minimum but short of full achievement of the Performance Criteria.

## 2.3    Stock Option Exercises

(a)      Methods of Exercise. Stock Options granted under the Plan may be exercised by the Grantee, by a Permitted Assignee thereof, or by the Grantee's executor, administrator, guardian or legal representative as to all or part of the Shares covered thereby, by the giving of notice of exercise to the Company or its designated agent, specifying the number of Shares to be purchased, accompanied by payment of the full Option Price for the Shares being purchased. The Option Price shall be payable to the Company in full at the option of the Grantee either (i) in cash or cash equivalents (including certified check or bank check or wire transfer of immediately available funds), (ii) by tendering previously acquired Shares (either actually or by attestation, valued at their then Fair Market Value), (iii) with the consent of the Committee, by delivery of other consideration (including, where permitted by law and the Committee, other Incentive Awards) having a Fair Market Value on the exercise date equal to the total Option Price, (iv) by withholding Shares otherwise issuable in connection with the exercise of the Option, (v)

---

[2]      Note to Draft: Subject to discussion.

10

through any other method specified in an Incentive Agreement, or (vi) any combination of any of the foregoing. The notice of exercise, accompanied by such payment, shall be delivered to the Company at its principal business office or such other office as the Committee may from time to time direct, and shall be in such form, containing such further provisions consistent with the provisions of the Plan, as the Committee may from time to time prescribe. In no event may any Option granted hereunder be exercised for a fraction of a Share. No adjustment shall be made for ordinary cash dividends or other rights for which the record date is prior to the date as of which the Grantee exercises the Option and becomes the sole owner of the subject Shares. An Option shall be automatically exercised as of the end of the last day of the term of the Option, if the Option Price is less than the Fair Market Value of a Share on such date, on a net exercise basis as contemplated by Section 2.3(a)(iv) and with tax withholding satisfied by the Company retaining Shares from the exercise as contemplated by Section 6.3.

(b)   Restrictions on Option Share Transferability. The Committee may impose such restrictions on any grant of Stock Options or on any Shares acquired pursuant to the exercise of a Stock Option as it may deem advisable. Any certificate issued to evidence Shares issued upon the exercise of an Incentive Award may bear such legends and statements as the Committee shall deem advisable to assure compliance with federal and state laws and regulations.

Any Grantee or other person exercising an Incentive Award shall be required, if requested by the Committee, to give a written representation that the Incentive Award and the Shares subject to the Incentive Award will be acquired for investment and not with a view to public distribution; provided, however, that the Committee, in its discretion, may release any person receiving an Incentive Award from any such representations either prior to or subsequent to the exercise of the Incentive Award.

### 2.4   Stock Appreciation Rights

(a)   Grant and Exercise. The Committee may provide Stock Appreciation Rights (i) in conjunction with all or part of any Option granted under the Plan or at any subsequent time during the term of such Option, (ii) in conjunction with all or part of any Incentive Award (other than an Option) granted under the Plan or at any subsequent time during the term of such Incentive Award (clause (i) above and this clause (ii), a "Tandem Stock Appreciation Right"), or (iii) without regard to any Option or other Incentive Award (a "Freestanding Stock Appreciation Right"), in each case upon such terms and conditions as the Committee may establish in its sole discretion. As used herein, "Stock Appreciation Right" means a Tandem Stock Appreciation Right or Freestanding Stock Appreciation Right.

(b)   Terms and Conditions. Stock Appreciation Rights shall be subject to such terms and conditions, not inconsistent with the provisions of the Plan, as shall be determined from time to time by the Committee, including the following:

(i)   Upon the exercise of a Stock Appreciation Right, the holder shall have the right to receive the excess of (i) the Fair Market Value of one Share on the date of exercise or such other amount as the Committee shall so determine at any time during a specified period before the date of exercise over (ii) the exercise price of the right on the date of grant, or in the case of a Tandem Stock Appreciation Right granted on the date of grant of the related Option, as

11

specified by the Committee in its sole discretion, which, except in the case of Substitute Awards or in connection with an adjustment provided in Section 5.5 or in accordance with paragraph (b)(vii) of this Section, shall not be less than the Fair Market Value of one Share on such date of grant of the right or the related Option, as the case may be. Other than pursuant to Section 5.5, the Committee shall not, without the approval of the Company stockholders, (a) lower the exercise price of a Stock Appreciation Right after it is granted, (b) cancel a Stock Appreciation Right when the exercise price exceeds the Fair Market Value of the underlying Shares in exchange for cash or another Incentive Award (other than in connection with Substitute Awards), or (c) take any other action with respect to a Stock Appreciation Right that may be treated as a repricing under the rules and regulations of the national securities exchange on which Shares are listed.

(ii)      Upon the exercise of a Stock Appreciation Right, the Committee shall determine in its sole discretion whether payment shall be made in cash, in whole Shares or other property, or any combination thereof.

(iii)      Any Tandem Stock Appreciation Right may be granted at the same time as the related Option is granted or at any time thereafter before exercise or expiration of such Option.

(iv)      Any Tandem Stock Appreciation Right may be exercised only when the related Option would be exercisable and the Fair Market Value of the Shares subject to the related Option exceeds the Option Price at which Shares can be acquired pursuant to the Option. In addition, if a Tandem Stock Appreciation Right exists with respect to less than the full number of Shares covered by a related Option, then an exercise or termination of such Option shall not reduce the number of Shares to which the Tandem Stock Appreciation Right applies until the number of Shares then exercisable under such Option equals the number of Shares to which the Tandem Stock Appreciation Right applies.

(v)      Any Option related to a Tandem Stock Appreciation Right shall no longer be exercisable to the extent the Tandem Stock Appreciation Right has been exercised.

(vi)      The provisions of Stock Appreciation Rights need not be the same with respect to each recipient.

(vii)      The Committee may impose such other conditions or restrictions on the terms of exercise and the exercise price of any Stock Appreciation Right as it shall deem appropriate. Notwithstanding the foregoing provisions of this Section 2.4(b), but subject to Section 5.5, a Freestanding Stock Appreciation Right shall generally have the same terms and conditions as Options, including (i) an exercise price not less than Fair Market Value on the date of grant and (ii) a term not greater than ten (10) years (including an extension of term as provided in Section 2.3 and automatic exercise of an otherwise expiring Incentive Award provided in Section 2.3). In addition to the foregoing, but subject to Section 5.5, the base amount of any Stock Appreciation Right shall not be reduced after the date of grant.

(viii)      The Committee may impose such terms and conditions on Stock Appreciation Rights granted in conjunction with any Incentive Award (other than an Option) as the Committee shall determine in its sole discretion.

12

(ix)     The terms and conditions of this <u>Section 2.4(b)</u> shall be applied to a Tandem Stock Appreciation Right identified in clause (ii) of <u>Section 2.4(a)</u>, and, for such purpose, references to Options in this <u>Section 2.4(b)</u> shall be replaced with the relevant Incentive Award related to such Tandem Stock Appreciation Right.

## SECTION 3 - RESTRICTED STOCK

### 3.1     Grant of Restricted Stock

(a)     <u>General Provisions</u>. With respect to a Grantee who is an Employee or Outside Director, Shares of Restricted Stock may be awarded by the Committee with such restrictions during the Restriction Period as the Committee shall designate in its discretion. Any such restrictions may differ with respect to a particular Grantee. Restricted Stock shall be awarded for no additional consideration or such additional consideration as the Committee may determine, which consideration may be less than, equal to or more than the Fair Market Value of the shares of Restricted Stock on the grant date. Any Restricted Stock Award may, at the time of grant, be designated by the Committee in its discretion as a Performance-Based Award.

(b)     <u>Immediate Transfer Without Immediate Delivery of Restricted Stock</u>. Unless otherwise specified in the Grantee's Incentive Agreement, each Restricted Stock Award shall constitute an immediate transfer of the record and beneficial ownership of the Shares of Restricted Stock to the Grantee in consideration of the performance of services as an Employee or Outside Director, as applicable, entitling such Grantee to all voting and other ownership rights in such Shares.

As specified in the Incentive Agreement, a Restricted Stock Award may limit the Grantee's dividend rights during the Restriction Period. In the Incentive Agreement, the Committee may apply any restrictions to the dividends that the Committee deems appropriate.

Shares awarded pursuant to a grant of Restricted Stock, whether or not under a Performance-Based Award, may be reflected in such manner as determined by the Committee until such time as the restrictions on transfer have expired.

### 3.2     Restrictions

(a)     <u>Forfeiture of Restricted Stock</u>. Restricted Stock awarded to a Grantee shall be subject to such restrictions that the Committee determines are appropriate, including, without limitation, provisions subjecting the Restricted Stock to continuing restrictions in the hands of any transferee.

(b)     <u>Issuance of Certificates</u>. Reasonably promptly after the date of grant with respect to Shares of Restricted Stock, the Company may cause to be issued a stock certificate or other book-entry evidence of ownership, registered in the name of the Grantee to whom such Shares of Restricted Stock were granted, evidencing such Shares; provided, however, that the Company shall not cause to be issued such a stock certificate unless it has received a stock power duly endorsed in blank by the Grantee with respect to such Shares. Any such stock certificate shall bear the following legend or any other legend approved by the Company:

13

*The transferability of this certificate and the shares of stock represented hereby are subject to the restrictions, terms and conditions (including forfeiture and restrictions against transfer) contained in the Parker Drilling Company 2019 Long-Term Incentive Plan and an Incentive Agreement entered into between the registered owner of such shares and Parker Drilling Company. A copy of this Plan and Incentive Agreement are on file in the main corporate office of Parker Drilling Company.*

Such legend shall not be removed from the certificate evidencing such Shares of Restricted Stock unless and until such Shares vest pursuant to the terms of the Incentive Agreement.

(c)     Removal of Restrictions. The Committee, in its discretion, shall have the authority to remove any or all of the restrictions on the Restricted Stock if it determines that such action is necessary or appropriate.

### 3.3     Delivery of Shares of Common Stock

Subject to withholding taxes under Section 6.3 and to the terms of the Incentive Agreement, evidence of ownership of the Shares of Restricted Stock with respect to which the restrictions in the Incentive Agreement have been satisfied shall be delivered to the Grantee or other appropriate recipient free of restrictions.

## SECTION 4 - OTHER AWARDS

### 4.1     Grant of Other Stock-Based Awards

Other Stock-Based Awards may be awarded by the Committee to selected Grantees that are payable in Shares or in cash, as determined in the discretion of the Committee. Types of Other Stock-Based Awards that are payable in Shares include, without limitation, purchase rights, Shares of Common Stock awarded that are not subject to any restrictions or conditions, Shares of Common Stock awarded subject to the satisfaction of specified performance criteria, Incentive Awards valued by reference to the performance of a specified Subsidiary, division or department of the Company, and Shares issued in settlement or cancellation of rights of any person with a vested interest in any other plan, fund, program or arrangement that is or was sponsored, maintained or participated in by the Company (or any Subsidiary).

In addition to Other Stock-Based Awards that are payable in Shares, the Committee may award to a Grantee either Phantom Shares that are payable in cash or Restricted Stock Units that are payable in Shares of Common Stock. A "Phantom Share" is one unit granted to a Grantee which entitles him to receive a cash payment equal to the Fair Market Value of one Share of Common Stock on the vesting date specified in the Incentive Agreement. A "Restricted Stock Unit" is one unit granted to a Grantee which entitles him to receive a Share of Common Stock on the vesting date specified in the Incentive Agreement.

### 4.2     Other Stock-Based Award Terms

(a)     Purchase Price. The amount of consideration required to be received by the Company shall be either: (i) no consideration other than services actually rendered (in the case of

14

authorized and unissued shares) or to be rendered; or (ii) as otherwise specified in the Incentive Agreement.

(b)      Performance Criteria. In its discretion, the Committee may specify Performance Criteria for: (i) vesting in Other Stock-Based Awards; and (ii) payment thereof to the Grantee. The extent to which any such Performance Criteria have been met shall be determined and certified by the Committee.

### 4.3      Other Cash Awards

(a)      Grant. Other Cash Awards may be awarded, in the discretion of the Committee, to a Grantee as a special recognition Incentive Award for exemplary performance, as a supplement to other grants, or for such reasons as the Committee may determine.

(b)      Settlement. Upon vesting of an Other Cash Award in accordance with its terms, the Grantee shall be entitled to receive a cash payment subject to such terms as the Committee may determine, if any. Unless otherwise provided in the Incentive Agreement, if the Grantee's Employment is terminated for any reason prior to full vesting in any part of an Other Cash Award, any non-vested portion at the time of such termination shall automatically expire and no further vesting shall occur after the termination date, subject to partial vesting as may be permitted by this Plan or an Incentive Agreement.

## SECTION 5 - PLAN PARTICIPATION

### 5.1      Incentive Agreement

Each Grantee to whom an Incentive Award is granted shall be required to enter into an Incentive Agreement with the Company, in such a form as is provided by the Committee, provided that (a) any Emergence Award that is a Restricted Stock Unit shall be granted pursuant to the Incentive Agreement attached to the applicable individual's employment agreement as Exhibit A and (b) any Emergence Award that is a Stock Option shall be granted pursuant to the Incentive Agreement attached to the applicable individual's employment agreement as Exhibit B. The Incentive Agreement shall contain specific terms as determined by the Committee, in its discretion, with respect to the Grantee's particular Incentive Award. Such terms need not be uniform among all Grantees or any similarly situated Grantees with the exception of the Emergence Awards. The Incentive Agreement may include, without limitation, vesting, forfeiture and other provisions particular to the particular Grantee's Incentive Award, as well as, for example, provisions to the effect that the Grantee: (i) shall not disclose any confidential information acquired during Employment with the Company; (ii) shall abide by all the terms and conditions of this Plan and such other terms and conditions as may be imposed by the Committee; (iii) shall not interfere with the employment or other service of any Employee; (iv) shall not compete with the Company or its Subsidiaries or become involved in a conflict of interest with the interests of the Company or its Subsidiaries; (v) shall forfeit an Incentive Award if terminated for Cause; (vi) shall not be permitted to make an election under Code Section 83(b) when applicable; and (vii) shall be subject to any other agreement between the Grantee and the Company regarding Shares that may be acquired under an Incentive Award including, without limitation, an agreement restricting the transferability of shares acquired or providing for the recoupment of shares or the cash equivalent

15

thereof. An Incentive Agreement shall include such terms and conditions as are determined by the Committee, in its discretion, to be appropriate with respect to any individual Grantee.

### 5.2    No Right to Employment

Nothing in this Plan or any instrument executed pursuant to this Plan shall create any Employment rights (including without limitation, rights to continued Employment) in any Grantee or affect the right of the Company or any Subsidiary to terminate the Employment of any Grantee at any time.

### 5.3    Transferability

Except as provided below, and except as otherwise authorized by the Committee in an Incentive Agreement, no Incentive Award and no Shares subject to Incentive Awards that have not been issued or as to which any applicable restriction, performance or deferral period has not lapsed, may be sold, assigned, transferred, pledged or otherwise encumbered, other than by will or the laws of descent and distribution, or pursuant to a qualified domestic relations order, and such Incentive Award may be exercised during the life of the Grantee only by the Grantee or the Grantee's guardian or legal representative. Notwithstanding the foregoing, a Grantee may assign or transfer an Incentive Award (i) for charitable donations, (ii) to the Grantee's spouse, children or grandchildren (including any adopted and stepchildren and grandchildren), (iii) to a trust for the benefit of one or more of the Grantee or the persons referred to in clause (ii), or (iv) to any other person with the consent of the Committee (each transferee thereof, a "Permitted Assignee"); provided that such Permitted Assignee shall be bound by and subject to all of the terms and conditions of the Plan and the Incentive Agreement relating to the transferred Incentive Award and shall execute an agreement satisfactory to the Company evidencing such obligations; and provided further that such Permitted Assignee shall remain bound by the terms and conditions of the Plan. The Company shall cooperate with any Permitted Assignee and the Company's transfer agent in effectuating any transfer permitted under this Section.

### 5.4    Rights as a Stockholder

(a)    No Stockholder Rights. Except as otherwise provided in Section 3.1(b) for grants of Restricted Stock, a Grantee of an Incentive Award (or a permitted transferee of such Grantee) shall have no rights as a stockholder with respect to any Shares of Common Stock until the issuance of a stock certificate or other evidence of ownership for such Shares.

(b)    Representation of Ownership. In the case of the exercise of an Incentive Award by a person or estate acquiring the right to exercise such Incentive Award by reason of the death or incapacity of a Grantee, the Committee may require reasonable evidence as to the ownership of such Incentive Award or the authority of such person. The Committee may also require such consents and releases of taxing authorities as it deems advisable.

### 5.5    Adjustments

(a)    Effect on Corporate Transactions. The existence of outstanding Incentive Awards shall not affect in any manner the right or power of the Company or its stockholders to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the capital stock of the Company or its business or any merger or consolidation of the Company, or

16

any issue of bonds, debentures, preferred or prior preference stock (whether or not such issue is prior to, on a parity with or junior to the Common Stock) or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding of any kind, whether or not of a character similar to that of the acts or proceedings enumerated above.

(b)   <u>Stock Splits, Dividends</u>. In the event of any subdivision or consolidation of outstanding Shares, declaration of a dividend payable in Shares or other stock split, then (i) the number of Shares available for issuance under this Plan, (ii) the number of Shares covered by outstanding Incentive Awards in the form of Common Stock or units denominated in Common Stock, (iii) the Option Price or other price in respect of such Incentive Awards, and (iv) the appropriate Fair Market Value and other price determinations for such Incentive Awards shall each be proportionately adjusted by the Committee to reflect such transaction. In the event of any other recapitalization or capital reorganization of the Company, any consolidation or merger of the Company with another corporation or entity, the adoption by the Company of any plan of exchange affecting the Common Stock or any distribution to holders of Common Stock of cash, securities or property (other than normal cash dividends or dividends payable in Common Stock), the Committee shall make appropriate adjustments to (1) the number of Shares covered by Incentive Awards in the form of Common Stock or units denominated in Common Stock, (2) the Option Price or other price in respect of such Incentive Awards, (3) the appropriate Fair Market Value and other price determinations for such Incentive Awards, and (4) the number of Shares available under this Plan for Stock Awards to give effect to such transaction; provided, that, such adjustments shall only be such as are necessary to maintain the proportionate interest of the holders of the Incentive Awards and preserve, without exceeding, the value of such Incentive Awards.

(c)   <u>Mergers, Reorganizations, Liquidations</u>. In connection with a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation (including a Change in Control), the Committee may make such adjustments to Incentive Awards or other provisions for the disposition of Incentive Awards as it deems equitable, and shall be authorized, in its discretion, to (i) provide for the substitution of a new Incentive Award or other arrangement (which, if applicable, may be exercisable for such property or stock as the Committee determines) for an Incentive Award or the assumption of the Incentive Award (and for Incentive Awards not granted under this Plan), regardless of whether in a transaction to which Code Section 424(a) applies, (ii) provide, prior to the transaction, for the acceleration of the vesting and exercisability of, or lapse of restrictions with respect to, the Incentive Award and, if the transaction is a cash merger, provide for the termination of any portion of the Incentive Award that remains unexercised at the time of such transaction, (iii) provide for the acceleration of the vesting and exercisability of an Incentive Award and the cancellation or settlement thereof in exchange for such payment (in cash, stock or other property) as the Committee, in its sole discretion, determines is a reasonable approximation of the value thereof, (iv) cancel any Incentive Awards and direct the Company to deliver to the individuals who are the holders of such Incentive Awards cash in an amount that the Committee shall determine in its sole discretion is equal to the Fair Market Value of such Incentive Awards as of the date of such event, which, in the case of any Option, shall be the amount equal to the excess of the Fair Market Value of a Share as of such date over the per-Share Option Price for such Option (for the avoidance of doubt, if such Option Price is less than such Fair Market Value, the Option may be canceled for no consideration), or (v) cancel Incentive

17

Awards that are Options and give the individuals who are the holders of such Incentive Awards notice and opportunity to exercise prior to such cancellation.

(d)    Compliance with Code Section 409A. No adjustment authorized by this Section 5.5 shall be made in such manner that would result in this Plan or any amounts or benefits payable hereunder to fail to comply with or be exempt from Code Section 409A, and any such adjustment that may reasonably be expected to result in such failure shall be of no force or effect.

## SECTION 6 - GENERAL

### 6.1    Conflicts with Plan

Except as set forth in the Incentive Agreement, in the event of any inconsistency or conflict between the terms of the Plan and an Incentive Agreement, the terms of the Plan shall govern.

### 6.2    Unfunded Plan

No provision of this Plan shall require the Company, for the purpose of satisfying any obligations under this Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made, or otherwise to segregate any assets. In addition, the Company shall not be required to maintain separate bank accounts, books, records or other evidence of the existence of a segregated or separately maintained or administered fund for purposes of this Plan. Although bookkeeping accounts may be established with respect to Grantees who are entitled to cash, Common Stock or rights thereto under this Plan, any such accounts shall be used merely as a bookkeeping convenience. The Company shall not be required to segregate any assets that may at any time be represented by cash, Common Stock or rights thereto. This Plan shall not be construed as providing for such segregation, nor shall the Company, the Board or the Committee be deemed to be a trustee of any cash, Common Stock or rights thereto. Any liability or obligation of the Company to any Grantee with respect to an Incentive Award shall be based solely upon any contractual obligations that may be created by this Plan and any Incentive Agreement, and no such liability or obligation of the Company shall be deemed to be secured by any pledge or other encumbrance on any property of the Company. None of the Company, the Board or the Committee shall be required to give any security or bond for the performance of any obligation that may be created by this Plan.

### 6.3    Withholding Taxes

The Company shall have the right to make all payments or distributions pursuant to the Plan to a Grantee (or a Permitted Assignee thereof) (any such person, a "Payee") net of any applicable federal, state and local taxes required to be paid or withheld as a result of (i) the grant of any Incentive Award, (ii) the exercise of an Option or Stock Appreciation Right, (iii) the delivery of Shares or cash, (iv) the lapse of any restrictions in connection with any Incentive Award or (v) any other event occurring pursuant to the Plan. The Company or any Subsidiary shall have the right to withhold from wages or other amounts otherwise payable to such Payee such withholding taxes as may be required by law, or to otherwise require the Payee to pay such withholding taxes. If the Payee shall fail to make such tax payments as are required, the Company or its Subsidiaries shall, to the extent permitted by law, have the right to deduct any such taxes from any payment of any kind otherwise due to such Payee or to take such other action as may be necessary to satisfy such

18

withholding obligations. The Grantee shall be authorized to elect to satisfy such obligation for the payment of such taxes by tendering previously acquired Shares (either actually or by attestation, valued at their then Fair Market Value), or by directing the Company to retain Shares (up to the Grantee's minimum required tax withholding rate or such other rate that will not trigger a negative accounting impact) otherwise deliverable in connection with the Incentive Award.

### 6.4    Deferrals; Dividend Equivalents

The Committee shall be authorized to establish procedures pursuant to which the payment of any Incentive Award may be deferred. Subject to the provisions of the Plan and any Incentive Agreement, the recipient of an Incentive Award (including any deferred Incentive Award) may, if so determined by the Committee, be entitled to receive, currently or on a deferred basis, cash, stock or other property dividends, or cash payments in amounts equivalent to cash, stock or other property dividends on Shares ("Dividend Equivalents") with respect to the number of Shares covered by the Incentive Award, as determined by the Committee, in its sole discretion. The Committee may provide that such amounts and Dividend Equivalents (if any) shall be deemed to have been reinvested in additional Shares or otherwise reinvested and may provide that such as amounts and Dividend Equivalents are subject to the same vesting or performance conditions as the underlying Incentive Award. Dividend Equivalents attributable to Performance-Based Awards shall not be paid out before the underlying Performance-Based Award has been earned.

### 6.5    No Guarantee of Tax Consequences

Neither the Company nor the Committee makes any commitment or guarantee that any federal, state or local tax treatment will apply or be available to any person participating or eligible to participate hereunder.

### 6.6    Securities Requirements

No Shares will be issued or transferred pursuant to an Incentive Award unless and until all then-applicable requirements imposed by applicable securities and other laws, rules and regulations and by any regulatory agencies having jurisdiction and by any stock market or exchange upon which the Common Stock may be listed, have been fully met. As a condition precedent to the issuance of Shares pursuant to the grant or exercise of an Incentive Award, the Company may require the Grantee to take any reasonable action to meet such requirements. The Company shall not be obligated to take any affirmative action in order to cause the issuance or transfer of Shares pursuant to an Incentive Award to comply with any law or regulation described in the second preceding sentence.

### 6.7    Designation of Beneficiary by Grantee

Each Grantee may, from time to time, name any beneficiary or beneficiaries (who may be named contingently or successively) to whom any benefit under this Plan is to be paid in case of his death before he receives any or all of such benefit. Each such designation shall revoke all prior designations by the same Grantee, shall be in a form prescribed by the Committee, and will be effective only when filed by the Grantee in writing with the Company's Human Resources Department, with a copy to the Committee, during the Grantee's lifetime, and received and accepted by the Human Resources Department. In the absence of any such designation, benefits

19

remaining unpaid at the Grantee's death shall be paid to the legal representative of the Grantee's estate.

### 6.8 Amendment and Termination

The Board may amend, modify, suspend or terminate this Plan (and the Committee may amend or modify an Incentive Agreement) for the purpose of meeting or addressing any changes in legal requirements or for any other purpose permitted by applicable law, except that: (i) no amendment or alteration that would adversely affect the rights of any Grantee in any material way under any Incentive Award previously granted to such Grantee shall be made without the consent of such Grantee; and (ii) no amendment or alteration shall be effective prior to its approval by the stockholders of the Company to the extent stockholder approval is otherwise required by applicable legal requirements or the requirements of the securities exchange on which the Common Stock is listed, including any amendment that expands the types of Incentive Awards available under this Plan, materially increases the number of Shares available for Incentive Awards under this Plan, materially expands the classes of persons eligible for Incentive Awards under this Plan, materially extends the term of this Plan, materially changes the method of determining the Option Price of Options, or deletes or limits any provisions of this Plan that prohibit the repricing of Options or Stock Appreciation Rights. Notwithstanding any provision in this Plan to the contrary, this Plan shall not be amended or terminated in such manner that would cause this Plan or any amounts or benefits payable hereunder to fail to comply with or be exempt from Code Section 409A, and any such amendment or termination that may reasonably be expected to result in such failure shall be of no force or effect.

### 6.9 Successors to Company

All obligations of the Company under this Plan with respect to Incentive Awards granted hereunder shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

### 6.10 Miscellaneous

(a)     No Employee or Outside Director, or other person shall have any claim or right to be granted an Incentive Award under this Plan. Neither this Plan, nor any action taken hereunder, shall be construed as giving any Employee or Outside Director any right to be retained in the Employment or other service of the Company or any Subsidiary.

(b)     The expenses of this Plan shall be borne by the Company.

(c)     By accepting any Incentive Award, each Grantee and each person claiming by or through him or her shall be deemed to have indicated his or her acceptance of this Plan.

### 6.11 Severability

In the event that any provision of this Plan shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable, but shall not affect the remaining provisions of this

20

Plan, and this Plan shall be construed and enforced as if the illegal, invalid, or unenforceable provision was not included herein.

### 6.12    Gender, Tense and Headings

Whenever the context so requires, words of the masculine gender used herein shall include the feminine and neuter, and words used in the singular shall include the plural. Section headings as used herein are inserted solely for convenience and reference and constitute no part of the interpretation or construction of this Plan.

### 6.13    Governing Law

This Plan shall be interpreted, construed and constructed in accordance with the laws of the State of Texas without regard to its conflicts of law provisions, except as may be superseded by applicable laws of the United States.

### 6.14    Effective Date; Expiration of Plan

The Plan shall be effective on the date of the effective date of the Amended Joint Chapter 11 Plan of Reorganization of the Company and its Debtor Affiliates (the "Effective Date").

### 6.15    Code Section 409A

(a)    [Incentive Awards made under this Plan are intended to comply with or be exempt from Code Section 409A, and ambiguous provisions hereof, if any, shall be construed and interpreted in a manner consistent with such intent. No payment, benefit or consideration shall be substituted for an Incentive Award if such action would result in the imposition of taxes under Code Section 409A. Notwithstanding anything in this Plan to the contrary, if any Plan provision or Incentive Award under this Plan would result in the imposition of an additional tax under Code Section 409A, that Plan provision or Incentive Award shall be reformed, to the extent permissible under Code Section 409A, to avoid imposition of the additional tax, and no such action shall be deemed to adversely affect the Grantee's rights to an Incentive Award.

(b)    Unless the Committee provides otherwise in an Incentive Agreement, each Incentive Award other than Options, Stock Appreciation Rights and Restricted Stock (or portion thereof if the Incentive Award is subject to a vesting schedule) shall be settled no later than the fifteenth (15th) day of the third (3rd) month after the end of the first calendar year in which the Incentive Award (or such portion thereof) is no longer subject to a "substantial risk of forfeiture" within the meaning of Code Section 409A. If the Committee determines that an Incentive Award other than Options, Stock Appreciation Rights and Restricted Stock is intended to be subject to Code Section 409A, the applicable Incentive Agreement shall include terms that are designed to satisfy the requirements of Code Section 409A.

(c)    If the Grantee is identified by the Company as a "specified employee" within the meaning of Code Section 409A(a)(2)(B)(i) on the date on which the Grantee has a "separation from service" (other than due to death) within the meaning of Treasury Regulation § 1.409A-1(h), any Incentive Award payable or settled on account of a separation from service that is deferred compensation subject to Code Section 409A shall be paid or settled on the earliest

21

of (i) the first business day following the expiration of six months from the Grantee's separation from service, (ii) the date of the Grantee's death, or (iii) such earlier date as complies with the requirements of Code Section 409A.]

[3]

---

[3] Note to Draft: To confirm language.

IN WITNESS WHEREOF, the Company has caused this Plan to be duly executed in its name and on its behalf by its duly authorized officer, to be effective as of the Effective Date.

**PARKER DRILLING COMPANY**

By: _____

Name: _____

Title: _____

**Exhibit J(iii)**

**Restricted Stock Unit Incentive Agreement**

**K&E DRAFT: 2/12/19**

**PARKER DRILLING COMPANY**

**RESTRICTED STOCK UNIT INCENTIVE AGREEMENT**

**THIS RESTRICTED STOCK UNIT INCENTIVE AGREEMENT** (this "**Agreement**") is made and entered into by and between Parker Drilling Company, a Delaware corporation (the "**Company**"), and [●], an employee of the Company ("**Grantee**"), as of [●] (the "**Grant Date**").[1] The Restricted Stock Units granted to Grantee pursuant to this Agreement shall be granted under the Parker Drilling Company 2019 Long-Term Incentive Plan, as it may be amended from time to time (the "**Plan**"), and are subject to the terms and conditions of the Plan. The Plan is hereby incorporated herein in its entirety by this reference and capitalized terms not otherwise defined in this Agreement shall have the meaning given to such terms in the Plan.

**WHEREAS**, the Company desires to grant Restricted Stock Units to Grantee, subject to the terms and conditions of this Agreement and the Plan, with a view to increasing Grantee's interest in the Company's success and growth; and

**WHEREAS**, Grantee desires to be the holder of Restricted Stock Units subject to the terms and conditions of this Agreement and the Plan.

**NOW, THEREFORE**, in consideration of the premises, mutual covenants and agreements contained herein, and such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**1.      Grant of Restricted Stock Units**. Subject to the terms and conditions of this Agreement and the Plan, the Company hereby grants to Grantee [●][2] Restricted Stock Units (the "**Units**"). Subject to Section 3 hereof, each Unit shall initially represent one share of the Company's Common Stock ("**Share**"). Each Unit represents an unsecured promise of the Company to deliver one Share to the Grantee pursuant to the terms and conditions of the Plan and this Agreement. As a holder of Units, the Grantee has the rights of a general unsecured creditor of the Company until the Units are converted to Shares upon vesting and transferred to Grantee, as set forth herein.

**2.      Transfer Restrictions**. Grantee shall not sell, assign, transfer, exchange, pledge, encumber, gift, devise, hypothecate or otherwise dispose of (collectively, "**Transfer**") any Units granted hereunder, except as provided under the Plan. Any purported Transfer of Units in breach of this Agreement shall be void and ineffective, and shall not operate to Transfer any interest or title in the purported transferee.

**3.      Vesting of Units and Delivery of Shares**.

---

[1]    NTD: Will align with emergence date.

[2]    NTD: To equal number of units set forth in RSA for each individual.

**Error! Unknown document property name.**

(a)      *Vesting Dates*. Grantee shall vest in the Units granted hereunder in accordance with the following schedule: (i) 33 1/3% of the Units shall vest on the first anniversary of the Grant Date, (ii) 33 1/3% of the Units shall vest on the second anniversary of the Grant Date and (iii) 33 1/3% of the Units shall vest on the third anniversary of the Grant Date (each, a "**Vesting Date**"), provided that the Grantee is still an Employee and has continuously been an Employee from the Grant Date through the respective Vesting Date, except as provided in Section 4 hereof.

(b)      *Change in Control*. If there is a Change in Control, all the outstanding Units shall automatically become 100% vested and free of all restrictions upon the consummation of the Change in Control.  Notwithstanding anything in the Plan to the contrary, a transaction by the Excluded Buyers that would otherwise constitute a Change in Control will not be considered to be a Change in Control for purposes of this Agreement unless the Excluded Buyers agree to provide the Grantee with [customary security holder rights, including customary tag along rights that permit the Grantee to participate on a pro rata basis in future sales by the Excluded Buyer or any of its Affiliates on the same terms and conditions as the applicable seller][3], provided that the Grantee may not be required to agree to restrictive covenants that are more onerous to the Grantee than those set forth in the Employment Agreement (defined below).

(c)      *Settlement of Shares*. As soon as practicable, but in no event later than ten (10) days after any Units become vested, the Company shall deliver to Grantee the number of Shares for the vested Units and such Units shall expire when exchanged for such Shares. The form of such delivery (*e.g.*, a stock certificate or electronic entry evidencing such Shares) shall be determined by the Company. In all cases, the delivery of Shares under this Award is intended to comply with Treasury Regulation 1.409A-1(b)(4) and shall be construed and administered in such a manner. All Shares delivered to or on behalf of Grantee in exchange for vested Units shall be subject to any further transfer or other restrictions as may be required by securities law or other applicable law as determined by the Company.

(d)      *Dividends and Splits*. If the Company (i) declares a stock dividend or makes a distribution on its Shares, (ii) subdivides or reclassifies outstanding Shares into a greater number of Shares, or (iii) combines or reclassifies outstanding Shares into a smaller number of Shares, then the number of Units granted under this Agreement shall be proportionately increased or reduced, as applicable, so as to prevent the enlargement or dilution of Grantee's rights and duties hereunder. The determination of the Committee regarding such adjustments shall be binding.

(e)      *Dividend Equivalents*.  Each Unit shall be credited with an amount equal to the cash dividends paid by the Company in respect of Shares ("**Dividend Equivalents**"). Dividend Equivalents will be withheld by the Company and credited to the Grantee's account, and interest may be credited on the amount of cash Dividend Equivalents credited to the Grantee's account at a rate and subject to such terms as determined by the Committee. Dividend Equivalents credited to a Grantee's account and attributable to any particular Unit (and earnings thereon, if applicable) will be distributed in cash upon settlement of

---

[3] NTD: Parties to discuss.

2

**Error! Unknown document property name.**

such Unit and, if such Unit is forfeited, the Grantee will have no right to such Dividend Equivalents.

4.      **Termination of Employment**. If Grantee's Employment is voluntarily or involuntarily terminated by the Company or Grantee, then Grantee shall immediately forfeit for no consideration the outstanding Units that are not already vested as of such date, except as provided below in this Section 4. Upon the forfeiture of any Units hereunder, the Grantee shall cease to have any rights in connection with such Units as of the date of forfeiture. Notwithstanding the foregoing, in the event of Grantee's Qualifying Termination, all of the restrictions and any other conditions for all Units scheduled to vest on the next Vesting Date shall be fully satisfied and such Units shall fully vest. Any remaining unvested Units shall be forfeited for no consideration. For purposes of this Agreement, "**Qualifying Termination**" means the Employment of Grantee is (i) terminated due to death or [Disability][4], (ii) involuntarily terminated by the Company (or by any successor to the Company) for any reason except Cause or (iii) voluntarily terminated by the Grantee for Good Reason. For purposes of this Agreement, "**Cause**" and "**Good Reason**" have the respective meanings set forth in the Grantee's Employment Agreement with the Company dated [_____], 2019 (the "**Employment Agreement**").

5.      **Grantee's Representations**. Notwithstanding any provision hereof to the contrary, the Grantee hereby agrees and represents that Grantee will not acquire any Shares, and that the Company will not be obligated to issue any Shares to the Grantee hereunder, if the issuance of such Shares constitutes a violation by the Grantee or the Company of any law or regulation of any governmental authority. Any determination in this regard that is made by the Committee, in good faith, shall be final and binding. The rights and obligations of the Company and the Grantee are subject to all applicable laws and regulations.

6.      **Tax Withholding**. To the extent that the receipt of Shares hereunder results in compensation income to Grantee for federal, state or local income tax purposes, Grantee shall deliver to Company at such time the sum that the Company requires to meet its tax withholding obligations under applicable law or regulation, or, at the election of the Grantee, the Company shall withhold Shares having a Fair Market Value equal to all payroll and income taxes imposed on or incurred by Grantee in connection with such settlement.

7.      **Independent Legal and Tax Advice**. The Grantee acknowledges that (a) the Company is not providing any legal or tax advice to Grantee and (b) the Company has advised the Grantee to obtain independent legal and tax advice regarding this Agreement and any payment hereunder.

8.      **No Rights in Shares**. The Grantee shall have no rights as a stockholder in respect of any Shares, unless and until the Grantee becomes the record holder of such Shares on the Company's records.

9.      **Conflicts with Plan, Correction of Errors, and Grantee's Consent**. In the event that any provision of this Agreement conflicts in any way with a provision of the Plan, the provisions of this Agreement shall control. All determinations and computations under this

---

[4] NTD: Parties to discuss.

3

**Error! Unknown document property name.**

Agreement shall be made by the Committee (or its authorized delegate) in its discretion as exercised in good faith.

The award of Units is intended to comply with or be exempt from Section 409A of the Internal Revenue Code and any ambiguous provisions hereof shall be interpreted accordingly. Accordingly, Grantee consents to such amendment of this Agreement as the Committee may reasonably make in furtherance of such intention, and the Company shall promptly provide, or make available, to Grantee a copy of any such amendment.

**10.     Restrictive Covenants**.  As a condition to the award of the Units, the Grantee agrees to comply with Sections 10 through 15 and be bound by Sections 16 through 18 of the Employment Agreement, which are incorporated herein by reference.

**11.     Miscellaneous.**

(a)     *No Fractional Share*s. All provisions of this Agreement concern whole Shares. If the application of any provision hereunder would yield a fractional Share, such fractional Share shall be rounded down to the next whole Share if it is less than 0.5 and rounded up to the next whole Share if it is 0.5 or more.

(b)     *Transferability of Units*. The Units are transferable only to the extent permitted in accordance with the Plan at the time of transfer (i) by will or by the laws of descent and distribution, or (ii) by a domestic relations order in such form as is acceptable to the Company. No right or benefit hereunder shall in any manner be liable for or subject to any debts, contracts, liabilities, obligations or torts of the Grantee or any permitted transferee thereof.

(c)     *Not an Employment Agreement*. This Agreement is not an employment agreement, and no provision of this Agreement shall be construed or interpreted to create any Employment relationship between Grantee and the Company for any time period. The Employment of Grantee with the Company shall be subject to termination to the same extent as if this Agreement did not exist.

(d)     *Notices*. Any notice, instruction, authorization, request or demand required hereunder shall be in writing, and shall be delivered either by personal in-hand delivery, by telecopy or similar facsimile means, by certified or registered mail, return receipt requested, or by courier or delivery service, addressed to the Company at its then current main corporate address, and to Grantee at the address indicated on the Company's records, or at such other address and number as a party has last previously designated by written notice given to the other party in the manner hereinabove set forth. Notices shall be deemed given when received, if sent by facsimile means (confirmation of such receipt by confirmed facsimile transmission being deemed receipt of communications sent by facsimile means); and when delivered and receipted for (or upon the date of attempted delivery where delivery is refused), if hand delivered, sent by courier or delivery service, or sent by certified or registered mail, return receipt requested.

(e)     *Amendment, Termination and Waiver*. This Agreement may be amended, modified, terminated or superseded only by written instrument executed by or on behalf of the Grantee and the Company (by action of the Committee or its delegate) if such action is adverse to the Grantee. Any waiver of the terms or conditions hereof shall be made only by a written

4

instrument executed and delivered by the party waiving compliance. Any waiver granted by the Company shall be effective only if executed and delivered by a duly authorized executive officer of the Company other than Grantee. The failure of any party at any time or times to require performance of any provisions hereof shall in no manner affect the right to enforce the same. No waiver by any party of any term or condition herein, or the breach thereof, in one or more instances shall be deemed to be, or construed as, a further or continuing waiver of any such condition or breach or a waiver of any other condition or the breach of any other term or condition.

(f) _No Guarantee of Tax or Other Consequences_. The Company makes no commitment or guarantee that any tax treatment will apply or be available to the Grantee or any other person. The Grantee has been advised, and provided with ample opportunity, to obtain independent legal and tax advice regarding this Agreement.

(g) _Governing Law and Severability_. This Agreement shall be governed by the laws of the State of Texas without regard to its conflicts of law provisions, except as preempted by controlling federal law. The invalidity of any provision of this Agreement shall not affect any other provision hereof or of the Plan, which shall remain in full force and effect.

(h) _Successors and Assigns_. This Agreement shall bind, be enforceable by, and inure to the benefit of, the Company and Grantee.

*[Signature page follows.]*

5

**Error! Unknown document property name.**

**IN WITNESS WHEREOF**, this Agreement is hereby approved and executed as of the date first written above.

**Parker Drilling Company**

By:  _____

Name: _____

Title: _____

**Grantee**

_____
Signature

[●]

Grantee's Address for Notices:

_____

_____

**Error! Unknown document property name.**

## Exhibit J(iv)

**Stock Option Incentive Agreement**

**K&E DRAFT: 2/12/19**

## PARKER DRILLING COMPANY

## STOCK OPTION INCENTIVE AGREEMENT

**THIS STOCK OPTION INCENTIVE AGREEMENT** (this "**Agreement**") is made and entered into by and between Parker Drilling Company, a Delaware corporation (the "**Company**"), and [●], an employee of the Company ("**Grantee**"), as of [●] [●], 2019 (the "**Grant Date**"). The Stock Options granted to Grantee pursuant to this Agreement shall be granted under the Parker Drilling Company 2019 Long-Term Incentive Plan, as it may be amended from time to time (the "**Plan**"), and are subject to the terms and conditions of the Plan. The Plan is hereby incorporated herein in its entirety by this reference and capitalized terms not otherwise defined in this Agreement shall have the meaning given to such terms in the Plan.

**WHEREAS**, the Company desires to grant Stock Options to Grantee, subject to the terms and conditions of this Agreement and the Plan, with a view to increasing Grantee's interest in the Company's success and growth; and

**WHEREAS**, Grantee desires to be the holder of Stock Options subject to the terms and conditions of this Agreement and the Plan.

**NOW, THEREFORE**, in consideration of the premises, mutual covenants and agreements contained herein, and such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      **Grant of Stock Options; Option Term**. Subject to the terms and conditions of this Agreement and the Plan, the Company hereby grants to Grantee, subject to the terms hereof and the terms of the Plan, the right and option to purchase all or a portion of [●][1] shares of the Common Stock of the Company (the "**Shares**"), par value [●] per Share, on or before the Expiration Date (the "**Options**"). No exercise as to a portion of the Shares shall preclude a later exercise or exercises as to additional portions. The Option shall be exercisable upon vesting only (a) as provided in <u>Section 3</u> hereof and (b) during such time as Grantee remains an employee of the Company, and for 90 days after termination of employment, except as otherwise provided in <u>Section 4</u>. The Options are Non-statutory Stock Options.

The term of the Options shall expire ten years after the Grant Date.

2.      **Transfer Restrictions**. Except as specifically authorized by the Board or the Compensation Committee, the Option shall be exercisable during Grantee's lifetime only by Grantee. The Options are transferable only to the extent permitted in accordance with the Plan at the time of transfer (a) by will or by the laws of descent and distribution, or (b) by a domestic relations order in such form as is acceptable to the Company. No right or benefit hereunder shall in any manner be liable for or subject to any debts, contracts, liabilities, obligations or torts of the Grantee or any permitted transferee thereof.

---

[1]      To equal number of units set forth in RSA for each individual in his or her emergence grant.

**Error! Unknown document property name.**

**3.**     **Terms and Conditions of the Option**. The Option shall be subject to the following terms and conditions:

(a)     *Option Price*. The price to be paid for each of the Shares with respect to which the Option is exercised, shall be [$●] (the "**Option Price**").

(b)     *Vesting Dates*. The Options granted hereunder will vest and become exercisable in accordance with the following schedule: (i) 33 1/3% of the Options shall vest and become exercisable on the first anniversary of the Grant Date, (ii) 33 1/3% of the Options shall vest and become exercisable on the second anniversary of the Grant Date and (iii) 33 1/3% of the Options shall vest and become exercisable on the third anniversary of the Grant Date (each, a "**Vesting Date**"), provided that the Grantee is still an Employee and has continuously been an Employee from the Grant Date through each Vesting Date, except as provided in Section 4 hereof.

(c)     *Change in Control*. If there is a Change in Control, all the outstanding Options shall automatically become 100% vested and exercisable and free of all restrictions upon the consummation of the Change in Control. Notwithstanding anything in the Plan to the contrary, a transaction by the Excluded Buyers that would otherwise constitute a Change in Control will be considered to be a Change in Control for purposes of this Agreement unless the Excluded Buyers agree to provide the Grantee with [customary security holder rights, including customary tag along rights that permit the Grantee to participate on a pro rata basis in future sales by the Excluded Buyer or any of its Affiliates on the same terms and conditions as the applicable seller][2], provided that the Grantee may not be required to agree to restrictive covenants that are more onerous to the Grantee than those set forth in the Employment Agreement (defined below).

(d)     *Exercise of Option*. The Option shall be exercisable as specified herein and in the Plan. Payment of the Option Price, and any payroll or income taxes imposed on or incurred by Grantee in connection with such exercise, for the number of Shares as to which the option is being exercised may be paid (i) in cash, (ii) in Shares held by the Grantee having an aggregate Fair Market Value, as determined as of the close of business on the day on which such Option is exercised, equal to the Option Price, (iii) by delivery of irrevocable instructions to a broker to promptly deliver to the Company the amount of sale proceeds necessary to pay for all Shares acquired through such exercise and any tax withholding obligations resulting from such exercise, (iv) by the withholding by the Company, pursuant to a written election delivered by the Grantee to the Administrator of the Plan on or prior to the date of exercise, from the Shares issuable upon any exercise of the Option that number of Shares having a Fair Market Value as of the close of business on the day prior to the day on which such Option is exercised equal to such Option Price, (v) by constructive delivery of Shares held by the Grantee having an aggregate Fair Market Value, as determined as of the close of business on the day of exercise, equal to the Option Price effected through providing the Company with a notarized statement on or before the day of exercise attesting to the number of Shares owned by the Grantee that will serve as the Option Price payment Shares, or (vi) by a combination of such methods. The Option shall not be exercisable with respect to fractions of a Share. Notwithstanding the foregoing, the Option shall not be exercisable to the extent and in any manner that the Company determines would violate applicable state or Federal

---

[2] Note to Draft: Parties to discuss.

2

**Error! Unknown document property name.**

securities laws or the rules and regulations of the New York Stock Exchange. In making any determination hereunder, the Company may rely upon the opinion of counsel for the Company.

(e) *Notice of Exercise*. Each exercise of the Option shall be by written notice to the Company. Each such notice shall state the number of Shares with respect to which the Option is being exercised and shall specify a date, not less than five nor more than ten days after the date of such notice, as the date on which the Shares will be delivered and payment made therefor at the principal offices of the Company. If any law or regulation requires the Company to take any action with respect to the Shares specified in such notice, then the date for delivery of such Shares against payment therefor shall be extended for the period necessary to take such action. In the event of any failure to pay for the number of Shares specified in such notice on the date set forth therein, subject to such date being extended as provided above, the Option shall terminate with respect to such number of Shares, but shall continue with respect to the remaining Shares covered by this Agreement and not yet acquired by exercise of the Option or any portion thereof.

(f) *Taxes*. Grantee shall pay all original issue or transfer taxes and all other fees and expenses incident to the issue, transfer, or delivery of Shares.

(g) *No Rights Until Issue*. No right to vote or receive dividends or any other rights as a stockholder of the Company shall exist with respect to the Shares, notwithstanding the exercise of the Option, until the underlying shares have been duly listed on the New York Stock Exchange and the issuance to the Grantee of a stock certificate or certificates representing such Shares.

(h) *Anti-dilution*. In the event of a merger, consolidation, reorganization, recapitalization, stock dividend, stock split or other change in the corporate structure or capitalization of the Company, the number of Shares and the Option Price shall be subject to appropriate adjustments as described in the Plan.

**4.** **Termination of Employment**. If Grantee's Employment is voluntarily or involuntarily terminated by the Company or Grantee, then Grantee shall immediately forfeit for no consideration the outstanding Options that are not already vested as of such date, except as provided below in this Section 4. Upon the forfeiture of any Options hereunder, the Grantee shall cease to have any rights in connection with such Options as of the date of forfeiture. Notwithstanding the foregoing, in the event of a Qualifying Termination, (i) all of the restrictions and any other conditions for all Options scheduled to vest on the next Vesting Date shall be fully satisfied and such Options shall fully vest and become exercisable and (ii) the vested portion of the Option shall be exercisable until the later of (A) five years after the Grant Date[3] and (B) two years after the Qualifying Termination. Any remaining unvested Options shall be forfeited for no consideration. For purposes of this Agreement, "**Qualifying Termination**" means the Employment of Grantee is (1) terminated due to death or [Disability][4], (2) involuntarily terminated by the Company (or by any successor to the Company) for any reason except Cause or (3) voluntarily terminated by the Grantee for Good Reason. For purposes of this Agreement, "**Cause**"

---

[3] NTD: Grant Date is Effective Date.

[4] NTD: Parties to discuss.

<div align="center">3</div>

**Error! Unknown document property name.**

and "**Good Reason**" have the respective meanings set forth in the Grantee's Employment Agreement with the Company dated [_____], 2019 (the "**Employment Agreement**").

        **5.**      **Independent Legal and Tax Advice**. The Grantee acknowledges that (a) the Company is not providing any legal or tax advice to Grantee and (b) the Company has advised the Grantee to obtain independent legal and tax advice regarding this Agreement and any payment hereunder.

        **6.**      **No Rights in Shares**. The Grantee shall have no rights as a stockholder in respect of any Shares, unless and until the Grantee becomes the record holder of such Shares on the Company's records.

        **7.**      **Conflicts with Plan, Correction of Errors, and Grantee's Consent**. In the event that any provision of this Agreement conflicts in any way with a provision of the Plan, the provisions of this Agreement shall control. All determinations and computations under this Agreement shall be made by the Committee (or its authorized delegate) in its discretion as exercised in good faith.

        The award of Options is intended to comply with or be exempt from Section 409A of the Internal Revenue Code and any ambiguous provisions hereof shall be interpreted accordingly. Accordingly, Grantee consents to such amendment of this Agreement as the Committee may reasonably make in furtherance of such intention, and the Company shall promptly provide, or make available, to Grantee a copy of any such amendment.

        **8.**      **Restrictive Covenants**.  As a condition to the award of the Units, the Grantee agrees to comply with Sections 10 through 15 and be bound by Sections 16 through 18 of the Employment Agreement, which are incorporated herein by reference.

        **9.**      **Miscellaneous.**

        (a)    *No Fractional Share*s. All provisions of this Agreement concern whole Shares. If the application of any provision hereunder would yield a fractional Share, such fractional Share shall be rounded down to the next whole Share if it is less than 0.5 and rounded up to the next whole Share if it is 0.5 or more.

        (b)    *Not an Employment Agreement*. This Agreement is not an employment agreement, and no provision of this Agreement shall be construed or interpreted to create any Employment relationship between Grantee and the Company for any time period. The Employment of Grantee with the Company shall be subject to termination to the same extent as if this Agreement did not exist.

        (c)    *Notices*. Any notice, instruction, authorization, request or demand required hereunder shall be in writing, and shall be delivered either by personal in-hand delivery, by telecopy or similar facsimile means, by certified or registered mail, return receipt requested, or by courier or delivery service, addressed to the Company at its then current main corporate address, and to Grantee at the address indicated on the Company's records, or at such other address and number as a party has last previously designated by written notice given to the other party in the manner hereinabove set forth. Notices shall be deemed given when received, if sent by facsimile

4

**Error! Unknown document property name.**

means (confirmation of such receipt by confirmed facsimile transmission being deemed receipt of communications sent by facsimile means); and when delivered and receipted for (or upon the date of attempted delivery where delivery is refused), if hand delivered, sent by courier or delivery service, or sent by certified or registered mail, return receipt requested.

(d)       *Amendment, Termination and Waiver*. This Agreement may be amended, modified, terminated or superseded only by written instrument executed by or on behalf of the Grantee and the Company (by action of the Committee or its delegate) if such action is adverse to the Grantee. Any waiver of the terms or conditions hereof shall be made only by a written instrument executed and delivered by the party waiving compliance. Any waiver granted by the Company shall be effective only if executed and delivered by a duly authorized executive officer of the Company other than Grantee. The failure of any party at any time or times to require performance of any provisions hereof shall in no manner affect the right to enforce the same. No waiver by any party of any term or condition herein, or the breach thereof, in one or more instances shall be deemed to be, or construed as, a further or continuing waiver of any such condition or breach or a waiver of any other condition or the breach of any other term or condition.

(e)       *No Guarantee of Tax or Other Consequences*. The Company makes no commitment or guarantee that any tax treatment will apply or be available to the Grantee or any other person. The Grantee has been advised, and provided with ample opportunity, to obtain independent legal and tax advice regarding this Agreement.

(f)       *Governing Law and Severability*. This Agreement shall be governed by the laws of the State of Texas without regard to its conflicts of law provisions, except as preempted by controlling federal law. The invalidity of any provision of this Agreement shall not affect any other provision hereof or of the Plan, which shall remain in full force and effect.

(g)       *Successors and Assigns*. This Agreement shall bind, be enforceable by, and inure to the benefit of, the Company and Grantee.

*[Signature page follows.]*

**Error! Unknown document property name.**

**IN WITNESS WHEREOF**, this Agreement is hereby approved and executed as of the date first written above.

**Parker Drilling Company**

By:  _____

Name: _____

Title: _____


**Grantee**

_____
Signature

[●]


Grantee's Address for Notices:

_____

_____

**Error! Unknown document property name.**

## Exhibit K

**Amended and Restated Backstop Commitment Agreement**

Execution Version

AMENDED AND RESTATED BACKSTOP COMMITMENT AGREEMENT

AMONG

PARKER DRILLING COMPANY

AND

THE COMMITMENT PARTIES PARTY HERETO

Dated as of January 28, 2019

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...............................................................................................2

    Section 1.1    Definitions.................................................................................2

    Section 1.2    Construction.............................................................................13

ARTICLE II BACKSTOP COMMITMENT .....................................................................14

    Section 2.1    The Rights Offering; Subscription Rights ..................................14

    Section 2.2    The Backstop Commitment ........................................................14

    Section 2.3    Commitment Party Default .........................................................15

    Section 2.4    Subscription Escrow Account Funding. ......................................16

    Section 2.5    Closing. ......................................................................................17

    Section 2.6    Designation and Assignment Rights. ..........................................18

    Section 2.7    No Financial Accommodation Agreement ..................................20

ARTICLE III PUT OPTION CASH PREMIUM; PUT OPTION EQUITY PREMIUM;
        EXPENSE REIMBURSEMENT ...................................................................20

    Section 3.1    Put Option Cash Premium ..........................................................20

    Section 3.2    Return of Put Option Cash Premium; Put Option Equity Premium ..........20

    Section 3.3    Expense Reimbursement.............................................................21

    Section 3.4    Amendment Fee .........................................................................23

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY...................23

    Section 4.1    Existence; Compliance with Law ...............................................23

    Section 4.2    Power; Enforceable Obligations .................................................24

    Section 4.3    Consents and Approvals .............................................................24

    Section 4.4    No Conflict.................................................................................25

    Section 4.5    No Material Litigation ................................................................25

    Section 4.6    Financial Statements; No Material Adverse Effect ....................25

    Section 4.7    Material Contracts......................................................................26

    Section 4.8    Authorized and Issued Capital Stock..........................................26

    Section 4.9    Ownership of Property; Liens......................................................27

    Section 4.10   Intellectual Property...................................................................28

    Section 4.11   Taxes..........................................................................................28

    Section 4.12   Labor Matters.............................................................................28

    Section 4.13   ERISA Compliance.....................................................................29

    Section 4.14   Investment Company Act; Other Regulations. ...........................30

TABLE OF CONTENTS

Page

Section 4.15   Subsidiaries.............................................................................................30

Section 4.16   Environmental Matters...........................................................................30

Section 4.17   Licenses and Permits.............................................................................31

Section 4.18   Company SEC Documents and Disclosure Statement............................32

Section 4.19   Insurance...............................................................................................32

Section 4.20   OFAC/Sanctions....................................................................................32

Section 4.21   No Unlawful Payments..........................................................................33

Section 4.22   Compliance with Money Laundering Laws.............................................33

Section 4.23   Arm's Length........................................................................................33

Section 4.24   No Broker's Fees...................................................................................33

Section 4.25   No Undisclosed Relationships................................................................33

Section 4.26   Internal Control Over Financial Reporting.............................................33

Section 4.27   Disclosure Controls and Procedures......................................................34

Section 4.28   CFIUS...................................................................................................34

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT
      PARTIES.........................................................................................................34

Section 5.1   Incorporation.........................................................................................34

Section 5.2   Corporate Power and Authority..............................................................34

Section 5.3   Execution and Delivery..........................................................................34

Section 5.4   No Conflict............................................................................................35

Section 5.5   Consents and Approvals.........................................................................35

Section 5.6   Note Claims and Equity Interests...........................................................35

Section 5.7   No Registration......................................................................................36

Section 5.8   Purchasing Intent...................................................................................36

Section 5.9   Sophistication; Investigation..................................................................36

Section 5.10  No Broker's Fees...................................................................................36

Section 5.11  Sufficient Funds....................................................................................36

ARTICLE VI ADDITIONAL COVENANTS......................................................................37

Section 6.1   Confirmation Order; Approval Order; Plan and Disclosure
      Statement...............................................................................................37

Section 6.2   Conduct of Business..............................................................................37

Section 6.3   Access to Information.............................................................................39

ii

TABLE OF CONTENTS

<div align="right">Page</div>

Section 6.4      Commercially Reasonable Efforts. ......................................................39

Section 6.5      Registration Rights Agreement; Governance Documents. ........................40

Section 6.6      Commitments of the Company. ...............................................................41

Section 6.7      Additional Provisions Regarding Company's Commitments.....................43

Section 6.8      DTC Eligibility .....................................................................................44

Section 6.9      Antitrust Approval ................................................................................44

Section 6.10     Other Entities .......................................................................................45

Section 6.11     Reorganized Parker. ..............................................................................45

Section 6.12     S-1 Preparation.....................................................................................45

Section 6.13     Share Legend ........................................................................................46

Section 6.14     Conversion Waiver ...............................................................................46

ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ...........................46

Section 7.1      Conditions to the Obligations of the Commitment Parties .......................46

Section 7.2      Waiver of Conditions to Obligation of Commitment Parties ...................49

Section 7.3      Conditions to the Obligations of the Company.........................................49

ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION ..................................................50

Section 8.1      Indemnification Obligations ..................................................................50

Section 8.2      Indemnification Procedure.....................................................................51

Section 8.3      Settlement of Indemnified Claims ..........................................................52

Section 8.4      Contribution .........................................................................................53

Section 8.5      Treatment of Indemnification Payments...................................................53

Section 8.6      No Survival ...........................................................................................53

ARTICLE IX TERMINATION.....................................................................................................53

Section 9.1      Termination Rights ................................................................................53

Section 9.2      Effect of Termination.............................................................................57

ARTICLE X GENERAL PROVISIONS.......................................................................................58

Section 10.1     Notices .................................................................................................58

Section 10.2     Assignment; Third Party Beneficiaries....................................................59

Section 10.3     Prior Negotiations; Entire Agreement ....................................................60

Section 10.4     Governing Law; Venue..........................................................................60

Section 10.5     Waiver of Jury Trial..............................................................................61

Section 10.6     Counterparts .........................................................................................61

TABLE OF CONTENTS

Page

Section 10.7   Waivers and Amendments; Rights Cumulative; Consent.........................61

Section 10.8   Headings ...........................................................................................63

Section 10.9   Specific Performance .........................................................................63

Section 10.10  Damages............................................................................................63

Section 10.11  No Reliance........................................................................................63

Section 10.12  Confidentiality and Publicity .............................................................63

Section 10.13  Settlement Discussions ......................................................................64

Section 10.14  No Recourse.......................................................................................64

Section 10.15  Enforceability of Agreement...............................................................65

Section 10.16  Relationship Among Parties ...............................................................65

SCHEDULES AND EXHIBITS

Schedule 1      Backstop Commitment Percentage – Put Option Cash Premium & Put Option Equity Premium

Schedule 2      Backstop Commitment Percentage – Unsubscribed Shares

Schedule 3      Notice Addresses for Commitment Parties

Schedule 4      Fully Diluted Capital Stock of Reorganized Parker

Schedule 5      Milestones

Exhibit A       Joinder Agreement

Exhibit B       Transfer Agreement

## AMENDED AND RESTATED BACKSTOP COMMITMENT AGREEMENT

THIS AMENDED AND RESTATED BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of January 28, 2019, is made by and among Parker Drilling Company, a Delaware corporation (as a debtor in possession or a reorganized debtor, as applicable, the "**Company**"), and the parties set forth on the signature pages hereto (each referred to herein, individually, as a "**Commitment Party**" and, collectively, as the "**Commitment Parties**"), on the other hand.  The Company and each Commitment Party signatory hereto is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**". Unless otherwise specified herein, all capitalized terms used and not defined herein shall have the meanings ascribed to them in that certain Restructuring Support Agreement, dated as of December 12, 2018, by and among the Company, each of the other Company Parties (as defined in the RSA) party thereto, and the Consenting Stakeholders (as defined in the RSA) party thereto (such agreement, together with all exhibits, term sheets, schedules and annexes thereto, as amended, restated or otherwise modified pursuant to the terms thereof, the "**RSA**") or if not defined therein, then shall have the meanings ascribed to them in the Restructuring Term Sheet attached as Exhibit A to the RSA.

## RECITALS

WHEREAS, the Debtors and the Commitment Parties other than Saba have entered into the RSA (simultaneously with the execution of the Original Agreement), which provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a "prearranged" plan of reorganization to be filed in the Chapter 11 Cases, implementing the terms and conditions of the Restructuring Transactions, including the terms and conditions set forth in the Restructuring Term Sheet attached as Exhibit A to the RSA;

WHEREAS, Saba has executed a joinder agreement to the RSA (simultaneously with the execution of this Agreement);

WHEREAS, the Debtors have filed with the Bankruptcy Court, in accordance with the terms of the RSA, a motion seeking entry of the Disclosure Statement Order and plan to file, in accordance with the terms of the RSA, a brief in support of the Confirmation Order;

WHEREAS, pursuant to the Plan and this Agreement, and in accordance with the Rights Offering Procedures, the Company will issue the Subscription Rights (as defined below) and conduct a rights offering in which, among other things, the Company will offer to holders of Unsecured Notes, holders of Existing Common Stock, holders of Existing Preferred Stock and the Commitment Parties (on account of their status as holders of Unsecured Notes, Existing Common Stock and Existing Preferred Stock, as applicable) the right to participate (based on such holders' Subscription Rights) in a rights offering to purchase New Common Stock to be issued by Reorganized Parker for an aggregate of $95,000,000 of cash for 41.9241% of post-Closing New Common Stock (subject to dilution by New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants) (the "**Rights Offering**"), as set forth on Schedule 4;

WHEREAS, subject to the terms and conditions contained in this Agreement, each Commitment Party has agreed that it shall purchase (on a several and not joint basis) its Backstop

1

Commitment Percentage of the Unsubscribed Shares, if any;

WHEREAS, the Parties (other than Saba) entered into the Backstop Commitment Agreement, dated as of December 12, 2018 (the "**Original Agreement**"); and

WHEREAS, (x) the Parties party to the Original Agreement desire (and have agreed pursuant to Section 10.7 of the Original Agreement to amend and restate the Original Agreement) and (y) Saba desires, to enter into this Agreement pursuant to which, among other things, Saba shall become a Commitment Party, in each case, on the terms and conditions as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby agrees as follows:

ARTICLE I

**DEFINITIONS**

Section 1.1    Definitions.    Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings set forth below:

"**Advance Payment Surplus**" has the meaning set forth in Section 3.3(c).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Affiliated Funds of such Person); provided, however, that for purposes of this Agreement, no Commitment Party shall be deemed an Affiliate of the Company or any of its Subsidiaries.   For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Affiliated Fund**" has the meaning set forth in Section 2.6(b).

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Akin Advance Payment**" has the meaning set forth in Section 3.3(b).

"**Alternative Restructuring Proposal"** has the meaning ascribed to such term in the RSA.

"**Amendment Fee**" has the meaning set forth in Section 3.4.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several

2

states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any of them.

"**Antitrust Laws**" mean the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct.

"**Applicable Consent**" has the meaning set forth in Section 4.3.

"**Approval Obligations**" means the obligations of the Company and the other Debtors under this Agreement and the Approval Order.

"**Approval Order**" means an order of the Bankruptcy Court approving the Debtors' entry into this Agreement, which may be the Confirmation Order.

"**Audited Financial Statements**" means the audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2016 and December 31, 2017, and the related consolidated statements of operations, comprehensive income, stockholders' equity and cash flows of the Company and its Subsidiaries, including the notes thereto, for the twelve (12) month periods ending December 31, 2016 and December 31, 2017, respectively.

"**Available Shares**" means the Unsubscribed Shares that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party.

"**Backstop Commitment**" has the meaning set forth in Section 2.2.

"**Backstop Commitment Percentage**" means, with respect to any Commitment Party, the percentage set forth opposite such Commitment Party's name as follows (as such Schedule 1, or Schedule 2, may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement):

    (i)    with respect to the Put Option Cash Premium and the Put Option Equity Premium, as set forth on Schedule 1; and

    (ii)    with respect to all Unsubscribed Shares, as set forth on Schedule 2.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, if applicable, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Cases.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and any successor statute.

"**Closing**" has the meaning set forth in Section 2.5(a).

"**Closing Date**" has the meaning set forth in Section 2.5(a).

3

"**Code**" means the Internal Revenue Code of 1986.

"**Commitment Party**" has the meaning set forth in the introductory paragraph hereto and each permitted transferee of any Backstop Commitment pursuant to Section 2.6.

"**Commitment Party Default**" means the failure by any Commitment Party to (a) deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of any Unsubscribed Shares by the Subscription Escrow Funding Date in accordance with Section 2.4(b) or (b) exercise its Subscription Rights (i) pursuant to and in accordance with the Plan and (ii) as required by Section 2.1(b).

"**Commitment Party Replacement**" has the meaning set forth in Section 2.3(a).

"**Commitment Party Replacement Period**" has the meaning set forth in Section 2.3(a).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Disclosure Schedule**" means the disclosure schedules delivered by the Company to the Commitment Parties on the date of this Agreement.

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company.

"**Confirmation Order**" shall have the meaning ascribed to such term in the RSA.

"**Contract**" means any legally binding agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other enforceable arrangement or obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Defaulting Commitment Party**" means, at any time, any Commitment Party that caused a Commitment Party Default that is continuing at such time.

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of comprehensive Sanctions (which, as of the date of this Agreement, includes only Crimea, Cuba, Iran, Syria, and North Korea).

"**DIP Facility**" has the meaning ascribed to such term in the RSA.

"**Disposition**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any Property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Employee Benefit Plan**" means any "employee benefit plan" (as such term is

4

defined in Section 3(3) of ERISA) established by the Company or any of its Subsidiaries or, with respect to any such plan that is subject to Section 412 or 403 of the Code or Section 302 or 303 or Title IV of ERISA, any ERISA Affiliate.

"**Environmental Law**" means any applicable international, regional, Federal, state, foreign or local law, treaties, directives, protocols, codes, standards, rules, regulations and rule of common law now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any Order, to the extent binding on the Company or any of its Subsidiaries, relating to the environment (including ambient air, surface water, ground water, navigable waters, waters of the contiguous zone, coastal water, ocean waters and international waters), and/or Hazardous Materials, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; Regulation (EC) No 1907/2006 of the European Parliament and of the Council of 18 December 2006 concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH); and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein).

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Company within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 or 430 of the Code or Section 302 or 303 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Company or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Company or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of an Employee Benefit Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the

5

appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Company or any ERISA Affiliate.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exit Facility**" has the meaning ascribed to such term in the RSA.

"**Expense Reimbursement**" has the meaning set forth in Section 3.3(a).

"**Filing Party**" has the meaning set forth in Section 6.9(b).

"**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**Foreign Benefit Plan**" has the meaning set forth in Section 4.13(d).

"**Foreign Government Scheme or Arrangement**" has the meaning set forth in Section 4.13(d).

"**Funding Notice**" has the meaning set forth in Section 2.4(a).

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Entity**" means any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court, or tribunal of competent

6

jurisdiction (including any branch, department or official thereof); excluding, however, any Person engaged in the oil and gas extraction or services business that is owned in whole or in part by any such U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court, or tribunal of competent jurisdiction (including any branch, department or official thereof).

"**Hazardous Materials**" means: (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," under any applicable Environmental Law; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Entity under Environmental Laws due to its dangerous or deleterious properties.

"**Houlihan**" has the meaning set forth in Section 3.3(a).

"**Houlihan Advance Payment**" has the meaning set forth in Section 3.3(b).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Initial Commitment Parties**" means those Commitment Parties who executed the Original Agreement on December 12, 2018.

"**Initial Consenting Stakeholders**" means those Consenting Stakeholders who executed the RSA on December 12, 2018.

"**Intellectual Property**" means all U.S. or foreign intellectual or industrial property or proprietary rights, including any: (a) trademarks, service marks, trade dress, domain names, social media identifiers, corporate and trade names, logos and all other indicia of source or origin, together with all associated goodwill, (b) patents, inventions, invention disclosures, technology, know-how, processes and methods, (c) copyrights and copyrighted works, (including software, applications, source and object code, databases and compilations, online, advertising and promotional materials, mobile and social media content and documentation), (d) trade secrets and confidential or proprietary information or content, and (e) all registrations, applications, renewals, re-issues, continuations, continuations-in-part, divisions, extensions, re- examinations and foreign counterparts of any of the foregoing.

7

"**IRS**" means the United States Internal Revenue Service.

"**Joint Filing Party**" has the meaning set forth in Section 6.9(c).

"**Knowledge of the Company**" means the actual knowledge, after a reasonable inquiry of their direct reports, of the chief executive officer, chief financial officer and chief compliance officer.

"**Legal Proceedings**" means any legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Losses**" has the meaning set forth in Section 8.1.

"**Material Adverse Effect**" means any Event which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries (or Reorganized Parker and its Subsidiaries), taken as a whole, or (b) the ability of the Company and its Subsidiaries (or Reorganized Parker and its Subsidiaries), taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Definitive Documents, including the Rights Offering, in each case, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Company and its Subsidiaries operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of this Agreement or the other Definitive Documents or the transactions contemplated hereby or thereby (including any act or omission of the Company and its Subsidiaries expressly required or prohibited, as applicable, by this Agreement or consented to or required by the Requisite Commitment Parties in writing); (iv) the filing or pendency of the Chapter 11 Cases; (v) changes in the market price or trading volume of the claims or equity or debt securities of the Company and its Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (vi) the departure of officers or directors of any of the Company or its Subsidiaries (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (vii) declarations of national emergencies in

8

the United States or natural disasters in the United States; (viii) any matters expressly disclosed in the Disclosure Statement or the Company Disclosure Schedule as delivered on the date hereof; or (ix) the occurrence of a Commitment Party Default; provided, however, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such Event is disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other companies in the industries in which the Company and its Subsidiaries operate.

"**Material Contracts**" means all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which the Company or any of its Subsidiaries is a party.

"**Maximum Saba Expense Reimbursement**" has the meaning set forth in Section 3.3(f).

"**Milestones**" means those certain milestones set forth in Schedule 5 attached hereto.

"**Money Laundering Laws**" has the meaning set forth in Section 4.22.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Company or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**New Common Stock**" means the common stock of Reorganized Parker.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Original Agreement**" has the meaning set forth in the recitals hereto.

"**Party**" has the meaning set forth in the introductory paragraph hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Company or any ERISA Affiliate or to which the Company or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five years.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not due and payable, (ii) are being contested in good faith by appropriate proceedings or for which adequate reserves have been made with respect thereto or (iii) the nonpayment of which is permitted by the Bankruptcy Code; (b) landlord's, operator's, vendors', carriers', warehousemen's, mechanics', materialmen's,

9

repairmen's and other similar Liens for labor, materials or supplies or other like Liens arising by operation of law in the ordinary course of business provided with respect to any Property incurred in the ordinary course of business consistent with past practice and as otherwise not prohibited under this Agreement, for amounts that are not more than sixty (60) days delinquent and that do not materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of the Company and its Subsidiaries (taken as a whole), or, if for amounts that do materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of the Company and its Subsidiaries (taken as a whole), if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; provided, that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (d) easements, covenants, conditions, minor encroachments, restrictions on transfer and other similar matters affecting title to any Real Property (including any title retention agreement) and other title defects and encumbrances that do not or would not materially impair the ownership, use or occupancy of such Real Property or the operation of the business of the Company and its Subsidiaries; (e) Liens granted under any Contracts, to the extent the same are ordinary and customary in the business of the Company and its Subsidiaries and do not or would not materially impair the ownership, use or occupancy of any Real Property or the operation of the Company and its Subsidiaries' business and which are for claims not more than sixty (60) days delinquent or, if such claim does materially impair such ownership, use, occupancy or operation and are for obligations that are more than sixty (60) days delinquent, are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (f) from and after the occurrence of the Effective Date, Liens granted in connection with the DIP Facility and the Exit Facility; (g) mortgages on a lessor's interest in a lease or sublease; provided, that no foreclosure proceedings have been duly filed (unless, in such case, such mortgage has been subordinated to the applicable lease); (h) Liens that, pursuant to the Plan and the Confirmation Order, will be discharged and released on the Effective Date; and (i) any Liens set forth on Section 1.1(a) of the Company Disclosure Schedule.

"**Per Share Purchase Price**" means a price per share of New Common Stock to result in the Rights Offering realizing aggregate proceeds of $95,000,000, calculated as set forth in the Rights Offering Procedures.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Post-Closing Expenses**" has the meaning set forth in Section 3.3(c).

"**Pre-Closing Period**" has the meaning set forth in Section 6.2.

"**Property**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, the Existing Interests.

10

"**Put Election**" has the meaning set forth in Section 2.2.

"**Put Option**" has the meaning set forth in Section 2.2.

"**Put Option Cash Premium**" has the meaning set forth in Section 3.1.

"**Put Option Equity Premium**" has the meaning set forth in Section 3.2(b).

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any of the Debtors, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Reasonable Approvals**" has the meaning set forth in Section 4.3.

"**Related Party**" means, with respect to any Person, (i) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (ii) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"**Related Purchaser**" has the meaning set forth in Section 2.6(a).

"**Replacing Commitment Parties**" has the meaning set forth in Section 2.3(a).

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Required Rights**" has the meaning set forth in Section 2.1.

"**Requirement of Law**" means as to any Person, any Law applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Requisite Commitment Parties**" means the Required Consenting Stakeholders (as defined in the RSA).

"**Rights Offering**" has the meaning set forth in the recitals hereto.

"**Rights Offering Expiration Time**" means the time and the date on which the rights offering subscription form must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures, together with the applicable Per Share Purchase Price.

"**Rights Offering Participants**" means those Persons who duly subscribe for

11

Rights Offering Shares in accordance with the Rights Offering Procedures.

"**Rights Offering Shares**" means, collectively, the shares of New Common Stock issued in the Rights Offering.

"**Rights Offering Subscription Agent**" means a subscription agent appointed by the Company and satisfactory to the Requisite Commitment Parties.

"**RSA**" has the meaning set forth in the introductory paragraph hereto.

"**Saba**" means Saba Capital Management, L.P., and its affiliated funds that are managed or advised by Saba Capital Management, L.P.

"**Sanctions**" means any sanctions administered or enforced by the United States government (including, without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. Department of State), the United Nations Security Council, the European Union or Her Majesty's Treasury or other applicable jurisdictions.

"**Significant Subsidiaries**" has the meaning set forth in Section 4.1.

"**Subscription Escrow Account**" has the meaning set forth in Section 2.4(a).

"**Subscription Escrow Agreement**" has the meaning set forth in Section 2.4(b).

"**Subscription Escrow Funding Date**" has the meaning set forth in Section 2.4(b).

"**Subscription Rights**" means, collectively, (i) the rights of holders of Unsecured Notes to purchase up to approximately 63.1579% of the New Common Stock offered in the Rights Offering (on a pro rata basis based on such holder's percentage holdings of Unsecured Notes), (ii) the rights of holders of Existing Common Stock to purchase up to approximately 22.1053% of the New Common Stock offered in the Rights Offering (on a pro rata basis based on such holder's percentage holdings of Existing Common Stock), and (iii) the rights of holders of Existing Preferred Stock to purchase up to approximately 14.7368% of the New Common Stock offered in the Rights Offering (on a pro rata basis based on such holder's percentage holdings of Existing Preferred Stock).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body or (c) has the power to direct the business and policies.

"**Taxes**" means all taxes, assessments, duties, or levies or other similar mandatory charges paid to a Governmental Entity, including all federal, state, local, non-U.S. and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax,

12

penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"**Ultimate Purchaser**" has the meaning set forth in Section 2.6(b).

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**Unsubscribed Shares**" means the Rights Offering Shares that have not been duly purchased by the Rights Offering Participants in accordance with the Rights Offering Procedures and the Plan.

"**willful or intentional breach**" has the meaning set forth in Section 9.2(a).

Section 1.2    Construction.  In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    the descriptive headings of the Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(c)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (.pdf), facsimile transmission or comparable means of communication;

(d)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(e)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(f)    the term this "Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(g)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(h)    references to "day" or "days" are to calendar days;

(i)    references to "the date hereof" means the date of this Agreement;

(j)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect on the date of this Agreement; and

(k)    references to "dollars" or "$" are to United States of America dollars.

ARTICLE II

**BACKSTOP COMMITMENT**

Section 2.1    The Rights Offering; Subscription Rights.  On and subject to the terms and conditions hereof, including entry of the Disclosure Statement Order and the Approval Order by the Bankruptcy Court, (a) the Company, on behalf of Reorganized Parker, shall conduct the Rights Offering pursuant to and in accordance with this Agreement, the Rights Offering Procedures, and the Plan and (b) each Commitment Party shall exercise or cause to be exercised all Subscription Rights issued in respect of all 2020 Notes Claims, 2022 Notes Claims and Existing Interests held by such Commitment Party or its Affiliates as of the date of the Original Agreement or, with respect to Saba or its Affiliates only, all 2020 Notes Claims, 2022 Notes Claims and Existing Interests held as of the close of business on January 23, 2019 (assuming all unsettled trades outstanding as of such time with respect to the Unsecured Notes have settled, regardless of whether such trades have in fact settled) and set forth on Schedule 6 hereto, or with respect to any Commitment Party who signs a joinder agreement in the form set forth on Exhibit A, shall exercise or cause to be exercised all Subscription Rights held by such Commitment Party or its Affiliates as of the date of execution of such joinder agreement (the "**Required Rights**"). If requested by the Requisite Commitment Parties from time to time prior to the Rights Offering Expiration Time (and any extensions thereto), the Company shall use commercially reasonable efforts to notify, or cause the Rights Offering Subscription Agent to notify, within two (2) Business Days of receipt of such request by the Company, the Commitment Parties of the aggregate number of Subscription Rights known by the Company or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request. The Rights Offering Shares and the shares of New Common Stock in respect of the Put Option Equity Premium will be made in reliance on the exemption from registration pursuant to Section 1145 of the Bankruptcy Code. The Unsubscribed Shares will be issued pursuant to the exemption from registration under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Section 2.2    The Backstop Commitment.  On and subject to the terms and conditions hereof, including entry of the Approval Order, each Commitment Party hereby grants to the Company an option (collectively, the "**Put Option**") to require such Commitment Party to purchase Unsubscribed Shares on the Closing Date subject to the terms and conditions of this Agreement. Upon the exercise of the Put Option, each Commitment Party agrees, severally and not jointly, to purchase, and the Company agrees to sell to such Commitment Party, on the Closing Date, the number of Unsubscribed Shares equal to (a) such Commitment Party's Backstop Commitment Percentage multiplied by (b) the aggregate number of Unsubscribed Shares

14

(provided, that, for the avoidance of doubt, such applicable portion of Unsubscribed Shares shall be multiplied by the applicable Backstop Commitment Percentage for such Commitment Party set forth on Schedule 2, subject to any restrictions set forth thereon), rounded among the Commitment Parties solely to avoid fractional shares as the Commitment Parties may determine in their sole discretion (provided, that in no event shall such rounding reduce the aggregate commitment of the Commitment Parties). The obligations of the Commitment Parties to purchase Unsubscribed Shares as described in this Section 2.2 shall be referred to as the "**Backstop Commitment**". The Company may exercise the Put Option by delivery to each Commitment Party of a written put election notice (the "**Put Election**"); provided, however, that the Put Option shall automatically and irrevocably be deemed to have been exercised by the Company, without the need for delivery of a written notice or the taking of any further action by the Company or any other Person. The purchase price payable by each Commitment Party in respect of each Unsubscribed Share that such Commitment Party is obligated to purchase under its Backstop Commitment shall be the Per Share Purchase Price.

Section 2.3    Commitment Party Default.

(a)    Upon the occurrence of a Commitment Party Default, the Commitment Parties (other than any Defaulting Commitment Party) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Commitment Parties of such Commitment Party Default, which notice shall be given promptly following the occurrence of such Commitment Party Default and to all Commitment Parties substantially concurrently (such five (5) Business Day period, the "**Commitment Party Replacement Period**"), to make arrangements for one or more of the Commitment Parties (other than the Defaulting Commitment Party) to purchase all or any portion of the Available Shares (such purchase, a "**Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts based upon the applicable Backstop Commitment Percentage of any such Commitment Parties or as may otherwise be agreed upon by all of the Commitment Parties electing to purchase all or any portion of the Available Shares (such Commitment Parties, the "**Replacing Commitment Parties**"); provided, however, that, notwithstanding the foregoing, the Outside Date shall not be extended automatically as a result of the existence of a Commitment Party Replacement Period and the Commitment Party Replacement Period shall expire on or before the Outside Date.

(b)    In the event that any Commitment Parties do not elect to purchase all Available Shares available for purchase pursuant to Section 2.3(a), the Company may, in its sole discretion, elect to utilize the Cover Transaction Period to consummate a Cover Transaction. As used herein, "**Cover Transaction**" means a circumstance in which the Company, in its sole discretion, arranges for the sale of all or any portion of the Available Shares to any other Person, on terms and conditions substantially similar to the Backstop Commitment and the other terms and conditions applicable to the Commitment Parties in their obligation to purchase Unsubscribed Shares pursuant to this Agreement, during the Cover Transaction Period, and "**Cover Transaction Period**" means the ten (10) Business Day period following expiration of the Commitment Party Replacement Period; provided, however, that, notwithstanding the foregoing, the Outside Date shall not be extended automatically as a result of the existence of a Cover Transaction Period and the Cover Transaction Period shall expire on or before the Outside Date.  For the avoidance of

15

doubt, the Company's election to pursue a Cover Transaction, whether or not consummated, shall not relieve any Commitment Party of its obligation to fulfill its Backstop Commitment.

(c)     Any such Available Shares purchased by a Replacing Commitment Party (and any commitment and applicable aggregate Per Share Purchase Price associated therewith) shall be included, among other things, in the determination of (x) the Unsubscribed Shares of such Replacing Commitment Party for all purposes hereunder, and (y) the Backstop Commitment Percentage of such Replacing Commitment Party for purposes of Section 2.3(d), Section 2.4(b), and Section 3.1.

(d)     If a Commitment Party is a Defaulting Commitment Party, it shall not be entitled to, and shall be deemed to have irrevocably forfeited its rights to (i) purchase or otherwise receive any of the Unsubscribed Shares and (ii) receive, any of the Put Option Equity Premium hereunder, and the Replacing Commitment Parties shall instead be entitled to such Put Option Equity Premium ratably in proportion to their respective Commitment Party Replacement (so long as such Defaulting Commitment Party is not Saba).

(e)     If an Initial Commitment Party becomes a Defaulting Commitment Party after the date of this Agreement, it shall be obligated to repay its ratable portion of the Put Option Cash Premium to the Replacing Commitment Parties ratably in proportion to their respective Commitment Party Replacement.

(f)     No Commitment Party shall have any liability for the Backstop Commitment of any other Commitment Party or for the failure of any other Commitment Party to exercise its Subscription Rights. Nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Backstop Commitment Percentage of the Unsubscribed Shares.

(g)     For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 9.2 but subject to Section 10.10, no provision of this Agreement shall relieve any Defaulting Commitment Party from liability hereunder, or limit the availability of the remedies set forth in Section 10.9, in connection with any such Defaulting Commitment Party's Commitment Party Default.

Section 2.4     Subscription Escrow Account Funding.

(a)     Funding Notice.  No later than the tenth (10th) Business Day following the Rights Offering Expiration Time, the Company shall cause the Rights Offering Subscription Agent to deliver to each Commitment Party in accordance with Section 10.1(b) and Section 10.1(c) a written notice (the "**Funding Notice**") of (i) the number of Rights Offering Shares elected to be purchased by the Rights Offering Participants and the aggregate Per Share Purchase Price therefor; (ii) the aggregate number of Unsubscribed Shares, if any, and the aggregate Per Share Purchase Price therefor; (iii) the aggregate number of Unsubscribed Shares (based upon such Commitment Party's Backstop Commitment Percentage) to be issued and sold by Reorganized Parker to such Commitment Party and the aggregate Per Share Purchase Price therefor; and (iv) the escrow account to which such Commitment Party shall deliver and pay the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of the Unsubscribed Shares

16

(the "**Subscription Escrow Account**").    The Company shall direct the Rights Offering Subscription Agent to promptly provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Commitment Party may reasonably request.

(b)    Subscription Escrow Account Funding.    Notwithstanding any earlier obligation contained in the Rights Offering Procedures, on the second (2nd) Business Day before the Closing Date (such date, the "**Subscription Escrow Funding Date**"), each Commitment Party shall deliver and pay an amount equal to the sum of (i) the aggregate Per Share Purchase Price for such Commitment Party's Backstop Commitment Percentage of the Unsubscribed Shares, plus (ii) the aggregate Per Share Purchase Price for the Rights Offering Shares pursuant to such Commitment Party's exercise of its Subscription Rights, by wire transfer in immediately available funds in U.S. dollars into the Subscription Escrow Account in satisfaction of such Commitment Party's Backstop Commitment and its obligations to fully exercise its Subscription Rights.  The Subscription Escrow Account shall be established with an escrow agent satisfactory to the Requisite Commitment Parties and the Company pursuant to an escrow agreement in form and substance reasonably acceptable to the Requisite Commitment Parties and the Company (the "**Subscription Escrow Agreement**").  If (x) this Agreement is terminated for any reason or (y) Closing has not occurred within four (4) Business Days after the Subscription Escrow Funding Date, the funds held in the Subscription Escrow Account shall be released, and each Commitment Party shall receive from the Subscription Escrow Account the cash amount actually funded to the Subscription Escrow Account by such Commitment Party, without any interest, as soon as practicable thereafter.

Section 2.5    Closing.

(a)    Subject to Article VII unless otherwise mutually agreed in writing between the Company and the Requisite Commitment Parties, the closing of the Backstop Commitments (the "**Closing**") shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, within three (3) Business Days of the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**", which, provided that all conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement, shall be the Effective Date.

(b)    At the Closing, the funds held in the Subscription Escrow Account shall be released and utilized as set forth in, and in accordance with, the Plan and the Subscription Escrow Agreement.

(c)    At the Closing, issuance of the Unsubscribed Shares and Available Shares, if any, will be made by Reorganized Parker to each Commitment Party (or to its designee in accordance with Section 2.6(a)) against payment of the aggregate Per Share Purchase Price for the Unsubscribed Shares purchased by such Commitment Party, in satisfaction of such Commitment Party's Backstop Commitment, and against payment of the aggregate Per Share Purchase Price for the Available Shares purchased by such Commitment Party, if any.  Unless a Commitment Party

17

requests delivery of a physical stock certificate, Reorganized Parker shall use commercially reasonable efforts to cause the entry of any Unsubscribed Shares, Available Shares, Rights Offering Shares and shares of New Common Stock in respect of the Put Option Equity Premium to be delivered pursuant to this Section 2.5(c) into the account of a Commitment Party pursuant to Reorganized Parker's book entry procedures and delivery to such Commitment Party of an account statement reflecting the book entry of such Unsubscribed Shares, Available Shares, Rights Offering Shares and shares of New Common Stock in respect of the Put Option Equity Premium shall be deemed delivery of such Unsubscribed Shares, Available Shares, Rights Offering Shares and shares of New Common Stock in respect of the Put Option Equity Premium for purposes of this Agreement, it being understood that such book entry procedures may be those of a transfer agent acting on behalf of Reorganized Parker in such capacity, such procedures and transfer agent being required to be reasonably satisfactory to the Requisite Commitment Parties. Notwithstanding anything to the contrary in this Agreement, all Unsubscribed Shares, Available Shares, Rights Offering Shares and shares of New Common Stock in respect of the Put Option Equity Premium will be delivered at the Closing and will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by Reorganized Parker.

Section 2.6    Designation and Assignment Rights.

(a)    Each Commitment Party shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of (w) the Unsubscribed Shares that it is obligated to purchase hereunder, (x) the Available Shares, if any, (y) the Rights Offering Shares pursuant to its exercise of the Subscription Rights, or (z) the shares of New Common Stock to be issued in respect of the Put Option Equity Premium, in each case, be issued in the name of, and delivered to, one or more of its Affiliates or Affiliated Funds (other than any portfolio company of such Commitment Party or its Affiliates) (each, a "**Related Purchaser**") upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Commitment Party and each such Related Purchaser, (ii) specify the number of Unsubscribed Shares, Rights Offering Shares or shares of New Common Stock to be issued in respect of the Put Option Equity Premium to be delivered to or issued in the name of such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations and warranties set forth in Section 5.7 through Section 5.11 as applied to such Related Purchaser; provided, however, that no such designation pursuant to this Section 2.6(a) shall relieve such Commitment Party from its obligations under this Agreement.

(b)    Each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment only to (i) any investment fund the primary investment advisor to which is such Commitment Party, the same investment advisor or manager as such Commitment Party, or an Affiliate thereof (other than any portfolio company) (an "**Affiliated Fund**") or (ii) one or more special purpose vehicles that are wholly-owned by one or more of such Commitment Party and its Affiliated Funds, created for the purpose of holding such Backstop Commitment or holding debt or equity of the Company and its Subsidiaries, and with respect to which such Commitment Party either (A) has provided an adequate equity support letter or a guarantee of such special purpose vehicle's Backstop Commitment, in form and substance reasonably acceptable to the

18

Company or (B) otherwise remains obligated to fund the Backstop Commitment to be transferred until the consummation of the Plan; provided, however, that such special purpose vehicle shall not be related to or Affiliated with any portfolio company of such Commitment Party or any of its Affiliates or Affiliated Funds (other than solely by virtue of its affiliation with such Commitment Party) and the equity of such special purpose vehicle shall not be directly or indirectly transferable other than to such Persons described in clauses (i) or (ii) of this Section 2.6(b), and in such manner as such Commitment Party's Backstop Commitment is transferable pursuant to this Section 2.6(b) (each of the Persons referred to in clauses (i) and (ii), an "**Ultimate Purchaser**"), and that, in each case, (1) the Ultimate Purchaser provides a written agreement to the Company under which it (w) confirms the accuracy of the representations set forth in Article V as applied to such Ultimate Purchaser (x) agrees to purchase such portion of such Commitment Party's Backstop Commitment, (y) agrees to be fully bound by, and subject to, this Agreement as a Commitment Party hereto pursuant to a joinder agreement in the form set forth on Exhibit A attached hereto, and (z) agrees to be bound by the RSA pursuant to a transfer agreement in the form set forth on Exhibit B attached hereto, and (2) the transferring Commitment Party and Ultimate Purchaser shall have duly executed and delivered to the Company written notice of such Transfer; provided, further, that no sale or Transfer pursuant to this Section 2.6(b) shall relieve such Commitment Party from its obligations under this Agreement.  Other than as set forth in this Section 2.6(b), no Commitment Party shall be permitted to Transfer all or any portion of its Backstop Commitment without the prior written consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed (it being understood that it would be unreasonable for the Company to withhold its consent to any such Transfer if (i) the transferee is another Commitment Party or an Affiliate of another Commitment Party (other than any portfolio company), or (ii) the transferee has the financial wherewithal to fulfill its obligations with respect to the Backstop Commitment to be transferred, as determined in the Company's reasonable opinion after request by the Company to the transferee, and prompt delivery to the Company by the transferee, of proof of such financial wherewithal, and, in the case of clauses (i) and (ii), such transferee provides a written agreement to the Company under which it (w) confirms the accuracy of the representations set forth in Article V as applied to such transferee, (x) agrees to purchase such portion of such Commitment Party's Backstop Commitment, (y) agrees to be fully bound by, and subject to, this Agreement as a Commitment Party hereto pursuant to a joinder agreement in the form set forth on Exhibit A attached hereto, and (z) agrees to be bound by the RSA pursuant to a transfer agreement in the form set forth on Exhibit B attached hereto). Any Transfer of a Commitment Party's obligations under this Agreement made in violation of this paragraph shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors or any Commitment Party, and shall not create any obligation or liability of any Debtor or any other Commitment Party to the purported transferee.

(c)    Each Commitment Party, severally and not jointly, agrees that it will not Transfer, at any time prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, any of its rights and obligations under this Agreement to any Person other than in accordance with Section 2.3, Section 2.6(a), and Section 2.6(b) of this Agreement. After the Closing Date, nothing in this Agreement shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer any of its Unsubscribed Shares, Rights Offering Shares or any interest therein; provided, however, that any such Transfer shall be made pursuant to an effective registration statement under the Securities Act or an

19

exemption from the registration requirements thereunder and pursuant to applicable securities laws.

Section 2.7    No Financial Accommodation Agreement.  The Parties hereby acknowledge, covenant, and agree that: (i) this Agreement does not, and shall not, constitute a "financial accommodation agreement" that cannot be assumed under Section 365(c)(2) of the Bankruptcy Code and the Parties hereby agree that they shall not take a position to the contrary in the Bankruptcy Court or any other court of competent jurisdiction and (ii) the Commitment Parties, alone or in combination, will not initiate, or assert in, any litigation or other legal proceeding that this Section 2.7 is illegal, invalid or unenforceable, in whole or in part, or that this Agreement does or may constitute a "financial accommodation agreement" under Section 365(c)(2) of the Bankruptcy Code.

ARTICLE III

**PUT OPTION CASH PREMIUM; PUT OPTION EQUITY PREMIUM; EXPENSE REIMBURSEMENT**

Section 3.1    Put Option Cash Premium.  Subject to Section 3.2, as consideration for the Put Option, the Backstop Commitment and the other agreements of the Initial Commitment Parties in this Agreement, the Company has paid or caused to be paid on or prior to the execution of the Original Agreement, an aggregate premium equal to $7,600,000.00, which premium has been paid in cash to the Initial Commitment Parties or their designees based upon their Backstop Commitment Percentages set forth on Schedule 1 (the "**Put Option Cash Premium**").  The Put Option Cash Premium is and has been fully earned, nonrefundable and non-avoidable, and has been paid by the Company, free and clear of any withholding or deduction for any applicable Taxes or any other claim, setoff, or reserve. The Put Option Cash Premium has been paid irrespective of the amount of Unsubscribed Shares (if any) actually existing or purchased.  The provisions for the payment of the Put Option Cash Premium, Amendment Fee and Expense Reimbursement, and the indemnification provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.

Section 3.2    Return of Put Option Cash Premium; Put Option Equity Premium.

(a)    The applicable Commitment Parties (other than Saba) hereby acknowledge and agree that the Put Option Cash Premium shall be returned and repaid to the Company only (i) if this Agreement is properly terminated by the Commitment Parties solely pursuant to (x) Section 9.1(b)(iii) or (y) Section 9.1(d) if and only if, at such time, (1) the only condition to the obligations of the Commitment Parties in Section 7.1 remaining to be satisfied is that the Confirmation Order has been entered by the Bankruptcy Court but it has not become a Final Order as set forth in Section 7.1(d), (2) no Commitment Party, to the extent applicable, has waived the condition in Section 7.1(d), and (3) solely due to the failure to waive the condition in Section 7.1(d), the Outside Date has not occurred, or (ii) if this Agreement is properly terminated by the Company pursuant to Section 9.1(c)(ii), in each case in respect of the foregoing clauses (i) and (ii) in this Section 3.2(a), in cash within two (2) Business Days following such proper termination, and (iii) in connection with the Closing pursuant to the terms of Section 3.2(b).

20

(b)      In connection with, and conditional upon the occurrence of, the Closing, and subject to the entry of the Approval Order, the applicable Commitment Parties (other than Saba) shall return and repay the full Put Option Cash Premium to the Company in exchange for, as consideration for the Put Option, the Backstop Commitment and the other agreements of the Commitment Parties in this Agreement, their ratable share, based on the Commitment Parties' respective Backstop Commitment Percentages set forth on Schedule 1 on the date of such payment, of 3.3539% of the New Common Stock, without any need for further payment for such New Common Stock by the applicable Commitment Parties (such New Common Stock, the "**Put Option Equity Premium**"), to be issued by Reorganized Parker (subject to dilution by New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants) (as set forth on Schedule 4); provided, however, that the aggregate Put Option Equity Premium payable pursuant to this Section 3.2 shall be reduced ratably upon a Commitment Party Default based on the Backstop Commitment Percentage set forth on Schedule 1 of the Defaulting Commitment Party; provided, further, that, if a Commitment Party Replacement sufficient to cure all or a portion of the Commitment Party Default occurs within the Commitment Party Replacement Period, the Put Option Equity Premium shall only be ratably reduced to the extent of the uncured Commitment Party Default, and such amount that would have otherwise been reduced shall be paid to the Replacing Commitment Parties; provided, further, that, the obligation to repay the Put Option Cash Premium as set forth in this Section 3.2(b) shall be several and not joint and not joint and several.

(c)      The Parties agree to treat the Put Option Cash Premium and the Put Option Equity Premium as "option premium" for U.S. federal income Tax purposes and to not take any action inconsistent therewith unless otherwise required by a final determination to the contrary within the meaning of Section 1313(a) of the Code.

Section 3.3      Expense Reimbursement.  (a) Subject to entry of the Approval Order, until the earlier to occur of (i) the Closing and (ii) the termination of this Agreement in accordance with its terms, regardless of whether the Restructuring Transactions are consummated, the Company agrees to pay (without duplication, and to the extent not otherwise paid pursuant to Section 14.22 of the RSA) in cash all reasonable and documented fees, costs and expenses (whether incurred before or after execution of this Agreement) of (a) Akin Gump, as counsel to the Initial Commitment Parties and the Initial Consenting Stakeholders, (b) any local counsel to the Initial Commitment Parties and the Initial Consenting Stakeholders, (c) Houlihan Lokey Capital, Inc. ("**Houlihan**"), as financial advisor to the Initial Commitment Parties and the Initial Consenting Stakeholders, and (d) any consultants or other professionals retained by the Initial Commitment Parties represented by Akin Gump in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any success fees contemplated therein, and in each case, without further order of, or application to, the Bankruptcy Court by such consultants or professionals, as applicable (the "**Expense Reimbursement**").

(b)      Simultaneously with the execution of the Original Agreement, the Company has paid (i) all reasonable and documented fees and expenses of Akin Gump incurred or estimated to be incurred prior to and including the date thereof and (ii) an amount equal to $3,000,000.00 to

21

Akin Gump (the "**Akin Advance Payment**") and an amount equal to $450,000.00 to Houlihan (the "**Houlihan Advance Payment**") and such amounts shall be considered as advance payments.

(c)      If, as of the earlier of the Closing or the termination of this Agreement in accordance with Article IX, as applicable, and after the application of the Akin Advance Payment or the Houlihan Advance Payment, as applicable, to fees and expenses of Akin Gump and/or Houlihan included in the Expense Reimbursement, there remain outstanding amounts in the Akin Advance Payment or the Houlihan Advance Payment, as applicable (any such amount the "**Advance Payment Surplus**"), then Akin Gump and/or Houlihan, as applicable, shall repay their portion (if any) of the Advance Payment Surplus to the Company either within ten (10) days of Closing or within ten (10) days following the termination of this Agreement in accordance with Article IX, as applicable; provided, that, in the event Closing occurs, the "Expense Reimbursement" shall also include (for all purposes including determination of the existence of an Advance Payment Surplus) all fees and expenses reasonably expected to be incurred by Akin Gump and/or Houlihan, as applicable, related to the Restructuring Transactions following Closing (such portion of the Expense Reimbursement in such scenario, the "**Post-Closing Expenses**"), which shall be paid in connection with Closing as an advance payment.

(d)      Any Expense Reimbursement incurred by Akin Gump or Houlihan in excess of the Akin Advance Payment or Houlihan Advance Payment (including for Post-Closing Expenses), as applicable, and any other Expense Reimbursement due to any other person, shall be due and payable by the Company contemporaneously with Closing and subject to entry of the Approval Order and shall not be due and payable prior thereto.

(e)      In addition, regardless of whether the Restructuring Transactions are consummated but subject to entry of the Approval Order, the Company shall promptly upon request reimburse each Initial Commitment Party in cash for all reasonable and documented out-of-pocket costs or expenses (without limiting the Company's obligations pursuant to the other provisions of this Section 3.3, which out-of-pocket costs or expenses shall not include any professional or advisor fees of such Initial Commitment Party otherwise covered by this Section 3.3) incurred by such Initial Commitment Party in connection with this Agreement or the Restructuring Transactions in connection with Closing.

(f)      If the Restructuring Transactions are consummated and Saba has not (i) terminated this Agreement as to itself pursuant to Section 9.1(e), (ii) terminated the RSA as to itself pursuant to Section 12.04 of the RSA, or (iii) breached (other than an immaterial breach) or defaulted (other than an immaterial default) on its obligations under this Agreement or the RSA (where such breach or default is not timely cured within three (3) Business Days after the Company provides written notice to Saba of such breach or default or, in any event, prior to Closing), at Closing and subject to entry of the Approval Order the Company agrees to pay in cash all reasonable and documented fees, costs and expenses (whether incurred before or after execution of this Agreement) of any consultants, counsel, financial advisors or other professionals retained by Saba in connection with matters related to the Company; provided, however, that the Company shall have no obligation to, and shall not, pay any such fees, costs and expenses that exceed $650,000 in the aggregate (the "**Maximum Saba Expense Reimbursement**"); provided, further, that, notwithstanding anything herein to the contrary, the consultants, counsel, financial advisors and other professionals retained by Saba shall only be entitled to reasonable and documented fees,

22

costs and expenses in connection with this Section 3.3(f) and not any other provision of this Section 3.3 or Section 14.22 of the RSA.

Section 3.4    Amendment Fee.  In connection with the entry into this Agreement, and conditional upon the occurrence of the Closing and entry of the Approval Order, the Company shall pay or cause to be paid to Saba a fee of $350,000 in cash (the "**Amendment Fee**") at the Closing; provided, however, that the Company shall have no obligation to, and shall not, pay the Amendment Fee if Saba has (i) terminated the Agreement as to itself pursuant to Section 9.1(e), (ii) terminated the RSA as to itself pursuant to Section 12.04 of the RSA, or (iii) breached (other than an immaterial breach) or defaulted (other than an immaterial default) on its obligations under this Agreement or the RSA, and such breach or default is continuing and is not timely cured within three (3) Business Days after the Company provides written notice to Saba of such breach or default or, in any event, prior to Closing.  The Amendment Fee will, when paid at Closing, be fully earned, nonrefundable and non-avoidable. The Amendment Fee, when paid at Closing, will be paid irrespective of the amount of Unsubscribed Shares (if any) actually existing or purchased.

ARTICLE IV

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except (i) as set forth in the Company Disclosure Schedules; provided, that such disclosure shall be made to Davis Polk, on behalf of Saba, on a confidential and professionals' eyes only basis, or (ii) as disclosed in the Company SEC Documents filed with the SEC on or after December 31, 2017 and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior to the date hereof (excluding the exhibits, annexes and schedules thereto, any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature), the Company hereby represents and warrants to the Commitment Parties (unless otherwise set forth herein, as of the date of the Original Agreement, as of the date of this Agreement (with respect to Section 4.1, Section 4.2, Section 4.3, and Section 4.4 only), and as of the Closing Date) as set forth below.

Section 4.1    Existence; Compliance with Law.  Except as set forth on Section 4.1 of the Company Disclosure Schedule, the Company and each of its Subsidiaries set forth on Exhibit 21 to the Company's Form 10-K for the fiscal year ended December 31, 2017 (such Subsidiaries, the "**Significant Subsidiaries**") (a) is duly organized or formed, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its organization or formation, (b) has the requisite power and authority (corporate or otherwise) to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified and licensed and, as applicable, in good standing under the laws of each jurisdiction where the conduct of its business, as currently conducted, requires such qualification, except to the extent that the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (d) is in compliance with all Requirements of Law and its Governance Documents, except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

23

Section 4.2    Power; Enforceable Obligations. The Company and each of its Subsidiaries that has entered into this Agreement (subject to entry of the Approval Order) or any other Definitive Document, as applicable, has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and, subject to entry of the Confirmation Order, each other Definitive Document to which it is a party and to perform its obligations hereunder and thereunder.  The Company and each of its Subsidiaries that has entered into this Agreement (subject to entry of the Approval Order) or any other Definitive Document, as applicable, has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and, subject to entry of the Confirmation Order, performance by it of this Agreement and the other Definitive Documents to which it is a party.  This Agreement, subject to entry of the Approval Order, will constitute, and each other Definitive Document upon execution will constitute, valid and legally binding obligations of the Company and its Subsidiaries, as applicable, that are a party hereto or thereto, enforceable against the Company and each of its Subsidiaries, as applicable, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability. Upon entry of the Approval Order, the Approval Obligations will constitute valid and legally binding obligations of the Company, and to the extent applicable, the other Debtors, enforceable against the Company, and to the extent applicable, the other Debtors, in accordance with their respective terms.

Section 4.3    Consents and Approvals.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over the Company or any of its Subsidiaries or any of their Property (each an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, its Subsidiaries, of this Agreement and each other Definitive Document, the compliance by the Company and, to the extent relevant, its Subsidiaries, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the Disclosure Statement Order, (b) the entry of an order approving the Rights Offering Procedures, (c) the entry of the Approval Order, (d) the entry of the Confirmation Order, (e) the entry by the Bankruptcy Court, or any other court of competent jurisdiction, of Orders as may be necessary in the Chapter 11 Cases from time to time, (f) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the purchase of the Unsubscribed Shares by the Commitment Parties, the issuance of the Subscription Rights and the issuance of the Rights Offering Shares pursuant to the exercise, if any, of the Subscription Rights, and (g) (1) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable filing, notification, authorization, approval, consent, clearance, waiting period or waiver under any other Antitrust Laws in connection with the transactions contemplated by this Agreement, and (2) any other governmental notifications, filings, consents, waivers, waiting periods and approvals, if any, required for the consummation of the transactions contemplated by this Agreement, the RSA and the Plan, which, in each case in respect of clauses (1) and (2) of this Section 4.3(g), if not made or obtained, would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Company or the Commitment Parties' performance of their obligations under this Agreement or any other Definitive Document to which the Company or the Commitment Parties are a party, as reasonably determined and agreed by the Company and

24

the Requisite Commitment Parties upon advice of counsel as of the date of this Agreement, and which have been discussed between Akin Gump and counsel to the Company prior to the date of this Agreement ((1) and (2) collectively, the "**Reasonable Approvals**"), and (h) any Applicable Consents that, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.4     No Conflict. Assuming the consents described in clauses (a) through (g) of Section 4.3 are obtained, the execution and delivery of this Agreement and each other Definitive Document to which the Company or its Subsidiaries is a party, the compliance by the Company and its Subsidiaries, as applicable, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) violate the Governance Documents of Reorganized Parker or any of the organization documents of any of the Company's Subsidiaries (other than with respect to the foregoing, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Company's or any Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases), (b) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which the Company or any Subsidiary will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the Company or any of its Subsidiaries will be subject as of the Closing Date after giving effect to the Plan, or (c) result in any violation of any Law or Order applicable to the Company or any of its Subsidiaries or its or their Property, except in the case of clause (b) and (c), for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.5     No Material Litigation. (a) Except as set forth in Section 4.5 of the Company Disclosure Schedule, and (b) other than the Chapter 11 Cases (and any adversary proceedings or contested motions commenced in connection therewith) or any matters referenced in any proof of claim filed therein, no material litigation, investigation, claim or proceeding of or before any arbitrator or Governmental Entity is pending or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries, pursuant to which any Property of the Company or its Subsidiaries is subject to, in each case, that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Definitive Documents or the transactions contemplated hereby or thereby, or that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.6     Financial Statements; No Material Adverse Effect.

(a)     The Audited Financial Statements, reported on by and accompanied by an unqualified report from an independent certified public accounting firm of national reputation, present fairly in all material respects the consolidated financial condition of the Company and its Subsidiaries as of December 31, 2016 and December 31, 2017, as applicable, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended, except as otherwise expressly noted therein.

(b)      The unaudited consolidated condensed balance sheet of the Company and its Subsidiaries as of September 30, 2018, and the related unaudited consolidated condensed statements of operations and cash flows for the period ended on such date, present fairly in all material respects the consolidated financial condition of the Company and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the quarterly period then ended (subject to the absence of footnotes, normal year-end audit adjustments and other presentation items), except as otherwise expressly noted therein.

(c)      All such financial statements described in subsections (a) and (b) of this Section 4.6, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as disclosed therein).

(d)      During the period from December 31, 2017 to and including the Closing Date, there has been no Disposition by the Company or any of its Significant Subsidiaries of any material part of its business or Property, except as reflected in the consolidated or consolidated condensed (as applicable) financial statements described in subsections (a) and (b) of this Section 4.6.

(e)      Except as set forth on Section 4.6 of the Company Disclosure Schedule and except for the Chapter 11 Cases, there has been no Event, either individually or in the aggregate, between December 31, 2017 and the date of the Original Agreement, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 4.7      Material Contracts.   Except as set forth on Section 4.7 of the Company Disclosure Schedule and other than as a result of a rejection motion filed by any of the Debtors in the Chapter 11 Cases, all Material Contracts are valid, binding and enforceable by and against the Company or its relevant Subsidiary party thereto (except where the failure to be valid, binding or enforceable by and against the Company or its relevant Subsidiary may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability), and no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company or any of its Subsidiaries (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).  Except as set forth on Section 4.7 of the Company Disclosure Schedule and other than as a result of the filing of the Chapter 11 Cases, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company has provided or made available correct and complete copies of all Material Contracts (together with any amendments or modifications thereto) in effect as of the date of the Original Agreement to the Initial Commitment Parties or their Representatives prior to the date hereof.

Section 4.8      Authorized and Issued Capital Stock.

(a)      The shares of New Common Stock to be issued pursuant to the Plan, including the shares of New Common Stock to be issued in connection with the consummation of the Rights Offering and pursuant to the terms hereof, will, when issued and delivered on the

26

Closing Date, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, Liens (other than Transfer restrictions imposed hereunder or under the Governance Documents of Reorganized Parker, the Registration Rights Agreement or by applicable Law), preemptive rights, subscription and similar rights.

(b)      Except as contemplated by the Plan, as of the Closing Date, no shares of capital stock or other Equity Interests in Reorganized Parker will have been issued, reserved for issuance or outstanding.

(c)      Except as described in this Section 4.8 and except as set forth in the Registration Rights Agreement, or the Governance Documents of Reorganized Parker, as of the Closing Date, neither Reorganized Parker nor any of its Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates Reorganized Parker or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, Reorganized Parker or any of its Subsidiaries or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, Reorganized Parker or any of its Subsidiaries, (ii) obligates Reorganized Parker or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any shares of capital stock of Reorganized Parker or any of its Subsidiaries or (iv) relates to the voting of any shares of capital stock of Reorganized Parker.

Section 4.9      Ownership of Property; Liens.

(a)      The Company and each of its Subsidiaries have good and defensible title to, or a valid leasehold interest in, its respective material Real Property, except for such defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and except where the failure (or failures) to have such title would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and none of such Property is subject to any Liens (except for Permitted Liens); provided, however, the enforceability of such leasehold interests may be limited by bankruptcy, insolvency reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability, including the Chapter 11 Cases.

(b)      Section 4.9(b) of the Company Disclosure Schedule sets forth a complete and accurate list of all drilling units, workover units, and all other rigs, whether land, barge, fixed, floating or otherwise owned or operated by the Company and each of its Subsidiaries, showing the name, capacity year built, classification society (if applicable), classification, IMO number and flag state (for rigs that are vessels), registration number as presented on any certificate of title, if applicable, or contained in the official records of the National Vessel Documentation Center of the United States Coast Guard, or other applicable Governmental Entity, and the status of each such rig or unit, including whether it is cold stacked, warm stacked, or preparing to be cold stacked or warm stacked.  No such rig, drilling unit, or related equipment or asset, including any platform, is under an operating lease from a lessor that has incurred non-recourse indebtedness to finance the acquisition of such rig, drilling unit, or asset.  Excluding drilling units that have been cold-stacked,

27

all material Property owned, used, or held for use in connection with the conduct of business by the Company or any Subsidiary, is in good condition and repair, ordinary wear and tear excepted, sufficient in all material respects to conduct such business in the ordinary course, consistent with past practice.

Section 4.10    Intellectual Property. Except as set forth on Section 4.10 of the Company Disclosure Schedule, each of the Company and its Subsidiaries owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted. Except as set forth on Section 4.10 of the Company Disclosure Schedule, no material claim has been asserted and is pending by any Person challenging or questioning the Company's or any of its Subsidiaries' use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor to the Knowledge of the Company is there any valid basis for any such claim. To the Knowledge of the Company, neither the Company nor any of its Subsidiaries interferes with, infringes upon, misappropriates or otherwise violates any Intellectual Property rights of any Person in any material respect.

Section 4.11    Taxes. Except as set forth on Section 4.11 of the Company Disclosure Schedule and except as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole: (a) the Company and each of its Subsidiaries has filed or caused to be filed all federal, state and non-U.S. Tax returns that are required to be filed and has paid all Taxes shown to be due and payable on said returns and all other Taxes (other than any amount the validity of which is currently being contested in good faith by appropriate proceedings in each case, with respect to which reserves in conformity with GAAP have been provided on the books of the Company or its Subsidiaries, as the case may be), (b) no Tax Lien has been filed other than Permitted Liens, (c) to the Knowledge of the Company, there is no pending claim with respect to unpaid Taxes (except for any such Tax liabilities to Taxing authorities outside of the United States which are not, in the aggregate, material to the Company and its Subsidiaries taken as a whole), (d) neither the Company nor any Subsidiary thereof is party to any tax sharing agreement, other than an agreement the principal purpose of which is not the allocation of Taxes, and (e) the unpaid Taxes of the Company and any Subsidiary do not exceed the reserves for Tax liability set forth on the financial statements of the Company and its Subsidiaries as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company and its Subsidiaries. The representations set forth in this Section 4.11 and Section 4.13 (below) are the only representations and warranties in this Agreement with respect to Tax matters, and any claim for breach of a representation or warranty with respect to Tax matters shall be based on the representations and warranties made in this Section 4.11 and Section 4.13 (below) and shall not be based on the representations and warranties set forth in any other provision of this Agreement.

Section 4.12    Labor Matters. Except as set forth on Section 4.12(i) of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to or subject to any collective bargaining agreement, works council agreement, labor union contract, trade union agreement or other written agreement or understandings with any union, works council, trade union or other labor organization.  Except as set forth on Section 4.12(ii) of the Company Disclosure Schedule and except as would not reasonably be expected to have a material impact on the ability of the Company and its Subsidiaries to carry on its business in the ordinary

28

course: (a) there are no strikes or other labor disputes pending or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries, (b) the hours worked and payments made to employees of the Company or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters, (c) all payments due from the Company or any of its Subsidiaries or for which any claim may be made against the Company or any of its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Company and its Subsidiaries to the extent required by GAAP, and (d) the consummation of the transactions contemplated by the Definitive Documents will not give rise to a right of termination or right of renegotiation on the part of any union, works council, trade union or other labor organization under any material collective bargaining agreement, works council agreement, labor union contract, trade union agreement or other written agreement or understanding with any union, works council, trade union or other labor organization to which the Company or any of its Subsidiaries is a party or by which any of them is bound.

Section 4.13    ERISA Compliance.

(a)    Except as set forth on Section 4.13 of the Company Disclosure Schedule and except for the filing and pendency of the Chapter 11 Cases, each Employee Benefit Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws, except where such non-compliance has not resulted and could not reasonably be expected to result in material adverse liability to the Company or any ERISA Affiliate. The base prototype plan document which each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code uses an opinion letter from the IRS, or an application for such a letter is currently being processed by the IRS with respect thereto and, to the Knowledge of the Company, nothing has occurred which would prevent, or cause the loss of, such qualification. Except to the extent the failure to do so could not reasonably be expected to result in material adverse liability to the Company or any ERISA Affiliate, the Company and each ERISA Affiliate have made all required contributions to each Employee Benefit Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Employee Benefit Plan.

(b)    There are no pending or, to the Knowledge of the Company, threatened claims, actions or lawsuits, or action by any Governmental Entity, with respect to any Employee Benefit Plan that could reasonably be expected to result in material adverse liability to the Company or any ERISA Affiliate. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Employee Benefit Plan that has resulted or could reasonably be expected to result in material adverse liability to the Company or any ERISA Affiliate.

(c)    Except to the extent such event could not reasonably be expected to result in material adverse liability to the Company or any ERISA Affiliate: (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Company nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Company nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has

29

occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Company nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(d)     Except as set forth on <u>Section 4.13</u> of the Company Disclosure Schedule, with respect to each scheme or arrangement mandated by a government other than the United States (a "**Foreign Government Scheme or Arrangement**") and with respect to each employee benefit plan maintained or contributed to by the Company or any of its Subsidiaries that is not subject to United States law (a "**Foreign Benefit Plan**"), each Foreign Benefit Plan is in compliance in all material respects with the provisions of the applicable law or terms of the applicable Foreign Government Scheme or Arrangement and no Event has occurred or is reasonably expected to occur with respect to such Foreign Government Scheme or Arrangement that would reasonably be expected to result in material adverse liability to the Company or any ERISA Affiliate.

Section 4.14     <u>Investment Company Act; Other Regulations</u>. Neither the Company nor any of its Subsidiaries is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

Section 4.15     <u>Subsidiaries</u>. The Subsidiaries listed on <u>Section 4.15</u> of the Company Disclosure Schedule constitute all of the Significant Subsidiaries of the Company at the Closing Date. <u>Section 4.15</u> of the Company Disclosure Schedule sets forth as of the Closing Date the name and jurisdiction of incorporation or formation of each such Subsidiary and, as to each, the percentage of each class of Equity Interests owned by the Company or each Subsidiary of the Company, as applicable. All of the outstanding Equity Interests in the Significant Subsidiaries of the Company have been validly issued, and (to the extent applicable) fully paid and non-assessable.

Section 4.16     <u>Environmental Matters</u>. Other than as set forth on <u>Section 4.16</u> of the Company Disclosure Schedule and exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)     The Company and its Subsidiaries: (i) are, and since January 1, 2014 have been, in compliance with all applicable Environmental Laws, (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any property owned, leased or otherwise operated by any of them, (iii) are, and since January 1, 2014 have been, in compliance with all of their Environmental Permits, and (iv) reasonably believe that (x) each of their Environmental Permits will be timely renewed and complied with, without material expense, (y) any additional Environmental Permits that may be required of any of them will be timely obtained and complied with, without material expense, and (z) compliance with any Environmental Law that is or is expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)     Hazardous Materials are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by the Company or any of its Subsidiaries, or at any other location (including, without limitation, any location to which Hazardous Materials have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably

30

be expected to (i) give rise to liability of the Company or any of its Subsidiaries under any applicable Environmental Law or otherwise result in costs to the Company or any of its Subsidiaries, or (ii) interfere with the Company's or any of its Subsidiaries' continued operations, or (iii) impair the fair saleable value of any real property owned or leased by the Company or any of its Subsidiaries.

(c)     There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which the Company or any of its Subsidiaries is, or to the Knowledge of the Company or any of its Subsidiaries will be, named as a party that is pending or, to the Knowledge of the Company or any of its Subsidiaries, threatened in writing.

(d)     Neither the Company nor any of its Subsidiaries has received any written request for information, or been notified that it is a potentially responsible party under or relating to the CERCLA or any similar Environmental Law, or with respect to any Hazardous Material.

(e)     Neither the Company nor any of its Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)     Neither the Company nor any of its Subsidiaries has assumed or retained, by contract or, to the Knowledge of Seller, operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Hazardous Material other than indemnity obligations in the ordinary course of business.

This Section 4.16 contains the sole representations and warranties of the Company in this Agreement with respect to matters arising under Environmental Laws or relating to Hazardous Materials.

Section 4.17     Licenses and Permits.  The Company and its Subsidiaries possess all material licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the business.  Neither the Company nor any of its Subsidiaries (a) has received notice of any revocation or modification of any such material license, certificate, permit or authorization or (b) has any reason to believe that any such material license, certificate, permit or authorization will not be renewed in the ordinary course. Except as set forth on Section 4.17 of the Company Disclosure Schedule, no drilling rig, drilling unit, or other material asset is, or will within six (6) months of the Original Agreement, be or become subject to material customs duties or charges, whether as a result of remaining in, or departing from, the jurisdiction in which such asset is located as of the date of the Original Agreement, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided, that, for the purposes of determining whether any conditions to Closing have been satisfied pursuant to Section 7.1(n), the representations and warranties contained in this Section 4.17 shall not be deemed to be incorrect or breached if the Company takes any action in respect of the activities described in this Section 4.17 and the consent of the Requisite Commitment Parties has been obtained in writing prior to the Company taking such

31

action.

Section 4.18 <u>Company SEC Documents and Disclosure Statement</u>.   Since January 1, 2017, the Company has filed all Company SEC Documents required to be filed by the Company with the SEC.  No Company SEC Document that has been filed prior to the date of the Original Agreement, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading. The Disclosure Statement as approved by the Bankruptcy Court will contain "adequate information," as such term in defined in section 1125 of the Bankruptcy Code, and will otherwise comply in all material respects with section 1125 of the Bankruptcy Code.

Section 4.19 <u>Insurance</u>. The properties of the Company and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Company, and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) such insurance policies are in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Company or the applicable Subsidiary operates, except to the extent that reasonable self-insurance meeting the same standards is maintained with respect to such risks, (b) all premiums due and payable in respect of material insurance policies maintained by the Company and its Subsidiaries have been paid, and (c) as of the date of the Original Agreement, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has received notice from any insurer or agent of such insurer with respect to any insurance policies of the Company and its Subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 4.20 <u>OFAC/Sanctions</u>.  Neither the Company nor any of its Subsidiaries, nor, to the Knowledge of the Company, any of its or their respective directors, officers, employees, agents, controlled Affiliates or other Persons acting on its behalf with express authority to so act, is an individual or entity that is, or is owned or controlled by, persons that are currently the subject of any Sanctions, or is located, organized or residing in any Designated Jurisdiction. Except as described on <u>Section 4.20</u> of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries, nor, to the Knowledge of the Company, any of its or their respective current or former directors, officers, employees, agents, controlled Affiliates or other Persons acting on its behalf with express authority to so act, has engaged at any time within the previous five years, or is engaged, in any transaction(s) or activities which would result in a violation of Sanctions, which, individually or in the aggregate, would have a material impact on the Company and its Subsidiaries, taken as a whole.  The Company will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) for the purpose of financing the activities of any Person that is the subject or target of Sanctions or located, organized or residing in any Designated Jurisdiction or (ii) in any other manner that would result in a violation of Sanctions by any Person (including the Commitment Parties).

32

Section 4.21    No Unlawful Payments. Except as set forth on Section 4.21 of the Company Disclosure Schedule, since January 1, 2016, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their Related Parties has in any material respect: (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity, (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds, (c) violated or is in violation of any provision of the United States Foreign Corrupt Practices Act of 1977 or the UK Bribery Act 2010 or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 4.22    Compliance with Money Laundering Laws.  The operations of the Company and its Subsidiaries are and have been at all times conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970 and other applicable anti-money laundering laws (collectively, the "**Money Laundering Laws**") and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

Section 4.23    Arm's Length.  The Company acknowledges and agrees that (a) each of the Commitment Parties is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of its Subsidiaries, and (b) no Commitment Party is advising the Company or any of its Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.24    No Broker's Fees.  Except as set forth on Section 4.24 of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Shares.

Section 4.25    No Undisclosed Relationships.  Other than Contracts or other direct or indirect relationships between or among the Company and its Subsidiaries, there are no material Contracts or other material direct or indirect relationships, existing as of the date of the Original Agreement, between or among the Company or any of its Subsidiaries, on the one hand, and any directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described in the Company SEC Documents, except for the transactions contemplated by this Agreement and the other Definitive Documents.

Section 4.26    Internal Control Over Financial Reporting.  The Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies in all material respects with the requirements of the Exchange Act and has been designed to provide reasonable

33

assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. To the Knowledge of the Company, there are no material weaknesses in the Company's internal control over financial reporting as of the date of the Original Agreement.

Section 4.27   Disclosure Controls and Procedures. Except as set forth on Section 4.27 of the Company Disclosure Schedule, the Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

Section 4.28   CFIUS. Neither the Company nor any of its Subsidiaries is a "pilot program U.S. business" as defined under 31 C.F.R. 800.213.

ARTICLE V

**REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES**

Each Commitment Party represents and warrants as to itself only (unless otherwise set forth herein, (w) as of the date of the Original Agreement (for all Commitment Parties other than Saba), (x) as of the date of this Agreement (for Saba, with respect to all of Article V), (y) as of the date of this Agreement (for the Commitment Parties other than Saba, with respect to Section 5.1, Section 5.2, Section 5.3, Section 5.4, and Section 5.5 only), and (z) as of the Closing Date) as set forth below.

Section 5.1   Incorporation. Such Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 5.2   Corporate Power and Authority. Such Commitment Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Definitive Document to which such Commitment Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Definitive Documents.

Section 5.3   Execution and Delivery; Enforceability. This Agreement and each other Definitive Document to which such Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Commitment Party and (b) assuming due and valid execution and delivery hereof and thereof by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Commitment Party, enforceable against such Commitment Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency reorganization

34

or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4     No Conflict.  Assuming that the consents referred to in clauses (a) and (b) of Section 5.5 are obtained, the execution and delivery by such Commitment Party of this Agreement and each other Definitive Document to which such Commitment Party is a party, the compliance by such Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Commitment Party, (b) conflict with, or result in a breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Commitment Party is a party or by which such Commitment Party is bound or to which any of the properties or assets of such Commitment Party are subject, and (c) result in any material violation of any Requirement of Law or Order applicable to such Commitment Party or any of its properties, except, in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement.

Section 5.5     Consents and Approvals.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Commitment Party or any of its Affiliates or properties is required for the execution and delivery by such Commitment Party of this Agreement and each other Definitive Document to which such Commitment Party is a party, the compliance by such Commitment Party with the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Commitment Party of its Backstop Commitment Percentage of the Unsubscribed Shares and its portion of the New Common Stock) contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Company or the Commitment Parties' performance of their obligations under this Agreement and each other Definitive Document to which the Company or the Commitment Parties are a party, (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, and (c) any other Reasonable Approvals.

Section 5.6     Note Claims and Equity Interests.

(a)     As of the date hereof, such Commitment Party and its Affiliates were, collectively, the beneficial owner of, or the investment advisor or manager for the beneficial owner of, the aggregate principal amount of Unsecured Notes and the aggregate amount of Equity Interests as previously disclosed to the Company or, with respect to Saba, set forth on Schedule 6.

(b)     As of the date hereof, such Commitment Party or its applicable Affiliates have the full power to vote, dispose of and compromise at least the aggregate principal amount of

35

Unsecured Notes and the number of shares of Preferred Stock and Common Stock as previously disclosed to the Company or, with respect to Saba, set forth on Schedule 6.

(c)      Other than the RSA or such Transfers permitted by the terms of the RSA or the BCA, such Commitment Party has not entered into any Contract to Transfer, in whole or in part, any portion of its right, title or interest in such Unsecured Notes, Preferred Stock, or Common Stock where such Transfer would prohibit such Commitment Party from complying with the terms of this Agreement or the RSA.

Section 5.7      No Registration.  Such Commitment Party understands that (a) the Unsubscribed Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the foregoing shares cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.8      Purchasing Intent.  Such Commitment Party is acquiring the Unsubscribed Shares for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and such Commitment Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities laws.

Section 5.9      Sophistication; Investigation.  Such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Unsubscribed Shares.  Such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.  Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time).  Except for the representations and warranties expressly set forth in this Agreement or any other Definitive Documents, such Commitment Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of the Company or any of its Subsidiaries.

Section 5.10      No Broker's Fees.  Such Commitment Party is not a party to any Contract with any Person (other than this Agreement, any Contract giving rise to the Expense Reimbursement hereunder, and any engagement letter or other agreement that has been provided to counsel to the Commitment Parties) that would give rise to a valid claim against the Company or any of its Subsidiaries, for a brokerage commission, finder's fee or like payment in connection with the Rights Offering, the sale of the Unsubscribed Shares or the payment of the Put Option Equity Premium.

Section 5.11      Sufficient Funds. Such Commitment Party has sufficient assets and the financial capacity to perform all of its obligations under this Agreement, including the ability

36

to fully exercise all Subscription Rights that it is required to exercise under this Agreement pursuant to the Rights Offering and fund such Commitment Party's Backstop Commitment.

ARTICLE VI

**ADDITIONAL COVENANTS**

Section 6.1    Confirmation Order; Approval Order; Plan and Disclosure Statement.  The Debtors shall use their commercially reasonable efforts to (a) obtain entry of the Confirmation Order and Approval Order and (b) cause the Confirmation Order and Approval Order to become Final Orders (and request that such Orders be effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable), in each case, consistent with the Bankruptcy Code, the Bankruptcy Rules, and the RSA.  The Debtors shall provide to each of the Commitment Parties and its counsel copies of the proposed pleadings seeking entry of the Confirmation Order, the Approval Order, the proposed Plan and the Disclosure Statement and any proposed amendment, modification, supplement or change to the Plan or the Disclosure Statement and a reasonable opportunity to review and comment on such pleadings prior to such pleadings being filed with the Bankruptcy Court and documents and each such pleading, amendment, modification, supplement or change to the Plan or the Disclosure Statement must be in form and substance reasonably acceptable to the Requisite Commitment Parties and the Debtors.  The Debtors shall provide to each of the Commitment Parties and its counsel a copy of the proposed Confirmation Order and Approval Order (together with copies of any briefs, pleadings and motions related thereto) and a reasonable opportunity to review and comment on such Order, briefs, pleadings and motions prior to such Order, briefs, pleadings and motions being filed with the Bankruptcy Court, and such Order, briefs, pleadings and motions must be in form and substance reasonably acceptable to the Requisite Commitment Parties and the Debtors.  The Confirmation Order and Approval Order entered by the Bankruptcy Court shall each be in form and substance reasonably acceptable to the Requisite Commitment Parties and the Debtors.  Any amendments, modifications, changes or supplements to the Confirmation Order and the Approval Order, and any of the pleadings seeking entry of such Orders, shall be in form and substance reasonably acceptable to the Requisite Commitment Parties and the Debtors.

Section 6.2    Conduct of Business.

(a)    Except as set forth in this Agreement, the RSA, the Plan or with the prior written consent of Requisite Commitment Parties, which consent shall not be unreasonably withheld, conditioned or delayed, during the period from the date of the Original Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), the Company shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course in a manner consistent with past practices and use its commercially reasonable efforts to (i) preserve intact its business, (ii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company or its Subsidiaries in connection with their business, (iii) maintain books, accounts and records, (iv) comply with applicable Law in all material respects and (v) file Company SEC Documents within the time periods required under the Exchange Act.

37

(b)      Except as set forth in this Agreement, the RSA, the Plan or with the prior written consent of the Requisite Commitment Parties, during the Pre-Closing Period, the Company shall not, and shall not permit any of its Subsidiaries to, enter into any transaction that is material to their business other than (A) transactions in the ordinary course of business and consistent with past practices, (B) other transactions after prior notice to the Initial Commitment Parties to implement tax planning which transactions are not reasonably expected to materially adversely affect any Commitment Party, (C) transactions expressly contemplated by the RSA or the other Definitive Documents, and (D) such other transactions set forth in Section 6.2 of the Company Disclosure Schedules.  For the avoidance of doubt, (1) the Company's and its Subsidiaries' entry into, or any amendment, assumption, modification, termination, waiver, supplement, replacement, restatement, reinstatement, or other change to, any Material Contract (x) with a value less than $10,000,000 or (y) that does not result in an increase (on a present value basis, applying a reasonable discount rate) of the Company's liabilities with respect to such Material Contract (other than any Material Contracts that are otherwise addressed by clause (ii) below) may be accomplished without the consent of the Requisite Commitment Parties, and (2) the following shall be deemed to occur outside of the ordinary course of business of the Company and shall require the prior written consent of the Requisite Commitment Parties unless the same would otherwise be expressly provided for under the RSA, the Plan or this Agreement (including the preceding clause (B), (C) or (D)): (i) transferring any material asset or material right of the Company Parties or any material asset or material right used in the business of the Company Parties to any Person or entity outside the ordinary course of business; (ii) entry into, or any amendment, assumption, modification, termination, waiver, supplement, replacement, restatement, reinstatement or other change to, any Material Contract that has a value equal to or greater than $10,000,000 (other than any Material Contracts that are otherwise addressed by clause (v) below); (iii) entry into, or any amendment, modification, termination (other than for cause), waiver, supplement or other change to, any employment agreement to which the Company or any of its Subsidiaries is a party or any assumption of any such employment agreement in connection with the Chapter 11 Cases, other than with respect to employment agreements entered into in the ordinary course of business consistent with past practice that do not contain a change of control or similar provision, or as may be required by law, (iv) the adoption of any management incentive or equity plan by the Company or any of its Subsidiaries, other than the Management Incentive Plan, (v) cold stacking, scrapping, abandonment, sale, lease, license, or other transfer or disposition, or acquisition, directly or indirectly (including through a commitment to an operating and maintenance agreement), of any rig, drilling unit, workover unit, platform, or other material equipment, fixture, or other asset, in each case, with a value in excess of $5,000,000, (vi) the termination, suspension, abrogation, or modification in any material respect of any material Environmental Permit or other material permit used or held for use by the Company or any of its Subsidiaries in connection with the conduct of business in the ordinary course, or (vii) capital expenditures made by the Company and its Subsidiaries on a per-project basis in excess of $10,000,000.  Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or direct the operations of the Company and its Subsidiaries prior to the Closing Date.  Prior to the Closing Date, the Company and its Subsidiaries shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Company and its Subsidiaries.

(c)      In the event the Company wishes to enter into a transaction or take an action that would be otherwise prohibited under this Section 6.2, then the Company shall send a written request to the Initial Commitment Parties (in accordance with Section 10.1(b) and Section 10.1(c)) for permission to enter into such transaction or take such action. If the Requisite Commitment Parties fail to respond to such request for a period of three (3) Business Days, then the Company may enter into such transaction or take such action without the prior written consent of the Requisite Commitment Parties.  For the avoidance of doubt, in no instance will the interim operating covenants set forth in this Section 6.2 restrict the Company's ability to take any actions that are necessary (in the Company's reasonable discretion) to address any emergency that threatens health, safety or the environment.

Section 6.3      Access to Information.  Subject to applicable Law, upon reasonable notice during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) afford the Initial Commitment Parties and their Representatives, upon request, reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's and its Subsidiaries' business or operations, to the Company's and its Subsidiaries' employees, properties, books, Contracts and records and, during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to such parties all reasonable information concerning the Company's and its Subsidiaries' business, properties and personnel as may reasonably be requested by any such party; provided, however, that the foregoing shall not require the Company (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company or any of its Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (b) to disclose any legally privileged information of the Company or any of its Subsidiaries, (c) to permit or conduct any invasive or intrusive investigations or other testing, analysis or sampling or (d) to violate any applicable Laws or Orders. All requests for information and access made in accordance with this Section 6.3 shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers.

Section 6.4      Commercially Reasonable Efforts.

(a)      Without in any way limiting any other respective obligation of the Company or any Commitment Party in this Agreement or the RSA, each Party shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement, the RSA and the Plan, including using commercially reasonable efforts in:

(i)      identifying any Reasonable Approvals as promptly as practicable and timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)      defending any Legal Proceedings in any way challenging, as

39

applicable, (A) this Agreement, the Plan or any other Definitive Document, (B) the Disclosure Statement Order, the Approval Order, and the Confirmation Order or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)     to the extent such Party is contemplated to execute and deliver such documents, working together to execute and deliver the Governance Documents, the Definitive Documents and all other documents relating thereto (for timely inclusion in the Plan and filing with the Bankruptcy Court) and any other agreement required to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement, the RSA or the Plan and the approval rights therein; provided, however, that, nothing in this Agreement shall modify the approval rights over the Definitive Documents set forth in the RSA (including Section 3.02 thereof), and that, except with respect to Section 10.7 of this Agreement, in the event of any inconsistency between this Agreement and the RSA the approval rights set forth in the RSA shall control.

(b)     Subject to applicable Laws relating to the exchange of information, and in accordance with the RSA, the Commitment Parties and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Commitment Parties or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; provided, however, that the Commitment Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, the Parties shall act reasonably and as promptly as practicable.

(c)     Without limitation to Section 6.1, the Company and its Subsidiaries shall (i) provide counsel for the Commitment Parties (including counsel for Saba) a reasonable opportunity to review (which shall be no less than two (2) Business Days) draft copies of all proposed orders, and (ii) to the extent reasonably practicable, provide counsel for the Commitment Parties (including counsel for Saba) a reasonable opportunity to review draft copies of any document that the Company or any of its Subsidiaries intends to file with the Bankruptcy Court; provided, however, that each such pleading or document shall be in form and substance reasonably acceptable to the Company and the Required Commitment Parties;

(d)     Nothing contained in this Section 6.4 shall limit the ability of any Commitment Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the RSA, this Agreement or the Plan.

Section 6.5     Registration Rights Agreement; Governance Documents.

(a)     From and after the Closing Date, the rights of each Initial Consenting Stakeholder to registration rights shall be determined pursuant to a Registration Rights Agreement. A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of

40

the Plan Supplement or an amendment thereto.

(b)      The Plan will provide that on the Effective Date, the Governance Documents shall be duly approved, adopted, and effective.  Forms of the Governance Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

Section 6.6      Commitments of the Company.

(a)      Affirmative Covenants.  Except as set forth in Section 6.7, from the date of the Original Agreement until the Closing Date, the Company agrees to (and to cause the other Company Parties to):

(i)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with the RSA, including the applicable Milestones set forth on Schedule 5 attached hereto;

(ii)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in the RSA, support and take all steps reasonably necessary and desirable to address and resolve any such impediment;

(iii)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and to the extent the Company Parties receive any Joinders or Transfer Agreements, notify the Commitment Parties and the Consenting Stakeholders of such Joinders and Transfer Agreements;

(iv)      actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(v)      consult and negotiate in good faith with the Initial Commitment Parties and the Consenting Stakeholders and their advisors regarding the execution of the Restructuring Transactions;

(vi)      upon reasonable request of the Initial Commitment Parties or the Initial Consenting Stakeholders, inform the advisors to the Initial Commitment Parties or the Initial Consenting Stakeholders as to:  (i) the material business and financial (including liquidity) performance of the Consolidated Group; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Commitment Party and Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

41

(vii)     inform counsel to the Initial Commitment Parties (and, in the event that counsel to the Initial Commitment Parties are so informed, counsel to Saba) and the Initial Consenting Stakeholders as soon as reasonably practicable after becoming aware of: (i) any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any material involuntary Insolvency Proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (iii) a breach of this Agreement (including a breach by any Company Party); and (iv) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(viii)    use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(ix)     on or after the date of the Original Agreement, not engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the Restructuring Transactions;

(x)     use commercially reasonable efforts to (i) provide counsel for the Initial Commitment Parties and the Initial Consenting Stakeholders a reasonable opportunity (which shall be no less than two (2) Business Days) to review draft copies of all First Day Pleadings and second day motions and proposed orders and, (ii) to the extent reasonably practicable, provide counsel for the Initial Commitment Parties and the Initial Consenting Stakeholders a reasonable opportunity to review and provide comments on draft copies of all other substantive documents that the Company Parties intend to file with the Bankruptcy Court; and

(xi)     take any and all actions necessary and appropriate to ensure that the provisions of the NOL Rights Plan are not triggered on account of the Restructuring Transactions or the entry into the RSA or this Agreement by any of the Consenting Stakeholders or Commitment Parties and that the NOL Rights Plan is terminated on the Effective Date.

(b)     Negative Commitments.  Except as set forth in Section 6.7, from the date of the Original Agreement until the Closing Date, the Company shall not (and shall cause the other Company Parties not to) directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement and the Definitive Documents;

42

(iii)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement and the Definitive Documents; or

(iv)     file any motion, pleading, or other Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement and the Definitive Documents.

Section 6.7     Additional Provisions Regarding Company's Commitments.

(a)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; provided, however, that to the extent that any such action or inaction is inconsistent with this Agreement or would be deemed to constitute a breach hereunder, including a determination to pursue an Alternative Restructuring Proposal, the Company Parties shall provide the Initial Consenting Stakeholders with written notice (and, in the event that the Initial Commitment Parties are provided with such written notice, counsel to Saba) two (2) Business Days prior to when it or they intend to take such action or inaction.

(b)     Notwithstanding anything to the contrary in this Agreement, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (i) consider, respond to, and facilitate Alternative Restructuring Proposals; (ii) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (iii) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (v) enter into or continue discussions or negotiations with holders of Claims against or Existing Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest (including, if applicable, in the Chapter 11 Cases (including any official committee and the United States Trustee)), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Restructuring Proposal, the Company Parties shall provide to Akin Gump updates on the status of any discussions regarding an Alternative Restructuring Proposal and a copy of any written offer or proposal for such Alternative Restructuring Proposal within three (3) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal.

(c)     Nothing in this Agreement shall: (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (ii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

43

Section 6.8 DTC Eligibility. The Company shall use commercially reasonable efforts to promptly make, when applicable from time to time after the Closing, all New Common Stock to be issued pursuant to the Rights Offering and the Plan eligible for deposit with The Depository Trust Company or able to be transferred through a transfer agent.

Section 6.9 Antitrust Approval.

(a) Each Party agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Agreement, the Plan, and the other Definitive Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts thereof) in connection with any Reasonable Approvals as soon as reasonably practicable (and with respect to any filings required pursuant to the HSR Act, no later than fifteen (15) Business Days following the date hereof) and (ii) promptly furnishing documents or information reasonably requested by any Antitrust Authority; provided, however, that nothing in this Section 6.9 shall require any Commitment Party or any of their Affiliates to engage in any sale, divestiture or disposition of any of its assets, properties or businesses or make any changes to its operations. Each Commitment Party agrees to monitor its expected holdings in Reorganized Parker pursuant to the transactions contemplated by this Agreement, the Plan, and the other Definitive Documents, and to notify the Company promptly if it is reasonably likely that any changes in such expected holdings would result in the need for such Commitment Party to make a filing pursuant to the HSR Act. Each Commitment Party agrees not to take any actions that would result in any changes in its expected holdings in Reorganized Parker pursuant to the transactions contemplated by this Agreement, the Plan, and the other Definitive Documents, if it is reasonably likely that such changes would result in the need for such Commitment Party or any other party to make a filing pursuant to the HSR Act.

(b) The Company and each Commitment Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Plan or the other Definitive Documents that has notified the Company in writing of such obligation (each such Commitment Party, a "**Filing Party**") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content. If applicable, the Company and each Filing Party shall, to the extent permitted by applicable Law: (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to

44

the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Commitment Parties and the Company.

(c)    Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Plan or the other Definitive Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)    The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, waivers, or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of filing, and (ii) avoid any Legal Proceeding, whether brought by any Antitrust Authority or any third party.  The communications contemplated by this Section 6.9 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 6.9 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Definitive Documents.

Section 6.10    Other Entities. The Company shall cause each of the other Debtors to comply with all terms of this Agreement applicable to such Debtors.

Section 6.11    Reorganized Parker.

(a)    The Debtors shall cause Reorganized Parker to be registered under Section 12 of the Exchange Act on the Effective Date or as promptly as commercially reasonable thereafter.

(b)    The Debtors shall cause Reorganized Parker to be a successor to the Company under the Plan and the Rights Offering will be exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code or, with the consent of the Requisite Commitment Parties, which consent shall not be unreasonably withheld, conditioned or delayed, another available exemption from registration under the Securities Act.

(c)    On the Effective Date, all rights and obligations of the Company under this Agreement shall vest in Reorganized Parker, and the Plan shall include language to such effect. From and after the Effective Date, Reorganized Parker shall be deemed to be a party to this Agreement as the successor to all rights and obligations of the Company hereunder.

Section 6.12    S-1 Preparation. The Company shall take all such necessary action in connection with its obligations under the Registration Rights Agreement to prepare and file with the SEC a registration statement on Form S-1 for the resale of the Registrable Securities (as defined in the Registration Rights Agreement) held by the Initial Consenting Stakeholders as soon as reasonably practicable after the Effective Date (and, in any event, no later than fifteen (15) days

45

after Closing, unless extended after Closing (i) by the board of directors of Reorganized Parker, which extension may be for a period of no more than an additional fifteen (15) days or (ii) in accordance with the terms of the Registration Rights Agreement) and shall consult with Akin Gump and include Akin Gump in all aspects of the process to finalize such registration statement.

Section 6.13   Share Legend.  Except for any Unsubscribed Shares being issued pursuant to Section 1145 of the Bankruptcy Code, if any, each certificate evidencing Unsubscribed Shares issued hereunder, and each certificate issued in exchange for or upon the Transfer of any such shares, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such shares are uncertificated, such shares shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by Reorganized Parker or agent and the term "Legend" shall include such restrictive notation.  Reorganized Parker shall remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such shares (or the share register or other appropriate Reorganized Company records, in the case of uncertificated shares), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144 of the Securities Act.  The Reorganized Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

Section 6.14   Conversion Waiver.  The Company acknowledges and agrees (on behalf of itself and the other Company Parties) that any Commitment Party or Consenting Stakeholder that has checked the box on its signature page to the RSA in connection with the "Existing Preferred Stock Conversion Waiver" shall have irrevocably waived its right thereby to convert any of the shares of Existing Preferred Stock into shares of Existing Common Stock until such time as the RSA is terminated other than upon the consummation of the Plan on the Effective Date.

ARTICLE VII

**CONDITIONS TO THE OBLIGATIONS OF THE PARTIES**

Section 7.1   Conditions to the Obligations of the Commitment Parties.  The obligations of each Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 7.2) the satisfaction of the following conditions prior to or at the Closing:

(a)   Disclosure Statement Order.  The Bankruptcy Court shall have entered the Disclosure Statement Order and such order shall modify the automatic stay to permit the

46

Commitment Parties or the Consenting Stakeholders to provide notices, including notice of termination, in connection with this Agreement and/or the RSA in accordance with the terms hereof and thereof and shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties.

(b)       RSA.  An Event shall not have occurred that, in the absence of the automatic stay imposed by section 362 of the Bankruptcy Code or similar provision of applicable Law, with or without the provision of any notice or the giving effect to any cure period, would constitute a termination event by the applicable threshold of Consenting Stakeholders under the RSA in accordance with its terms, and the Company Parties shall not be in breach or default of their obligations under the RSA.

(c)       Approval Order.  The Bankruptcy Court shall have entered the Approval Order and such order shall be in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties and shall be a Final Order; provided, that, notwithstanding anything to the contrary in Section 7.2, the condition that the Approval Order must be a Final Order may be waived after the applicable appeals period has elapsed during the pendency of an appeal by any single Initial Commitment Party, and such waiver shall be applicable with respect to all Commitment Parties.

(d)       Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order and such order shall be in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties and shall be a Final Order; provided, that, notwithstanding anything to the contrary in Section 7.2, the condition that the Confirmation Order must be a Final Order may be waived after the applicable appeals period has elapsed during the pendency of an appeal by any single Initial Commitment Party, and such waiver shall be applicable with respect to all Commitment Parties.

(e)       Plan.  The Plan shall be in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties. The Company and all of the other Debtors shall have complied, in all respects, with the terms of the Plan (as amended or supplemented from time to time) that are to be performed by the Company and the other Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or, with the prior written consent of the Requisite Commitment Parties, waived in accordance with the terms thereof.

(f)       Rights Offering.  The Rights Offering shall have been conducted, in all material respects, in accordance with this Agreement, the Rights Offering Procedures and the Disclosure Statement Order, and the Rights Offering Expiration Time shall have occurred.

(g)       Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(h)       Funding Notice.  The Commitment Parties shall have received a Funding Notice in accordance with Section 2.4(a).

47

(i)      MAE. Since the date of the Original Agreement, no Material Adverse Effect shall have occurred.

(j)      Registration Rights Agreement; Governance Documents.

(i)      The Registration Rights Agreement, in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties, shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the Initial Commitment Parties desiring to be a party thereto and the other parties thereto, and shall be in full force and effect.

(ii)      The Governance Documents of Reorganized Parker, in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties, shall have been duly approved and adopted and shall be in full force and effect.

(k)      Expense Reimbursement.  The Company and its Subsidiaries shall have paid all Expense Reimbursement accrued or anticipated through the Closing Date as well as the Post-Closing Expenses reasonably expected to be incurred after the Closing Date, in each case in accordance with Section 3.3; provided, that invoices for such Expense Reimbursements shall have been received by the Company at least three (3) Business Days prior to the Closing Date in order to be required to be paid on the Closing Date (which invoice, if for Post-Closing Expenses, shall set forth a reasonable estimate with respect thereto).

(l)      Consents.  The Reasonable Approvals shall have been received.

(m)      No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity of competent authority that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(n)      Representations and Warranties.

(i)      The representations and warranties of the Company and its Subsidiaries, as applicable, contained in Section 4.6(e) shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)      The representations and warranties of the Company and its Subsidiaries, as applicable, contained in Section 4.2, Section 4.4, and Section 4.8, shall be true and correct in all material respects on and as of the Closing Date (after giving effect to the Plan) with the same effect as if made on and as of the Closing Date (after giving effect to the Plan) (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(iii)      The other representations and warranties of the Company and its Subsidiaries, as applicable, contained in this Agreement shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing

48

Date (after giving effect to the Plan) with the same effect as if made on and as of the Closing Date (after giving effect to the Plan) (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

(o)     Covenants.  The Company and its Subsidiaries shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(p)     Officer's Certificate.  The Commitment Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in Section 7.1(n) and Section 7.1(o) have been satisfied.

(q)     Minimum Liquidity and Minimum Cash of the Company.  The amount, determined on a pro forma basis after giving effect to the occurrence of the Effective Date and the transactions contemplated by the Definitive Documents, of unrestricted cash and cash equivalents of the Company shall be no less than $25 million of unrestricted cash, net of all fees, expenses and any other payments contemplated in connection with the consummation of the Restructuring Transactions (other than the proceeds from the Rights Offering, which shall not be included for purposes of calculating such $25 million).

(r)     Put Option.  The Put Option shall have been exercised in accordance with Section 2.2; provided, that the Put Option shall automatically and irrevocably be deemed to have been exercised by the Company in accordance with Section 2.2, without the need for delivery of a written notice or the taking of any further action by the Company or any other Person.

(s)     Improper Amendment or Modification.  None of this Agreement, the RSA or any other Definitive Document shall have been amended, restated, modified, changed, supplemented or altered without obtaining the requisite approvals pursuant to this Agreement (including, for the avoidance of doubt, pursuant to Section 10.7 of this Agreement) and the RSA (including, for the avoidance of doubt, pursuant to Section 13 of the RSA) in writing.

Section 7.2     Waiver of Conditions to Obligation of Commitment Parties.  Except for Section 7.1(s), all or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to all Commitment Parties by a written instrument executed by the Requisite Commitment Parties in their sole discretion and if so waived, all Commitment Parties shall be bound by such waiver; provided, that a waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of counsel.

Section 7.3     Conditions to the Obligations of the Company.  The obligation of the Company and any of the other Debtors to consummate the transactions contemplated hereby with any Commitment Party is subject to (unless waived by the Company) the satisfaction of each

49

of the following conditions:

(a)     Approval Order.    The Bankruptcy Court shall have entered the Approval Order and such order shall be in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties.

(b)     Confirmation Order.    The Bankruptcy Court shall have entered the Confirmation Order and such order shall be in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties.

(c)     Plan.  The Plan shall be in form and substance reasonably acceptable to the Company Parties and the Requisite Commitment Parties. The Requisite Commitment Parties shall have complied with the terms of the Plan that are to be performed by the Requisite Commitment Parties on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or waived in accordance with the terms thereof.

(d)     Rights Offering.  The Rights Offering Expiration Time shall have occurred.

(e)     Consents.  The Reasonable Approvals shall have been received.

(f)     No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity of competent authority that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(g)     Representations and Warranties.  The representations and warranties of the Initial Commitment Parties contained in this Agreement which contain materiality or Material Adverse Effect qualifiers shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all respects only as of the specified date), and those representations and warranties of the Initial Commitment Parties without such qualifiers shall be true and correct in all material respects, on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(h)     Covenants.  Each of the Initial Commitment Parties shall have performed and complied, in all material respects, with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement.

ARTICLE VIII

**INDEMNIFICATION AND CONTRIBUTION**

Section 8.1     Indemnification Obligations.  Following entry of the Approval Order, the Company and its Subsidiaries (the "**Indemnifying Parties**" and each an "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Commitment Party and its

50

Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Commitment Parties except to the extent otherwise provided for in this Agreement) arising out of a claim asserted by a third party (but excluding any claims asserted by either (i) advisors to Saba or its Affiliates against Saba or its Affiliates or (ii) Saba or its Affiliates against advisors to Saba or its Affiliates) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the transactions contemplated hereby and the obligations hereunder, including the Backstop Commitments, the Rights Offering, the payment of the Put Option Equity Premium or, with respect to Saba, the Amendment Fee or the use of the proceeds of the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, its Subsidiaries, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, however, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party, its Related Parties or any Indemnified Person related thereto, caused by a Commitment Party Default by such Commitment Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction, whether such judgment is in such underlying action, suit or proceeding, or otherwise, to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person .

Section 8.2   Indemnification Procedure.   Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, however, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VIII. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, however, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those

51

available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company and its Subsidiaries shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company and its Subsidiaries.

Section 8.3   <u>Settlement of Indemnified Claims</u>. In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this <u>Article VIII</u>, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed). If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this <u>Article VIII</u>. Notwithstanding anything in this <u>Article VIII</u> to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses in connection with investigating, responding to or defending any Indemnified Claims as contemplated by this <u>Article VIII</u>, the Indemnifying Party shall be liable for any settlement of any Indemnified Claims effected without its written consent if (a) such settlement is entered into more than forty-five (45) days after receipt by the Indemnifying Party of such request for reimbursement, so long as the Indemnifying Party has not notified the Indemnified Party that it contests, in good faith, such request for reimbursement, (b) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement, and (c) the Indemnifying Party shall not have instructed the Indemnified Person to avoid settlement of any Indemnified Claims prior to the date of such

52

settlement. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4    Contribution.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Unsubscribed Shares in the Rights Offering contemplated by this Agreement and the Plan bears to (b) the Put Option Cash Premium and the Put Option Equity Premium (or, with respect to Saba, the Amendment Fee) paid or proposed to be paid to the Commitment Parties.  The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5    Treatment of Indemnification Payments.  All amounts paid by an Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the Per Share Purchase Price for all Tax purposes. The provisions of this Article VIII are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.

Section 8.6    No Survival.  All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

ARTICLE IX

**TERMINATION**

Section 9.1    Termination Rights. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

53

(a)     by mutual written consent of the Company and the Requisite Commitment Parties;

(b)     by the Requisite Commitment Parties upon written notice to the Company if:

(i)     (x) the failure of any of Milestones a., b., c., or d. on <u>Schedule 5</u> to be satisfied which remains unsatisfied for three (3) Business Days, or (y) the failure of Milestone e. on <u>Schedule 5</u> to be satisfied which remains unsatisfied for one (1) Business Day;

(ii)     the Disclosure Statement Order is reversed, stayed, dismissed, vacated, or is modified or amended after entry without the prior written consent of the Requisite Commitment Parties;

(iii)     either of the Confirmation Order or the Approval Order has not become a Final Order after the applicable appeals period has elapsed due to a pending appeal; <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary herein, each Initial Commitment Party must provide written notice to the Company in order for this Agreement to be terminated pursuant to this <u>Section 9.1(b)(iii)</u>;

(iv)     any of this Agreement, the RSA, the Rights Offering Procedures, the Plan or any documents related to the Plan, including notices, exhibits or appendices, or any of the Definitive Documents is amended, restated, modified, changed, supplemented or altered without obtaining the requisite approvals of the Commitment Parties pursuant to this Agreement (including, for the avoidance of doubt, pursuant to <u>Section 10.7</u> of this Agreement) and the Consenting Stakeholders pursuant to the RSA (including, for the avoidance of doubt, pursuant to Section 13 of the RSA) in writing;

(v)     if an Event occurs that, in the absence of the automatic stay imposed by section 362 of the Bankruptcy Code or similar provisions of applicable Law, with or without the provision of any notice or the giving effect to any cure period, would constitute a termination event under the RSA in accordance with its terms;

(vi)     (i) the Company shall have breached (other than an immaterial breach) any representation, warranty, covenant or other agreement made by the Company in this Agreement or any such representation or warranty shall have become inaccurate after the date of this Agreement, and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in <u>Section 7.1(n)</u> or <u>Section 7.1(o)</u> not to be satisfied, (ii) the Requisite Commitment Parties shall have delivered written notice of such breach or inaccuracy to the Company, and (iii) such breach or inaccuracy is not cured (to the extent curable) by the Company or its Subsidiaries by the fifth (5th) Business Day after receipt of such notice; <u>provided</u>, <u>however</u>, that the Requisite Commitment Parties shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(b)(vi)</u> if they are then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in <u>Section 7.3</u> being satisfied;

54

(vii)     any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Definitive Documents;

(viii)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, (iv) terminating exclusivity under Bankruptcy Code section 1121, or (v) rejecting this Agreement;

(ix)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties that would materially and adversely affect the Company's operational or financial performance;

(x)      the Company Parties (i) withdraw the Plan, (ii) publicly announce their intention not to support the Restructuring Transactions or (iii) file, publicly announce, or execute a definitive written agreement with respect to an Alternative Restructuring Proposal;

(xi)     the making public, modification, amendment, restatement, change, alteration or filing of any of the Definitive Documents without obtaining the requisite approvals of the Consenting Stakeholders pursuant to the RSA (including, for the avoidance of doubt, pursuant to Section 13 of the RSA) in writing;

(xii)    upon the delivery of notice by the Company Parties pursuant to Section 6.7(a);

(xiii)   failure by the Company to pay the fees and expenses set forth in Section 3.3 of this Agreement as and when required;

(xiv)    the Company Parties file any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within two (2) Business Days of receipt by the Company Parties of written notice from the Requisite Commitment Parties that such motion or pleading is inconsistent with this Agreement; or

(xv)     the Bankruptcy Court orders that (A) any Commitment Party must return or repay all or part of the Put Option Cash Premium to the Company, other than pursuant to Section 3.2(b) or if any Commitment Party becomes a Defaulting Commitment Party, or (B) Akin Gump or Houlihan must return or repay all or part of the Akin Advance

55

Payment or Houlihan Advance Payment, as applicable, to the Company other than repayment of the Advance Payment Surplus (if any) pursuant to Section 3.3(c);

(c)     by the Company upon written notice to each Commitment Party if:

(i)     any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Definitive Documents;

(ii)     subject to the right of the Commitment Parties to arrange a Commitment Party Replacement in accordance with Section 2.3(a), (i) any Initial Commitment Party shall have breached (other than an immaterial breach) any representation, warranty, covenant or other agreement made by such Initial Commitment Party in this Agreement or any such representation or warranty shall have become inaccurate, and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 7.3(g) or Section 7.3(h) not to be satisfied, (ii) the Company shall have delivered written notice of such breach or inaccuracy to such Initial Commitment Party, (iii) such breach or inaccuracy is not cured (to the extent curable) by such Initial Commitment Party by the fifth (5th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, a condition set forth in Section 7.3(g) or Section 7.3(h) is not capable of being satisfied or has not been satisfied by the date on which such condition must, by its terms, be satisfied; provided, however, that the Company shall not have the right to terminate this Agreement pursuant to this Section 9.1(c)(ii) if it is then in breach of any representation, warranty, covenant or other agreement (x) hereunder that would result in the failure of any condition set forth in Section 7.1 being satisfied or (y) under the RSA; or

(iii)     two (2) Business Days after delivery of notice by the Company Parties pursuant to Section 6.7(a);

provided, however, that the Company may terminate this Agreement as to Saba individually, and not as to all Commitment Parties, in connection with a breach (other than an immaterial breach) of any of Saba's obligations, covenants, representations or warranties set forth in this Agreement, and such breach is continuing and is not timely cured within five (5) Business Days after the Company provides written notice to Saba of such breach (in which event upon failure to so cure within such time period). Notwithstanding the termination by the Company as to Saba individually, the Agreement and the transactions contemplated by this Agreement shall continue with respect to the Commitment Parties other than Saba;

(d)     by any Initial Commitment Party or the Company, upon written notice to the Company or to each Initial Commitment Party, as applicable, upon the occurrence of the Outside Date and at any time thereafter, provided, that no Party shall have the right to terminate this Agreement pursuant to this Section 9.1(d) if it is then in willful or intentional breach (as defined below) of this Agreement; and

(e)     by Saba upon written notice to the Company if:

56

(i)        entry of the Approval Order has been denied by the Bankruptcy Court; provided, that notwithstanding anything to the contrary herein, in the RSA or any other Definitive Document, in the event that entry of the Approval Order has been denied by the Bankruptcy Court, the Company shall provide Saba with an opportunity to file an objection to the Plan and this Agreement within five (5) Business Days from such date of denial of the Approval Order and adjourn the Confirmation Hearing to a date on or after the expiration of such five (5) Business Day period; provided, that Saba shall not seek or support an adjournment of the Confirmation Hearing by more than five (5) Business Days from such date of denial of the Approval Order; or

(ii)       (x) the Company shall have breached (other than an immaterial breach) any representation, warranty, covenant or other agreement made by the Company in this Agreement or any such representation or warranty shall have become inaccurate after the date of this Agreement, and such breach or inaccuracy would (i) have a material, disproportionate, and adverse effect on Saba as opposed to all other Commitment Parties (on account of its holdings of 2020 Notes Claims, 2022 Notes Claims, and Existing Interests versus those held by all Commitment Parties) or (ii) have the effect of reducing the amount of the Amendment Fee or the Maximum Saba Expense Reimbursement, or otherwise adversely affect Saba's right to receive the Amendment Fee at Closing and Saba's advisors' right to receive the Maximum Saba Expense Reimbursement at Closing, (y) Saba shall have delivered written notice of such breach or inaccuracy to the Company, and (z) such breach or inaccuracy is not cured (to the extent curable) by the Company or its Subsidiaries by the fifth (5th) Business Day after receipt of such notice.

provided, however, that any such termination by Saba pursuant to this Section 9.1(e), shall, notwithstanding anything to the contrary herein or in the RSA, cause a termination of this Agreement and the RSA with respect to Saba individually, and not as to the Company and all other Commitment Parties.  Notwithstanding the termination by Saba as to Saba individually, the Agreement, the RSA and the transactions contemplated by this Agreement and the RSA shall continue with respect to the Commitment Parties other than Saba.

Section 9.2     Effect of Termination.

(a)        Unless otherwise provided herein, upon termination of this Agreement pursuant to this Article IX, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; provided, however, that, (i) the obligations of the Company and its Subsidiaries to pay the Expense Reimbursement pursuant to and in accordance with Section 3.3 and to satisfy their indemnification obligations pursuant to and in accordance with Article VIII shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in this Section 9.2 and Article X shall survive the termination of this Agreement in accordance with their terms, (iii) pursuant to and in accordance with Section 3.2(a), the obligations of the Commitment Parties (other than Saba) to repay the Put Option Cash Premium in the event of termination of this Agreement under the circumstances set forth in Section 3.2(a) shall survive the termination of this Agreement and shall remain in full force and effect until such obligations have been satisfied, (iv) the provisos set forth in Section 9.1(e)(i) shall survive termination of this

57

Agreement, and (v) subject to Section 10.10, nothing in this Section 9.2 shall relieve any Party from liability for its gross negligence or any willful or intentional breach of this Agreement; provided, further, for the avoidance of doubt, the Company shall not be obligated to, and shall not, pay the Amendment Fee or the reasonable and documented fees, costs and expenses of any consultants, counsel, financial advisors or other professionals retained by Saba in connection with matters related to the Company in the event that this Agreement is terminated pursuant to this Article IX.  For purposes of this Agreement, "**willful or intentional breach**" shall mean a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)     If this Agreement is terminated for any reason other than by the Commitment Parties (other than Saba) under Section 9.1(b)(iii) or by the Company under Section 9.1(c)(ii), the Commitment Parties shall be entitled to keep the full Put Option Cash Premium, and, for the avoidance of doubt, (i) if this Agreement is terminated by the Commitment Parties (other than Saba) under Section 9.1(b)(iii) or by the Company under Section 9.1(c)(ii), the Commitment Parties (other than Saba) shall be required to, within two (2) Business Days following such proper termination, return the full Put Option Cash Premium to the Company and (ii) contemporaneously with the Closing, the Commitment Parties (other than Saba) shall return the full Put Option Cash Premium to the Company in exchange for the Put Option Equity Premium in accordance with Section 3.2(b).  For the avoidance of doubt, other than the Company's payment of the Put Option Cash Premium, which has been paid to the Commitment Parties (other than Saba) at or prior to the effectiveness of this Agreement, the Commitment Parties shall not and do not have any additional recourse against the Debtors for any obligations or liabilities relating to or arising from this Agreement, except for liability for gross negligence or willful or intentional breach of this Agreement pursuant to Section 9.2(a).  For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder and under the RSA.

ARTICLE X

**GENERAL PROVISIONS**

Section 10.1   Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered via electronic mail, courier, or registered or certified mail (return receipt requested) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)     If to the Company:

Parker Drilling Company
Five Greenway Plaza, Suite 100
Houston, TX 77046
Attention: John Edward Menger and Jennifer Simons
Email: Ed.Menger@parkerdrilling.com and
Jennifer.Simons@parkerdrilling.com

with a copy (which shall not constitute notice) to:

> Kirkland  & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attention: Christopher J. Marcus, P.C., Brian Schartz, P.C.,
>      Julian Seiguer, P.C., Matthew Fagen and Benjamin Adelson
> Email: christopher.marcus@kirkland.com; brian.schartz@kirkland.com;
>      matthew.fagen@kirkland.com; julian.seiguer@kirkland.com;
>      benjamin.adelson@kirkland.com

(b)      If to the Commitment Parties (or to any of them, other than Saba) or any other Person to which notice is to be delivered hereunder, to the address set forth opposite each such Commitment Party's name on Schedule 3, with a copy (which shall not constitute notice) to:

> Akin Gump Strauss Hauer & Feld LLP
> 1333 New Hampshire Avenue, N.W.
> Washington, D.C. 20036
> Attention: James Savin and Daniel Fisher
> Email: jsavin@akingump.com; dfisher@akingump.com
>
> and
>
> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park, Bank of America Tower
> New York, NY 10036
> Attention: Michael S. Stamer
> Email: mstamer@akingump.com

(c)      If to Saba, to the address set forth opposite its name on Schedule 3, with a copy (which shall not constitute notice) to:

> Davis Polk & Wardwell LLP
> 450 Lexington Ave.
> New York, NY 10017
> Attention: Brian M. Resnick and Adam L. Shpeen
> Email: brian.resnick@davispolk.com; adam.shpeen@davispolk.com

Section 10.2    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Requisite Commitment Parties, other than an assignment by a Commitment Party expressly permitted by Section 2.3 or Section 2.6 and any purported assignment in violation of this Section 10.2 shall be void *ab initio*.  Except as provided in Article VIII with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.

59

Section 10.3   <u>Prior Negotiations; Entire Agreement</u>.

(a)      This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement (including the Original Agreement), except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the RSA (including the Restructuring Term Sheet) and other Definitive Documents will each continue in full force and effect in accordance with their respective terms and constitute valid and binding obligations of the Parties thereto.  All exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(b)      Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with <u>Section 10.7</u>.

Section 10.4   <u>Governing Law; Venue</u>.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD FOR ANY CONFLICTS OF LAW PRINCIPLES THAT WOULD APPLY THE LAWS OF ANY OTHER JURISDICTION, OR, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  THE PARTIES CONSENT AND AGREE THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTES ARISE IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT WHERE THE DEBTORS FILE THE CHAPTER 11 CASES (OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, EXCLUSIVELY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY).  THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT SOLELY IN CONNECTION WITH THIS AGREEMENT AND THE AUTHORITY OF THE BANKRUPTCY COURT TO ENTER FINAL ORDERS RELATING TO SUCH DISPUTES.  EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE RELATED TO THIS AGREEMENT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTIONS TO VENUE OR JURISDICTION OR ANY CLAIM THAT (I) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, (II) SUCH PARTY OR SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY THE BANKRUPTCY COURT OR (III) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN THE

BANKRUPTCY COURT IS BROUGHT IN AN INCONVENIENT FORUM. THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5    Waiver of Jury Trial.   EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6    Counterparts.   This Agreement may be executed through the use of electronic signature and in any number of counterparts, all of which will be considered an original and one and the same agreement and will become effective when counterparts have been signed (electronically or otherwise) by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7    Waivers and Amendments; Rights Cumulative; Consent.   This Agreement may be amended, restated, modified, changed, supplemented or altered only by a written instrument signed by the Company and the Requisite Commitment Parties; provided, however, that (a) the prior written consent of each Commitment Party that was an original signatory to the Original Agreement still a Commitment Party as of such date of amendment, restatement, modification, change, supplement or alteration shall be required for any amendment, restatement, modification, change, supplement or alteration to this Agreement, the RSA or any other Definitive Document that would, directly or indirectly: (i) modify such Commitment Party's Backstop Commitment Percentage set forth on Schedule 1, or Schedule 2, or the amount of the Backstop Commitment applicable to such Commitment Party, (ii) increase the Per Share Purchase Price to be paid in respect of its Unsubscribed Shares, (iii) modify the Put Option Cash Premium, the Put Option Equity Premium, Section 3.1, Section 3.2 or the amount of the Put Option Cash Premium or Put Option Equity Premium applicable to such Commitment Party, (iv) modify its Subscription Rights (including any percentages contained in the definition thereof) or the amount of Rights Offering Shares applicable to such Commitment Party, (v) modify its right and requirement to purchase the Unsubscribed Shares, (vi) modify any of its rights to receive the Expense Reimbursement, the Put Option Cash Premium, the Put Option Equity Premium and the indemnification provisions, (vii) modify the Rights Offering, the aggregate amount of cash proceeds to be received in the Rights Offering of $95 million, the 41.9241% amount of post-Closing shares of New Common Stock (subject to dilution by New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants) to be issued pursuant to such Rights Offering, or the allocation of rights among classes of debt and equity, (viii) modify the percentage of New Common Stock to be issued to the holders of 2020 Notes Claims and 2022 Notes Claims, as set forth in the Restructuring Term Sheet and the exhibits thereto, (ix) modify the principal amount, coupon, call schedule, term, security or priority of the New Second Lien Term Loan, as set forth in the Restructuring Term Sheet, the Second Lien Term

Loan Term Sheet and the exhibits thereto, (x) modify the percentage of the New Warrants to be issued to the holders of Existing Common Stock and Existing Preferred Stock, the provisions of the New Warrant Term Sheet under the section entitled "Sales of Reorganized Parker", the strike price of the New Warrants as determined in accordance with the New Warrant Term Sheet or the term of the New Warrants, as set forth in the Restructuring Term Sheet, the New Warrant Term Sheet and the exhibits thereto, (xi) modify the percentage of New Common Stock to be issued to the holders of Existing Common Stock or Existing Common Stock, as set forth in the Restructuring Term Sheet and the exhibits thereto, (xii) have a materially adverse and disproportionate effect on such Commitment Party as opposed to all other Commitment Parties (on account of its holdings of 2020 Notes Claims, 2022 Notes Claims and Existing Interests versus those held by all Commitment Parties), or (xiii) amend, change or alter the definition of "Outside Date" or "Requisite Commitment Parties" (including, for the avoidance of doubt, due to a change in the definition of "Required Consenting Stakeholders"), and (b) the prior written consent of Saba if Saba is still a Commitment Party as of such date of amendment, restatement, modification, change, supplement or alteration shall be required for any amendment, restatement, modification, change, supplement or alteration to this Agreement, the RSA or any other Definitive Document that would: (i) modify any of its rights to receive the Amendment Fee and up to the Maximum Saba Expense Reimbursement, or the amount of the Amendment Fee or the Maximum Saba Expense Reimbursement, (ii) modify its Backstop Commitment Percentage set forth on Schedule 2 or the amount of the Backstop Commitment applicable to Saba, (iii) modify Schedule 6 hereto, (iv) modify the percentage of the New Warrants to be issued to the holders of Existing Common Stock and Existing Preferred Stock in any manner that is adverse to holders of Existing Common Stock, (v) materially reduce the percentage of New Common Stock to be issued to the holders of Existing Common Stock, as set forth in the Restructuring Term Sheet and the exhibits thereto, (vi) have a material, disproportionate, and adverse effect on Saba as opposed to all other Commitment Parties (on account of its holdings of 2020 Notes Claims, 2022 Notes Claims, and Existing Interests versus those held by all Commitment Parties); provided, however, that the consent of any Defaulting Commitment Party shall not be required for any amendments set forth in clauses (a)(ii) or (a)(iii) above.  Notwithstanding the foregoing, Schedule 1, and Schedule 2 shall be revised as necessary without requiring a written instrument signed by the Company and the Requisite Commitment Parties to reflect changes in the composition of the Commitment Parties and the Backstop Commitment Percentages as a result of Transfers permitted in accordance with the terms and conditions of this Agreement and no such revisions shall give rise to any termination right or allow the Commitment Parties to fail to close the transactions contemplated by this Agreement; provided, each Commitment Party shall receive a revised copy of all such Schedules. The terms and conditions of this Agreement (other than (x) Section 7.1(s), Section 7.2, Section 9.1(b)(iv), Section 9.1(b)(xi), and this Section 10.7, the waiver of which shall only be made with the requisite approvals of the Commitment Parties pursuant to this Agreement (including, for the avoidance of doubt, pursuant to this Section 10.7), (y) Section 10.7(b), the waiver of which shall only be made with the requisite approval of Saba, as applicable, pursuant to this Agreement (including, for the avoidance of doubt, pursuant to Section 10.7(b)), and (z) other than the conditions set forth in Section 7.1 and Section 7.3, the waiver of which shall be governed solely by Article VII) may be waived (i) by the Company and its Subsidiaries only by a written instrument executed by the Company and (ii) by the Requisite Commitment Parties only by a written instrument executed by the Requisite Commitment Parties.  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver

62

on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. Any proposed amendment, restatement, modification, change, alteration, supplement or waiver that does not comply with this Section 10.7 shall be ineffective and void *ab initio*.

Section 10.8    Headings.    The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9    Specific Performance.    The Parties agree that irreparable damage may occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 10.10 Damages.    Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

Section 10.11 No Reliance.  No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein or in the RSA.  Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity, (d) no Commitment Party may rely, and each Commitment Party confirms that it has not relied, on any due diligence investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities and (e) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Unsubscribed Shares or Backstop Commitment Percentage of its Backstop Commitment.

Section 10.12 Confidentiality and Publicity.  Other than as may be required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Commitment Party), other than legal, accounting, financial and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose

63

compliance with such obligations the Company Parties shall be responsible for), the name or the principal amount or percentage of the Company Claims/Interests held by any Commitment Party or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer); provided, however, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims/Interests held by the Commitment Parties collectively; and, provided, further, that the Company Parties may disclose the names of any Commitment Party (at the institution level) at a hearing in connection with the Chapter 11 Cases, but not the principal amount or percentage of the Company Claims/Interests held by any such Commitment Party or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer). Notwithstanding the foregoing, the Commitment Parties hereby consent to the disclosure of the execution, terms and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by law or regulation; provided, however, that (i) if any of the Company Parties determines that they are required to attach a copy of this Agreement, any Joinder or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will redact any reference to or identifying information concerning a specific Commitment Party and such Commitment Party's holdings (including before filing any pleading with the Bankruptcy Court) and (ii) if disclosure of additional identifying information of any Commitment Party is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each Commitment Party (who shall have the right to seek a protective order prior to disclosure). The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement. Notwithstanding the foregoing, the Company Parties will submit to counsel for the Initial Commitment Parties all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with applicable law) in advance of release and will take such counsel's view with respect to such communications into account. Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

Section 10.13 Settlement Discussions. This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Section 408 of the U.S. Federal Rule of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than a Legal Proceeding to approve or enforce the terms of this Agreement).

Section 10.14 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with

64

this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or respective Related Parties, in each case, other than the Parties to this Agreement and each of their respective successors and permitted assignees based upon, arising out of or relating to this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by, any of the Related Parties not a Party to this Agreement or any documents or instruments delivered in connection herewith, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of, such obligations or liabilities or their creation; provided, however, nothing in this Section 10.14 shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns for any breach or violation of, its obligations under this Agreement or such other documents or instruments entered into in connection with the transactions contemplated hereby and thereby (including any confidentiality, non-disclosure or similar agreements).

Section 10.15 Enforceability of Agreement.  The Parties hereby acknowledge, covenant and agree: (i) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code, (ii) that they waive any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulate and consent hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required, (iii) that they shall not take a position to the contrary of this Section 10.15 in the Bankruptcy Court or any other court of competent jurisdiction and (iv) that they will not initiate, or assert in, any litigation or other legal proceeding that this Section 10.15 is illegal, invalid or unenforceable, in whole or in part.

Section 10.16 Relationship Among Parties.  Notwithstanding anything to the contrary herein, the duties and obligations of the Commitment Parties under this Agreement shall be several, not joint.  None of the Commitment Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Commitment Party, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Commitment Parties, in each case except as expressly set forth in this Agreement.  No prior history, pattern or practice of sharing confidence among or between any of the Commitment Parties and/or the Company Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of any of the Company Parties and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder.  For the avoidance of doubt: (1) each Commitment Party is entering into this Agreement directly with the Company and not with any other Commitment Party, (2) no other Commitment Party shall have any right to bring any action against any other Commitment Party with respect to this Agreement (or any breach thereof) and (3) no Commitment Party shall, nor shall any action taken by a Commitment Party pursuant to this Agreement, be deemed to be acting

65

in concert or as any group with any other Commitment Party with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Commitment Parties are in any way acting as a group.  All rights under this Agreement are separately granted to each Commitment Party by the Company and vice versa, and the use of a single document is for the convenience of the Company.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

PARKER DRILLING COMPANY

By: _____
Name:  Michael W. Sumruld
Title:   Senior Vice President & Chief Financial Officer

**Schedule 4**

**Fully Diluted Capital Stock of Reorganized Parker**

The fully diluted post-Closing New Common Stock on the Effective Date shall be held as the following:

| Source of New Common Stock | Percentage of post-Closing New Common Stock on a fully-diluted basis[1] |
|---|---|
| Rights Offering | 41.9241% |
| Put Option Equity Premium | 3.3539% |
| Converted 2020 Notes | 18.7932% |
| Converted 2022 Notes | 34.4239% |
| Existing Preferred Stock | 0.6019% |
| Existing Common Stock | 0.9029% |

---

[1] All percentages reflected in the chart above are subject to dilution by New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants.

## Schedule 5

### Milestones

a.  The Debtors shall commence the Chapter 11 Cases and file the First Day Pleadings with the Bankruptcy Court no later than 2 days after the date of the Original Agreement.

b.  Within one day of the Petition Date, the Debtors shall file the Plan, the Disclosure Statement, and a motion (or motions) for approval of the Rights Offering Procedures and the Disclosure Statement with the Bankruptcy Court.

c.  The Debtors shall obtain entry by the Bankruptcy Court of orders approving (i) the Disclosure Statement and (ii) the Rights Offering Procedures, in each case within 45 days after the Petition Date.

d.  The Debtors shall obtain entry of the Confirmation Order and the Approval Order by no later than 92 days after the Petition Date.

e.  The Effective Date of the Plan and Closing of the Rights Offering shall have occurred by no later than (i) 107 days after the Petition Date and (ii) 15 days after the date (without taking into account any grace period provided under Section 9.1(b)(i) of this Agreement) set forth in sub-clause d. of this Schedule 5.

**Exhibit A**

**Form of Joinder Agreement**

This joinder agreement (the "**Joinder Agreement**") to Amended and Restated Backstop Commitment Agreement, dated January 28, 2019 (as has been or may be hereafter amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**BCA**"), between Parker Drilling Company (the "**Company**") and the Commitment Parties party thereto, is executed and delivered by [•] (the "**Joining Party**") as of [•], 201[•] (the "**Joinder Date**"). Each capitalized term used herein but not otherwise defined herein shall have the meaning set forth in the BCA.

Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the BCA, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, amended and restated or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a "Commitment Party" for all purposes under the BCA. The Joining Party and the Company agree that the Backstop Commitment Percentage will be updated in accordance with the terms of the BCA.

Representations and Warranties. The Joining Party hereby severally and not jointly makes the representations and warranties of the Commitment Parties set forth in Article 5 of the BCA to the Company as of the Joinder Date.

Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard for any conflicts of law principles that would apply the laws of any other jurisdiction, or, to the extent applicable, the Bankruptcy Code.

[*Signature Pages Follow*]

Exhibit A

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the Joinder Date.

**JOINING PARTY**

[COMMITMENT PARTY]

By: _____

Name: _____

Title: _____

AGREED AND ACCEPTED (as of the Joinder Date):

PARKER DRILLING COMPANY

By: _____

Name: _____

Title: _____

[*Signature Page to Joinder Agreement*]

## EXHIBIT B

## Form of Transfer Agreement

The undersigned ("**Transferee**"), as of the date executed below, (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, made and entered into as of December 12, 2018, (as has been or may be hereafter amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among Parker Drilling Company, the other Company Parties party thereto and the Consenting Stakeholders party thereto, (b) desires to acquire the Company Claims/Interests held by the transferor (the "**Transferor**") described below, and acknowledges and agrees that it shall be deemed a "Consenting Stakeholder" under the terms of the Agreement, (c) agrees to be bound by the terms and conditions of the Agreement to the extent applicable to the Transferor and (d) the Transferee hereby severally and not jointly makes all representations and warranties of the Consenting Stakeholders set forth in Section 9 of the Agreement as of the date hereof. Capitalized used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Date Executed:

**[TRANSFEREE]**

By:        _____
Name:      _____
Title:     _____

Address:   _____

E-mail address(es): _____
Telephone: _____
Facsimile: _____

| Aggregate Amount of Transferred Company Claims/Interests | |
|---|---|
| **Type** | **Amount** |
| | |
| | |
| | |
| | |

Exhibit B

## Exhibit L

**Restructuring Support Agreement**

*EXECUTION VERSION*

PARKER DRILLING COMPANY, *ET AL*.,

RESTRUCTURING SUPPORT AGREEMENT

**December 12, 2018**

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING FOR THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES.  ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS RESTRUCTURING SUPPORT AGREEMENT IS A SETTLEMENT PROPOSAL TO CERTAIN UNAFFILIATED HOLDERS OF THE COMPANY PARTIES' UNSECURED NOTES, EXISTING PREFERRED STOCK AND EXISTING COMMON STOCK IN FURTHERANCE OF SETTLEMENT DISCUSSIONS.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of December 12, 2018 (the "**Execution Date**"), by and among the following parties, each in the capacity set forth on its signature page to this Agreement (each of the following described in sub-clauses (i) through (ii) of this preamble, collectively, the "**Parties**"):[1]

i. Parker Drilling Company, a company incorporated under the Laws of Delaware ("**Parker**"), 2M-TEK, Inc., Anachoreta, Inc., Pardril, Inc., Parker Aviation Inc., Parker Drilling Arctic Operating, LLC, Parker Drilling Company of Niger, Parker Drilling Company North America, Inc., Parker Drilling Company of Oklahoma, Incorporated, Parker Drilling Company of South America, Inc., Parker Drilling Management Services, Ltd., Parker Drilling Offshore Company, LLC, Parker Drilling Offshore USA, L.L.C., Parker North America Operations, LLC, Parker Technology, Inc., Parker Technology, L.L.C., Parker Tools, LLC, Parker-VSE, LLC, Quail USA, LLC, and Quail Tools, L.P. (together with Parker, collectively, the "**Company Parties**"); and

ii. the undersigned and non-Affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, among other securities, Unsecured Notes, Existing Preferred Stock and/or Existing Common Stock, that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement, and as specified in the term sheet attached as **Exhibit A** hereto (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**") and the exhibits thereto, the term sheet for the New Warrants (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, "**New Warrant Term Sheet**") attached as **Exhibit B** hereto, the Backstop Commitment Agreement attached as **Exhibit C** hereto, and the term sheet for the New Second Lien Term Loan attached as **Exhibit 2** to **Exhibit A** (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**New Second Lien Term Loan Term Sheet**"), the term sheet for the DIP Facility attached as **Exhibit 3-A** to **Exhibit A** (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**DIP Facility Term Sheet**"), the term sheet for the Exit Facility attached as **Exhibit 3-B** to **Exhibit A** (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Exit Facility Term Sheet**"), the corporate governance term sheet attached as **Exhibit 4** to **Exhibit A** (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

"**Governance Term Sheet**") and the term sheet relating to certain matters with respect to management and employees attached hereto as **Exhibit 5** to **Exhibit A** (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Compensation Term Sheet**") and such transactions as described in, and in accordance with, this Agreement, the Restructuring Term Sheet and the exhibits thereto, the Backstop Commitment Agreement, the New Warrant Term Sheet, the New Second Lien Term Loan Term Sheet, the Governance Term Sheet, the DIP Facility Term Sheet, the Exit Facility Term Sheet and the Compensation Term Sheet, the "**Restructuring Transactions**");

WHEREAS, the Company Parties intend to implement the Restructuring Transactions in accordance with the terms set forth in this Agreement by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"); and

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**      *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**2020 Notes**" means the 7.500% Senior Notes due 2020, issued in the original principal amount of $225.0 million, pursuant to the 2020 Notes Indenture.

"**2020 Notes Indenture**" means that certain Indenture, dated as of July 30, 2013, as amended, restated, amended and restated, supplemented or otherwise modified, or replaced from time to time, for the 2020 Notes, among Parker, each of the guarantors party thereto, and the Trustee.

"**2022 Notes**" means the 6.750% Senior Notes due July 2022, issued in the original principal amount of $360.0 million, pursuant to the 2022 Notes Indenture.

"**2022 Notes Indenture**" means that certain Indenture, dated as of January 22, 2014, as amended, restated, amended and restated, supplemented or otherwise modified, or replaced from time to time, for the 2022 Notes, among Parker, each of the guarantors party thereto, and the Trustee.

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

3

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which all of the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Akin Gump**" means Akin Gump Strauss Hauer & Feld LLP.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties, or any Affiliates of the Company Parties, or the debt, equity, or other interests in any one or more Company Parties or any Affiliates of the Company Parties, in each case other than the Restructuring Transactions.

"**Backstop Commitment Agreement**" means one or more commitment agreements substantially in the form attached as **Exhibit C** hereto to be dated the date hereof pursuant to which certain parties specified therein will backstop 100% of the Rights Offering in accordance with the terms thereof.

"**Backstop Commitment Parties**" means at any time and from time to time, the parties that have committed to backstop the rights offering and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas administering the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, Existing Equity Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or

4

unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company**" means Parker together with its Debtor and non-Debtor Affiliates.

"**Company Claims**" means any Claim against a Company Party, including the Unsecured Note Claims.

"**Company Interests**" means any Existing Equity Interest in the Company Parties.

"**Company Claims/Interests**" means, collectively, Company Claims or Company Interests.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with the proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, which Confirmation Order shall be in accordance with this Agreement and the Definitive Documents.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholder Fees and Expenses**" has the meaning set forth in Section 14.22.

"**Consolidated Group**" means Parker and each of its majority-owned direct and indirect subsidiaries.

"**Debtors**" means the Company Parties.

"**Definitive Documents**" has the meaning set forth in Section 3.01, which Definitive Documents shall be in accordance with this Agreement.

"**DIP Facility**" means the financing facility that certain Company Parties will enter into on terms consistent with the Restructuring Term Sheet and as set forth in the DIP Facility Term Sheet, which DIP Facility shall be in accordance with this Agreement and the Definitive Documents.

"**DIP Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Disclosed Letters**" has the meaning set forth in Section 4.01(b)(v).

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, which Disclosure Statement shall be in accordance with this Agreement and the Definitive Documents.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code and modification of the automatic stay to permit the Consenting Stakeholders to provide any notices, including notices of termination, with respect to the Backstop Commitment Agreement and/or this Agreement in accordance with the terms hereof or thereof, which Disclosure Statement Order will be in accordance with this Agreement and the Definitive Documents.

"**Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Common Stock**" means the shares of common stock issued by Parker.

"**Existing Equity Interests**" means, collectively, the shares (or any class thereof), Existing Common Stock, Existing Preferred Stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Existing Preferred Stock**" means the shares of 7.25% Series A Mandatory Convertible Preferred Stock issued by Parker.

"**Exit Facility**" means the financing facility that certain Company Parties will enter into on terms consistent with the Restructuring Term Sheet and as set forth in the Exit Facility Term Sheet, which Exit Facility shall be in accordance with this Agreement and the Definitive Documents.

"**Exit Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending

6

or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine in consultation with the Required Consenting Stakeholders, are necessary or desirable to file.

"**Governance Documents**" means the organizational and governance documents for Reorganized Parker and its subsidiaries, including without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, identity of proposed members of the Reorganized Parker's board of directors and limited partnership agreements (or equivalent governing documents), which Governance Documents shall be in accordance with this Agreement (including the Governance Term Sheet) and the Definitive Documents and otherwise reasonably acceptable to the Required Consenting Stakeholders and the Company Parties.

"**Indentures**" means, collectively, the 2020 Notes Indenture and the 2022 Notes Indenture.

"**Insolvency Proceeding**" means any corporate action, legal proceedings or other procedure or step taken in any jurisdiction in relation to:

(a)     the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition or reorganisation (by way of voluntary arrangement, scheme or otherwise) of any member of the Consolidated Group, including under the Bankruptcy Code;

(b)     a composition, conciliation, compromise or arrangement with the creditors generally of any member of the Consolidated Group or an assignment by any member of the Consolidated Group of its assets for the benefit of its creditors generally or any member of the Consolidated Group becoming subject to a distribution of its assets;

(c)     the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any member of the Consolidated Group or any of its assets;

(d)     enforcement of any security over any assets of any member of the Consolidated Group; or

(e)     any procedure or step in any jurisdiction analogous to those set out in the preceding sub-paragraphs (a) to (d).

7

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Management Incentive Plan**" means the equity incentive program for the members of the management team of Reorganized Parker, to be established in accordance with this Agreement and the Definitive Documents.

"**Milestones**" has the meaning set forth in Section 6.01(a).

"**New Common Stock**" means the common stock of Reorganized Parker.

"**New Second Lien Term Loan**" means the $210 million new second lien secured term loan that Reorganized Parker will incur on the Effective Date under the New Second Lien Term Loan Agreement.

"**New Second Lien Term Loan Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**New Second Lien Term Loan Agreement**" means that certain credit agreement for the New Second Lien Term Loan that Reorganized Parker will enter into in accordance with this Agreement and the Definitive Documents.

"**New Warrants**" means the warrants to acquire an aggregate number of shares of common stock issued by Reorganized Parker equal to 13.5% of the New Common Stock of Reorganized Parker, which will be issued pursuant to the New Warrant Agreement.

"**New Warrant Agreement**" means that certain agreement providing for, among other things, the issuance and terms of the New Warrants in accordance with this Agreement (including the New Warrant Term Sheet) and the Definitive Documents.

"**NOL Rights Plan**" means the Rights Agreement, dated as of July 12, 2018, between Parker and Equiniti Trust Company, as Rights Agent, as amended, restated, modified, supplemented, or replaced from time to time.

"**Outside Date**" means the date that is 160 days after the Petition Date.

"**Parker**" has the meaning set forth in the preamble to this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means a Transfer of any Company Claims/Interests that meets the requirements of Section 8.01.

8

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the date on which the Company Parties commence the Chapter 11 Cases in accordance with this Agreement and the Definitive Documents.

"**Plan**" means the joint chapter 11 plan of reorganization filed by the Debtors in the Chapter 11 Cases to implement the Restructuring Transactions in accordance with this Agreement and the Definitive Documents.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court in accordance with this Agreement and the Definitive Documents.

"**Put Option Cash Premium**" means a premium equal to $7,600,000 payable to the Backstop Commitment Parties in accordance with the Backstop Commitment Agreement.

"**Put Option Equity Premium**" means a premium equal to 3.3539% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants, payable to the Backstop Commitment Parties in accordance with the Backstop Commitment Agreement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt). For the avoidance of doubt, none of the Consenting Stakeholders represented by Akin Gump are Qualified Marketmakers.

"**Registration Rights Agreement**" means any agreements providing registration rights to the Consenting Stakeholders and any other parties thereto on account of New Common Stock acquired by them pursuant to the Restructuring Transactions in accordance with this Agreement (including the Governance Term Sheet) and the Definitive Documents.

"**Reorganized Parker**" means Parker, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

"**Required Consenting Stakeholders**" means, as of the relevant date, at least two (2) non-Affiliated Consenting Stakeholders represented by Akin Gump that collectively hold at least 66% of the aggregate outstanding principal amount of Unsecured Notes that are held by all such Consenting Stakeholders represented by Akin Gump.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

9

"**Rights Offering**" means the rights offering of the New Common Stock to be issued by Reorganized Parker for $95,000,000 of cash for 41.9241% of post-closing New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants.

"**Rights Offering Procedures**" means the procedures governing the conduct of the Rights Offering, which Rights Offering Procedures shall be in accordance with this Agreement and the Definitive Documents.

"**Rules**" means Rule 501(a) of the Securities Act.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement and the Definitive Documents.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04 or 12.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

"**Trustee**" means any indenture trustee or other trustee or similar entity under any series of the Unsecured Notes.

"**Unsecured Notes**" means, collectively, the 2020 Notes and the 2022 Notes.

"**Unsecured Note Claim**" means any Claim on account of the Unsecured Notes.

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended,

restated, amended and restated, supplemented, or otherwise modified or replaced from time to time in accordance with this Agreement; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)　　unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)　　the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)　　captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)　　references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)　　the use of "include" or "including" is without limitation, whether stated or not;

(i)　　the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties; and

(j)　　the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**Section 2.**　　*Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties according to its terms as of 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)　　each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; provided, however, that signature pages executed by Consenting Stakeholders shall (i) be treated in accordance with Section 14.21 and (ii) be delivered to other Consenting Stakeholders in a redacted form that removes the details of such Consenting Stakeholders' holdings of Company Claims/Interests;

(b)　　Consenting Stakeholders holding the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties as of the date hereof:

(i)　　holders of at least two-thirds of the aggregate outstanding principal amount of the 2020 Notes;

(ii)　　holders of at least two-thirds of the aggregate outstanding principal amount of the 2022 Notes; and

11

(c)      counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 14.10 (by email or otherwise) hereof that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred; and

(d)      in accordance with Section 25 of the NOL Rights Plan, the board of directors of Parker has previously approved by resolution that the Restructuring Transactions, the entry into this Agreement and the consummation of the Restructuring Transactions and the Plan shall be fully exempted from the provisions of the NOL Rights Plan and shall have deemed the Consenting Stakeholders and their Affiliates both individually and collectively to be an "Exempt Person" as defined in the NOL Rights Plan with respect to the Restructuring Transactions contemplated under the Plan.

**Section 3.      *Definitive Documents*.**

3.01.   <u>Definitive Documents</u>.   The documents related to or otherwise utilized to implement or effectuate the Restructuring Transactions (collectively, the "**Definitive Documents**") shall include, among others:

(a)      the New Second Lien Term Loan Agreement;

(b)      the documents comprising the DIP Facility;

(c)      the documents comprising the Exit Facility;

(d)      the New Warrant Agreement;

(e)      the Backstop Commitment Agreement;

(f)      any disclosure documents related to the issuance of the New Second Lien Term Loan, the issuance of the New Common Stock and the Rights Offering;

(g)      the Registration Rights Agreement;

(h)      the First Day Pleadings and all orders sought pursuant thereto;

(i)      the Plan;

(j)      the Plan Supplement;

(k)      the Disclosure Statement;

(l)      the Disclosure Statement Order;

(m)      the Solicitation Materials;

(n)      the motion or motions seeking approval of the Solicitation Materials, the forms of ballots and notices and related relief and confirmation of the Plan (including all exhibits, appendices, supplements and related documents);

12

(o)     any orders relating to the use of cash collateral and the DIP Facility (including any exhibits, schedules, amendments, modifications or supplements thereto);

(p)     the Confirmation Order;

(q)     the Rights Offering Procedures;

(r)     a motion for approval of the Rights Offering Procedures and an order approving the Rights Offering Procedures;

(s)     any other exhibits, schedules, amendments, modifications, supplements or other documents and/or agreements relating to the Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, the Backstop Commitment Agreement or the Rights Offering Procedures;

(t)     the Governance Documents;

(u)     all documentation relating to the Management Incentive Plan and any new employment agreements;

(v)     such other definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to consummate the Restructuring Transactions; and

(w)     any and all deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents related to the Restructuring Transactions (including any exhibits, amendments, modifications or supplements made from time to time thereto).

3.02.   <u>Consent Rights Regarding Definitive Documents</u>.   Each of the Definitive Documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in this Agreement, and shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

**Section 4.**     *Commitments of the Consenting Stakeholders*.

4.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)     During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement to:

(i)     support and cooperate with the Debtors to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement, and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

13

(ii)     not, and shall not direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims/Interests or Existing Equity Interests against the Company Parties other than in accordance with this Agreement and the Definitive Documents;

(iii)     give any notice, order, instruction, or direction to the applicable Trustees necessary to give effect to the Restructuring Transactions; and

(iv)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party.

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the other Restructuring Transactions, the Chapter 11 Cases contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document, to effectuate the Restructuring Transactions in accordance therewith, or as otherwise permitted under this Agreement;

(v)     object to, delay, or impede (A) the payment of reasonable and documented fees and expenses incurred under any engagement letters for any professional advisors to the Company Parties in existence as of the Agreement Effective Date to the extent that copies of such engagement letters have been provided to the Consenting Stakeholders at least seven (7) days prior to the Agreement Effective Date and have not thereafter been modified (such engagement letters (the "**Disclosed Letters**")) or (B) orders of the Bankruptcy Court approving and authorizing (1) the retention of any such advisors by the Company Parties in accordance with the Disclosed Letters and (2) the payment of reasonable and documented fees and expenses incurred under the Disclosed Letters; and

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or, interfere with the automatic stay arising under section 362 of the Bankruptcy Code; provided, however, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order or any other Definitive Document.

4.02.    Voting and Motions.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above; provided, however, that nothing in this Agreement shall prevent any Party from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Party.

Notwithstanding any other provision of this Agreement, including this Section 4, nothing in this Agreement shall require any Consenting Stakeholder to (i) incur any material expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to any Consenting Stakeholder or its Affiliates other than as expressly provided in this Agreement (including the Restructuring Term Sheet) or in the Backstop Commitment Agreement or (ii) provide any information that it determines, in its sole discretion, to be sensitive or confidential.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action reasonably likely to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is explicitly contemplated by and in accordance with this Agreement.

**Section 5.    *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.** Notwithstanding anything contained in this Agreement, and notwithstanding any delivery of a consent or vote to accept the Plan by any Consenting Stakeholder, or any acceptance of the Plan by any class of creditors, nothing in this Agreement shall:

(a)    be constructed to prohibit any Consenting Stakeholder from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(b)    be construed to prohibit any Consenting Stakeholder from appearing as a party-in-interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement

15

and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere or impede, directly or indirectly, the Restructuring Transactions;

(c)      affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties or any other party in interest;

(d)      impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited under this Agreement;

(e)      prevent any Consenting Stakeholder from enforcing this Agreement;

(f)      obligate a Consenting Stakeholder to deliver a vote to support the Plan or prohibit a Consenting Stakeholder from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date); provided that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date), such vote shall be deemed void *ab initio* and such Consenting Stakeholder shall have the opportunity to change its vote;

(g)      (i) prevent any Consenting Stakeholder from taking any action which is required by applicable Law, (ii) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege, or (iii) incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations; provided, however, that if any Consenting Stakeholder proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable Law, such Consenting Stakeholder shall provide at least three (3) Business Days' advance notice to the Company Parties;

(h)      prevent any Consenting Stakeholder by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; or

(i)      prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement.

**Section 6.      *Commitments of the Company Parties*.**

6.01.   Affirmative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the applicable milestones set forth on Schedule 1 to this Agreement (collectively, the "**Milestones**");

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address and resolve any such impediment;

16

(c)      use commercially reasonable efforts to obtain any and all required governmental, regulatory (including self-regulatory) and/or third-party approvals for the Restructuring Transactions;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and to the extent the Company Parties receive any Joinders or Transfer Agreements, notify the Consenting Stakeholders of such Joinders and Transfer Agreements;

(f)      actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)      consult and negotiate in good faith with the Consenting Stakeholders and their advisors regarding the execution of the Restructuring Transactions;

(h)      upon reasonable request of the Consenting Stakeholders, inform the advisors to the Consenting Stakeholders as to:  (i) the material business and financial (including liquidity) performance of the Consolidated Group; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)      inform counsel to the Consenting Stakeholders as soon as reasonably practicable after becoming aware of:  (i) any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any material involuntary Insolvency Proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (iii) a breach of this Agreement (including a breach by any Company Party); and (iv) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(j)      use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(k)      use commercially reasonable efforts to not (i) operate their business outside the ordinary course, taking into account the Restructuring Transactions without the consent of the Required Consenting Stakeholders (not to be unreasonably withheld) or (ii) transfer any asset or right of the Company Parties or any asset or right used in the business of the Company Parties to

17

any person or entity outside the ordinary course of business without the consent of the Required Consenting Stakeholders (not to be unreasonably withheld);

(l)      on or after the date hereof, not engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the Restructuring Transactions;

(m)      use commercially reasonable efforts to (i) provide counsel for the Consenting Stakeholders a reasonable opportunity (which shall be no less than two (2) Business Days) to review draft copies of all First Day Pleadings and second day motions and proposed orders and, (ii) to the extent reasonably practicable, provide counsel for the Consenting Stakeholders a reasonable opportunity to review and provide comments on draft copies of all other substantive documents that the Company Parties intend to file with the Bankruptcy Court; and

(n)      take any and all actions necessary and appropriate to ensure that the provisions of the NOL Rights Plan are not triggered on account of the Restructuring Transactions or the entry into this Agreement by any of the Consenting Stockholders and that the NOL Rights Plan is terminated on the Effective Date.

6.02.   Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement and the Definitive Documents;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement and the Definitive Documents; or

(d)      file any motion, pleading, or other Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement and the Definitive Documents.

**Section 7.**      ***Additional Provisions Regarding Company Parties' Commitments***.

7.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; provided, however, that to the extent that any such action or inaction is inconsistent with this Agreement or would be deemed to constitute a breach hereunder, including a determination to pursue an Alternative Restructuring Proposal, the Company Parties shall

18

provide the Consenting Stakeholders with written notice two (2) Business Days prior to when it or they intend to take such action or inaction.

7.02.    Notwithstanding anything to the contrary in this Agreement, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Existing Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest (including, if applicable, in the Chapter 11 Cases (including any official committee and the United States Trustee)), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Restructuring Proposal, the Company Parties shall provide to Akin Gump with updates on the status of any discussions regarding an Alternative Restructuring Proposal and a copy of any written offer or proposal for such Alternative Restructuring Proposal within three (3) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**      *Transfer of Interests and Securities*.

8.01.    After the Agreement Effective Date, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either: (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement; or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that

(a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if:  (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**    *Representations and Warranties of Consenting Stakeholders.*  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and it is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement, a Joinder or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

20

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law.

**Section 10.**      *Representations and Warranties of Company Parties*.   Each Company Party severally, and not jointly, represents and warrants that as of the date such Company Party executes and delivers this Agreement and as of the Effective Date:

(a)      to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of it or any other Company Party or other member of the Consolidated Group, and no analogous procedure has been commenced in any jurisdiction; provided, however, that this Section 10 does not apply to any proceeding commenced in connection with filing the Chapter 11 Cases;

(b)      in accordance with Section 25 of the NOL Rights Plan, the Consenting Stakeholders both individually and collectively, in connection with the entry into this Agreement and their agreements in connection with the Restructuring Transactions contemplated hereby, have been deemed by the board of directors of Parker to be an "Exempt Person" as defined in the NOL Rights Plan and the board of directors has previously approved by resolution that the Restructuring Transactions and the entry into this Agreement are fully exempted from the provisions of the NOL Rights Plan; and

(c)      acknowledge, and the Company Parties hereby agree, that any Consenting Stakeholder that has checked the box on its signature page to this Agreement in connection with the "Existing Preferred Stock Conversion Waiver" shall have irrevocably waived its right hereby to convert any of the shares of Existing Preferred Stock into shares of Existing Common Stock until such time as this Agreement is terminated other than upon the consummation of the Plan on the Effective Date.

**Section 11.**      *Mutual Representations, Warranties, and Covenants; Further Assurances*.   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Effective Date:

(a)      it is validly existing and in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be

21

limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Backstop Commitment Agreement, the Plan, the Restructuring Term Sheet, and the Bankruptcy Code (or as reasonably determined by the Company Parties and the Required Consenting Stakeholders upon advice of counsel), no consent or approval is required by a governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange, third party or any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement other than any such consent or approval which has been obtained, provided, or otherwise satisfied prior to the Agreement Effective Date and which consent or approval has not been subsequently revoked;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents; and

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement.

**Section 12.**      *Termination Events*.

12.01.   <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated by the Required Consenting Stakeholders, by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence and continuation of any of the following events, in each case, other than as contemplated by the Restructuring Transactions:

(a)      the (i) breach (other than an immaterial breach) in any respect by a Company Party of any of the undertakings, representations, warranties, or covenants of the Company Parties set forth in this Agreement or (ii) failure of the Company Parties to act in a manner materially consistent with this Agreement, which breach or failure remains uncured (to the extent curable) for five (5) Business Days after the Required Consenting Stakeholders transmit a written notice to the Company Parties in accordance with Section 14.10 hereof identifying such breach;

(b)      the making public, modification, amendment, or filing of any of the Definitive Documents without the consent of the applicable Required Consenting Stakeholders in accordance with this Agreement;

(c)      the Company Parties (i) withdraw the Plan, (ii) publicly announce their intention not to support the Restructuring Transactions or (iii) file, publicly announce, or execute a definitive written agreement with respect to an Alternative Restructuring Proposal;

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the

consummation of a material portion of the Restructuring Transactions, including the Plan and (ii) either (1) such ruling, judgment or order has been issued at the request of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for fifteen (15) Days after such terminating Required Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; provided that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)     (i) the failure of any of Milestones (a), (b), (c), or (d) on Schedule 1 to this Agreement to be satisfied, which remains unsatisfied for three (3) Business Days, or (ii) the failure of Milestone (e) on Schedule 1 to this Agreement to be satisfied, which remains unsatisfied for one (1) Business Day;

(f)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, (iv) terminating exclusivity under Bankruptcy Code section 1121, or (v) rejecting this Agreement;

(g)     if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(h)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties that would materially and adversely affect the Company's operational or financial performance;

(i)     upon the delivery of notice by the Company Parties pursuant to Section 7.01;

(j)     failure by the Company Parties to pay the fees and expenses set forth in Section 14.22 of this Agreement as and when required, subject to applicable Law; provided, however, that the Effective Date shall not occur until and unless the fees and expenses set forth in Section 14.22 have been paid in full; or

23

(k)      the Company Parties file any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within two (2) Business Days of receipt by the Company Parties of written notice from the Required Consenting Stakeholders that such motion or pleading is inconsistent with this Agreement.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)      the breach (other than an immaterial breach) by Consenting Stakeholders holding an amount of Unsecured Notes that would result in non-breaching Consenting Stakeholders holding less than two-thirds ($^2/_3$) of the aggregate principal amount of 2020 Notes or 2022 Notes of their undertakings, representations, warranties, or covenants set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Company Parties of notice of such breach; provided, however, that the Company Parties may only terminate this Agreement as to any Consenting Stakeholder individually and not as to all Parties for a breach described in the immediately preceding clause;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (A) enjoins the consummation of a material portion of the Restructuring Transactions and (B) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; provided that this termination right shall not apply to or be exercised to the extent a Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(c)      two (2) Business Days after the delivery of notice by the Company Parties pursuant to Section 7.01.

12.03.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

12.04.  Termination on and after the Outside Date.  Any Consenting Stakeholder may terminate its obligations under this Agreement, by the delivery to the Company Parties and all other Consenting Stakeholders of a written notice in accordance with Section 14.10 hereof, upon the occurrence of the Outside Date and at any time thereafter.

12.05.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately upon consummation of the Plan on the Effective Date.

12.06.  Effect of Termination.  Except as set forth in Section 14.17, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and

24

remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, tenders, waivers, forbearances, ballots and votes delivered by a Party subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder. No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(c). Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(c). For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

**Section 13.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (i) each Company Party and (ii) the Required Consenting Stakeholders; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Stakeholders holding claims within the same class as provided for in the Restructuring Term Sheet), and adverse effect on any of the Company Claims/Interests held by such Consenting Stakeholder(s), then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; provided, further that written consent of all Consenting Stakeholders represented by Akin Gump as of the Agreement Effective Date (so long as such Consenting Stakeholders continue to hold Company Claims/Interests as of the relevant date) shall be required for any modification, amendment, waiver or supplement to this Agreement, or any other Definitive Document that modifies:

25

(x)(i) the percentage of New Common Stock to be issued to the Holders of 2020 Notes Claims and 2022 Notes Claims, as set forth in the Restructuring Term Sheet and the exhibits thereto;

(ii) the Rights Offering Amount (as defined in the Restructuring Term Sheet), the allocation of rights among classes of debt and equity, the Put Option Cash Premium, the Put Option Equity Premium, and the backstop allocations as among the Backstop Commitment Parties, all as set forth in the Restructuring Term Sheet, Backstop Commitment Agreement and the exhibits thereto;

(iii) the principal amount, coupon, call schedule, term, security and priority of the New Second Lien Term Loan, as set forth in the Restructuring Term Sheet, New Second Lien Term Loan Term Sheet and the exhibits thereto;

(iv) the percentage of the New Warrants to be issued to the holders of Existing Common Stock and Existing Preferred Stock, the provisions of the New Warrant Term Sheet under the section entitled "Sales of Reorganized Parker", the strike price of the New Warrants as determined in accordance with the New Warrant Term Sheet and the term of the New Warrants, as set forth in the Restructuring Term Sheet, New Warrant Term Sheet and the exhibits thereto; and

(v) the percentage of New Common Stock to be issued to the holders of Existing Common Stock and Existing Preferred Stock, as set forth in the Restructuring Term Sheet and the exhibits thereto; or

(y) the defined term "Outside Date" or "Required Consenting Stakeholders".

(c) Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.** *Miscellaneous*.

14.01. <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance

with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02. Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03. Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable; provided however that this Section 14.03 shall not limit the right of any party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Section 3.02).

14.04. Complete Agreement. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart,

27

when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)    if to a Company Party, to:

        Parker Drilling Company
        Five Greenway Plaza, Suite 100
        Houston, Texas 77046
        Attention:  John Edward Menger and Jennifer Simons
        E-mail address:  Ed.Menger@parkerdrilling.com and
        Jennifer.Simons@parkerdrilling.com

        with copies to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, New York 10022
        Attention:  Christopher J. Marcus, P.C., Brian Schartz, P.C., and Matthew Fagen
        E-mail address:  christopher.marcus@kirkland.com, brian.schartz@kirkland.com, and matthew.fagen@kirkland.com

    (b)    if to a Consenting Stakeholder, to each Consenting Stakeholder at the addresses or e-mail addresses set forth below the Consenting Stakeholder's signature page to this Agreement (or to the signature page to a Joinder or Transfer Agreement in the case of any Consenting Stakeholder that becomes a party hereto after the Agreement Effective Date):

    with a copy to (which shall not constitute notice):

<div align="center">28</div>

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Attention:  James Savin and Kevin Eide
Email address:  jsavin@akingump.com and keide@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park, Bank of America Tower
New York, NY  10036
Attention:  Michael S. Stamer
Email address:  mstamer@akingump.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  Independent Due Diligence and Decision Making.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  Enforceability of Agreement.  The Parties hereby acknowledge and agree: (i) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code, (ii) waives any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required, (iii) that they shall not take a position to the contrary of this Section 14.12 in the Bankruptcy Court or any other court of competent jurisdiction and (iv) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 14.12 is illegal, invalid or unenforceable, in whole or in part.

14.13.  Waiver.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

29

14.15. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17. <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with Section 8 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 12.06, Section 14 (except for Section 14.22 with respect to fees and expenses incurred after the termination of this Agreement (other than with respect to fees and expenses incurred after the termination of this Agreement due to the consummation of the Plan on the Effective Date)), and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.18. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.19. <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.20. <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 13 or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.21. <u>Confidentiality and Publicity</u>.  Other than as may be required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the name or the principal amount or percentage of the Company Claims/Interests held by any Consenting Stakeholder or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer); provided, however, that the Company Parties shall be

30

permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims/Interests held by the Consenting Stakeholders collectively; and, provided, further, that the Company Parties may disclose the names of any Consenting Stakeholder (at the institution level) at a hearing in connection with the Chapter 11 Cases, but not the principal amount or percentage of the Company Claims/Interests held by any such Consenting Stakeholder or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer).   Notwithstanding the foregoing, the Consenting Stakeholders hereby consent to the disclosure of the execution, terms and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by law or regulation; provided, however, that (i) if any of the Company Parties determines that they are required to attach a copy of this Agreement, any Joinder or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will redact any reference to or identifying information concerning a specific Consenting Stakeholders and such Consenting Stakeholder's holdings (including before filing any pleading with the Bankruptcy Court) and (ii) if disclosure of additional identifying information of any Consenting Stakeholders is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each Consenting Stakeholder (who shall have the right to seek a protective order prior to disclosure). The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement. Notwithstanding the foregoing, the Company Parties will submit to counsel for the Consenting Stakeholders all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with applicable Law) in advance of release and will take such counsel's view with respect to such communications into account.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

14.22. Fees and Expenses.  Regardless of whether the Restructuring Transactions are consummated, the Company Parties shall promptly pay in cash all reasonable and documented fees and expenses of (i) (a) Akin Gump, as counsel to the Consenting Stakeholders, (b) any local counsel to the Consenting Stakeholders and (c) Houlihan Lokey Capital, Inc., as financial advisor to the Consenting Stakeholders and (ii) any consultants or other professionals retained by the Consenting Stakeholders represented by Akin Gump in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any success fees contemplated therein, and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals, (collectively, the "**Consenting Stakeholder Fees and Expenses**"); provided, however, that simultaneously with the execution of this Agreement, the Company Parties shall pay all such unpaid Consenting Stakeholder Fees and Expenses incurred at any time prior to the Agreement Effective Date; and provided, further, that in the event that the Plan is consummated, the Consenting Stakeholder Fees and Expenses shall also include all fees and expenses reasonably expected to be incurred by the foregoing persons related to the

Restructuring Transactions following the Effective Date, which shall be payable in accordance with the terms of the Backstop Commitment Agreement.

14.23.   Relationship Among Parties.  Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Stakeholders under this Agreement shall be several, not joint.  None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Stakeholders, in each case except as expressly set forth in this Agreement.  It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of any Company Parties without the consent of the Company or any Consenting Stakeholder, subject to Section 8 of this Agreement and applicable securities laws.  No prior history, pattern or practice of sharing confidence among or between any of the Consenting Stakeholders, and/or the Company Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of any of the Company Parties and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder.  For the avoidance of doubt: (1) each Consenting Stakeholder is entering into this Agreement directly with the Company and not with any other Consenting Stakeholder, (2) no other Consenting Stakeholder shall have any right to bring any action against any other Consenting Stakeholder with respect this Agreement (or any breach thereof) and (3) no Consenting Stakeholder shall, nor shall any action taken by a Consenting Stakeholder pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting Stakeholder with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting Stakeholders are in any way acting as a group.   All rights under this Agreement are separately granted to each Consenting Stakeholder by the Company and vice versa, and the use of a single document is for the convenience of the Company. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

14.24.   Damages.  Notwithstanding anything to the contrary in this Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this Agreement any punitive, special, indirect or consequential damages or damages for lost profits.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signatures Follow*]

32

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**PARKER DRILLING COMPANY**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**2M-TEK, INC.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**ANACHORETA, INC.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARDRIL, INC.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER AVIATION INC.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING ARCTIC OPERATING, LLC**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER DRILLING COMPANY OF NIGER**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER DRILLING COMPANY NORTH AMERICA, INC.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER DRILLING COMPANY OF OKLAHOMA, INCORPORATED**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER DRILLING COMPANY OF SOUTH AMERICA, INC.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING MANAGEMENT SERVICES, LTD.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER DRILLING OFFSHORE COMPANY, LLC**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER DRILLING OFFSHORE USA, L.L.C.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER NORTH AMERICA OPERATIONS, LLC**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER TECHNOLOGY, INC.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory

**PARKER TECHNOLOGY, L.L.C.**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER TOOLS, LLC**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**PARKER-VSE, LLC**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**QUAIL USA, LLC**

By: /s/ Michael W. Sumruld

Name:  Michael W. Sumruld

Authorized Signatory


**QUAIL TOOLS, L.P.**

By: /s/ Michael W. Sumruld

Name:  Quail USA, LLC, its General Partner

Authorized Signatory

## Schedule 1

### Milestones

(a) The Debtors shall commence the Chapter 11 Cases and file the First Day Pleadings with the Bankruptcy Court no later than 2 days after the Agreement Effective Date;

(b) Within one day of the Petition Date, the Debtors shall file the Plan, the Disclosure Statement, and a motion (or motions) for approval of the Rights Offering Procedures and the Disclosure Statement with the Bankruptcy Court;

(c) The Debtors shall obtain entry by the Bankruptcy Court of orders approving the Disclosure Statement and the Rights Offering Procedures, in each case within 45 days after the Petition Date;

(d) The Debtors shall obtain entry of the Confirmation Order by no later than 91 days after the Petition Date; and

(e) The Effective Date of the Plan shall have occurred by the later of (i) 106 days after the Petition Date and (ii) 15 days after the date (without taking into account any grace period provided under section 12.01(e) of the Agreement) set forth in sub-clause (d) of this Schedule 1.

**<u>Exhibit L(i)</u>**

**Restructuring Support Agreement Amendment**

Execution Version

### *FIRST AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT*

This FIRST AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT (including any exhibit attached hereto, this "**Amendment**") is made and entered into as of January 28, 2019, by and among:

(i) Parker Drilling Company, a company incorporated under the Laws of Delaware ("**Parker**"), 2M-TEK, Inc., Anachoreta, Inc., Pardril, Inc., Parker Aviation Inc., Parker Drilling Arctic Operating, LLC, Parker Drilling Company of Niger, Parker Drilling Company North America, Inc., Parker Drilling Company of Oklahoma, Incorporated, Parker Drilling Company of South America, Inc., Parker Drilling Management Services, Ltd., Parker Drilling Offshore Company, LLC, Parker Drilling Offshore USA, L.L.C., Parker North America Operations, LLC, Parker Technology, Inc., Parker Technology, L.L.C., Parker Tools, LLC, Parker-VSE, LLC, Quail USA, LLC, and Quail Tools, L.P. (together with Parker, collectively, the "**Company Parties**"); and

(ii) the undersigned and non-Affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, among other securities, Unsecured Notes, Existing Preferred Stock and/or Existing Common Stock, that have executed and delivered counterpart signature pages to this Amendment to counsel to the Company Parties (the "**Consenting Stakeholders**").

This Amendment collectively refers to the Company Parties and the Consenting Stakeholders as the "**Parties**" and each individually as a "**Party**."

This Amendment amends that certain Restructuring Support Agreement, dated as of December 12, 2018, by and among the Company Parties and the Consenting Stakeholders (the "**RSA**").[1]

### *RECITALS*

**WHEREAS**, the Company Parties and the requisite Consenting Stakeholders desire to amend the RSA as set forth in this Amendment;

**WHEREAS**, Section 13 of the RSA permits modifications, amendments, or supplements to the RSA with the consent of the Company Parties and the requisite Consenting Stakeholders by written agreement; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees to amend the RSA as follows:

---

[1]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the RSA.

*AMENDMENT*

1.        Amendment to the Restructuring Term Sheet.  The Restructuring Term Sheet is amended to include, and shall be deemed to incorporate, the terms of the revised Plan attached hereto as Exhibit A.[2]  To the extent of any conflicts between the Restructuring Term Sheet and the Plan, the terms of the Plan shall control.

2.        Amendments to the RSA.

(a)      Section 1.01 of the RSA shall be amended to add a new defined term as set forth below:

""**Initial Consenting Stakeholder**"" means those Consenting Stakeholders who executed the RSA on December 12, 2018, and are represented by Akin Gump.".

(b)      The term "Consenting Stakeholder" or "Consenting Stakeholders", as applicable, in each of the following provisions, shall be amended to "Initial Consenting Stakeholder" or "Initial Consenting Stakeholders", as applicable:

> i.        Section 4.01(b)(v);
>
> ii.       Section 6.01(g);
>
> iii.      Section 6.01(h);
>
> iv.      Section 6.01(m);
>
> v.       Section 14.22;
>
> vi.      the final paragraph of the section captioned "Restructuring Transaction Overview" of the Restructuring Term Sheet; and
>
> vii.     the first sentence of the first full paragraph under the section captioned "Registration Rights Agreement" of the Governance Term Sheet.

(c)      The definition of "Registration Rights Agreement" in Section 1.01 of the RSA shall be amended and restated in its entirety as follows:

""**Registration Rights Agreement**" means any agreements providing registration rights to the Initial Consenting Stakeholders on account of New Common Stock acquired

---

[2]     For the avoidance of doubt, (i) the phrase "Assuming that Class 10 Existing Common Stock votes to accept the Plan" under the caption "Rights Offering" and (ii) the last sentence in the third column under the caption "Class 10", each in the Restructuring Term Sheet, are each hereby deleted.

2

by them pursuant to the Restructuring Transactions in accordance with this Agreement (including the Governance Term Sheet) and the Definitive Documents.".

(d)      Section 12.02(a) of the RSA shall be amended and restated in its entirety as follows:

"(a)      the breach (other than an immaterial breach) by the Initial Consenting Stakeholders holding an amount of Unsecured Notes that would result in non-breaching Consenting Stakeholders holding less than two-thirds (2/3) of the aggregate principal amount of 2020 Notes or 2022 Notes of their undertakings, representations, warranties, or covenants set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Company Parties of notice of such breach; provided, however, that the Company Parties may only terminate this Agreement as to any Consenting Stakeholder individually and not as to all Parties for a breach described in the immediately preceding clause; provided, further, however, that the Company may terminate this Agreement as to any Consenting Stakeholder that is not an Initial Consenting Stakeholder individually, and not as to all Consenting Stakeholders, in connection with a breach (other than an immaterial breach) of any of such Consenting Stakeholder's obligations, covenants, representations or warranties set forth in this Agreement, and such breach is continuing and is not timely cured within five (5) Business Days after the Company provides written notice to such Consenting Stakeholders of such breach (in which event upon failure to so cure within such time period). Notwithstanding the termination by the Company as to any Consenting Stakeholder that is not an Initial Consenting Stakeholder as set forth in the proviso in this Section 12.02(a), the Agreement and the transactions contemplated by this Agreement shall continue with respect to the all such other Consenting Stakeholders.

(e)      The initial clause in Section 13(b) of the RSA shall be amended and restated in its entirety as follows:

"(b)      This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (i) each Company Party and (ii) the Required Consenting Stakeholders; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Stakeholders holding claims within the same class as provided for in the Restructuring Term Sheet), and adverse effect on any of the Company Claims/Interests held by any Initial Consenting Stakeholder or Saba (as defined in the Backstop Commitment Agreement, as amended), to the extent Saba executes a joinder to the RSA, then the consent of each such affected Initial Consenting Stakeholder or Saba, as applicable, shall also be required to effectuate such modification, amendment, waiver or supplement; provided, further that written consent of all Initial Consenting Stakeholders represented by Akin Gump as of the Agreement Effective Date (so long as such Consenting Stakeholders continue to hold Company Claims/Interests as of the relevant date) shall be required for any modification, amendment, waiver or supplement to this Agreement, or any other Definitive Document that modifies:"

(f)      The Plan attached hereto as Exhibit A shall be deemed to be the "Plan" under the RSA.

3

3.      Ratification.  Except as specifically provided for in this Amendment (including the Plan), no waivers, releases, changes, amendments, or other modifications have been made on or prior to the date hereof or are being made to the terms of the RSA or the rights and obligations of the parties thereunder, all of which such terms are hereby ratified and confirmed and remain in full force and effect.

4.      Effect of Amendment.  This Amendment shall be effective on the date hereof and at the time when all counterpart signatures have been executed and delivered by the Company Parties and the Consenting Stakeholders (the "**Effective Time**"), provided, however, that this Amendment shall be effective with regard to the Company Parties only upon the entry of a Bankruptcy Court order approving (i) this Amendment, or (ii) the Debtors' assumption of the RSA, as amended by this Amendment.  Following the Effective Time of this Amendment, whenever the RSA is referred to in any agreements, documents, and instruments, such reference shall be deemed to be to the RSA as amended by this Amendment.  All references to the "Agreement", "herein", "hereof", "hereto" or words of similar import in the RSA shall be deemed to include the RSA as amended by this Amendment.

5.      Waiver of Certain Termination Rights.  The amendment to the RSA as set forth in this Amendment is being effectuated in accordance with the RSA, and, therefore, shall not constitute a termination event thereunder or otherwise constitute a breach by any of the Parties under the RSA.

6.      Headings.  Titles and headings in this Amendment are inserted for convenience of reference only and are not intended to affect the interpretation of construction of this Amendment.

7.      Counterparts.  This Amendment may be signed in one or more counterparts (including by means of facsimile, electronic mail, or PDF signature pages), each of which need not contain the signature of all Parties hereto, and all of such counterparts taken together shall constitute a single agreement.

8.      Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in such state, without giving effect to the conflict of laws principles thereof.

*[Signature pages follow]*

4

IN WITNESS WHEREOF, the Parties have executed this Amendment on the day and year first above written.

**Company Parties' Signature Page to
the First Amendment to the Restructuring Support Agreement**

**PARKER DRILLING COMPANY**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**2M-TEK, INC.**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**ANACHORETA, INC.**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**PARDRIL, INC.**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**Signature Page of Company Parties to First Amendment to the Restructuring Support Agreement**

**PARKER AVIATION INC.**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING ARCTIC OPERATING, LLC**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING COMPANY OF NIGER**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING COMPANY NORTH AMERICA, INC.**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING COMPANY OF OKLAHOMA, INCORPORATED**

By: _Michael W Sumruld_

Name:  Michael W. Sumruld

Authorized Signatory

**Signature Page of Company Parties to First Amendment to the Restructuring Support Agreement**

**PARKER DRILLING COMPANY OF SOUTH AMERICA, INC.**

By: _Michael W Sumruld_

Name: Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING MANAGEMENT SERVICES, LTD.**

By: _Michael W Sumruld_

Name: Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING OFFSHORE COMPANY, LLC**

By: _Michael W Sumruld_

Name: Michael W. Sumruld

Authorized Signatory

**PARKER DRILLING OFFSHORE USA, L.L.C.**

By: _Michael W Sumruld_

Name: Michael W. Sumruld

Authorized Signatory

**PARKER NORTH AMERICA OPERATIONS, LLC**

By: _Michael W Sumruld_

Name: Michael W. Sumruld

Authorized Signatory

**Signature Page of Company Parties to First Amendment to the Restructuring Support Agreement**

**PARKER TECHNOLOGY, INC.**

By: _Michael W Sumruld_____

Name: Michael W. Sumruld

Authorized Signatory

**PARKER TECHNOLOGY, L.L.C.**

By: _Michael W Sumruld_____

Name: Michael W. Sumruld

Authorized Signatory

**PARKER TOOLS, LLC**

By: _Michael W Sumruld_____

Name: Michael W. Sumruld

Authorized Signatory

**PARKER-VSE, LLC**

By: _Michael W Sumruld_____

Name: Michael W. Sumruld

Authorized Signatory

**QUAIL USA, LLC**

By: _Michael W Sumruld_____

Name: Michael W. Sumruld

Authorized Signatory

**Signature Page of Company Parties to First Amendment to the Restructuring Support Agreement**

**QUAIL TOOLS, L.P.**

By: _Michael W Sumruld_

Name: Quail USA, LLC, its General Partner

Authorized Signatory

Signature Page of Company Parties to First Amendment to the Restructuring Support Agreement

**Consenting Stakeholder Signature Page to
the First Amendment to the Restructuring Support Agreement**

**[CONSENTING STAKEHOLDER]**

_____
Name:
Title:

**Signature Page of Consenting Stakeholders to First Amendment to the Restructuring Support Agreement**

## EXHIBIT A

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PARKER DRILLING COMPANY, *et al.*,[1] | ) | Case No. 18-36958 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**AMENDED JOINT CHAPTER 11**
**PLAN OF REORGANIZATION OF PARKER DRILLING COMPANY AND ITS DEBTOR AFFILIATES**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:        (713) 836-3600
Facsimile:        (713) 836-3601
Email:        brian.schartz@kirkland.com
        anna.rotman@kirkland.com
-and-
James H.M. Sprayregen, P.C.
Laura E. Krucks (admitted *pro hac vice*)
300 North LaSalle Street
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        james.sprayregen@kirkland.com
        laura.krucks@kirkland.com
-and-
Christopher J. Marcus, P.C. (admitted *pro hac* vice)
Matthew Fagen (admitted *pro hac* vice)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:        christopher.marcus@kirkland.com
        matthew.fagen@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  January 23, 2019

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77002
Telephone:        (713) 752-4284
Facsimile:        (713) 308-4184
Email:        ptomasco@jw.com
        mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949), Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6129); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is:  5 Greenway Plaza, Suite 100, Houston, Texas 77046.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................................1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
      GOVERNING LAW, AND OTHER REFERENCES..............................................................1
      A.    Defined Terms ...................................................................................1
      B.    Rules of Interpretation ....................................................................13
      C.    Computation of Time.......................................................................13
      D.    Governing Law ................................................................................13
      E.    Reference to Monetary Figures .......................................................14
      F.    Reference to the Debtors or the Reorganized Debtors .....................14
      G.    Controlling Document.....................................................................14

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS.........................................................14
      A.    Administrative Claims .....................................................................14
      B.    Professional Fee Claims...................................................................14
      C.    Priority Tax Claims.........................................................................15
      D.    DIP Claims.....................................................................................15
      E.    Statutory Fees.................................................................................15

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS.........15
      A.    Classification of Claims and Interests..............................................15
      B.    Treatment of Classes of Claims and Interests ..................................16
      C.    Special Provision Governing Unimpaired Claims .............................19
      D.    Elimination of Vacant Classes .........................................................19
      E.    Voting Classes; Presumed Acceptance by Non-Voting Classes ..........20
      F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................20
      G.    Intercompany Interests ...................................................................20
      H.    Subordinated Claims and Interests...................................................20

ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN......................................20
      A.    General Settlement of Claims, Interests, and Causes of Action........20
      B.    Restructuring Transactions ..............................................................20
      C.    New Second Lien Term Loan ...........................................................21
      D.    Issuance and Distribution of New Common Stock .............................21
      E.    Issuance and Distribution of New Warrants......................................21
      F.    Rights Offering ...............................................................................22
      G.    Exit Facility....................................................................................22
      H.    Management Incentive Plan..............................................................23
      I.    Management of Reorganized Parker ..................................................23
      J.    Exemption from Registration Requirements......................................23
      K.    Vesting of Assets ............................................................................23
      L.    Cancelation of Instruments, Certificates, and Other Documents .......24
      M.    Corporate Action............................................................................24
      N.    Corporate Existence ........................................................................24
      O.    New Organizational Documents .......................................................25
      P.    Effectuating Documents; Further Transactions..................................25
      Q.    Section 1146(a) Exemption..............................................................25
      R.    Directors and Officers ....................................................................26
      S.    Employee Arrangements of the Reorganized Debtors ........................26
      T.    Preservation of Causes of Action......................................................26
      U.    Indenture Trustee Expenses .............................................................27

**TABLE OF CONTENTS (CONT'D)**

<div align="right">**Page**</div>

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......................27
    A.    Assumption or Rejection of Executory Contracts and Unexpired Leases......................................27
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases..................................28
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..................................28
    D.    Indemnification ..................................................................................................................................29
    E.    Insurance Policies .............................................................................................................................29
    F.    Contracts and Leases After the Petition Date..................................................................................29
    G.    Reservation of Rights........................................................................................................................29
    H.    Nonoccurrence of Effective Date ....................................................................................................30

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ........................................................**30**
    A.    Distributions on Account of Claims and Interests Allowed as of the Effective Date ....................30
    B.    Rights and Powers of the Distribution Agent..................................................................................30
    C.    Special Rules for Distributions to Holders of Disputed Claims......................................................30
    D.    Delivery of Distributions ..................................................................................................................31
    E.    Claims Paid or Payable by Third Parties.........................................................................................32
    F.    Setoffs ..............................................................................................................................................33
    G.    Allocation Between Principal and Accrued Interest ........................................................................33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ......................................**34**
    A.    Allowance of Claims.........................................................................................................................34
    B.    Claims Administration Responsibilities...........................................................................................34
    C.    Estimation of Claims........................................................................................................................34
    D.    Adjustment to Claims Without Objection.........................................................................................34
    E.    Time to File Objections to Claims ...................................................................................................34
    F.    Disallowance of Claims ...................................................................................................................35
    G.    Amendments to Claims.....................................................................................................................35
    H.    No Distributions Pending Allowance................................................................................................35
    I.    Distributions After Allowance .........................................................................................................35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN** ........................................................**35**
    A.    **Discharge of Claims and Termination of Interests** .................................................................35
    B.    **Releases by the Debtors** ...............................................................................................................36
    C.    **Releases by Holders of Claims and Interests** .............................................................................36
    D.    **Exculpation**...................................................................................................................................37
    E.    **Injunction**....................................................................................................................................37
    F.    Protection Against Discriminatory Treatment .................................................................................38
    G.    Release of Liens................................................................................................................................38
    H.    Reimbursement or Contribution.......................................................................................................38
    I.    Recoupment ......................................................................................................................................38
    J.    Subordination Rights.........................................................................................................................39
    K.    SEC Rights Reserved .......................................................................................................................39

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**..........................................**39**
    A.    Conditions Precedent to the Effective Date .....................................................................................39
    B.    Waiver of Conditions .......................................................................................................................40
    C.    Effect of Non-Occurrence of Conditions to Consummation............................................................40
    D.    Substantial Consummation ...............................................................................................................40

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**............................**41**
    A.    Modification of Plan .........................................................................................................................41
    B.    Effect of Confirmation on Modifications..........................................................................................41
    C.    Revocation or Withdrawal of Plan...................................................................................................41

**TABLE OF CONTENTS (CONT'D)**

**Page**

**ARTICLE XI. RETENTION OF JURISDICTION** ..................................................................................41

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ...........................................................................43
    A.    Immediate Binding Effect ...................................................................................43
    B.    Additional Documents .........................................................................................43
    C.    Dissolution of the Creditors' Committee ...........................................................43
    D.    Payment of Statutory Fees ..................................................................................43
    E.    Reservation of Rights..........................................................................................43
    F.    Successors and Assigns.......................................................................................44
    G.    Service of Documents .........................................................................................44
    H.    Term of Injunctions or Stays...............................................................................44
    I.    Entire Agreement ................................................................................................44
    J.    Plan Supplement .................................................................................................45
    K.    Non-Severability ................................................................................................45
    L.    Votes Solicited in Good Faith.............................................................................45
    M.    Closing of Chapter 11 Cases...............................................................................45
    N.    Waiver or Estoppel..............................................................................................45

**INTRODUCTION**

Parker Drilling Company and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof.  Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.      *Defined Terms*

1.      "*2020 Notes*" means the 7.50% Senior Notes due August 2020, issued in the original principal amount of $225,000,000.00, pursuant to the 2020 Notes Indenture.

2.      "*2020 Notes Claim*" means any Claim against the Debtors arising from or based upon the 2020 Notes or the 2020 Notes Indenture.

3.      "*2020 Notes Indenture*" means that certain Indenture, dated as of July 30, 2013, as amended, restated, amended and restated, supplemented or otherwise modified, or replaced from time to time, for the 2020 Notes, among Parker, each of the other Debtors party thereto, and the Indenture Trustee.

4.      "*2022 Notes*" means the 6.75% Senior Notes due July 2022, issued in the original principal amount of $360,000,000.00, pursuant to the 2022 Notes Indenture.

5.      "*2022 Notes Claim*" means any Claim against the Debtors arising from or based upon the 2022 Notes or the 2022 Notes Indenture.

6.      "*2022 Notes Indenture*" means that certain Indenture, dated as of January 22, 2014, as amended, restated, amended and restated, supplemented or otherwise modified, or replaced from time to time, for the 2022 Notes, among Parker, each of the other Debtors party thereto, and the Indenture Trustee.

7.      "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

8.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

9.     "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

10.     "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

11.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

12.     "*Backstop Commitment Agreement*" means that certain backstop commitment agreement, entered into and dated as of December 12, 2018, pursuant to which the Backstop Commitment Parties have agreed to Backstop the Rights Offering, as may be amended or modified from time to time in accordance with the terms thereof.

13.     "*Backstop Commitment Parties*" means at any time and from time to time, the parties that have committed to backstop the Rights Offering and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.

14.     "*Bank of America Credit Card Program*" has the meaning ascribed to such term in the Final DIP Order.

15.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

16.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

17.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court.

18.     "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed with respect to such Claims, as may be ordered by the Bankruptcy Court.

19.     "*Bar Date Order*" means the order of the Bankruptcy Court establishing the Claims Bar Date [Docket No. 265].

20.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

21.     "*Causes of Action*" means any claims, Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

22.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

23.     "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

25.     "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

26.     "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

27.     "*Company*" means Parker together with its Debtor and non-Debtor Affiliates.

28.     "*Compensation Term Sheet*" has the meaning ascribed to such term in the Restructuring Support Agreement.

29.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

30.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

31.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

32.     "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

33.     "*Consenting Stakeholder Fees and Expenses*" has the meaning ascribed to such term in the Restructuring Support Agreement.

34.     "*Consenting Stakeholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

3

35.     "*Consummation*" means the occurrence of the Effective Date.

36.     "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

37.     "*Creditors' Committee*" means the official committee of unsecured creditors, if any, appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

38.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default(s) under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

39.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', officers', and employees' liability.

40.     "*Debtors*" means, collectively, Parker Drilling Company, 2M-TEK, Inc., Anachoreta, Inc., Pardril, Inc., Parker Aviation Inc., Parker Drilling Arctic Operating, LLC, Parker Drilling Company of Niger, Parker Drilling Company North America, Inc., Parker Drilling Company of Oklahoma, Incorporated, Parker Drilling Company of South America, Inc., Parker Drilling Management Services, Ltd., Parker Drilling Offshore Company, LLC, Parker Drilling Offshore USA, L.L.C., Parker North America Operations, LLC, Parker Technology, Inc., Parker Technology, L.L.C., Parker Tools, LLC, Parker-VSE, LLC, Quail USA, LLC, and Quail Tools, L.P.

41.     "*Definitive Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement.

42.     "*DIP Credit Agreement*" means that certain Debtor in Possession Credit Agreement, dated as of December 14, 2018, by and among Parker, as parent borrower, certain other Debtors, as designated borrowers, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Facility Agent.

43.     "*DIP Facility*" means the certain $50 million senior secured revolving credit facility provided pursuant to the DIP Credit Agreement.

44.     "*DIP Facility Agent*" means Bank of America, N.A., or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

45.     "*DIP Facility Claims*" means any Claim held by any of the DIP Facility Lenders or the DIP Facility Agent arising under or related to the DIP Credit Agreement.

46.     "*DIP Facility Lenders*" means those certain lenders under the DIP Credit Agreement, solely in their capacity as such.

47.     "*Disallowed*" means any Claim that is not Allowed.

48.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, which disclosure statement shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

49.     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement, entered on [●], 2019 [Docket No. [●]].

50.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in

4

the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

51. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

52. "*Distribution Date*" means, except as otherwise set forth herein and except distributions to holders of public securities, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*DTC*" means The Depository Trust Company.

54. "*Effective Date*" means the date that is the first business day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, and the Plan is deemed effective by the Debtors.

55. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

56. "*Estate*" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

57. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) holders of the New Second Lien Term Loan; (c) the New Second Lien Term Loan Agent; (d) the Existing ABL Agent; (e) the Existing ABL Lenders; (f) the Consenting Stakeholders; (g) the Indenture Trustee; (h) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.

58. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

59. "*Existing ABL Agent*" means Bank of America, N.A., in its capacity as Administrative Agent under the Existing ABL Facility.

60. "*Existing ABL Claims*" means any Claim derived from, based upon, or secured by the Existing ABL Documents, including any Claim related to a letter of credit outstanding under the Existing ABL Credit Agreement.

61. "*Existing ABL Credit Agreement*" means that certain Second Amended and Restated Credit Agreement, dated as of January 26, 2015 (as amended, supplemented, or modified from time to time) among certain of the Debtors, Bank of America, N.A. as Administrative Agent and L/C Issuer, Wells Fargo Bank, National Association as Syndication Agent, Barclays Bank PLC as Documentation Agent, Merrill Lynch Pierce, Fenner & Smith Incorporated and Wells Fargo Securities, LLC as Joint Lead Arrangers and Joint Bookrunners, and other lenders and L/C issuers from time to time party thereto.

62. "*Existing ABL Documents*" means the Existing ABL Credit Agreement and any other agreements or documents executed in connection therewith or related thereto.

63. "*Existing ABL Facility*" means that certain prepetition senior secured revolving financing facility dated as of January 26, 2015 in the aggregate principal amount of up to $80.0 million at any time outstanding among

5

certain of the Debtors, the Existing ABL Agent, and the Existing ABL Lenders, which was cancelled upon the filing of these Chapter 11 Cases.

64.    "*Existing ABL Lenders*" means, collectively, each financial institution party to the Existing ABL Credit Agreement as a Lender thereunder (and as defined therein).

65.    "*Existing Common Interests*" means the Interests in Parker arising from or related to the Existing Common Stock.

66.    "*Existing Common Stock*" means the shares of common stock issued by Parker.

67.     "*Existing Common Stockholder Subscription Rights*" means the non-certificated rights to be distributed to each Holder of Existing Common Stock that will enable each holder thereof to purchase its Pro Rata share of 9.2674% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

68.    "*Existing Interests*" means, collectively, the Existing Preferred Stock and the Existing Common Stock.

69.    "*Existing L/C*" has the meaning ascribed to such term in the Final DIP Order.

70.    "*Existing L/C Issuer*" has the meaning ascribed to such term in the Final DIP Order.

71.    "*Existing Preferred Interests*" means the Interests in Parker arising from or related to the Existing Preferred Stock.

72.    "*Existing Preferred Stockholder Subscription Rights*" means the non-certificated rights to be distributed to each Holders of Existing Preferred Stock that will enable each holder thereof to purchase its Pro Rata share of 6.1783% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

73.     "*Existing Preferred Stock*" means the shares of 7.25% Series A Mandatory Convertible Preferred Stock issued by Parker with a par value $1.00 per share.

74.    "*Exit Facility*" means the secured revolving credit facility that Reorganized Parker and certain other Reorganized Debtors will incur on the Effective Date in accordance with the Exit Facility Documents.

75.    "*Exit Facility Agent*" means Bank of America, N.A., as administrative and collateral agent under the Exit Facility Credit Agreement, solely in its capacity as such.

76.    "*Exit Facility Commitment Letter*" means that certain letter agreement dated December 12, 2018 among Bank of America, N.A., in its capacity as a lead arranger and an initial lender, Deutsche Bank Securities Inc., in its capacity as a lead arranger, Deutsche Bank AG New York Branch, in its capacity as an initial lender, and Parker, by which the initial lenders committed to provide the Exit Facility to certain of the Reorganized Debtors.

77.    "*Exit Facility Credit Agreement*" means the revolving credit agreement governing the Exit Facility.

78.    "*Exit Facility Documents*" means the agreements and related documents governing the Exit Facility, which agreements and documents shall be consistent in all respects with the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders, and the Exit Facility Agent in accordance with the Exit Facility Commitment Letter.

6

79. "*Exit Facility Fee Letter*" means that certain letter agreement dated December 12, 2018 among Bank of America, N.A., Deutsche Bank AG New York Branch, and Parker, setting forth Parker's agreement to pay certain fees as consideration for the agreements and commitments under the Exit Facility Commitment Letter.

80. "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

81. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

82. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

83. "*Final DIP Order*" means the *Final Order Authorizing Limited Use of Cash Collateral, Obtaining Post-Petition Credit Secured by Senior Liens, Granting Adequate Protection, Scheduling a Final Hearing, and Granting Related Relief* [Docket No. 174].

84. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

85. "*General Unsecured Claim*" means any Claim that is not Secured and is not:  (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) a Notes Claim; or (f) an Intercompany Claim.

86. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

87. "*Governance Term Sheet*" has the meaning ascribed to such term in the Restructuring Support Agreement.

88. "*Holder*" means an Entity holding a Claim or Interest, as applicable.

89. "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

90. "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

91. "*Indenture Trustee*" means the Bank of New York Mellon Trust Company, N.A., and any successor thereto, as trustee under the 2020 Notes Indenture and the 2022 Notes Indenture, respectively.

92. "*Indenture Trustee Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and claims for indemnity, subrogation, and contribution incurred or owed to the Indenture Trustee, whether prior to or after the Petition Date, in each case under the Indentures.

93. "*Intercompany Claim*" means any Claim held by a Debtor or a direct or indirect subsidiary of a Debtor against another Debtor.

94.     "*Intercompany Interest*" means, other than an Interest in Parker, an Interest in one Debtor held by another Debtor.

95.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

96.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

97.     "*Management Incentive Plan*" means a post-Effective Date management incentive plan, the terms of which shall be consistent in all respects with Article IV.H of the Plan and the Compensation Term Sheet and otherwise be on terms reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

98.     "*New Common Stock*" means the common stock of Reorganized Parker.

99.     "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, which certificates or articles of incorporation, bylaws, or such other applicable formation documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance acceptable to the Required Consenting Stakeholders and reasonably acceptable to the Debtors.

100.    "*New Second Lien Agent*" means the administrative agent under the New Second Lien Term Loan, as determined by the Required Consenting Stakeholders in their sole discretion.

101.    "*New Second Lien Term Loan*" means $210 million new second lien secured term loan that Reorganized Parker will obtain on the Effective Date under the New Second Lien Term Loan Agreement.

102.    "*New Second Lien Term Loan Agreement*" means that certain credit agreement for the New Second Lien Term Loan that Reorganized Parker and certain other Reorganized Debtors will enter into in accordance with the Restructuring Support Agreement (including the New Second Lien Term Loan Term Sheet) and which shall be consistent in all respect with the Restructuring Support Agreement (including the New Second Lien Term Loan Term Sheet) and otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

103.    "*New Second Lien Term Loan Term Sheet*" has the meaning ascribed to such term in the Restructuring Support Agreement.

104.    "*New Warrant Agreement*" means that certain agreement providing for, among other things, the issuance and terms of the New Warrants, which shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement (including the New Warrant Term Sheet) and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

105.    "*New Warrants*" means the warrants to acquire an aggregate number of shares of New Common Stock equal to (after giving effect to the full exercise of the New Warrants) 13.5% of the New Common Stock, which will be issued pursuant to the New Warrant Agreement.

106.    "*New Warrant Term Sheet*" has the meaning ascribed to such term in the Restructuring Support Agreement.

107.    "*Noteholder Subscription Rights*" means the non-certificated rights to be distributed to each Holder of 2020 Notes Claims and 2022 Notes Claims that will enable each holder thereof to purchase its Pro Rata share of 26.4784% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants, pursuant to the terms of the Rights Offering Procedures and the Backstop Commitment Agreement.

108.   "*Notes*" means, collectively, the 2020 Notes and the 2022 Notes.

109.   "*Notes Claim*" means a 2020 Notes Claim or 2022 Notes Claim.

110.   "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

111.   "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than an Existing ABL Claim.

112.   "*P-Card Issuer*" has the meaning ascribed to such term in the Final DIP Order.

113.   "*Parker*" means Parker Drilling Company.

114.   "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

115.   "*Petition Date*" means the date, if applicable, on which the Debtors commenced the Chapter 11 Cases.

116.   "*Plan*" means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto), which shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement to the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

117.   "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 21 days before the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the material New Organizational Documents; (b) the New Second Lien Term Loan Agreement; (c) the New Warrant Agreement; (d) a list of retained Causes of Action; (e) a disclosure of the members of the Reorganized Parker Board; (f) the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; (h) the Restructuring Transactions Exhibit; (i) the form of the Management Incentive Plan; (j) the Registration Rights Agreement; and (k) the material Exit Facility Documents. Such documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Restructuring Support Agreement and the Backstop Commitment Agreement, including the consent rights of the Required Consenting Stakeholders.

118.   "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

119.   "*Pro Rata*" means the proportion that an Allowed Claim or Existing Common Stock or Existing Preferred Stock in a particular Class bears to the aggregate amount of the Allowed Claims or Existing Common Stock or Existing Preferred Stock in that respective Class, or the proportion of the Allowed Claims or Existing Common Stock or Existing Preferred Stock in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Existing Common Stock or Existing Preferred Stock under the Plan.

120.   "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

9

121. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

122. "*Professional Fee Claim*" means all Administrative Claims for the aggregate amount of compensation and other unpaid fees and expenses of Professionals that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates such Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

123. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the total estimated amount of the Professional Fee Amount as set forth in Article II.B of the Plan.

124. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date.

125. "*Put Option Cash Premium*" has the meaning ascribed to such term in the Backstop Commitment Agreement.

126. "*Put Option Equity Premium*" means a premium equal to 3.3539% of the New Common Stock, subject to dilution by the New Common Stock issued in connection with the Management Incentive Plan and the exercise of the New Warrants, payable to the Backstop Commitment Parties in accordance with the Backstop Commitment Agreement.

127. "*Registration Rights Agreement*" means that certain registration rights agreement by and among Reorganized Parker and certain of the Consenting Stakeholders party thereto, which registration rights agreement shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Required Consenting Stakeholders and the Debtors.

128. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

129. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the holders of the New Second Lien Term Loan; (c) the New Second Lien Agent; (d) the Existing ABL Agent; (e) the Existing ABL Lender(s); (f) the Consenting Stakeholders; (g) the Indenture Trustee; (h) the Exit Facility Agent; (i) the Exit Facility Lenders; (j) the DIP Facility Agent; (k) the DIP Facility Lenders; (l) the Existing L/C Issuer; (m) the P-Card Issuer; (n) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies; and (o) with respect to each of the foregoing Entities in clauses (a) through (n), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.

130. "*Releases*" means the releases provided for in Article VIII of the Plan.

131. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the holders of New Second Lien Term Loan; (c) the New Second Lien Agent; (d) the Existing ABL Agent; (e) the Existing ABL Lender(s); (f) the Consenting Stakeholders; (g) the Indenture Trustee; (h) the Exit Facility Agent; (i) the Exit Facility Lenders; (j) the DIP Facility Agent; (k) the DIP Facility Lenders; (l) the Existing L/C Issuer; (m) the P-Card Issuer; (n) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies; (o)

10

with respect to each of the foregoing Entities in clauses (a) through (n), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; and (p) all Holders of Claims and Interests not described in the foregoing clauses (a) through (o).

132.     "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions, or any successor thereto.

133.     "*Reorganized Parker*" means Parker, as reorganized pursuant to and under the Plan, or any successor thereto.

134.     "*Reorganized Parker Board*" means the board of directors of Reorganized Parker on and after the Effective Date.

135.     "*Required Consenting Stakeholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

136.     "*Restructuring Support Agreement*" means that certain restructuring support agreement, entered into and dated as of December 12, 2018 by and among the Debtors and the Restructuring Support Parties, including all exhibits and schedules attached thereto, as such agreement may be amended from time to time in accordance with the terms thereof.

137.     "*Restructuring Support Parties*" means, collectively, the Consenting Stakeholders and the Debtors, in each case, that are party to the Restructuring Support Agreement.

138.     "*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

139.     "*Restructuring Transactions*" mean those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Consenting Stakeholders reasonably determine to be necessary to implement the Plan.

140.     "*Restructuring Transactions Exhibit*" means an exhibit, which may be included, as needed, in the Plan Supplement, and which sets forth the Restructuring Transactions the Debtors shall implement on the Effective Date.

141.     "*Rights Offering*" means the distribution of Subscription Rights to the Rights Offering Participants, pursuant to which such Holders are eligible to purchase Rights Offering Shares in accordance with the Rights Offering Procedures.

142.     "*Rights Offering Offerees*" means, collectively, (i) the Holders of Existing Preferred Stock and Existing Common Stock and (ii) the Holders of the Notes Claims.

143.     "*Rights Offering Participants*" means, collectively, (i) the Holders of Existing Preferred Stock and Existing Common Stock and (ii) the Holders of the Notes Claims who duly subscribe for New Common Stock in accordance with the Rights Offering Procedures.

144.     "*Rights Offering Procedures*" means those certain rights offering procedures with respect to the Rights Offering, approved by the Disclosure Statement Order, which rights offering procedures shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

145.    "*Rights Offering Shares*" means, collectively, the shares of New Common Stock issued in the Rights Offering.

146.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto), if any, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which schedule shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

147.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which schedule shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

148.    "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

149.    "*SEC*" means the Securities and Exchange Commission.

150.    "*Secured*" means, when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

151.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

152.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.  "*Securities*" shall have a correlative meaning.

153.    "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

154.    "*Solicitation Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

155.    "*Solicitation Commencement Date*" means the date of distribution of the Solicitation Materials to Holders of Claims and Interests in Voting Classes.

156.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan, which solicitation materials shall be consistent in all respects with, and shall contain, the terms and conditions set forth in the Restructuring Support Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

157.     "*Subscription Rights*" means, collectively, the Existing Common Stockholder Subscription Rights, Existing Preferred Stockholder Subscription Rights, and Noteholder Subscription Rights.

158.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Existing Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular

12

distribution; (c) responded to the Debtors' or reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

159.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party to that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

160.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

161.    "*Unsubscribed Shares*" has the meaning ascribed to such term in the Backstop Commitment Agreement.

162.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

163.    "*Voting Classes*" has the meaning ascribed to such term in the Disclosure Statement Order.

B.    *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D.    *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder

13

shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement Document shall control.  In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.  For the avoidance of doubt, the executed post-Effective Date Definitive Documents shall control the matters set forth therein in the event of a conflict between any such Definitive Document and any other document.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Claims*

Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *Professional Fee Claims*

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the

14

Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than 3 business days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of Holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D.      *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement. Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Holder shall receive payment in full in cash. Upon the payment in full of the Allowed DIP Claims in accordance with the Plan, on the Effective Date, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

E.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description

15

of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Existing Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date.  For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, as applicable; *provided*, that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.D below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Reserved | | |
| 4 | 2020 Notes Claims | Impaired | Entitled to Vote |
| 5 | 2022 Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Intercompany Claims | Unimpaired, or Impaired | Deemed to Accept, or Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 9 | Existing Preferred Interests | Impaired | Entitled to Vote |
| 10 | Existing Common Interests | Impaired | Entitled to Vote |

B.      *Treatment of Classes of Claims and Interests*

1.      Class 1 — Other Secured Claims

a.      *Classification*:  Class 1 consists of all Other Secured Claims against the Debtors.

b.      *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld) either:

i.      payment in full in Cash;

ii.     delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii.    Reinstatement of such Other Secured Claim; or

iv.     such other treatment rendering such Other Secured Claim Unimpaired.

c.      *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Other Secured Claims in Class 1 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

16

2. <u>Class 2 — Other Priority Claims</u>

    a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

    b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

        i. Cash in an amount equal to such Allowed Other Priority Claim; or

        ii. such other treatment rendering such Other Priority Claim Unimpaired.

    c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 — Reserved</u>

4. <u>Class 4 — 2020 Notes Claims</u>

    a. *Classification*: Class 4 consists of all 2020 Notes Claims against the Debtors.

    b. *Treatment*: In full and final satisfaction of each Allowed 2020 Notes Claim, each Holder of an Allowed 2020 Notes Claim shall receive its Pro Rata share of:

        i. 34.3431% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants;

        ii. $92,571,429.00 of the New Second Lien Term Loan;

        iii. 38.4615% of the Noteholder Subscription Rights; and

        iv. cash sufficient to satisfy the Indenture Trustee Expenses, to the extent not otherwise paid by the Debtors.

    c. *Voting*: Class 4 is Impaired. Holders of Allowed 2020 Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 — 2022 Notes Claims</u>

    a. *Classification*: Class 5 consists of all 2022 Notes Claims against the Debtors.

    b. *Treatment*: In full and final satisfaction of each Allowed 2022 Notes Claim, each Holder of an Allowed 2022 Notes Claim shall receive its Pro Rata share of:

        i. 62.9069% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants;

        ii. $117,428,571.00 of the New Second Lien Term Loan;

17

iii.      61.5385% of the Noteholder Subscription Rights; and

iv.      cash sufficient to satisfy the Indenture Trustee Expenses, to the extent not otherwise paid by the Debtors.

c.      *Voting*: Class 5 is Impaired. Holders of Allowed 2022 Notes Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.      <u>Class 6 — General Unsecured Claims</u>

a.      *Classification*: Class 6 consists of all General Unsecured Claims against the Debtors.

b.      *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder thereof shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later of: (i) the Effective Date; or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claim.

c.      *Voting*: Class 6 is Unimpaired. Holders of Allowed General Unsecured Claims in Class 6 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7.      <u>Class 7 — Intercompany Claims</u>

a.      *Classification*: Class 7 consists of all Intercompany Claims against the Debtors.

b.      *Treatment*: Unless otherwise provided for under the Plan, on the Effective Date, Intercompany Claims shall be reinstated, compromised, or cancelled at the election of the Debtors (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld), such that Intercompany Claims are treated in a tax-efficient manner.

c.      *Voting*: Class 7 is either Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 7 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Claims in Class 7 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Claim in Class 7 will not be entitled to vote to accept or reject the Plan.

8.      <u>Class 8 — Intercompany Interests</u>

a.      *Classification*: Class 8 consists of any Intercompany Interests in any Debtor.

b.      *Treatment*: On the Effective Date, Allowed Intercompany Interests shall receive no recovery or distribution and shall be Reinstated solely to maintain the Debtors' corporate structure.

c.      *Voting*: Class 8 is Unimpaired. Holders of Allowed Intercompany Interests in Class 8 are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9.     <u>Class 9 — Existing Preferred Interests</u>

    a.     *Classification*:  Class 9 consists of all Existing Preferred Interests in Parker.

    b.     *Treatment*:  On the Effective Date, each Existing Preferred Interest in Parker shall be cancelled and shall be of no further force and effect.  Each Holder thereof shall receive its Pro Rata share of:

        i.     1.1% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Equity Premium, and the exercise of the New Warrants;

        ii.     the Existing Preferred Stockholder Subscription Rights; and

        iii.     40.0% of the New Warrants.

    c.     *Voting*:  Class 9 is Impaired.  Holders of Existing Preferred Interests in Class 9 are entitled to vote to accept or reject the Plan.

10.     <u>Class 10 — Existing Common Interests</u>

    a.     *Classification*: Class 10 consists of all Existing Common Interests in Parker.

    b.     *Treatment*:  On the Effective Date, each Existing Common Interest in Parker shall be cancelled and shall be of no further force and effect.  Each Holder thereof shall receive its Pro Rata share of:

        i.     1.65% of the New Common Stock, subject to dilution by New Common Stock issued in connection with the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the exercise of the New Warrants;

        ii.     the Existing Common Stockholder Subscription Rights; and

        iii.     60.0% of the New Warrants.

    c.     *Voting*:  Class 10 is Impaired.  Holders of Existing Common Interests in Class 10 are entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Existing Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.       *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote on the Plan and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

F.       *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Restructuring Support Agreement, the Backstop Commitment Agreement, the Bankruptcy Code and the Bankruptcy Rules.

G.       *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

H.       *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Existing Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.       *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.       *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Reorganization Transactions and take all actions reasonably acceptable to the Consenting Stakeholders as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring,

20

conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C.      *New Second Lien Term Loan*

On the Effective Date, the Reorganized Debtors shall enter into the New Second Lien Term Loan Agreement and any related documents to the extent a party thereto, including, without limitation, any documents required in connection with the creation or perfection of Liens in connection therewith.  The Confirmation Order shall approve the New Second Lien Term Loan, the New Second Lien Term Loan Agreement and all related documents and agreements, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into and execute the New Second Lien Term Loan Agreement and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

The lenders under the New Second Lien Term Loan Agreement shall have valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the New Second Lien Term Loan Agreement and all related documents and agreements.  To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the New Second Lien Term Loan and all related documents and agreements are granted in good faith as an inducement to the lenders under the New Second Lien Term Loan Agreement to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the New Second Lien Term Loan Agreement and any relevant related documents and agreements.

D.      *Issuance and Distribution of New Common Stock*

All Existing Interests in Parker shall be cancelled on the Effective Date and Reorganized Parker shall issue the New Common Stock to Holders of Claims and Interests entitled to receive New Common Stock pursuant to the Plan, the Rights Offering, and the Backstop Commitment Agreement.  The issuance of New Common Stock shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or by Holders of any Claims or Interests, as applicable.  All New Common Stock issued under the Plan (including the New Common Stock underlying the New Warrants) shall be duly authorized, validly issued, fully paid, and non-assessable.

E.      *Issuance and Distribution of New Warrants*

On the Effective Date, Reorganized Parker shall issue the New Warrants to Holders of Existing Interests pursuant to the Plan and in accordance with the New Warrant Agreement.  The issuance of the New Warrants, including the underlying New Common Stock, shall be duly authorized without the need for any further corporate action.  The holders of New Warrants shall be deemed to be parties to, and bound by, the terms of the New Warrant Agreement (solely in their capacity as shareholders and warrant holders of Reorganized Parker) without further action or signature.  The New Warrant Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Warrants shall be bound thereby.

F.    *Rights Offering*

The Debtors shall distribute the Subscription Rights for the $95,000,000.00 Rights Offering to the Rights Offering Offerees as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Rights Offering shall be open to all Rights Offering Participants.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Reorganized Debtors shall be authorized to issue the New Common Stock in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.

Pursuant to the Backstop Commitment Agreement, the Backstop Commitment Parties shall purchase any Rights Offering Shares not subscribed to by Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement.  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors.

In addition, on the Effective Date, New Common Stock in an amount equal to the Put Option Equity Premium shall be distributed to the Backstop Commitment Parties under and as set forth in the Backstop Commitment Agreement.

G.    *Exit Facility*

On the Effective Date, the applicable Reorganized Debtors shall enter into the Exit Facility Documents to the extent a party thereto, including, without limitation, any documents required in connection with the creation or perfection of Liens in connection therewith.  The Confirmation Order shall include approval of the Exit Facility and the Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under the Exit Facility Documents and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.  Notwithstanding anything in the Plan or Plan Supplement to the contrary, the Exit Facility Lenders shall not be obligated to enter into or fund the Exit Facility other than as set forth in the Exit Facility Commitment Letter and the Exit Facility Fee Letter.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders under the Exit Facility shall have valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Exit Facility Documents.  To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the Exit Facility Documents are granted in good faith as an inducement to the lenders under the Exit Facility to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents.  The Reorganized Debtors and the persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

22

H.      *Management Incentive Plan*

The entry of the Confirmation Order shall constitute approval of the Management Incentive Plan and the authorization for the Reorganized Parker Board to adopt such plan.

I.      *Management of Reorganized Parker*

The Debtors' current management team shall remain in their current positions after consummation of the Restructuring Transactions, and shall enter into new employment agreements in connection with the Restructuring Transactions on terms and conditions consistent with the Compensation Term Sheet and otherwise reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

J.      *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities, including the New Common Stock, and New Warrants, pursuant to the Plan, including the Rights Offering Shares and the New Common Stock issued on account of the Put Option Equity Premium, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under Section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act.  Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock and New Warrants issued under the Plan may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) any other applicable regulatory approval; and (3) the transfer restrictions set forth in the New Organizational Documents, if any.  All Unsubscribed Shares of New Common Stock issued to the Backstop Commitment Parties pursuant to the Backstop Commitment Agreement (other than shares of New Common Stock issued on account of the Put Option Equity Premium) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

If the ownership of the New Common Stock, the New Warrants or the New Common Stock issued upon the exercise of the New Warrants is reflected through the facilities of the DTC, neither the Debtors, the Reorganized Debtors, nor any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock and the New Warrants under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock, the New Warrants and/or shares of New Common Stock issued upon the exercise of the New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock, the New Warrants and the shares of New Common Stock issued upon the exercise of the New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

K.      *Vesting of Assets*

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property

23

and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

L.      *Cancelation of Instruments, Certificates, and Other Documents*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, including the Existing ABL Credit Agreement, the 2020 Notes, the 2022 Notes, and any other credit agreements and indentures, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged.  In addition to the foregoing, the Indentures shall continue in effect solely to the extent necessary to: (i) allow a disbursing agent or the Indenture Trustee to make distributions to the Holders of Notes Claims; (ii) permit the Indenture Trustee to assert its charging lien; and (iii) allow the Indenture Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Indenture.

If the record holder of the 2020 Notes or 2022 Notes is DTC or its nominee or another securities depository or custodian thereof, and such 2020 Notes or 2022 Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the 2020 Notes or 2022 Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

M.      *Corporate Action*

On and after the Effective Date, all actions contemplated by the Plan are and shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable:  (1) the adoption, execution, and/or filing of the New Organizational Documents; (2) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the Reorganized Parker Board; (3) the authorization, issuance, and distribution of the New Second Lien Term Loan, the Exit Facility, and the New Common Stock and the New Warrants and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (5) the formation of any Entities pursuant to the Restructuring Transactions; (6) the implementation of the Restructuring Transactions;  (7) the adoption of the Management Incentive Plan by the Reorganized Parker Board; and (8) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any Security holders, members, directors, or officers of the Debtors or Reorganized Debtors, as applicable.

On or before the Effective Date, as applicable, the appropriate directors and officers of the Debtors or the Reorganized Debtors shall be (or shall be deemed to have been) authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.M shall be effective notwithstanding any requirements under non-bankruptcy law.

N.      *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation,

24

constituent or governance documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).  Notwithstanding the foregoing, the Debtors reserve the right to modify the Debtors' corporate structure as of the Effective Date, including by merger or liquidation of any Reorganized Debtor or otherwise.

O.      *New Organizational Documents*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan, the Restructuring Support Agreement (including the Governance Term Sheet) the New Organizational Documents, as applicable, and the Bankruptcy Code.  To the extent required under the Plan or applicable nonbankruptcy law, the Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Organizational Documents shall, among other things:  (1) authorize the issuance of the New Common Stock and the New Warrants and the shares of New Common Stock issued upon the exercise of the New Warrants; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents.

P.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers (or other relevant governing body) thereof, including the Reorganized Parker Board, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

Q.      *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral as security for the New Second Lien Term Loan, as applicable; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and

shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R.      *Directors and Officers*

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the Reorganized Parker Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  As set forth in the Restructuring Support Agreement (including the Governance Term Sheet), the initial Reorganized Parker Board shall consist of 7 members, consisting of (i) 6 members selected by the Required Consenting Stakeholders in their sole discretion and (ii) the Chief Executive Officer of Reorganized Parker.  The Chief Executive Officer of Parker shall be permitted to participate in any formal interviews of candidates for the Reorganized Parker Board to the extent that the Chief Executive Officer is available whenever such formal interviews are scheduled.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Parker Board, as well as those Persons that will serve as officers of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the Reorganized Parker Board will be disclosed in the New Organizational Documents.

S.      *Employee Arrangements of the Reorganized Debtors*

On the Effective Date, the Debtors shall have (1) assumed each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors (but excluding any severance agreements with any of Debtors' former employees) that are not set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases; or (2) entered into a new employee agreement on terms acceptable to the respective employee and the Reorganized Debtors, and on the terms and conditions and subject to the approval rights set forth in the Restructuring Support Agreement (including the Compensation Term Sheet attached thereto as Exhibit 4 thereto); *provided,* that it is agreed and understood that any employment agreements or arrangements that constitute a component of at will employment arrangements, are provided or determined in the Debtors' discretion, or are subject to modification or termination by the Debtors in accordance with applicable law will remain as such with respect to the Reorganized Debtors.  Except to the extent provided by Article VIII of the Plan, nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such employment agreements.  Notwithstanding the foregoing, it is agreed an understood that (i) the consummation of the Restructuring Transactions and the Plan shall not trigger any change in control provision (or other similar provision) under any contract, agreement, policy, program, or plan; and (ii) the Debtors' existing quarterly cash incentive program for insiders will terminate at the end of the calendar quarter during which the Effective Date occurs in accordance with the Compensation Term Sheet.

Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

T.      *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions

26

specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.T include any claim or Cause of Action with respect to, or against, a Released Party that is released under Article VIII of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Article IV.T that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

U. *Indenture Trustee Expenses*

On the Effective Date, the Debtors or Reorganized Debtors shall distribute Cash to the Indenture Trustee in an amount equal to the Indenture Trustee Expenses; provided, that the Indenture Trustee shall provide the Debtors with the invoices for which it seeks payment no later than five (5) days prior to the Effective Date. If the Debtors dispute any Indenture Trustee Expenses, the Debtors shall (i) pay the undisputed portion of the Indenture Trustee Expenses and (ii) notify the Indenture Trustee within five (5) days after presentation of the invoices by the Indenture Trustee.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Exit Facility Commitment Letter, and Exit Facility Fee Letter were previously approved by the Bankruptcy Court and shall not be rejected.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

27

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any, shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement.  Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of the order of the Bankruptcy Court approving such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.  Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 15 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

28

D.      *Indemnification*

On and as of the Effective Date, the Indemnification Provisions will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors (or similar governing body) of, any of the Debtors as of the Petition Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

E.      *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance).  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain tail coverage under the D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the existing D&O Liability Insurance Policies.  In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

F.      *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

G.      *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

29

H.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Distributions on Account of Claims and Interests Allowed as of the Effective Date*

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article III.B.2 and Article III.B.1, respectively.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

B.      *Rights and Powers of the Distribution Agent*

1.      <u>Powers of Distribution Agent</u>

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

C.      *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties:  (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

Any fund established to hold consideration to be received under the Plan pending resolution of Disputed Claims shall be treated as a "disputed ownership fund" pursuant to Treasury Regulation section 1.468B-9.  Any such

fund shall, therefore, be subject to entity-level taxation.  For the avoidance of doubt, any New Common Stock shall not be issued to such fund; rather, Reorganized Parker shall retain sufficient authorized, but unissued, New Common Stock and issue them directly to Holders of Claims following the resolution of Disputed Claims.

D.  *Delivery of Distributions*

1.  Record Date for Distributions

Except for distributions to holders of public securities, three business days before the Effective Date, the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after 3 business days before the Effective Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.  For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2.  Distribution Process

The Distribution Agent shall make all distributions required under the Plan, except that with respect to distributions to Holders of Allowed Claims governed by a separate agreement, shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement.   Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Existing Interests, including Claims and Interests that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of 3 business days before the Effective Date:  (a) to the address of such Holder or designee as set forth in the applicable register (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is 10 calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register, no Proof of Claim has been Filed, and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 calendar days before the Effective Date.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.  Except as otherwise provided in the Plan, Holders of Claims and Holders of Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3.  Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

4.  Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the

31

exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

> 5. Fractional, Undeliverable, and Unclaimed Distributions

>> a. *Fractional Distributions.* Whenever any distribution of fractional shares of New Common Stock or the New Second Lien Term Loan would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest interest or share or dollar, as applicable, with half interests of shares, or any amount equal to $0.50, or less being rounded down. The total number of authorized shares of New Common Stock and New Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

>> b. *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.5.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

>> c. *Reversion.* Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is comprised of New Common Stock or New Warrants, each shall be deemed canceled. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

> 6. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing paragraph, this Article VI.D.6 shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

> 1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized

Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

## 2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

## 3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F.    *Setoffs*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G.    *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Consenting Stakeholders shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

C.      *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

34

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

**ARTICLE VIII.**
**EFFECT OF CONFIRMATION OF THE PLAN**

A.      *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or**

35

retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.      *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.      the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2.      any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.      the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.      any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud, (ii) the rights of any party under any employment agreement or plan, or (iii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

C.      *Releases by Holders of Claims and Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

36

1.       the Debtors, the Debtors' restructuring efforts, intercompany transactions, or the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

2.       any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

3.       the Chapter 11 Cases, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.       any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

D.       *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.       *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties or the Exculpated Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating,

37

**perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

F.      *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.      *Release of Liens*

Except as otherwise specifically provided in the Plan, the New Second Lien Term Loan Agreement, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.  In addition, at the sole expense of the Debtors or the Reorganized Debtors, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent(s) for the Exit Facility and the New Second Lien Term Loan to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

H.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

I.      *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Subordination Rights*

Any distributions under the Plan to Holders of Allowed Claims or Existing Interests shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

K.      *SEC Rights Reserved*

Nothing in the Plan or the Confirmation Order (1) releases any non-Debtor Entity from any Claim or cause of action of the SEC; or (2) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Claims, causes of action, proceedings or investigations against any non-Debtor Entity in any forum.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders, and the Confirmation Order shall be a Final Order; provided, that notwithstanding anything to the contrary herein, the determination to not consummate the Plan after the expiration of the applicable period to file an appeal solely on the basis that the Confirmation Order has not become a Final Order after the applicable appeals period has elapsed due to a pending appeal shall require the unanimous written consent of all Consenting Stakeholders represented by Akin Gump; and *provided*, *further*, that in the event that the Effective Date of the Plan does not occur solely as a result of the Confirmation Order not being a Final Order after the applicable period has elapsed due to a pending appeal, the Backstop Commitment Parties shall not be entitled to receive the Put Option Equity Premium until and unless the Plan, including the Rights Offering, is consummated, and the Put Option Cash Premium received by the Backstop Commitment Parties in connection with execution of the Backstop Commitment Agreement shall be returned to the Debtors in accordance therewith;

2.      The Plan, the Definitive Documents, and all documents contained in any Plan supplement, including any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or filed, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise reasonably acceptable to the Company Parties and the Required Consenting Stakeholders and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

3.      The Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing;

4.      The Backstop Commitment Agreement and the Restructuring Support Agreement shall remain in full force and effect, all conditions shall have been satisfied thereunder, and there shall be no breach that would give rise to a right to terminate the Backstop Commitment Agreement or the Restructuring Support Agreement for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder), or such notice could have been given to the extent such notice is not permitted due to the commencement of the Chapter 11 cases and the related automatic stay;

39

5.      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting, in a material respect, the consummation of the Plan, the Restructuring, the Restructuring Support Agreement or any of the Definitive Documents contemplated thereby;

6.      The Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions;

7.      The Debtors shall have paid all Consenting Stakeholder Fees and Expenses;

8.      All Allowed Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

9.      Immediately after the consummation of the Restructuring, the Company shall have at least $25 million unrestricted cash, net of all fees, expenses, and any other payments contemplated in connection with the consummation of the Restructuring Transactions, without taking into account the proceeds of the Rights Offering;

10.     The Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Restructuring Support Agreement (subject to the consent rights of the Parties set forth therein); and

11.     All Allowed DIP Claims shall have been paid in full in accordance with the terms hereof.

B.      *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in Article IX of the Plan may only be waived with the consent of the Debtors and the Required Consenting Stakeholders (such consents not to be unreasonably withheld) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided*, that the condition to the Effective Date of the Plan set forth in Section IX.A.1 may be waived after any applicable appeals period has elapsed with the consent of the Debtors and any one Consenting Stakeholder represented by Akin Gump; *provided further*, that the condition to the Effective Date of the Plan set forth in Section IX.A.11 may not be waived without the prior written consent of the DIP Facility Agent.

C.      *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement or the Backstop Commitment Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Restructuring Support Agreement or the Backstop Commitment Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

40

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      *Modification of Plan*

Effective as of the date hereof and subject to the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement:  (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided*, that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

41

4.      ensure that distributions to Holders of Allowed Claims and Existing Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases ,and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.      enforce all orders previously entered by the Bankruptcy Court;

16.      hear and determine disputes involving all matters the implementation of the Plan, including the New Second Lien Term Loan to the extent required to adjudicate the foregoing, *provided*, *however*, that upon the closing of the relevant facilities and execution of the New Organizational Documents, disputes with respect to the Exit Facility, the Existing L/Cs, the Bank of America Credit Card Program, the New Second Lien Term Loan, and the New Organizational Documents that are not related to the Plan shall otherwise be governed by the jurisdictional, forum selection or dispute resolution clause contained in such document; and

17.      hear any other matter not inconsistent with the Bankruptcy Code.

42

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order or the Plan, or the Bankruptcy Code.  As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the Exit Facility, the Existing L/Cs, the Bank of America Credit Card Program, the New Second Lien Term Loan Agreement, the New Warrant Agreement, and the Registration Rights Agreement shall be governed by the jurisdictional provisions contained therein.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents*

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement and the Backstop Commitment Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Creditors' Committee*

On the Confirmation Date, the Creditors' Committee, if any is appointed, shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Confirmation Date.

D.      *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

E.      *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an

admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| **Reorganized Debtors** | **Parker Drilling Company** |
| | 5 Greenway Plaza, Suite 100 |
| | Houston, Texas 77046 |
| | Attn:     John Edward Menger |
| | Jennifer Simons |

with copies to:

| **Counsel to Debtors** | **Kirkland & Ellis LLP** |
| | **Kirkland & Ellis International LLP** |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Attn:     James H.M. Sprayregen, P.C. |
| | Laura E. Krucks |

**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
601 Lexington Avenue
New York, New York 10022
Attn:     Christopher J. Marcus, P.C.
Brian E. Schartz, P.C.
Matthew C. Fagen

H.      *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at https://cases.primeclerk.com/parkerdrilling or the Bankruptcy Court's website at https://www.pacer.gov/.

K.      *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Required Consenting Stakeholders; and (3) non-severable and mutually dependent.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of the Restructuring Support Parties and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  January 23, 2019                    PARKER DRILLING COMPANY
                                            on behalf of itself and all other Debtors


                                            */s/ Michael Sumruld*
                                            _____
                                            Name:  Michael Sumruld
                                            Title:   Chief Financial Officer
                                                     Parker Drilling Company

45

Houston, Texas
January 23, 2019

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4284
Facsimile:     (713) 308-4184
Email:            ptomasco@jw.com
                      mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:     (713) 836-3601
Email:            brian.schartz@kirkland.com
                      anna.rotman@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Laura Krucks (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:            james.sprayregen@kirkland.com
                      laura.krucks@kirkland.com

-and-

Christopher J. Marcus, P.C. (admitted *pro hac vice*)
Matthew Fagen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:            christopher.marcus@kirkland.com
                      matthew.fagen@kirkland.com

*Co-Counsel to the Debtors
and Debtors in Possession*