**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE:<br><br>PARKER DRILLING COMPANY, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-36958 (MI) |

## EMERGENCY MOTION OF BARINGS LLC FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761); Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd. (7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C. (1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA, LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is: 5 Greenway Plaza, Suite 100, Houston, Texas 77046.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................................1

JURISDICTION AND VENUE ........................................................................................................5

BACKGROUND ..............................................................................................................................5

    I.      The Parties and Other Relevant Entities ............................................................5

    II.     Questions Abound as to Why the Backstop Commitment Parties, as
            Holders of the Debtors' Equity Interests (as Well as Notes), Obtained
            Outsized and Highly Favorable Terms at the Expense of Barings and
            Other Similarly Situated Noteholders ..................................................................7

    III.    Questions Also Abound as to Whether the Backstop Commitment Parties
            Usurped the Plan Process for Their Own Improper Benefit .............................12

RELIEF REQUESTED ....................................................................................................................13

BASIS FOR RELIEF ......................................................................................................................14

    I.      The Court Should Appoint an Examiner Pursuant to Section 1104(c) of the
            Bankruptcy Code ..............................................................................................14

          A.     The Appointment of an Examiner is Required Under Section
                  1104(c)(2) of the Bankruptcy Code....................................................15

          B.     The Appointment of an Examiner is Required under Section
                  1104(c)(1) of the Bankruptcy Code....................................................16

    II.     The Court Should Provide the Examiner With a Broad Mandate ......................19

BASIS FOR EMERGENCY CONSIDERATION ..........................................................................21

CONCLUSION...............................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Gilman Services*,
   46 B.R. 322 (Bankr. D. Mass 1985) ................................................................19

*In re Granite Broadcasting Corp.*,
   No. 16-12984 (Bankr. S.D.N.Y. Feb. 20, 2007) ...............................................19

*In re Keene Corp.*,
   164 B.R. 844 (Bankr. S.D.N.Y. 1994) ..............................................................16

*In re Level Propane Gases, Inc.*,
   2007 WL 171985 (Bankr. N.D. Ohio 2007) ......................................................19

*In re Loral Space & Commc'ns, Ltd.*,
   2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004) .............................................16, 20

*In re Revco D.S., Inc.*,
   898 F.2d 498 (6th Cir. 1990) .......................................................................16, 19

*In re Schepps Food Stores, Inc.*,
   148 B.R. 27 (S.D. Tex. 1992) ............................................................................15

*In re UAL Corp.*,
   307 B.R. 80 (N.D. Ill. 2004) ..............................................................................16

*Walton v. Cornerstone Ministries Invs., Inc.*,
   398 B.R. 77 (Bankr. N.D. Ga. 2008) .................................................................16

STATUTES

11 U.S.C. § 101(2)(A) ...............................................................................2, 3, 18

11 U.S.C. § 1104(c) .....................................................................................*passim*

11 U.S.C. § 1129(a) ...........................................................................3,4,18, 19

15 U.S.C. § 78m(d)(3) .........................................................................................18

28 U.S.C. § 157(a) ................................................................................................5

28 U.S.C. § 1334 ..................................................................................................5

28 U.S.C. § 1408 ..................................................................................................5

28 U.S.C. § 1409 ................................................................................................................5

**OTHER AUTHORITIES**

7 *Collier on Bankruptcy* § 1103.03[1] (16th Rev. Ed. 2016) ......................................20

17 C.F.R. § 240.13d-5(b)(1) .............................................................................18

Local Bankruptcy Rule 9013-1(i) ....................................................................22

Barings LLC ("**Barings**"), on behalf of certain of its managed funds and investment accounts, which collectively hold approximately $35 million of the Debtors' 6.75% unsecured senior notes due 2022 (the "**2022 Notes**"), for its emergency motion (the "**Emergency Motion**") pursuant to section 1104(c) of title 11 the United States Code (the "**Bankruptcy Code**") for the appointment of an examiner in the above-captioned Chapter 11 cases, respectfully states as follows.

## PRELIMINARY STATEMENT

1.      On December 12, 2018 (the "**Petition Date**"), Parker Drilling Company ("**Parker Drilling**," and, together with its debtor affiliates, the "**Debtors**") filed their Chapter 11 Plan of Reorganization (as amended, the "**Plan**") with the Court.  The Plan provides substantial value to certain entities (collectively, the "**Backstop Commitment Parties**") at the expense of Barings and other similarly situated creditors, who were excluded from the Plan negotiations and from obtaining many of the substantial benefits under the Plan.  As the sole group to negotiate the terms of the Plan with the Debtors, the Backstop Commitment Parties—who upon information and belief held approximately 77% of the Notes[2] issued by the Debtors, 62% of the Existing Preferred Interests and 25% of the Existing Common Stock—arrogated substantial value to themselves at the expense of Barings and other similarly situated Noteholders.

2.      In particular, and as discussed more fully below, the Plan gives the Backstop Commitment Parties (with whom the Debtors were complicit) an outsize distribution of Plan value in a multitude of ways.  First, the Plan improperly shifts Plan value that rightfully should

---

[2]      Any capitalized term used herein but not defined herein shall have the meaning ascribed to such term in the Amended Joint Chapter 11 Plan of Reorganization of Parker Drilling Company and its Debtor Affiliates dated January 23, 2019, Dkt. No. 309.  References to a "Dkt. No." or "Dkt. Nos." that are unaccompanied by a case caption refer to docket entries in these Chapter 11 Cases.

have gone to all Noteholders (including Barings) over to junior stakeholders, including the Backstop Commitment Parties, by giving them an incredibly large and improperly enhanced recovery on their holdings of Existing Preferred Interests and Existing Common Stock (collectively, the "**Equity Interests**").  Indeed, Equity Interests are to receive under the Plan an extremely disproportionate allocation of subscription rights to a heavily discounted Rights Offering.  What's more, adding insult to injury, is that the Plan gives the Backstop Commitment Parties the exclusive right to backstop this heavily discounted Rights Offering and thereby soak up additional Plan value by purchasing all of the unsubscribed shares offered to holders of Equity Interests in the Rights Offering.  Finally, there is absolutely no justification whatsoever for the Plan's better treatment of the 2020 Notes than the 2022 Notes.  All of these benefits inure to the Backstop Commitment Parties at the direct expense of Barings and other similarly situated Noteholders.

3.     Upon information and belief, the Backstop Commitment Parties negotiated the terms of the Plan with the Debtors as a ***group*** (the "**Backstop Commitment Group**"); indeed, the Backstop Commitment Group was represented by one single counsel during negotiations. The fact that the Backstop Commitment Parties acted in concert to arrogate to themselves such substantial benefits raises significant questions as to whether the Backstop Commitment Parties improperly leveraged their collective position to usurp and control the Plan process.  In view of the Backstop Commitment Parties' apparent holdings of 25% of the Existing Common Stock, the Backstop Commitment Group appears to constitute an "affiliate" as well as an "insider" under sections 101(2)(A) and 101(31)(E) of the Bankruptcy Code.  Indeed, at all material times during the Plan negotiations, it appears that the Backstop Commitment Group "own[ed], control[ed] or

h[e]ld[] with power to vote" 20% or more of the outstanding voting securities of the debtor. 11 U.S.C. § 101(2)(A).

4.      If it shall be determined that the Backstop Commitment Group constitutes an insider, then the Backstop Commitment Parties' votes will not count for purposes of section 1129(a)(10) of the Bankruptcy Code, and there may be no non-insider impaired class to vote in favor of the Plan.  Given that the Backstop Commitment Parties appear to have more than two-thirds in amount of the classes of claims entitled to vote on the Plan, the question of whether the Backstop Commitment Group is an insider, or worked in concert, may lead this Court to determine that the Backstop Commitment Parties' votes must be excluded for purposes of Section 1129(a)(10) and/or compel a determination by this Court that the Plan cannot be confirmed.

5.      Notably, it appears that the Backstop Commitment Parties also failed to comply with their obligation under Federal Rule of Bankruptcy Procedure 2019 ("**Bankruptcy Rule 2019**") to file a verified statement with the Court, disclosing that they were "acting in concert to advance their common interests."  *See* Fed. R. Bankr. P. 2019(b)&(c).  Even if the Backstop Commitment Group is held not to constitute an insider, the Court may still hold invalid the Backstop Commitment Parties' acceptance of the Plan if it determines that the Backstop Commitment Parties were working in concert yet failed to make the requisite disclosures pursuant to Bankruptcy Rule 2019.

6.      More fundamentally, to the extent that the Plan negotiation process was unduly influenced by the Backstop Commitment Parties, this raises serious questions as to whether (i) the Debtors are really the true Plan proponents or whether it is the Backstop Commitment Group masquerading as the Debtors, (ii) the Plan has been proposed in good faith, and (iii) the

Plan proponents have complied with the applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. §§ 1129(a)(1), (2) & (3).

7.      In view of the foregoing, Barings respectfully requests that an examiner be appointed to investigate whether the Plan process has been improperly usurped by the Backstop Commitment Group.  In connection therewith, the examiner should investigate, among other things:  (i) how the Plan proponents and/or the Backstop Commitment Group determined the allocation of the subscription rights available to each group of stakeholders in the Rights Offering and particularly amongst each of the 2020 Notes, the 2022 Notes, the Existing Preferred Interests and the Existing Common Stock; (ii) whether the Plan distributions to holders of Existing Preferred Interests and/or Existing Common Stock are inappropriate or unjustified; (iii) whether the recovery provided under the Plan to holders of Equity Interests is really a disguised return on the Backstop Commitment Parties' Notes that is not available to other Noteholders; (iv) whether the Backstop Commitment Group constitutes an insider and an affiliate, as each of those terms is used in Section 101 of the Bankruptcy Code; (v) whether the Backstop Commitment Group exercised control over the Debtors and usurped the Plan process; (vi) whether the Backstop Commitment Parties were required to file a verified statement pursuant to Bankruptcy Rule 2019 and failed to do so; (vii) whether the fee being paid to the Backstop Commitment Group for backstopping the Rights Offering is excessive; and (viii) whether there is any legitimate basis for the disparity in treatment between the 2020 Notes and the 2022 Notes.

8.      Furthermore, the examiner should be authorized to retain counsel, financial advisers and such other professionals as are necessary to assist the examiner with the investigation.  Given the potentially drastic consequences that the examiner's investigation may

have on Plan confirmation, the examiner should be allowed sufficient time to perform an adequate investigation. The appointment of an examiner is an efficient way for a neutral party to shine much needed daylight on the significant issues clouding the Plan's negotiation and proposal process.

9.      Finally, rather than proceed on the currently expedited schedule for a Plan that potentially cannot be confirmed, Barings respectfully submits that the voting deadline, objection deadline and confirmation hearing should be continued and adjourned until an appropriate time after the examiner finishes his or her investigation.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (L).

11.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

12.      The statutory basis for the relief requested is section 1104(c) of the Bankruptcy Code.

## BACKGROUND

### I.      The Parties and Other Relevant Entities

13.      Barings is a global investment management firm that manages certain funds and accounts that are the beneficial holders of approximately $35 million of the Debtors' 2022 Notes. Barings has been an investor in the 2022 Notes since 2014, the year that the 2022 Notes were issued.

14.      On the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. That same day, the Debtors filed a proposed Plan, a proposed disclosure statement (as amended, the "**Disclosure Statement**" (Dkt. No. 310)) for the Plan, and a motion seeking an order that, *inter alia*, approved the adequacy of the Disclosure Statement

and solicitation and notice procedures with respect to confirmation of the Plan.  On January 23, 2019, the Court granted the Debtors' motion.  *See* Dkt. No. 312.  The deadline for creditors to vote on and file any objection to the Plan is February 22, 2019, and the hearing (the "**Confirmation Hearing**") to consider Plan confirmation currently is scheduled for March 5, 2019.  *See* Notice of Hearing to Consider Confirmation of the First Chapter 11 Plan Filed by the Debtors and Related Voting and Objecting Deadlines (Dkt. No. 327) at 1-3.

15.     The Backstop Commitment Parties are Brigade Capital Management, LP ("**Brigade**"), Highbridge Capital Management, LLC ("**Highbridge**"), Varde Partners, Inc. ("**Varde**"), and Whitebox Advisors, LLC ("**Whitebox**").[3]  Upon information and belief, during the period in which the Backstop Commitment Parties negotiated the Plan with the Debtors, they owned approximately 25% of Parker Drilling's Existing Common Stock.  *See* Hutten Decl.,[4] Ex. A, Brigade Schedule 13G/A at 2 (Feb. 13, 2018) (8.25%); Hutten Decl., Ex. B, Highbridge Schedule 13G/A at 2 (Feb. 14, 2018) (9.61%); Hutten Decl., Ex. C, Whitebox Schedule 13G/A at 3 (July 20, 2018) (6.4%).[5]  The Backstop Commitment Parties also hold 77% of Parker Drilling's Notes, and 62% of Parker Drilling's Existing Preferred Interests.  *See* Dkt. No. 21 at 5.

---

[3]     On January 28, 2019, approximately six weeks after the Plan was filed, the Debtors and the above-named Backstop Commitment Parties permitted Saba Capital Management, L.P. to join the Backstop Commitment Parties in backstopping the Rights Offering.  *See* Notice of First Amendment to Restructuring Support Agreement and Amended Restated Backstop Commitment Agreement (Dkt. No. 326).

[4]     References to the "Hutten Decl." are to the Declaration of Henry V. Hutten, which is being submitted contemporaneously with this Emergency Motion.

[5]     The Forms 13G cited above are the last Parker Drilling beneficial ownership reports that the Backstop Commitment Parties filed with the Securities and Exchange Commission before they received "certain of the Debtors' confidential information" in July 2018 and thereby "became restricted" from trading Parker Drilling's securities throughout the duration of their negotiations of the Plan with the Debtors.  *See* Declaration of John Edward Menger, Chief Restructuring Officer of Parker Drilling Company, In Support of Chapter 11 Petitions and First Day Motions (the "**First Day Decl.**," (Dkt. No. 15)) at ¶ 66.  While the Backstop Commitment

II.    **Questions Abound as to Why the Backstop Commitment Parties, as Holders of the Debtors' Equity Interests (as Well as Notes), Obtained Outsized and Highly Favorable Terms at the Expense of Barings and Other Similarly Situated Noteholders**

16.    Upon information and belief, the only creditor entity with which the Debtors engaged in connection with their efforts to reorganize was the Backstop Commitment Group. The negotiations between the Backstop Commitment Group and the Debtors resulted in a Plan that (i) provides an incredibly large and improperly enhanced distribution of value to junior stakeholders (*i.e.* the Existing Preferred Interests and the Existing Common Stock), through the allocation of subscription rights in the Rights Offering, at the expense of the Notes; (ii) allows the Backstop Commitment Parties to soak up additional value because they have leveraged their exclusive right to purchase unsubscribed shares (and particularly unsubscribed shares allocated to Equity Interests where the Backstop Commitment Parties hold substantially smaller positions and thus have a greater potential to soak up value by purchasing the unsubscribed shares allocated to Equity Interests held outside of the Backstop Commitment Group) in the deeply discounted Rights Offering as a way to arrogate Plan value to themselves at the expense of Barings and other similarly situated Noteholders; and (iii) unfairly discriminates between the 2020 Notes and 2022 Notes.

17.    *The Plan Provides Excessive Value to Junior Stakeholders and the Backstop Commitment Parties at the Expense of the Notes Held by those Outside the Backstop Commitment Group.*    The Plan contemplates a $95 million Rights Offering which is made

Parties recently filed Forms 13G on February 14, disclosing that certain Backstop Commitment Parties had increased while others decreased their holdings of Existing Common Shares as of December 31, 2018, any transactions in these shares presumably took place after the Plan was disclosed publicly on December 12, 2018, at which Point the Backstop Commitment Parties no longer possessed material, nonpublic information that would prevent them from transacting legally in the Existing Common Shares.

available to all holders of 2020 Notes, 2022 Notes, Existing Preferred Interests and Existing Common Stock. *See* Disclosure Statement at 21. The Rights Offering is an extremely attractive opportunity because the shares offered in the Rights Offering are offered at a steep 48% discount to Plan equity value. Furthermore, the Rights Offering is especially beneficial to the Backstop Commitment Parties because they have the sole right to purchase any and all unsubscribed shares in the Rights Offering and, thus, the sole right to soak up additional value through the discounted Rights Offering.

18. Thus, the Plan improperly diverts value from those Noteholders (such as Barings) who are outside the Backstop Commitment Group in favor of the Backstop Commitment Parties in two substantial respects. First, the Plan diverts an incredibly large and improperly enhanced opportunity to participate in the Rights Offering to Equity Holders (including the Backstop Commitment Parties) at the expense of the Noteholders. Second, the Plan allows the Backstop Commitment Parties to soak up extraordinary value by purchasing the unsubscribed shares allocated in the Rights Offering to the holders of Equity Interests. In other words, because the Backstop Commitment Group admittedly holds approximately 77% of the Notes, its ability to soak up additional value in the Rights Offering by purchasing unsubscribed shares allocated to the Noteholders is constrained—to about 23% of the subscription rights allocated to the Notes. By contrast, because the Backstop Commitment Group holds 62% of the Existing Preferred Interests and 25% of the Existing Common Stock, the Backstop Commitment Group's best opportunity to soak up additional value by backstopping the Rights Offering was by diverting an excessive and egregiously disproportionate right to participate in the Rights Offering to holders of Equity Interests—including the 38% of the Existing Preferred Interests and 75% of the Existing Common Stock held outside the Backstop Commitment Group.

19.     More specifically, under the Rights Offering, New Common Stock of reorganized Parker Drilling ("**Reorganized Parker**") will be offered at a substantial 48% discount to Plan equity value based on the "settlement total enterprise value"—*e.g.*, Plan value.  *See* First Day Decl., Ex. B (Restructuring Support Agreement, Term Sheet) at p. 2.  However, holders of Equity Interests are afforded under the Plan an outsized opportunity to purchase shares at this monumental discount, to the detriment of the Noteholders (which are senior in priority) such as Barings.

20.     The reasons why Barings respectfully submits that the allocation of Plan equity value to the holders of Equity Interests under the Plan is egregiously disproportionate are objective, concrete and based on the Debtors' admissions.  Indeed, whereas the Debtors have acknowledged that the Existing Preferred Interests and Existing Common Stock comprised only approximately 9% of the Debtors' capital structure as of the Petition Date, *see* Disclosure Statement at 30, these stakeholders are being allocated approximately 37% of the subscription rights in the Rights Offering.  *See* First Day Decl. Ex. B, Term Sheet p. 2.  Thus, the portion of the subscription rights being allocated to the Equity Interests in the Rights Offering is *over four times* larger than the percentage of the capital structure represented by these Equity Interests as of the Petition Date.  Because the Notes are the only stakeholders other than the Equity Interests to whom the Rights Offering is being made available, *see* Disclosure Statement at 21, this outsize allocation to the Equity Interests comes at the direct expense of the Notes, even though the Notes are senior in priority.

21.     Furthermore, the Debtors had initially determined that the 2020 Notes and the 2022 Notes should collectively receive approximately 97% of Reorganized Parker Drilling New Common Stock before accounting for dilution.  *See* Disclosure Statement at 24.  By extension,

given that the Equity Interests represented merely 9% of the Debtors' capital structure as of the Petition Date, the Debtors had initially determined that holders of Equity Interests should collectively receive approximately 3% of Reorganized Parker New Common Stock before accounting for dilution.  *See id.*  However, rather than offering the holders of Equity Interests subscription rights to purchase 3% of the New Common Stock offered in the Rights Offering, the Plan provides the holders of Equity Interests subscription rights to purchase a remarkable 37% of the New Common Stock issued pursuant to the Rights Offering.  Accordingly, it appears that based on the Debtors' capital structure as it existed as of the Petition Date, the Plan takes more than $44 million in value away from the Noteholders and gives it to the holders of Equity Interests through the subscription rights to purchase New Common Stock in the deeply discounted Rights Offering.

22.     Questions abound as to why the 37% allocation of subscription rights to holders of Equity Interests differs so wildly from the 3% of New Common Stock to which the Debtors have acknowledged these stakeholders are entitled based on their interests in the capital structure as of the Petition Date.  Likewise, questions abound as to why the Plan appears to divert improperly an extraordinary $44 million in value from the Notes to Equity Interests.  The answer seems to be that while the Plan terms imply that the Backstop Commitment Group gives up 5.5% of equity that they would otherwise be entitled to (as Noteholders) through the value transfer to holders of Equity Interests, the Backstop Commitment Group stands to recoup a whopping **9%** of the equity by backstopping the subscription rights available under the Plan to holders of Equity Interests outside the Backstop Commitment Group.

23.     *The Rights Offering Improperly Arrogates Plan Value to the Backstop Commitment Parties (As Holders of Equity Interests) at the Expense of Barings and Other*

_Similarly Situated Noteholders._   The Backstop Commitment Parties and the Debtors have entered into an agreement (the "**Backstop Commitment Agreement**") pursuant to which the Backstop Commitment Parties are required to exercise the subscription rights that are attributable to the Notes, Existing Preferred Interests and Existing Common Stock held by them, and to purchase any New Common Shares of Reorganized Parker that are offered through the Rights Offering, but remain unsubscribed after the Rights Offering closes.   _See_ First Day Decl., Ex. C (Backstop Commitment Agreement) at §§ 2.1 & 2.2.   As discussed above, the New Common Stock of Reorganized Parker is being issued at a substantial 48% discount to Plan equity value. Moreover, the Backstop Commitment Parties have the sole opportunity to purchase the unsubscribed shares in the Rights Offering, which shares are being sold at a colossal discount. This means that, not only do the Backstop Commitment Parties get to purchase their own ratable share of New Common Stock at a 48% discount, but also they have the _exclusive right_ to buy unsubscribed shares at this same discount.

24.     Significantly, the disproportionate allocation of subscription rights to holders of Equity Interests gives the Backstop Commitment Group a better opportunity to soak up Plan value from its exclusive right to buy unsubscribed shares than the Backstop Commitment Group would have if a larger share of the Rights Offering were made to the Noteholders.   Whereas only 23% of the Notes are owned by Noteholders outside of the Backstop Commitment Group, 38% of the Existing Preferred Interests and 75% of the Existing Common Stock is owned by equity holders that are not in the Backstop Commitment Group (at least during the time the Plan was being negotiated).   Thus, by shifting a substantial allocation of subscription rights to holders of Equity Interests, the Backstop Commitment Group has maximized the amount of heavily discounted New Common Stock that could potentially remain unsubscribed after the Rights

Offering closes, and thereby maximized its ability to purchase unsubscribed, heavily discounted shares.

25.     As consideration for the Backstop, the Backstop Commitment Parties received a "fully earned, non-refundable and non-avoidable" payment of $7.6 million in the form of a "Put Option Cash Premium."  *See* First Day Decl., Ex. C at § 3.1.  Under the Put Option provided to the Backstop Commitment Parties under the Plan, the Backstop Commitment Parties have the right to exchange the $7.6 million fee for shares worth substantially more than that amount.  *See* First Day Decl. Ex. C at § 3.2(b) & Ex. B at Term Sheet p. 2.  On information and belief, this fee is excessive and unreasonably high.  *See* Statement of Reservation of Rights of Saba Capital Management, L.P. (Dtk. No. 239) at ¶¶ 1-2; Notice of First Amendment to Restructuring Support Agreement and Amended Restated Backstop Commitment Agreement (Dkt. No. 326).

26.     *The Disparate Treatment of Pari Passu Noteholders*.  The Debtors estimate that the Plan will result in a 73% recovery for any 2020 Notes Claim, but only a 69% recovery for any 2022 Notes Claim, even though both classes of senior, unsecured notes are equal in priority. Disclosure Statement at 9.  The Debtors have provided no legitimate basis or principled rationale for the unfair discrimination between these two creditor classes of the same rank and priority.

## III.    Questions Also Abound as to Whether the Backstop Commitment Parties Usurped the Plan Process for Their Own Improper Benefit

27.     The negotiating leverage that the Backstop Commitment Group brought to bear on the Debtors through its 25% ownership of Parker Drilling's Existing Common Stock, as well as the resulting provisions of the Plan—which deliver unusually favorable terms to the Backstop Commitment Parties—suggest that the Plan may be the result of the Backstop Commitment Parties' undue influence upon the Debtors.

28. The Plan's substantive provisions described above—including those related to the high recovery for junior equity stakeholders pursuant to the Rights Offering, the benefits that the Backstop Commitment Parties arrogated solely to themselves pursuant to the Backstop Commitment Agreement, and the disparate treatment of the 2020 and 2022 Notes—all suggest that the Backstop Commitment Parties "ran the table" during Plan negotiations to the severe detriment of any Noteholders, such as Barings, who were outside of the Backstop Commitment Group.  These items, taken together, raise serious questions about whether the Backstop Commitment Parties, as a matter of fact, usurped the Plan negotiation process, in violation of the Debtors' fiduciary duties to all stakeholders, so that the Backstop Commitment Parties could arrogate to themselves very substantial Plan value at the expense of Barings and other creditors.

## RELIEF REQUESTED

29. By this Emergency Motion, Barings respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, (1) appointing an examiner pursuant to Section 1104(c) of the Bankruptcy Code to investigate whether the Plan process has been improperly usurped by the Backstop Commitment Group; (2) authorizing the examiner to investigate and make recommendations to the Court with respect to (i)  how the Plan proponents and/or the Backstop Commitment Group determined the allocation of the subscription rights available to each group of stakeholders in the Rights Offering and particularly amongst each of the 2020 Notes, the 2022 Notes, the Existing Preferred Interests and the Existing Common Stock; (ii) whether the Plan distributions to holders of Existing Preferred Interests and/or Existing Common Stock are inappropriate or unjustified; (iii) whether the recovery provided under the Plan to holders of Equity Interests is really a disguised return on the Backstop Commitment Parties' Notes that is not available to other Noteholders; (iv) whether the Backstop

Commitment Group constitutes an insider and an affiliate, as each of those terms is used in Section 101 of the Bankruptcy Code; (v) whether the Backstop Commitment Group exercised control over the Debtors and usurped the Plan process; (vi) whether the Backstop Commitment Parties were required to file a verified statement pursuant to Bankruptcy Rule 2019 and failed to do so; (vii) whether the fee being paid to the Backstop Commitment Group for backstopping the Rights Offering is excessive; and (viii) whether there is any legitimate basis for the disparity in treatment between the 2020 Notes and the 2022 Notes; and (3) adjourning and continuing the deadlines to vote on and object to the Plan, as well as the Confirmation Hearing, until an appropriate time after the examiner finishes his or her investigation.

## BASIS FOR RELIEF

### I.    THE COURT SHOULD APPOINT AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE

30.    Section 1104(c) of the Bankruptcy Code sets out the standard governing appointment of an examiner:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of the plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor if—
>
> (1) such appointment is in the interest of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debtors for goods, services or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).

31.    The statute indicates that the court "shall" appoint an examiner on motion by an interested party. *Id.* In light of that language, courts have routinely held that appointment of an

examiner "is mandatory" if the statutory requirements are met. *See, e.g.*, *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 29-30 (S.D. Tex. 1992). Here, Barings respectfully submits that the appointment of an examiner is mandatory because the following four statutory conditions are met: *First*, the debtor must still be in possession of the estate and a trustee must not have been appointed. *Second*, a plan must not have been confirmed. *Third*, a party in interest or the United States Trustee must request the appointment. *Fourth*, one of the conditions set out in (c)(1) or (c)(2) must be satisfied—either the appointment of the examiner is in the interests of the creditors, any equity security holders, and other interests of the estate or the specified unsecured debts exceed $5 million.

32.     Here, there can be no dispute that (i) no trustee has been appointed; (ii) no plan has been confirmed; (iii) Barings, who holds approximately $35 million of the 2022 Notes on behalf of certain of its affiliated funds, is a party in interest; and (iv) the Debtors' fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider exceed $5 million (indeed, the Debtors have asserted that they have $585 million of outstanding unsecured Notes, $35 million of which is owed to Barings, who is not an insider or affiliate of the Debtors). Moreover, given that the Backstop Commitment Parties have negotiated above-market provisions in the Plan that are materially more favorable to the Backstop Commitment Parties than to the Debtors' other *pari passu* creditors, there can also be no dispute that an investigation is necessary in this Chapter 11 case and in the interests of the Debtors' creditors and other stakeholders.

### A.     The Appointment of an Examiner is Required Under Section 1104(c)(2) of the Bankruptcy Code.

33.     Appointment of an examiner under section 1104(c)(2) "is mandatory" where a party in interest seeks an appointment of an examiner for a debtor with the threshold amount of

qualifying debt. *See In re Revco D.S., Inc.*, 898 F.2d 498, 500–01 (6th Cir. 1990) (section 1104(c)(2) mandates the appointment of an examiner if the debt threshold is met); *Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 81-82 (Bankr. N.D. Ga. 2008) (appointment of examiner required where debt threshold is met); *In re Loral Space & Commc'ns, Ltd.*, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2004) (the majority view of Section 1104(c)(2) is that it "mandates the appointment of an examiner where a party in interest moves for an examiner and the debtor has $5,000,000 of qualifying debt"); *In re UAL Corp.*, 307 B.R. 80, 84-86 (N.D. Ill. 2004) (concluding language of 1104(c)(2) requires appointment of an examiner).

34.     Here, it is undisputed that the Debtors' qualifying debt is well in excess of $5 million. *See* Disclosure Statement at 6. Thus, the appointment of an examiner is required upon this Emergency Motion.

**B.     The Appointment of an Examiner is Required Under Section 1104(c)(1) of the Bankruptcy Code.**

35.     The appointment of an examiner is also required under section 1104(c)(1) because the appointment is "in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(c)(1). The appointment of an examiner is mandated pursuant to this provision when allegations of misconduct or mismanagement "are substantiated by credible evidence." *See In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994).

36.     Here, for at least two reasons, the publicly available information described above provides credible evidence that the Backstop Commitment Group exerted undue influence on the Debtors for their own benefit during the Plan negotiation process, and that the Debtors' act of allowing them to do so was inappropriate.

37.     *First*, the benefits arrogated exclusively to the Backstop Commitment Parties through the Rights Offering, unjustifiable recovery to junior equity stakeholders, and disparate

treatment of the 2020 Notes and 2022 Notes, when taken together, suggest that the Backstop Commitment Parties usurped the Plan process, essentially defeated the Debtors' exclusive right to propose a plan and exerted undue influence over the Debtors for their own benefit when negotiating the Plan; all at the expense of outsider Noteholders, such as Barings, who are discriminated against under the Plan. One of the most egregious examples is that the portion of subscription rights being allocated to the holders of Equity Interests in the Rights Offering is *over four times* larger than the percentage of the capital structure represented by these Equity Interests as of the Petition Date, and *is over twelve time larger* than the 3% of New Common Stock to which the Debtors have acknowledged these stakeholders are entitled based on their interests in the capital structure as of the Petition Date. Not only does this outsize allocation allow the Backstop Commitment Parties to participate in the Rights Offering through their Equity Interests at the expense of the Notes, but also maximizes the amount of potentially unsubscribed shares in the Rights Offering that are made available exclusively to the Backstop Commitment Group.

38.     Therefore, it is clearly in the interests of creditors for an examiner to investigate why so much Plan value was reallocated away from the Notes through the Rights Offering. An examiner is especially necessary given that the proposed allocation of subscription rights pursuant to the Rights Offering differs so wildly from what the allocation should have been had value been allocated in accordance with the Debtors' capital structure as of the Petition Date.

39.     *Second*, the joint negotiation of the Plan by the Backstop Commitment Group—which, upon information and belief, owned approximately 25% of Parker Drilling's Existing Common Stock while negotiating the Plan with the Debtors, and appears to have been represented by one single counsel during these negotiations—suggests that the Backstop

Commitment Parties were acting in concert, and therefore should be treated as "affiliates" under section 101(2)(A) of the Bankruptcy Code; *i.e.*, as entities "that directly or indirectly own[], control[] or hold[] with power to vote, 20 percent or more of the outstanding voting securities of the debtor."[6]

40.     The issues of whether, during Plan negotiations, the Backstop Commitment Parties (i) acted in concert (and should therefore be considered "affiliates" pursuant to section 101(2)(A) of the Bankruptcy Code); or (ii) exercised control over the Debtor are both critical issues to be examined by an examiner.  To the extent that the Backstop Commitment Parties acted in concert, or did in fact usurp the Plan process by exercising control over the Debtors, they should be deemed "insiders" whose votes cannot count for purposes of confirming the Plan in accordance with section 1129(a)(10).  Because the Backstop Commitment Parties appear to have more than two-thirds in amount of the classes of claims entitled to vote pursuant to the Plan, *see* Disclosure Statement at 7, their potential status as an "insider" will have a drastic impact on how to determine whether any impaired class has voted in favor of the Plan for purposes of section 1129(a)(10) of the Bankruptcy Code.

41.     In addition, the Backstop Commitment Parties' representation by a single counsel suggests that they were "acting in concert to advance their common interests" and were therefore required to file a verified statement disclosing as much under Bankruptcy Rule 2019, even if

---

[6]     *See also* 15 U.S.C. § 78m(d)(3) ("When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a [single] 'person' for the purposes of this subsection."); 17 C.F.R. § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.").

their aggregate shareholdings did not reach the 20% threshold.  *See* Fed. R. Bankr. P. 2019(b)(2) & (c)(1)(a).  The Backstop Commitment Parties failure to do so could, standing alone, invalidate their acceptance of the Plan.  *See* Fed. R. Bankr. P. 2019(e)(2)(B).

42.    Moreover, to the extent that the Backstop Commitment Group exercised undue influence over the Debtors to procure unreasonable benefits under the Plan at the expense of other *pari passu* Noteholders such as Barings, this would raise serious concerns about whether the Plan could satisfy the requirements in section 1129(a)(3) that it be proposed in good faith and not by any means forbidden by law.

43.    Accordingly it is "in the interests of creditors, any equity security holders, and other interests of the estate" to appoint an examiner to investigate, among the other issues specified above, whether the Backstop Commitment Parties improperly usurped the Plan process by acting as a group or individually to exercise control over the Debtors during the negotiation of the Plan.  Therefore appointment of an examiner is mandated by section 1104(c)(1) of the Bankruptcy Code.  *See*, *e.g.*, *In re Level Propane Gases, Inc.*, 2007 WL 171985, at *3 (Bankr. N.D. Ohio 2007) (describing examiner's investigation as focusing on post-petition matters relating to the integrity of the bankruptcy process and debtors' exercise of their fiduciary duties); Order, *In re Granite Broadcasting Corp.*, No. 06-12984 (Bankr. S.D.N.Y Feb. 20, 2007) (Dkt. No. 183) (directing the examiner to investigate whether the debtor's officers and directors properly discharged their fiduciary duties).

## II.    THE COURT SHOULD PROVIDE THE EXAMINER WITH A BROAD MANDATE

44.    The Court has discretion to determine the scope and duration of the examiner's investigation.  *In re Revco*, 898 F.2d at 501.  As Section 1104(c) makes clear, the investigation may include a broad range of issues.  *See* 11 U.S.C. § 1104(c); *In re Gilman Services*, 46 B.R.

322, 327 (Bankr. D. Mass 1985); *see also* 7 *Collier on Bankruptcy* § 1104.03[1] (16th Rev. Ed. 2016) ("The court may order the examiner to investigate any aspect of the case, the business, or events leading up the bankruptcy case."). While the examiner's duties should be defined in order to minimize or avoid interference with the ongoing bankruptcy proceedings, *In re Loral Space*, 2004 WL 2979785 at *5, the fact that the reorganization process would be delayed or that an examiner's work would entail expense to the estate generally are not valid grounds for refusing to appoint an examiner, and certainly are not valid grounds under the current circumstances, which call into question the integrity of the Plan negotiation and approval process, and whether (and how) the Plan can be confirmed.

45.     Accordingly, Barings asks for the appointment of an examiner with a broad mandate to investigate the Plan negotiation process and to examine the officers, employees and corporate representatives of the Debtors and Backstop Commitment Parties, so that the examiner can determine whether the Plan process has been improperly usurped by the Backstop Commitment Parties. In connection therewith, the examiner should be authorized to investigate, among other things, (i) how the Plan proponents and/or the Backstop Commitment Group determined the allocation of the subscription rights available to each group of stakeholders in the Rights Offering and particularly amongst each of the 2020 Notes, the 2022 Notes, the Existing Preferred Interests and the Existing Common Stock; (ii) whether the Plan distributions to holders of Existing Preferred Interests and/or Existing Common Stock are inappropriate or unjustified; (iii) whether the recovery provided under the Plan to holders of Equity Interests is really a disguised return on the Backstop Commitment Parties' Notes that is not available to other Noteholders; (iv) whether the Backstop Commitment Group constitutes an insider and an affiliate, as each of those terms is used in Section 101 of the Bankruptcy Code; (v) whether the

Backstop Commitment Group exercised control over the Debtors and usurped the Plan process; (vi) whether the Backstop Commitment Parties were required to file a verified statement pursuant to Bankruptcy Rule 2019 and failed to do so; (vii) whether the fee being paid to the Backstop Commitment Group for backstopping the Rights Offering is excessive; and (viii) whether there is any legitimate basis for the disparity in treatment between the 2020 Notes and the 2022 Notes.

46.     Barings also respectfully submits that, given the gravity of the issues to be investigated by the examiner and the potential consequences of his or her investigation, the examiner should be authorized to retain counsel, financial advisers and such other professionals as are necessary to assist the examiner with the investigation.  The Examiner should also be allowed sufficient time to perform an adequate investigation, which should be no less than 45 days, with allowances for reasonable extensions as is necessary, notwithstanding that this will postpone the deadlines for voting on and objecting to the Plan, and will postpone the Confirmation Hearing.

47.     Appointing an examiner now will allow the Court to determine whether the Plan satisfies the requirements of the Bankruptcy Code, and will help the Court, the Debtors and all stakeholders avoid wasting resources pursuing a plan that potentially cannot be confirmed. Moreover, Barings respectfully submits that appointing a neutral examiner with a broad mandate is an efficient solution to resolve the serious questions concerning the Debtors' negotiations with the Backstop Commitment Parties.  By comparison to the potential adversary proceedings, motion practice, objections to Plan confirmation, and discovery disputes that would be entailed by Barings' attempt to resolve its concerns through litigation with the Debtors and Backstop Commitment Parties, appointment of a neutral examiner who can cooperate with the parties will

minimize the disruption to the above-captioned Chapter 11 cases, while also ensuring that resolution of these cases is not the product of any improper conduct.

## BASIS FOR EMERGENCY CONSIDERATION

48.     Barings respectfully requests emergency consideration of this Emergency Motion in accordance with Local Bankruptcy Rule 9013-1(i).  The deadline for voting on and objection to the Plan is February 22, 2019, and the Confirmation Hearing is set for March 5, 2019.  However, should the Emergency Motion be heard without emergency consideration, the hearing would not take place until after voting is finished, and after the Confirmation Hearing takes place.  Given that Barings is requesting the appointment of an examiner to investigate issues that bear on the integrity of the Plan itself, including whether it was procured as a result of undue influence, Barings respectfully submits that it would be in the interests of the estate and all stakeholders to hear the Emergency Motion on an emergency basis, and to suspend the deadlines for voting and objecting to the Plan, and for the Confirmation Hearing, until at least the time that the Emergency Motion can be heard and ruled upon.

## CONCLUSION

49.     For the reasons above, Barings respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A** (i) granting the Emergency Motion; (ii) directing the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code with the authority to conduct an investigation as set forth herein; (iii) continuing and adjourning the deadline to vote on the Plan, to object to the Plan, and for the Confirmation Hearing until an appropriate time after the examiner finishes its investigation; and (iv) granting such other and further relief that the Court deems just and proper.

Dated: New York, New York
     February 20, 2019

FRESHFIELDS BRUCKHAUS DERINGER US LLP

*/s/* Madlyn Gleich Primoff
Madlyn Gleich Primoff
madlyn.primoff@freshfields.com
Henry V. Hutten
henry.hutten@freshfields.com
601 Lexington Avenue,
31st Floor
New York, New York 10022
Telephone:  (212) 277-4000

*Attorneys for Barings LLC*

POLSINELLI PC

*/s/* Trey A. Monsour
Trey A. Monsour
tmonsour@polsinelli.com
State Bar No 14277200
1000 Louisiana Street, Suite 6400
Houston, Texas  77002
Telephone:  (713) 374-1643

*Attorneys for Barings LLC*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE:<br><br>PARKER DRILLING COMPANY, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-36958 (MI) |

**ORDER GRANTING EMERGENCY MOTION OF BARINGS LLC FOR THE
APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)**

The Court has considered the Emergency Motion of Barings LLC for the
Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) (the "**Emergency Motion**"), any
responses to the Emergency Motion, and the Court having held a hearing on the Emergency
Motion, and it appearing to the Court that adequate notice has been given and that no further
notice is necessary; and the Court having reviewed the Emergency Motion; and the Court having
determined that the legal and factual bases set forth in the Emergency Motion establish just cause
for the relief granted herein, it is hereby

ORDERED that the Emergency Motion is hereby granted; and it is further

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's
federal tax identification number, are:  Parker Drilling Company (8660); 2M-TEK, Inc. (1761);
Anachoreta, Inc. (3667); Pardril, Inc. (4469); Parker Aviation Inc. (6372); Parker Drilling Arctic
Operating, LLC (6834); Parker Drilling Company of Niger (4204); Parker Drilling Company
North America, Inc. (6381); Parker Drilling Company of Oklahoma Incorporated (8949); Parker
Drilling Company of South America, Inc. (0657); Parker Drilling Management Services, Ltd.
(7200); Parker Drilling Offshore Company, LLC (9092); Parker Drilling Offshore USA, L.L.C.
(1469); Parker North America Operations, LLC (1180); Parker Technology, Inc. (6599); Parker
Technology, L.L.C. (1875); Parker Tools, LLC (8864); Parker-VSE, LLC (2282); Quail USA,
LLC (8885); and Quail Tools, L.P. (1471).  The Debtors' service address is: 5 Greenway Plaza,
Suite 100, Houston, Texas 77046.

ORDERED that the United States Trustee (the "**U.S. Trustee**") is directed to appoint a disinterested examiner (the "**Examiner**") in accordance with 11 U.S.C. § 1104(d); and it is further

ORDERED that the Examiner shall investigate and make recommendations (the "**Investigation**") to the Court regarding whether the Plan[2] process has been improperly usurped by the Backstop Commitment Parties.  In connection therewith, the examiner should investigate, among other things, (i) how the plan proponents and/or the Backstop Commitment Parties determined the allocation of the subscription rights available to each group of stakeholders in the Rights Offering and particularly amongst each of the 2020 Notes, the 2022 Notes, the Existing Preferred Interests and the Existing Common Stock; (ii) whether the Plan distributions to holders of Existing Preferred Interests and/or Existing Common Stock are inappropriate or unjustified; (iii) whether the recovery provided under the Plan to holders of equity interests is really a disguised return on the Backstop Commitment Parties' Notes that is not available to other Noteholders; (iv) whether the Backstop Commitment Parties constitute an insider and an affiliate, as each of those terms is used in Section 101 of the Bankruptcy Code; (v) whether the Backstop Commitment Parties exercised control over the Debtors and usurped the Plan process; (vi) whether the Backstop Commitment Parties were required to file a verified statement pursuant to Bankruptcy Rule 2019 and failed to do so; (vii) whether the fee being paid to the Backstop Commitment Group for backstopping the Rights Offering is excessive; and (viii) whether there is any legitimate basis for the disparity in treatment between the 2020 Notes and the 2022 Notes; and it is further

---

[2]      Any capitalized term used herein but not defined herein shall have the meaning ascribed to such term in the Emergency Motion.

ORDERED that the Examiner, parties in interest, the Debtors, any official committee appointed pursuant to 11 U.S.C. § 1102 (the "**Committee**") and the U.S. Trustee shall have the right to petition the Court to further expand the scope of the Investigation, if during the Investigation other relevant matters are revealed which the Examiner, parties in interest, the Debtors, any Committee, or the U.S. Trustee believe should be brought to the attention of the Court; and it is further

ORDERED that the Examiner shall have access to the books and records of the Debtors and Backstop Commitment Parties concerning all matters related to the subjects of the Investigation, and that the Examiner shall be allowed to examine the officers, employees and corporate representatives of the Debtors and the Backstop Commitment Parties with respect to all matters related to the subjects of the Investigation; and it is further

ORDERED that the Examiner is authorized to retain counsel, financial advisers and such other professionals if she or he determines that such retention is necessary to assist the Examiner with the Investigation, with such retention being subject to the Court's approval under 11 U.S.C. § 327; and it is further

ORDERED that the Examiner shall be entitled to appear at hearings and be heard with respect to matters that are within the Examiner's duties, including extension of deadlines associated with the Investigation; and it is further

ORDERED that the Examiner shall have 45 days to complete the Investigation and submit the findings of the Investigation to the Court, and will be allowed reasonable extensions upon written request as is necessary for the Examiner to complete a full and fair investigation; and it is further

ORDERED that the Debtors and the Backstop Commitment Parties, including the directors, officers, and employees of the Debtors and Backstop Commitment Parties, and all affiliates, subsidiaries, and other companies under the control of the Debtors or Backstop Commitment Parties must (i) cooperate fully with the Examiner in connection with the Examiner's performance of duties, (ii) subject to any claim of privilege recognized by the federal courts, provide the Examiner all documents, discovery responses, testimony and other information that the Examiner deems relevant to the discharge of the Examiner's duties under this Order, and (iii) to the maximum extent possible, proceed with such discovery informally without requiring compliance with the time limits prescribed in the Federal Rules of Bankruptcy Procedure; and it is further

ORDERED that the Examiner and any professionals retained by the Examiner pursuant to any order of this Court shall be compensated and reimbursed for the expenses pursuant to any procedures for interim compensation and reimbursement of expenses of professionals that are established in the above-captioned Chapter 11 cases.  Compensation and reimbursement of the Examiner shall be determined pursuant to 11 U.S.C. §§ 330 & 331, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to the standards equivalent to those set forth in 11 U.S.C. §§ 330 & 331; and it is further

ORDERED that the deadlines to vote on and object to the Plan are suspended, and the Confirmation Hearing is hereby continued and adjourned, until an appropriate time after the Examiner finishes the Investigation, and shall be set upon motion by the Debtors that may be made no earlier than 10 days after the Examiner provides a formal report and recommendations to the Court, the Debtors, the Backstop Commitment Parties and Barings; and it is further

ORDERED that the Court shall retain jurisdiction over any matters arising from or relating to the implementation or interpretation of this Order.

SO ORDERED this ___ day of _____, 2019

_____
UNITED STATES BANKRUPTCY JUDGE